**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| One William Street Capital Master Fund Ltd., *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>JPMorgan Chase Bank, National Association, *et al.*,<br><br>     Defendants. | Case No. 1:26-cv-01622-JSR<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR JOINT MOTION TO DISMISS**

April 9, 2026

**TABLE OF CONTENTS**

*Page*

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ..................................................................................................................... 8

      A.      The Parties ........................................................................................................ 8

      B.      Tricolor's Business and Its Fraud on its Warehouse Lenders............................... 9

      C.      Tricolor's TAST Securitizations.................................................................... 12

      D.      Discovery of Tricolor's Fraud ........................................................................ 13

      E.      Plaintiffs' Claims .......................................................................................... 14

ARGUMENT.......................................................................................................................... 14

I.      Plaintiffs' Section 10(b) Securities Fraud Claim Should Be Dismissed ........................ 15

      A.      Plaintiffs Have Not Pled a Strong Inference of Scienter ..................................... 15

            1.      Plaintiffs Do Not Allege a Motive To Commit Fraud ............................. 16

            2.      Plaintiffs Do Not Allege Conscious Misbehavior or Recklessness .......... 18

      B.      Defendants Did Not Make Any of the Challenged Statements ........................... 28

      C.      Plaintiffs Do Not Plead Basic Facts Concerning Their Individual Transactions Nor Allege That They Relied on the Challenged Statements.......... 30

      D.      Many of the Challenged Statements in the TAST Offering Documents Are Not Actionable .................................................................................................. 33

II.      The Court Should Decline Supplemental Jurisdiction Over the State Law Claims ......... 36

III.     Alternatively, the State Law Claims Should Be Dismissed Because Plaintiffs Fail To State a Claim................................................................................................................ 37

      A.      Plaintiffs Fail to Plead a Common Law Fraud Claim.......................................... 37

      B.      Plaintiffs Fail to Plead Blue Sky Law Claims ..................................................... 37

      C.      Plaintiffs Fail to Plead Fraudulent Transfer Claims ............................................ 39

CONCLUSION...................................................................................................................... 45

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re A.W. Lawrence & Co.*,
    346 B.R. 51 (N.D.N.Y. 2006) ...........................................................................................42

*In re Amp'd Mobile, Inc.*,
    404 B.R. 118 (Bankr. D. Del. 2009) ..................................................................................40

*Anvil Tr.* v. *Ernst & Young*,
    2026 WL 743608 (S.D.N.Y. Mar. 17, 2026) .......................................................................22

*Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) .........................................................................................15, 35

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) .................................................................................................6, 14

*Ashland Inc.* v. *Morgan Stanley & Co.*,
    652 F.3d 333 (2d Cir. 2011) .............................................................................................32

*In re AstraZeneca plc Sec. Litig.*,
    2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022).....................................................................34

*B.E.L.T., Inc.* v. *Wachovia Corp.*,
    403 F.3d 474 (7th Cir. 2005) ...........................................................................................43

*Black Diamond Fund, LLLP* v. *Joseph*,
    211 P.3d 727 (Colo. App. 2009).......................................................................................38

*Boca Raton F'fighters* v. *Bahash*,
    506 F. App'x 32 (2d Cir. 2012) .......................................................................................33

*Bos. Trading Grp., Inc.* v. *Burnazos*,
    835 F.2d 1504 (1st Cir. 1987)........................................................................................8, 43

*Brooks* v. *Dash*,
    2019 WL 5797971 (S.D.N.Y. Oct. 2, 2019) ........................................................................39

*Burkhart* v. *Genworth Fin., Inc.*,
    275 A.3d 1259 (Del. Ch. 2022).....................................................................................40, 44

*In re Citigroup Inc. S'holder Deriv. Litig.*,
    964 A.2d 106 (Del. Ch. 2009).........................................................................................26

*In re CL H Winddown LLC*,
 2023 WL 5740195 (Bankr. D. Del. Sept. 5, 2023) ...................................................................44

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
 2013 WL 12148482 (C.D. Cal. June 7, 2013) ...........................................................................7

*Crystallex Int'l Corp.* v. *Petroleos De Venezuela, S.A.*,
 879 F.3d 79 (3d Cir. 2018)........................................................................................................42

*Dalberth* v. *Xerox Corp.*,
 766 F.3d 172 (2d Cir. 2014)......................................................................................................33

*DeRobbio* v. *Harvest Communities of Sioux City, Inc.*,
 2002 WL 31947203 (D.N.J. Oct. 30, 2002)..............................................................................39

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
 2017 WL 4049253 (S.D.N.Y. June 28, 2017) ..........................................................................36

*In re DNTW Chartered Accts. Sec. Litig.*,
 172 F. Supp. 3d 675 (S.D.N.Y. 2016)........................................................................................23

*In re Doral Fin. Corp. Sec. Litig.*,
 563 F. Supp. 2d 461 (S.D.N.Y. 2008).................................................................................4, 27

*ECA* v. *JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009).................................................................................................14, 34

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
 563 U.S. 804 (2011).................................................................................................................31

*In re Fannie Mae 2008 Sec. Litig.*,
 891 F. Supp. 2d 458 (S.D.N.Y. 2012)...................................................................................5, 28

*Fintech Leaders Fund, LLC* v. *Cogut*,
 2025 WL 3755292 (S.D.N.Y. Dec. 29, 2025) ........................................................................36

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
 308 F. Supp. 2d 249 (S.D.N.Y. 2004)........................................................................................28

*Gamm* v. *Sanderson Farms, Inc.*,
 944 F.3d 455 (2d Cir. 2019)..................................................................................................2, 15

*In re Glob. Cord Blood Corp. Sec. Litig.*,
 ___ F. Supp. 3d ___, 2026 WL 444770 (S.D.N.Y. Feb. 17, 2026) ....................................6, 30

*Greco* v. *Qudian Inc.*,
 2022 WL 4226022 (S.D.N.Y. Sept. 13, 2022).......................................................................16, 27

*In re Green Field Energy Servs., Inc.*,
  2018 WL 6191949 (Bnkr. D. Del. Nov. 28, 2018) ...............................................................41

*Grippo* v. *Perazzo*,
  357 F.3d 1218 (11th Cir. 2004) .........................................................................................38

*GSC Partners CDO Fund* v. *Washington*,
  368 F.3d 228 (3d Cir. 2004)...............................................................................................25

*Hanson* v. *Frazer*,
  2013 WL 5372749 (S.D.N.Y. Sept. 24, 2013)............................................................ *passim*

*Hanson* v. *Frazer*,
  2015 WL 4561707 (S.D.N.Y. July 17, 2015) ...............................................................21, 25

*Hubiack* v. *Li-Cycle Holdings Corp.*,
  2024 WL 2943959 (S.D.N.Y. June 10, 2024) ............................................................26, 33, 34

*Iowa Pub. Emps.' Ret. Sys.* v. *Deloitte & Touche LLP*,
  973 F. Supp. 2d 459 (S.D.N.Y. 2013) ...........................................................................19, 21

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012).....................................................................................36

*Jackson* v. *Abernathy*,
  960 F.3d 94 (2d Cir. 2020)..............................................................................................3, 15, 16

*Jacquemyns* v. *Spartan Mullen Et Cie, S.A.*,
  2011 WL 348452 (S.D.N.Y. Feb. 1, 2011)..............................................................................32

*Janus Cap. Grp., Inc.* v. *First Derivative Traders*,
  564 U.S. 135 (2011)...................................................................................................... *passim*

*In re Joy Recovery Tech. Corp.*,
  286 B.R. 54 (Bankr. N.D. Ill. 2002) .......................................................................................44

*Kleinman* v. *Elan Corp.*,
  706 F.3d 145 (2d Cir. 2013)...................................................................................................10

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012).....................................................................................18

*Lamothe* v. *Decentral Life, Inc.*,
  2024 WL 5055576 (D. Colo. Oct. 24, 2024) ........................................................................38

*Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*,
  478 F. App'x 679 (2d Cir. 2012) ............................................................................................16

*Li* v. *Eqonex Ltd.*,
  2024 WL 4241951 (S.D.N.Y. Sept. 18, 2024)..................................................................16

*In re Livent, Inc. Noteholders Sec. Litig.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001)..............................................................................15

*Long Miao* v. *Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020)..............................................................................28

*Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).............................................................................................37

*Luo* v. *Sogou, Inc.*,
  465 F. Supp. 3d 393 (S.D.N.Y. 2020)..............................................................................15

*May* v. *Barclays PLC*,
  2025 WL 887300 (S.D.N.Y. Mar. 21, 2025) ...................................................................19

*Medina* v. *Tremor Video, Inc.*,
  640 F. App'x 45 (2d Cir. 2016) .......................................................................................26

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
  2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .................................................................19

*In re Meridian Funds Grp. Sec. & ERISA Litig.*,
  2015 WL 1258380 (S.D.N.Y. Mar. 13, 2015) ...................................................................5

*Meridian Horizon Fund, LP* v. *KPMG (Cayman)*,
  487 F. App'x 636 (2d Cir. 2012) .....................................................................................27

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  2012 WL 1994707 (S.D.N.Y. June 4, 2012) ...................................................................32

*In re Mobileye Glob. Sec. Litig.*,
  2025 WL 3640904 (2d Cir. Dec. 16, 2025) .....................................................................30

*In re Morgan Stanley Info. Fund Sec. Litig.*,
  592 F.3d 347 (2d Cir. 2010).............................................................................................35

*Nguyen* v. *Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ...........................................................................................22

*In re Norfolk S. Corp. Bond/Note Sec. Litig.*,
  2025 WL 641089 (S.D.N.Y. Feb. 27, 2025).....................................................................35

*In re Norfolk S. Corp. Bond/Note Sec. Litig.*,
  2026 WL 555420 (2d Cir. Feb. 27, 2026)...................................................................35, 36

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000).................................................................................19

*One William Street Cap. Master Fund Ltd..* v. *Wilmington Trust Nat'l Ass'n*,
   No. 1:26-cv-01123 (S.D.N.Y.).................................................................................9

*Ong* v. *Chipotle Mexican Grill, Inc.*,
   2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) .............................................................18

*In re Opus E. LLC*,
   698 F. App'x 711 (3d Cir. 2017) .............................................................................45

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) .....................................................................................34

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ..................................................................................6, 35

*Puchtler* v. *Barclays PLC*,
   2025 WL 887502 (S.D.N.Y. Mar. 21, 2025) ...........................................................18

*In re PXRE Grp., Ltd., Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................................17

*In re Refco Inc. Sec. Litig.*,
   2011 WL 13168427 (S.D.N.Y. July 5, 2011) ..........................................................43

*Rombach* v. *Chang*,
   355 F.3d 164 (2d Cir. 2004).....................................................................................33

*Roseton OL, LLC* v. *Dynegy Holdings Inc.*,
   2011 WL 3275965 (Del. Ch. July 29, 2011).......................................................41, 42

*Royal Canin U.S.A., Inc.* v. *Wullschleger*,
   604 U.S. 22 (2025).................................................................................................6, 36

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009).......................................................................................18

*Saraf* v. *Ebix, Inc.*,
   632 F. Supp. 3d 389 (S.D.N.Y. 2022)......................................................................26

*Schmidt* v. *Fleet Bank*,
   1998 WL 47827 (S.D.N.Y. Feb. 4, 1998).............................................................16, 17

*In re Sharp Int'l Corp.*,
   403 F.3d 43 (2d Cir. 2005)..................................................................................7, 8, 43

*Shields* v. *Citytrust Bancorp, Inc.*,
 25 F.3d 1124 (2d Cir. 1994)...........................................................................................1

*Shriners Hosps. for Child.* v. *Qwest Commc'ns Int'l Inc.*,
 2005 WL 2350569 (D. Colo. Sept. 23, 2005)..............................................................38

*Singh* v. *Cigna Corp.*,
 918 F.3d 57 (2d Cir. 2019).............................................................................................15

*Smallen* v. *W. Union Co.*,
 950 F.3d 1297 (10th Cir. 2020) .....................................................................................23

*Song* v. *Fish*,
 2024 WL 2304362 (M.D. Fla. Jan. 17, 2024)...............................................................38

*Special Situations Fund III QP, LP* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
 33 F. Supp. 3d 401 (S.D.N.Y. 2014)..................................................................20, 23, 24

*Special Situations Fund III QP, LP* v. *Deloitte Touche Tohmatsu CPA, Ltd.*,
 645 F. App'x 72 (2d Cir. 2016) ......................................................................................22

*Stephenson* v. *PricewaterhouseCoopers, LLP*,
 768 F. Supp. 2d 562 (S.D.N.Y. 2011)............................................................................19

*Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*,
 552 U.S. 148 (2008)........................................................................................................31

*In re Suprema Specialties, Inc. Sec. Litig.*,
 438 F.3d 256 (3d Cir. 2006)...........................................................................................16

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007)..................................................................................................15, 27

*Thomas* v. *Shiloh Indus., Inc.*,
 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ...............................................................28

*Tradeshift, Inc.* v. *Smucker Servs. Co.*,
 2021 WL 4463109 (S.D.N.Y. Sept. 29, 2021)...............................................................16

*In re Tricolor Holdings, LLC*,
 No. 25-33487 (Bankr. N.D. Tex.)..............................................................................42, 43

*Trustpilot Damages LLC* v. *Trustpilot, Inc.*,
 2021 WL 2667029 (S.D.N.Y. June 29, 2021) ........................................................5, 29, 41

*In re Verizon Ins. Coverage Appeals*,
 222 A.3d 566 (Del. 2019) ..............................................................................................39

*W. Virginia Inv. Mgmt. Bd.* v. *Doral Fin. Corp.*,
344 F. App'x 717 (2d Cir. 2009) ...................................................................27

*Webb* v. *Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018) ........................................................................22

*In re Wickes Tr.*,
2008 WL 4698477 (Del. Ch. Oct. 16, 2008) ...............................................43

*Woodley* v. *Wood*,
2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) .............................................23, 24

*In re WorldCom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004).............................................................29

*Wyse* v. *Metro. Com. Bank*,
2025 WL 2208161 (S.D.N.Y. Aug. 4, 2025)...................................................32

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
2009 WL 464934 (S.D.N.Y. Feb. 25, 2009).....................................................34

*Yerkyn* v. *Yakovlevich*,
164 F.4th 224 (2d Cir. 2026) .....................................................................29, 31

## Statutes, Regulations and Rules

6 Del. C. § 1304 ......................................................................................44, 45

6 Del. C. § 1311 ..............................................................................................39

15 U.S.C. § 78u-4 ...................................................................................... *passim*

17 C.F.R. § 230.144A ................................................................................ *passim*

Colo. Rev. Stat. § 11-51-501 ....................................................................37, 38

Colo. Rev. Stat. § 11-51-604 ....................................................................37, 38

Fla. Stat. Ann. § 517.301 .................................................................................38

N.J. Stat. Ann. § 49:3-71..................................................................................39

N.Y. Debtor & Creditor Law § 279 .................................................................39

Fed. R. Civ. P. 9..........................................................................................14, 15

Fed. R. Civ. P. 23..............................................................................................3

Tex. Bus. & Com. Law § 24.001......................................................................39

**Other Authorities**

Anna Gelpern & Adam J. Levitin, *Rewriting Frankenstein Contracts: Workout Prohibitions in Residential Mortgage-Backed Securities*, 82 S. CAL. L. REV. 1075 (2009) .......................................................................................................45

*Asset-Backed Securities*, 70 Fed. Reg. 1506 (Jan. 7, 2005) ...........................................45

DOJ Press Release, *CEO, CFO, COO Charged In Connection With Billion-Dollar Collapse Of Tricolor Auto* (Dec. 17, 2025) <tinyurl.com/43rjj46h>.......................................14

*Mortgage & Asset Backed Securities Litig. Handbook* (Nov. 2025)..................................12, 29, 45

## PRELIMINARY STATEMENT

On December 17, 2025, the Department of Justice ("DOJ") unsealed an indictment against the former executives of subprime auto lender Tricolor, alleging they defrauded Tricolor's lenders (including Defendants here) by secretly double pledging collateral and falsifying borrower payment data to obtain cash advances under warehouse lending agreements that were supposed to be secured by car loans Tricolor made to its customers.  Plaintiffs, a self-determined group of 30 sophisticated institutional investors who bought asset-backed securities issued by Tricolor in different non-registered offerings under Rule 144A, seek to turn that indictment on its head. Plaintiffs claim that the indictment they copied and pasted into their Complaint suggests that Defendants—the very lenders that DOJ concluded were *victims* of Tricolor's fraud—are somehow perpetrators of the scheme by supposedly "fail[ing] to stop" Tricolor's "intentional[] . . . fraud" sooner than they did.  (Compl. ¶ 78.)  But even if Plaintiffs had properly pleaded such a claim (they have not), that claim is barred by black-letter law:  merely alleging that "defendants should have been more alert and more skeptical," as Plaintiffs do here, does not establish that Defendants were "promoting a fraud."  *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).

To be sure, Tricolor's conduct impacted both Defendants and Plaintiffs.  That conduct included (i) "double-pledging" loans to "multiple warehouse credit lines with different banks," (ii) "transfer[ring] fictitious loans . . . to various warehouse lenders," and (iii) falsifying borrower payment data to make delinquent loans appear eligible for the warehouse lines.  (Compl. ¶¶ 71, 74-75.)  Because many loans had been double pledged by Tricolor, Defendants incurred significant losses on the warehouse credit lines.  That is why DOJ characterized Defendants as victims of Tricolor's fraud.  (*See* Ex. 1 ¶ 1 ("[M]ultiple Tricolor executives repeatedly defrauded lenders using various schemes, including 'double-pledging' collateral.").)

Because Defendants imposed lending limits on the warehouse lines, Tricolor needed to free up space on its lending facilities to access funds to continue its business of making car loans to subprime borrowers. So Tricolor packaged loans into asset-backed securities called TAST (short for Tricolor Auto Securitization Trust) that it sold to qualifying institutional investors, such as Plaintiffs here. Tricolor then used the sale proceeds to pay down the warehouse lines, which Tricolor could then refill with more double-pledged or outright fictitious loans—thereby further perpetuating its fraud on Defendants. (Compl. ¶ 81.) Tricolor allegedly defrauded TAST noteholders the same way it defrauded Defendants: it double pledged loans to multiple securitizations and warehouse lines and dumped ineligible and defaulted loans into deals by falsifying borrower data. (*Id.* ¶¶ 70-76.)

Despite relying on an indictment that makes clear that Defendants were victims of Tricolor's fraud, Plaintiffs improperly try to shift their losses onto Defendants by claiming that Defendants had an economically irrational motive to perpetuate a fraudulent scheme that served only to exacerbate their losses. Worse, Plaintiffs' strategy of blaming Defendants for Tricolor's fraud comes directly from the indictment's description of how Tricolor's now-indicted CEO cynically considered extorting Defendants as his fraud began to unravel. As the indictment alleges, "[Tricolor's CEO] and the others discussed the possibility that they could blame the banks for purportedly ignoring red flags of their frauds and use that threat as leverage to extract a favorable settlement" from them. (Ex. 1 ¶ 24.) That is exactly what Plaintiffs improperly try to do here.

This action represents exactly the kind of "strike suit[]" that Congress intended to curb when it enacted the Private Securities Litigation Reform Act ("PSLRA"). *Gamm* v. *Sanderson Farms, Inc.*, 944 F.3d 455, 464 (2d Cir. 2019). Not only does the Complaint improperly blame Defendants for a fraud for which Defendants are the primary victims, but the pleading is woefully

deficient in that it lumps together the individual claims of 30 separate plaintiff entities, each asserting separate causes of action against individual Defendants, without pleading the circumstances of each named Plaintiff's purported transactions. Each of Plaintiffs' claims is deficient in numerous respects and should be dismissed.

    ***1. The 10(b) Claim.*** At the outset, Plaintiffs' 10(b) claim suffers from an overarching pleading failure. The Complaint fails to plead even the most basic facts and circumstances concerning each of the 30 individual Plaintiff's transactions. Instead, Plaintiffs plead their Complaint as if it is a Rule 23 class action concerning publicly-traded securities, which it is not. The transactions at issue are non-registered notes sold pursuant to Rule 144A at different times in multiple different TASTs. Each of the 30 separate Plaintiffs is asserting its own individual claims. The choice to join 30 separate claims in a single action belongs to Plaintiffs, but in those circumstances they are required to plead the elements of securities fraud with particularity as to each separate Plaintiff. This includes pleading for each Plaintiff what it purchased, when and from whom it purchased, what information it reviewed and relied upon, what in the information it relied upon was allegedly false, and the basis for alleging scienter on the part of each Defendant it seeks to hold liable for the particular transaction. The Complaint does not come close to doing so.

    Beyond that threshold pleading failure, the Section 10(b) claim fails for four independent reasons.

    *First*, Plaintiffs fail to plead that any Defendant acted with the required "strong inference" of intent to defraud TAST noteholders—*i.e.*, an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Jackson* v. *Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020). Plaintiffs try to plead fraudulent intent by contending generically that Defendants sought to earn "fees" by providing "services for Tricolor." (Compl. ¶ 6.) But in this

Circuit, a generalized motive to earn fees—shared by every corporation—has never been sufficient to plead fraud. Without any viable theory of motive, Plaintiffs shift to mischaracterizing certain consulting reports Defendants received in connection with their lending facilities.[1] But those reports never suggested that Tricolor was defrauding the Defendants by double pledging loans; in fact, they included tests designed to detect double pledging and did not identify any. Because those reports negate Plaintiffs' scienter theory, Plaintiffs focus instead on the reports' identification of mistakes and other shortcomings about matters having nothing to do with double pledging and which are common among private companies (like Tricolor) not subject to the rigorous financial reporting obligations applicable to public companies. (*Id.* ¶¶ 85-96.)

Plaintiffs do not allege that any Defendant knew of Tricolor's fraud prior to August 2025, but according to Plaintiffs, had Defendants asked more questions and probed Tricolor more deeply about the tangential issues flagged in the consulting reports, they might have discovered Tricolor's fraud sooner than they did. (*Id.* ¶¶ 72-73.) But as this Court, among others, has held, conditional allegations that if Defendants had "follow[ed] th[e] trail, [they] would have discovered a series of suspicious facts that would have led them to discover" the company's actual fraud does not plead scienter. *Hanson* v. *Frazer*, 2013 WL 5372749, at *5 (S.D.N.Y. Sept. 24, 2013) (Rakoff, J.).

Moreover, as this Court held in analogous circumstances, Plaintiffs' scienter theory ignores the "far more compelling . . . inference" that, as the very indictment Plaintiffs rely upon makes clear, "[defendants] [were] . . . victim[s] of [Tricolor's] fraud" and thus "did not discover the fraud, not because of recklessness, but because [Tricolor's] management hid the fraud from [Defendants] just as it did from the public at large." *In re Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465, 467 (S.D.N.Y. 2008). Indeed, the reasoning of courts in the Bernie Madoff litigation, where

---

[1] As to Fifth Third Securities, Plaintiffs merely state it received a "similar" report. (Compl. ¶ 98.)

plaintiffs similarly asserted Section 10(b) claims against anyone who interacted with the "perpet[rator] [of a] Ponzi-like fraud" (Compl. ¶ 1), applies fully here:  "[T]he complaint cannot support a strong inference that the red flags created meaningful doubt about Madoff in the minds of the defendants.  Instead, the complaint supports the opposite inference; that the [] defendants were among the many victims of Madoff."  *In re Meridian Funds Grp. Sec. & ERISA Litig.*, 2015 WL 1258380, at *7 (S.D.N.Y. Mar. 13, 2015).

*Second*, Defendants did not "make" any of the alleged misstatements in Tricolor's Offering Memoranda.  *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142-43 (2011).  Although the Complaint asserts (at ¶ 117) that Defendants "made multiple misstatements of material fact in the Offering Memoranda," that unsupported legal conclusion is contradicted by the Offering Memoranda, which are incorporated by reference into the Complaint.  (Compl. App'x.)  When a "document integral to the complaint contradicts that complaint, the document controls, and the court need not accept the complaint's allegations as true."  *Trustpilot Damages LLC* v. *Trustpilot, Inc.*, 2021 WL 2667029, at *3 (S.D.N.Y. June 29, 2021).  Each Offering Memorandum states that it "has been prepared . . . by the Depositor [a Tricolor entity]," and warns that "[n]otwithstanding any investigation that the Initial Purchasers [*i.e.*, Defendants] may have conducted with respect to the information contained herein, the *Initial Purchasers make no representation or warranty as to the accuracy or completeness* of such information."  (Ex. 2 at 6 (emphasis added).)[2]  It is "absolutely clear that [Tricolor], not [Defendants], had ultimate authority over [the challenged] statements."  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 484 (S.D.N.Y. 2012).  Nor can Plaintiffs cure that fatal deficiency by conclusorily parroting

---

[2] The Defendants include Offering Memoranda for two of the securitizations as Exhibits 2 and 5. The Offering Memoranda for the other securitizations contain nearly identical statements and disclosures.  There are only minor differences between the Offering Memoranda, for example, differences in COVID-19 disclosures, which are inconsequential for purposes of this action.

Section 10(b)'s statutory language that Defendants "carried out a plan[] [or] scheme." (Compl. ¶ 116.) For one, "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). For another, the Complaint "do[es] not attribute a deceptive or manipulative act to [Defendants]." *In re Glob. Cord Blood Corp. Sec. Litig.*, ___ F. Supp. 3d ___, 2026 WL 444770, at *21 (S.D.N.Y. Feb. 17, 2026).

*Third*, Plaintiffs' conclusory claim that "Plaintiffs relied upon Defendants' misstatements" (Compl. ¶ 122), does not remotely satisfy their burden to plead reliance with particularity in a non-class case involving securities that were not publicly traded and not entitled to a fraud on the market presumption. For each of the 30 different Plaintiffs, the Complaint was required to plead that each Plaintiff read and relied on the particular challenged statements on which that Plaintiff's claim is based. The Complaint does not even attempt to do so.

*Fourth*, many of the challenged statements are not actionable as a matter of law. Plaintiffs allege that Tricolor made statements that (i) are generic statements of optimism that are not actionable (*e.g.*, that Tricolor has a "highly experienced management team" (*id.* ¶ 6)); or (ii) are true on their face and not alleged to be false (*e.g.*, "factors" affecting the payment ability of subprime borrowers "include general economic conditions, employment levels, [and] the circumstances of individual borrowers" (*id.* ¶ 118)). Plaintiffs cannot transform inactionable generalities and indisputably truthful factual statements into securities fraud by claiming that Tricolor failed to accuse itself of "uncharged, unadjudicated wrongdoing." *Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021).

**2. State Law Claims.** As the Supreme Court recently reiterated, when the sole federal claim is subject to dismissal on a motion to dismiss, "the court may (and indeed, ordinarily should) kick the case." *Royal Canin U.S.A., Inc.* v. *Wullschleger*, 604 U.S. 22, 32 (2025). Thus, the Court

-6-

should decline to exercise supplemental jurisdiction over any of the state law claims. Even if considered, however, Plaintiffs' state law claims fail as a matter of law.

Plaintiffs acknowledge that their common law fraud claim has, at minimum, the same elements as their 10(b) claim (Compl. ¶ 140), and thus it fails for the same reasons the 10(b) claim fails. Different Plaintiffs' claims under various state securities acts fail for much the same reasons.

Lastly, Plaintiffs' state law fraudulent transfer claims fail for multiple independent reasons. For starters, despite Plaintiffs' conclusory allegations to the contrary, the Offering Memoranda on which the Complaint relies make clear that the "transfers" Plaintiffs seek to challenge—transfers of "cash" raised by "selling the Notes" in exchange for "auto loan receivables" (*Id.* ¶ 153)—were made not by the TAST trusts (the only entities to which Plaintiffs allege any "debtor" relationship), but instead by separate Tricolor-related entities to which Plaintiffs allege no relationship at all and for which they have no standing to sue. Plaintiffs' fraudulent transfer claims fail for that reason alone. But even if Plaintiffs could allege the TAST trusts made those transfers (and they cannot), Plaintiffs do not allege that Tricolor fraudulently took any receivables out of the securitization trusts after the debt to TAST noteholders arose to "deplete the assets available to creditors." *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2013 WL 12148482, at *6 (C.D. Cal. June 7, 2013). Instead, Plaintiffs claim that Tricolor *fraudulently created the debt* by putting assets into the TAST trusts that were less valuable than promised. (Compl. ¶¶ 153-54.) That is, "[t]he fraud alleged in the complaint relates to the manner in which [Tricolor] obtained [] funding from the Noteholders, not [Tricolor's] subsequent" and fraudulent transfer of assets out of the securitization trusts that were meant to pay Plaintiffs and other noteholders. *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). Even if Tricolor obtained Plaintiffs' "money through dishonest means" (*i.e.*, lying in the Offering Memoranda and putting less valuable assets into the trusts), fraudulent

transfer law "is not ordinarily concerned with" the "manner in which the original debt to [plaintiff] arose." *Bos. Trading Grp., Inc.* v. *Burnazos*, 835 F.2d 1504, 1508-10 (1st Cir. 1987). Plaintiffs' claims fail on that ground, too.

Last, Plaintiffs' claim that Tricolor used proceeds from selling TAST notes to pay back its lenders is not a fraudulent transfer. (Compl. ¶¶ 156, 167-68.) The "repayment of pre-existing debts to some creditors"—here, the debt Tricolor owed to its warehouse lenders—"does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because '[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them.'" *Sharp*, 403 F.3d at 54. At bottom, Plaintiffs are merely trying to dress up a fraud claim as a "fraudulent transfer" claim, which is insufficient to state a claim.

## BACKGROUND

### A.    The Parties

Plaintiffs are 30 different entities claiming to have purchased notes in one or more of seven separate TAST securitizations. (Compl. ¶¶ 9-38, 46, 63.)

Defendants JPMorgan Chase Bank, N.A. ("JPMorgan Bank"), Barclays Bank PLC ("Barclays Bank"), and Fifth Third Bank, N.A. ("Fifth Third Bank" and collectively, "Lender Defendants") provided loans to Tricolor through warehouse facilities. (*Id.* ¶¶ 39, 41, 43.) Defendants J.P. Morgan Securities LLC ("JPMorgan Securities"), Barclays Capital Inc. ("Barclays Capital"), and Fifth Third Securities, Inc. ("Fifth Third Securities" and collectively, "Initial Purchaser Defendants") served as the Initial Purchasers of different TAST notes. (*Id.* ¶¶ 40, 42, 44.) Specifically, each Initial Purchaser Defendant purchased TAST notes from a Tricolor entity

in private placements and then the notes were resold to highly sophisticated qualified institutional buyers in transactions exempt from SEC registration under Rule 144A.  (*Id.* at App'x p. 72.)[3]

**B.    Tricolor's Business and its Fraud on Its Warehouse Lenders**

Tricolor was an automobile finance company that operated a "buy here, pay here" business model in which it both sold and financed used automobiles to "primarily [] high risk borrowers with poor or no credit history."  (*Id.* ¶ 50.)  Prior to its downfall in September 2025, Tricolor was led by Daniel Chu (founder and CEO), Jerome (Jerry) Kollar (CFO), David Goodgame (COO), and others.  (*Id.* ¶ 7; Ex. 1 ¶ 1.)

Tricolor made loans to its customers to purchase vehicles.  (Compl. ¶¶ 50-51.)  To fund its business, Tricolor entered into warehouse facilities and credit lines with the Lender Defendants and others.  (*Id.*)  Under those arrangements, the warehouse lenders provided cash advances to Tricolor, and in exchange, Tricolor pledged to the lenders the payment streams that the borrowers made on their auto loans (*i.e.*, provided a security interest in the loans).  (*Id.*)  JPMorgan Bank established a warehouse facility (known as SPV4) with Tricolor in 2020.  (*Id.* ¶ 65.)  Barclays Bank established a warehouse facility (known as SPV5) with Tricolor in 2021, but in late 2023 (not 2020 as the Complaint suggests) it discontinued that facility and joined the SPV4 warehouse

---

[3] In a separate action, most of the Plaintiffs asserted contract and fiduciary duty claims against Wilmington Trust, N.A., which acted as both collateral custodian for and indenture trustee of all of the TASTs and also collateral custodian under the Lender Defendants' facilities.  *See One William Street Cap. Master Fund Ltd.* v. *Wilmington Trust N.A.*,  No. 1:26-cv-01123 (S.D.N.Y.), Compl. ¶ 3 & n.1.  In that action, which was filed in New York state court and removed to this Court, Plaintiffs seek to recover the same damages they seek to recover in this action, accusing Wilmington Trust of certifying delivery of documentation for loans deposited in the TASTs without actually verifying delivery, thereby allowing "Tricolor to pledge, repledge, and sell both actual and fictitious receivables to whomever it pleased."  *Id.* ¶ 65.  Plaintiffs moved to remand the action to New York state court and Defendants moved to transfer it to the Northern District of Texas Bankruptcy Court, the location of Tricolor's bankruptcy.  *Id.*, ECF. Nos. 41, 43.

facility. (*Id.* ¶¶ 41, 65; *see* Ex. 1 ¶ 27.)[4] Fifth Third Bank established the SPV6 warehouse facility with Tricolor in 2022. (Compl. ¶ 65.)

Each of Tricolor's warehouse lending agreements included specific eligibility requirements for the pledged loans, including that the loans be performing—meaning the borrowers are making their monthly payments. (*Id.* ¶ 52.) Tricolor could borrow funds up to a percentage of the principal value of the loans pledged to each lender. (*Id.*) To draw more funds, Tricolor would deliver a spreadsheet reflecting "the Eligible Loan Balance." (*Id.*) "Tricolor therefore had an incentive to sell as many eligible loans as possible to the warehouse SPVs in order to maximize its borrowing capacity." (*Id.*)

Unbeknownst to Defendants, however, Tricolor was perpetrating a massive fraud against its warehouse lenders—a fraud that began in 2018, at least two years before Tricolor entered warehouse lending arrangements with any of the Lender Defendants. (*Id.* ¶ 76; Ex. 1 ¶ 1.) As part of its fraudulent scheme, Tricolor double pledged thousands of loans that should have been uniquely pledged to a single warehouse line and securitizations. (Compl. ¶ 71.) To do so, Tricolor created "clone loans" bearing fictitious loan ID numbers but with the same loan characteristics as the original real loans. (*Id.* ¶ 72.) Tricolor then repeatedly pledged the real loans as well as the "clone loans" to multiple warehouse lines. (*Id.* ¶¶ 71-72.) Tricolor also made up completely "fictitious loans" with fake loan characteristics that Tricolor pledged to warehouse lines. (*Id.* ¶ 74.) Further, Tricolor manipulated characteristics of loans collateralizing the warehouse facilities by altering the payment status of "severely delinquent" loans to make them appear to be performing and "eligible" for the warehouse lines. (*Id.* ¶ 75.)

---

[4] In assessing a motion to dismiss, the court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *Kleinman* v. *Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

Tricolor's executives elaborately concealed this fraud.  The Complaint alleges that, in 2018, Tricolor's CEO and CFO (i) "create[d] a fictitious portfolio company in Tricolor's dealer management system to hold" these "non-performing" loans; (ii) "arrange[d] for other Tricolor employees to manually enter fake payments from customers on those [] loans in its dealer management system"; and (iii) "pa[id] off those [] loans using proceeds from loans secured from other lenders."  (*Id.* ¶ 76.)  As more loans defaulted, Tricolor needed more and more funds to keep its house of cards from crumbling down.  As the Chapter 7 bankruptcy trustee alleges in its complaint, which the Complaint here incorporates by reference (*see* Compl. ¶¶ 7, 71-76, 163), the "creation of fictitious loans increased considerably" in late 2023 (Ex. 3 ¶ 87).

Under the applicable warehouse agreements, each Lender Defendant had the right to request a third-party review of Tricolor's business operations and the loan portfolios in its respective warehouse facility.  (Compl. ¶¶ 53, 68.)  Plaintiffs make much of the fact that JPMorgan Bank exercised those rights and retained a vendor to review Tricolor and the SPV4 warehouse facility in 2024.  (*Id.* ¶¶ 83-94.)  Although that 2024 consulting report identified certain internal control weaknesses—specifically, the 2024 report attached a prior report from Tricolor's auditor for fiscal year 2022—Plaintiffs omit that these reports include responses from Tricolor's management team that explained the errors or inconsistencies and proposed remedial steps to correct any issues.  As discussed further below, these reports did not raise a "five-alarm fire" about potential fraud, as Plaintiffs insinuate.  For example, the reports included a credit file review that examined a sample of 55 loans.  (Ex. 4 at 35.)  With a few exceptions, the vendor (CBIZ) reported that "the loans were approved in compliance with the Company's policies and procedures, [and] the asset details included in the detailed data tape agreed to the respective system."  (*Id.*)  And although CBIZ "did not have a master servicer report of all facilities," CBIZ did not identify any

-11-

evidence suggesting that Tricolor double pledged any loans. (*Id.*)  Indeed, as the indictment incorporated by reference into the Complaint alleges, Tricolor "fabricated and falsified backup records when audits of the borrowing bases were conducted, including loan payment ledgers and system records indicating to which lender a loan had been pledged," which would have prevented the discovery of double pledging. (Ex. 1 ¶ 16.)  Further, CBIZ's review of the "eligibility criteria for all 55 loans selected for Credit File Testing noted no issues, and all accounts tested were correctly identified as eligible or ineligible." (Ex. 4 at 36.)

### C.      Tricolor's TAST Securitizations

After originating a "sufficient volume" of loans in connection with the warehouse facilities, Tricolor would package them into asset-backed securities that it sold in unregistered private offerings to highly sophisticated investors. (Compl. ¶ 55.)  Between 2022 and 2025, Tricolor issued seven securitizations: TAST 2022-1, TAST 2023-1, TAST 2024-1, TAST 2024-2, TAST 2024-3, TAST 2025-1, and TAST 2025-2. (*Id.* ¶ 45.)

Although Plaintiffs label the Initial Purchaser Defendants as "underwriter[s]" (*id.* ¶ 117), that is not correct.  The TAST deals were not SEC-registered offerings sold on the public market by underwriters with due diligence obligations under Section 11 of the Securities Act.  Rather, Tricolor, which "controlled all processes related to the securitization program" (*id.* ¶ 153), sold the TAST notes to the Initial Purchaser Defendants in private placements.  The notes were then resold to highly sophisticated qualified institutional buyers under SEC Rule 144A. (*Id.* at App'x p. 72.)

The TAST securitizations were structured in the typical way for asset-backed securities, as bankruptcy-remote entities to protect noteholders if Tricolor went bankrupt. (*Id.* ¶ 56; Ex. 2 at 37); *Mortgage & Asset Backed Securities Litig. Handbook* § 2:10 (Nov. 2025) (describing typical securitization structure).  Specifically, the "sponsor" (a Tricolor entity called Tricolor Auto

Acceptance, LLC), sold a pool of loan receivables—that is, rights to the payments made by borrowers on their auto loans—to the "depositor" (another Tricolor entity called Tricolor Auto Receivables 2 LLC).  (Ex. 2 at 14-16.)  The depositor transferred the receivables to the securitization trust in exchange for notes, which were issued in different tranches having different rights and payment priorities.  (*Id.*; Compl. ¶ 57.)  The depositor then sold the notes to one or more of the Initial Purchaser Defendants in private placements, and the notes were then re-sold to sophisticated investors, including Plaintiffs, under Rule 144A.  (Ex. 2 at 14-16.)

### D.    Discovery of Tricolor's Fraud

According to the Complaint, in August 2025, an analyst at a mezzanine lender of the SPV4 warehouse facility identified certain discrepancies in Tricolor's collateral data.  (Compl. ¶ 110.) Specifically, after comparing certain reports, the analyst noticed the principal balances were not declining on loans reported as "performing" or "current," as should occur if borrowers were making their monthly payments.  (*Id.*)  The mezzanine lender raised its concerns to JPMorgan Bank, who investigated the issue further and then engaged FTI Consulting "to run a forensic analysis of the collateral pool."  (*Id.* ¶ 111.)  Certain warehouse lenders confronted Tricolor's executives, including Chu and Kollar, about these discrepancies.  (Ex. 1 ¶¶ 19-23.)  As they had done for years, Chu and Kollar "proposed various lies the conspirators could tell to resolve the audit and explain the manipulated data" to conceal their fraud.  (*Id.* ¶ 21.)  Nonetheless, JPMorgan Bank and FTI soon uncovered Tricolor's fraud and the warehouse lenders quickly terminated the warehouse lines.  (Compl. ¶¶ 111-12.)  On September 10, 2025, a number of Tricolor-related entities, including Tricolor Auto Acceptance, LLC, filed for Chapter 7 bankruptcy in the Northern District of Texas.

On December 17, 2025, DOJ unsealed an indictment against Chu and Goodgame.  (*See* Ex. 1.)  On the same day, DOJ announced that Kollar and another Tricolor executive had pled guilty to defrauding Tricolor's lenders.[5]

### E.    Plaintiffs' Claims

In an attempt to "recover their losses" not from the perpetrators of Tricolor's fraud but from another set of Tricolor's victims (Compl. ¶ 8), Plaintiffs' Complaint asserts seven claims. All 30 Plaintiffs assert claims for (i) securities fraud under Section 10(b) of the Exchange Act against the Initial Purchaser Defendants; (ii) common law fraud against the Initial Purchaser Defendants; (iii) actual fraudulent transfer under Delaware and Texas law against the Lender Defendants; and (iv) constructive fraudulent transfer under Delaware and Texas law against the Lender Defendants.  Different individual Plaintiffs assert claims for (v) securities fraud under Colorado's blue sky law against Barclays Capital and JPMorgan Securities; (vi) securities fraud under Florida's blue sky law against Barclays Capital; and (vii) securities fraud under New Jersey's blue sky law against JPMorgan Securities.  (*Id.* ¶¶ 114-69.)

## ARGUMENT

To withstand dismissal, Plaintiffs must plead enough facts to "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.  "[L]abels and conclusions," or "'naked assertion[s]' devoid of 'further factual enhancement'" do not suffice.  *Id.*  Moreover, because Plaintiffs plead securities fraud claims, they must meet "heightened pleading requirements" under Rule 9(b) and the PSLRA, *ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009), which "require a securities fraud complaint to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

---

[5] DOJ Press Release, *CEO, CFO, COO Charged In Connection With Billion-Dollar Collapse Of Tricolor Auto* (Dec. 17, 2025) <tinyurl.com/43rjj46h>.

the statements were fraudulent,'" *Gamm*, 944 F.3d at 462. In addition, Plaintiffs must plead particularized facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Although in the case of a publicly-traded security in an efficient market a plaintiff can plead reliance by invoking fraud on the market, *see Ark. Tchr. Ret. Sys.* v. *Goldman Sachs Grp., Inc.*, 77 F.4th 74, 85 (2d Cir. 2023), Plaintiffs must individually plead a factual basis for having reasonably relied on any alleged misstatement in a case like this (involving privately-offered securities), *see In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 438 (S.D.N.Y. 2001) ("[R]easonable reliance must be pleaded and proved as an element of a § 10(b) securities fraud claim.").

Because "Plaintiffs' claims sound in fraud," Rule 9(b)'s "heightened pleading requirements" apply to all claims, except for the constructive fraudulent transfer claim. *Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 408 (S.D.N.Y. 2020).

## I.    Plaintiffs' Section 10(b) Securities Fraud Claim Should Be Dismissed.

Plaintiffs' securities fraud claim must be dismissed for failure to plead four independently required elements:  (i) "a material misrepresentation (or omission)" (ii) made by the defendant (iii) with "scienter"; and (iv) "reliance." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019).

### A.    Plaintiffs Have Not Pled a Strong Inference of Scienter.

Under the PSLRA, Plaintiffs must allege a "strong inference" of scienter, *i.e.*, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319-20 (2007). "Where a defendant is a corporation," the plaintiff must "plead[] facts that give rise to 'a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Jackson*, 960 F.3d at 98. An employee's scienter can be imputed only if the employee "made," "craft[ed]," or "review[ed]" the alleged

misstatements or otherwise was "involved in the[ir] dissemination." *Id.* at 98-99.  Here, the Complaint does not identify *any* individuals who acted on behalf of *any* Defendant.

Moreover, where there are "multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *Greco* v. *Qudian Inc.*, 2022 WL 4226022, at *25 (S.D.N.Y. Sept. 13, 2022).  Plaintiffs make no attempt to do so here, and instead improperly lump all Defendants together, which is "textbook group pleading" that "'runs afoul of the PSLRA.'" *Li* v. *Eqonex Ltd.*, 2024 WL 4241951, at *13 (S.D.N.Y. Sept. 18, 2024).  This is reason alone to dismiss the 10(b) claims.

### 1.    Plaintiffs Do Not Allege a Motive To Commit Fraud.

Plaintiffs' principal claim of scienter is that Defendants were motivated to earn "fees" by selling TAST notes.  (Compl. ¶¶ 3, 6.)  But this is precisely the type of "general profit motive common to all corporations" that the Second Circuit repeatedly has held "does not suffice" to plead "any particular motive" as a matter of law.  *Landesbank Baden-Wurttemberg* v. *Goldman, Sachs & Co.*, 478 F. App'x 679, 681 (2d Cir. 2012); *see also Tradeshift, Inc.* v. *Smucker Servs. Co.*, 2021 WL 4463109, at *6 (S.D.N.Y. Sept. 29, 2021) (rejecting "general profit motive" to "earn fees"); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 282 (3d Cir. 2006) (rejecting "allegation [of] motive to commit fraud simply because [underwriter] stood to collect underwriting fees").

Plaintiffs also allege that Defendants had a motive to not "stop" Tricolor from defrauding TAST noteholders (Compl. ¶ 78), because "Tricolor's fraud . . . helped preserve the securitization pipeline" by allowing Tricolor to "pay down the warehouse lines" (*id.* ¶ 79).  But this supposed motive—namely, a desire that Tricolor continue its business by securitizing loans to free up space on its warehouse lines so it can access capital and make more loans—merely describes the general business model of warehouse-lending.  It is a "generalized motive[], which could be imputed to almost any bank." *Schmidt* v. *Fleet Bank*, 1998 WL 47827, at *6 (S.D.N.Y. Feb. 4, 1998).  Because

"'[a]ny corporation would be motivated to make a profit, to avoid bankruptcy, or to finance the successful launch of a promising product,'" Plaintiffs' allegations are "far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 532 (S.D.N.Y. 2009).

Moreover, Plaintiffs' motive allegations make no sense. Plaintiffs' theory is *not* that Defendants encouraged Tricolor to securitize loans so that the Defendants could use those proceeds to pay off the warehouse lines and permanently eliminate their exposure to Tricolor. Rather, Plaintiffs' theory is that Tricolor securitized loans to "create[] new borrowing capacity for the warehouse [lines], and enabled Tricolor to continue perpetrating" its "Ponzi-like scheme" against its lenders, the Defendants here. (Compl. ¶ 154; *see id.* ¶ 61 (alleging that Tricolor used securitization proceeds to "pay down the amounts owed to the warehouse lenders, thereby freeing up additional borrowing capacity for more auto loan originations")).) Indeed, the Complaint alleges that over time the Lender Defendants actually *increased* their exposure to Tricolor, which makes no sense if anyone knew or believed that Tricolor was backing the money it was borrowing with phony collateral. (*Id.* ¶¶ 61-62, 65.) Under Plaintiffs' theory, because Defendants always remained massively exposed to Tricolor's ever-growing house of cards, Defendants actually had every incentive to *avoid* being part of any such scheme—the precise opposite of the untenable inference Plaintiffs assert. "[G]iven that all Ponzi schemes are doomed to collapse, . . . logic defeats the inference that [Defendants] would expose [themselves] to substantial financial liability and reputational harm by participating in [Tricolor's] scheme simply for the short-term benefit of" reducing exposure on their warehouse lines through securitizations, such that Tricolor could draw more funding from Defendants and continue defrauding Defendants. *Schmidt*, 1998 WL 47827, at *10. "An alleged scheme that defies common sense or economic reason 'does not yield a

reasonable inference of fraudulent intent.'" *Puchtler* v. *Barclays PLC*, 2025 WL 887502, at \*14 (S.D.N.Y. Mar. 21, 2025).

### 2. Plaintiffs Do Not Allege Conscious Misbehavior or Recklessness.

"In the absence of a showing of motive, 'it is still possible to plead scienter by identifying circumstances' indicative of conscious misbehavior or recklessness on the part of the defendant, 'though the strength of the circumstantial allegations must be correspondingly greater.'" *Ong* v. *Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at \*14 (S.D.N.Y. Mar. 8, 2017). Plaintiffs attempt to plead only the latter. The Second Circuit has made clear that "conscious recklessness" is "not merely a heightened form of negligence," but "a state of mind approximating actual intent." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Pleading recklessness requires allegations of "an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it*." *Id.* (emphasis in original). "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness." *Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012). That is all the Complaint alleges.

The Complaint tries to plead extreme recklessness by alleging Defendants (i) would have uncovered Tricolor's fraud had they made various inquiries that Plaintiffs suggest in hindsight and (ii) ignored supposed "red flags," which Plaintiffs attribute to all Defendants, Lender and Initial Purchaser alike. (Compl. ¶¶ 54, 72-73.) Both types of allegations fall far short.

***Plaintiffs' Hindsight Criticisms Do Not Establish Scienter.*** Plaintiffs allege that Defendants might have uncovered Tricolor's double-pledging scheme if they had "checked the VINs listed for the securitization collateral," and compared them against (i) the VINs for vehicles serving as collateral in each of their respective warehouse lines, and (ii) the VINs in prior TAST deals. (Compl. ¶¶ 72-73, 120.) Setting aside Plaintiffs' failure to allege facts specific to each

Defendant, "saying that [Defendants] could have known about" Tricolor's fraud "by aggregating a variety of sources" is insufficient to plead scienter. *Stephenson* v. *PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 576 (S.D.N.Y. 2011). "[T]here are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others," and "[t]hus, the failure of a non-fiduciary," as here, "to identify problems . . . does not constitute reckless conduct sufficient for § 10(b) liability." *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). In short, "it is not enough that the auditor [or other third-party] could have had access to information that might have constituted a red flag if seen." *Hanson*, 2013 WL 5372749, at *5; *see Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *26 (S.D.N.Y. Mar. 30, 2021) (scienter "allegations that a defendant 'would have learned the truth' if it had performed sufficient due diligence have been repeatedly rejected").

The reason courts reject this line of argument is simple. The assumption that "just because a defendant could have easily discovered a controls failure," its failure to do so must mean that it acted with scienter, reflects classic and improper hindsight bias: "Even if 'there was certainly a monster under the bed[,] the question is whether anyone had a reason to look there.'" *May* v. *Barclays PLC*, 2025 WL 887300, at *25 (S.D.N.Y. Mar. 21, 2025).

***Purported "Red Flags" Do Not Establish Scienter.*** "For ignorance of supposed 'red flags' to rise to the level necessary to demonstrate conscious recklessness under the PSLRA's 'rigorous' pleading standards, the warning signs 'must [have] be[en] particularized, specific, and together, egregious' to alert defendants to the precise misconduct that was occurring." *Menora Mivtachim*, 2021 WL 1199035, at *25. The Complaint must plead facts that "support a plausible inference that [each Defendant to be charged] ignored red flags of *fraud*." *Iowa Pub. Emps.' Ret. Sys.* v. *Deloitte & Touche LLP*, 973 F. Supp. 2d 459, 466 (S.D.N.Y. 2013) (emphasis in original).

Purported red flags must "constitute clear indicia of wrongdoing." *Special Situations Fund III QP, LP* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 430 (S.D.N.Y. 2014). Plaintiffs come nowhere close to showing that.

Plaintiffs' red flags theory is similar to the allegations this Court rejected in *Hanson* v. *Frazer*, 2013 WL 5372749 (S.D.N.Y. Sept. 24, 2013) (Rakoff, J.). In that case, shareholders of China Natural Gas brought a Section 10(b) claim against the company's auditors alleging that they "acted recklessly by failing to heed 'red flags' that would have revealed to the auditors" that certain loans were related-party transactions. *Id.* at *3. Specifically, the plaintiff identified three purported "red flags": (i) the loan proceeds "did not go to the purported borrower (Wang)," but instead "were wired to [an affiliated company]," (ii) "[t]he bank wire advice stated that the disbursement was for 'raw material expenses,' which conflicted with [the company's] 'recordation of a loan,'" and (iii) the purported borrower (Wang), was a "senior Chinese government official[]," which suggested potential "bribery." *Id.* at *5. The plaintiff further alleged that if the auditors had "follow[ed] this trail, [they] would have discovered a series of suspicious facts that would have led them to discover that the Wang loan was a related-party transaction." *Id.* This Court rejected those allegations. With respect to the loan details, the Court held that "[t]he failure to acknowledge a relatively tangential discrepancy, without more, at best supports a claim of negligence, but negligence is insufficient for a securities fraud claim." *Id.* As to the potential bribery concern, the Court explained that "it is unclear how a suggestion that [the company] might be bribing government officials would necessarily lead the auditors down a path leading to the revelation of a related-party transaction," and thus the auditor's knowledge of potential bribery did not "constitute[] a red flag pointing toward the actual fraud that occurred." *Id.*

Finally, the plaintiff in *Hanson* amended the complaint to bolster its case by alleging that auditors knew that the company's CEO gave "conflicting explanations" for the loans, and the Court rejected that too. *Hanson* v. *Frazer*, 2015 WL 4561707, at *2-3 (S.D.N.Y. July 17, 2015). The CEO's "contradictory statements were a single hint—and a vague and ambiguous one at that— that something might be amiss at [the company]." *Id.* at *4. Because those "statements did not disclose, or even allude to, the possibility that the loans were made to related parties," they were "not the type of pervasive, glaring 'red flags' that could support an inference of scienter." *Id.*

In this case, Plaintiffs ask this Court to draw the same inferences it rejected in *Hanson* based on a consulting report that Barclays Bank and JPMorgan Bank received in connection with reviews of their warehouse lines (not the TAST deals).[6] Indeed, although Plaintiffs quote extensively from the 2024 CBIZ report to show that CBIZ identified issues unrelated to any double-pledging scheme, Plaintiffs conveniently omit the table showing that CBIZ checked for double-pledged loans and did not identify any evidence suggesting double pledging. (Ex. 4 at Ex. B.1.) The Complaint also omits that the indictment incorporated by reference into the Complaint alleges that Tricolor "fabricated and falsified backup records when audits of the borrowing bases were conducted, including loan payment ledgers and system records indicating to which lender a loan had been pledged," which would have prevented discovery of double pledging. (Ex. 1 ¶ 16.) These facts alone defeat Plaintiffs' speculation that various purported deficiencies should have led Defendants to make further inquiries, which might have uncovered Tricolor's actual double-pledging scheme—even putting aside that courts reject such inferential leaps. *See Deloitte*, 973 F.

---

[6] Notably, Plaintiffs do *not* allege that Fifth Third received this report. Instead, Plaintiffs allege only that Fifth Third "received a similar CBIZ report for its separate SPV6 warehouse facility around the same time." (Compl. ¶ 98.)

Supp. 2d at 465 (no scienter where "auditor fail[ed] to investigate certain red flags that, while themselves are not indicative of actual fraud, could, if pursued, lead to the discovery of fraud").

A close look at each of Plaintiffs' alleged red flags reveals that the Complaint's allegations "are high on alarming adjectives . . . [b]ut they are short on the facts." *Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020).

Plaintiffs first point to the findings of an "audit" for the year ending December 31, 2022—which was attached as an exhibit to the 2024 CBIZ report—to allege that Defendants were or should have been aware that "Tricolor had cultivated an environment ripe for fraud and abuse." (Compl. ¶ 83.)  Not so.  Those 2022 findings identified the absence of controls to verify the "accuracy" of various data, and criticized certain "manual" processes. (*Id.*)  Nothing about that suggested rampant fraud, as opposed to the reality that Tricolor was a private company and, as such, may not have the same formalized controls that public companies need to meet the rigorous financial reporting obligations under the Sarbanes-Oxley Act.  Thus, these purported "red flags" cannot be "fairly characterized as obvious signs of fraud"; rather, "[i]t is only with the benefit of hindsight that these records can be characterized as red flags, but allegations of 'fraud by hindsight' are insufficient." *Special Situations Fund III QP, LP* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72, 75 (2d Cir. 2016); *see Webb* v. *Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (rejecting scienter allegations even if defendants "had reason to suspect that the company's internal accounting controls were imperfect"); *Anvil Tr.* v. *Ernst & Young*, 2026 WL 743608, at *13 (S.D.N.Y. Mar. 17, 2026) (auditor's "concerned observations about the accuracy and professionalism of [company's] financial reporting standards" does not suggest that audit recklessly failed to discover "existence of [a] round-tripping scheme").

The Complaint also omits that the 2024 CBIZ report attached the remediation plan Tricolor had adopted to address the issues that the 2022 findings identified. (*See* Ex. 4 at 12-14 & Ex. F.2.) Plaintiffs do not allege that Defendants had any reason to question the sincerity of Tricolor's efforts to address those control weaknesses, let alone that further inquiry by Defendants would have revealed the fraud that occurred here. *See Smallen* v. *W. Union Co.*, 950 F.3d 1297, 1313 (10th Cir. 2020) (no "strong inference" that executives "ignored ongoing, unremedied illegality" where they were told that company had "implemented remedial measures to address the issue").

Plaintiffs' allegations about CBIZ's 2024 consulting report for JPMorgan Bank's and Barclays Bank's warehouse lines are all of a similar stripe—none of CBIZ's findings suggest "clear indicia of wrongdoing." *Special Situations Fund*, 33 F. Supp. 3d at 430. Plaintiffs cite an "aging test" that CBIZ conducted on 25 loans to verify if Tricolor properly reported the delinquency status, which concluded that four loans had been incorrectly aged (*e.g.*, two loans were identified as 32-days past due when they were 52-days past due). (Compl. ¶ 85; Ex. 4 at 37.) Plaintiffs also point to an "expired accounts test" where CBIZ reviewed the overdue accounts included in the warehouse (Compl. ¶ 88), which represented 0.01% of the portfolio, and identified a subset of those accounts that should have been deemed ineligible for inclusion (Ex. 4 at 42). Plaintiffs do not explain how these minor discrepancies "constitute clear indicia of wrongdoing." *Special Situations Fund*, 33 F. Supp. 3d at 430; *see Hanson*, 2013 WL 5372749, at *5 ("failure to acknowledge a relatively tangential discrepancy" not indicative of scienter). Rather, Plaintiffs merely assert at most that Defendants "did nothing" to follow up on these minor discrepancies (Compl. ¶ 84), which, even if true, does not constitute scienter. *See Woodley* v. *Wood*, 2022 WL 103563, at *8 (S.D.N.Y. Jan. 11, 2022) (Plaintiffs have not "shown that the accounting errors were so patently wrong as to be obvious indicators of fraud."); *In re DNTW Chartered Accts. Sec. Litig.*,

-23-

172 F. Supp. 3d 675, 688 (S.D.N.Y. 2016) (allegation that "if [auditor] had exercised greater skepticism or performed further procedures, it potentially could have discovered the fraud" is "not sufficient to allege scienter").

Other issues that CBIZ identified were explained by Tricolor's policies and not indicative of fraud.  For example, CBIZ determined that the payment status for 5 of the 25 loans it tested had not properly shifted from month-to-month (a so-called "age shifting test").  (Compl. ¶ 86.)  But as the 2024 report states, Tricolor management explained that its servicing department had "pause[d]" the borrowers' payment obligations on 3 of the 5 loans because the cars had been in the shop for repairs.  (Ex. 4 at 12, 38.)  Only one of the remaining loans should have been deemed ineligible, but one mistake is not indicative of fraud.  (*Id.*)  *See Woodley*, 2022 WL 103563, at *10 ("mistakes can be made without fraudulent intent").[7]  Plaintiffs also say it was "startling[]" that Tricolor's accounting policy ascribed the "black book" "wholesale value[]" to vehicles that it had not yet repossessed when a borrower has defaulted.  (Compl. ¶¶ 87, 91.)  Here again, Plaintiffs omit that the 2024 report states that Tricolor management explained that if a borrower successfully evaded Tricolor's efforts to repossess a vehicle, "Tricolor bears the wholesale loss."  (Ex. 4 at 11.)  Plaintiffs never explain why this accounting policy was "startling[]" (Compl. ¶ 87) or how Defendants' knowledge of this accounting policy was a "red flag" of entirely unrelated conduct of double pledging collateral or creating fictitious loans.

---

[7] Similarly, Plaintiffs note that CBIZ found that certain payments were routed to an incorrect bank account (Compl. ¶ 89), while again ignoring the explanation from Tricolor management that the error occurred because Tricolor had "consolidated the SPV5 warehouse line into the [SPV4] warehouse in November 2023 and repurchased receivables from SPV3, which are now part of SPV4.  Management stated the process of directing customer payments to the correct account is manual and there are errors, which the Company is currently working to correct."  (Ex. 4 at 9.)  Again, this is not "clear indicia of wrongdoing."  *Special Situations Fund*, 33 F. Supp. 3d at 430.

Grasping at straws, Plaintiffs observe (at ¶ 92) that CBIZ made an "Observation," without flagging it as an issue, that Tricolor "backs into" a particular calculation using a formula, and that CBIZ "verified [that] the calculation" was accurate (Ex. 4 at 15). Plaintiffs contend that, in theory, Tricolor's "backing into" approach might have "allow[ed] it to make up" certain data, and then fault Defendants for not leaping to that nefarious conclusion, notwithstanding CBIZ's determination that it verified the calculation. (Compl. ¶ 92.) Plaintiffs also observe (Compl. ¶ 90) that CBIZ had commented that Tricolor did not provide account information for 4 of the 25 loans to trace payments to a "corresponding bank statement" (Ex. 4 at 52). As this Court held in *Hanson*, this kind of "single hint—and a vague and ambiguous one at that—that something might be amiss at [Tricolor]" is a country mile from "the type of pervasive, glaring 'red flags' that could support an inference of scienter." 2015 WL 4561707, at \*4.

Lastly, Plaintiffs claim that it "should have been a five-alarm fire" (Compl. ¶ 95) that CBIZ "did not have access to a master servicer report for all [warehouse] facilities to confirm if there was any evidence that the assets were pledged to a third party" (Ex. 4 at 35). But CBIZ never stated that it was unable to assess Tricolor without that report. Moreover, in the absence of any hint of wrongdoing, and even assuming that CBIZ had requested that information and Tricolor declined to share it (which CBIZ's report does not say and which one would expect it would say if it had happened and was of concern to CBIZ), it would not be alarming that Tricolor might resist sharing with JPMorgan Bank and Barclays Bank—the recipients of the 2024 CBIZ report—detailed information about loans in other banks' warehouse facilities. *Cf. GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 244 (3d Cir. 2004) ("[I]t is not uncommon for a target to be somewhat uncooperative with respect to due diligence requests from a potential acquirer.").

Additionally, as noted above (*supra* at 21), CBIZ did conduct a double-pledging analysis and it did not find any instance of double-pledged loans.  In any event, as this Court held in *Hanson*, conditional allegations that if Defendants had "follow[ed] this trail, [they] would have discovered a series of suspicious facts that would have led them to discover" the double pledging does not plead scienter.  2013 WL 5372749, at *5.  Indeed, drawing that inference reflects classic and improper "hindsight bias"—*i.e.*, "the tendency for people with knowledge of an outcome to exaggerate the extent to which they believe that outcome could have been predicted."  *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 124 n.50 (Del. Ch. 2009); *see Medina* v. *Tremor Video, Inc.*, 640 F. App'x 45, 49 (2d Cir. 2016) ("With the benefit of hindsight, it may be possible to say that seeds of what was to come were available to defendants at the time.  But we cannot attribute to defendants, based on hindsight alone, knowledge that events that may well have appeared unremarkable at the time, were omens of future material problems.").

*JPMorgan Securities' alleged knowledge that Tricolor's CFO had previously worked for an individual who had committed a crime.*  Lastly, Plaintiffs contend that in connection with vetting Tricolor for a potential IPO, JPMorgan Securities "discovered that Tricolor's CFO, Kollar," had previously worked at an unspecified company where the CEO supposedly was indicted and sent to prison for an unspecified crime.  (Compl. ¶ 97.)  This Court has expressly rejected scienter allegations that a company should have assumed that an individual "has a propensity to defraud investors because [that individual] allegedly did so under unelaborated circumstances once before."  *Hubiack* v. *Li-Cycle Holdings Corp.*, 2024 WL 2943959, at *10 (S.D.N.Y. June 10, 2024); *see Saraf* v. *Ebix, Inc.*, 632 F. Supp. 3d 389, 400-01 (S.D.N.Y. 2022) (rejecting plaintiff's "attempts to bolster his scienter argument by citing to previous instances in which Ebix was accused of misconduct").  Plaintiffs now ask the Court to take that already-rejected

theory one step further by claiming that JPMorgan Securities should have assumed that Kollar had a propensity to commit fraud not because he had personally engaged in past wrongdoing, but because he had worked for someone who had violated the law in some unspecified way. *See Greco*, 2022 WL 4226022, at \*25 (rejecting "guilt by association" scienter allegations). JPMorgan Securities had no basis to do so and surely none of the other Defendants, who are not even alleged to have known of this, did either.

\*    \*    \*

*Tellabs* requires the Court to consider the "opposing inference[s] of nonfraudulent intent." 551 U.S. at 314. Applying *Tellabs*, the conclusion is clear: "The opposing inference [of nonfraudulent intent]—that [Tricolor] concealed its fraud from [Defendants], just as it concealed its fraud from [TAST] investors—is objectively more compelling than plaintiffs' allegations of recklessness." *W. Virginia Inv. Mgmt. Bd.* v. *Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009); *see Doral*, 563 F. Supp. 2d at 465 (same). That Tricolor went to extensive lengths to conceal its fraud from both Defendants and the consultants retained by certain Defendants—as detailed in DOJ's indictment incorporated into the Complaint (Ex. 1 ¶¶ 10, 16) and guilty pleas— reinforces the compelling inference of non-fraudulent intent. *See Meridian Horizon Fund, LP* v. *KPMG (Cayman)*, 487 F. App'x 636, 641 (2d Cir. 2012) ("[T]he more compelling inference as to why Madoff's fraud went undetected for two decades was his proficiency in covering up his scheme and deceiving the SEC and other financial professionals.").

Any inference of scienter is further undermined by the fact that after a mezzanine lender raised concerns, JPMorgan Bank "responded" by engaging a third party "to run a forensic analysis," and once double pledging was revealed, immediately "terminated funding on the warehouse lines." (Compl. ¶¶ 111-12.) The "initiation of an independent investigation . . . , if

-27-

anything, supports the opposite inference [to scienter]." *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 808 (S.D.N.Y. 2020); *see Thomas* v. *Shiloh Indus., Inc.*, 2017 WL 1102664, at *5 (S.D.N.Y. Mar. 23, 2017) ("Defendants' conduct 'demonstrat[es] a pursuit of truth rather than reckless indifference to the truth,' as discovering facts that instigate an investigation 'is a very great distance from convincing proof of intent to deceive.'").

### B.    Defendants Did Not Make Any of the Challenged Statements.

Section 10(b) applies only to the "maker" of a statement, meaning the person with "ultimate authority over the statement" who "takes credit" for it by signing the document. *Janus*, 564 U.S. at 142-43.   Here, Defendants did not make any of the statements in Tricolor's Offering Memoranda.[8]  Each Offering Memorandum states that it "has been prepared by the Depositor [a Tricolor entity]." (Ex. 2 at 7.)  To remove any doubt, each Offering Memorandum affirmatively states that Defendants did not make any of the statements:  "[n]otwithstanding any investigation that the Initial Purchasers [Defendants] may have conducted with respect to the information contained herein, the *Initial Purchasers make no representation or warranty as to the accuracy or completeness* of such information."  (*Id.* at 6 (emphasis added).)  It is "absolutely clear that [Tricolor], not [Defendants], had ultimate authority over [the challenged] statements." *Fannie Mae*, 891 F. Supp. 2d at 484.[9]

---

[8] In this regard, claims not involving an underwritten public offering are different than claims involving a public offering subject to Section 11 of the Securities Act, where underwriters are liable for misstatements in the offering documents subject to a due diligence defense. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 254 (S.D.N.Y. 2004).  The Initial Purchaser Defendants here are not underwriters and have no statutory liability for alleged misstatements in the Offering Memoranda, particularly where the memoranda expressly state they are not statements by the Initial Purchasers.

[9] Plaintiffs also observe (Compl. ¶ 99) that the Offering Memoranda state that "the Depositor [a Tricolor entity], Tricolor and the Initial Purchasers [Defendants] will be available to answer questions from prospective investors . . . and will furnish additional information (to the extent they have or can acquire such additional information without unreasonable effort or expense) necessary

Plaintiffs cannot evade *Janus* by misrepresenting Defendants' roles and what the Offering Memoranda say. When a "document integral to the complaint contradicts that complaint, the document controls." *Trustpilot*, 2021 WL 2667029, at *3. Thus, the Court "need not accept . . . as true," *id.*, the Complaint's bald assertion that Defendants "made" the challenged statements "in the Offering Memoranda." (Compl. ¶ 117). Likewise, Plaintiffs' assertion that "Defendants' names were displayed prominently *as authors* on the cover of each Offering Memorandum" is not true. (*Id.* ¶ 121 (emphasis added).) The Offering Memoranda identify Tricolor as the author of the statements (Ex. 2 at 7), and identify particular Defendants as either "structuring agent" "bookrunner," or "co-manager" (*see* Exs. 2, 5)—specialized terms that are not synonymous with "author."[10]

Nor can Plaintiffs assert a "scheme" claim under Rule 10b-5(a) and (c). Plaintiffs plead no facts that Defendants participated in a fraudulent scheme; the Complaint contains just one throwaway conclusory sentence that Defendants "carried out a plan[] [or] scheme." (Compl. ¶ 116.) This Court is "not obliged—or indeed permitted—to credit 'mere conclusory statements' or 'a legal conclusion couched as a factual allegation.'" *Yerkyn* v. *Yakovlevich*, 164 F.4th 224, 231 (2d Cir. 2026). Thus, Plaintiffs plead nothing that could support a "scheme" among Defendants or between Defendants and anyone else.

---

to verify the information furnished in this offering memorandum." (Ex. 2 at 7.) Plaintiffs do not explain why they find this disclosure significant. They do not allege that they asked the Initial Purchasers any questions, let alone that any Initial Purchaser provided an allegedly false or misleading response. Instead, every statement Plaintiffs challenge was contained "in the Offering Memoranda" (Compl. ¶¶ 117-18), and thus made by Tricolor, not Defendants.

[10] Structuring agents, or "arrangers," "provide the Issuers with a sense of what type of securities investors are interested in buying as well as investors' pricing requirements and risk tolerance, thereby providing guidance as to the structure and pricing of the securities." *Mortgage & Asset Backed Securities Litig. Handbook* § 1:7 (2025). "A book runner is responsible for pricing the offering and allocating [the notes] to institutional" investors. *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 645 n.19 (S.D.N.Y. 2004).

To plead a scheme, "Plaintiffs must allege 'something beyond misstatements and omissions' that renders the challenged conduct a scheme to defraud." *In re Mobileye Glob. Sec. Litig.*, 2025 WL 3640904, at *3 (2d Cir. Dec. 16, 2025). And, as to each Defendant, that additional "something" must be "affirmatively deceptive or manipulative." *Glob. Cord Blood*, 2026 WL 444770, at *21. Here, the Complaint alleges only that certain Defendants, as Initial Purchasers, resold Tricolor's notes to highly sophisticated investors, while making clear in writing that Tricolor had sole responsibility for all statements (including any alleged misrepresentations) in the Offering Memoranda. Plaintiffs do not, and cannot, allege that this was inherently deceptive or manipulative. *See id.* ("Courts have distinguished conduct that merely facilitates a scheme to defraud from the commission of an affirmatively deceptive or manipulative act. Allegations that describe a party's participation in a scheme, but do not attribute a deceptive or manipulative act to the party, have been held not to give rise to a claim of scheme liability.").

## C.    Plaintiffs Do Not Plead Basic Facts Concerning Their Individual Transactions Nor Allege That They Relied on the Challenged Statements.

The Complaint purports to assert individual claims by 30 separate Plaintiffs against six separate Defendants. But with limited exceptions, the Complaint fails to plead even the most basic facts regarding the circumstances of each individual Plaintiff's transactions, including when each Plaintiff purchased, what each Plaintiff purchased, and from whom that purchase was made. Instead, the Complaint lumps Plaintiffs together as an undifferentiated block and fails to differentiate between purchases made directly from Defendants (much less from which Defendant) or from third parties. (*See, e.g.*, Compl. ¶ 6 (alleging "Plaintiffs" (plural) "purchased over $230 million . . . in Tricolor Trusts [Notes] from Defendants *and others*" (emphasis added)); *id.* ¶ 63 (alleging "*[t]he majority* of th[e] Notes were purchased at initial offering from *either* JPMorgan

or Barclays" (emphasis added)).)   Without pleading the fundamental facts underlying each Plaintiff's transactions, the Complaint fails to state a claim.

Moreover, because the Notes were all nonregistered offerings governed by Rule 144A, Plaintiffs—all sophisticated investors—do not and cannot argue that any presumption of reliance applies, and they must instead plead direct "eyeball" reliance by each individual Plaintiff.  *See Stoneridge Inv. Partners, LLC* v. *Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (discussing the fraud-on-the-market and *Affiliated Ute* presumptions of reliance).  To establish "direct" reliance, each Plaintiff must plead and prove that it "was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing [notes]—based on that specific misrepresentation."  *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 810 (2011).

The Complaint does not allege that each of the 30 Plaintiffs read and relied on all 15 (or 16) alleged misrepresentations in each Offering Memorandum for the TAST notes that each Plaintiff purchased.  Rather, the Complaint makes sweeping and "conclusory" allegations that the Court need not credit, *Yerkyn*, 164 F.4th at 231—*i.e.*, that "Plaintiffs relied upon Defendants' misstatements." (Compl. ¶ 122.)  Indeed, the closest thing to a specific factual allegation is the assertion that Plaintiffs "analyzed the loan portfolio and performance data as given," and "relied on these representations in deciding to purchase Notes at the prices they paid." (*Id.* ¶ 109.)  Even here, however, this conclusory allegation cannot meet Plaintiffs' burden to plead that each of the 30 different Plaintiffs, who purchased different securities in different offerings at different times from different Defendants (or from third parties), read and relied on that specific data in deciding to buy TAST notes in each of the seven separate offerings.

This is not a class action and it does not involve a publicly-traded security.  Plaintiffs cannot evade the pleading requirements by banding together and filing a joint Complaint.  "[C]ourts in

-31-

this Circuit have consistently held that plaintiffs may not circumvent pleading standards by aggregating individualized claims and asserting them as a collective, even when the claims arise from a common course of conduct." *Wyse* v. *Metro. Com. Bank*, 2025 WL 2208161, at *16 (S.D.N.Y. Aug. 4, 2025). Here, as in *Wyse*, the Complaint "does not plead that any particular [Plaintiff] saw any particular statement" and it "does not plead that any particular [Plaintiff] relied on any particular statement in making any relevant decision" to buy TAST notes in a particular TAST offering. *Id.* at *15. That alone is fatal and requires dismissal. *See Jacquemyns* v. *Spartan Mullen Et Cie, S.A.*, 2011 WL 348452, at *8 (S.D.N.Y. Feb. 1, 2011) ("Plaintiffs are reminded that they are separate individuals, and that each of them individually must plead facts tending to demonstrate that specific misrepresentations were made to them by specific persons, and that they in fact relied on something that the [Defendants] did in making the decision to invest.").

Rather than plead actual reliance, as required, Plaintiffs—investors eligible to participate in a private Rule 144A offerings and "fend[] for themselves," *In re Merrill Lynch Auction Rate Sec. Litig.*, 2012 WL 1994707, at *5 (S.D.N.Y. June 4, 2012)—collectively claim that they reasonably relied on their assumption that Initial Purchaser Defendants "were responsible for guarding the integrity of that securitization market and protecting bondholders" from potential misrepresentations by Tricolor in the Offering Memoranda. (Compl. ¶ 107.) But there exists no such duty and any such assumption is refuted by the clear warning in the Offering Memoranda that the Initial Purchaser Defendants "make no representation or warranty as to the accuracy or completeness of [the] information" in the Offering Memoranda. (Ex. 2 at 6; Ex. 5 at 7.) As a matter of law, Plaintiffs were not "justified in relying" on their assumptions that are negated by "explicit[] disclos[ures]" in the Offering Memoranda. *Ashland Inc.* v. *Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011) (dismissing 10(b) claim).

### D. Many of the Challenged Statements in the TAST Offering Documents Are Not Actionable.

The Section 10(b) claim does not come close to pleading a claim and should be dismissed in its entirety for the multiple independent reasons above. But if the Court allows any part of the claim to move forward, many of the challenged statements are not actionable misstatements and should be dismissed as the basis for any claim. In assessing whether Plaintiffs have satisfied the heightened pleading standard for alleging misrepresentations, the Court must consider whether the statements in the Offering Memoranda, "taken together and in context, would have misled a reasonable investor." *Rombach* v. *Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004). Moreover, "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *Dalberth* v. *Xerox Corp.*, 766 F.3d 172, 183 (2d Cir. 2014). "'Rule 10b-5(b) does not proscribe pure omissions,' no matter how material they may be to a reasonable investor." *Hubiack*, 2024 WL 2943959, at *8 n.10.

*First*, the Complaint does not satisfy the PSLRA's requirement to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Instead, the Complaint merely identifies a "bullet-point list" of alleged false statements, followed by a generalized list of "true facts" that "were then known to or recklessly disregarded by each of the Defendants"—a pleading tactic that the Second Circuit has expressly rejected. *Boca Raton F'fighters* v. *Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012); *see* Compl. ¶¶ 116-19. "Such allegations do not specify why and how each statement is misleading because they do not specify what understanding each statement left investors, and how that understanding was

-33-

inconsistent with alleged omissions." *In re AstraZeneca plc Sec. Litig.*, 2022 WL 4133258, at *6 (S.D.N.Y. Sept. 12, 2022).[11]

*Second,* a number of the statements Plaintiffs challenge are generic statements that are not material as a matter of law.  This includes that Tricolor (i) has a "Highly Experienced Management Team With Strong Operating Track Record," and (ii) uses "Sophisticated and Proprietary Information-Based Systems and Strategies."  (Compl. ¶ 118.)  Such "'vague descriptions' of [Tricolor's] activities" and "generally optimistic opinions" are "inactionable" because they "are too general to cause a reasonable investor to rely upon them." *Hubiack*, 2024 WL 2943959, at *5; *see In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (statements characterizing medical studies as "rigorous," "extensive," and "systematic," and the "scientists who performed them as 'expert' and 'world-class,' … are inactionable"); *JP Morgan*, 553 F.3d at 206 (statement that JP Morgan "set the standard for best practices in risk management techniques" inactionable); *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("soft adjectives" describing "management team" as "strong," "experienced," and "capable" are inactionable).

*Third,* Plaintiffs do not allege a basis to conclude that many challenged statements are either false or misleading.  For example, Plaintiffs challenge (Compl. ¶ 142) a risk warning in the TAST Offering Memoranda about the reasons loans to "sub-prime borrowers" "entail significantly higher risk and are likely to experience higher levels of delinquencies"—specifically, that "[t]he performance of the Receivables will depend on a number of factors, including general economic

---

[11] The Complaint alleges that certain data tables in the Offering Memoranda about the characteristics of the underlying loans were false because Tricolor had double pledged loans and falsified borrower payment data.  (Compl. ¶¶ 117, 141.)  For purposes of this motion only, Defendants do not dispute that the Complaint adequately alleges that those data tables contained inaccurate information.

conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (Ex. 2 at 31-32; Ex. 5 at 32.) Plaintiffs do not allege any basis to find that this statement was false, or identify any omitted fact about the subject of the statement (*i.e.*, risks pertaining to sub-prime borrowers) that rendered the statement misleading. Instead, Plaintiffs assert that the Offering Memoranda omitted to disclose "the significant fraud" (*i.e.*, that Tricolor "double-pledg[ed]" collateral) "that later caused Tricolor to collapse." (Compl. ¶ 119.)

This argument, which Plaintiffs also try to apply to a number of statements identified below, collides with two bedrock securities law doctrines. *First*, because there is no duty to disclose "uncharged, unadjudicated wrongdoing," *Danske Bank*, 11 F.4th at 98, Plaintiffs cannot claim that "risk disclosures" were misleading by omitting "a detailed admission of severe wrongdoing," *Ark. Tchr. Ret. Sys.*, 77 F.4th at 101. *Second*, it is axiomatic that disclosures about one topic "d[o] not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding" Tricolor. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010). Thus, "[t]o prevail on an omission theory, 'plaintiffs must establish a sufficiently close nexus between the affirmative statement and the alleged omission.'" *In re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2025 WL 641089, at *5 (S.D.N.Y. Feb. 27, 2025). "The mere fact that investors would have benefitted from knowing that information does not suffice." *In re Norfolk S. Corp. Bond/Note Sec. Litig.*, 2026 WL 555420, at *2 (2d Cir. Feb. 27, 2026). Plaintiffs make no effort to establish such a nexus here.

The same failing applies to the following additional statements challenged by Plaintiffs, which should be dismissed as the basis for any claim:

- "The Receivables have been … originated by the Originators in accordance with Tricolor's credit policies." (Compl. at App'x p. 72.) Plaintiffs do not allege that Tricolor made auto

loans to borrowers who did not qualify under Tricolor's guidelines; instead, Plaintiffs allege that Tricolor later manipulated borrowers' payment data and double pledged loans. (*Id.* ¶ 119.)  *See Norfolk S.*, 2026 WL 555420, at *2 ("The complaint does not allege that the Safety Committee did not exist or did not perform the listed functions, and thus fails to plead falsity.").

- "The operations of Tricolor require significant amounts of capital.  To fund its operations, Tricolor has borrowed, and will continue to borrow, capital and complete securitizations or other structured finance transactions.  Notwithstanding the COVID-19 pandemic, Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature." (Compl. ¶ 118; Ex. 5 at 40.)  Plaintiffs do not even try to allege how Tricolor's opinion that it did not expect to seek new loans from lenders was false.

- "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month . . ." (Compl. ¶ 117.)  The fact that Tricolor later manipulated delinquency data to make loans appear current when borrowers had stopped paying does not render false a general description of Tricolor's policy.  *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *7 (S.D.N.Y. June 28, 2017) ("Many of Plaintiffs' identified statements state that certain internal control policies are in place, but Plaintiffs do not plead that the controls did not exist, but merely that they were ineffective.").

- "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date."  (Compl. ¶ 117.)  Here too, Plaintiffs do not allege that Tricolor falsely stated the definition of a delinquent loan.  *See In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[S]tatements are not misleading because they do not suggest that the undisclosed improper activity alleged by Plaintiff was not occurring.").

## II.    The Court Should Decline Supplemental Jurisdiction Over the State Law Claims.

Because the only federal claim Plaintiffs plead should be dismissed, "the court may (and indeed, ordinarily should) kick the case." *Royal Canin*, 604 U.S. at 32.  As this Court recently put it after dismissing all federal claims, "the state-law claims are best left to a state court to decide." *Fintech Leaders Fund, LLC* v. *Cogut*, 2025 WL 3755292, at *9 (S.D.N.Y. Dec. 29, 2025). Accordingly, upon dismissing Plaintiffs' 10b-5 claim, the Court should decline supplemental jurisdiction over the state law claims and dismiss the entire action.

### III.   Alternatively, the State Law Claims Should Be Dismissed Because Plaintiffs Fail To State a Claim.

#### A.   Plaintiffs Fail to Plead a Common Law Fraud Claim.

Because a common law fraud claim has the same elements as a Section 10(b) claim (Compl. ¶ 140), the common law fraud claims the 30 Plaintiffs seek to assert should be dismissed for the same reasons as the 10b-5 claims—*i.e.*, the Complaint does not plead the elements of individual fraud claims against individual defendants, element-by-element with specificity as required, and Plaintiffs in all events fail adequately to plead the substantive elements of fraud, including in particular scienter and individual reliance.[12]

#### B.   Plaintiffs Fail to Plead Blue Sky Law Claims.

The Complaint fails to state a claim under the Colorado, Florida, and New Jersey securities acts.  (Compl. ¶¶ 125-38.)

*1. Colorado Securities Act.*  The Colorado Securities Act has two anti-fraud provisions, and the Complaint fails to state a claim against Barclays Capital and JPMorgan Securities under either of them.

The first provision (Colo. Rev. Stat. § 11-51-604(3)) imposes liability on "[a]ny person who recklessly, knowingly, or with an intent to defraud sells or buys a security in violation of section 11-51-501(1)."  Section 604(3) mirrors federal Rule 10b-5 and requires that a defendant engage in a fraudulent "scheme" or "make any untrue statement of a material fact or [] omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," *id.* § 11-51-501(1).  Thus, Plaintiffs

---

[12] The "strong inference" of scienter standard, and the requirement to consider plausible opposing inferences of innocent conduct, applies to all complaints asserting fraud claims, and not just those subject to the PSLRA.  *See Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (New York common law fraud claims).

were required to plead that (i) Barclays Capital and JPMorgan Securities made false statements or engaged in a fraudulent scheme, (ii) scienter, and (iii) reliance. *See Lamothe* v. *Decentral Life, Inc.*, 2024 WL 5055576, at *10 (D. Colo. Oct. 24, 2024). Accordingly, this claim fails for the same reasons that Plaintiffs' federal 10b-5 claim fails.

The second provision (Colo. Rev. Stat. § 11-51-604(4)) does not impose a scienter requirement, *Black Diamond Fund, LLLP* v. *Joseph*, 211 P.3d 727, 736 (Colo. App. 2009), but in exchange for lowering the plaintiffs' burden of proof, it sweeps more narrowly than Section 604(3) by imposing liability only on the maker of the alleged misstatement. Specifically, Section 604(4) imposes liability on "[a]ny person who sells a security in violation of section 11-51-501(1)(b)," which limits liability to the person who "make[s] an[] untrue statement of a material fact," *id.* § 11-51-501(1)(b); *see Shriners Hosps. for Child.* v. *Qwest Commc'ns Int'l Inc.*, 2005 WL 2350569, at *13 (D. Colo. Sept. 23, 2005) (Section 11-51-501(1)(b) makes it unlawful "[t]o **make** any untrue statement of a material fact") (emphasis added). Accordingly, this claim fails because, as shown above, the Offering Memoranda themselves make clear that neither Barclays Capital nor JPMorgan Securities was the maker of any of the challenged statements, many of which are, in any event, not actionable.

**2. Florida Securities Act.** "The elements of . . . § 517.301 are identical to those under the Federal Rule 10b-5, except that the scienter requirement under Florida law is satisfied by a showing of mere negligence." *Grippo* v. *Perazzo*, 357 F.3d 1218, 1222 (11th Cir. 2004). The Florida Securities Act claim against Barclays Capital (Compl. ¶¶ 132-34) should be dismissed because, as shown above, the Complaint fails to plead (i) that Barclays Capital "made a misstatement," and (ii) "reliance." *Song* v. *Fish*, 2024 WL 2304362, at *4 (M.D. Fla. Jan. 17, 2024).

*3. New Jersey Securities Act.*  The elements of a New Jersey Securities Act claim "are substantially the same as those of Section 10(b) of the Exchange Act:  (1) an untrue material statement or omission; (2) scienter; (3) causation; and (4) injury to a plaintiff."  *DeRobbio* v. *Harvest Communities of Sioux City, Inc.*, 2002 WL 31947203, at \*6 (D.N.J. Oct. 30, 2002).  But the standard for scienter is higher, requiring *both* that the defendant "*knew* of the untruth or omission *and* intended to deceive the buyer."  N.J. Stat. Ann. § 49:3-71(b)(1) (emphasis added).  Accordingly, the New Jersey claim against JPMorgan Securities (Compl. ¶¶ 136-38) fails for the same reasons Plaintiffs' federal 10b-5 claim fails.

## C.    Plaintiffs Fail to Plead Fraudulent Transfer Claims.

Plaintiffs' claims for both actual and constructive fraudulent transfer against the Lender Defendants are facially meritless.

Plaintiffs seek to misapply fraudulent transfer principles to challenge certain "transfers" of "cash" raised by "selling the Notes to the warehouse SPVs" in "exchange for auto loan receivables that were partially fictitious, double-pledged, or otherwise significantly impaired."  (Compl. ¶ 153.)  Plaintiffs' allegations bear no resemblance to anything that could be considered a fraudulent transfer.  Fraudulent transfer laws "prevent *debtors* from prejudicing *creditors* by improperly moving assets beyond their reach."  *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019) (emphasis added).[13]  Here, the only "debtors" with whom Plaintiffs allege

---

[13] Plaintiffs bring their fraudulent transfer claims under Delaware and Texas law (Compl. ¶¶ 149-69), both of which adopt the Uniform Fraudulent Transfer Act, which moots any choice-of-law concerns.  *See* 6 Del. C. § 1311; Tex. Bus. & Com. Law § 24.001.  Regardless, Delaware law governs.  This Court applies the "choice of law rules of the forum state, in this case New York."  *Brooks* v. *Dash*, 2019 WL 5797971, at \*5 (S.D.N.Y. Oct. 2, 2019).  Under New York law, fraudulent transfer claims are "governed by the local law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred."  N.Y. Debtor & Creditor Law § 279.  Here, the TAST trusts (the debtor) are Delaware statutory trusts with a Delaware-based indenture trustee and collateral custodian (*see* Ex. 2 at 16, 54-56), and thus Delaware law applies.

any "creditor" relationship are the TAST trusts.  (Compl. ¶¶ 151, 161.)  But none of those trusts "transferred" any "cash raised by selling the Notes."  (*Id.* ¶ 153.)  Rather, as the Offering Memoranda make clear, the TAST trusts did not receive or transfer any cash; all "transfers" of cash related to the sale of notes issued by the TAST trusts were conducted by separate Tricolor entities as to which Plaintiffs allege no creditor relationship whatsoever.  (Ex. 2 at 14.)  Accordingly, Plaintiffs' claims fail for that fundamental reason alone.  However, even if Plaintiffs could allege contrary to the disclosures in the Offering Memoranda that the TAST trusts made those transfers (and they cannot), Plaintiffs' allegations describe nothing more than a fraudulent *creation* of debt, not a subsequent transfer of assets by a debtor to avoid creditors.  Plaintiffs' allegations are nothing more than attempt to force the square peg of a fraud claim into the round hole of fraudulent transfer.

Indeed, Plaintiffs' claim is incompatible with every aspect of fraudulent transfer law.  The typical remedy for fraudulent transfer is "return [of] the transferred property to the transferor"— *i.e.*, to "give[] the debtor its property back."  *In re Amp'd Mobile, Inc.*, 404 B.R. 118, 125 & n.7 (Bankr. D. Del. 2009).  But Plaintiffs do not have standing to seek that relief, nor do they ask for it.  Instead, they want "[m]oney damages" and/or "[r]escission" of their purchases of TAST notes (Compl. Prayer for Relief), which they did not purchase from the TAST trusts and only reinforces that this is a fraud claim masquerading as a fraudulent transfer claim.

***1.    Actual Fraudulent Transfer.***    The Uniform Fraudulent Transfer Act "protects a 'creditor'" from "actual fraudulent transfers," which are "'transfer[s]' by debtors that are made 'with actual intent to hinder, delay or defraud.'"  *Burkhart* v. *Genworth Fin., Inc.*, 275 A.3d 1259, 1269 (Del. Ch. 2022).  For at least three reasons, Plaintiffs do not state an actual fraudulent transfer claim.

-40-

*First*, Plaintiffs cannot allege any transfer of "property of the debtor" (*i.e.*, the TAST trusts) that put that property beyond the reach of creditors (*i.e.*, Plaintiffs who hold notes issued by the TAST trusts). *See Roseton OL, LLC* v. *Dynegy Holdings Inc.*, 2011 WL 3275965, at \*15 (Del. Ch. July 29, 2011); *In re Green Field Energy Servs., Inc.*, 2018 WL 6191949, at \*37 (Bnkr. D. Del. Nov. 28, 2018) (Plaintiff "must first prove that Debtor held an interest in the property transferred.").

According to the Complaint, the "*Trusts* transferred the cash raised by selling the Notes to the warehouse [lines] in exchange for auto loan receivables." (Compl. ¶ 153 (emphasis added).) But that allegation is directly contradicted by the Offering Memoranda on which the Complaint itself relies. *See Trustpilot, Inc.*, 2021 WL 2667029, at \*3 (when a "document integral to the complaint contradicts that complaint, the document controls"). As the Offering Memoranda explain, no transfer of "cash" was made by any TAST trust (the only "debtor" alleged here). Rather, the transfers involving "cash" raised from the sale of notes, which are the transfers that are the subject of the purported fraudulent transfer claim, were made by entirely separate Tricolor entities as to which Plaintiffs do not allege *any* "creditor" relationship. A simplified version of the flow chart contained in the Offering Memoranda (Ex. 2 at 14) illustrates this. The only transfer involving the TAST trust was to obtain "Receivables" in exchange for the "Notes." The TAST trust never received, had or transferred "cash" at all. Rather, the *Depositor* (Tricolor Auto Receivables 2 LLC) sold the notes to the Initial Purchasers (who in turn sold the notes to noteholders like Plaintiffs) in exchange for cash, and the *Depositor* then subsequently transferred that cash to the *Sponsor and Servicer* (Tricolor Auto Acceptance LLC), an entity now in bankruptcy, which purportedly used that cash to pay down the warehouse lines. (Ex. 2 at 14, 52.)

-41-



As alleged creditors of TAST trusts (Compl. ¶¶ 151, 161), Plaintiffs lack standing to assert fraudulent transfer claims based on *non-debtor* transfers (here, a transfer by the Depositor and then by the Sponsor) of property (cash) that was never property of the debtor (the TAST trusts). *See Crystallex Int'l Corp.* v. *Petroleos De Venezuela, S.A.*, 879 F.3d 79, 86 (3d Cir. 2018) ("[A] non-debtor transferor is not liable under" Delaware's fraudulent transfer statute.); *Roseton*, 2011 WL 3275965, at *15 (Delaware Fraudulent Transfer Act "focuses on 'transfers' of an 'asset,' which is defined to mean the 'property of the debtor'"; where debtor "does not directly own any of the power plants subject to transfer," "Plaintiffs' allegations . . . do not involve the 'transfer' of any 'asset' of [the debtor]"); *In re A.W. Lawrence & Co.*, 346 B.R. 51, 57-58 (N.D.N.Y. 2006) ("neither the check . . . nor cash . . . passed through [debtor's] bank account," thus transfer of those funds "did not diminish the monies available to pay [debtor's] creditors"). Moreover, as made clear by the Offering Memoranda, before any transfer reached any Lender Defendant, it went through multiple transfers involving other entities, including the Sponsor, Tricolor Auto Acceptance, LLC. But as previously indicated, the Sponsor is a Tricolor entity that is now in bankruptcy, *see In re*

*Tricolor Holdings, LLC*, No. 25-33487 (Bankr. N.D. Tex.), ECF No. 1, and thus Plaintiffs' attempt to claw back transfers made by that entity must be brought in the bankruptcy case, not in this one. *See In re Refco Inc. Sec. Litig.*, 2011 WL 13168427, at *2 (S.D.N.Y. July 5, 2011) ("[C]laims of the creditors arising from insolvency of the debtor should proceed through the bankruptcy estate.").

*Second*, even if Plaintiffs could plead a relevant transfer, they fail to plead that the transfer was "fraudulent *as to a creditor*." *In re Wickes Tr.*, 2008 WL 4698477, at *7 (Del. Ch. Oct. 16, 2008) (emphasis added). Plaintiffs' claim is not about any transfer that diminished or stripped the assets available to pay noteholders, but rather fraud in the inducement: that Tricolor defrauded noteholders by transferring into the TAST trusts receivables that were less valuable than described in the Offering Memoranda. (Compl. ¶ 153.) Simply put, "[t]he fraud alleged in the complaint relates to the manner in which [Tricolor] obtained [money] from the [TAST] Noteholders, not [Tricolor's] subsequent" transfer of property out of the TAST trusts to "hinder, delay, or defraud" creditors. *Sharp*, 403 F.3d at 56. Even if Tricolor obtained Plaintiffs' "money through dishonest means" and then transferred that money to someone else, that is simply a "fraud" in the creation of a debt, not a "fraudulent transfer" to hinder a creditor. *Bos. Trading*, 835 F.2d at 1508-10.

*Third*, Plaintiffs' contention that Tricolor used the proceeds from the sale of notes "to repay their warehouse loans" (Compl. ¶¶ 46, 156) is a complaint about the "[r]epayment of an antecedent loan," which is not a "fraudulent conveyance[]." *B.E.L.T., Inc.* v. *Wachovia Corp.*, 403 F.3d 474, 477-78 (7th Cir. 2005). "[T]o find an actual intent to defraud creditors" from a transfer that repays a preexisting creditor "would tend to deflect fraudulent conveyance law from one of its basic functions (to see that an insolvent debtor's limited funds are used to pay *some* worthy creditor), while providing it with a new function (determining *which* creditor is the more worthy)." *Bos. Trading*, 835 F.2d at 1511.

**2. *Constructive Fraudulent Transfer.*** Plaintiffs' constructive fraudulent transfer claim is similarly meritless. Constructively fraudulent transfers are "'transfer[s]' by debtors where the debtor (i) did not receive 'reasonably equivalent value' and (ii) was rendered insolvent." *Burkhart*, 275 A.3d at 1269-70. A debtor is insolvent when, after the transaction, it has "unreasonably small" assets or "debts beyond [its] ability to pay as they became due." 6 Del. C. § 1304(a)(2).

Plaintiffs' constructive fraudulent transfer claim fails for the same three reasons their actual fraudulent transfer claim fails. But the constructive fraud claim also fails for additional reasons.

*First*, Tricolor's use of allegedly fraudulently transferred cash to pay an antecedent debt held by the Lender-Defendants (Compl. ¶ 167) constitutes "reasonably equivalent value" as a matter of law. *See In re CL H Winddown LLC*, 2023 WL 5740195, at *4 (Bankr. D. Del. Sept. 5, 2023) (A "transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value."). Here, Plaintiffs allege that their cash "flowed immediately from the warehouse SPVs to the Lender Defendants to repay their warehouse loans," which constitutes reasonably equivalent value. (Compl. ¶ 46.)

*Second*, Plaintiffs fail to plead that the TAST trusts were "insolvent" or had "unreasonably small capital" to pay their debts when the purportedly fraudulently transfers were made. (Compl. ¶ 165.) The Complaint itself refutes that the TAST trusts were insolvent when created merely because the receivables transferred to the Trusts were less valuable than the Offering Memoranda disclosed: as the Complaint alleges, each TAST trust had been making payments to noteholders— some, for more than three years—before Tricolor declared bankruptcy and some of the "senior-most" noteholders exercised their right to accelerate payment on their notes. (Compl. ¶ 113.) *See In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("[C]ourts will not find that a company had unreasonably low capital if the company survives for an extended period after

-44-

the subject transaction."); *In re Opus E. LLC*, 698 F. App'x 711, 715 (3d Cir. 2017) (same).

Moreover, the very idea that passthrough entities like the TAST trusts can be "insolvent" or had "unreasonably small [assets] in relation to the business or transaction," 6 Del. C. § 1304(a)(2), makes no sense. The TAST trusts do not conduct any business. Their sole obligation is to pass along borrowers' payments of principal and interest on the underlying receivables, without any liability or obligation to make up for any shortfall. (Ex. 2 at 20 ("If Available Collections and any available credit enhancement are insufficient to make required payments of principal on the Notes, losses will be borne in reverse order of payment priority."); *id.* at 93 ("The funds available to the Issuer to make payments on the Notes on each Distribution Date will come from Available Funds, which will be the only funds that will be used to make payments to Noteholders on each Distribution Date.").) In other words, they merely "pass-through . . . the cash flows from the underlying asset pool." SEC Release, *Asset-Backed Securities*, 70 Fed. Reg. 1506, 1511 (Jan. 7, 2005); *see Mortgage & Asset Backed Securities Litig. Handbook* § 1:6 ("[L]oans owned by the trust provide the cash flow to make intended payments on the certificates which are sold to investors."). Because their sole obligation was to pass on payments they received on the underlying receivables, the TAST trusts could not be rendered insolvent as long as they retained possession of those receivables—by definition, such bankruptcy-remote passthrough entities cannot be "insolvent." *See* Anna Gelpern & Adam J. Levitin, *Rewriting Frankenstein Contracts: Workout Prohibitions in Residential Mortgage-Backed Securities*, 82 S. Cal. L. Rev. 1075, 1098 (2009) (Securitization trusts are "immortal automatons: they cannot go bankrupt, and they are immune to management discretion. Once launched, they . . . operate more or less on autopilot until the securities they issue are paid off.").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

-46-

Dated:  April 9, 2026

Respectfully submitted,

/s/ *Robert A. Sacks*
Robert A. Sacks
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000

*Attorneys for JPMorgan Chase Bank, N.A.
and J.P. Morgan Securities LLC*

/s/ *Robert J. McGahan*
Robert J. McGahan
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street, N.W., Suite 1350
Washington, DC 20036
Tel:  (202) 719-8298

Jonathan Ross Harrington
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 5th Avenue N.
Birmingham, Alabama 35203
Tel:  (205) 521-8069

Rebeccah Lynn Bower
BRADLEY ARANT BOULT CUMMINGS LLP
Promenade Tower
1230 Peachtree Street NE, Suite 2100
Atlanta, Georgia 30309
Tel:  (404) 868-2806

/s/ *Jenna M. Dabbs*
Jenna M. Dabbs
Sean Hecker
Marshall L. Miller
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel:  (212) 763-0883

*Attorneys for Fifth Third Bank, N.A.
and Fifth Third Securities, Inc.*

/s/ *Jeffrey T. Scott*
Jeffrey T. Scott
Jonathan M. Sedlak
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000

*Attorneys for Barclays Bank PLC
and Barclays Capital Inc.*