# EXHIBIT 4

# JPMorgan Chase Bank, N.A.

# Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC

# Consulting Report

**February 23, 2024**

**For information related to this report, contact:**

**CBIZ MHM, LLC**
**1001 Conshohocken State Road, Ste 1-406**
**West Conshohocken, PA 19428-2906**

| | |
|---|---|
| **Imran A. Siddiqi** | **M. Michael Aquino** |
| **Director** | **Lead Managing Director** |
| **405-590-5140** | **610-862-2737** |
| **isiddiqi@cbiz.com** | **maquino@cbiz.com** |

*THIS REPORT IS FOR CLIENT'S INTERNAL USE ONLY*
*AND SHOULD NOT BE RELIED UPON BY ANY THIRD PARTY.*



JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

# JPMorgan Chase Bank, N.A.

## Consulting Engagement

Name:        Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC

Address:     6021 Connection Drive, 4th Floor
             Irving, TX 75039

Contact:     Jerry Kollar, Chief Financial Officer

Phone:       972-638-5460

E-mail:      jkollar@tricolor.com

Consultants:     Imran Siddiqi
                 Jennifer McFadden
                 Hayley Rea

Report Date:     February 23, 2024

Lender Contact:      Alan English, Executive Director

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                      Consulting Report

February 23, 2024                                                   Prepared by:   Imran A. Siddiqi

**PRIVATE & CONFIDENTIAL**

Mr. Alan English, Executive Director
JPMorgan Chase Bank, N.A.
10 South Dearborn
Chicago, IL 60670

Dear Mr. English:

Please find our enclosed report (the "Report") which was prepared at the request of JPMorgan Chase Bank, N.A., in its capacity as Lender ("JPM" or "Client") in connection with your conduct of due diligence procedures for the existing extension of credit, be it through a warehouse line of credit, term loan, securitization, or other means (such extensions of credit being referred to as the "Facility" or "Transaction" herein), to Tricolor Holdings ("Parent"), Tricolor Auto Acceptance LLC ("Originator", "Servicer" and "Seller") and Tricolor Funding SPV 4 LLC ("Borrower" or "SPV"), together "Tricolor", the "Customer" or the "Company", in accordance with the terms of the Engagement Letter dated February 2, 2024 ("Engagement", "Arrangement" or "Services").

**Client Acknowledgements**

By acceptance of the Report, you acknowledge that (1) you have determined that the procedures we performed are the procedures that you requested us to perform, that you are solely responsible for the sufficiency of such procedures for your purposes, and that you do not require us to perform any further procedures, (2) we make no representations and express no opinion as to the sufficiency of the procedures for your purposes and had we performed additional procedures, other matters might have come to our attention that would have been reported to you, (3) the procedures that we performed should not be taken to supplant additional inquiries and procedures that you should undertake in your evaluation of the Facility, (4) except in the case of information provided to and verified by CBIZ MHM, LLC ("CBIZ") at the specific request of JPMorgan Chase Bank, N.A., CBIZ shall be entitled to rely on the completeness and accuracy of all information provided to it by JPMorgan Chase Bank, N.A., Company or Company's Advisors, as well as the authenticity of such information or documents provided by same to CBIZ, (5) the decision whether to consummate the Facility lies solely with you, and neither our work nor our findings shall in any way constitute a recommendation whether you should or should not consummate the Facility, or on what terms.

**Limitations of Procedures**

The procedures we performed do not constitute, in accordance with generally accepted auditing or other applicable professional standards, (1) an audit, review, or compilation of the Company's historical financial statements or specified elements, accounts or items thereof, (2) an examination or compilation of the Company's prospective financial information, (3) an appraisal of the Company or of any of the Company's assets or liabilities or (4) an examination of the Company's internal controls, and, accordingly, we express no opinion or other form of assurance thereon and our work cannot be relied upon to disclose errors, fraud or illegal acts that may exist.

We have not verified the information we obtained or presented in the Report, unless specified therein.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

**Use of the Report**

This letter and the Report are solely for JPM use and is not to be used for any other purpose or distributed to individuals outside of JPM, and their respective attorney's and advisors, without written consent of CBIZ, which will be in a form of a release letter.  Notwithstanding the foregoing, you may provide copies of the Report in accordance with the terms and conditions set forth in the Master Engagement Letter dated May 27, 2014 and Engagement Confirmation Letter dated February 2, 2024, to your legal representatives or other professional advisors solely for their informational use in connection with the Facility provided that (1) this letter shall be attached at the front of the Report at the time of disclosure, and (2) any such legal representative or other professional advisor has agreed to keep the Report confidential and fully releases CBIZ from any liability arising out of, or in reliance upon, this Report.

**Updating the Report**

We have no responsibility to update this letter or the Report for events or circumstances occurring after the date of this letter.

Very truly yours,

CBIZ MHM, LLC

By:    _M. Michael Aquino_
       M. Michael Aquino, Lead Managing Director

CBIZ MHM, LLC

*THIS REPORT IS FOR CLIENT'S INTERNAL USE ONLY AND SHOULD NOT BE RELIED UPON BY ANY THIRD PARTY.*

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

**Legal Notice**

This report is provided solely to JPMorgan Chase, N.A. and current loan participants for its internal use and information, pursuant to our Master Engagement Letter dated May 27, 2014, and Engagement Confirmation Letter dated February 2, 2024 with no third-party beneficiaries being created thereby, and is subject in all respects to the terms and conditions of that letter, including restrictions on disclosure of this report to third parties.

If this report is received by anyone other than JPMorgan Chase, N.A. and its current loan participants, the recipient is placed on notice that the attached report has been prepared solely for JPMorgan Chase, N.A. and its current loan participants for their internal use and this report and its contents may not be shared with or disclosed to anyone without the express written consent of JPMorgan Chase, N.A. and CBIZ MHM, LLC.  CBIZ MHM, LLC shall have no liability, and shall pursue all available legal and equitable remedies against recipient, for the unauthorized use or distribution of this report to third parties.

**Legal Representation**

Client acknowledges and agrees that it is responsible for its own legal representation and guidance related to the Facility and that it will consult its own legal resources before acting upon any deliverables CBIZ provides under this Agreement.  Client further acknowledges and agrees CBIZ is not a law firm and is not providing legal advice or analysis and that CBIZ has not engaged legal counsel with respect to the services, and that matters of legal interpretation are beyond the scope of the Services.  CBIZ expressly disclaims any and all responsibility for the accuracy, adequacy, completeness or appropriateness of any legal document, relating to the Facility or otherwise, reviewed during the performance of Services as outlined herein.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

## General Information

During this engagement, the consultants held discussions with the following employees at Tricolor Auto Acceptance, LLC:

| Contact Name | Title |
|---|---|
| Jerry Kollar | Chief Financial Officer |
| Ameryn Seibold | Director of Internal Consultancy |
| Alexander Velasquez | VP of Credit Operations |
| Andrew Mata | VP of Loan Servicing |
| Matthew Lewis | VP Accounting and Controller |

**Note:**  All samples were judgmentally selected.  Slight mathematical variances may be noted in the tables presented due to rounding.

## Terminology

The following terminology is used throughout this Report and is based on discussions with management.

- APR                    Annual Percentage Rate
- CDE                    Credit Decision Engine
- CDFI                   Community Development Financial Institution
- CPI                    Creditor Placed Insurance
- CRA                    Credit Rating Agency
- ERM                    Enterprise Risk Management
- EY                     Ernst & Young
- FDCPA                  Fair Debt Collection Practices Act
- FPD                    First Payment Default
- GAP                    Guaranteed Auto Protection
- IDMS                   Tricolor Auto Acceptance, LLC's current Servicing System
- LOS                    Loan Operating System
- M                      U.S. Dollars in 000's
- MM                     U.S. Dollars in 000,000's
- OCCC                   Texas Office of Consumer Credit Commissioner
- OCIS                   Office of Cyber Security and Information Security
- QA                     Quality Assurance
- TILA                   Truth-In-Lending Act
- VIN                    Vehicle Identification Number
- VIR                    Vehicle Inspection Report

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

**TABLE OF CONTENTS**

**EXECUTIVE SUMMARY** ............................................................................................................**9**

**SCOPE PROCEDURES** .........................................................................................................**16**

**SCOPE MODIFICATIONS**.....................................................................................................**32**

**A.  MANAGEMENT DISCUSSION** ......................................................................................**33**

**B.  UNDERWRITING/CREDIT APPROVAL (INCLUDING LOAN FILE TEST)**....................**34**

**C.  SERVICING/COLLECTIONS** .........................................................................................**36**

**D.  BOARDING OF ACCOUNTS/BILLING**..........................................................................**42**

**E.  ACCOUNTS RECEIVABLE ROLL-FORWARD**..............................................................**43**

**F.  INTERNAL /EXTERNAL/REGULATORY AUDITS** ........................................................**44**

**G.  LOAN LOSS RESERVE AND STATIC POOL DATA** ....................................................**48**

**H.  CASH MANAGEMENT** ..................................................................................................**49**

**I.  REPOSSESSIONS** ........................................................................................................**53**

**J.  INSURANCE AND TITLE TRACKING**...........................................................................**54**

**K.  ACCOUNTING POLICIES AND PROCEDURES**...........................................................**54**

**L.  MONTHLY SERVICER REPORT** ..................................................................................**55**

**M.  REVIEW OF THE COMPUTER SYSTEMS & CONTROLS** ..........................................**67**

**N.  OTHER** ..........................................................................................................................**68**

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

**EXHIBITS**

A.1   -   Tricolor Holdings Corporate and Executive Organizational Chart

B.1   -   Credit File Review

B.2   -   Eligibility Review

C.1   -   Aging Test

C.2   -   Aging Shift Test

C.3   -   Modification Test

C.4   -   Bankruptcy Test

C.5   -   Fees and Finance Charges Test

C.6   -   Charge-off Test

C.7   -   Wreck Test

C.8   -   First Payment Default Test

C.9   -   Paid-Ahead Test

C.10  -   Last Payment Test

C.11  -   Expired Account Test

E.1   -   Receivables Roll-Forward

F.1   -   2022 Management Letter

F.2   -   Management Remediation Plan – November Status

H.1   -   Cash Application Test

I.1   -   Repossession Test

M.1   -   SPV6 Servicer Report-2024-January

PF.1  -   Permanent File

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                     Consulting Report

**EXECUTIVE SUMMARY**

**<u>Overview</u>**

*The following provides highlights resulting from the procedures performed.  Please note that not all findings are highlighted below, and the reader is directed to the entirety of the Report for discussion of all procedures performed and findings noted.*

**<u>OPEN ITEMS</u>**

None noted.

**<u>FINDINGS AND SUGGESTIONS</u>**

<u>Finding #1</u>:

Per the GLD's and Company policy, it is required that the Company obtain proof of insurance from the borrower prior to origination and throughout the term of the loan.  For 51 of 55 accounts reviewed in the credit file sample, the Company initially provided an agreement that the borrower signed that notes that the borrower will maintain insurance; however, they did not provide proof of said insurance.

<u>Management's Response #1</u>

The Company uses Berkshire Risk Services ("Berkshire") to manage and administer the Collateral Protection Insurance Program ("CPI").  CPI is a requirement under the retail installment contract if the consumer does not carry sufficient third-party insurance.  Berkshire monitors all Tricolor's contracts to ensure the customer has insurance.  If the customer does not or causes valid third-party insurance to lapse, Berkshire provides notice to the customer and the CPI is contractually enforced, thus ensuring the contract collateral is insured.  This report is available upon request.

<u>Suggestion #1</u>

It is suggested that the Company maintain and provide documentation from Berkshire showing borrower is insured under the CPI.

<u>Finding #2</u>

Two-day Cash Test:  The consultants requested, and were provided by the Company, details of the cash collection general ledger activity for the dates of January 12, 2024, and January 24, 2024.  Information provided by management indicated some collections related to SPV4 were deposited to an account other than the Wells Fargo Master Collection Account ending in x7276 and some deposits to the Wells Fargo Master Collection Account ending in x7276 are not related to SPV4.  Per management, the Company consolidated the SPV5 warehouse line into the JPM warehouse in November 2023 and repurchased receivables from SPV3, which are now part of SPV4.  Management stated the process of directing customer payments to the correct account is manual and there are errors, which the Company is currently working to correct.

Approximately $376M, 49% of payments received on January 12, 2024 per the G/L and $163M, or 32% of payments received on January 24, 2024 per the G/L, were deposited to an account other than the Wells Fargo Master Collection Account ending in x7276.  The January 2024 Method of Receipt reconciliation

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                                    Consulting Report

shows that, as indicated in management's response below, there were sufficient funds deposited to the Wells Fargo ("WF") Collections and the Wilmington Trust ("WT") Collections accounts to cover obligor collection during the month of January 2024.

Management Response #2

According to management, the Company ensures the correct deposits are in the Wilmington Trust ("WT") Collections and the Wells Fargo ("WF") Collections account by monitoring collections daily with deposits typically received on a three- four-day lag.  This was evident by the deposits in the WT Collections and WF account deposits are within a small tolerance of the MSR amounts accounting for monthly deposit lags for payments (three-five business days) as well as timing of recovery/liquidation proceeds (typically 10-14 days).

The following management table shows a nine-month trend in deposits into the WF and WT collections account with a variance to the MSR required amounts.  As one can see there are monthly fluctuations that are primarily driven by the liquidation/ recovery amounts.  Overall, for the nine-month period, the WF account had 6.4% more deposits than required, while the WT collections account had 2% more deposits than required.  The WF deposits include some sales tax and from time-to-time CPI payments, which are the property of Tricolor.

Tricolor MSR to WF and WT Collections Account Analysis

| | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 | 9 month totals |
|---|---|---|---|---|---|---|---|---|---|---|
| MSR P &I | $ 7,887,004 | $ 10,524,244 | $ 15,438,663 | $ 14,806,763 | $ 6,223,281 | $ 7,687,823 | $ 8,299,198 | $ 5,097,044 | $ 3,009,306 | |
| Liquidation and Recoveries | 1,743,139 | 1,756,466 | 630,280 | 1,355,780 | 2,936,664 | 10,209,642 | 5,800,301 | 5,646,309 | 8,128,635 | |
| Total Available Funds | $ 9,630,143 | $ 12,280,709 | $ 16,068,943 | $ 16,162,543 | $ 9,150,945 | $ 17,897,465 | $ 14,099,498 | $ 10,743,354 | $ 11,137,941 | $ 117,180,541 |
| JPM WF *7634 Collections Account | 10,491,977 | 14,036,605 | 14,814,443 | 16,209,086 | 15,006,952 | 9,032,182 | 18,469,531 | 15,111,827 | 11,557,299 | $ 124,729,903 |
| JPM WF to MSR Variance | 861,834 | 1,755,895 | (1,254,500) | 46,543 | 5,847,007 | (8,865,283) | 4,370,033 | 4,368,474 | 419,359 | 7,549,362 |
| % variance | 8.9% | 14.3% | -7.8% | 0.3% | 63.8% | -49.5% | 31.0% | 40.7% | 3.8% | 6.4% |
| JPM WT *271-000 Collections Account | 8,423,681 | 11,639,188 | 15,051,130 | 16,569,601 | 15,051,130 | 8,810,929 | 18,165,401 | 14,262,877 | 11,557,196 | $ 119,531,133 |
| JPM WT to MSR Variance | (1,206,462) | (641,522) | (1,017,813) | 407,058 | 5,891,185 | (9,086,536) | 4,065,903 | 3,519,524 | 419,255 | 2,350,592 |
| % variance | -12.5% | -5.2% | -6.3% | 2.5% | 64.3% | -50.8% | 28.8% | 32.8% | 3.8% | 2.0% |

In addition to monitoring daily, Tricolor periodically reviews the deposits for accounts and corrects with the payment processor.

Suggestion #2

According to Section 2.09(a) of the GLD, "the Servicer shall direct and instruct all related Obligors to make all payments in respect of the related Receivables to the Master Collection Account."  The consultants suggest the Company correct the system errors and ensure that all collections related to SPV4 are deposited to the Wells Fargo Master Collection Account ending in x7276, as this is the account defined in the Master Collection Account Agreement with a Deposit Account Control Agreement in place.

Finding #3

Charge-Off Test Results:  During the charge-off testing the consultants noted that two  of the 13 accounts to have recovery amounts per the data tape (one of which was discussed in the initial executive summary provided to Client and another that was found once the missing sample documentation was received) were not recovered by the Company.  The journal entries for these two charge-offs noted a credit for a recovery and a debit for "Inventory Acquisition Clearing", or sale to the retail division.  However, according to the collection notes, these vehicles were never recovered.  Per the data tape, gross charge-off for these two accounts totaled $75M, with recovery values of $47M, and a net charge-off of $28M.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Management Response #3

According to management, Tricolor's policy is to charge off an account once it is greater than 120 days at the end of a month.  In certain cases, the Company has not recovered the vehicle, but assigns a value based upon the VIN, make model year and estimated mileage using the Black Book valuation tool.  In this case, SPV 4 benefited from the full recovery, while Tricolor's skip tracing department worked on the physical recovery of the vehicle.  If Tricolor cannot recover the vehicle, Tricolor bears the wholesale loss, while SPV 4 benefited from the transaction.

Suggestion #3

The consultants suggest the Company only report recoveries on vehicles that have been physically recovered.  Although SPV 4 received funds for vehicles that were not recovered, the Net Loss-to-Liquidation Ratio calculation would be artificially low based on recoveries that were not actually received.  The Net Loss-to-Liquidation Ratio is used in the determining a Step-Up Credit Enhancement Trigger Event and a Termination Event.  Additionally, recording recoveries when none were received would skew any analysis performed to determine expected recoveries should it become necessary for Client to collect on the portfolio.  This situation is further exacerbated by the fact much of the repossession testing was waived and the consultants were unable to test the amount of actual recoveries (cash received) for repossessed vehicles (whether at auction or resold by Tricolor) as compared to the Manheim Market Report ("MMR") value used to reduce the gross charge-off.

Finding #4

Aging Test Results:  The consultants utilized the sample of 25 accounts judgmentally selected for credit file testing to perform an aging test.  The consultants reviewed the payment histories and collection notes for each account and determined that four accounts had exceptions.

During the consultants' review of the collection notes it appears that three accounts were repossessed as of January 31, 2024 but were not marked as such on the January 31, 2024 data tape.  These three accounts totaling $71M should have been considered ineligible due to being repossessed, but were not as of January 31, 2024.

Two accounts (one account is also part of the repossession exceptions) were determined to be 52 DPD, although both were marked as 32 DPD on the January 31, 2024 data tape.  The aging bucket of 31-60 DPD was correct for both accounts.

Management Response #4

These four accounts with exceptions were the four missing aging test files that were uploaded by the Company five months after the consultants were on site and less than one week prior to Client's need for a draft report.  Because of these time constraints the consultants did not have time to get management's comments on reasons for either the aging discrepancies or the reason three accounts were not marked as repossessed, and therefore ineligible, on the data tape.

Suggestion #4

The consultants suggest Client follow up with management to discuss the reason for these discrepancies and discuss the ultimate accuracy of the data tapes provided by the Company.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Finding #5

Aging Shift Test:    Of the 25 aging shift test samples tested, five accounts (20.0%) did not shift correctly from December 31, 2023 to January 31, 2024.  Two of these were marked as 31-60 DPD on the January 31, 2024 data tape and considered eligible but should have been 61-90 DPD and ineligible.

After receiving management's response, the consultants re-reviewed the accounts in question.  There was no mention in the collection notes of the vehicle having mechanical issues, being in the shop, or being redeemed by the obligor for two accounts.  Per the consultants' review, as of January 31, 2024 one account with a principal balance of $41M should have been in the 31-60 DPD aging bucket and the other account with a principal balance of $24M should have been in the 61-90 DPD bucket and considered ineligible.  Due to time constraints, the consultants did not reach out to management for further comments.

Management Response #5

Management stated the above exceptions were in for service for more than 30 days whereby loan servicing department pauses the aging and collaborates with the obligor to expedite the service completion.  At least one account was redeemed and became current once the car was released to the customer.  The consultants noted mentions of mechanical issues and/or the vehicle being redeemed from repossession for three of the five accounts.

Suggestion #5

Because of previously discussed time constraints the consultants did not have time to get further comments from management after the consultant re-reviewed the collection notes.  The consultants suggest Client follow up with management to discuss the reason for these discrepancies and discuss the ultimate accuracy of the data tapes provided by the Company.

Finding #6

The Company provided the management letter related to the 2022 audit.  The following is a summary of internal control weaknesses related to collateral, servicing, collections, etc.  The entire 2022 Management Letter, including auditor recommendations, is included as Exhibit F.1.  Management provided the Tricolor Audit Committee of the Board of Directors' November 2023 meeting minutes, which outlines management's remediation plan and status of such plan, which is included as Exhibit F.2.

***Material Weaknesses:***

*IT General Control Issues over IDMS*

- No formal user provisioning control or periodic system access review control in place.
- Lack of segregation of duties, as the system administrator is part of accounting team.
- Lack of segregation of duties, as system administrator is part of payroll department.

*Accounting and Financial Reporting*

- No controls to ensure reconciling items are addressed in a timely manner.
- Insufficient controls surrounding inventory, specifically the following:
    *"There were a number of errors identified within inventory such as lack of controls to identify needed reclassifications from inventory to charge offs, inventory recorded to the general ledger that the*

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

---

*Company did not have possession of, and lack of review of repossession related accounts to ensure proper accounting and valuation of repossessions in process."*

<u>Fair Value of Receivables Estimate</u>

- Insufficient review over the fair value model, including review of inputs and tie out to the financial statements.
- No formal process in place to review the estimation and evaluate the qualitative and quantitative inputs to determine whether significant assumptions in the model remain relevant in estimating fair value.
- No documentation maintained over model access, change management process, or change log.

<u>Related Party Transactions</u>

- No formalized control to identify and disclose related party transactions, or the completeness of the related party listing.
- The related party receivable account is not properly monitored and there is not a precise review procedure in place to ensure executive activity on the corporate American Express is for proper business purposes.

<u>Account Setup of Finance Receivables (Significant Deficiency)</u>

- Insufficient manual controls surrounding the IDMS application to ensure all new finance receivables receive a post-close review for accuracy.

Material weaknesses were also noted in the areas of Control Environment and Deficiency Remediation Implementation and Monitoring.

<u>Management Response #6</u>

The following are management's direct responses to the above finding:

*<u>IT General Control Issues over IDMS</u>*

- Tricolor's IT Department is responsible as administrators for IDMS and a majority of the systems Tricolor operates.  The Company's IT department has address and monitors' access.  The limitation is in IDMS, that a user is provisioned having access to all functions, and then needs to have the functions removed.
- Lack of segregation of duties, as system administrator is part of the accounting team and payroll – Tricolor's accounting team as administrative duties in the Oracle accounting system and payroll in the ADP system, only IT has administrative capabilities in the dealer management/loan operating system.

*<u>Accounting and Financial Reporting</u>*

- <u>Inventory Controls</u>

    o Lack of controls to identify needed reclassification from inventory to charge-offs – the company reclasses loans out for repossession to inventory on the balance sheet every

13

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

period since 2021.  This is not a material weakness but a process for ensuring GAAP accounting
- o  Inventory recorded to the general ledger that the company did not have possession of and lack of review…: the company has since 2022 recorded charged-off but not recovered vehicles to inventory BUT with an identified lot code of RIP (repo in transit) so that the skip tracing department can track and follow-up on physical recovery of these units. The company also has an established reserve on the units based upon historical data for those that would not be recovered.

- Fair Value of Receivables Estimate

  - o  This comment came from Crowe because they disagreed with the Company's discount. The Company has model validation analysis performed by third parties that validated the model.  The estimates and inputs are all documented based upon measurable level I inputs (Treasury yields, ABS market Spreads) as well as company level III inputs derived from historical data.  The model can only be accessed by a small group of individuals that have access to the controlled shared drive and have the password. Change log and change management was an area for improvement and is being addressed with our outside model validation firm.

- Related Party Transactions

  - o  This comment related primarily to the company issued credit card by Tricolor's CEO and the lack of an executive expense policy.  The CEO from time-to-time may incur a personal charge on the card.  The CEO codes it to an employee receivable account, accounting records the transaction to the account, monitors the account and the CEO periodically reimburses Tricolor.  Tricolor's Audit Committed, reviewed all the expenses for 2023, has an executive expense policy and reviews 2024 expenses.

- Account Setup of Finance Receivables (Significant Deficiency)

  - o  The Post Close department under the Underwriting area, reviews all contracts and does not "fund" until any errors are corrected.

Suggestion #6

The consultants suggest Client follow up with Company to ensure the appropriate steps are taken to remediate these deficiencies.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

## OTHER OBSERVATIONS

Other Observation #1

The consultants experienced significant delays in attempting to complete the Scope of Service.  The Company continues to be very slow during the process of the examination.  This includes providing all the files from the request list, sample support, and other general questions.  The consultants discussed this issue with the Client.

Other Observation #2

The consultants performed testing on accounts past maturity date.  Per management, all 10 accounts selected were transferred from the previous loan management system and once the account goes past maturity the system stops aging the account.  The Company is working to correct these accounts in the system by year end, but noted these are low balance loans and the Company is still collecting some payments and the Loan Servicing Team is confident they will be able to collect the remaining balances.  The GLD definition for eligible receivable criteria does not speak to any eligible criteria related to a receivable's maturity date.  The total current principal balance of all 90 accounts past their current maturity date is $100M and, due to the immaterial amount, no suggestions are being made at this time.

Other Observation #3

The sole product offered for sale by the Company is the direct financing of automobiles.  All warranties are offered at no cost to the borrower.  As incentive for borrowers to complete their payments on-time, Tricolor offers to purchase automobile-adjacent items and various gift cards or checks for customers.

Other Observation #4

Per management and the consultants review of the formulas, the Company backs into the Collections Allocable to Principal amount based on knowing the Beginning Principal Balance, New Contracts Pledged, Securitization Release, Write-Offs and Ending Principal Balance amounts.  While the consultants verified the calculation, it is suggested that management generate a report that captures all Collections Allocable to Principal rather than back into the amount.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

**SCOPE PROCEDURES**

**A.  Management Discussion:**

1.  Obtain an overview of the organizational structure involved in the typical originating, underwriting, processing and servicing of the loans to be included in the transaction, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.
2.  Obtain description of different loans being financed, including product features and add-ons products **(GAP, Warranty, GPS Tracking, etc.)**, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.

**B.  Underwriting/Credit Approval (including loan file test)**

1.  Obtain and review the Company's Credit Policies and Procedures of the Company and determine that management has formally adopted them.  Include a copy as an exhibit to the report.  Inquire of management as to the date they were last updated.  If the Company does not have a written credit policy, describe the process management completes to extend credit.  Include in this discussion any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024 and any anticipated changes going forward.

    a.  Review (or discuss) and summarize the Company's credit approval process.  Since the previous examination period ended as of September 30, 2022 through January 31, 2024, obtain from the Company the percent of loans approved from applications received and percent of loans funded on those approved.
    b.  Discuss, observe, and summarize the Company's security procedures regarding original loan documentation, such as promissory notes, application for credit, vehicle titles, and insurance coverage. Inquire about any back-up copies for this documentation that may be maintained by the Company.
    c.  Describe and document the Company's use of other complimentary products **(i.e., warranty, GAP, Car Club, etc.)** including terms/pricing and accounting treatment of income/expenses. Based on conversations with management, calculate or estimate the % of customers that utilize such products.
    d.  **Note the journal entry when a loan is originated.**

2.  With reference to the Company's underwriting and credit approval policy ensure that new loans were approved in accordance with descriptions of the key controls in place to mitigate underwriting risks – examples are the following areas:

    a.  Methodology for assigning credit tier.
    b.  Assigning credit tiers in accordance with Company policy.
    c.  How the Company verifies title and perfection are properly documented and retained?
    d.  All documents required by the credit and collection policy are in the loan files.  Document any quality control reviews or checklists in use in this area by the Company.
    e.  Incomplete obligor information (underlying borrower information, breach of credit score levels, income verification etc.).

3.  Through inquiry and observation, document the Company's procedures for underwriting credit, noting any changes since the previous examination period ended as of <u>September 30, 2022 through January 31, 2024</u>.  This should cover the following:

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                Consulting Report

---

a. Are loans written in accordance with established policies?
b. Is a credit review performed on new customers prior to entering into a loan **(including obtaining and reviewing credit reports, and evaluating the financial condition of cosigners or guarantors)**?
c. How are loan documents properly executed by borrowers?
d. How the terms of each loan match the program parameters, including pricing, etc.?
e. Are loans properly approved by appropriate levels of management?
f. Has the Company established dollar limits and credit standards for customers, products and/or credit underwriter?
g. Are discrete functions adequately segregated by personnel, e.g., personnel responsible for collecting on loans and performing customer service functions are not involved in the underwriting and approval of the loans they collect, in the application of customer payments on the loans they collect and do not have the ability to change the ongoing records relating to the status of the loan?
h. Are documents supporting new loans inspected for proper form, completeness and accuracy by someone independent of the origination and underwriting functions?
i. Is information submitted by the obligor as part of application and utilized in underwriting decisions verified for completeness and accuracy by someone independent of the origination and underwriting functions?
j. Note that post-origination quality control, including post-mortem reviews of defaulted agreements, is a discrete function performed by personnel adequately segregated from other Company operations.  Note that each quality control review is documented and that the results of such activities are communicated to and monitored by senior management.
k. Note that any post-origination actions, such as payment deferrals, re-ages or other modifications of contract terms are made by authorized individuals, in accordance with Company policies.  Note that information on deviations, if any, is made available to senior management on a regular and formalized basis.  **(See Testing in Section C – Servicing/Collections)**
l. Review any quality control or operational audits performed since the previous examination period ended as of June 30, 2021 through September 30, 2022 by parent companies or other third parties for any material deviations **(see Section F – Internal/External/Regulatory Audits for further testing).**

4. Describe how the Company documents credit underwriting exceptions and how the Company tracks such exceptions, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Obtain the most recent management reports tracking such exceptions and include such as an exhibit to the report.

    a. Are exceptions to underwriting standards and policy deviations properly approved by appropriate levels of management and if documentation related to such exceptions conform to Company policy?  Are underwriting exceptions and policy deviations made known to and periodically reviewed by senior management?  Also, note how the Company manages such exceptions.

5. Judgmentally select 55 loans **(30 loans from Tricolor Dealership, 15 loans from Ganas Dealership, five (5) loans from Ganas Ya! Dealership and five (5) loans from Indirect Franchise dealers)** as of January 31, 2024 month-end **(coordinate sample selection with Section C.5.b)**.  Document the information sighted in the Credit File and note if the loan was approved in compliance with the Company's policies and procedures.  Also, note that the asset details included in the Data Tape / Aging Trial Balance agree to the Credit File and system.  Briefly

document the results of these procedures.  Note that the actual loan proceeds were paid to the obligor or dealer.  ***Note that the names of borrowers and co-borrowers should remain anonymous in documenting test results.***

a.  Obtain the original physical contract/loan documentation files and review for the items noted below **(as well as any additional items on the tape that could reasonably be agreed to source documentation in the Credit File)**.  For items marked below as "confirm" note whether the item is noted as part of the underlying documentation.  For items marked as "compare" agree the item on the data tape to the underlying system of record and information included within the file (when applicable).  Document your testing results in a worksheet.  **(Data Tape to Credit File to System Testing)**

  i.    Confirm and Compare borrower's name (Y/N)
  ii.   Confirm and Compare the borrower's citizen status (Y/N)
  iii.  Confirm and Compare borrower's address (Y/N)
  iv.   Confirm and Compare borrower's account number (Y/N)
  v.    Confirm original signed paper (or electronic) retail installment contract
  vi.   Confirm ACH pre-authorization forms, if applicable
  vii.  Confirm vehicle title (existence of, note endorsement/lienholder data on title or application for title)
  viii. Confirm UCC Statement or security documents, if applicable
  ix.   Confirm evidence of credit approval
  x.    Confirm evidence of Loan Disclosure, if any
  xi.   Confirm items being financed: add-ons, insurance, warranty, service contract, etc.
  xii.  If applicable, confirm employment verification
  xiii. If applicable, confirm residence verification
  xiv.  Confirm evidence of insurance at origination **(certificate of insurance, insurance binder, application form signed by customer, or signed letter of representation)**
  xv.   Confirm and Compare date of contract, first payment date, and maturity date
  xvi.  Compare remaining contract term **(recalculate and compare to data tape)**
  xvii. Confirm and Compare original contract financed amount
  xviii. Confirm and Compare original contract term
  xix.  Confirm and Compare contract interest rate (APR)
  xx.   Compare vehicle cost
  xxi.  Compare remaining (current) balance
  xxii. Compare last payment
  xxiii. Compare next due date (verify next due date is correct)
  xxiv. Confirm and Compare monthly payment amount and note frequency of payment
  xxv.  Compare state of origination of contract
  xxvi. Compare make, model and year of vehicle
  xxvii. Confirm **(to title or title registration)** and Compare VIN
  xxviii. Compare FICO score(s) and/or internal credit score
  xxix. Compare Days Past Due and Past Due Amounts (if applicable)
  xxx.  Compare Dealer Number and State
  xxxi. Compare Loan-to-Value **(re-perform the calculation, noting what value is used for the "V" (i.e., Kelly Bluebook Average Condition, Manheim, etc.))**
  xxxii. Compare Payment-to-Income at origination **(re-perform the calculation)**
  xxxiii. Compare Debt-to-Income at origination **(re-perform the calculation)**
  xxxiv. **Note that the above sample loans meet the eligibility criteria in the GLD**
  xxxv. Is there any evidence that the receivables have been pledged to a third-party?

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

___

xxxvi.  Are the receivables originated by any corporate entity other than the specified originator?

xxxvii.  What credit information is there on the obligor?  **(Credit Report, FICO, credit references, etc.)**  Is the information maintained in the file consistent with the underwriting requirements contained in the credit policies and procedures?

6.  Document testing results in a worksheet.  Any exceptions to the Company's credit policies and procedures should be noted and discussed.

7.  If applicable, obtain the latest Custodian Collateral Report and note if there are any exceptions on the report and the reasons for the exceptions.  If applicable, discuss the movement of title and contracts to the Custodian and briefly describe the custody arrangement.  Comment on how the titles will be held safely and securely and where original files will be housed.  Determine if there will be exception reporting related to missing documentation, contracts, titles maintained at the Custodian.

8.  Judgmentally select 15 contracts out of the 55-contract sample noted above and perform the following:

    a.  For those loans where the vehicle has been sourced from a repossession, verify that the vehicle has not been marketed and sold by a Tricolor (or affiliated) dealer more than twice in total.

9.  Inquire with management regarding the controls in place at the Company over the loans to ensure that loans will only be sold once and there is no double pledging of loans, noting any since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Explain how the Company will utilize flags or markers within their system of record to indicate ownership of receivables and avoid the double pledging of collateral.  Judgmentally select a sample of 10 loans **(subset of Sample selected in B.5)** and note any instances of double pledging.  Contact Lead Managing Director for any instances of double pledging noted.

10.  **For the months of September 30, 2022 through January 31, 2024, prepare a schedule by month, noting accounts with duplicate VINs.**  For all of the accounts noted as with duplicate VINs as of each month-end, obtain the payment history and last payment received, delinquency aging bucket status as of each month-end **(September 30, 2022 through January 31, 2024)** and next due date as of each month-end **(September 30, 2022 through January 31, 2024)**.  **Note management's reason why accounts in repossession would make a payment.  Also, note the payment came from the Obligor.  Notify the Lead Managing Director of the Credit Risk Group to discuss the findings in order to communicate such to the Client.**

11.  Per observation and inquiry, determine if the quality of the Credit Department is adequate to handle the credit function for the legal entity.

12.  Request from the Company a summary of the controls they use to ensure each loan is accurately and completely recorded, together with the vehicle security details, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.

13.  Per management discussions, note if the Company ever purchases loans at a discount.  If yes, document how the Company determines the discount, how they record such at the time of purchase and how they account for such on an on-going basis.  **Note: See detail testing under Section B.5.  Note:  See further testing under Section G – Loan Loss Reserve and Static Pool Data.**

## C.  Servicing/Collections

1.  Obtain and review the Company's Collection Policies and Procedures of the Company and determine that management has formally adopted them.  Include a copy as an exhibit to the report.  Inquire of management as to the date they were last updated.  If the Company does not have a written collection policy, describe the process management completes to collect loan receivables.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Include in this discussion any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024 and any anticipated changes going forward.

2. Through inquiry and observation, document the Company's procedures for collections, noting any changes since the previous examination September 30, 2022 through January 31, 2024.  This should cover the following:

   a. Are any post-purchase actions with respect to loans, such as payment deferrals, extensions or other modifications of contract terms, made by authorized individuals, in accordance with Company policies and information is on deviations (if any) made available to senior management on a regular and formalized basis?  **See testing in Section C.5.d below.**

   b. Are discrete functions adequately segregated by personnel, e.g., personnel responsible for collecting on loans and performing customer service functions are not involved in the underwriting and approval of the loans they collect, in the application of customer payments on the loans they collect and do not have the ability to change the ongoing records relating to the status of the loan?

   c. Does collection staff make customer contact at appropriate times, document contact at the required level of detail and specificity, issue written notices to customers at the appropriate times and provide the appropriate level of information to personnel responsible for directing repossessions and liquidations?

   d. Are loans reviewed on a timely basis for collectability, and charge-offs recorded in accordance with Company policy?

   e. Are aging schedules accurately and periodically prepared and used to assess collectability of Loan cash flow streams?

   f. Is control maintained over delinquent or charged-off receivables?

   g. Do reasonable and consistent collection efforts continue after the date of charge-off or delinquency?

   h. Are decisions to repossess or not to repossess made by authorized personnel, at the appropriate level of delinquency in accordance with Company policy?  Is the method of liquidation of repossessions **(i.e., auction vs. other method, particular auction site, etc.)** in accordance with Company policy?  Is the outcome of the repossession process, including deviations from policy (if any), made available to senior management on a regular and formalized basis?  **Refer to the Section I - Repossession for detail testing.**

   i. Are receivables re-aged **(i.e., when there is a partial payment)**?

3. Determine that Management receives and reviews information relative to the accounts that are past due 90 days or more.  Comment on the actions that are taken by Management regarding the accounts that are past due more than 90 days.

4. Determine and include in your report the exact definition of the receivable aging policy utilized, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024 (**i.e., original contract, present contract, recency of payment or contractual payment)**, include the following:

   a. Are loans aged by due date (contractual)?  **Make sure that the aging of accounts adheres to the Governing Legal Documents ("GLD") and ensure the Company's aging policy and procedure agrees to the GLD.  If the accounts are aged on a recency basis, notify the Lead Managing Director in the Credit Risk Services Group immediately so we can discuss such with the Company and then, notify the Client.**

   b. Does the delinquent balance represent the total receivable balance or the past due installment?

   c. How does the Company account for any unapplied amounts, and/or partial payments?

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

d. What are the criteria to bring a delinquent account current **(i.e., full payment, partial payment, a set number of monthly payments, or just the promise to pay)**?

5. Describe and document the following as it relates to the Company's collection policies and procedures **(through inquiry and observation, except where testing is noted)**:

    a. Obtain the monthly delinquency statistics for the Company since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Obtain the delinquency statistics for the total portfolio. Compare the statistics to recent periods.  Obtain an explanation for any fluctuations greater than 15% between months.

    b. Test a judgmental sample of 25 accounts **(from various aging categories)** as of January 31, 2024 and determine that they are properly aged in accordance with the contract terms and aging methodology **(include in the selection the five (5) largest 60+ day past due loans) (subset of Sample selected in B.5)**.  Review collection notes on the system to determine that the Company collection policies and procedures have been properly followed.  Document the amount of loan payment to move an account for aging purposes **(i.e., 90% or 100% of loan payment)**.  **Note if the loan accounts are contractually aged**.

        i.  Perform the aging test by examining account payment histories.
        ii. Note any accounts that may be aged in a non-conforming manner.  Prepare a listing of the accounts analyzed with an indication of the aging accuracy and reason for the delinquency.
        iii. Regarding delinquent (60+ days past due) accounts, determine if the Company is handling the accounts in a manner consistent with its Policy.

    c. Prepare an "Aging Shift Analysis" between the months of December 2023 and January 2024 and document if the accounts are being properly aged in accordance with the Company's credit and collection policy and note any accounts that may be aged in a non-conforming manner. Judgmentally select 25 accounts.  Note any discrepancies.

    d. Test payment deferrals, extensions, rewrites, restructurings, due date changes, modifications and renewals **(collectively, "modifications" or "revisions")** from original loan terms for a judgmental sample of 15 such loans, including a review of their accuracy per the January 31, 2024.  Obtain volumes and reasons and assess for proper approval.

        i.  Note those modifications that relate to a loan that was previously modified and record the total number of modifications permitted over the life of the loan to date.  Review portfolio wide trends in use of modifications since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Show total monthly modifications as a percentage against total outstanding loans.  Note any unusual trends and obtain the Company's explanation for such.
        ii. Note that any post-origination actions, such as payment deferrals, re-ages or other modifications of contract terms are made by authorized individuals, in accordance with Company policies.  Note that information on deviations, if any, is made available to senior management on a regular and formalized basis.
        iii. Determine if the type of modifications granted on the account (if any) adheres to the Company's Credit Policy (Credit/Underwriting/Collections), noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Discuss with management the magnitude of accounts that have been modified.  Inquire of management if there is an annual modification program.  If so, obtain a description of this program and how an obligor qualifies for this program.

21

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

    e.  Obtain a listing of bankrupt loan accounts where legal action has been taken.  Test a judgmental sample of five (5) Bankrupt accounts as of January 31, 2024 from the Company and determine that accounts are properly aged.  Note that Company policies and procedures are being followed and actions on the Bankrupt Accounts are properly documented.

    f.  **For all samples above, how are these loans (notes) reflected in the aging?**

    g.  Judgmentally select 10 accounts and test for proper posting of fees and finance charges.

6.  Obtain from management the Company's charge-off policy/procedure, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024. Identify any exceptions to charge-off policy/procedure since the previous examination period ended as of September 30, 2022 through January 31, 2024 by examining the aged trial balance for such period.

    a.  Attach a roll-forward of monthly write-off and recovery data since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Reconcile these amounts to the supporting journals and the general ledger.  Determine that the write-offs shown are the amount of write-offs actually taken, noting their timing, whether they are taken against an allowance account or directly expensed.  Explain any reconciling items.

    b.  Select the 15 largest accounts that have been written-off since the previous examination period ended as of September 30, 2022 through January 31, 2024 and note if the Company is in compliance with their policies and procedures and analyze documentation files on each, noting the sales proceeds, reason for charge-off, timing of repossession versus write-off, whether or not the vehicle was reconditioned and intended to be resold, and disposal of equipment and recovery amount, if any.  **If applicable, note the charge-offs were recorded properly on the Static Pool Analysis against the correct month of origination.  Review through management discussions and summarize the Company's loan account charge-off policy.  Note the journal entry for a charged-off account.**

    c.  Judgmentally select 10 accounts that have been identified as "WRECK" on the data tape as of January 31, 2024 and note if the Company is in compliance with their policies and procedures, including the accuracy of their identification on the data tape.  Identify if the account obligor has continued to remit payment throughout its duration of "WRECK" status, or if the vehicle's insurer has (or intends to) remit payment for the value of the vehicle.

7.  Obtain a sample of 15 charged-off accounts since the previous examination period ended as of September 30, 2022 through January 31, 2024 and note the value of the repossessed vehicle relative to the Manheim auto value.  Obtain supporting documentation noting the value of the vehicle.  **Note the journal entry for the sale of the vehicle to the Captive Dealership**. Additionally, note the purchase price of the vehicle on the Captive Dealership's lot **(obtain supporting documentation)**.  **Trace the purchase price of the vehicle through the retail division financials**.

8.  Inquire of management and document the policies and procedures relating to the placing of accounts on non-accrual status, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Judgmentally select a sample of 10 accounts from the Company in non-accrual status as of January 31, 2024 and determine whether the Company's policies and procedures were followed.

9.  On a sample basis (10 accounts), test first payment defaults, deferred term accounts, legal accounts, deferred down payment, deficiency balance accounts and extension accounts for propriety against the Company's policies and procedures.

10. Obtain from the Company a paid ahead report as of January 31, 2024 and note why accounts are considered paid ahead.  Prepare a stratification of Paid Aheads by next due date utilizing the

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

categories of Paid Ahead by 1-30 days, 31, 60 days, 61-90 days and 90+ days paid ahead.  Note any unusual trends or if the number of paid aheads seems excessive.  Judgmentally select 10 accounts (from various Paid Ahead buckets) for detail testing to verify management reasons for paid aheads and note if accounts are properly aged.  **Note:  This test relates to detecting if the Company is moving the next due date out into the future to mask delinquencies.  Thus, note any such items and notify the Lead Managing Director of the Credit Risk Group to discuss the findings in order to communicate such to the Client.**

11. Obtain a Last Payment Report **(inclusive of last payment, next payment and aging status)** as of January 31, 2024.  Judgmentally select 10 accounts and note that they are properly aged.  **Note:  This test relates to detecting if the Company is moving the next due date out into the future to mask delinquencies.  Thus, note any such items and notify the Lead Managing Director of the Credit Risk Group to discuss the findings in order to communicate such to the Client.**

12. Obtain a listing of Expired Accounts (next due date after maturity date) as of January 31, 2024.  Prepare a stratification of expired accounts by the next due date utilizing the categories of Expired Accounts by 1-30 days, 31-60 days, 61-90 days and 90+ days expired.  **Note any unusual trends or if the number of expired accounts seems excessive.  Judgmentally select 10 Expired Accounts and note reason for such.  Note eligibility and if in accordance with the Governing Legal Documents.**

## D.  Boarding of Accounts/Billing

1. Through inquiry and observation, document the Company's process for boarding and invoicing customer accounts, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Assess level of detail provided in billing system for various ancillary fees.  How are past due amounts represented?  Inquire how the Company determines that bills match with performance data and accounting records.  Inquire regarding how the Company determines that discrepancies are investigated in a timely manner.

2. Per management inquiry, note that loan originations and subsequent account activity are recorded accurately, completely and only once in individual borrower accounts.  **Note:  Boarding of accounts was tested under Section B.**

3. For a judgmental sample of 10 loans **(subset of Sample selection in Section B.5)**, test that invoices are prepared accurately as to borrower, payment due, remaining balance and terms or per an approved ACH form.

4. Rates and methods used in determining late fee charges are properly authorized and conform to account terms.

5. Describe the Company's fee structure for their loan accounts, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.

6. Describe how loans are funded and note the internal controls in place before a loan is funded, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.

7. Obtain and summarize any reports the Company provides on the monthly incidence of first and/or early payment defaults since the previous examination period ended as of September 30, 2022 through January 31, 2024.

## E.  Loan Receivables Roll-Forward (Note: Same consultant will also perform Section M - Monthly Servicer Report ("MSR"))

1. Obtain a summary roll-forward schedule for the Company's loan receivables indicating, by month, the beginning balance, receivable additions, payments, charge-offs, other journal entry adjustments and ending balance.  The roll-forward of loan receivables should be for a 16-month

23

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

period ending January 31, 2024.  Analyze cash collections against gross loan receivables on a monthly basis for any unusual trends.

2.  For the 12-month period ending January 31, 2024 and on a monthly basis, obtain a schedule from the Client of expected cash to be received by month and compare such to the accounts receivable roll-forward (actual cash received), noting any discrepancies and management's reasoning for such.

3.  Judgmentally select one month (January 2024) from the Company and trace and agree all components of the loan receivables roll-forward to supporting documentation.  Explain any differences.

4.  Perform the following for the month ended January 31, 2024:

    a.  **For the most recent month (January 2024)**, reconcile the monthly balances and loan receivables roll-forward activity to supporting journals, aging trial balance and the general ledger.  Ensure that any discrepancies are just timing related.  Explain any reconciling items.
    b.  **For the most recent month (January 2024)**, reconcile the month end loan balance to the Company's financial statements.  Explain any reconciling items.
    c.  Note the frequency and timing of the reconciliation process.  If there are material reconciling items, determine if they are being resolved appropriately and whether they have an impact on the stated amount of the loan receivable assets.

## F.  Internal /External/Regulatory Audits

1.  Obtain a copy of the Management Letter (if any) prepared in conjunction with the Company's most recent fiscal year-end financial statement audit.  Note any weaknesses identified in the Company's operations and/or related controls.  Discuss the current status of these issues with Management.

2.  Review operational audits performed by external auditors/parties since the previous examination period ended as of September 30, 2022 through January 31, 2024 to assess the results.  Inquire regarding whether any recommendations have been successfully implemented by the Company.

3.  Review and attach Company's quarterly internal audit reports and the management's related responses since the previous examination period ended as of September 30, 2022 through January 31, 2024 to assess the results.  Inquire regarding whether any recommendations were implemented correctly.

4.  Inquire with management regarding any regulatory audits that have been performed since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Obtain a copy of the examination results and management responses.  Briefly describe the results of these procedures.

    a.  Ensure this review includes examinations by the Texas Office of Consumer Credit Commissioner and report on these results.

5.  Review any quality control or operational audits performed since the previous examination period ended as of September 30, 2022 through January 31, 2024 by parent companies or other third parties for any material deviations.

6.  Review internal quality assurance review results, particularly with respect to the Service Department.

7.  Review any post-loan closing quality control procedures, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.

8.  Note if the Company had a SSAE 18 type review performed since the previous examination period ended as of September 30, 2022 through January 31, 2024.  If yes, obtain such and note any findings and management's responses to the findings.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                Consulting Report

**G. Loan Loss Reserve and Static Pool Data**

1. Review through discussions with management, any changes to the Company's methodology(ies) towards the establishment and maintenance of what management considers to be a sufficient loan loss reserve, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.
2. Obtain from the Company, a summary and roll-forward of the allowance for credit losses for the last two fiscal year-ends and interim period (January 2024) of examination, indicating beginning balances, additions, charge-offs and ending balances and agree the amounts to the Company's general ledger and financial statements.

   a. Calculate the ratio of net charge-offs to average net receivables for the last two fiscal year-ends and interim period (January 2024) of examination.
   b. Prepare a rolling 3-, 6- and 12-month charge-off analysis for the last 12 months ending January 31, 2024.
   c. Obtain a reconciliation of the allowance for credit losses to the general ledger and financial statements as of January 31, 2024.

3. If applicable, obtain, discuss and gather an understanding of the Company's static pool data.  On a sample basis **(judgmentally select January 2024)**, test the static pool data.
4. If applicable and if the Company uses the Fair Value of Accounting for their loan portfolio, note if the Company obtains a third-party valuation on the managed portfolio or performs the valuation internally.  Note how often the valuation is performed.  Also, note how the Company accounts for such (note the journal entries used to reflect the Fair Value Accounting Treatment in the report). Additionally, note if this is per Generally Accepted Accounting Principles (GAAP).  **In addition, note when the Company will implement CECL and if the Company has run models for CECL's impact to the Company.**

**H. Cash Management**

1. Review through management discussions and summarize the Company's internal cash controls and payment processing policies and procedures.  Note any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024 and any anticipated changes within the next 12 months.
2. Obtain from the Company a listing of the bank accounts / lockboxes that are utilized by the Company's Corporate Office and Branch offices/dealerships (as applicable), noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024. Have the Company indicate the purpose of each, what liens exist, if any, and in favor of whom, and the authorized signatories of each.
3. Per discussion with management and a review of the cash management processes, note the overall controls and segregation of duties and approvals applicable to the cash management process, particularly relating to ACH and wire transfer transactions **(both as a recipient and originator of wires)**, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Inquire about and/or confirm counterparty controls for creating or changing wire instructions at the Company and between the various parties involved in a wire transfer **(i.e., note how each party validates that the person authorized to perform the wire transfer is the proper authorized person)**.  Report on both strengths and weaknesses of Company's control processes.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

a. For wire transfers, summarize the verification process including how changes are confirmed and validated prior to processing and if callbacks are required when wire instructions are added, changed or deleted.

b. For wire transfers, note that individuals receiving or sending wire transfers are independent from the bank statement reconciliation process.

c. For wire transfers, inquire if the confirmation transmittal is audio recorded and reviewed by management to ensure authenticity.

d. Note any issues related to fraud **(phishing, etc.)** with regards to wire transfers and management's response to such issues.

4. In connection with testing, observe whether access to cash receipts processing functions and related data records is properly restricted and audited according to Company's policies.

5. Review through management discussions the Company's bank account reconciliation policies and procedures.  Inquire in regard to the timeliness of completion.  Request and, if provided, review the most recent month-end reconciliation **(January 2024)** that has been completed by the Company noting any large or what appears to be any unusual reconciling or suspense items.

6. Ask management to prepare a schedule for the latest month **(January 2024** summarizing collections by method of receipt for the Company **(similar to the format presented below)**.

| Method of Receipt ($000's) | Jan-24 | % |
|---|---|---|
| Obligor sent payment to lockbox account (via check or EFT) | | |
| Pre-authorized ACH (direct debit) | | |
| Obligor's sent payment to Company's office/branch | | |
| Credit Card | | |
| Other (describe) | | |
| Total Deposits per Bank Statement(s) | | |
| Reconciling items | | |
| Total Collections per Loan Receivables Roll-forward, MSR and General Ledger | | |

a. Verify the accuracy of this schedule selecting one month **(January 2024)** by tracing to bank statements. If deposits do not exceed collections per the loan receivables roll-forward, obtain an explanation for any shortfall.

b. **For the month of January 2024,** obtain from the Company a cash reconciliation of all cash received per the bank statements to the Company's general ledger, MSR and Loan Receivables Roll-Forward **(proof of cash received)**.

7. Judgmentally select two (2) recent business days **(between January 1, 2024 and January 31, 2024)** and substantiate the collections received on those dates for the Company.  Trace the daily deposits made to the bank accounts from the deposit slips to: (i) reports generated daily from the Company's servicing system and (ii) the respective monthly bank statement.  Determine those collections are applied on a timely basis.

a. Judgmentally select 25 accounts **(subset of sample selected in Section B.5.a)** and test the most recent payments to source documentation including the borrowers check, remittance advice, validated deposit ticket or lockbox receipt and other information (as applicable) to facilitate agreement to the bank statement.  Trace to the deposit ticket, bank statement, receivable system, daily cash receipts report, servicing system and general ledger. Make sure that the amount was properly applied to the servicing system. Make the payment came directly from the obligor. **For the sample, note the payment was applied to the correct account, applied correctly as to fees, interest and principal and if the payment was**

26

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

**properly deducted from the aging**.  **(Note: Make sure payments are from the obligor). Note journal entry for the receipt of a payment.**

8.  For the most current month **(January 2024)**, test that deposits made to the local banks are reconciled at the Company's corporate office to the daily payment journal for each branch (as applicable) to ensure that all payments were deposited.
9.  Inquire with management regarding the methodology and timing of sweeping deposits to the corporate consolidation account.  Judgmentally select two (2) test dates (from January 2024) to determine if total deposits to the local banks are swept to Company's Corporate Office in accordance with policy.
10. Note how the Company handles unapplied cash, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Obtain a listing of unapplied cash as of January 31, 2024 and note if it is reconciled to a general ledger account.  Note the aging of the unapplied cash and when management intends to clear the items.
11. Note how the Company handles suspense account items, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Obtain a listing of suspense account items as of January 31, 2024 and note if it is reconciled to a general ledger account.  Note the reasons for such items, the aging of the suspense account items and when management intends to clear the items.  Judgmentally select 10 suspense items and note how the Company handles such.
12. Note how the Company handles Non-Sufficient Funds if it was via a check or an ACH ("NSF"), Payment Stops and Account Closed items received from the Company's bank on a daily basis.  Note the Company's policies and procedures to handle each of the aforementioned items.  How are these items processed, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024?  How does the borrowing base get adjusted for these items/amounts?  What has been the global and individual Product Line NSF checks, Payment Stops and Account Closed activity since the previous examination period ended as of September 30, 2022 through January 31, 2024?  Judgmentally test two (2) of each item **(total sample of six (6) items)** and note how the Company handles such.
13. If applicable, note how the Company handles credit card fraud transactions and credit card transaction reversals.  Also, note how these types of transactions are recorded in the accounting records.

## I.  Repossessions

1.  Request and, if provided, review and summarize the Company's vehicle repossession policies and procedures, including redemptions.  Note any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024 and any anticipated changes within the next 12 months.

    a.  Per discussion with management, note any new repossession agents and note how the process compares to other repossession agents utilized by the Company.
    b.  At what point are accounts placed for repossession?  How is this identified in the Company's reporting/systems? **Note the journal entry for a repossession.**
    c.  Who decides to proceed or not to proceed with repossession and what criteria are used in making this decision?
    d.  Explain the Company's disposition of repossessed vehicles including how they account for the repossession in its financials, obtain the vehicle, where it is stored, how decisions are made for whether or not to recondition and remarket the vehicle, and which methods are utilized for

ultimate disposition, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.

e. Obtain, review, and summarize any reports management makes available in regard to the Company's monthly repossession activities covering October 1, 2022 to January 31, 2024 on a monthly basis (including volume, month-end inventory (aging), redemptions, vehicle sales and corresponding recovery/loss percentages recognized). Review the average loss trend for the above period, including recoveries and turnover.

f. Request required/appropriate documentation and, if provided, conduct limited testing procedures on the accuracy of the reported net realizable value and gain/loss amount and adherence to stated charge-off policies on a judgmentally selected sample comprised of 10 sold repossessed accounts from the Company as being completed since the previous examination period ended as of September 30, 2022 through January 31, 2024.

   i. In the course of this testing, document how the Company accounts for sale/disposition of repossessed vehicles or equipment.
   ii. Is there a separate ledger account in which delinquent loans are placed prior to eventual loss?
   iii. Has the Company reserved for any non-delinquent or non-defaulted loans?
   iv. Determine what components are used to calculate net losses (i.e. – what repossession expenses and recovery amounts both with respect to disposed vehicles and reconditioned/remarketed vehicles).
   v. If applicable, obtain a listing of repossessions re-sold/re-financed and judgmentally select 10 accounts as of the three-month period ending January 31, 2024.  Note the sale is per Company policy and the previous account was removed from the Aged Trial Balance and Servicing System.  Also, note proceeds were properly submitted to the correct facility.

g. Obtain a listing by month during the 16-month period ending January 31, 2024 of recoveries on deficiency accounts **(insurance, bulk sales, etc.)**.  Note the policy with regards to receipts on deficiency accounts.  Judgmentally select a sample of 20 deposits and note that the proceeds were applied per the Company's policy and the GLDs and to the proper facility and account.

h. Obtain a listing of charged-off and recovered loans for the three (3) months ended January 31, 2024 and judgmentally select a sample of 20 charged-off with subsequent recovered loans **(10 sold at auction and 10 reconditioned and placed back on the dealer's lot)** tracing through the activity performing the following steps:

   i. Indicate when it was charged off.
   ii. Indicate the time to recovery (repossession to date funds were received).
   iii. Indicate the recovery type (auction, reconditioning and sale, etc.) and also indicate if the sale was at the dealership and confirm the sales price.
   iv. Indicate the recovery amount relative to Manheim and confirm the methodology was followed in determining the Manheim value.
   v. Trace the cash pertaining to the recovery (final payment in SPV account through final recovery payment in SPV).  Note the timing of final payment in the SPV account relative to charge-off date (and time of receipt of recovery proceeds).
   vi. Perform a datatape to file confirmation including (charge-off amount, charge-off date, recovery amount, recovery date, etc.).
   vii. Perform a ledger confirmation by comparing the net recovery per general ledger to recovery in the datatape.
   viii. Confirm how recoveries are accounted for differently, both on the tape and in the Company's financials, if the vehicle is ultimately reconditioned versus auctioned.

    ix.  Confirm what expenses are deducted from gross recovery proceeds. If expenses are deducted confirm if they are accounted for in the recovery amount on the datatape.

    i.  If applicable, note if the Company accounts for their repossessions at Fair Market Value ("FMV"). Additionally, note the Company's accounting policies for repossessions, including repossession expenses. Note how the Company handles cash proceeds from repossessions.

## J. Management Reporting

1. Identify all internal management reports, frequency of distribution, parties to which distributed and append example of each in final report and comment on scope/frequency of management reporting function vs. other similar operators in this industry.

## K. Insurance and Title Tracking

1. Review the Company's policies and procedures pertaining to placing various insurance policies as it relates to the loan receivables, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.

    a.  Determine how the Company's insurance programs work and how revenue is recognized.

2. Review and summarize a report on financed vehicle contracts that lack documented proof of presently in force auto insurance coverage.
3. Review and summarize a report on "missing" vehicle titles as of the most recent month-end that this information is available. Note why titles are missing.

## L. Accounting Policies and Procedures

1. Inquire with management regarding the Company's policy as it pertains to income recognition, especially relating to delinquent loans and when it stops accruing, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.
2. Inquire with management regarding the Company's policy on reversing accrued finance charges when accounts are charged-off, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.
3. Inquire with management regarding any ongoing litigation, the status thereof, and any reserves, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.
4. Inquire with management regarding the Company's policy for recording initial direct costs ("IDC") and origination fees, recognizing such into the income statement and determine if reasonable and appropriate, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.
5. If applicable, through inquiry of management, document the Company's procedure of recording unearned interest and document the method used to transfer unearned income to revenue on a monthly basis, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024. Document if unearned interest is properly accounted for.

    a.  Judgmentally select five (5) accounts to determine that unearned interest income is properly recorded.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                                    Consulting Report

6. Per observation and inquiry, determine if the quality of the Accounting Department is adequate to handle the accounting function for the legal entity.
7. As of January 31, 2024, obtain the reconciliation of outstanding loan receivables, all outstanding cash accounts, accrued finance charges, unearned interest income, non-accrual loans, repossessions, dealer holdbacks / reserves, dealer liability and the allowance for loan losses accounts. **(Note:  Some of these accounts could have been covered in other sections of the scope)**.

    a. Document the timing that such reconciliations are reviewed by management.
    b. Test and agree totals contained on the reconciliations to appropriate financial ledgers and financial statements.
    c. Inquire with management regarding the nature of any reconciling items greater than $10,000 and over 30 days old and items over $5,000 and over 60 days old.

**M. Monthly Servicer Report ("MSR") (Note: Same consultant will also perform Sections E - Loans Receivable Roll-Forward)**

1. Document the source of each line item for the January 31, 2024 Servicer Report ("Test Period") and agree each line item to the appropriate source documentation, general ledger, financial statement and Governing Legal Documents.  Also, compare all reserve calculations, concentration limits, termination events, and other applicable items on the MSR to transactional legal documents ("Agreements") and compare cash balances reported on the MSR to the applicable bank statements, noting any discrepancies.  Based on the criteria set forth in the Agreements (including any additional amendments which may have affected any respective definitions), inquire whether only eligible assets are being financed.  Completely recalculate and agree all ratios, including those inputs into monthly averages, to the general ledger.  Test inputs and calculations of all financial covenants included as termination events under the Agreement.  Per management inquiry, identify any other sources of offset risk within the Company.  Prepare a chart which compares the client submitted report to the recalculated items, noting any discrepancies.  Document management's response and/or resolution to any discrepancies.  **Note if additional ineligibles should be considered by the Client.**
2. Scan the most recent month-end general ledger to test for any credits or offsets to the accounts receivable, including review of the accounts payable aging.

**N. Review of the Computer Systems & Controls**

1. Based on conversations with Company personnel, discuss the operating and software systems utilized by the Company, noting any changes since the previous examination period ended as of September 30, 2022 through January 31, 2024.  Included in this should be whether the Company owns the system security codes and any maintenance agreements, if applicable.
2. Note the Company's policy and procedure with regards to Cyber Security, how it is monitored, testing performed and management's response to any issues noted.  Per discussions with Company management, note any Cyber Security breaches.  If yes, note what occurred, impact to the Company **(financial and non-financial)**, resolution by the Company and steps implemented by the Company to strengthen Cyber Security Controls.
3. Please inquire of management as to the Company's systems and procedures related to the following, noting any shortcomings:

    a. Employees in the Information Technologies ("I.T.") Department do not perform incompatible functions (management; system analysis, design and application programs; software

maintenance; operations, data control; data security).

b. Monitoring of the activities of systems programmers and other knowledgeable individuals.

c. Ability to restrict Programmers from making inaccurate or unauthorized changes to application software that will reduce the reliability of financial information processed through the system.

d. Management's opinion as to whether I.T. resources are sufficient in capacity and technological advancement to adequately support contract processing and servicing.

e. Existence of back-up and disaster recovery procedures to ensure continued contract processing and/or recovery in the event of significant computer downtime or other I.T. disaster. Inquire of management when the corporation last tested its disaster recovery plan, what the results were, how any issues were addressed, and when the next disaster recovery test will be conducted.

f. Restrictions to direct general access by unauthorized persons to data files or application programs.

g. Assess the Company's ability to mark its data processing records with a legend indicating the ownership interest in the receivables. Inquire of management how loans are marked to bank facilities in order to facilitate tracking for reporting. Note what controls are in place to prevent double pledging of loans.

h. Physical protection of original loans and supporting documentation is adequate.

4. Per observation and inquiry, determine if the quality of the I.T. Department is adequate to handle the I.T. function for the new legal entity and the system is capable to handle additional growth.

## O. Other

1. Per discussions with management, note the Company's process for treating the receipt and payment of any taxes **(i.e., sales taxes, property taxes, payroll taxes and corporate taxes)**. Inquire of management if the Company is current with all of their taxes.

2. Obtain evidence of Errors and Omissions Insurance Coverage and document the coverage.

3. Inquire if the Company is engaged in any material litigation as either a plaintiff or defendant. If so, obtain through inquiry the particulars on the matter(s), as well as the Company's estimate on the Company's potential liability.

4. Using professional judgment, inquire of several management and employee personnel about the risks of fraud and how the Company addresses them. Specifically ask about the following:

a. Their knowledge of any actual fraud or suspicions of fraud affecting the Company.

b. Their awareness of any allegations of fraud or suspected fraud affecting the Company.

c. Their understanding of the risks of fraud within the Company, including any specific fraud risks the Company has identified or account balances or transaction classes that may be susceptible to fraud.

d. How they communicate to employees the importance of ethical behavior and appropriate business practices?

e. Programs and controls the Company has implemented to address identified fraud risks or otherwise help prevent, deter, and detect fraud, and how those programs and controls are monitored.

f. The nature and extent of monitoring multiple locations or business segments and whether any of them have a higher level of fraud risk.

g. The Company's (1) compliance with laws and regulations, (2) policies relative to the prevention of illegal acts, and (3) use of directives (for example, a code of ethics) and periodic representations obtained from management-level employees related to compliance with laws and regulations.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

h.  Has the Company established a compliance infrastructure in place, including a compliance officer, up to date written policies and procedures, internal auditing and corrective action processes, and proper compliance training?

i.  Does the Company have a formal training process which includes regularly scheduled training for employees?

j.  For companies with a Board of Directors, is the board updated regularly on compliance matters and are individuals overseeing compliance accountable to the board?  What about managers and key personnel?

## SCOPE MODIFICATIONS

<u>Section I – Repossessions</u>

The following Scope steps could not be performed as part of the repossession testing with applicable reasons below.

1.  Scope step was waived based on discussions between JPM and Tricolor management teams for this examination.  It was mentioned by JPM management that they would consider pursuing the completion of the step on future examinations.
2.  Scope step could not be performed as it was not applicable to Tricolor.
3.  Scope step could not be performed as no information was provided beyond the charge-off testing. This is based on discussion between JPM and Tricolor management.

<u>Step I.1.f.v</u>      Reason 1 above

<u>Step I.1.g</u>      Reason 2 above

<u>Step I.1.h</u>      Reasons 1 and 2 above

32

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

## A.  Management Discussion

Company Overview

Tricolor is principally engaged in procuring, reconditioning, selling and financing quality, certified used auto vehicles with a focus on the Hispanic consumer.  Many of the Company's customers have limited financial resources and would not qualify for conventional financing.  The Company is committed to "doing well by doing good", and its mission is to advance financial inclusion to a highly underserved Hispanic market and offer responsible, credit building auto loans to individuals with no or limited credit history.  To achieve this, the Company has developed a proprietary AI-powered risk model which risk-rates and segments these consumers, enabling the Company model to score these conventional non-scoreable consumers.

Tricolor was founded in 2007 and Tricolor Holdings, LLC was formed in 2015, formerly known as Ganas Holdings, LLC.  The name changed to Tricolor Holdings, LLC in January of 2020.  In 2021, the Company launched Tricolor Financial to provide franchise dealers with the ability to transact incremental sales to the Company's target consumer.

The Company's service to the community has been recognized by the U.S. Department of the Treasury, which has certified it as a Community Development Financial Institution, or CDFI, since 2019.  CDFIs are certified by the U.S. Department of the Treasury's Community Development Financial Institutions Fund, known as the CDFI Fund.  CDFIs must have a primary mission of promoting community development, providing financial products and services, serving one or more defined low-income target markets, and maintaining accountability to the communities they serve.

Organizational Structure

Corporate Organizational charts pertaining to the flow of operations among various departments effective January 2024 as well as C-Level management were provided to the consultants and are included within this report as Exhibit A.1.

Per Management, there were some changes in the last 12 months ended January 31, 2024 and are listed below.

Chief Supply Chain Officer – Richard Wallis (Hired July 2023)
VP of Fixed Operations – Joseph Foti (Hired July 2023)
Senior Director of Fixed Operations – Albert Gracia (Hired October 2022)
Senior VP of Marketing and Customer Acquisition – Vanessa Mata (Promoted December 2022)

Product Overview

Tricolor, a "Buy Here, Pay Here" automotive financier, operates, across multiple brands (Tricolor, Ganas Ya and Ganas), 52 retail dealerships across Texas, California, Nevada, Arizona, New Mexico.  All dealerships are strategically located in areas with a high density of Hispanic population, which remains the Company's primary demographic.

The sole product offered for sale by the Company is the direct financing of automobiles.  All warranties are offered at no cost to the borrower.  As incentive for borrowers to complete their payments on-time, Tricolor offers to purchase automobile-adjacent items and various gift cards or checks for customers.  A partnership with AutoZone in 2019 related to the aforementioned incentives has allowed for additional marketing and incentive-based reach.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                Consulting Report

## B. Underwriting/Credit Approval (including loan file test)

Policies and Procedures

The consultants were provided a copy of the Tricolor Underwriting Policy dated November 18, 2020, last updated March 3, 2022. Per the consultant's review, only minor changes made were made to the maximum loan term based on the FICO score and Grade and the credit application and verification requirements since the last examination report dated November 11, 2022. Management also stated that they do not expect to make any material revisions to these policies and procedures within the next 12 months. The credit policies and procedures have been fully adopted by the Company. Refer to Exhibit PF.1 (Permanent File) for details.

Statistics

| Funded Loans From Approved Applications | | | | | | |
|---|---|---|---|---|---|---|
| Year / Quarter | Tricolor Approved Applications | % Funded | Ganas Approved Applications | % Funded | Ganas Ya Approved Applications | % Funded |
| 2022Q1 | 13,574 | 69% | 3,955 | 40% | 3,799 | 30% |
| 2022Q2 | 13,065 | 41% | 4,152 | 40% | 3136 | 35% |
| 2022Q3 | 12,207 | 40% | 4,417 | 44% | 3520 | 37% |
| Total | 38,846 | 39% | 12,524 | 41% | 10,455 | 34% |

The Company provided the total amount of loan approved applications and the total loans funded from those approved applications for all Tricolor facilities. Analysis of Ganas yielded 39% of loans were funded from approved applications, while 41% of Ganas Ya's Loans are funded from approved applications. Per management, all applications are typically approved since the Company's offer is based on the customer's provided information per the application.

Ancillary Products

For the credit files tested as of January 31, 2024, the Company did not provide the information to determine if the customer was enrolled in Collateral Protection Insurance ("CPI"), at the time of the contract origination. Of the 55 credit files reviewed, the company provided the customer's insurance. For the remaining 51 credit files, the Company provided the agreement signed by the borrower that notes that insurance is required. Per management, the company uses Berkshire Risk Services ("Berkshire") to manage and administer the CPI. CPI is a requirement under the retail installment contract if the consumer does not carry sufficient third-party insurance. Berkshire monitors all Tricolor's contracts to ensure the customer has insurance. If the customer does not or causes valid third-party insurance to lapse, Berkshire provides notice to the customer and the CPI is contractually enforced, thus ensuring the contract collateral is insured.

Exceptions Report

The consultants' review of the data tape as of January 2024noted instances of flagged account exceptions related to down payments, monthly payments, payment to income (PTI), and debt to income (DTI). There were 75 accounts, which had a principal balance, that had flagged exceptions. The total outstanding principal balance of flagged accounts was $1,182M, or 0.2% of the total outstanding portfolio principal

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

balance as of January 31, 2024.  The GLDs do not have a concentration limit for the account exceptions. Presented below are the types of exceptions reported and number of instances of occurrence in the report.

| ` | Number of Instances | Principal Balance |
|---|---|---|
| DownPayment_Operating_Exception | 26 | $ 422 |
| DownPayment_GlobalLimit_Exception | 22 | 418 |
| MonthlyPayment_Operating_Exception | 7 | 146 |
| DTI_Operating_Exception | 19 | 193 |
| DTI_GlobalLimit_Exception | 1 | 4 |
| Grand Total | 75 | $ 1,182 |

Credit File Review

The consultants judgmentally selected 55 loans as of January 31, 2024 for review of underwriting records and underlying documentation.  Except where documented below, the loans were approved in compliance with the Company's policies and procedures, the asset details included in the detailed data tape agreed to the respective system.  The consultants did not have a master servicer report of all facilities to confirm if there was any evidence that the assets were pledged to a third party.  Refer to Exhibit B.1 for details of this testing.

Specific findings within the credit file review are as follows:

- The original maturity date for six accounts was different from current maturity date.  Per management, this was due to modifications.  The maturity date can shift back and forth during the life of the loan, per management, based on payment schedules that are adjusted as a result of early payments, deferments, or extensions.
- None of the 55 credit files sampled were set up for automatic payments so there was not any signed automatic ACH agreement provided for the accounts.
- For five selections, the consultant requested further information regarding the total income calculation.  Per the consultant's review, the information provided was less than what the total income is per the data tape.  Additional information was not provided.
- For one instance, the financial ratios per the data tape did not tie to the consultant's calculation. Per management, the errors related to one account that was an indirect account and was not originated directly by Tricolor.  The credit/underwriting information is not in the Tricolor CDE and is manually stored.
- For 51 of 55 accounts reviewed in the credit file sample, the Company initially provided an agreement that the borrower signed that notes that the borrower will maintain insurance; however, they did not provide proof of said insurance.  Per the GLD's and Company policy, it is required that the Company obtain proof of insurance from the borrower prior to origination and throughout the term of the loan
- There were 43 instances in which the amount financed per the data tape and the amount financed per the contract varied due to the contract financed amount also including sales tax.  Per management, differences between the amount financed per the data tape and the contract is primarily due to deferred sales tax.

Per the underwriting policy, management must approve any and all exceptions to Company policy.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Additionally, the consultants noted the following averages, minimums, and maximums within the Loan File Test Sample:

| Metric | Average | Minimum | Maximum |
|---|---|---|---|
| Interest Rate | 15.5% | 7.9% | 23.1% |
| Payment | $ 395 | 150 | $ 1,016 |
| Original Term (Months) | 65 | 47 | 72 |
| Remaining Balance | $ 30,383 | 10,686 | $ 44,341 |
| Time at Residence (Years) | 0 | 0 | 21 |
| Time at Job (Years) | 7 | 0 | 20 |
| Monthly Income | $ 6,941 | 3,033 | $ 26,134 |
| FICO Score | 624 | 467 | 790 |
| Year of Collateral | 1500 | 1,500 | 1500 |
| Mileage | 78,829 | 9 | 141,900 |
| Amount Financed | $ 31,087 | $ 10,975 | $ 49,359 |
| APR | 15.5% | 8% | 23.1% |
| Vehicle Total Cost | $ 25,116 | $ - | $ 39,848 |
| Down Payment | $ 3,448 | $ 1,450 | $ 10,990 |
| Down Payment % | 13.3% | 7% | 35.7% |
| Debt-to-Income % | 23.1% | 0% | 48% |
| Payment to Income | 11.9% | 0% | 22.7% |
| Loan to Value | 122.1% | 0% | 158.7% |

A review of eligibility criteria for all 55 loans selected for Credit File Testing noted no issues, and all accounts tested were correctly identified as eligible or ineligible.

The consultants were to judgmentally select 15 contracts out of the 55 contract sample noted above to review loans where the vehicle has been sourced from a repossession, and to verify that the vehicle has not been marketed and sold by a Tricolor (or affiliated) dealer more than twice in total. Per management, none of the 15 selections were sold by Tricolor more than twice in total.

## C. Servicing/Collections

Policies and Procedures

Management provided the consultants with a copy of the 2021 Servicing and Collection Policy. The current version was officially approved and implemented on June 2, 2022. Due to the size of the file, the Servicing and Collection Policy is retained in the consultants' workpapers and available upon request. The policies are reviewed on an annual basis, with subsequent revisions requiring approval from both Vice Presidents of Servicing and the Director of Compliance. Per management, there have been no significant changes to the servicing and collection policy since the last examination report dated November 11, 2022 and no significant changes are expected during the upcoming 12-month period. Refer to Exhibit PF.1 (Permanent File) for details.

Testing

*Delinquency Statistics*

The Company did not provide the data necessary for the consultants to compile monthly delinquency statistics for the 12-month period ended January 31, 2024. The Company provided the following information:

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report



## Managed Portfolio – Delinquency

Management did not have any specific comments related to the trending of accounts, stating that all delinquency totals were within Company expectations.

*Aging Test*

The consultants utilized the Credit File Review's 25 judgmentally selected accounts comprised of various stages of delinquency for a review of the aging of accounts as of January 31, 2024.  In support of this review, the Company provided the consultants with the payment history and collection notes for each account.  Of the accounts reviewed, 23 were determined to be aged correctly.  After review of the payment histories, the consultants noted four accounts with exceptions.  Two accounts were determined to be incorrectly aged.  Review of the payment history indicated the accounts were 52 DPD, whereas they were both marked as 32 DPD on the January 31, 2024 data tape.  During the consultants' review of the collection notes it appears that three accounts with current balances totaling $71M were considered repossessed, and should have been ineligible, but were not marked as either repossessed or ineligible on the January 31, 2024 data tape.

These four accounts with exceptions (one was both incorrectly aged and not marked as repossessed) were the four missing aging test files that were uploaded by the Company five months after the consultants were on site and less than one week prior to Client's need for a draft report.  Because of these time constraints the consultants did not have time to get management's comments on reasons for either the aging discrepancies noted above or the reason these three accounts were not marked as repossess, and therefore ineligible, on the data tape.

Refer to Exhibit C.1 for specific details.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

*Aging Shift Test*

The consultants judgmentally selected 25 accounts on the January 31, 2024 data tape for an aging shift test. Delinquency status was compared between December 31, 2023 and January 31, 2024, with a review of the January 2024 collection activity conducted in support of the month's migration. The Company provided the consultants with collection notes and payment ledgers. The aging of 20 the 25 accounts sampled shifted correctly from the December 31, 2023 data tape to the January 31, 2024 data tape. The consultants noted exceptions for five accounts as follows:

- P94039 – DPD Bucket per the December 31, 2023 data tape was 1-15 DPD. There were no payments received in January 2024. DPD Bucket per the January 31, 2024 was 16-30 DPD. Consultant reviewed collection notes and saw no mention of the vehicle being in the shop or an extension/deferral. DPD Bucket at January 31, 2024 should have been 31-60 DPD.
- P97823 – DPD Bucket per the December 31, 2023 data tape was 31-60 DPD. There were no payments received in January 2024. DPD Bucket per the January 31, 2024 was 31-60 DPD. The vehicle was repossessed in December 2023 (and marked as such on the December 31, 2023 data tape) and the last collection note on January 17, 2024 is for customer advocacy which mentions the obligor would like to redeem the vehicle and was possibly having mechanical issues.
- P102414 – DPD Bucket per the December 31, 2023 data tape was 31-60 DPD. There were no payments received in January 2024. DPD Bucket per the January 31, 2024 was 31-60 DPD. Consultant reviewed collection notes and saw no mention of the vehicle being in the shop or an extension/deferral. DPD Bucket at January 31, 2024 should have been 61-90 DPD and ineligible.
- P79508 – DPD Bucket per the December 31, 2023 data tape was 1-15 DPD. There was one payment received in January 2024, but the account should have been 31 DPD with a DPD Bucket of 31-60 DPD but the DPD Bucket per the January 31, 2024 was 16-30 DPD. Mechanical issues and vehicle being in the shop for an extended period were documented in the collection notes. Per management, servicing (and by extension the account aging) pauses when the vehicle is in the shop for over 30 days.
- P102975 – DPD Bucket per the December 31, 2023 data tape was 1-15 DPD. There were no payments received in January 2024. DPD Bucket per the January 31, 2024 was 16-30 DPD. Mechanical issues and vehicle being in the shop for an extended period were documented in the collection notes. Per management, servicing (and by extension the account aging) pauses when the vehicle is in the shop for over 30 days.

Although not part of the formal servicing and collection policy provided to the consultants, management stated the above exceptions were in for service for more than 30 days whereby loan servicing department pauses the aging and collaborates with the obligor to expedite the service completion and at least one account was redeemed and became current once the car was released to the customer. The consultants noted mentions of mechanical issues and/or the vehicle being redeemed from repossession for three of the five accounts.

Two of the above accounts had no mention in the collection notes of the vehicle having mechanical issues, being in the shop, or being redeemed by the obligor. Per the consultants' review, as of January 31, 2024 one account with a principal balance of $41M should have been in the 31-60 DPD aging bucket and the other account with a principal balance of $24M should have been in the 61-90 DPD bucket and considered ineligible.

Refer to Exhibit C.2 for details.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

*Modification Test*

Per management, the Company does not maintain an independent report tracking modifications, but the data tape includes columns to flag accounts that were ever deferred, the deferred date, extended, and the number of extensions.

Per the January 31, 2024 data tape, 5,312 active accounts with an outstanding balance of $78,710M are flagged as having ever been deferred, with 275 of these accounts totaling $4,242M deferred in January 2024.   Furthermore, 939 active accounts totaling $15,204M were noted to have one extension and 14 active accounts totaling $64M were noted to have two extensions.  No active accounts were noted to have more than two extensions on the data tape.

The consultants judgmentally selected 15 accounts flagged as deferred on the January 31, 2024 data tape for a review of compliance with the Company's policies.  The Company provided a copy of the amendment signed and dated by the customer for each sample selection, along with the payment history and collection notes.  One of the 15 samples had an exception that was approved by a supervisor and, as such, within the Company's policy.  Please refer to Exhibit C.3 for specific details.

*Bankruptcy Test*

Similar to the monitoring of modified receivables, accounts in which the obligor has filed for bankruptcy are flagged as a specific criterion on the Company's data tape.  The January 31, 2024 data tape noted 10 accounts with an outstanding balance of $140M flagged accordingly.

The consultants selected five bankruptcy accounts from the January 31, 2024 data tape for review of the Company's handling of bankruptcies.  Review of the payment history and collection notes show collection efforts ceased once the Company was notified of the bankruptcy filing, and payments continued for each of the accounts, which were all aged correctly as of January 31, 2024.

Detailed results can be found within this report as Exhibit C.4.

*Fees & Finance Charges*

The consultants judgmentally selected 10 accounts for the review of proper posting of fees and finance charges.  The consultants have included the testing results as Exhibit C.5.  All were noted to be in compliance with policy.

*Charge-Off Test*

Per management, the Company's static pool summary is populated from all activity listed within the data tape, as the report encompasses the entire history of the portfolio, including all accounts that were charged-off and their respective balances.  Accordingly, the January 31, 2024 data tape indicated 4,864 charge-offs with a total charged-off balance of $37,361M.  A preparation of charge-offs and recoveries by vintage on the data tape is discussed within the Loan Loss Reserve Section of this Report.

The consultants judgmentally selected 15 charged-off accounts per the January 31, 2024 data tape for review and confirmation of compliance with Company policy.  The Company provided collection notes, payment histories, and journal entry for the 15 samples selected.  Of the 15 accounts reviewed, 11 were charged off due to past due payments, three were abandoned at impound, and one was abandoned at the dealership.  None of the accounts were flagged as repossessed on the data tape.  Management stated

that the repossession flag is removed from the data tape when an account is charged off and a recovery amount is applied based on the Wholesale Average Adjusted Manheim Motor Report ("MMR") value in instances where a VIN (vehicle) can be, or has been, re-sold.

Thirteen of the sampled accounts were noted to have recovery amounts per the data tape; however, the vehicles related to two of these 13 accounts were not recovered by the Company. The journal entries for these two charge-offs noted a credit for a recovery and a debit for "Inventory Acquisition Clearing", or sale to the retail division. However, according to the collection notes, these vehicles were never recovered. Per the data tape, gross charge-off for these two accounts totaled $75M, with recovery values of $47M, and a net charge-off of $28M. It should be noted this issue was identified by the Company's audit firm as a material weakness in controls surrounding inventory. Refer to Section F for further discussion of the auditor's management letter comments.

Refer to Exhibit C.6 for specific details of the test samples.

*Non-Accrual Receivables*

Per discussions with management, no receivables are placed in non-accrual status. Charged-off receivables are removed entirely from the Company's receivables base, and only exist as a "WRITE-OFF" status on the data tape/internal reporting platforms.

*Wreck Test*

Similar to the monitoring of modified receivables, accounts that have wrecked are flagged as a specific criterion on the Company's data tape. The consultants judgmentally selected 10 wrecked status accounts from the January 31, 2024 data tape for review of the Company's handling of wrecked vehicles. The Company provided collection notes and payment histories from IDMS as support for testing. Results were satisfactory, with collection efforts continuing throughout the claims process and each of the accounts being properly aged. One of the accounts was considered a total loss and CPI had paid $11M, which was applied to the obligor's account. The Company consistently attempted to collect on the deficiency balance and the account was aged based on the last obligor payment rather than considered paid ahead by the lump sum insurance payment.

Refer to Exhibit C.7 of this report for specific details.

*First Payment Default & Deferred Down Payment Test*

Similar to the monitoring of modified receivables, accounts that have committed a first payment default ("FPD") or have a deferred down payment are flagged as a specific criterion on the Company's data tape. The January 31, 2024 data tape noted 288 first payment default accounts, all of which were classified as charged-off and did not maintain a current principal balance. The data tape as of the same date identified 5,664 active accounts that originated with a deferred down payment; of these accounts, 16 maintained a total deferred down payment outstanding of $27M as of January 31, 2024.

The following are the FPD statistics for the 12-months ended January 31, 2024:

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

| Month of First Due Date | Count of FPD | Amount Financed |
|---|---|---|
| Oct 2022 | 1 | $ 29,899 |
| Nov 2022 | 0 | - |
| Dec 2022 | 29 | 752,102 |
| Jan 2023 | 3 | 69,964 |
| Feb 2023 | 2 | 55,872 |
| Mar 2023 | 5 | 155,805 |
| Apr 2023 | 3 | 101,434 |
| May 2023 | 6 | 167,159 |
| Jun 2023 | 5 | 145,184 |
| Jul 2023 | 5 | 167,582 |
| Aug 2023 | 7 | 191,865 |
| Sep 2023 | 11 | 307,452 |
| **Total** | **77** | **$ 2,144,318** |

The consultants judgmentally selected 10 accounts (five first payment defaults and five with deferred down payments) from the January 31, 2024 data tape for review of the Company's handling of both activities. The consultants reviewed collection and payment notes from IDMS as support for testing. Results were satisfactory, with collection efforts initialized within zero to three calendar days of the missed payment for the FPD accounts. The five accounts reviewed for deferred down payments had collection efforts initialized within one day of the missed deferred down payment, in accordance with policy. Refer to Exhibit C.8 of this report for specific details.

*Paid-Ahead Test*

Accounts that have been paid ahead will have a next payment due date in excess of 31 days from the date of data tape, as no customers were noted to have repayment terms less frequent than monthly. Paid ahead accounts were stratified as follows:

| Days Past Maturity | # | Current Principal Balance | % |
|---|---|---|---|
| 31-60 | 186 | $ 2,969,622 | 57.0% |
| 61-90 | 69 | 855,841 | 16.4% |
| 91-120 | 45 | 538,817 | 10.3% |
| 121-150 | 29 | 320,379 | 6.1% |
| 151-180 | 13 | 158,855 | 3.0% |
| >180 | 53 | 370,323 | 7.1% |
| Total | 395 | $ 5,213,837 | 100.0% |

The consultants judgmentally selected 10 accounts from the January 31, 2024 data tape for review the aging of paid-ahead accounts. All accounts were noted to have been aged correctly, with most customers making regular payments in excess of their contractual amount. Refer to Exhibit C.9 for specific details.

*Next/Last Payment Date Test*

The Last Payment Date and Next Payment Date for each account is listed on the data tape. The consultants judgmentally selected 10 accounts from the January 31, 2024 data tape to test that they are properly aged, and the correct last payment date and next payment date are reflected on the data tape. The consultants reviewed the payment history of each account and noted that for nine of the 10 samples, the account was properly aged and the last payment date and next payment date on the January 31, 2024 data tape were correct. One sample had an incorrect last payment date and was irregularly aged.

Management stated this exception was due to the collection department pausing the aging on the account while working with the obligor to get the account back on track.

Refer to Exhibit C.10 for specific details.

*Expired Accounts*

The consultants reviewed the January 31, 2024 data tape, noting 90 accounts with current principal balances totaling $100M with maturity dates prior to January 31, 2024, representing 0.01% of the portfolio, and stratified as follows:

| Days Past Maturity | # | Current Principal Balance | % |
|---|---|---|---|
| 1-30 | 7 | $ 8,618 | 8.7% |
| 31-60 | 4 | 6,228 | 6.3% |
| 61-90 | 11 | 14,549 | 14.6% |
| 91-120 | 9 | 14,720 | 14.8% |
| 121-150 | 6 | 5,265 | 5.3% |
| 151-180 | 5 | 6,794 | 6.8% |
| >181 | 48 | 43,424 | 43.6% |
| Total | 90 | $ 99,597 | 100.0% |

The consultants judgmentally selected 10 accounts more than 90 days past maturity and requested management provide a reason for such.  Per management, all 10 accounts were transferred from the previous loan management system and once the account goes past maturity the aging pauses.  Per management, the Company is working to correct these accounts in the system by year end, but noted these are low balance loans and the Company is still collecting some payments and the Loan Servicing Team is confident they will be able to collect the remaining balances.  The GLD definition for eligible receivable criteria does not speak to any eligible criteria related to a receivable's maturity date but indicates the remaining term must be more than one month, which each of the accounts sampled had more than one month remaining. Management did state these accounts are not aging correctly due to these loans being transferred from the previous loan management system as previously discussed, and should be considered over 60 DPD and therefore ineligible.

Refer to Exhibit C.11 for specific details.

## D.  Boarding of Accounts/Billing

Policies and Procedures

Per the consultants discussion with management, the Company's Boarding of Accounts and Billing procedures have not changed since the last examination report dated November 11, 2022.  Management also stated that they do not expect to make any material revisions to these policies and procedures within the next 12 months.  The Boarding of Accounts and Billing procedures have been fully adopted by the Company.  Refer to Exhibit PF.1 (Permanent File) for details.

Management stated that the Company does not send payment coupon booklets or invoices (either electronically or manually) to its borrowers; therefore, the consultants did not complete the testing related to these items.  Additionally, the Company does not have a portal for customers to access payment information or make payments.  Management stated that the Company calls a customer on day one when

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

an account becomes delinquent.  Amongst the consultants' testing performed in Section B of this Report, none of the 25 credits reviewed had an automatic payment program active.

Reference the Servicing/Collections Section of this Report for a discussion on the Company's servicing system and the reports the Company provides regarding the monthly incidence of first payment defaults for the 12 months ending January 31, 2024.

## E.  Accounts Receivable Roll-Forward

Summary Roll-Forward

The Company provided a roll-forward for the 16 months ended January 31, 2024 which is based off of the Monthly Servicer Report over the same time period.  Management cites this activity as the most accurate determination of receivables balances.  The facility with JPMorgan Chase Bank started November 13, 2020.  During November 2023, there was a significant pledge of assets made to JPM which is noted on the accounts receivable roll-forward.  Refer to Exhibit E.1 for details.  The consultants reviewed supporting documentation for the month of January 2024 and agreed all components of the January 2024 roll-forward to the following supporting documentation:

- New Contracts Pledged – Per monthly SPV4 contracts pledged summary generated by the Company.
- Collections Allocable to Principal – Per monthly SPV4 principal payment support summary generated by the Company.
- Securitization Release – Per monthly SPV4 Servicer Reports there were securitization releases noted in February 2023 and January 2024.
- Write-Offs – Per the Pool Loan Detail tab in the Servicer Report.

Cash Collection Percentages

The consultants calculated the monthly cash collection percentages for the three-month, six-month and 12-month periods ended December 31, 2022, January 31, 2023, December 31, 2023 and January 31, 2024.  Refer to Exhibit E.1 for details.  The consultants' results are as follows:

| Statistic | 3-Months Ended 12/31/22 | 6-Months Ended 12/31/22 | 12-Months Ended 12/31/22 |
|---|---|---|---|
| Avg BOM Loan Receivable | $121,589,277 | $109,435,982 | $103,050,038 |
| Avg Principal Cash Collections | $1,403,487 | $1,251,345 | $1,064,120 |
| Cash Collection Percentage | 1.2% | 1.1% | 1.0% |
| Statistic | 3-Months Ended 01/31/23 | 6-Months Ended 01/31/23 | 12-Months Ended 01/31/23 |
| Avg BOM Loan Receivable | $144,971,119 | $127,287,712 | $112,628,999 |
| Avg Principal Cash Collections | $1,632,542 | $1,431,099 | $1,165,919 |
| Cash Collection Percentage | 1.1% | 1.1% | 1.0% |
| Statistic | 3-Months Ended 12/31/23 | 6-Months Ended 12/31/23 | 12-Months Ended 12/31/23 |
| Avg BOM Loan Receivable | $450,182,724 | $361,616,036 | $244,854,799 |
| Avg Principal Cash Collections | $7,684,502 | $5,349,055 | $3,448,939 |
| Cash Collection Percentage | 1.7% | 1.5% | 1.4% |
| Statistic | 3-Months Ended 01/31/24 | 6-Months Ended 01/31/24 | 12-Months Ended 01/31/24 |
| Avg BOM Loan Receivable | $566,873,655 | $441,261,446 | $287,474,548 |
| Avg Principal Cash Collections | $10,361,871 | $6,849,653 | $4,316,764 |
| Cash Collection Percentage | 1.8% | 1.6% | 1.5% |

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Per discussion with management the cash collections percentages should be consistent with the Company's other facilities on a go forward basis and approximate between 1% to 2%.

For a reconciliation of monthly cash collections between the roll-forward/MSR and internally prepared reports, refer to the Cash Management Section of this Report.

Expected vs. Actual Cash

The consultants requested from the Company a schedule of expected cash to be received for the 12-month period ending January 31, 2024 and on a monthly basis. Management stated that they do not keep or are able to provide such a report, as the Company's cash is managed globally rather than by facility. Additionally, the global report was not provided by management through the issuance of this draft report.

Reconciliation

The Company provided the following reconciliation for loan receivables, between the roll-forward and trial balance as of January 31, 2024:

| Reconciliation | Amount |
|---|---|
| **Balance per the SPV4 Trial Balance** | |
| GL #12000 Notes Receivable | $    483,612,060 |
| GL #12040 Non Earning Principal | 1,099,541 |
| GL #12751 IDMS Clearing Notes Receivable | 508,482 |
| **Reconciled Balance per the SPV4 Trial Balance** | $    485,220,083 |
| **Balance per the Roll-Forward / MSR** | $    485,220,083 |
| Variance | $                    - |
| Percentage Variance | 0.00% |

Frequency and Timing of Reconciliations

Per management, reconciliations such as loan receivables and cash are done the second business day after month end by the appropriate member of the accounting team and then are approved by management.

**F.  Internal /External/Regulatory Audits**

External Audit Reports

The Company provided the audited financial statements for the years ended December 2021 and 2022 for Tricolor Holdings, LLC, and subsidiaries.

The consultants reviewed the audited financial statements prepared by Crowe LLP, with an issuance date of July 31, 2023. The Company's auditors provided the following statement regarding the financials:

*"We have audited the consolidated financial statements of Tricolor Holdings, LLC, which comprise the consolidated balance sheets as of December 31, 2022 and 2021, and the related consolidated statements of operations, members' equity (deficit), and cash flows for the years then ended, and the related notes to the financial statements.*

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                      Consulting Report

*In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Tricolor Holdings, LLC as of December 31, 2022 and 2021, and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America."*

Management Letter Comments

The Company provided the management letter related to the 2022 audit. The following is a summary of internal control weaknesses related to collateral, servicing, collections, etc. The entire 2022 Management Letter, including auditor recommendations, is included as Exhibit F.1. As it is pass word protected the consultants could not include as an exhibit. Management provided the Tricolor Audit Committee of the Board of Directors' November 2023 meeting minutes, which outlines management's remediation plan and status of such plan, which is included as Exhibit F.2.

***Material Weaknesses:***

*IT General Control Issues over IDMS*

- No formal user provisioning control or periodic system access review control in place.
- Lack of segregation of duties, as the system administrator is part of accounting team.
- Lack of segregation of duties, as system administrator is part of payroll department.

*Accounting and Financial Reporting*

- No controls to ensure reconciling items are addressed in a timely manner.
- Insufficient controls surrounding inventory, specifically the following:
  *"There were a number of errors identified within inventory such as lack of controls to identify needed reclassifications from inventory to charge offs, inventory recorded to the general ledger that the Company did not have possession of, and lack of review of repossession related accounts to ensure proper accounting and valuation of repossessions in process."*

*Fair Value of Receivables Estimate*

- Insufficient review over the fair value model, including review of inputs and tie out to the financial statements.
- No formal process in place to review the estimation and evaluate the qualitative and quantitative inputs to determine whether significant assumptions in the model remain relevant in estimating fair value.
- No documentation maintained over model access, change management process, or change log.

*Related Party Transactions*

- No formalized control to identify and disclose related party transactions, or the completeness of the related party listing.
- The related party receivable account is not properly monitored and there is not a precise review procedure in place to ensure executive activity on the corporate American Express is for proper business purposes.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

*Account Setup of Finance Receivables (Significant Deficiency)*

- Insufficient manual controls surrounding the IDMS application to ensure all new finance receivables receive a post-close review for accuracy.

Material weaknesses were also noted in the areas of Control Environment and Deficiency Remediation Implementation and Monitoring.

Compliance Management System –Policies and Procedures

Tricolor's written Compliance Program utilizes the compliance management system which includes a comprehensive set of policies and procedures, including:

- Fair Lending Program Manual
- Complaint Response/Resolution Program
- Servicing and Collections Policy and Procedures
- Service Provider Program Manual
- Cash Reporting Policies and Procedures
- Marketing Policies and Procedures
- Red Flag Policies and Procedures
- Office of Foreign Assets Control Policies and Procedures
- Safeguards Program
- Servicemember Civil Relief Act (SCRA) Procedures
- Social Media Usage Policy
- Unfair, Deceptive, or Abusive Acts or Practices
- Privacy Policies and Procedures
- Origination Compliance
- TILA Compliance & Funding
- Furnisher & Credit Dispute Resolution Policies and Procedures

Operational Audit Reports

Per discussions with management, the Company has not conducted an operation audit in the last 12 months as of January 31, 2024.

Internal Audit Reports

In Q1 2023 Tricolor engaged Ernst & Young to perform internal audit procedures.  Per management, this project has been on hold since the beginning of April 2023 with the first area of review, human resources and payroll, left incomplete.  The Company did not indicate if, or when, they expect to complete this project.

Regulatory Reports

Per discussions with management, there have been no regulatory examinations in the last 12 months as of January 31, 2024.

The regulators from the Texas Office of Consumer Credit Commissioner ("OCCC") have not scheduled the next examination as of the consultants' report date of November 11, 2022.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

The last regulatory report issued by the OCC was in August 2020 involving Tricolor Auto Acceptance.  The audit findings noted that the Company's Guadalajara, Mexico location did not have an OCCC license for servicing loans.  Per recommendations, management resolved the issue by applying and receiving a retroactive license for the aforementioned location.  The audit also discovered that Tricolor was charging-off accounts sooner than the 20-day minimum window after a vehicle had been repossessed.  Management has since updated its policy to prevent this from happening.

The OCCC audit of Tricolor Auto Group in August 2020 did not identify any weaknesses.

Internal Quality Assurance Reviews

- The Director of Compliance conducts the internal Quality Assurance ("QA") reviews for each department of the organization.  The QA reviews do not entail a detailed audit program, but a checklist of questions tailored to the department's key areas to evaluate their performance.  QA program is designed to ensure accountability within the department, reporting to key stakeholders, training, and compliance with regulatory requirements.  QA provides weekly scores and feedback to the department heads including agent scores and feedback.  Agents scoring less than 90% are required to attend one on one training until performance improves.  Insufficient manual controls surrounding the IDMS application to ensure all new finance receivables receive a post-close review for accuracy was noted as a significant deficiency in the auditor's management letter.

Per inquiry, the Company's QA training program was rolled out in November 2019.    The following is a list of areas covered by the training program: Customer Care, Early-Stage Collections, Late-Stage Collections, Loss Mitigation, Underwriting, Insurance, Post-Closing, Closing Videos, Verifications, Customer Relations, and Service Departments.

Post-Loan Closing Quality Control Procedures

The consultants were provided the post-closing procedures performed by the quality control team.  The Purchase Agreement and Retail Installment Contracts are electronically signed by the customer using SecureClose and are reviewed next business day.  The personal information on the purchase agreement is matched against the customer ID and account information in IDMS.  The customer's proof of residence is matched against the purchase agreements and the vehicle mileage and pertinent information is verified against the title application, odometer disclosure form and the Tri-warranty contract, if applicable.

The retail installment contract terms are reviewed for agreement with the data maintained within IDMS.  The following are some of the terms verified which includes total amount financed, first and last payment, down payment, annual percentage rate ("APR"), number of payments, applicable fees, etc.  The retail installment contract disclosures are reviewed for compliance with federal regulations for the Truth in Lending Act ("TILA") and Regulation Z.  If there are any missing disclosures, they noted for follow up by their supervisors.

Any deal documents that are manually signed by the customer are also uploaded and retained within SecureClose.  Missing deal documentation are tracked in CDE and reported weekly to the Regional Managers ("RM"), Chief Financial Officer ("CFO") and Senior Management ("SM") via email.  A missing retail installment contracts report is also sent out weekly.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Unfunded retail installment contracts are usually caused by discrepancies between the customer information entered within IDMS and the purchase and retail installment contracts.  Regional Managers are tasked to resolve discrepancies as their commissions are tied directly to the funding of the deals.  Any discrepancies that cannot be resolved by Regional Managers is escalated to the Director of Compliance for corrections.  Once all discrepancies are resolved an e-mail is sent out that the deal is ready to be fund.

## G.  Loan Loss Reserve and Static Pool Data

Reserve Methodology

Per discussion with management, Tricolor reports its receivables under the Fair Value Accounting valuation, in accordance with GAAP, and has done so since the beginning of the 2018 calendar year.  Accordingly, no loan loss reserves are noted within the financial statements.  However, refer to the Material Weaknesses in Section F for additional comments.

Summary Roll-Forward of Allowances for Credit Losses

Due to the reserve methodology, the summary roll-forward of the allowance for credit losses for the last two fiscal year-end and interim period (January 31, 2024) could not be performed (Scope step G.2).

Static Pool Data

Per discussions with management, the Company's static pool data is comprised entirely of charge-off data populated within the data tape.  Given the comprehensive tracking of activity among all accounts originated throughout Tricolor's history within the tape, no additional testing has been conducted by the consultants.  All information pertaining to the data tape within the Charge-Off Test samples agreed to servicing records.

A historical static pool for the SPV4 facility was not applicable as the Company does not create static pools for each individual facility.  The Company prepared a summary of static pool information among all of its portfolios through January 31, 2024.  A copy of this summary has been retained within the consultants' workpapers and is available upon request.

In place of a historical static pool, the consultants analyzed the charge-offs included in the AR Rollforward for the 16-month period ending January 31, 2024 to determine the facility's charge-off percentage, as well as the rolling percentages over the time periods of three, six, and twelve months.

The results are included in the table below, with management stating that the percentages were within expectations:

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC          Consulting Report

| Period | Beginning Principal Balance | | Charge-Offs | | C/O Percentage | 3-Mo C/O | 6-Mo C/O | 12-Mo C/O |
|---|---|---|---|---|---|---|---|---|
| Oct-22 | $ | 111,687,202 | $ | 3,675,032 | 0.0% | N/A | N/A | N/A |
| Nov-22 | | 106,659,199 | | 5,678,653 | 5.3% | N/A | N/A | N/A |
| Dec-22 | | 146,421,429 | | 6,896,762 | 4.7% | 4.5% | N/A | N/A |
| Jan-23 | | 181,832,730 | | 5,841,246 | 3.2% | 4.2% | N/A | N/A |
| Feb-23 | | 175,155,766 | | 5,746,873 | 3.3% | 3.7% | N/A | N/A |
| Mar-23 | | 87,443,886 | | 1,847,792 | 2.1% | 3.0% | 3.7% | N/A |
| Apr-23 | | 84,376,399 | | 318,020 | 0.4% | 2.3% | 3.4% | N/A |
| May-23 | | 90,748,461 | | 688,982 | 0.8% | 1.1% | 2.8% | N/A |
| Jun-23 | | 149,004,134 | | 250,636 | 0.2% | 0.4% | 1.9% | N/A |
| Jul-23 | | 215,397,255 | | 564,960 | 0.3% | 0.3% | 1.2% | N/A |
| Aug-23 | | 288,300,188 | | 3,125,896 | 1.1% | 0.6% | 0.7% | N/A |
| Sep-23 | | 315,450,601 | | 2,834,286 | 0.9% | 0.8% | 0.7% | 1.9% |
| Oct-23 | | 343,196,922 | | 2,713,377 | 0.8% | 0.9% | 0.7% | 1.7% |
| Nov-23 | | 379,942,977 | | 1,226,379 | 0.3% | 0.7% | 0.6% | 1.3% |
| Dec-23 | | 627,408,274 | | 984,780 | 0.2% | 0.4% | 0.5% | 0.9% |
| Jan-24 | | 693,269,714 | | 2,627,372 | 0.4% | 0.3% | 0.5% | 0.7% |

Fair Value of Accounting & CECL Implementation

The Company has prepared a manual for determining all factors in estimating the Fair Value of receivables and any Expected Credit Losses.  This report is reviewed annually, report itself was created by Tricolor's Chief Financial Officer and Chief Risk Officer, with a subsequent review completed by the Company's auditors, Crowe LLP.  As part of each annual fiscal year-end audit, the aforementioned auditors reviewed the quantitative estimates and actual results that are used to derive all valuations.  All activity reviewed as part of the 2022 fiscal year-end audit was noted to be satisfactory within the notes to the financial statements.  However, also refer to Section F Material Weaknesses discussion.

Purchase discounts pertaining to each SPV's acquisition of receivables are maintained independently on the general ledger.  The unearned discount (G/L #12110) per the SPV4 trial balance totaled $49,187M as of January 31, 2024.

As the Company uses Fair Value accounting for its receivables, they are already compliant with any upcoming CECL implementation requirements.

**H.  Cash Management**

Policies and Procedures

Per the consultants' discussion with management, the Company does not have a formalized cash control / payment processing policy outside of what is discussed within the Servicing and Collections handbook.  Within the handbook, all aspects and instructions pertaining to cash application within the IDMS platform are discussed but maintains no accounting-specific discussion or instructions.  Per management, cash control policy is governed independently by the accounting department.  Per management, the Company's Cash Management policies and procedures have not changed since the last examination report dated November 11, 2022.  Management also stated that they do not expect to make any material revisions to these policies and procedures within the next 12 months.  Refer to Exhibit PF.1 (Permanent File) for details.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

<u>Bank Accounts and Reconciliations</u>

The Company maintains two bank accounts related to the collection of payments for the existing JPM facility:

- Master Collection Account with Wells Fargo Bank, account ending in x7276, comprised of various third-party collection receipts.
- Collection Account with Wilmington Trust, account ending in x1-000, comprised of daily transfers from the Master Collection Account.

Bank reconciliations and statements were provided for both accounts as of January 31, 2024 with no significant reconciling items of note.

<u>Cash Collections by Method of Payment</u>

The Company provided the following reconciliation of cash collections by method of payment for the month ending January 31, 2024:

| Method of Receipt | Jan-24 | % |
|---|---|---|
| PayNearMe | $ 16,207,874 | 100.0% |
| Repay | 1,212 | 0.0% |
| Wire Transfer from Tricolor Auto Acceptance LLC | - | 0.00% |
| Total Deposits per Bank Statement | $ 16,209,086 | 100.0% |
| | | |
| Total Collections per MSR | $ 16,162,543 | |
| Variance - Deposits per WF*7276 to Collections per MSR | 46,543 | 0.29% |
| | | |
| Total Receipts per Roll-Forward | $ 12,454,032 | |
| | | |
| *Reconciling Items* | | |
| Interest Collections | $ 2,352,731 | |
| Liquidation Proceeds | 1,355,780 | |
| | | |
| Adjusted Receipts per Roll-Forward | $ 16,162,543 | |
| Variance - Collections per MSR to Adjusted Receipts per Roll-Forward | - | 0.00% |
| | | |
| Receipts per Wilmington Trust Collection Account *1-000 | $ 217,824,985 | |
| | | |
| *Reconciling Items* | | |
| *Deposit related to release of collateral* | (199,561,069) | |
| Receipts related to TAST2024-1 | (1,694,315) | |
| | | |
| Adjusted Receipts per Wilmington Trust Collection Account *8-000 | $ 16,569,601 | |
| Variance | $ (407,059) | -2.5% |

The above totals were able to be reconciled between the Wells Fargo account ending in x7276, the January 31, 2024 MSR, the summary receivable roll-forward report, and deposits to the Wilmington Trust Collection Account x1-000, with minimal unreconciled variances.  Management attributed the variance of $407M when reconciling to the Wilmington Trust, account ending in x1-000 to timing differences.

<u>Two-Day Cash Test</u>

The consultants requested, and were provided by the Company, details of the cash general ledger activity for the dates of January 12, 2024 and January 24, 2024.  Information provided by management indicated some collections related to SPV4 are deposited to an account other than the Wells Fargo Master Collection

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Account ending in x7276 and some deposits to the Wells Fargo Master Collection Account ending in x7276 are not related to SPV4.   The January 2024 Method of Receipt reconciliation shows that, as indicated in management's response below, there were sufficient funds deposited to the Wells Fargo ("WF") Collections and the Wilmington Trust ("WT") Collections accounts to cover obligor collection during the month of January 2024.

The two-day cash test reconciled as follows:

| Method of Receipt | Jan 12, 2024 | % | Jan 24, 2024 | % |
|---|---|---|---|---|
| PayNearMe | $ 656,499 | 85.6% | $ 291,204 | 57.1% |
| Debit Card | 567 | 0.1% | 217 | 0.0% |
| Speed Pay | 2,475 | 0.3% | 777 | 0.2% |
| Cash / Check | 947 | 0.1% | 190,704 | 37.4% |
| Customer Credit | 6,274 | 0.8% | 5,459 | 1.1% |
| Recoveries | 100,087 | 13.1% | 21,358 | 4.2% |
| Total Collections per Payment File (G/L) | $ 766,849 | 100.0% | $ 509,720 | 100.0% |
|  |  |  |  |  |
| *Reconciling Items* |  |  |  |  |
| Recoveries (deposited 7-14 days later) | (100,087) |  | (21,358) |  |
| Customer Credit (non-cash) | (6,274) |  | (5,459) |  |
| Cash Check lag | (947) |  | (190,704) |  |
| Adjusted Collections per Payment File | $ 659,541 |  | $ 292,199 |  |
|  |  |  |  |  |
| Total Collections per WF*7276 Bank Statement | $ 2,614,968 | 1/18/2024 | $ 243,299 | 1/29/2024 |
|  |  |  |  |  |
| *Reconciling Items* |  |  |  |  |
| Payments initiated Jan 13, 14, 15 deposited Jan 18 | (2,010,107) |  | - |  |
| Deposits to WF*7276 not related to SPV4 | (336,250) |  | (126,369) |  |
| SPV4 Payments Deposited to WF*9370 | 74,815 |  | 26,918 |  |
| SPV4 Payments Deposited to WF *7634 | 180,275 |  | 80,209 |  |
| SPV4 Payments Deposited to WF *7292 | 64,178 |  | 26,632 |  |
| SPV4 Payments Deposited to WF *7284 | 57,004 |  | 29,164 |  |
| Deposits in Transit to WF*7276 | 9,530 |  | 11,331 |  |
| Adjusted Collections per Bank Statement | $ 654,413 |  | $ 291,186 |  |
| Variance Adjusted Collections per WF*7276 to Adjusted Collections per G/L | 5,128 | 0.20% | 1,013 | 0.42% |

Per management, the Company consolidated the SPV5 warehouse line into the JPM warehouse in November 2023 and repurchased receivables from SPV3, which are now part of SPV4.  Management states the process of directing customer payments to the correct account is manual and there are errors. Management has indicated they are working to correct these errors.  Currently, the Company ensures the balance in the Wilmington Trust Collection Account x1-000 ties to the MSR cash required; however, this is not in compliance with the GLD, which states ""the Servicer shall direct and instruct all related Obligors to make all payments in respect of the related Receivables to the Master Collection Account.".

Approximately $376M, 49% of payments received on January 12, 2024 per the G/L and $163M, or 32% of payments received on January 24, 2024 per the G/L, were deposited to an account other than the Wells Fargo Master Collection Account ending in x7276.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

Management provided the following commentary.

*"The Company ensures the correct deposits are in the Wilmington Trust("WT") Collections and the Wells Fargo ("WF") Collections account by monitoring collections daily with deposits typically received on a 3- 4-day lag.  This was evident by the deposits in the WT Collections and WF account deposits are within a small tolerance of the MSR amounts accounting for monthly deposit lags for payments (3-5 business days) as well as timing of recovery/liquidation proceeds (typically 10-14 days).*

*The following table shows a 9-month trend in deposits into the WF and WT collections account with a variance to the MSR required amounts.  As one can see there are monthly fluctuations that are primarily driven by the liquidation/ recovery amounts.  Overall, for the 9-month period, the WF account had 6.4% more deposits than required, while the WT collections account had 2% more deposits than required.  The WF deposits include some sales tax and from time-to-time CPI payments, which are the property of Tricolor.*

Tricolor MSR to WF and WT Collections Account Analysis

| | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 | 9 month totals |
|---|---|---|---|---|---|---|---|---|---|---|
| MSR P &I | $ 7,887,004 | $ 10,524,244 | $ 15,438,663 | $ 14,806,763 | $ 6,223,281 | $ 7,687,823 | $ 8,299,198 | $ 5,097,044 | $ 3,009,306 | |
| Liquidation and Recoveries | 1,743,139 | 1,756,466 | 630,280 | 1,355,780 | 2,936,664 | 10,209,642 | 5,800,301 | 5,646,309 | 8,128,635 | |
| Total Available Funds | $ 9,630,143 | $ 12,280,709 | $ 16,068,943 | $ 16,162,543 | $ 9,159,945 | $ 17,897,465 | $ 14,099,498 | $ 10,743,354 | $ 11,137,941 | $ 117,180,541 |
| **JPM WF *7634 Collections** | | | | | | | | | | |
| **Account** | 10,491,977 | 14,036,605 | 14,814,443 | 16,209,086 | 15,006,952 | 9,032,182 | 18,469,531 | 15,111,827 | 11,557,299 | $ 124,729,903 |
| JPM WF to MSR Variance | 861,834 | 1,755,895 | (1,254,500) | 46,543 | 5,847,007 | (8,865,283) | 4,370,033 | 4,368,474 | 419,359 | 7,549,362 |
| % variance | 8.9% | 14.3% | -7.8% | 0.3% | 63.8% | -49.5% | 31.0% | 40.7% | 3.8% | 6.4% |
| **JPM WT *271-000** | | | | | | | | | | |
| **Collections Account** | 8,423,681 | 11,639,188 | 15,051,130 | 16,569,601 | 15,051,130 | 8,810,929 | 18,165,401 | 14,262,877 | 11,557,196 | $ 119,531,133 |
| JPM WT to MSR Variance | (1,206,462) | (641,522) | (1,017,813) | 407,058 | 5,891,185 | (9,086,536) | 4,065,903 | 3,519,524 | 419,255 | 2,350,592 |
| % variance | -12.5% | -5.2% | -6.3% | 2.5% | 64.3% | -50.8% | 28.8% | 32.8% | 3.8% | 2.0% |

*In addition to monitoring daily, Tricolor periodically reviews the deposits for accounts and corrects with the payment processor."*

Cash Application Test

The consultants utilized a subset of 25 accounts selected for the Credit File Review for a review the most recent payment prior to January 31, 2024.  The Company provided information that allowed the consultants to trace the most recent payments to a batch ID/amount and reconciled to a corresponding bank statement for 20 of the 25 sampled accounts.  One account had no payment received prior to January 31, 2024 and the Company did not provide the payment information for the other four accounts.

For the 20 accounts where information was available, no lag time was noted between the payment application date on IDMS and the initiation date, the lag time between batch initiation and deposit into the bank ranged from two to three business days (average 2.8 days) and the lag time between the payment application on IDMS to the bank deposit ranged from two to three business days (average 2.7 days).  Refer to Exhibit H.1 for specific details.

Unapplied Cash

Per management, given the nature of all payment methodologies utilized by the Company, the likelihood for unapplied cash or suspense items is virtually non-existent.  All payments require some correspondence between a payment processor (PayNearMe/IDMS), which requires account information input prior to a successful payment, and the customer itself.  Similar to prior exams, no subsequent testing was conducted by the consultants, and no account is noted on the trial balance as of January 31, 2024.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                                    Consulting Report

Rejected Payments

Per management, the Company rarely has rejected payments, as most cash receipts come from third parties and are cash oriented.  No rejected payments were noted within the SPV6 facility.  Management noted that there had been minimal credit card chargeback activity related to payments made via Repay in other facilities.  Payments made via Repay during January 2024 totaled $1M, statistically 0.0% of total payments.  As such, rejected payments were not tested during this exam.

Credit Card Fraud

Per discussions with management, no formal policy is in place with respect to the treatment of credit card fraud.  Typically, discovery of fraud stems from a charge-back of a debit/credit card, from which the Company's Servicing team members will investigate and, if fraud is determined, begin the repossession and charge-off process.

I.  **Repossessions**

Policies and Procedures

Per discussion with management, the Company's Repossessions policies and procedures have not changed since the prior examination report dated November 11, 2022.  Management also stated that they do not expect to make any material revisions to these policies and procedures within the next 12 months.  Refer to Exhibit PF.1 for further details on the Company's Repossession Policies and Procedures.

As mentioned in the Material Weakness section of this Report, accounts that have been subject to a repossession are flagged as a specific criterion on the Company's data tape.  The January 31, 2024 data tape indicates 290 accounts with a current principal balance of $5,275M have been repossessed but not yet charged-off.

The consultants judgmentally selected 15 accounts to test the Company's procedures on the accuracy of the reported net realizable value and gain/loss amount and that the accounts were charged-off in accordance with charge-off policies.  Of the 15 accounts, all had successfully been repossessed.  Management provided the consultants with MMRs to support the recovery value.  The average repossession proceeds was 67% to the charged off amount.  Refer to Exhibit I.1 for specific details on the testing.

The consultants were to select 20 deficiency recoveries to test that the proceeds were applied per the Company's policy, the GLDs and the proper facility and account.  However, per management, the Company does not collect on deficiencies, and there were no recoveries for the 12 months ending January 31, 2024.  Therefore, the testing was not applicable.

Per management, the proceeds from the auction are not directly tied to the recovery of any charged off loan.  Once the Company charges off a loan, and the repossession is completed, the black book value is obtained and used to determine the value of the vehicle that is placed back into the Company's inventory.  The vehicle is then reconditioned, as necessary, and then either sold via auction or placed back onto a lot to be resold.  Management internally uses the black book value as the liquidation proceeds value, and those proceeds are included in the waterfall payments made to JPM.  The auction proceeds are not related to any recovery of a charged-off loan and the Company utilizes the black book value to offset the loss on the collateral.

53

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

The consultants were to judgmentally select 10 accounts that were charged off and resold within the three months ending January 31, 2024.  The consultants were to test that the sale was completed in accordance with the Company's policy and procedures, that the account was removed from the aged trial balance, and the Company's system, that any proceeds were sent to the appropriate facility.  The consultants were to compare the information per the data tape to the Company's records.  Per bank management, the testing of auctioned vehicles, and information subsequent to the sale of the vehicle, is not applicable.  Therefore, the testing was not completed.

## J.  Insurance and Title Tracking

Policies and Procedures

Per discussion with management, the Company's Insurance and Title Tracking policies and procedures have not changed since the prior examination report dated November 11, 2022.  Management also stated that they do not expect to make any material revisions to these policies and procedures within the next 12 months.  Refer to Exhibit PF.1 for further details on the Company's Insurance and Title Tracking Policies and Procedures.

Title Exceptions

Management stated the Company is not provided a custodian collateral exception report for the JPMorgan facility, as the Company maintains the collateral information and verifies the collateral prior to pledging. Discussion of any titles not provided during the credit file testing is included within the Underwriting/Credit Approval Section of this Report.

Per management, there were no missing titles exceptions noted based on an internal Company generated report titled "Titles Pending From Auction (Missing Titles Report)" as of January 31, 2024.

## K.  Accounting Policies and Procedures

Policies and Procedures

Per discussion with management the Company's Accounting Policies and Procedures have not changed since the prior examination report dated November 11, 2022.  Management also stated that they do not expect to make any material revisions to these policies and procedures within the next 12 months.  Refer to Exhibit PF.1 for further details on the Company's Accounting Policies and Procedures.

Charge-off of Financed Receivables

Refer to Section C – Servicing/Collections which includes the Company's policies and testing of charged-off accounts.

Litigation Reserves

Per the consultants review of the fiscal year ended December 31, 2022 audited financial statements, it is noted that there were $999M of reserves for litigation based on a California payroll litigation.  A final order of the litigation settlement was filed with the Superior Court of California  on March 16, 2023.  The Company made a partial payment of $500M on March 24, 2023 with the remaining payment of $499M  on September

4, 2023.   The consultants traced and verified these two payments to the applicable monthly bank statement.

Also, as of December 31, 2022, the Company was involved in a lawsuit with a former supplier, who the Company sued for damages, and the supplier countersued the Company for amounts alleged to be owed to the supplier.   The Company has asserted various claims against the supplier including claims for damages arising from the supplier's conversion of the Company's vehicles, breaches of warranties, and breaches of contract.   The Company additionally disputes the amounts alleged to be owed to the supplier. Management believes it is likely the Company will be successful in reaching a settlement with the supplier that would reduce amounts alleged by the supplier to be due, as well as compensate the Company for damages suffered.   There were no contingent liabilities recorded as of December 31, 2022.

Additionally, refer to Section O of this report for additional litigation discussion.

Unearned Interest Income

Unearned interest income is not recorded on the consolidated balance sheet as of January 31, 2024 due to Fair Value Accounting.   The level yield method is used to report its interest income at the end of each month.   The value of the financed receivables is revalued using the Company's internal rate of return which discounts future cash flows considering potential credit losses based on the historical loss rates.   The monthly changes in fair value of the finance receivables is adjusted and passed through the income statement as change in market value for the period.   The testing of unearned interest income is not applicable at this time.   Therefore, no testing was performed.

Adequacy of the Accounting Department

Tricolor's accounting department includes a head count of 20 full-time employees located both in Mexico and the US.   The corporate offices are maintained in the US lead by the Vice President and Controller. The staffing levels is competent with duties ranging from general accounting, financial reporting, payables, payroll, reconciliation specialists, etc.

Reconciliations

The Company provided the following reconciliations as of January 31, 2024:

- Cash
- Finance Receivables

Refer to Section E - Accounts Receivable Roll-Forward and Section H - Cash Management for further discussion for testing to the general ledger for each of the reconciliations including any large outstanding reconciling items.

**L.  Monthly Servicer Report**

MSR Preparation Procedures

The consultants held discussions with the Company with regard to the various policies and procedures related to the completion of the Monthly Servicer Report ("MSR") and Borrowing Base Calculations ("BBC").

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

The MSR and as necessary mid-month BBCs are prepared by the Director of Internal Consultancy and reviewed and signed by the CFO and CEO.  A BBC is prepared as necessary to draw down the JPM line of credit, in addition to the monthly MSR that is reported to JPM.

The MSR is due on the 10th of the subsequent reporting month, which contains data from the prior month end.  The MSR is then processed (e.g., funds released) by JPM on the 15th of the same reporting month.

MSR Testing

The Company provided the consultants with the following Governing Legal Documents ("GLDs") for review of the January 31, 2024 Monthly Servicer Report:

- Credit Agreement dated November 13, 2020
- Amendment No. 1 to Credit Agreement dated February 4, 2021
- Amendment No. 2 to Credit Agreement dated March 31, 2021
- Amendment No. 3 to Credit Agreement dated November 30, 2021
- Amendment No. 4 to Credit Agreement dated February 2, 2022
- Amendment No. 5 to Credit Agreement dated June 8, 2022
- Amendment No. 5 to Credit Agreement dated November 29, 2022
- Amendment No. 6 to Credit Agreement and Amendment No. 1 to Second Amended and Restated Fee Letter dated December 7, 2022
- Amendment No. 7 to Credit Agreement dated June 9, 2023
- Amendment No. 8 to Credit Agreement dated July 31, 2023
- Amendment No. 9 to Credit Agreement dated August 2, 2023
- Amendment No. 10 to Credit Agreement dated October 27, 2023

The Company provided the consultants with a copy of the MSR file as of January 31, 2024.  Refer to Exhibit M.1 for details.  The file provided included the following data sets as supplementary schedules:

- Aging of all Loans and Balance Roll-Forward
- Pool Loan Detail listing all Loans including Ineligible Loans
- Detailed excess concentration calculations
- Detailed performance trigger calculations
- Waterfall and liquidity detail

A review of the borrowing base and performance triggers for the month ending January 31, 2024 is as follows:

| Dates | Per Company | Per Consultants | Footnote |
|---|---|---|---|
| Facility Closing Date | 11/13/20 | 11/13/20 | A |
| Commitment Termination Date | 11/13/21 | 11/13/21 | A |
| Final Maturity Date | 05/15/28 | 05/15/28 | A |
| Determination Date | 02/09/24 | 02/09/24 | A |
| Payment Date | 02/15/24 | 02/15/24 | A |
| Collection Period Begin Date | 01/01/24 | 01/01/24 | A |
| Collection Period End Date | 01/31/24 | 01/31/24 | A |
| Collection Period Number | 39 | 39 | A |
| Interest Period Begin Date | 01/01/24 | 01/01/24 | A |
| Interest Period End Date | 01/31/24 | 01/31/24 | A |
| Number of Days in Interest Period | 31 | 31 | B |

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                     Consulting Report

A. Agreed to the definition Section 1.01 of the Credit Agreement.
B. Per 2024 Calendar.

| Loan Information | Per Company | Per Consultants | Variance | Note |
|---|---|---|---|---|
| Aggregate Commitment Amount | $550,000,000 | $ 550,000,000 | $           - | A |
| Total Drawn Amount at the beginning of the Funding Request | 477,311,835 | 477,311,835 | - | B |
| Principal Balance of Eligible Pledged Contracts at end of Funding Request | 478,568,873 | 478,433,664 | 135,209 | C |
| Borrowing Base Availability at end of Funding Request | 330,212,522 | 330,119,228 | 93,294 | D |
| Borrowing Base Payments Availability at Beginning of Funding Request | 58,550,000 | 58,550,000 | - | E |
| Unused Availability at end of Funding Request | - | - | - | F |

A. Aggregate Principal Amount of Revolving Commitments per Schedule A of the Credit Agreement and as amended by the participating lenders from time to time.
B. The consultants agreed amount to the Ending Note Balance per the December 31, 2023 general ledger trial balance.
C. Principal Balance of Eligible Pledged Contracts at End of Funding Request is Note L from the Receivables Balance and Borrowing Base table below.
D. Borrowing Base Availability at end of Funding Request is Note N from the Receivables Balance and Borrowing Base table below.
E. Formula (note D from Note Balance table below) minus (note B from Loan Information table above minus note C from Note Balance table below).
F. Formula (note N from Receivables Balance and Borrowing Base table below) minus (note D from Note Balance table below minus note E from Note Balance table below).

| Receivables Balance and Borrowing Base | Per Company | Per Consultants | Variance | Note |
|---|---|---|---|---|
| Beginning Principal Balance | $     693,269,714 | $     693,269,714 | $            - | A |
| New Contracts Pledged | 100,561,875 | 100,561,875 | - | B |
| Collections Allocable to Principal | 12,454,032 | 12,454,032 | - | C |
| Securitization Release | 293,530,102 | 293,530,102 | - | D |
| Write-offs | 2,627,372 | 2,627,372 | - | E |
| Ending Principal Balance | $     485,220,083 | $     485,220,083 | $            - | F |
| Defaulted Receivables | - | - | - | G |
| Other Ineligible Receivables | 6,651,210 | 6,786,419 | (135,209) | H |
| Aggregate Ineligible Receivables | 6,651,210 | 6,786,419 | (135,209) | I |
| Eligible Pool Balance | $     478,568,873 | $     478,433,664 | $     135,209 | J |
| Excess Concentration Amount | - | - | - | K |
| Adjusted Pool Balance | $     478,568,873 | $     478,433,664 | $     135,209 | L |
| Advance Rate | 69.0% | 69.0% | 0.0% | M |
| Totals (Borrowing Base) | $     330,212,522 | $     330,119,228 | $     93,294 | N |

A. Beginning Principal Balance was agreed to the previous months SPV4 Servicer Report (December 31, 2023) ending balance.
B. Balance supported by activity per the Receivables Roll-Forward discussed in Section E within this Report, as balance per MSR is tied to the sum of receivables included on 16 different specific pledge dates (December 1, 4, 5, 6, 8 11, 12, 13, 15, 18, 19, 20, 22, 26, 27, and 29, 2023).
C. Per management and the consultants review of the formulas, the Company backs into the Collections Allocable to Principal amount based on knowing the Beginning Principal Balance, New Contracts Pledged, Securitization Release, Write-Offs and Ending Principal Balance amounts. While the consultants verified the calculation, it is suggested that management generate a report that captures all Collections Allocable to Principal rather than back into the amount.
D. The consultants confirmed and agreed the Securitization Release number to the Securitization Release tab of the January 2024 MSR. The consultants also compared all the accounts listed on the Securitization Release tab to the Pool Loan Detail tab of the January 2024 MSR and noted no incidences of duplication.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

E.  The consultants confirmed and agreed the Write-Offs number to the Pool Loan Detail tab of the January 2024 MSR.  The consultants confirmed the amount by filtering columns BH and BI with Write-Offs number reflected in column BJ.

F.  Formula (note A plus note B minus note C minus note D minus note E) in the Receivables Balance and Borrowing Base table above.

G.  The consultants confirmed the defaulted receivables number greater than or equal to 120 days, by filtering column AR and then summing column U on the Pool Loan Detail tab of the January 2024 MSR.  The consultants noted that there were $135M of defaulted receivables compared to the Company reported amount of $0.  Management indicated that this was an oversight and that the Company has since corrected the error.  The amount has been included in Note H and the accompanying table.

H.  Amount of Other Ineligible Receivables is and not including 120 days.  As such the consultants noted a variance of $135M which has been accounted for in the table.

I.  Formula (note G plus note H) in the Receivables Balance and Borrowing Base table above.

J.  Formula (note F minus note I) in the Receivables Balance and Borrowing Base table above.

K.  From Concentration table below, note C.

L.  Formula (note J minus note K) in the Receivables Balance and Borrowing Base table above.

M.  Note I from Note Balance table below.

N.  Formula (note L multiplied by note M) in the Receivables Balance and Borrowing Base table above.

| Other Ineligible Calculations | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
| (vi), (ix) 60+ DPD and LTV | $        30,800 | $        30,800 | $        - | A |
| (vi), (ix) 60+ DPD & > 66 <= 70 A/A+ Only Term | 39,625 | 39,625 | - | A |
| (vi), (iii) 60+ DPD & Employed 2 Months | 10,708 | 10,708 | - | A |
| (vi), (x) 60+ DPD & Min FICO | 23,000 | 23,000 | - | A |
| (vi), (xxiii) Income Verification | 23,774 | 23,774 | - | A |
| (vi) 60+ DPD | 6,338,006 | 6,338,006 | - | A |
| (ix) LTV | 7,393 | 7,393 | - | A |
| (x) Min FICO | 21,186 | 21,186 | - | A |
| (xxiii) Income Verification | 156,719 | 156,719 | | A |
| (vi) > 120 DPD (Not included in original formula) | - | 135,209 | (135,209) | A |
| **Total Ineligibles** | **$    6,651,210** | **$    6,786,419** | **$   (135,209)** | B |

Ineligible calculations per consultants were completed in order of the listing of Eligibility Criteria on pages 194-197 of the Credit Agreement to avoid double counting, and matched the total calculated by the Company.

A.  Per the Credit Agreement, the Other Ineligibles were noted based on the consultants testing of the datatape through systematic filtering process of columns AR, columns DN through DW, column DX with all in reference to column U (Current Principal Balance).

B.  Formula (Sum of note A) in the Ineligible Calculations above.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

| Note Balance | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
| Beginning of Collection Period Loans Outstanding | $ 477,311,835 | $ 477,311,835 | $ - | A |
| Increases in Note Balance for Funding Request Date - Advance Requested | 58,550,000 | 58,550,000 | - | B |
| Decreases in Note Balance during current collection period | 1,931,965 | 1,931,965 | - | C |
| End of Collection Period Loans Outstanding | $ 533,929,870 | $ 533,929,870 | $ - | D |
| Monthly Principal Payment Amount Due | 4,156,279 | 4,156,279 | - | E |
| Securitization | 199,561,069 | 199,561,069 | - | F |
| Increase to Loans Outstanding after Collection Period prior to Payment Date | - | - | - | G |
| Note Balance after the Payment Date | $ 330,212,522 | $ 330,212,522 | $ - | H |
| Collateral Coverage Ratio | 69.0% | 69.0% | 0.0% | I |

A. The consultants agreed amount to the Ending Note Balance per the December 31, 2023 SPV4 Servicer Report and the general ledger trial balance.
B. The consultants reviewed and agreed amount to the JPM Interest statements and the GL account #20347 LOC.
C. The consultants reviewed and agreed amount to the JPM Interest statements and the GL account #20347 LOC.  Per management and the consultants review of general ledger activity, there was a decrease of $1,932M in Note Balance for Funding Request Date – Advance Requested noted during January 2024.
D. Formula (note A plus note B minus note C) from the Note Balance table above.
E. Formula (note D from Note Balance table above minus (note N from Receivables Balance and Borrowing Base table above) minus note F from the Note Balance table above).
F. The consultants reviewed and agreed the securitization amount to the general ledger trial balance noted for the TAST 2022-1 Securitization.
G. Per management and the consultants review of the general ledger trial balance there was a zero balance noted for Increase to Loans Outstanding after Collection Period prior to Payment Date.
H. Formula (note D minus note E minus note F minus note G) from the Note Balance table above.
I. Formula (note H from Note Balance table above divided by (note L from Receivables Balance and Borrowing Base table above)).

| Available Funds | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
| Interest | $ 2,352,731 | $ 2,352,731 | $ - | A |
| Principal | 12,454,032 | 12,454,032 | - | B |
| Release Amount | - | - | - | C |
| Liquidation Proceeds | 1,355,780 | 1,355,780 | - | D |
| Insurance Proceeds | - | - | - | E |
| Recoveries | - | - | - | F |
| Payments from Hedging Agreements and Deferred Down Payments | - | - | - | G |
| Other | - | | - | H |
| Collections | $ 16,162,543 | $ 16,162,543 | - | I |
| Investment Earnings - Collection Account | - | - | - | J |
| Total Available Funds | $ 16,162,543 | $ 16,162,543 | - | K |

A. The consultants agreed Interest amount to the JPM Payments File that reflects daily principal and interest provided by the Company.
B. Note C from the Receivables Balance and Borrowing Base table above.  Additionally, agreed Principal amount to the JPM Payments file that reflects daily principal and interest provided by the Company.
C. Per management and the consultants review, there were no amounts released.  Additionally, management indicated that this line item is not applicable.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

D. The consultants agreed the Liquidation Proceeds amount by filtering the data tape for all accounts with a recovery date within January 2024 (column BI) and then summing the Amount Recovered (column BK). Liquidation Proceeds totaled $1,356M per the data tape.
E. Per management and the consultants review, there were no insurance proceeds noted.
F. The consultants agreed the Recoveries zero balance by taking the difference between the December 2023 Servicer Report cumulative recoveries balance and the January 2024 Servicer Report cumulative recoveries balance prior to January 1, 2024.
G. Per management and the consultants review, there were no payments from hedging agreements and deferred down payments noted.
H. Per management and the consultants review, there were no Other amounts noted.
I. Formula (sum of notes A through note H) from the Available Funds table above.
J. Per management and the consultants review, there were no Investment Earnings – Collection Account noted.
K. Formula (sum of note I and note J) from the Available Funds table above.

| Collateral Statistics/Delinquency Information | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
| Current | $ 453,354,421 | $ 453,313,876 | $ 40,545 | A |
| 31-60 days delinquent | 25,264,540 | 25,281,073 | (16,533) | A |
| 61-90 days delinquent | 3,647,336 | 3,671,348 | (24,012) | A |
| 91+ days delinquent | 2,953,786 | 2,953,786 | - | A |
| 120+ days and Charged off Losses | - | - | - | A |
| Average Daily Pool Balance | $ 589,244,899 | $ 589,244,899 | $ - | B |
| | | | | |
| Servicing Fee Rate | 3.00% | 3.00% | 0.00% | C |
| Servicing Fee | $ 1,733,174 | $ 1,733,174 | $ - | D |

A. The consultants agreed the delinquency information to detail presented within the data tape. However, based on the aging test in the servicing section of this report, the delinquencies have been adjusted.
B. The consultants agreed the Average Daily Pool Balance which is calculated as the average of note A and note F from the Receivables Balance and Borrowing Base table above calculations.
C. The Servicing Fee Rate is from note E from the Excess Spread table below.
D. Formula (note C from Collateral Statistics/Delinquency information table above divided by 12) multiplied by note A from the Receivables Balance and Borrowing Base table above).

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

| Portfolio - Servicing Covenants | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
| **3-Month Rolling Average Net Loss to Liquidation Ratio** | | | | |
| January 2024 Net Loss to Liquidation % | 7.74% | 7.74% | | A |
| December 2023 Net Loss to Liquidation % | 5.77% | 5.77% | | A |
| November 2023 Net Loss to Liquidation % | 6.81% | 6.81% | | A |
| **Three-Month Average** | **6.77%** | **6.77%** | **0.00%** | B |
| **Overcollateralization Increase Event Trigger? (30.00%)** | **Yes** | **Yes** | | C |
| **Termination Event Trigger? (35.00%)** | **Yes** | **Yes** | | C |
| | | | | |
| **3-Month Rolling Average Extension Ratio** | | | | |
| January 2024 Extension % | 1.31% | 1.31% | | D |
| December 2023 Extension % | 0.06% | 0.06% | | D |
| November 2023 Extension % | 0.10% | 0.10% | | D |
| **Three-Month Average** | **0.49%** | **0.49%** | **0.00%** | E |
| **Overcollateralization Increase Event Trigger? (5.75%)** | **Yes** | **Yes** | | F |
| **Termination Event Trigger? (7.00%)** | **Yes** | **Yes** | | F |
| | | | | |
| **3-Month Rolling Average Delinquency Ratio** | | | | |
| January 2024 Delinquency % | 1.36% | 1.36% | | G |
| December 2023 Delinquency % | 0.51% | 0.51% | | G |
| November 2023 Delinquency % | 0.00% | 0.00% | | G |
| **Three-Month Average** | **0.62%** | **0.62%** | **0.00%** | H |
| **Overcollateralization Increase Event Trigger? (7.50%)** | **Yes** | **Yes** | | I |
| **Termination Event Trigger? (10.50%)** | **Yes** | **Yes** | | I |
| | | | | |
| **Serviced Portfolio 3-Month Rolling Average Net Loss to Liquidation Ratio** | | | | |
| January 2024 Delinquency % | 17.83% | 17.83% | | J |
| December 2023 Delinquency % | 17.79% | 17.79% | | J |
| November 2023 Delinquency % | 20.00% | 20.00% | | J |
| **Three-Month Average** | **18.54%** | **18.54%** | **0.00%** | K |
| **Overcollateralization Increase Event Trigger? (30.00%)** | **Yes** | **Yes** | | L |
| **Termination Event Trigger? (35.00%)** | **Yes** | **Yes** | | L |
| | | | | |
| **Serviced Portfolio 3-Month Rolling Average Extension Ratio** | | | | |
| January 2024 Extension % | 2.40% | 2.40% | | M |
| December 2023 Extension % | 2.18% | 2.18% | | M |
| November 2023 Extension % | 1.39% | 1.39% | | M |
| **Three-Month Average** | **1.99%** | **1.99%** | **0.00%** | N |
| **Overcollateralization Increase Event Trigger? (5.75%)** | **Yes** | **Yes** | | O |
| **Termination Event Trigger? (7.00%)** | **Yes** | **Yes** | | O |
| | | | | |
| **Serviced Portfolio 3-Month Rolling Average Delinquency Ratio** | | | | |
| January 2024 Delinquency % | 4.82% | 5.13% | | P |
| December 2023 Delinquency % | 4.61% | 4.52% | | P |
| November 2023 Delinquency % | 4.43% | 4.63% | | P |
| **Three-Month Average** | **4.62%** | **4.76%** | **-0.14%** | Q |
| **Overcollateralization Increase Event Trigger? (7.50%)** | **Yes** | **Yes** | | R |
| **Termination Event Trigger? (10.50%)** | **Yes** | **Yes** | | R |
| | | | | |
| **Excess Spread Percentage** | | | | |
| January 2024 Excess Spread Percentage | **4.21%** | **4.21%** | **0.00%** | S |
| **Termination Event Trigger? (4.00%)** | **Yes** | **Yes** | | T |

A. Per definition of the Net Loss to Liquidation Ratio in the GLDs for the SPV4 portfolio, the monthly calculation is completed by the Aggregate Principal of all Receivables that became defaulted receivables during the collection period, minus the Aggregate Liquidation Proceeds received in

respect of all defaulted receivables during the collection period divided by the sum of Average Aggregate Principal of all Receivables during the collection period and the Aggregate amount of all collections in respect of principal on the Receivables during such collection period.  No variances were calculated between the Company and the consultants for the period November 2023 through January 2024.

B.  Average of respective monthly ratios presented in note A in Portfolio - Servicing Covenants table above.

C.  Net Loss to Liquidation Ratio for the SPV4 portfolio Overcollateralization Increase Event Trigger per page 59 of the Credit Agreement and Termination Event Trigger per page 158 of the Credit Agreement.

D.  Per definition of Extension Ratio in the GLD for the SPV4 portfolio, the monthly calculation is the percentage equivalent of a fraction whereby the numerator of which is the aggregate number of Receivables that became Extended Receivables during such collection period and the denominator of which is the aggregate number of Receivables of the last day of such Collection Period.

E.  Average of respective monthly ratios presented in note D in Portfolio - Servicing Covenants table above.

F.  Average Extension Ratio for the SPV4 portfolio Overcollateralization Increase Event Trigger per page 59 of the Credit Agreement and Termination Event Trigger per page 158 of the Credit Agreement.

G.  Per definition of Delinquency Ratio in the GLD for the SPV4 portfolio, the monthly calculation is the percentage equivalent of a fraction whereby the numerator of which is equal to the Aggregate Principal Balance of all Delinquent Receivables as of the last day of such collection period and the denominator of which is equal to the Aggregate Principal balance of the Receivables as of the last day of such collection period.

H.  Average of respective monthly ratios presented in note G in Portfolio - Servicing Covenants table above.

I.  Average Delinquency Ratio for the SPV4 portfolio Overcollateralization Increase Event Trigger per page 59 of the Credit Agreement and Termination Event Trigger per page 158 of the Credit Agreement.

J.  Per definition of Serviced Portfolio Net Loss to Liquidation Ratio for the SPV4 portfolio, the monthly calculation is the ratio expressed as a percentage of the Aggregate Principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month, minus the aggregate Serviced Portfolio Liquidation Proceeds received in respect of all Serviced Portfolio Defaulted Receivables during such month divided by the sum of (a) the aggregate principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month plus (b) the aggregate amount of all collections in respect of principal on the Serviced Portfolio Receivables received during such month.

K.  Average of respective monthly ratios presented in note J in Portfolio - Servicing Covenants table above.

L.  Serviced Portfolio Net Loss to Liquidation Ratio for the SPV4 portfolio Overcollateralization Increase Event Trigger per page 59 of the Credit Agreement and Termination Event Trigger per page 158 of the Credit Agreement.

M.  Per definition of Serviced Portfolio Extension Ratio for the SPV4 portfolio, the monthly calculation is the percentage equivalent of a fraction, whereby the numerator of which is the aggregate number of Serviced Portfolio Receivables that became Serviced Portfolio Extended Receivables during such month and the denominator of which is the aggregate number of Serviced Portfolio Receivables as of the last day of such month.

N.  Average of respective monthly ratios presented in note M in Portfolio - Servicing Covenants table above.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                Consulting Report

O. Serviced Portfolio Average Extension Ratio for the SPV4 portfolio Overcollateralization Increase Event Trigger per page 59 of the Credit Agreement and Termination Event Trigger per page 158 of the Credit Agreement.

P. Per definition of the Serviced Portfolio Net Loss to Liquidation Ratio for the SPV4 portfolio, the monthly calculation is ratio expressed as a percentage of the aggregate principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month, minus the aggregate Serviced Portfolio Liquidation Proceeds received in respect of all Serviced Portfolio Defaulted Receivables during such month divided by the sum of the aggregate principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month plus the aggregate amount of all collections in respect of principal on the Serviced Portfolio Receivables received during such month.

Q. Average of respective monthly ratios presented in note P in Portfolio - Servicing Covenants table above.

R. Serviced Portfolio Average Delinquency Ratio for the SPV4 portfolio Overcollateralization Increase Event Trigger per page 59 of the Credit Agreement and Termination Event Trigger per page 158 of the Credit Agreement.

S. Per Excess Spread Percentage table below and per page 37 of the Credit Agreement.

T. Excess Spread Percentage for the SPV4 portfolio Termination Event Trigger per page 46 of the Credit Agreement.

| *Excess Spread Calculation* | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
| Weighted Average APR of all Receivables | 16.16% | 16.16% | 0.00% | A |
| | | | | |
| Servicing Fee Rate | 3.00% | 3.00% | 0.00% | B |
| Usage Fee Rate | 3.50% | 3.50% | 0.00% | C |
| Backup Servicing Fee Rate | 0.01% | 0.01% | 0.00% | D |
| Collateral Custodian Fee Rate | 0.02% | 0.02% | 0.00% | E |
| Interest Rate Cap | 5.42% | 5.42% | 0.00% | F |
| | | | | |
| Total Calculated Excess Spread | 4.21% | 4.21% | 0.00% | G |
| | | | | |
| **Minimum Excess Spread Threshold? (4.00%)** | Yes | Yes | | H |

A. The Weighted Average APR of all Receivables in the portfolio is the sum of each loan within the portfolio interest rates multiplied in relation of their Ending Principal Balance to the total Portfolio's Month-End Principal Balance.

B. The consultants confirmed and agreed the correct Servicing Fee Rate of 3.0% to the rate as established on page 55 of the Credit Agreement renewal dated November 29, 2022.

C. The consultants confirmed and agreed the correct Usage Fee Rate of 3.5% to the rate as established by the JPMorgan Fee Letter dated January 31, 2024.

D. The consultants confirmed and agreed the correct Backup Servicing Fee Rate of 0.01% to the rate as established on page 21 of the Credit Agreement renewal dated November 29, 2022.

E. The consultants confirmed and agreed the correct Collateral Custodian Fee Rate of 0.02% to the rate as established on page 26 of the Credit Agreement renewal dated November 29, 2022.

F. Benchmark Rate is the rate established based on the Secured Overnight Financing Rate ("SOFR") 30 day average noted on page 18 of the Credit Agreement renewal dated November 29, 2022. The consultants agreed the amount to the established website of sofrrate.com for the period under review. The Company correctly used a 5.42% benchmark rate based on definition.

G. Formula (note A minus the sum of note B through note D) from the Excess Spread Calculation table above.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                              Consulting Report

H.  Minimum Interest Rate Spread established on page 1 of Amendment No. 7 dated June 9, 2023 of the Credit Agreement renewal dated November 29, 2022.

| Section 2.07 | Payment Waterfall | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|---|
| (i) | Accrued and Unpaid Servicing Fees | $ 1,733,174 | $ 710,346 | $ 1,022,828 | A |
| (ii) | Accrued and Unpaid Back Up Servicer Fees, Expenses and Indemnities | 13,971 | 1,000 | 12,971 | B |
| (iii) | Admin Agent Monthly Interest and Fees | 3,944,644 | 1,340,496 | 2,604,148 | C |
| (iv) | Admin Agent Monthly Principal Payment Amount | 4,156,279 | 5,599,050 | (1,442,771) | D |
| (v) | Partial Expiration Event Pro Rata Loans Outstanding Lender Advances to zero | - | - | - | E |
| (vi) | Subordinated Monthly Interest and Fees | - | - | - | F |
| (vii) | Unpaid Account Bank Amounts | - | - | - | G |
| (viii) | Aggregate Unpaids | - | - | - | H |
| (ix) | Remaining Amount to Borrower | 6,314,474 | 6,314,474 | - | I |
| | Total Available Funds | $ 16,162,543 | $ 13,965,366 | $ 2,197,177 | J |

A.  Note D from Collateral Statistics and Delinquency Information table above.  The product of 1/12th of the Servicing Fee Rate multiplied by note A the Beginning Principal Balance per the Receivables Balance and Borrowing Base table above.

B.  Comprised of Backup Servicer Fees, Custodian Fees, and Agent Fees per detail within the Servicer Report and the GLDs.  For the current month end period of January 31, 2024, there was only custodian fees charged which the consultants agreed to the Wilmington Trust bank statement for January 2024 ending xxxxxx-000.

C.  Comprised of sum of Interest Payments and Unused Fees per January 31, 2024 invoice from JPM.

D.  Note E from Note Balance table above.

E.  Per management and the consultants review there were no partial expiration events that occurred to reduce pro rate portion of the loans outstanding constituting the lender advances of any non-extending lender to zero.

F.  Per management and the consultants review there were no subordinated monthly interest and fees noted.

G.  Per management and the consultants review there were no unpaid account bank amounts noted.

H.  Per management and the consultants review there were no aggregate unpaids noted.

I.  Formula (excess of Note J less Notes A through H) in the Payment Waterfall table above.  This agrees to the prior of payments section of the GLDs.

J.  Note K in the Available Funds table above.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

| Concentration Limits | Threshold | Per Current Balance | Per Company Amount | Excess | Per Consultants Amount | Excess | Footnote |
|---|---|---|---|---|---|---|---|
| Net Eligible Receivables ("ER") | | $478,433,664 | | | | | A |
| UPB Texas Resident | Max 80% | | 76.7% | $    - | 76.7% | $    - | B |
| UPB California Resident | Max 40% | | 21.2% | - | 21.2% | - | B |
| UPB non Texas or California Resident | Max 10% | | 2.1% | - | 2.1% | - | B |
| UPB ER from single dealer % of Pool | Max 10% | | 7.3% | - | 7.3% | - | B |
| UPB LTV ER | Max 32.5% | | 23.9% | - | 23.9% | - | B |
| UPB Non-FICO | Max 65% | | 59.5% | - | 59.5% | - | B |
| UPB FICO below 500 | Max 7.5% | | 4.0% | - | 4.0% | - | B |
| UPB ER E grade % of pool | Max 1.5% | | 0.1% | - | 0.1% | - | B |
| UPB ER D&E grade % of pool | Max 3% | | 0.6% | - | 0.6% | - | B |
| UPB ER <B grade % of pool | Max 30% | | 12.9% | - | 12.9% | - | B |
| UPB Time Obligor at Residence less than 12 months | Max 12.5% | | 1.8% | - | 1.8% | - | B |
| UPB Ganas Ya! | Max 10% | | 8.6% | - | 8.6% | - | B |
| UPB Ride Now | Max 1% | | 0.0% | - | 0.0% | - | B |
| UPB Income < $2,000 | Max 5% | | 0.2% | - | 0.2% | - | B |
| UPB Original term >60 | Max 10% | | 9.7% | - | 9.7% | - | B |
| UPB Original term >66 | Max 3% | | 0.4% | - | 0.4% | - | B |
| UPB Indirect Receivables | Max 1.5% | | 0.0% | - | 0.0% | - | B |
| WA LTV ER | Max 135% | | 127.9% | - | 127.9% | - | C |
| WA Non-Zero FICO not to be less than | Min 560 | | 578 | - | 578 | - | C |
| WA Combined Income | Min $3,750 | | $6,248 | - | $6,248 | - | C |
| WA PTI ER | Max 17% | | 12.1% | - | 12.1% | - | C |
| WA DTI ER | Max 32.5% | | 26.8% | - | 26.8% | - | C |
| Excess Concentration Amount | | | | $    - | | $    - | D |

All concentration thresholds presented above agreed to those of the Credit Agreement or as amended on page 1 of Amendment No. 5 to the Credit Agreement dated June 8, 2022.  The consultants calculation differed from the Company's calculations for excess concentrations for the January 31, 2024 reporting period due to the additional ineligibles calculated by the consultants.

The consultants were unable to test the Company's compliance with Credit Agreement whether electronic signed contracts represented 10% or less of the total portfolio as the data tape did not include the denoting attribute.  Management indicated that the Company does not have any chattel paper as there is no e-vault in place.

- A.  Note J from the Receivables Balance and Borrowing Base table above.
- B.  Per testing of the data tape.
- C.  Per testing of weighted average calculations based on the data tape.
- D.  Formula (sum of notes B and C) from the Concentration Limits table above.

All concentration thresholds presented above agreed to those defined in the Agreement, with the exception of the UPB Non-FICO.  The threshold per the Warehouse Agreement is a maximum of 70% of the eligible receivables.   The consultants verified the Company's calculations for excess concentrations for the January 2024 reporting period which was properly reflected on MSR reported to the bank without exception.

- E.  Note J from the Receivables Balance and Borrowing Base table above.
- F.  The consultants agreed to the January 31, 2024 MSR, tabs entitled "Concentration Limits" and "Pool Loan Data" to the Agreement.
- G.  Formula (sum of note B) from the Concentration Limits table above.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

## Covenant Testing

The Company's borrowing base submission for January 2024 included their computations of the debt covenants which the consultants compared and tested against Governing Legal Documents. It should be noted that the December 31, 2023 financial statements were not completed or provided as of the consultants fieldwork during the week ending February 23, 2024. As such the Company used September 30, 2023 quarter end for covenant testing.

| Tangible Net Worth: (000's) | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
|  |  |  |  |  |
| Consolidated Net Worth | $ 104,164 | $ 104,164 | $ - | A |
| Aggregate Deferred Tax Assets and Intangible Assets | 14,903 | 14,903 | - | B |
| Addback Non-Cash Fair Value Discount Adjustment | 59,663 | 59,663 |  | C |
| Addback Income Tax Valuation Allowance | 8,424 | 8,424 |  | D |
| Adjusted Tangible Net Worth | $ 187,153 | $ 187,153 | $ - | E |
| Minimum Tangible Net Worth Threshold | $ 110,000 | $ 110,000 | $ - | F |
| In Compliance | Yes | Yes |  |  |

A. The Warehouse Agreement calls for the quarterly reporting of Tangible Net Worth based on the Company's GAAP financial statements. The consultants traced the Company calculation of Net Worth to the internal monthly consolidated balance sheet of Tricolor Holdings, LLC and Subsidiaries as of September 30, 2023 and noted no variances.
B. The consultants traced the Company calculation of Aggregate Deferred Tax Assets and Intangible Assets of $14,903M to the internal monthly consolidated balance sheet of Tricolor Holdings, LLC and Subsidiaries as of September 30, 2023 and noted no variances. Adjustments to calculate the Tangible Net Worth includes an addback for aggregate deferred taxes, intangibles such as goodwill, trademarks etc.
C. The consultants traced the Company calculation of Non-Cash Fair Value Discount of $59,663M to the internal monthly consolidated balance sheet of Tricolor Holdings, LLC and Subsidiaries as of September 30, 2023 and noted no variances.
D. The consultants traced the Company calculation of Income Tax Valuation Allowance of $8,424M to the internal monthly consolidated balance sheet of Tricolor Holdings, LLC and Subsidiaries as of September 30, 2023 and noted no variances.
E. Formula (sum of note A through note D) from the Tangible Net Worth table above.
F. Minimum Net Worth Threshold per the Credit Agreement is defined as follows. As of the last day of the most recent calendar quarter the Minimum Net Worth Threshold is defined as the greater than the sum of (i) $110MM and (ii) 25% of Net Proceeds of all issuances of Equity Interests by Tricolor Holdings after the Closing Date. The consultants recalculated the Tangible Net Worth of Tricolor Holdings, LLC as of September 30, 2023 and noted no variance. As such, the Company's calculated Tangible Net Worth was compliant with the GLDs for the January 2024 MSR.

| Total Indebtedness to Tangible Net Worth Ratio in 000's | Per Company | Per Consultants | Variance | Footnote |
|---|---|---|---|---|
|  |  |  |  |  |
| Total Indebtedness of Tricolor Holdings, LLC as of October 2023 | $ 1,136,989 | $ 1,136,989 | $ - | A |
| All Other Obligations as defined in the GLDs (clauses (ii) through vi) | - | - | - | B |
| Maximum Total Liabilities of the Company and its Subsidiaries | $ 1,139,263 | $ 1,139,263 | $ - | C |
| Tangible Net Worth | $ 187,153 | $ 187,153 | $ - | D |
| Total Indebtedness to Net Worth Ratio | 6.09 | 6.09 | - | E |
| Minimum Indebtedness to Tangible Net Worth Threshold | 6.25 | 6.25 | - | F |
| In Compliance | Yes | Yes |  |  |

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                     Consulting Report

A. The Agreement calls for the quarterly reporting of Total Indebtedness to Tangible Net Worth based on the Company's GAAP financial statements. Therefore, the internal monthly consolidated balance sheet of Tricolor Holdings, LLC and Subsidiaries as of September 30, 2023 was used for the calculating compliance with GLDs. The consultants traced the Company calculation of Total Indebtedness which includes adjustments to indebtedness for cash reserves, etc. and noted no variances.

B. Per management and the consultants review, there were no other obligations noted.

C. The consultants traced the maximum total liabilities to the internal monthly consolidated balance sheet of Tricolor Holdings, LLC and Subsidiaries as of September 30, 2023

D. Tangible Net Worth as calculated in the tangible net worth table above. No variances were noted between the Company and consultant calculations for the reporting period.

E. Formula (note C divided by note D) from the Total Indebtedness to Tangible Net Worth Ratio above.

F. Minimum Indebtedness to Tangible Net Worth Threshold was not exceeded as defined by the Agreement. Therefore, the Company was compliant with the terms of the GLDs for the January 2024 MSR reporting period.

## M. Review Of The Computer Systems & Controls

Per discussion with management, there have not been any changes to the Computer Systems and Controls since the prior examination report dated November 11, 2022. Management also stated that they do not expect to make any material revisions to these systems and controls within the next 12 months. Refer to Exhibit PF.1 for further details on the Company's Computer Systems and Controls.

The Company has back-up and disaster recovery procedures in place to ensure continued contract processing and/or recovery in the event of significant computer downtime or other I.T. disaster. The table below reflects the overall health assessment for critical systems and locations for the Company as of January 31, 2024.

| | Failover Capability | | Last Unplanned Failover | Last Successful Test | Next Planned Test | Notes/Lessons Learned |
|---|---|---|---|---|---|---|
| **System** | **Primary** | **Secondary** | | | | |
| GDLMEX FIREWALLS | Pass | Pass | | 1/23 | 2024 (Q2) | DNS missing on second firewall. Issues resolved. Company has cluster firewalls. |
| CORPORATE FIREWALLS | Pass | Pass | | 5/23 | 2024 (Q2) | Company added second firewall. Now have clustered firewalls. |
| COLO DATA CENTER FIREWALLS | Pass | Pass | 2/23 | | 2024 (Q3) | Primary firewall failed unexpected. Now have clustered firewalls. |
| GDL NETWORKS | Pass | Pass | | 4/23 | 2024 (Q4) | Company upgraded the primary networks and executed a successful failover test. |
| CORPORATE NETWORKS | Pass | Pass | 12/22 | 3/23 | 2024 (Q4) | Primary network circuit had outages and failed over the second networks. Q1 2023 test was successful. |
| COLO DATACENTER NETWORKS | Pass | Pass | 4/22 | 1/23 | 2024 (Q3) | Primary network circuit had outages and failed over the second networks. Q1 2023 test was successful. |
| CDE/TRICOLON ET DATABASE | Fail | Fail | | 2/23 | 2024 (Q4) | Test was incomplete in a Colo datacenter. Entire system was moved to Azure Cloud at the end of 2023. Company will execute a DR in Q4 as the Company re-engineers the Azure Cloud. DR will be executed in the Azure Cloud. |
| FIVE9 | Pass | Pass | | 2/23 | 2024 Pending | Failover for Five between primary Five9 datacenter and second datacenter was executed successfully. Vendor has not scheduled the 2024 test. |
| MXIE VOICE SYSTEMS | Pass | Pass | | 3/23 | 2024 (Q4) | Company has a Voice System in High Availability clustered. |

**N.  Other**

Taxes

The 941-payroll tax form for the fourth quarter of 2023 was provided to the consultants, which is available upon request.  The consultants reviewed fourth quarter 2023 payments to the associated payroll bank statements noting the Company was current with payroll tax obligations.  Additionally, according to management, no other delinquencies related to all Company tax obligations existed as of the date of the Report.

Insurance

Management provided the consultants with evidence of Errors and Omissions Insurance Coverage (professional liability insurance) and an Excess Errors and Omissions Policy .  The coverage is as follows:

| | |
|---|---|
| Insured: | Tricolor Holdings, LLC |
| | |
| Insurer: | AmTrust North America |
| Policy Period; | June 16, 2023 through June 16, 2024 |
| Occurrence/Aggregate Limit of Liability: | $5,000,000 |
| Coverage Type: | Professional Liability |
| | |
| Insurer: | Bridgeway Insurance Company |
| Policy Period; | June 16, 2023 through June 16, 2024 |
| Each Incident/Aggregate: | $5,000,000 |
| Coverage Type: | E&O - Miscellaneous |

Outstanding Litigation

The Company provided the consultants with the pending litigation in which it is the defendant or plaintiff as of the date of the Report and is listed below.

As a consumer finance company, Tricolor Holdings, LLC and its affiliates are subject to various consumer claims and litigation seeking damages and statutory penalties, based upon, among other things, usury, disclosure inaccuracies, wrongful repossession, violations of bankruptcy stay provisions, certificate of title disputes, fraud, breach of contract and discriminatory treatment of credit applicants. In addition, the Company is, from time to time, engaged in various other lawsuits, including employment-related lawsuits, lawsuits relating to our leases, etc.  As of the date of these responses, neither Tricolor nor its affiliates is subject to litigation that individually or in the aggregate is expected to have a material adverse effect on the business of the Company or its assets.

As of January 31, 2024, the Company was involved in five immaterial lawsuits as described below.

*Tricolor v. CARS* - Pending lawsuit in Texas State Court. Dispute with Company vendor who was involved in the repossession of vehicles.  Company is claiming overpayment and duplication of payments in the amount of $3MM-5MM.  Vendor is claiming nonpayment for services rendered in the amount of $5MM.

*TD Industries v. Tricolor* - Pending lawsuit in Texas State Court. Dispute with General Contractor responsible for constructing Mega Recon.  Company claims that General Contractor mismanaged project resulting in numerous delays.  Company is claiming delay damages in the amount of $7MM.  Contractor is claiming nonpayment of $1.2MM.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                    Consulting Report

*FTI v. Tricolor* - Pending lawsuit in Federal Court in New York.  Dispute with law firm (Reed Smith)  and financial consultant (FTI) brought in by Audit Committee to assist in fiscal year 2022 Audit.  Vendors are claiming nonpayment for services rendered in the amount of $1.4MM.

*Kabat Chapman Ozmer v. Tricolor* - Threatened lawsuit.  Dispute with law firm that represented the Company in consumer litigation in California.  Law firm is claiming nonpayment for services rendered in the amount of $1.2MM.  Company is claiming overpayment of fees in the amount of $2MM.

*Tricolor v. Autozone* - Threatened lawsuit.  Dispute with vendor who supplies auto parts to the Company. Company claims improper billing and overcharging in the amount of $3MM.

Fraud Questionnaire

Per discussions with management, the following was noted with regards to areas of fraud as it relates to Tricolor.

a. **The Company's knowledge of any actual fraud or suspicions of fraud affecting the Company.**

   Per management, there are no known frauds or suspicions of fraud currently affecting the Company.

b. **Their awareness of any allegations of fraud or suspected fraud affecting the Company.**

   Per management, there are no known allegations of fraud or suspicions of fraud currently affecting the Company.

c. **Their understanding of the risks of fraud within the Company, including any specific fraud risks the Company has identified or account balances or transaction classes that may be susceptible to fraud.**

   Per management, the Company constantly evaluates loan originations for fraud through the underwriting process and works to minimize/eliminate any potential fraud risk.

d. **How they communicate to employees the importance of ethical behavior and appropriate business practices?**

   Per management, every year each employee must review and acknowledge all policies and electronically sign via the compli platform.

e. **Programs and controls the Company has implemented to address identified fraud risks to help prevent, deter, and detect fraud, and how those programs and controls are monitored.**

   Per management, the Company uses NINJIO cyber security training for all employees. Underwriting reviews all applications prior to loan origination.

JPMorgan Chase Bank, N.A.
Tricolor Auto Acceptance, LLC and Tricolor Funding SPV 4 LLC                          Consulting Report

f.   **The nature and extent of monitoring multiple locations or business segments and whether any of them have a higher level of fraud risk.**

Per management, underwriting reviews and stores all historical analysis on a cohort and location basis.

g.   **The Company's (1) compliance with laws and regulations, (2) policies relative to the prevention of illegal acts, and (3) use of directives (for example, a code of ethics) and periodic representations obtained from management-level employees related to compliance with laws and regulations.**

Per management, see response to (d).  Ethics and compliance with law is addressed in the employee handbook as well as multiple Company policies.

h.   **Has the Company established a compliance infrastructure in place, including a compliance officer, up to date written policies and procedures, internal auditing and corrective action processes, and proper compliance training?**

Per management, the Company has an established compliance structure, although the Company does not have a formal internal audit department.

i.   **Does the Company have a formal training process which includes regularly scheduled training for employees?**

Per management, see responses to (d).

j.   **For companies with a Board of Directors, is the board updated regularly on compliance matters and are individuals overseeing compliance accountable to the board?  What about managers and key personnel?**

Per management, the Board of Directors is updated from time to time on compliance and other business matters.  The Chief Compliance Officer has direct access to the Chairman of the Audit Committee as well as Board members.

Exhibit A.1

# Organizational Charts – Executive Team & Corporate



1

Exhibit A.1

# Executive Team Organizational Chart

**Daniel Chu**
CEO

**Finance**
Jerry Kollar
Chief Financial Officer

**Operations**
David Goodgame
Chief Operations Officer

**Product**
Kartheek Veeravalli
Chief Product Officer

**Tricolor Financial**
Stephanie Hanson
President

**Corp. Dev. & Legal**
Albert Hoover
Chief Corp. Dev. and Legal Officer

**Data Science**
James Li
Chief Lending and
Data Science Officer

**Compliance**
Cametra Thompson
Chief Compliance Officer &
Deputy General Counsel

**Supply Chain**
Troy Sterk
Chief Supply Chain Officer

**Loan Servicing**
Andy Mata
VP Loan Servicing

**Customer Experience**
Eduardo Perez
Chief Customer Experience Officer

**Sales Operations**
Mark Schmitz
VP Sales Ops

**Human Resources**
Open
VP Human Resources

**ERM**



Exhibit A.1

# Corporate Organizational Chart



**JPM - Tricolor Auto Acceptance LLC**
**Credit File Review**
**As of January 31, 2024**

Exhibit B.1

| # | Account No. | State of Residence | Residence (Mos.) | Employment (Mos.) | Monthly Income | Borrower ID | Principal Balance | Amount Financed | Original Term (Mos.) | Remaining Term (Mos.) | Recalc Remaining Term | Interest Rate | APR | Payment Amount | Note Date | Maturity Date | Payment Frequency | FICO | Refreshed FICO score | Internal Risk Grade |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P105075-1 | TX | 26 | 121 | $ 21,667 | Other_License | $ 39,855 | $ 39,860 | 70 | 68 | 68 | 11.9 | 11.87 | $ 384 | 12/14/23 | 10/20/29 | BiWeekly | 698 | N/A | A |
| 2 | P106227-1 | TX | 48 | 38 | 4,767 | Other | 39,394 | 39,150 | 72 | 71 | 71 | 11.9 | 11.87 | 369 | 12/26/23 | 01/12/30 | BiWeekly | 653 | N/A | A+ |
| 3 | P107570-1 | TX | 81 | 96 | 5,171 | Texas_License | 38,776 | 38,850 | 72 | 71 | 71 | 12.4 | 12.43 | 404 | 12/30/23 | 01/05/30 | Semi-Monthly | 632 | N/A | B |
| 4 | P107472-1 | TX | 122 | 98 | 8,929 | Other | 38,721 | 38,652 | 66 | 70 | 70 | 11.4 | 11.39 | 361 | 12/30/23 | 12/29/29 | BiWeekly | 704 | N/A | A+ |
| 5 | P107662-1 | TX | 85 | 66 | 4,225 | Other_License | 38,310 | 38,153 | 72 | 71 | 71 | 14.2 | 14.22 | 382 | 12/29/23 | 01/12/30 | BiWeekly | 608 | N/A | A |
| 6 | P105487-1 | TX | 29 | 44 | 6,933 | Other_License | 38,028 | 38,218 | 71 | 70 | 70 | 13.4 | 13.38 | 375 | 12/22/23 | 12/22/29 | BiWeekly | 680 | N/A | B |
| 7 | P105594-1 | TX | 39 | 45 | 7,477 | Other_License | 37,500 | 37,245 | 72 | 70 | 70 | 13.2 | 13.22 | 363 | 12/05/23 | 12/22/29 | BiWeekly | 607 | N/A | A |
| 8 | P104415-1 | TX | 48 | 72 | 4,550 | Texas_License | 37,414 | 38,144 | 72 | 70 | 70 | 13.4 | 13.38 | 373 | 12/06/23 | 12/22/29 | BiWeekly | 655 | N/A | A+ |
| 9 | P105074-1 | TX | 48 | 108 | 5,417 | Other_License | 37,171 | 37,140 | 72 | 71 | 71 | 13.4 | 13.36 | 364 | 12/27/23 | 01/12/30 | BiWeekly | N/A | N/A | A+ |
| 10 | P105505-1 | NM | 155 | 67 | 4,119 | Other_License | 36,949 | 37,243 | 72 | 70 | 70 | 11.9 | 11.90 | 365 | 12/14/23 | 12/21/29 | Semi-Monthly | 592 | N/A | A+ |
| 11 | P106700-1 | TX | 40 | 180 | 5,160 | Other_License | 36,141 | 36,350 | 72 | 70 | 70 | 17.4 | 17.36 | 854 | 12/13/23 | 12/06/29 | Monthly | 536 | N/A | B |
| 12 | P106760-1 | TX | 36 | 96 | 26,134 | Texas_License | 35,896 | 36,200 | 72 | 70 | 70 | 17.2 | 17.20 | 847 | 12/30/23 | 12/20/29 | Monthly | 511 | N/A | B |
| 13 | R100855-1 | TX | 18 | 51 | 7,258 | Other_License | 24,797 | 24,719 | 65 | 64 | 64 | 11.9 | 11.87 | 248 | 11/29/23 | 06/02/29 | BiWeekly | 786 | 757 | A+ |
| 14 | P104333-1 | TX | 13 | 25 | 8,298 | Mexico_License | 23,289 | 23,163 | 64 | 61 | 62 | 17.7 | 17.70 | 271 | 11/27/23 | 03/31/29 | BiWeekly | N/A | N/A | B |
| 15 | P100886-1 | TX | 3 | 24 | 6,842 | Other_License | 37,151 | 37,846 | 71 | 69 | 69 | 15.4 | 15.35 | 390 | 11/20/23 | 11/17/29 | BiWeekly | 634 | N/A | A |
| 16 | P102616-1 | TX | 27 | 26 | 5,565 | Other | 22,147 | 22,654 | 66 | 67 | 67 | 14.0 | 14.00 | 229 | 11/16/23 | 09/29/29 | BiWeekly | N/A | N/A | A |
| 17 | R101482-1 | TX | 135 | 147 | 7,398 | Other | 21,693 | 21,863 | 66 | 67 | 64 | 16.8 | 16.76 | 244 | 11/11/23 | 06/09/29 | BiWeekly | N/A | N/A | B |
| 18 | P102312-1 | TX | 60 | 84 | 5,417 | Other_License | 23,793 | 23,804 | 65 | 66 | 63 | 15.8 | 15.84 | 262 | 11/06/23 | 05/05/29 | BiWeekly | N/A | N/A | A |
| 19 | R99713-1 | TX | 110 | 111 | 19,576 | Texas_License | 26,378 | 27,321 | 60 | 56 | 56 | 19.9 | 19.94 | 757 | 11/03/23 | 10/25/28 | Monthly | 503 | N/A | C |
| 20 | R98694-1 | TX | 249 | 236 | 7,309 | Texas_License | 14,553 | 14,648 | 57 | 54 | 54 | 19.8 | 19.84 | 193 | 11/02/23 | 08/12/28 | BiWeekly | N/A | N/A | B |
| 21 | P98828-1 | TX | 5 | 48 | 7,763 | Other_License | 30,655 | 31,507 | 64 | 61 | 61 | 17.0 | 17.02 | 363 | 10/31/23 | 03/03/29 | BiWeekly | 612 | N/A | B |
| 22 | P99610-1 | TX | 40 | 56 | 4,024 | Other | 25,440 | 25,467 | 57 | 57 | 54 | 16.8 | 16.78 | 314 | 10/31/23 | 08/05/28 | BiWeekly | N/A | N/A | A |
| 23 | P100075-1 | TX | 22 | 84 | 5,633 | Other | 25,470 | 26,299 | 64 | 61 | 61 | 16.9 | 16.89 | 302 | 10/31/23 | 03/03/29 | BiWeekly | N/A | N/A | B |
| 24 | P100015-1 | TX | 159 | 60 | 6,067 | Other_License | 23,069 | 23,797 | 57 | 54 | 54 | 17.7 | 17.70 | 300 | 10/31/23 | 08/05/28 | BiWeekly | 553 | N/A | B |
| 25 | R100513-1 | TX | 96 | 72 | 4,333 | Other | 21,462 | 21,443 | 57 | 57 | 54 | 18.7 | 18.74 | 275 | 10/31/23 | 08/05/28 | BiWeekly | N/A | N/A | B |
| 26 | P98949-1 | TX | 172 | 197 | 8,450 | Other_License | 24,673 | 25,015 | 66 | 67 | 67 | 18.1 | 18.05 | 279 | 10/28/23 | 09/01/29 | BiWeekly | 538 | N/A | B |
| 27 | R97597-1 | TX | 112 | 60 | 8,059 | Other_License | 27,377 | 29,326 | 64 | 60 | 60 | 19.1 | 19.15 | 769 | 10/19/23 | 02/11/29 | Monthly | 467 | N/A | B |
| 28 | R97379-1 | TX | 48 | 36 | 3,052 | Other | 20,412 | 21,209 | 64 | 60 | 60 | 16.9 | 16.85 | 243 | 10/07/23 | 02/10/29 | BiWeekly | N/A | N/A | A |
| 29 | P96697-1 | TX | 96 | 108 | 3,939 | Other_License | 20,691 | 21,264 | 47 | 43 | 43 | 21.2 | 21.21 | 323 | 09/18/23 | 09/18/27 | BiWeekly | 498 | 498 | D |
| 30 | P67892-1 | TX | 69 | 61 | 3,368 | Texas_License | 29,055 | 32,950 | 64 | 53 | 53 | 11.9 | 11.87 | 339 | 03/04/23 | 07/08/28 | BiWeekly | 644 | 637 | A+ |
| 31 | R77019-10 | CA | 13 | 48 | 7,324 | Other_License | 33,976 | 35,188 | 65 | 61 | 61 | 13.9 | 13.90 | 774 | 10/24/23 | 03/18/29 | Monthly | 684 | N/A | A+ |
| 32 | P97823-10 | CA | 187 | 4 | 3,467 | Other | 25,710 | 25,868 | 57 | 57 | 54 | 17.0 | 16.95 | 307 | 11/02/23 | 08/12/28 | BiWeekly | N/A | N/A | A |
| 33 | R100623-10 | CA | 156 | 36 | 5,200 | Other_License | 23,357 | 23,837 | 65 | 62 | 62 | 12.9 | 12.86 | 235 | 11/04/23 | 04/21/29 | BiWeekly | 719 | N/A | A+ |
| 34 | P99278-10 | CA | 106 | 240 | 3,900 | Other_License | 30,483 | 31,616 | 63 | 60 | 60 | 12.9 | 12.91 | 694 | 11/05/23 | 02/02/29 | Monthly | 712 | N/A | A+ |
| 35 | P102414-10 | CA | 63 | 72 | 7,142 | Other_License | 24,012 | 24,163 | 66 | 66 | 63 | 22.9 | 22.91 | 324 | 11/06/23 | 05/10/29 | Semi-Monthly | 558 | N/A | C |
| 36 | P102176-10 | CA | 242 | 30 | 6,956 | Other_License | 26,753 | 27,186 | 65 | 62 | 62 | 15.9 | 15.86 | 288 | 11/06/23 | 04/21/29 | BiWeekly | 647 | N/A | A |
| 37 | P102445-10 | CA | 25 | 9 | 4,826 | Other | 32,835 | 33,853 | 66 | 68 | 68 | 14.3 | 14.30 | 326 | 11/07/23 | 10/29/29 | BiWeekly | N/A | N/A | A |
| 38 | R99753-10 | CA | 72 | 72 | 8,005 | Other_License | 29,766 | 29,868 | 71 | 69 | 69 | 13.5 | 13.49 | 281 | 11/10/23 | 11/10/29 | BiWeekly | N/A | N/A | A+ |
| 39 | P100228-10 | CA | 99 | 100 | 7,367 | Other_License | 34,119 | 36,673 | 71 | 69 | 69 | 11.9 | 11.87 | 331 | 11/11/23 | 11/10/29 | BiWeekly | N/A | N/A | A+ |
| 40 | P103032-10 | CA | 48 | 170 | 8,000 | Other_License | 29,780 | 30,235 | 72 | 69 | 69 | 19.2 | 19.24 | 356 | 11/14/23 | 11/17/29 | Semi-Monthly | 547 | N/A | B |
| 41 | R102974-10 | CA | 2 | 47 | 5,417 | Other | 13,869 | 14,185 | 56 | 53 | 53 | 22.5 | 22.48 | 189 | 11/17/23 | 07/22/28 | BiWeekly | N/A | N/A | C |
| 42 | P103701-10 | CA | 3 | 24 | 3,033 | Other_License | 32,399 | 32,904 | 71 | 69 | 69 | 11.9 | 11.87 | 297 | 11/18/23 | 11/17/29 | BiWeekly | 711 | N/A | A+ |
| 43 | R96847-10 | CA | 90 | 216 | 5,633 | Other_License | 36,743 | 37,342 | 65 | 63 | 63 | 11.9 | 11.87 | 359 | 11/19/23 | 05/26/29 | BiWeekly | 776 | N/A | A |
| 44 | P104129-10 | CA | 98 | 62 | 4,874 | Other_License | 38,440 | 38,598 | 71 | 69 | 69 | 15.4 | 15.36 | 382 | 11/25/23 | 11/10/29 | BiWeekly | N/A | N/A | A |
| 45 | R104280-10 | CA | 251 | 183 | 7,800 | Other | 10,686 | 10,975 | 47 | 45 | 45 | 17.8 | 17.85 | 150 | 11/28/23 | 11/20/27 | BiWeekly | N/A | N/A | A |
| 46 | R79508-12 | CA | 152 | 149 | 10,017 | Other_License | 32,462 | 32,644 | 65 | 66 | 63 | 17.2 | 17.21 | 356 | 11/11/23 | 05/12/29 | BiWeekly | 622 | N/A | A+ |
| 47 | R102975-12 | CA | 96 | 72 | 8,233 | Other_License | 32,309 | 32,504 | 57 | 58 | 55 | 16.1 | 16.14 | 379 | 11/25/23 | 09/02/28 | BiWeekly | N/A | N/A | A+ |
| 48 | R92740-12 | CA | 73 | 60 | 3,467 | Other_License | 29,067 | 29,349 | 57 | 55 | 55 | 19.0 | 19.03 | 363 | 11/29/23 | 09/02/28 | BiWeekly | N/A | N/A | A |
| 49 | P96754-12 | TX | 74 | 75 | 7,004 | Texas_License | 27,916 | 28,231 | 57 | 54 | 54 | 16.0 | 16.04 | 344 | 11/08/23 | 08/19/28 | BiWeekly | 524 | N/A | A+ |
| 50 | R103136-12 | CA | 36 | 12 | 4,982 | Other_License | 27,186 | 27,396 | 60 | 58 | 58 | 23.1 | 23.06 | 387 | 11/21/23 | 12/01/28 | Semi-Monthly | N/A | N/A | C |
| 51 | P83479-10 | CA | 91 | 144 | 7,800 | Other_License | 44,341 | 49,359 | 66 | 63 | 63 | 7.9 | 7.88 | 400 | 05/21/23 | 05/26/29 | BiWeekly | 790 | 765 | A+ |
| 52 | P95359-1 | TX | 115 | 48 | 5,877 | Other_License | 38,282 | 40,042 | 64 | 67 | 67 | 12.2 | 12.19 | 830 | 09/28/23 | 09/21/29 | Monthly | 628 | 628 | A |
| 53 | P94039-1 | TX | 85 | 157 | 5,728 | Mexico_License | 40,545 | 40,858 | 64 | 70 | 67 | 12.2 | 12.17 | 390 | 09/26/23 | 09/29/29 | BiWeekly | N/A | N/A | A |
| 54 | TF1056-45 | TX | 30 | 30 | 5,800 | Other | 39,836 | 45,466 | 66 | 54 | 54 | 15.07 | 15.07 | 1,016 | 03/18/23 | 08/20/28 | Monthly | 622 | 622 | B |
| 55 | P88765-10 | CA | 52 | 37 | 6,988 | Other_License | 39,927 | 41,949 | 71 | 67 | 67 | 15.4 | 15.40 | 415 | 09/02/23 | 09/01/29 | BiWeekly | 574 | 559 | B |

**JPM - Tricolor Auto Acceptance LLC**                                                                                               **Exhibit B.1**
**Credit File Review**
**As of January 31, 2024**

| # | Account No. | VIN | Model Year of the Vehicle | Mileage | Vehicle Total Cost | Down Payment | Down Payment % | Debt-to-Income % | Pmt-to-Income % | Loan-to-Value % | Info per Application | Applicant ID | ID | Employment | Residence | Monthly Income | Income Calc | Income Proof Type | Proof of Insurance | Type of Insurance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P105075-1 | 1GNSKBKC6KR377928 | TAHOE | 99,958 | $ 33,793 | $ 4,000 | 12% | 3.84% | 3.84% | 117.95% | Yes | N/A | Yes | Yes | Waived | $ 21,667 | NP | Bank Statement | Agreement | N/A |
| 2 | P106227-1 | 1GNSCBKC5HR229677 | Tahoe | 38,707 | 35,850 | 4,650 | 13% | 37.00% | 16.77% | 109.21% | Yes | N/A | Yes | Yes | Yes | 4,767 | $ 4,392 | Bank Statement | Agreement | N/A |
| 3 | P107570-1 | 3GCPWEED3LG179270 | Silverado 1500 | 95,533 | 35,183 | 5,000 | 14% | 48.21% | 15.63% | 110.42% | Yes | N/A | Yes | Yes | Yes | 5,171 | 5,171 | Bank Statement | Agreement | N/A |
| 4 | P107472-1 | 1GKS1BKC0KR244243 | YUKON | 94,561 | 32,435 | 3,000 | 9% | 23.01% | 8.76% | 119.17% | Yes | N/A | Yes | Yes | Yes | 8,929 | 9,564 | Form/Check Stub | Yes | Vehicle |
| 5 | P107662-1 | 1FTEW1CP4NKD55784 | F-150 | 63,534 | 33,349 | 4,000 | 12% | 40.89% | 19.59% | 114.41% | Yes | N/A | Yes | Yes | Yes | 4,225 | NP | Bank Statement | Agreement | N/A |
| 6 | P105487-1 | 1FTEW1C45KKC47739 | F-150 | 36,987 | 32,781 | 4,500 | 14% | 29.39% | 11.72% | 116.59% | Yes | N/A | Yes | Yes | Yes | 6,933 | 6,887 | Paystub | Agreement | N/A |
| 7 | P105594-1 | 1C6SRFFT4MN634804 | 1500 | 63,833 | 35,451 | 4,100 | 12% | 30.10% | 10.52% | 105.06% | Yes | N/A | Yes | Yes | Yes | 7,477 | 6,935 | Form/Check Stub | Agreement | N/A |
| 8 | P104415-1 | 1GCRYDED1KZ370987 | SILVERADO 1500 | 47,562 | 32,087 | 4,600 | 14% | 39.74% | 17.76% | 118.88% | Yes | N/A | Yes | Yes | Yes | 4,550 | 4,507 | Check Stub | Agreement | N/A |
| 9 | P105074-1 | 1GNSKBKC0KR362874 | TAHOE | 85,585 | 30,671 | 3,500 | 11% | 33.02% | 14.56% | 121.09% | Yes | N/A | Yes | Yes | Yes | 5,417 | 5,417 | Check | Agreement | N/A |
| 10 | P105505-1 | 1GNSKBKC6HR241386 | TAHOE | 88,356 | 30,553 | 4,500 | 15% | 17.72% | 17.72% | 121.89% | Yes | N/A | Yes | Yes | Yes | 4,119 | 4,709 | Form/Check Stub | Agreement | N/A |
| 11 | P106700-1 | JN8AY2ND5K9086607 | ARMADA | 70,164 | 32,248 | 4,000 | 12% | 33.02% | 16.55% | 112.72% | Yes | N/A | Yes | Yes | Yes | 5,160 | 5,310 | Bank Statement | Agreement | N/A |
| 12 | P106760-1 | 5XYP34HC1NG196477 | Telluride | 76,909 | 33,471 | 4,150 | 12% | 5.15% | 3.24% | 108.16% | Yes | N/A | Yes | Yes | Yes | 26,134 | 26,587 | Bank Statement | Agreement | N/A |
| 13 | R100855-1 | 3FA6P0HD2LR169167 | Fusion | 72,583 | 23,069 | 1,800 | 8% | 19.11% | 7.40% | 107.16% | Yes | N/A | Yes | Yes | Yes | 7,258 | 7,306 | Paystub | Agreement | N/A |
| 14 | P104333-1 | KNDJ23AU4L7067357 | SOUL | 61,279 | 16,682 | 2,050 | 12% | 16.72% | 7.08% | 138.85% | Yes | N/A | Yes | Yes | Yes | 8,298 | NP | Bank Statement | Agreement | N/A |
| 15 | P100886-1 | 1C6SRFBTXKN885510 | 1500 | 34,570 | 35,109 | 4,000 | 11% | 28.24% | 12.35% | 107.80% | Yes | N/A | Yes | Yes | Yes | 6,842 | 6,842 | Paystub | Agreement | N/A |
| 16 | P102616-1 | 5YFEPMAEXNP331541 | Corolla | 32,993 | 21,742 | 2,650 | 12% | 24.19% | 8.92% | 104.20% | Yes | N/A | Yes | Yes | Yes | 5,565 | 5,051 | Bank Statement | Agreement | N/A |
| 17 | R101482-1 | 2GNAXJEV8L6162564 | Equinox | 118,023 | 16,264 | 2,400 | 15% | 19.31% | 7.15% | 134.42% | Yes | N/A | Yes | Yes | Yes | 7,398 | 6,730 | Bank Statement | Agreement | N/A |
| 18 | P102312-1 | 1N4BL4BV5LC145480 | ALTIMA | 96,995 | 17,906 | 2,000 | 11% | 10.48% | 10.48% | 132.94% | Yes | N/A | Yes | Yes | Yes | 5,417 | 6,250 | Bank Statement | Agreement | N/A |
| 19 | R99713-1 | 3VV3B7AX9KM794189 | Tiguan | 92,580 | 19,534 | 3,400 | 17% | 8.46% | 3.87% | 139.86% | Yes | N/A | Yes | Yes | Yes | 19,576 | 19,556 | Bank Statement | Agreement | N/A |
| 20 | R98694-1 | 3C4PDCAB0JT444942 | Journey | 113,893 | 10,962 | 1,950 | 18% | 17.21% | 5.72% | 133.63% | Yes | N/A | Yes | Yes | Yes | 7,309 | 7,654 | Form/Check Stub | Agreement | N/A |
| 21 | P98828-1 | 4T1G11AK6NU682170 | CAMRY | 35,900 | 27,916 | 3,400 | 12% | 45.72% | 10.13% | 112.86% | Yes | N/A | Yes | Yes | Yes | 7,763 | 8,085 | paystub | Agreement | N/A |
| 22 | P99610-1 | 5NPD74LF3LH604976 | ELANTRA | 47,737 | 19,941 | 2,150 | 11% | 36.78% | 16.91% | 127.71% | Yes | N/A | Yes | Yes | Yes | 4,024 | 6,595 | Bank Statement | Agreement | N/A |
| 23 | P100075-1 | 4T1G11AKXMU535753 | CAMRY | 90,633 | 19,768 | 3,000 | 15% | 24.04% | 11.62% | 133.04% | Yes | N/A | Yes | Yes | Yes | 5,633 | 5,634 | Paystub | Agreement | N/A |
| 24 | P100015-1 | 1N4BL4BV5LC222400 | ALTIMA | 58,598 | 18,124 | 2,700 | 15% | 10.71% | 10.71% | 131.30% | Yes | N/A | Yes | Yes | Yes | 6,067 | 7,294 | Bank Statement | Agreement | N/A |
| 25 | R100513-1 | 1C6RR6FT8HS300710 | 1500 | 112,700 | 14,644 | 2,550 | 17% | 25.29% | 13.75% | 146.43% | Yes | N/A | Yes | Yes | Yes | 4,333 | 4,333 | form | Agreement | N/A |
| 26 | P98949-1 | 3GNAXHEV3KL186553 | EQUINOX | 80,800 | 19,205 | 2,300 | 12% | 17.80% | 7.15% | 130.26% | Yes | N/A | Yes | Yes | Yes | 8,450 | 8,450 | VOE phone Call | Agreement | N/A |
| 27 | R97597-1 | 3GCUKREC7HG219316 | Silverado 1500 | 141,900 | 28,471 | 3,300 | 12% | 20.71% | 9.54% | 103.00% | Yes | N/A | Yes | Yes | Yes | 8,059 | 7,917 | Letter and VOE | Agreement | N/A |
| 28 | R97379-1 | 3FA6P0HDXKR689958 | Fusion | 98,150 | 15,337 | 2,000 | 13% | 46.74% | 17.25% | 138.28% | Yes | N/A | Yes | Yes | Yes | 3,052 | 3,088 | Bank Statement | Agreement | N/A |
| 29 | P96697-1 | 1G1ZD5ST7JF180245 | MALIBU | 66,918 | 19,188 | 6,850 | 36% | 17.77% | 17.77% | 110.82% | Yes | N/A | Yes | Yes | Yes | 3,939 | 3,939 | Paystub | Agreement | N/A |
| 30 | P67892-1 | 3GCPCREC7HG101119 | Silverado 1500 | 104,482 | 38,308 | 3,000 | 8% | 21.81% | 21.81% | 86.01% | Yes | N/A | Yes | Yes | Yes | 3,368 | 3,250 | Paystub | Agreement | N/A |
| 31 | R77019-10 | 1FTEW1CGXHKD10398 | F-150 | 68,405 | 39,848 | 6,800 | 17% | 20.81% | 10.57% | 88.30% | Yes | N/A | Yes | Yes | Yes | 7,324 | NP | Bank Statement | Agreement | N/A |
| 32 | P97823-10 | 3FA6P0HD7JR189251 | FUSION | 51,763 | 17,432 | 2,050 | 12% | 19.19% | 19.19% | 148.39% | Yes | N/A | Yes | Yes | Yes | 3,467 | 3,600 | Form | Yes | Vehicle |
| 33 | R100623-10 | 1G1ZD5ST5JF208222 | Malibu | 73,299 | 15,025 | 2,000 | 13% | 9.79% | 9.79% | 158.65% | Yes | N/A | Yes | Yes | Yes | 5,200 | 5,200 | Form | Agreement | N/A |
| 34 | P99278-10 | 5TFAX5GN6KX163552 | TACOMA | 130,838 | 23,163 | 4,000 | 17% | 17.79% | 17.79% | 136.50% | Yes | N/A | Yes | Yes | Yes | 3,900 | 3,707 | Bank Statement | Agreement | N/A |
| 35 | P102414-10 | 1N4BL4BV1LC223026 | ALTIMA | 87,809 | 17,419 | 3,200 | 18% | 9.07% | 9.07% | 138.72% | Yes | N/A | Yes | Yes | Yes | 7,142 | NP | Paystub | Agreement | N/A |
| 36 | P102176-10 | 1C4RDHDG4HC610964 | DURANGO | 116,718 | 17,554 | 3,500 | 20% | 8.97% | 8.97% | 154.87% | Yes | N/A | Yes | Yes | Yes | 6,956 | 8,541 | Paystub and Form | Agreement | N/A |
| 37 | P102445-10 | 1HGCV1F36NA047283 | Accord | 35,893 | 26,764 | 3,150 | 12% | 26.11% | 14.64% | 126.49% | Yes | N/A | Yes | Yes | Yes | 4,826 | 4,825 | Paystub and Form | Agreement | N/A |
| 38 | R99753-10 | 3C4PDDEG2KT756367 | Journey | 53,024 | 22,783 | 2,000 | 9% | 7.61% | 7.61% | 131.10% | Yes | N/A | Yes | Yes | Yes | 8,005 | 7,876 | Paystub and Form | Agreement | N/A |
| 39 | P100228-10 | 3GCUKREC2HG113474 | SILVERADO 1500 | 102,763 | 33,750 | 3,600 | 11% | 9.74% | 9.74% | 108.66% | Yes | N/A | Yes | Yes | Yes | 7,367 | 7,367 | Form | Agreement | N/A |
| 40 | P103032-10 | 4T1G11AK6MU427940 | CAMRY | 92,490 | 19,948 | 2,600 | 13% | 23.45% | 8.90% | 151.57% | Yes | N/A | Yes | Yes | Yes | 8,000 | 8,000 | Form | Agreement | N/A |
| 41 | R102974-10 | 3FA6P0HD0GR674467 | Fusion | 138,392 | 9,149 | 2,000 | 22% | 21.37% | 7.52% | 155.04% | Yes | N/A | Yes | Yes | Yes | 5,417 | 5,417 | Form | Yes | Vehicle |
| 42 | P103701-10 | 4T1C11AK6NU711665 | CAMRY | 39,876 | 23,107 | 2,750 | 12% | 45.94% | 21.21% | 142.40% | Yes | N/A | Yes | Yes | Yes | 3,033 | 2,923 | Form | Agreement | N/A |
| 43 | R96847-10 | 3TMAZ5CN7KM102541 | Tacoma | 77,214 | 30,601 | 4,950 | 16% | 27.96% | 13.81% | 122.03% | Yes | N/A | Yes | Yes | Yes | 5,633 | 5,633 | Form | Agreement | N/A |
| 44 | P104129-10 | 1GCRYCEF0LZ249512 | SILVERADO 1500 | 110,279 | 29,331 | 4,000 | 14% | 29.29% | 16.98% | 131.60% | Yes | N/A | Yes | Yes | Yes | 4,874 | 4,874 | Paystub | Agreement | N/A |
| 45 | R104280-10 | 1N4BL3AP0HC913894 | Altima | 123,489 | 9,286 | 1,450 | 16% | 4.17% | 4.17% | 118.19% | Yes | N/A | Yes | Yes | Yes | 7,800 | 7,800 | Form | Agreement | N/A |
| 46 | R79508-12 | 3GCPCREC8FG509707 | Silverado 1500 | 97,403 | 29,188 | 2,000 | 7% | 39.83% | 7.70% | 111.84% | Yes | N/A | Yes | Yes | Yes | 10,017 | 10,196 | Paystub and Form | Agreement | N/A |
| 47 | R102975-12 | 3GCUKREC9GG115740 | Silverado 1500 | 140,926 | 21,369 | 2,000 | 9% | 9.97% | 9.97% | 152.10% | Yes | N/A | Yes | Yes | Yes | 8,233 | 8,233 | Form | Yes | Vehicle |
| 48 | R92740-12 | 1FTEW1EP0FFC01855 | F-150 | 114,718 | 26,719 | 2,000 | 7% | 22.69% | 22.69% | 109.85% | Yes | N/A | Yes | Yes | Yes | 3,467 | 3,467 | Form | Agreement | N/A |
| 49 | P96754-12 | 3C6RR7LT4GG371137 | 1500 | 102,799 | 24,421 | 2,400 | 10% | 48.29% | 10.64% | 115.60% | Yes | N/A | Yes | Yes | Yes | 7,004 | 7,388 | Paystub | Agreement | N/A |
| 50 | R103136-12 | 2HGFC1F72GH984899 | Civic | 78,834 | 18,038 | 2,000 | 11% | 15.54% | 15.54% | 151.88% | Yes | N/A | Yes | Yes | Yes | 4,982 | 4,982 | Paystub | Agreement | N/A |
| 51 | P83479-10 | 3TYAX5GN0NT049979 | Tacoma | 8,598 | 38,729 | 4,500 | 12% | 20.73% | 11.11% | 127.45% | Yes | N/A | Yes | Yes | Yes | 7,800 | 7,800 | check | Agreement | N/A |
| 52 | P95359-1 | 3GTP8DED2LG136432 | Sierra 1500 | 82,555 | 36,046 | 4,600 | 13% | 14.12% | 14.12% | 111.08% | Yes | N/A | Yes | Yes | Yes | 5,877 | 5,475 | check | Agreement | N/A |
| 53 | P94039-1 | 3GCPWBEK9MG242418 | SILVERADO 1500 | 34,164 | 37,295 | 4,000 | 11% | 32.21% | 14.75% | 109.55% | Yes | N/A | Yes | Yes | Yes | 5,728 | 5,728 | Paystub | Agreement | N/A |
| 54 | TF1056-45 | 3TYCZ5AN5PT127588 | Tacoma | 9 | - | 10,990 | NP | 0.00% | 0.00% | 0.00% | Yes | N/A | Yes | Yes | Yes | 5,800 | 5,611 | Paystub | Agreement | N/A |
| 55 | P88765-10 | 3TYAX5GN3MT013377 | Tacoma | 50,906 | 34,373 | 5,600 | 16% | 31.37% | 12.87% | 122.04% | Yes | N/A | Yes | Yes | Yes | 6,988 | 7,992 | Bank Statement | Agreement | N/A |

**JPM - Tricolor Auto Acceptance LLC**
**Credit File Review**
**As of January 31, 2024**

**Exhibit B.1**

| # | Account No. | Contract Signatures | Contract Details | Remaining Term | Vehicle Information | Debt-to-Income | Payment-to-Income | Loan-to-Value | Title / Title App | Title App Date | App Lag (days) | Down Payment Exception | Down Payment Global Limit | Monthly Payment Exception | Monthly Payment Global Limit Exception | PTI Exception | PTI Global Limit Exception | DTI Exception | DTI Global Limit Exception | Exceptions | Unique Pledge | ACH Form | Sep 2023 Statement |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P105075-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title / Title App | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 2 | P106227-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 3 | P107570-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 4 | P107472-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 5 | P107662-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 6 | P105487-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 7 | P105594-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 8 | P104415-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Ttile | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 9 | P105074-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 10 | P105505-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 11 | P106700-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 12 | P106760-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 13 | R100855-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Tile | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 14 | P104333-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 15 | P100886-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 16 | P102616-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 17 | R101482-1 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 18 | P102312-1 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 19 | R99713-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 20 | R98694-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 21 | P98828-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 22 | P99610-1 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 23 | P100075-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 24 | P100015-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 25 | R100513-1 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 26 | P98949-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 27 | R97597-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 28 | R97379-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 29 | P96697-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 30 | P67892-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 31 | R77019-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Ttile | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 32 | P97823-10 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 33 | R100623-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 34 | P99278-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 35 | P102414-10 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 36 | P102176-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Tile | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 37 | P102445-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 38 | R99753-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 39 | P100228-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 40 | P103032-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 41 | R102974-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 42 | P103701-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 43 | R96847-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 44 | P104129-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 45 | R104280-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 46 | R79508-12 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 47 | R102975-12 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 48 | R92740-12 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 49 | P96754-12 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 50 | R103136-12 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 51 | P83479-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 52 | P95359-1 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 53 | P94039-1 | Yes | Yes | No | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 54 | TF1056-45 | Yes | Yes | Yes | Yes | No | No | No | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |
| 55 | P88765-10 | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Title | N/A | N/A | No | No | No | No | No | No | No | No | No | Yes | N/A | N/A |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P105075-1 | P106227-1 | P107570-1 | P107472-1 | P107662-1 | P105487-1 | P105594-1 | P104415-1 | P105074-1 | P105505-1 | P106700-1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I. | (i) which is payable in Dollars in the United States or one of its territories; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| II | (ii) for which the related Obligor is a natural Person and not (a) a commercial entity, (b) an employee of any Tricolor Entity or an Affiliate thereof or (c) the government of the United States or any State or other Governmental Authority; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| III | (iii) which at the time of origination, was originated in the United States and the related Obligor (a) provided as its most recent billing address an address located in the United States, (b) had a PTI not greater than 30.0%, (c) had a DTI not greater than 50.0% and (d) had an LTV not greater than 185.0%; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| IV | which, as of the related Cutoff Date or the related Funding Date, no Scheduled Payment is greater than 30 days past due and the most recent Scheduled Payment has not been extended or deferred; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| V | (v) with respect to which, to the knowledge of the Borrower, at the related Cutoff Date, the related Obligor was (a) not the subject of an ongoing bankruptcy proceeding and (b) not deceased; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| VI | (vi) which is not, and has not ever been, absent manifest error, a Defaulted Receivable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (vii) which was originated in the United States by (a) an Originator and then sold to Tricolor pursuant to a Transfer Agreement in the ordinary course of Tricolor's business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by such Originator in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle or (b) a Dealer and then sold to Tricolor pursuant to a Dealer Agreement in the ordinary course of Tricolor business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by Tricolor in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (viii) which arose under a Contract with respect to which the related Originator or Dealer and Tricolor have performed all obligations required to be performed by it thereunder, and the related Financed Vehicle has been delivered to the related Obligor; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Viii | provides for level monthly, weekly, bi-weekly or semi-monthly payments (provided that the payment in the first and last months of the Receivable may be minimally different from the level payment) that fully amortize the Amount Financed by its maturity date pursuant to the Simple Interest Method and (c) has a fixed APR of not more than the Maximum Lawful Rate; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| X | (x) if an Eligible Credit Score Receivable, the Obligor (or with respect to an Eligible Credit Score Receivable that has co-obligors, the co-obligor with the higher of the Credit Score) has a Credit Score of at least 400; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| XI | (xi) is secured by (a) in the case of an Indirect Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle or (b) in the case of any other Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle, which, in the case of either clause (a) or (b), (1) has a GPS device installed in the related Financed Vehicle, (2) has not been repossessed from the Obligor or constitutes a total insurance loss on or prior to the related Funding Date, (3) has not been sold by a Tricolor, Ganas or Ganas Ya! Dealership on more than two occasions, (4) does not have a starter interrupter device installed in such Financed Vehicle that has been activated and (5) has not been included in a "fleet" sale (i.e., a sale to any single Obligor of more than five Financed Vehicles); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Xii | (xii) in respect of which the Amount Financed does not include any portion of the required down payment for the related Financed Vehicle; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Xiii | (xiii) which, as of the related Funding Date, (a) is secured by a first priority validly perfected security interest in the Financed Vehicle in favor of the related Originator, as secured party, or all necessary actions have been commenced that would result in a first priority security interest in the Financed Vehicle in favor of such Originator, as secured party, which security interest, in either case, is assignable without the consent of the related Obligor or any other Person and has been so assigned by Tricolor to the Borrower and by the Borrower to the Administrative Agent and (b) the related Financed Vehicle has neither been repossessed or assigned for repossession; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xiv | (xiv) as to which the Borrower has good and marketable title thereto and which is not subject to any Lien on the related Financed Vehicle which are Liens prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by the Receivable, and as to which at any time, the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected first priority security interest, free and clear of all Liens and rights of others (other than Permitted Liens); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xv | (xv) which arises under a Contract which is a fixed rate retail installment sale contract or conditional sale contract that has been properly executed by the parties thereto and which represents the genuine, legal, valid and binding payment obligation in writing of the Obligor, in full force and effect, enforceable by the holder thereof in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P105075-1 | P106227-1 | P107570-1 | P107472-1 | P107662-1 | P105487-1 | P105594-1 | P104415-1 | P105074-1 | P105505-1 | P106700-1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| xvi | (xvi) which was not subject to any right of rescission, cancellation, set-off, claim, counterclaim or defense (including the defense of usury) of the Obligor or any proceedings pending or, to the best of the Borrower's knowledge, threatened; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xvii | (xvii) which shall have complied with all Requirements of Law, including all consumer protection laws; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xviii | (xviii) with respect to which the related Contract (a) had not been modified, extended, amended, waived or altered in any respect, except in accordance with the Credit and Collection Policy and (b) constitutes Tangible Chattel Paper or Electronic Chattel Paper; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xix | (xix) with respect to which the related Financed Vehicle was required by the terms of the related Contract to be covered by a comprehensive and collision insurance policy at the time such Contract was entered into; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xx | (xx) with respect to which (a) each of Tricolor and the Borrower has done nothing to impair the rights of the Secured Parties therein, (b) neither Tricolor nor an Affiliate thereof has advanced funds to keep the related Contract current and (c) no selection procedures adverse to the interests of the Secured Parties have been utilized; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxi | (xxi) which (a) is assignable without the consent of, or notice to, the related Obligor and (b) has not been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer and assignment of such Receivable under this Agreement or pursuant to a transfer of the Contract shall be unlawful, void or voidable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxii | (xxii) with respect to which the related transfer, assignment and conveyance by Tricolor pursuant to the Purchase Agreement is not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiii | (xxiii) with respect to which the related Contract satisfies in all material respects the requirements of the Credit and Collection Policy that was in effect as of the date on which such Contract was originated and it was underwritten by Tricolor in accordance with the Credit and Collection Policy; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiv | (xxiv) with respect to which (a) there exists a Receivable File, (b) such Receivable File contains the fully executed Contract and each other document specified in the definition of "Receivable File", (c) such Receivable File has been delivered to the Servicer in accordance with the requirements of this Agreement and (d) the Servicer holds the Certificate of Title or a copy of a completed application for a Certificate of Title for the related Financed Vehicle and, in the case of a Receivable as to which the Servicer is not holding the Certificate of Title, the Servicer will obtain the Certificate of Title with respect to the Financed Vehicle within 180 days following the date of origination of the related Contract; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxv | (xxv) with respect to any Electronic Contract, (a) the Authoritative Copy of such Electronic Contract does not have any marks or notations indicating that such Electronic Contract has been pledged, assigned or otherwise conveyed to any Person other than Tricolor, the Borrower or the Administrative Agent (on behalf of the Secured Parties) and (b) no party other than the Borrower or Tricolor has "control" (within the meaning of Section 9-105 of the UCC) over the Authoritative Copy of such Electronic Contract; (xxvi) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor; and | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvi | (xxvii) with respect to which the related Obligor has not been subject to an ongoing Insolvency Proceeding for more than 180 days. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvii | (xxvii) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P106760-1 | R100855-1 | P104333-1 | P100886-1 | P102616-1 | R101482-1 | P102312-1 | R99713-1 | R98694-1 | P98828-1 | P99610-1 | P100075-1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I. | (i) which is payable in Dollars in the United States or one of its territories; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| II | (ii) for which the related Obligor is a natural Person and not (a) a commercial entity, (b) an employee of any Tricolor Entity or an Affiliate thereof or (c) the government of the United States or any State or other Governmental Authority; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| III | (iii) which at the time of origination, was originated in the United States and the related Obligor (a) provided as its most recent billing address an address located in the United States, (b) had a PTI not greater than 30.0%, (c) had a DTI not greater than 50.0% and (d) had an LTV not greater than 185.0%; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| IV | which, as of the related Cutoff Date or the related Funding Date, no Scheduled Payment is greater than 30 days past due and the most recent Scheduled Payment has not been extended or deferred; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| V | (v) with respect to which, to the knowledge of the Borrower, at the related Cutoff Date, the related Obligor was (a) not the subject of an ongoing bankruptcy proceeding and (b) not deceased; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| VI | (vi) which is not, and has not ever been, absent manifest error, a Defaulted Receivable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (vii) which was originated in the United States by (a) an Originator and then sold to Tricolor pursuant to a Transfer Agreement in the ordinary course of Tricolor's business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by such Originator in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle or (b) a Dealer and then sold to Tricolor pursuant to a Dealer Agreement in the ordinary course of Tricolor business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by Tricolor in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (viii) which arose under a Contract with respect to which the related Originator or Dealer and Tricolor have performed all obligations required to be performed by it thereunder, and the related Financed Vehicle has been delivered to the related Obligor; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Viii | provides for level monthly, weekly, bi-weekly or semi-monthly payments (provided that the payment in the first and last months of the Receivable may be minimally different from the level payment) that fully amortize the Amount Financed by its maturity date pursuant to the Simple Interest Method and (c) has a fixed APR of not more than the Maximum Lawful Rate; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| X | (x) if an Eligible Credit Score Receivable, the Obligor (or with respect to an Eligible Credit Score Receivable that has co-obligors, the co-obligor with the higher of the Credit Score) has a Credit Score of at least 400; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| XI | (xi) is secured by (a) in the case of an Indirect Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle or (b) in the case of any other Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle, which, in the case of either clause (a) or (b), (1) has a GPS device installed in the related Financed Vehicle, (2) has not been repossessed from the Obligor or constitutes a total insurance loss on or prior to the related Funding Date, (3) has not been sold by a Tricolor, Ganas or Ganas Ya! Dealership on more than two occasions, (4) does not have a starter interrupter device installed in such Financed Vehicle that has been activated and (5) has not been included in a "fleet" sale (i.e., a sale to any single Obligor of more than five Financed Vehicles); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Xii | (xii) in respect of which the Amount Financed does not include any portion of the required down payment for the related Financed Vehicle; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Xiii | (xiii) which, as of the related Funding Date, (a) is secured by a first priority validly perfected security interest in the Financed Vehicle in favor of the related Originator, as secured party, or all necessary actions have been commenced that would result in a first priority security interest in the Financed Vehicle in favor of such Originator, as secured party, which security interest, in either case, is assignable without the consent of the related Obligor or any other Person and has been so assigned by Tricolor to the Borrower and by the Borrower to the Administrative Agent and (b) the related Financed Vehicle has neither been repossessed or assigned for repossession; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xiv | (xiv) as to which the Borrower has good and marketable title thereto and which is not subject to any Lien on the related Financed Vehicle which are Liens prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by the Receivable, and as to which at any time, the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected first priority security interest, free and clear of all Liens and rights of others (other than Permitted Liens); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xv | (xv) which arises under a Contract which is a fixed rate retail installment sale contract or conditional sale contract that has been properly executed by the parties thereto and which represents the genuine, legal, valid and binding payment obligation in writing of the Obligor, in full force and effect, enforceable by the holder thereof in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P106760-1 | R100855-1 | P104333-1 | P100886-1 | P102616-1 | R101482-1 | P102312-1 | R99713-1 | R98694-1 | P98828-1 | P99610-1 | P100075-1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| xvi | (xvi) which was not subject to any right of rescission, cancellation, set-off, claim, counterclaim or defense (including the defense of usury) of the Obligor or any proceedings pending or, to the best of the Borrower's knowledge, threatened; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xvii | (xvii) which shall have complied with all Requirements of Law, including all consumer protection laws; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xviii | (xviii) with respect to which the related Contract (a) had not been modified, extended, amended, waived or altered in any respect, except in accordance with the Credit and Collection Policy and (b) constitutes Tangible Chattel Paper or Electronic Chattel Paper; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xix | (xix) with respect to which the related Financed Vehicle was required by the terms of the related Contract to be covered by a comprehensive and collision insurance policy at the time such Contract was entered into; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xx | (xx) with respect to which (a) each of Tricolor and the Borrower has done nothing to impair the rights of the Secured Parties therein, (b) neither Tricolor nor an Affiliate thereof has advanced funds to keep the related Contract current and (c) no selection procedures adverse to the interests of the Secured Parties have been utilized; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxi | (xxi) which (a) is assignable without the consent of, or notice to, the related Obligor and (b) has not been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer and assignment of such Receivable under this Agreement or pursuant to a transfer of the Contract shall be unlawful, void or voidable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxii | (xxii) with respect to which the related transfer, assignment and conveyance by Tricolor pursuant to the Purchase Agreement is not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiii | (xxiii) with respect to which the related Contract satisfies in all material respects the requirements of the Credit and Collection Policy that was in effect as of the date on which such Contract was originated and it was underwritten by Tricolor in accordance with the Credit and Collection Policy; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiv | (xxiv) with respect to which (a) there exists a Receivable File, (b) such Receivable File contains the fully executed Contract and each other document specified in the definition of "Receivable File", (c) such Receivable File has been delivered to the Servicer in accordance with the requirements of this Agreement and (d) the Servicer holds the Certificate of Title or a copy of a completed application for a Certificate of Title for the related Financed Vehicle and, in the case of a Receivable as to which the Servicer is not holding the Certificate of Title, the Servicer will obtain the Certificate of Title with respect to the Financed Vehicle within 180 days following the date of origination of the related Contract; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxv | (xxv) with respect to any Electronic Contract, (a) the Authoritative Copy of such Electronic Contract does not have any marks or notations indicating that such Electronic Contract has been pledged, assigned or otherwise conveyed to any Person other than Tricolor, the Borrower or the Administrative Agent (on behalf of the Secured Parties) and (b) no party other than the Borrower or Tricolor has "control" (within the meaning of Section 9-105 of the UCC) over the Authoritative Copy of such Electronic Contract; (xxvi) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor; and | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvi | (xxvii) with respect to which the related Obligor has not been subject to an ongoing Insolvency Proceeding for more than 180 days. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvii | (xxvii) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P100015-1 | R100513-1 | P98949-1 | R97597-1 | R97379-1 | P96697-1 | P67892-1 | R77019-10 | P97823-10 | R100623-10 | P99278-10 | P102414-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I. | (i) which is payable in Dollars in the United States or one of its territories; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| II | (ii) for which the related Obligor is a natural Person and not (a) a commercial entity, (b) an employee of any Tricolor Entity or an Affiliate thereof or (c) the government of the United States or any State or other Governmental Authority; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| III | (iii) which at the time of origination, was originated in the United States and the related Obligor (a) provided as its most recent billing address an address located in the United States, (b) had a PTI not greater than 30.0%, (c) had a DTI not greater than 50.0% and (d) had an LTV not greater than 185.0%; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| IV | which, as of the related Cutoff Date or the related Funding Date, no Scheduled Payment is greater than 30 days past due and the most recent Scheduled Payment has not been extended and deferred; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| V | (v) with respect to which, to the knowledge of the Borrower, at the related Cutoff Date, the related Obligor was (a) not the subject of an ongoing bankruptcy proceeding and (b) not deceased; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| VI | (vi) which is not, and has not ever been, absent manifest error, a Defaulted Receivable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (vii) which was originated in the United States by (a) an Originator and then sold to Tricolor pursuant to a Transfer Agreement in the ordinary course of Tricolor's business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by such Originator in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle or (b) a Dealer and then sold to Tricolor pursuant to a Dealer Agreement in the ordinary course of Tricolor business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by Tricolor in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (viii) which arose under a Contract with respect to which the related Originator or Dealer and Tricolor have performed all obligations required to be performed by it thereunder, and the related Financed Vehicle has been delivered to the related Obligor; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Viii | provides for level monthly, weekly, bi-weekly or semi-monthly payments (provided that the payment in the first and last months of the Receivable may be minimally different from the level payment) that fully amortize the Amount Financed by its maturity date pursuant to the Simple Interest Method and (c) has a fixed APR of not more than the Maximum Lawful Rate; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| X | (x) if an Eligible Credit Score Receivable, the Obligor (or with respect to an Eligible Credit Score Receivable that has co-obligors, the co-obligor with the higher of the Credit Score) has a Credit Score of at least 400; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| XI | (xi) is secured by (a) in the case of an Indirect Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle or (b) in the case of any other Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle, which, in the case of either clause (a) or (b), (1) has a GPS device installed in the related Financed Vehicle, (2) has not been repossessed from the Obligor or constitutes a total insurance loss on or prior to the related Funding Date, (3) has not been sold by a Tricolor, Ganas or Ganas Ya! Dealership on more than two occasions, (4) does not have a starter interrupter device installed in such Financed Vehicle that has been activated and (5) has not been included in a "fleet" sale (i.e., a sale to any single Obligor of more than five Financed Vehicles); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Xii | (xii) in respect of which the Amount Financed does not include any portion of the required down payment for the related Financed Vehicle; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Xiii | (xiii) which, as of the related Funding Date, (a) is secured by a first priority validly perfected security interest in the Financed Vehicle in favor of the related Originator, as secured party, or all necessary actions have been commenced that would result in a first priority security interest in the Financed Vehicle in favor of such Originator, as secured party, which security interest, in either case, is assignable without the consent of the related Obligor or any other Person and has been so assigned by Tricolor to the Borrower and by the Borrower to the Administrative Agent and (b) the related Financed Vehicle has neither been repossessed or assigned for repossession; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xiv | (xiv) as to which the Borrower has good and marketable title thereto and which is not subject to any Lien on the related Financed Vehicle which are Liens prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by the Receivable, and as to which at any time, the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected first priority security interest, free and clear of all Liens and rights of others (other than Permitted Liens); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xv | (xv) which arises under a Contract which is a fixed rate retail installment sale contract or conditional sale contract that has been properly executed by the parties thereto and which represents the genuine, legal, valid and binding payment obligation in writing of the Obligor, in full force and effect, enforceable by the holder thereof in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P100015-1 | R100513-1 | P98949-1 | R97597-1 | R97379-1 | P96697-1 | P67892-1 | R77019-10 | P97823-10 | R100623-10 | P99278-10 | P102414-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| xvi | (xvi) which was not subject to any right of rescission, cancellation, set-off, claim, counterclaim or defense (including the defense of usury) of the Obligor or any proceedings pending or, to the best of the Borrower's knowledge, threatened; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xvii | (xvii) which shall have complied with all Requirements of Law, including all consumer protection laws; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xviii | (xviii) with respect to which the related Contract (a) had not been modified, extended, amended, waived or altered in any respect, except in accordance with the Credit and Collection Policy and (b) constitutes Tangible Chattel Paper or Electronic Chattel Paper; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xix | (xix) with respect to which the related Financed Vehicle was required by the terms of the related Contract to be covered by a comprehensive and collision insurance policy at the time such Contract was entered into; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xx | (xx) with respect to which (a) each of Tricolor and the Borrower has done nothing to impair the rights of the Secured Parties therein, (b) neither Tricolor nor an Affiliate thereof has advanced funds to keep the related Contract current and (c) no selection procedures adverse to the interests of the Secured Parties have been utilized; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxi | (xxi) which (a) is assignable without the consent of, or notice to, the related Obligor and (b) has not been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer and assignment of such Receivable under this Agreement or pursuant to a transfer of the Contract shall be unlawful, void or voidable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxii | (xxii) with respect to which the related transfer, assignment and conveyance by Tricolor pursuant to the Purchase Agreement is not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiii | (xxiii) with respect to which the related Contract satisfies in all material respects the requirements of the Credit and Collection Policy that was in effect as of the date on which such Contract was originated and it was underwritten by Tricolor in accordance with the Credit and Collection Policy; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiv | (xxiv) with respect to which (a) there exists a Receivable File, (b) such Receivable File contains the fully executed Contract and each other document specified in the definition of "Receivable File", (c) such Receivable File has been delivered to the Servicer in accordance with the requirements of this Agreement and (d) the Servicer holds the Certificate of Title or a copy of a completed application for a Certificate of Title for the related Financed Vehicle and, in the case of a Receivable as to which the Servicer is not holding the Certificate of Title, the Servicer will obtain the Certificate of Title with respect to the Financed Vehicle within 180 days following the date of origination of the related Contract; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxv | (xxv) with respect to any Electronic Contract, (a) the Authoritative Copy of such Electronic Contract does not have any marks or notations indicating that such Electronic Contract has been pledged, assigned or otherwise conveyed to any Person other than Tricolor, the Borrower or the Administrative Agent (on behalf of the Secured Parties) and (b) no party other than the Borrower or Tricolor has "control" (within the meaning of Section 9-105 of the UCC) over the Authoritative Copy of such Electronic Contract; (xxvi) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor; and | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvi | (xxvii) with respect to which the related Obligor has not been subject to an ongoing Insolvency Proceeding for more than 180 days. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvii | (xxvii) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P102176-10 | P102445-10 | R99753-10 | P100228-10 | P103032-10 | R102974-10 | P103701-10 | R96847-10 | P104129-10 | R104280-10 | R79508-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| I. | (i) which is payable in Dollars in the United States or one of its territories; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| II | (ii) for which the related Obligor is a natural Person and not (a) a commercial entity, (b) an employee of any Tricolor Entity or an Affiliate thereof or (c) the government of the United States or any State or other Governmental Authority; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| III | (iii) which at the time of origination, was originated in the United States and the related Obligor (a) provided as its most recent billing address an address located in the United States, (b) had a PTI not greater than 30.0%, (c) had a DTI not greater than 50.0% and (d) had an LTV not greater than 185.0%; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| IV | which, as of the related Cutoff Date or the related Funding Date, no Scheduled Payment is greater than 30 days past due and the most recent Scheduled Payment has not been extended and deferred; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| V | (v) with respect to which, to the knowledge of the Borrower, at the related Cutoff Date, the related Obligor was (a) not the subject of an ongoing bankruptcy proceeding and (b) not deceased; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| VI | (vi) which is not, and has not ever been, absent manifest error, a Defaulted Receivable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (vii) which was originated in the United States by (a) an Originator and then sold to Tricolor pursuant to a Transfer Agreement in the ordinary course of Tricolor's business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by such Originator in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle or (b) a Dealer and then sold to Tricolor pursuant to a Dealer Agreement in the ordinary course of Tricolor business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by Tricolor in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (viii) which arose under a Contract with respect to which the related Originator or Dealer and Tricolor have performed all obligations required to be performed by it thereunder, and the related Financed Vehicle has been delivered to the related Obligor; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Viii | provides for level monthly, weekly, bi-weekly or semi-monthly payments (provided that the payment in the first and last months of the Receivable may be minimally different from the level payment) that fully amortize the Amount Financed by its maturity date pursuant to the Simple Interest Method and (c) has a fixed APR of not more than the Maximum Lawful Rate; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| X | (x) if an Eligible Credit Score Receivable, the Obligor (or with respect to an Eligible Credit Score Receivable that has co-obligors, the co-obligor with the higher of the Credit Score) has a Credit Score of at least 400; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| XI | (xi) is secured by (a) in the case of an Indirect Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle or (b) in the case of any other Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle, which, in the case of either clause (a) or (b), (1) has a GPS device installed in the related Financed Vehicle, (2) has not been repossessed from the Obligor or constitutes a total insurance loss on or prior to the related Funding Date, (3) has not been sold by a Tricolor, Ganas or Ganas Ya! Dealership on more than two occasions, (4) does not have a starter interrupter device installed in such Financed Vehicle that has been activated and (5) has not been included in a "fleet" sale (i.e., a sale to any single Obligor of more than five Financed Vehicles); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Xii | (xii) in respect of which the Amount Financed does not include any portion of the required down payment for the related Financed Vehicle; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Xiii | (xiii) which, as of the related Funding Date, (a) is secured by a first priority validly perfected security interest in the Financed Vehicle in favor of the related Originator, as secured party, or all necessary actions have been commenced that would result in a first priority security interest in the Financed Vehicle in favor of such Originator, as secured party, which security interest, in either case, is assignable without the consent of the related Obligor or any other Person and has been so assigned by Tricolor to the Borrower and by the Borrower to the Administrative Agent and (b) the related Financed Vehicle has neither been repossessed or assigned for repossession; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xiv | (xiv) as to which the Borrower has good and marketable title thereto and which is not subject to any Lien on the related Financed Vehicle which are Liens prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by the Receivable, and as to which at any time, the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected first priority security interest, free and clear of all Liens and rights of others (other than Permitted Liens); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xv | (xv) which arises under a Contract which is a fixed rate retail installment sale contract or conditional sale contract that has been properly executed by the parties thereto and which represents the genuine, legal, valid and binding payment obligation in writing of the Obligor, in full force and effect, enforceable by the holder thereof in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | P102176-10 | P102445-10 | R99753-10 | P100228-10 | P103032-10 | R102974-10 | P103701-10 | R96847-10 | P104129-10 | R104280-10 | R79508-12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| xvi | (xvi) which was not subject to any right of rescission, cancellation, set-off, claim, counterclaim or defense (including the defense of usury) of the Obligor or any proceedings pending or, to the best of the Borrower's knowledge, threatened; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xvii | (xvii) which shall have complied with all Requirements of Law, including all consumer protection laws; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xviii | (xviii) with respect to which the related Contract (a) had not been modified, extended, amended, waived or altered in any respect, except in accordance with the Credit and Collection Policy and (b) constitutes Tangible Chattel Paper or Electronic Chattel Paper; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xix | (xix) with respect to which the related Financed Vehicle was required by the terms of the related Contract to be covered by a comprehensive and collision insurance policy at the time such Contract was entered into; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xx | (xx) with respect to which (a) each of Tricolor and the Borrower has done nothing to impair the rights of the Secured Parties therein, (b) neither Tricolor nor an Affiliate thereof has advanced funds to keep the related Contract current and (c) no selection procedures adverse to the interests of the Secured Parties have been utilized; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxi | (xxi) which (a) is assignable without the consent of, or notice to, the related Obligor and (b) has not been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer and assignment of such Receivable under this Agreement or pursuant to a transfer of the Contract shall be unlawful, void or voidable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxii | (xxii) with respect to which the related transfer, assignment and conveyance by Tricolor pursuant to the Purchase Agreement is not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiii | (xxiii) with respect to which the related Contract satisfies in all material respects the requirements of the Credit and Collection Policy that was in effect as of the date on which such Contract was originated and it was underwritten by Tricolor in accordance with the Credit and Collection Policy; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiv | (xxiv) with respect to which (a) there exists a Receivable File, (b) such Receivable File contains the fully executed Contract and each other document specified in the definition of "Receivable File", (c) such Receivable File has been delivered to the Servicer in accordance with the requirements of this Agreement and (d) the Servicer holds the Certificate of Title or a copy of a completed application for a Certificate of Title for the related Financed Vehicle and, in the case of a Receivable as to which the Servicer is not holding the Certificate of Title, the Servicer will obtain the Certificate of Title with respect to the Financed Vehicle within 180 days following the date of origination of the related Contract; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxv | (xxv) with respect to any Electronic Contract, (a) the Authoritative Copy of such Electronic Contract does not have any marks or notations indicating that such Electronic Contract has been pledged, assigned or otherwise conveyed to any Person other than Tricolor, the Borrower or the Administrative Agent (on behalf of the Secured Parties) and (b) no party other than the Borrower or Tricolor has "control" (within the meaning of Section 9-105 of the UCC) over the Authoritative Copy of such Electronic Contract; (xxvi) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor; and | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvi | (xxvii) with respect to which the related Obligor has not been subject to an ongoing Insolvency Proceeding for more than 180 days. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvii | (xxvii) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | R102975-12 | R92740-12 | P96754-12 | R103136-12 | P83479-10 | P95359-1 | P94039-1 | TF1056-45 | P88765-10 |
|---|---|---|---|---|---|---|---|---|---|---|
| I. | (i) which is payable in Dollars in the United States or one of its territories; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| II | (ii) for which the related Obligor is a natural Person and not (a) a commercial entity, (b) an employee of any Tricolor Entity or an Affiliate thereof or (c) the government of the United States or any State or other Governmental Authority; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| III | (iii) which at the time of origination, was originated in the United States and the related Obligor (a) provided as its most recent billing address an address located in the United States, (b) had a PTI not greater than 30.0%, (c) had a DTI not greater than 50.0% and (d) had an LTV not greater than 185.0%; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| IV | which, as of the related Cutoff Date or the related Funding Date, no Scheduled Payment is greater than 30 days past due and the most recent Scheduled Payment has not been extended or deferred; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| V | (v) with respect to which, to the knowledge of the Borrower, at the related Cutoff Date, the related Obligor was (a) not the subject of an ongoing bankruptcy proceeding and (b) not deceased; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| VI | (vi) which is not, and has not ever been, absent manifest error, a Defaulted Receivable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (vii) which was originated in the United States by (a) an Originator and then sold to Tricolor pursuant to a Transfer Agreement in the ordinary course of Tricolor's business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by such Originator in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle or (b) a Dealer and then sold to Tricolor pursuant to a Dealer Agreement in the ordinary course of Tricolor business pursuant to a transaction constituting a bona fide sale and which was created as a result of an advance by Tricolor in the ordinary course of its business, directly to or for the benefit of an Obligor for the purchase or refinancing of the related Financed Vehicle; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Vii | (viii) which arose under a Contract with respect to which the related Originator or Dealer and Tricolor have performed all obligations required to be performed by it thereunder, and the related Financed Vehicle has been delivered to the related Obligor; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Viii | provides for level monthly, weekly, bi-weekly or semi-monthly payments (provided that the payment in the first and last months of the Receivable may be minimally different from the level payment) that fully amortize the Amount Financed by its maturity date pursuant to the Simple Interest Method and (c) has a fixed APR of not more than the Maximum Lawful Rate; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| X | (x) if an Eligible Credit Score Receivable, the Obligor (or with respect to an Eligible Credit Score Receivable that has co-obligors, the co-obligor with the higher of the Credit Score) has a Credit Score of at least 400; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| XI | (xi) is secured by (a) in the case of an Indirect Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle or (b) in the case of any other Receivable, an automobile, pickup truck, minivan, sport utility vehicle or other passenger vehicle, which, in the case of either clause (a) or (b), (1) has a GPS device installed in the related Financed Vehicle, (2) has not been repossessed from the Obligor or constitutes a total insurance loss on or prior to the related Funding Date, (3) has not been sold by a Tricolor, Ganas or Ganas Ya! Dealership on more than two occasions, (4) does not have a starter interrupter device installed in such Financed Vehicle that has been activated and (5) has not been included in a "fleet" sale (i.e., a sale to any single Obligor of more than five Financed Vehicles); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| Xii | (xii) in respect of which the Amount Financed does not include any portion of the required down payment for the related Financed Vehicle; | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Xiii | (xiii) which, as of the related Funding Date, (a) is secured by a first priority validly perfected security interest in the Financed Vehicle in favor of the related Originator, as secured party, or all necessary actions have been commenced that would result in a first priority security interest in the Financed Vehicle in favor of such Originator, as secured party, which security interest, in either case, is assignable without the consent of the related Obligor or any other Person and has been so assigned by Tricolor to the Borrower and by the Borrower to the Administrative Agent and (b) the related Financed Vehicle has neither been repossessed or assigned for repossession; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xiv | (xiv) as to which the Borrower has good and marketable title thereto and which is not subject to any Lien on the related Financed Vehicle which are Liens prior to, or equal or coordinate with, the security interest in the Financed Vehicle granted by the Receivable, and as to which at any time, the Administrative Agent, for the benefit of the Secured Parties, shall have a valid and perfected first priority security interest, free and clear of all Liens and rights of others (other than Permitted Liens); | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xv | (xv) which arises under a Contract which is a fixed rate retail installment sale contract or conditional sale contract that has been properly executed by the parties thereto and which represents the genuine, legal, valid and binding payment obligation in writing of the Obligor, in full force and effect, enforceable by the holder thereof in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

JPM - Tricolor Auto Acceptance LLC
Eligibility Review
As of January 31, 2024

Exhibit B.2

| # | Account No. | R102975-12 | R92740-12 | P96754-12 | R103136-12 | P83479-10 | P95359-1 | P94039-1 | TF1056-45 | P88765-10 |
|---|---|---|---|---|---|---|---|---|---|---|
| xvi | (xvi) which was not subject to any right of rescission, cancellation, set-off, claim, counterclaim or defense (including the defense of usury) of the Obligor or any proceedings pending or, to the best of the Borrower's knowledge, threatened; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xvii | (xvii) which shall have complied with all Requirements of Law, including all consumer protection laws; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xviii | (xviii) with respect to which the related Contract (a) had not been modified, extended, amended, waived or altered in any respect, except in accordance with the Credit and Collection Policy and (b) constitutes Tangible Chattel Paper or Electronic Chattel Paper; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xix | (xix) with respect to which the related Financed Vehicle was required by the terms of the related Contract to be covered by a comprehensive and collision insurance policy at the time such Contract was entered into; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xx | (xx) with respect to which (a) each of Tricolor and the Borrower has done nothing to impair the rights of the Secured Parties therein, (b) neither Tricolor nor an Affiliate thereof has advanced funds to keep the related Contract current and (c) no selection procedures adverse to the interests of the Secured Parties have been utilized; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxi | (xxi) which (a) is assignable without the consent of, or notice to, the related Obligor and (b) has not been originated in, or is subject to the laws of, any jurisdiction under which the sale, transfer and assignment of such Receivable under this Agreement or pursuant to a transfer of the Contract shall be unlawful, void or voidable; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxii | (xxii) with respect to which the related transfer, assignment and conveyance by Tricolor pursuant to the Purchase Agreement is not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiii | (xxiii) with respect to which the related Contract satisfies in all material respects the requirements of the Credit and Collection Policy that was in effect as of the date on which such Contract was originated and it was underwritten by Tricolor in accordance with the Credit and Collection Policy; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxiv | (xxiv) with respect to which (a) there exists a Receivable File, (b) such Receivable File contains the fully executed Contract and each other document specified in the definition of "Receivable File", (c) such Receivable File has been delivered to the Servicer in accordance with the requirements of this Agreement and (d) the Servicer holds the Certificate of Title or a copy of a completed application for a Certificate of Title for the related Financed Vehicle and, in the case of a Receivable as to which the Servicer is not holding the Certificate of Title, the Servicer will obtain the Certificate of Title with respect to the Financed Vehicle within 180 days following the date of origination of the related Contract; | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxv | (xxv) with respect to any Electronic Contract, (a) the Authoritative Copy of such Electronic Contract does not have any marks or notations indicating that such Electronic Contract has been pledged, assigned or otherwise conveyed to any Person other than Tricolor, the Borrower or the Administrative Agent (on behalf of the Secured Parties) and (b) no party other than the Borrower or Tricolor has "control" (within the meaning of Section 9-105 of the UCC) over the Authoritative Copy of such Electronic Contract; (xxvi) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor; and | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvi | (xxvii) with respect to which the related Obligor has not been subject to an ongoing Insolvency Proceeding for more than 180 days. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |
| xxvii | (xxvii) with respect to any Receivable, the starter interrupter device installed on the related Financed Vehicle has not been activated by Tricolor. | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W | R&W |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Aging Test**
**As of January 31, 2024**

Exhibit C.1

| CBIZ Control | Account No. | Current Principal Balance | Payment Amount | Payment Frequency | First Payment Date | Next Payment Date | Days Past Due | Account Status | Aged Correctly? | Collection Notes Within Policy? | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P105075 | $39,855 | $ 832 | BiWeekly | 01/06/24 | 02/03/24 | 0 | Current | Yes | Yes | |
| 2 | P106227 | 39,394 | 369 | BiWeekly | 01/20/24 | 02/03/24 | 0 | Current | Yes | Yes | |
| 3 | P107570 | 38,776 | 404 | Semi-Monthly | 01/20/24 | 02/05/24 | 0 | Current | Yes | Yes | |
| 4 | P107472 | 38,721 | 361 | BiWeekly | 01/20/24 | 02/03/24 | 0 | Current | Yes | Yes | |
| 5 | P107662 | 38,310 | 382 | BiWeekly | 01/20/24 | 02/03/24 | 0 | Current | Yes | Yes | |
| 6 | P105487 | 38,028 | 375 | BiWeekly | 01/13/24 | 02/10/24 | 0 | Current | Yes | Yes | |
| 7 | P105594 | 37,500 | 363 | BiWeekly | 12/30/23 | 02/10/24 | 18 | 16-30 | Yes | Yes | |
| 8 | P104415 | 37,414 | 373 | BiWeekly | 12/30/23 | 02/10/24 | 0 | Current | Yes | Yes | |
| 9 | P105074 | 37,171 | 364 | BiWeekly | 01/20/24 | 02/03/24 | 11 | 1-15 | Yes | Yes | |
| 10 | P105505 | 36,949 | 365 | Semi-Monthly | 01/06/24 | 02/06/24 | 0 | Current | Yes | Yes | |
| 11 | P106700 | 36,141 | 854 | Monthly | 01/06/24 | 02/06/24 | 0 | Current | Yes | Yes | |
| 12 | P106760 | 35,896 | 847 | Monthly | 01/20/24 | 02/20/24 | 0 | Current | Yes | Yes | |
| 13 | R100855 | 24,797 | 248 | BiWeekly | 12/23/23 | 02/03/24 | 11 | 1-15 | Yes | Yes | |
| 14 | P104333 | 23,289 | 271 | BiWeekly | 12/16/23 | 02/10/24 | 18 | 16-30 | Yes | Yes | |
| 15 | P100886 | 37,151 | 390 | BiWeekly | 12/09/23 | 02/17/24 | 0 | Current | Yes | Yes | |
| 16 | P102616 | 22,147 | 229 | BiWeekly | 12/02/23 | 02/10/24 | 0 | Current | Yes | Yes | |
| 17 | R101482 | 21,693 | 244 | BiWeekly | 12/02/23 | 02/10/24 | 24 | 16-30 | Yes | Yes | This was a voluntary repo.  Per the collection notes it was marked as such 1/10/24.  This isn't marked as a repo on the 1/31/24 data tape. |
| 18 | P102312 | 23,793 | 262 | BiWeekly | 11/25/23 | 02/03/24 | 31 | 31-60 | Yes | Yes | Repo recorded 1/26/24 but was not marked as repo on the 1/31/24 data tape. |
| 19 | R99713 | 26,378 | 757 | Monthly | 11/25/23 | 02/25/24 | 0 | Current | Yes | Yes | |
| 20 | R98694 | 14,553 | 193 | BiWeekly | 11/25/23 | 02/03/24 | 25 | 16-30 | Yes | Yes | |
| 21 | P98828 | 30,655 | 363 | BiWeekly | 11/18/23 | 02/10/24 | 0 | Current | Yes | Yes | |
| 22 | P99610 | 25,440 | 314 | BiWeekly | 11/18/23 | 02/10/24 | 52 | 31-60 | No | Yes | The aging on this is wrong.  If the payment history is correct this should only be 32 DPD.  The vehicle was marked as Repo on Hand 1/23/24 but was not marked as repo on the 1/31/24 data tape. |
| 23 | P100075 | 25,470 | 302 | BiWeekly | 11/18/23 | 02/10/24 | 0 | Current | Yes | Yes | |
| 24 | P100015 | 23,069 | 300 | BiWeekly | 11/18/23 | 02/10/24 | 0 | Current | Yes | Yes | |
| 25 | R100513 | 21,462 | 275 | BiWeekly | 11/18/23 | 02/10/24 | 52 | 31-60 | No | Yes | The aging on this is wrong.  If the payment history is correct this should only be 32 DPD.  But the aging bucket is correct. |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Aging Shift Test**
**As of January 31, 2024**

**Exhibit C.2**

| CBIZ Control | Account No. | Current Principal Balance | Payment Amount | Payment Frequency | Next Payment Date | Last Payment Date | 12/31/23 Status | Amount Paid Jan 2024 | 01/31/24 Status | Shifted Correctly ? (Y/N) | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P83479 | $ 44,341 | $ 400 | BiWeekly | 02/24/24 | 01/30/24 | Current | $ 800 | Current | Yes | |
| 2 | P95359 | 38,282 | 830 | Monthly | 02/21/24 | 01/19/24 | Current | 930 | Current | Yes | |
| 3 | P94039 | 40,545 | 390 | BiWeekly | 02/10/24 | 12/13/23 | 1-15 | - | 16-30 | No | No payments since Dec. Oldest outstanding due date is 12/16/23. Do not see any mention of the vehicle being in the shop or any extention/deferally offered in the collection notes. |
| 4 | TF1056 | 39,836 | 1,016 | Monthly | 02/20/24 | 01/20/24 | Current | 1,016 | Current | Yes | |
| 5 | P67892 | 29,055 | 339 | BiWeekly | 02/10/24 | 01/31/24 | 1-15 | 1,017 | Current | Yes | |
| 6 | R77019 | 33,976 | 774 | Monthly | 02/18/24 | 01/16/24 | Current | 774 | Current | Yes | |
| 7 | P97823 | 25,710 | 307 | BiWeekly | 02/03/24 | 12/20/23 | 31-60 | - | 31-60 | No | No payments received on this account. Oldest outstanding due date is 11/25/23. The vehicle was repossessed in December 2023 and the last collection note on 1/17/24 is for customer advocacy and mentions the obligor would like to redeem the vehicle. |
| 8 | R100623 | 23,357 | 235 | BiWeekly | 02/03/24 | 01/26/24 | Current | 470 | Current | Yes | |
| 9 | P99278 | 30,483 | 694 | Monthly | 03/02/24 | 01/30/24 | Current | 694 | Current | Yes | |
| 10 | P102414 | 24,012 | 324 | Semi-Monthly | 02/07/24 | 12/24/23 | 31-60 | - | 31-60 | No | No payments received on this account. Oldest outstanding due date is 11/25/23. Do not see any mention of the vehicle being in the shop or any extention/deferally offered in the collection notes. |
| 11 | P102176 | 26,753 | 288 | BiWeekly | 02/03/24 | 01/06/24 | Current | 288 | 1-15 | Yes | |
| 12 | P102445 | 32,835 | 326 | BiWeekly | 02/03/24 | 01/20/24 | Current | 680 | Current | Yes | |
| 13 | R99753 | 29,766 | 281 | BiWeekly | 02/10/24 | 01/27/24 | 1-15 | 338 | 16-30 | Yes | |
| 14 | P100228 | 34,119 | 331 | BiWeekly | 04/06/24 | 01/12/24 | Current | 1,811 | Current | Yes | |
| 15 | P103032 | 29,780 | 356 | Semi-Monthly | 02/02/24 | 01/24/24 | 1-15 | 1,260 | Current | Yes | |
| 16 | R102974 | 13,869 | 189 | BiWeekly | 02/10/24 | 01/29/24 | 1-15 | 620 | 1-15 | Yes | |
| 17 | P103701 | 32,399 | 297 | BiWeekly | 02/03/24 | 01/21/24 | Current | 594 | Current | Yes | |
| 18 | R96847 | 36,743 | 359 | BiWeekly | 02/10/24 | 01/27/24 | Current | 718 | Current | Yes | |
| 19 | P104129 | 38,440 | 382 | BiWeekly | 02/10/24 | 01/06/24 | 1-15 | 864 | 16-30 | Yes | |
| 20 | R104280 | 10,686 | 150 | BiWeekly | 02/17/24 | 01/29/24 | 1-15 | 1,205 | Current | Yes | |
| 21 | R79508 | 32,462 | 356 | BiWeekly | 02/10/24 | 01/09/24 | 1-15 | 406 | 16-30 | No | The oldest due date is 12/30/23, which would make this 31 DPD. Mechanical issues were documented in the collection notes. |
| 22 | R102975 | 32,309 | 379 | BiWeekly | 02/10/24 | 01/17/24 | 1-15 | - | 16-30 | No | No payment received, oldest due date is 12/16/23. Mechanical issues were documented in the collection notes. |
| 23 | R92740 | 29,067 | 363 | BiWeekly | 02/10/24 | 01/02/24 | 1-15 | 826 | 16-30 | Yes | |
| 24 | P96754 | 27,916 | 344 | BiWeekly | 02/10/24 | 01/24/24 | 1-15 | 788 | 1-15 | Yes | |
| 25 | R103136 | 27,186 | 387 | Semi-Monthly | 02/01/24 | 01/03/24 | 1-15 | 874 | 1-15 | Yes | |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Modification Test**
**As of January 31, 2024**

**Exhibit C.3**

| CBIZ Control | Account No. | Current Principal Balance | Modification Date | Type of Modification | Signed Modification Agreement | Modification # | Proper Authorization? | Agreed to Policy? | Correctly Aged? | Eligible per Data Tape | Exceptions approved |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P84783 | $ 35,278 | 10/12/23 | Defer 10/12/23 | Yes | 2 | Yes | Yes | Yes | $ 35,278 | |
| 2 | P67399 | 26,822 | 10/12/23 | Defer 10/14/23 | Yes | 1 | Yes | Yes | Yes | 26,822 | |
| 3 | P34036 | 19,305 | 01/24/24 | Defer 1/20/24 | Yes | 1 | Yes | Yes | Yes | 19,305 | |
| 4 | R20054 | 11,049 | 01/30/24 | Defer 1/29/24 | Yes | 2 | Yes | Yes | Yes | 11,049 | |
| 5 | P42526 | 15,446 | 01/11/24 | Defer 12/30/23 & 1/13/24 | Yes | 2 | Yes | Yes | Yes | 15,446 | |
| 6 | P26287 | 13,732 | 01/16/24 | Defer 1/13/24 | Yes | 1 | Yes | Yes | Yes | 13,732 | |
| 7 | P19340 | 11,071 | 01/09/24 | Defer 12/31/23 & 1/15/24 | Yes | 2 | Yes | Yes | Yes | 11,071 | |
| 8 | P23066 | 22,817 | 01/04/24 | Defer 1/3/24 | Yes | 2 | Yes | Yes | Yes | 22,817 | |
| 9 | P7045 | 16,503 | 01/10/24 | Defer 12/16/23 & 12/30/23 | Yes | 3 | Yes | Yes | Yes | 16,503 | |
| 10 | P5018 | 9,798 | 01/24/24 | Defer 1/19/24 & 2/2/24 | Yes | 1 | Yes | Yes | Yes | 9,798 | |
| 11 | R15675 | 3,276 | 01/29/24 | Defer 1/20/24 & 2/3/24 | Yes | 2 | Yes | Yes | Yes | 3,276 | |
| 12 | P38813 | 14,637 | 01/11/24 | Defer 12/28/23 & 1/11/24 | Yes | 2 | Yes | Yes | Yes | 14,637 | |
| 13 | P26929 | 14,375 | 01/10/24 | Defer 1/5/24 | Yes | 1 | Yes | Yes | Yes | 14,375 | |
| 14 | 49919 | 5,839 | 01/12/24 | Defer 1/12/24 pmt | Yes | 4 | Yes | Yes | Yes | 5,839 | Suporvisor approved the 4th deferment |
| 15 | P4561 | 7,369 | 01/10/24 | Defer 1/8/24 & 1/22/24 | Yes | 1 | Yes | Yes | Yes | 7,369 | |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Bankrupt Account Test**
**As of January 31, 2024**

**Exhibit C.4**

| CBIZ Control | Account No. | Status per Data Tape | Bankruptcy Indicator per Data Tape | Date of Bankruptcy | Chapter | Date Collections Ceased | Charge-Off Amount | Date of Charge-Off | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1 | P36190 | OPEN | Y | 01/08/24 | 7 | 01/08/24 | N/A | N/A | Payments continued to be received |
| 2 | P34639 | OPEN | Y | 10/17/23 | 7 | 10/27/23 | N/A | N/A | Payments continued to be received |
| 3 | R23008 | OPEN | Y | 12/12/23 | 7 | 12/12/23 | N/A | N/A | Payments continued to be received |
| 4 | P15667 | OPEN | Y | 08/18/23 | 13 | 08/18/23 | N/A | N/A | Payments continued to be received |
| 5 | R15993 | OPEN | Y | 10/03/23 | 7 | 10/03/23 | N/A | N/A | Payments continued to be received |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Fees and Finance Charge Test**
**As of January 31, 2024**

**Exhibit C.5**

| CBIZ Control | Account No. | Current Principal Balance | Regular Payment Amount | Current APR on Data Tape | Prior Pmt | Last Pmt | Interest Recalc | Interest Allocated for Pmt | Late Fees | Late Fee % | Compliant with Policy |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P73261 | $ 35,186 | $ 374 | 11.15% | 10/23/23 | 11/06/23 | $ 151 | $ 150 | N/A | N/A | Yes |
| 2 | P88765 | 39,927 | 415 | 15.90% | 12/16/23 | 01/27/24 | 734 | 734 | N/A | N/A | Yes |
| 3 | P90110 | 37,251 | 425 | 10.90% | 09/16/23 | 11/03/23 | 550 | 546 | 21.25 | 5.0% | Yes |
| 4 | P96697 | 20,691 | 323 | 21.27% | 12/30/23 | 01/18/24 | 230 | 226 | N/A | N/A | Yes |
| 5 | P105075 | 39,855 | 384 | 11.90% | 01/06/24 | 01/20/24 | 183 | 182 | N/A | N/A | Yes |
| 6 | P105487 | 38,028 | 375 | 13.90% | 01/06/24 | 01/19/24 | 190 | 188 | N/A | N/A | Yes |
| 7 | P105505 | 36,949 | 365 | 11.90% | 01/05/24 | 01/19/24 | 170 | 169 | N/A | N/A | Yes |
| 8 | R98694 | 14,553 | 193 | 19.90% | 12/11/23 | 12/27/23 | 127 | 127 | 9.65 | 5.0% | Yes |
| 9 | P106227 | 39,394 | 369 | 11.90% | 12/26/23 | 01/19/24 | 309 | 306 | N/A | N/A | Yes |
| 10 | P106700 | 36,141 | 854 | 17.90% | 12/13/23 | 01/08/24 | 467 | 464 | N/A | N/A | Yes |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Charge-Off Test**
**As of January 31, 2024**

**Exhibit C.6**

| CBIZ Control | Account No. | Date of Charge-Off | Amount Charged-Off | Reason for Charge-Off | Date of Repossession | Charge-Off Lag | Recovery on Repo? (Y/N) | MMR Vehicle Value | Recovery per Data Tape | Repo Proceeds per Ledger | Sale to Retail per Ledger | Net Charge-Off | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P81353 | 01/11/24 | $ 40,642 | Past Due | 10/17/23 | 86 | Yes | $ 24,378 | $ 24,378 | $ 24,378 | $ 24,378 | $ 16,264 | |
| 2 | P90399 | 11/01/23 | 40,128 | Past Due | 10/02/23 | 30 | Yes | 26,750 | 26,750 | 26,750 | 26,750 | 13,378 | |
| 3 | P81806 | 10/31/23 | 37,877 | Abandoned | 09/15/23 | 46 | Yes | 28,045 | 28,045 | 28,045 | 28,045 | 9,832 | |
| 4 | P89823 | 10/26/23 | 37,890 | Impound | 09/20/23 | 36 | Yes | 31,375 | 31,375 | 31,375 | 31,375 | 6,515 | |
| 5 | P81675 | 11/08/23 | 40,931 | Past Due | N/A | N/A | No | | - | N/A | N/A | 40,931 | Vehicle not recovered |
| 6 | P85515 | 01/11/24 | 38,787 | Past Due | 10/06/23 | 97 | Yes | 25,706 | 25,706 | 25,706 | 25,706 | 13,081 | |
| 7 | P88046 | 10/12/23 | 37,715 | Past Due | 09/07/23 | 35 | Yes | 30,275 | 30,275 | 30,275 | 30,275 | 7,440 | |
| 8 | P88131 | 01/27/24 | 37,610 | Past Due | N/A | N/A | No | 23,027 | 23,027 | 23,027 | 23,027 | 14,583 | Vehicle not recovered |
| 9 | P84061 | 10/28/23 | 37,535 | Past Due | N/A | N/A | No | 24,441 | 24,441 | 24,441 | 24,441 | 13,094 | Vehicle not recovered |
| 10 | P82007 | 10/19/23 | 41,473 | Past Due | 09/19/23 | 30 | Yes | 26,739 | 26,739 | 26,739 | 26,739 | 14,733 | |
| 11 | P80490 | 11/09/23 | 41,253 | Impound | 09/29/23 | 41 | Yes | 27,860 | 27,860 | 27,860 | 27,860 | 13,394 | |
| 12 | P84802 | 10/28/23 | 39,523 | Past Due | N/A | N/A | No | N/A | - | N/A | N/A | 39,523 | Vehicle not recovered |
| 13 | P83955 | 10/04/23 | 38,123 | Past Due | 08/16/23 | 49 | Yes | 25,156 | 25,156 | 2,156 | 25,156 | 12,967 | |
| 14 | R94084 | 01/15/24 | 40,893 | Abandoned | 11/08/23 | 68 | Yes | 26,167 | 26,167 | 26,167 | 26,167 | 14,726 | |
| 15 | P88921 | 10/09/23 | 37,885 | Past Due | 09/04/23 | 35 | Yes | 30,265 | 30,625 | 30,625 | 30,625 | 7,260 | |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Wrech Test**
**As of January 31, 2024**

**Exhibit C.7**

| CBIZ Control | Account No. | Current Principal Balance | Payment Amount | Payment Frequency | Last Payment Date | Account Status | Accident Reported | Comments |
|---|---|---|---|---|---|---|---|---|
| 1 | P95926 | $ 37,615 | $ 387 | BiWeekly | 12/20/23 | 31-60 | 10/30/23 | Correctly aged.  Insurance still in review at 1/31/24 |
| 2 | P87256 | 34,209 | 362 | BiWeekly | 01/24/24 | 16-30 | 10/11/23 | Correctly aged but it appears that as of 1/31/24 the vehicle was repaired. |
| 3 | P86482 | 3,177 | 387 | BiWeekly | 12/11/23 | 16-30 | 10/20/23 | Correctly aged.  Insurance reported as total loss on 11/29/23 - ACH pending 1/31/24. |
| 4 | P82472 | 37,002 | 368 | BiWeekly | 01/15/24 | 1-15 | 08/27/23 | Customer continued to pay while vehicle awaiting repairs and in shop. |
| 5 | P81978 | 36,807 | 387 | BiWeekly | 01/23/24 | 16-30 | 10/19/23 | Corrrectly aged. |
| 6 | P64437 | 7,423 | 192 | BiWeekly | 12/20/23 | 31-60 | 11/03/23 | Aged correctly.  CPI payment received 11/30/23 with vehicle being considered a total loss. $11,188 applied 11/30/23.  Company has consistently followed up with obligor to pay deficiency balance. |
| 7 | P22333 | 4,332 | 257 | BiWeekly | 01/31/24 | Current | 08/14/23 | Correctly aged |
| 8 | P17299 | 10,206 | 240 | BiWeekly | 12/26/23 | 16-30 | 01/04/24 | Correctly aged.  Insurance reported as total loss on 1/5/24-Still waiting for payment from Insurance company |
| 9 | P6367 | 6,794 | 230 | BiWeekly | 01/27/24 | Current | 01/30/24 | Correctly aged. |
| 10 | P43261 | 20,885 | 344 | BiWeekly | 01/27/24 | Current | 01/29/24 | Correctly aged. |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**First Payment Default Test**
**As of January 31, 2024**

**Exhibit  C.8**

| CBIZ Control | Account No. | Financed Amount | First Payment Due Date | Original DDP Balance | Current DDP Balance | DPD at Charge-Off | Agree to Policy? (Y/N) | Collection Notes |
|---|---|---|---|---|---|---|---|---|
| 1 | P62141 | $ 32,240 | 12/17/2022 | $ - | $ - | 133 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |
| 2 | P49703 | 34,317 | 8/16/2022 | - | - | 104 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |
| 3 | R52727 | 21,897 | 8/25/2022 | 300 | - | 131 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |
| 4 | P51777 | 33,534 | 8/29/2022 | - | - | 122 | Y | Customer contact within three business days of the first missed payment with consistent follow-up.  Car in shop prior to 1st payment and abandoned at shop. |
| 5 | P43637 | 35,908 | 5/14/2022 | - | - | 138 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |
| 6 | P37042 | 25,771 | 3/24/2022 | 500 | - | 13 | Y | Customer contact one day after missed deferred down.  Voluntary repo prior to 1st due date. |
| 7 | P23874 | 19,119 | 9/6/2021 | 500 | - | 145 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |
| 8 | P10912 | 19,813 | 12/18/2020 | 500 | - | 123 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |
| 9 | P50727 | 28,854 | 8/26/2022 | - | - | 126 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |
| 10 | P42899 | 28,956 | 7/11/2022 | 450 | - | 116 | Y | Customer contact within three business days of the first missed payment with consistent follow-up |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Paid Ahead Test**
**As of January 31, 2024**

**Exhibit C.9**

| CBIZ Control | Account No. | Current Principal Balance | Payment Amount | Payment Frequency | Next Payment Due Date | Collection Notes / Reason for Paid-Ahead | Aged Correctly? (Y/N) |
|---|---|---|---|---|---|---|---|
| 1 | P34488 | $ 10,491 | $ 366 | BiWeekly | 04/22/25 | Customer regularly made payments in excess of contractual payment | Y |
| 2 | P71713 | 25,316 | 324 | BiWeekly | 05/11/24 | Customer regularly made payments in excess of contractual payment | Y |
| 3 | P54234 | 2,136 | 252 | BiWeekly | 06/05/26 | Customer regularly made payments in excess of contractual payment | Y |
| 4 | R41877 | 11,819 | 349 | BiWeekly | 10/15/24 | Customer regularly made payments in excess of contractual payment | Y |
| 5 | P34618 | 15,096 | 287 | BiWeekly | 02/08/25 | Customer regularly made payments in excess of contractual payment | Y |
| 6 | P40196 | 14,161 | 218 | BiWeekly | 06/15/24 | Additional lump sum payment made prior to first due date | Y |
| 7 | P31910 | 12,401 | 310 | BiWeekly | 11/11/24 | Customer regularly made payments in excess of contractual payment | Y |
| 8 | P27937 | 11,721 | 302 | BiWeekly | 09/13/24 | Customer regularly made payments in excess of contractual payment | Y |
| 9 | P8799 | 1,831 | 202 | BiWeekly | 01/19/25 | Customer regularly made payments in excess of contractual payment | Y |
| 10 | P4030 | 579 | 277 | BiWeekly | 06/28/24 | Customer regularly made payments in excess of contractual payment | Y |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Last Payment Test**
**As of January 31, 2024**

**Exhibit C.10**

| CBIZ Control | Account No. | Current Principal Balance | Payment Amount | Payment Frequency | Next Payment Due Date | Last Payment Date | Aging Status Category | Last Pmt Date Correct? | Aged Correctly? | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | P106760 | $ 35,896 | $ 847 | Monthly | 02/20/24 | 01/19/24 | Current | Yes | Yes | |
| 2 | R97379 | 20,412 | 243 | BiWeekly | 02/03/24 | 01/19/24 | Current | Yes | Yes | |
| 3 | P96697 | 20,691 | 323 | BiWeekly | 02/10/24 | 01/18/24 | 1-15 | Yes | Yes | |
| 4 | P67892 | 29,055 | 339 | BiWeekly | 02/10/24 | 01/31/24 | Current | Yes | Yes | |
| 5 | R77019 | 33,976 | 774 | Monthly | 02/18/24 | 01/16/24 | Current | Yes | Yes | |
| 6 | P97823 | 25,710 | 307 | BiWeekly | 02/03/24 | 12/20/23 | 31-60 | No | No | There was no payment on 12/20/23 and the oldest unpaid due date also appears to be 11/25/23, which would make this account >60 DPD. |
| 7 | P96754 | 27,916 | 344 | BiWeekly | 02/10/24 | 01/24/24 | 1-15 | Yes | Yes | |
| 8 | R103136 | 27,186 | 387 | Semi-Monthly | 02/01/24 | 01/03/24 | 1-15 | Yes | Yes | |
| 9 | P83479 | 44,341 | 400 | BiWeekly | 02/24/24 | 01/30/24 | Current | Yes | Yes | |
| 10 | P95359 | 38,282 | 830 | Monthly | 02/21/24 | 01/19/24 | Current | Yes | Yes | |

**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Expired Account Test**
**As of January 31, 2024**

**Exhibit C.11**

| CBIZ Control | Account No. | Maturity Date | Days Past Maturity | Eligible Balance | Remaining Term | Aging Status Category | Current Principal Balance | Reason, Per Management | Eligible Account |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 6727-10 | 04/15/23 | 291 | $ 882 | 3 | Current | $ 882 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. The Company is working to correct this issue by year end. | Yes |
| 2 | 54355-1 | 09/23/23 | 130 | 609 | 3 | Current | 609 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 3 | 55618-1 | 10/07/23 | 116 | 1,488 | 4 | Current | 1,488 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 4 | 52872-1 | 09/29/23 | 124 | 659 | 3 | Current | 659 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 5 | 53623-1 | 12/03/22 | 424 | 821 | 3 | Current | 821 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 6 | 52511-1 | 06/03/23 | 242 | 1,439 | 5 | Current | 1,439 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 7 | 4073R-10 | 09/24/22 | 494 | 2,168 | 6 | Current | 2,168 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 8 | 42329-1 | 09/11/21 | 872 | 1,208 | 3 | Current | 1,208 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 9 | 43800-1 | 08/01/20 | 1278 | 1,470 | 4 | Current | 1,470 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |
| 10 | 55443R-1 | 06/03/23 | 242 | 746 | 3 | Current | 746 | Transfer from previous loan management system and once the account goes past maturity the aging pauses. | Yes |

**JPM - Tricolor Funding SPV4 LLC**
**Receivables Roll-Forward**
**As of January 31, 2024**

Exhibit E.1

| Month Ending | Beginning Balance | Originations | Cash Collections | Securitization Release | Charge-Offs | Ending Balance | Monthly Collection % | 3-Month Avg BOM AR | 6-Month Avg BOM AR | 12-Month Avg BOM AR | 3-Month Avg Cash Collections | 6-Month Avg Cash Collections | 12-Month Avg Cash Collections | Average 3-Month C/C % | Average 6-Month C/C % | Average 12-Month C/C % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11/30/20 | $ - | $ 15,353,444 | $ 27,388 | $ - | $ - | $ 15,326,056 | 0.0% | $ - | $ - | $ - | $ - | $ - | $ - | 0.0% | 0.0% | 0.0% |
| 12/31/20 | 15,326,056 | 16,551,715 | 180,107 | - | 43,258 | 31,654,406 | 1.2% | - | - | - | - | - | - | 0.0% | 0.0% | 0.0% |
| 01/31/21 | 31,654,406 | 22,427,232 | 736,624 | - | 262,884 | 53,082,130 | 2.3% | 15,660,154 | - | - | 314,706 | - | - | 2.0% | 0.0% | 0.0% |
| 02/28/21 | 53,082,130 | 19,614,098 | 523,040 | - | 302,776 | 71,870,412 | 1.0% | 33,354,197 | - | - | 479,924 | - | - | 1.4% | 0.0% | 0.0% |
| 03/31/21 | 71,870,412 | 44,053,949 | 1,529,751 | - | 1,498,384 | 112,896,226 | 2.1% | 52,202,316 | - | - | 929,805 | - | - | 1.8% | 0.0% | 0.0% |
| 04/30/21 | 112,896,226 | 30,495,240 | 1,249,672 | - | 1,928,368 | 140,213,426 | 1.1% | 79,282,923 | 47,471,538 | - | 1,100,821 | 707,764 | - | 1.4% | 1.5% | 0.0% |
| 05/31/21 | 140,213,426 | 29,657,543 | 1,665,077 | - | 2,858,316 | 165,347,576 | 1.2% | 108,326,688 | 70,840,443 | - | 1,481,500 | 980,712 | - | 1.4% | 1.4% | 0.0% |
| 06/30/21 | 165,347,576 | 23,294,745 | 2,217,508 | - | 2,960,371 | 183,464,442 | 1.3% | 139,485,743 | 95,844,030 | - | 1,710,753 | 1,320,279 | - | 1.2% | 1.4% | 0.0% |
| 07/31/21 | 183,464,442 | 17,063,388 | 666,763 | 149,171,872 | 3,242,858 | 47,446,338 | 0.4% | 163,008,482 | 121,145,702 | - | 1,516,449 | 1,308,635 | - | 0.9% | 1.1% | 0.0% |
| 08/31/21 | 47,446,338 | 30,576,451 | 463,438 | 33,515,550 | 274,870 | 43,768,931 | 1.0% | 132,086,119 | 120,206,404 | - | 1,115,903 | 1,298,702 | - | 0.8% | 1.1% | 0.0% |
| 09/30/21 | 43,768,931 | 16,526,231 | 492,735 | - | 414,968 | 59,387,459 | 1.1% | 91,559,904 | 115,522,823 | - | 540,979 | 1,125,866 | - | 0.6% | 1.0% | 0.0% |
| 10/31/21 | 59,387,459 | 1,114,789 | 748,651 | 5,307,141 | 1,042,497 | 53,403,958 | 1.3% | 50,200,909 | 106,604,695 | 77,038,117 | 568,275 | 1,042,362 | 875,063 | 1.1% | 1.0% | 0.0% |
| 11/30/21 | 53,403,958 | - | 737,383 | - | 969,234 | 51,697,340 | 1.4% | 52,186,783 | 92,136,451 | 81,488,447 | 659,590 | 887,746 | 934,229 | 1.3% | 1.0% | 1.1% |
| 12/31/21 | 51,697,340 | 18,370,092 | 779,116 | - | 2,403,117 | 66,885,200 | 1.51% | 54,829,586 | 73,194,745 | 84,519,387 | 755,050 | 648,014 | 984,147 | 1.4% | 0.9% | 1.2% |
| 01/31/22 | 66,885,200 | 17,500,643 | 818,539 | - | 2,504,669 | 81,062,635 | 1.22% | 57,328,833 | 53,764,871 | 87,455,287 | 778,346 | 673,310 | 990,973 | 1.4% | 1.3% | 1.1% |
| 02/28/22 | 81,062,635 | 42,354,454 | 988,886 | - | 2,311,924 | 120,116,279 | 1.22% | 66,548,392 | 59,367,587 | 89,786,995 | 862,180 | 760,885 | 1,029,793 | 1.3% | 1.3% | 1.1% |
| 03/31/22 | 120,116,279 | 36,691,908 | 1,384,816 | - | 2,545,790 | 152,877,581 | 1.15% | 89,354,705 | 72,092,145 | 93,807,484 | 1,064,080 | 909,565 | 1,017,715 | 1.2% | 1.3% | 1.1% |
| 04/30/22 | 152,877,581 | 15,332,427 | 447,625 | 91,095,475 | 2,492,168 | 74,174,740 | 0.29% | 118,018,832 | 87,673,832 | 97,139,264 | 940,442 | 859,394 | 950,878 | 0.8% | 1.0% | 1.0% |
| 05/31/22 | 74,174,740 | 14,888,588 | 770,248 | - | 3,424,948 | 84,868,132 | 1.04% | 115,722,867 | 91,135,629 | 91,636,040 | 867,563 | 864,872 | 876,309 | 0.7% | 0.9% | 1.0% |
| 06/30/22 | 84,868,132 | 15,313,537 | 851,253 | 22,488,084 | 2,119,983 | 74,722,350 | 1.00% | 103,973,484 | 96,664,095 | 84,929,420 | 689,708 | 876,894 | 762,454 | 0.7% | 0.9% | 0.9% |
| 07/31/22 | 74,722,350 | 29,990,775 | 961,613 | - | 2,310,397 | 101,441,115 | 1.29% | 77,921,741 | 97,970,286 | 75,867,579 | 861,038 | 900,740 | 787,025 | 1.1% | 0.9% | 1.0% |
| 08/31/22 | 101,441,115 | 21,340,854 | 1,218,790 | - | 5,878,585 | 115,684,595 | 1.20% | 87,010,532 | 101,366,700 | 80,367,143 | 1,010,552 | 939,057 | 849,971 | 1.2% | 0.9% | 1.1% |
| 09/30/22 | 115,684,595 | 577,925 | 1,117,208 | - | 3,458,111 | 111,687,202 | 0.97% | 97,282,687 | 100,628,086 | 86,360,115 | 1,099,203 | 894,456 | 902,011 | 1.1% | 0.9% | 1.0% |
| 10/31/22 | 111,687,202 | - | 1,352,971 | - | 3,675,032 | 106,659,199 | 1.21% | 109,604,304 | 93,763,022 | 90,718,427 | 1,229,656 | 1,045,347 | 952,371 | 1.1% | 1.1% | 1.0% |
| 11/30/22 | 106,659,199 | 46,391,643 | 950,760 | - | 5,678,653 | 146,421,429 | 0.89% | 111,343,665 | 99,177,099 | 95,156,364 | 1,140,313 | 1,075,432 | 970,152 | 1.0% | 1.1% | 1.0% |
| 12/31/22 | 146,421,429 | 44,214,796 | 1,906,732 | - | 6,896,762 | 181,832,730 | 1.30% | 121,589,277 | 109,435,982 | 103,050,038 | 1,403,487 | 1,251,345 | 1,064,120 | 1.2% | 1.1% | 1.0% |
| 01/31/23 | 181,832,730 | 1,204,415 | 2,040,134 | - | 5,841,246 | 175,155,766 | 1.12% | 144,971,119 | 127,287,712 | 112,628,999 | 1,632,542 | 1,431,099 | 1,165,919 | 1.1% | 1.1% | 1.0% |
| 02/28/23 | 175,155,766 | 16,541,604 | 1,386,692 | 97,119,919 | 5,746,873 | 87,443,886 | 0.79% | 167,803,308 | 139,573,487 | 120,470,093 | 1,777,853 | 1,459,083 | 1,199,070 | 1.1% | 1.0% | 1.0% |
| 03/31/23 | 87,443,886 | 1,219,695 | 1,847,792 | - | 84,376,399 | 1.39% | | 148,144,127 | 134,866,702 | 117,747,394 | 1,548,840 | 1,476,164 | 1,185,310 | 1.0% | 1.1% | 1.0% |
| 04/30/23 | 84,376,399 | 7,841,983 | 1,151,900 | - | 318,020 | 90,748,461 | 1.37% | 115,658,683 | 130,314,901 | 112,038,962 | 1,252,763 | 1,442,652 | 1,244,000 | 1.1% | 1.1% | 1.1% |
| 05/31/23 | 90,748,461 | 60,240,193 | 1,295,538 | - | 688,982 | 149,004,134 | 1.43% | 87,522,915 | 127,663,112 | 113,420,105 | 1,222,378 | 1,500,115 | 1,287,774 | 1.4% | 1.2% | 1.1% |
| 06/30/23 | 149,004,134 | 68,842,739 | 2,198,982 | - | 250,636 | 215,397,255 | 1.48% | 108,042,998 | 128,093,563 | 118,764,772 | 1,548,807 | 1,548,823 | 1,400,084 | 1.4% | 1.2% | 1.2% |
| 07/31/23 | 215,397,255 | 76,918,337 | 3,450,445 | - | 564,960 | 288,300,188 | 1.60% | 151,716,617 | 133,687,650 | 130,487,681 | 2,314,988 | 1,783,875 | 1,607,487 | 1.5% | 1.3% | 1.2% |
| 08/31/23 | 288,300,188 | 32,916,477 | 2,640,169 | - | 3,125,896 | 315,450,601 | 0.92% | 217,567,193 | 152,545,054 | 146,059,270 | 2,763,198 | 1,992,788 | 1,725,935 | 1.3% | 1.3% | 1.2% |
| 09/30/23 | 315,450,601 | 33,530,817 | 2,950,210 | - | 2,834,286 | 343,196,922 | 0.94% | 273,049,348 | 190,546,173 | 162,706,438 | 3,013,608 | 2,281,207 | 1,878,686 | 1.1% | 1.2% | 1.2% |
| 10/31/23 | 343,196,922 | 43,881,358 | 4,421,926 | - | 2,713,377 | 379,942,977 | 1.29% | 315,649,237 | 233,682,927 | 181,998,914 | 3,337,435 | 2,826,212 | 2,134,432 | 1.1% | 1.2% | 1.2% |
| 11/30/23 | 379,942,977 | 255,550,257 | 6,858,581 | - | 1,226,379 | 627,408,274 | 1.81% | 346,196,833 | 281,882,013 | 204,772,562 | 4,743,572 | 3,753,385 | 2,626,750 | 1.4% | 1.3% | 1.3% |
| 12/31/23 | 627,408,274 | 78,619,220 | 11,773,000 | - | 984,780 | 693,269,714 | 1.88% | 450,182,724 | 361,616,036 | 244,854,799 | 7,684,502 | 5,349,055 | 3,448,939 | 1.7% | 1.5% | 1.4% |
| 01/31/24 | 693,269,714 | 100,561,875 | 12,454,032 | 293,530,102 | 2,627,372 | 485,220,083 | 1.80% | 566,873,655 | 441,261,446 | 287,474,548 | 10,361,871 | 6,849,653 | 4,316,764 | 1.8% | 1.6% | 1.5% |

Exhibit F.1



Crowe LLP
Independent Member Crowe Global

Management and Those Charged with Governance
Tricolor Holdings, LLC and Subsidiaries
Dallas, Texas

In planning and performing our audit of the financial statements of Tricolor Holdings, LLC and Subsidiaries ("Company") as of and for the year ended December 31,2022 in accordance with the standards established by the Public Company Accounting Oversight Board and with auditing standards generally accepted in the United States of America, we considered the Company's internal control over financial reporting ("internal control") as a basis for designing our auditing procedures for the purpose of expressing our opinion on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control.  Accordingly, we do not express an opinion on the effectiveness of the Company's internal control.

Our consideration of internal control was for the limited purpose described in the preceding paragraph and would not necessarily identify all deficiencies in internal control that might be significant deficiencies or material weaknesses.  However, as discussed below, we identified certain matters in internal control that we are required to or wish to communicate to you.  Matters communicated in this letter are classified as follows:

- Material Weakness – A deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

- Significant Deficiency – A deficiency, or combination of deficiencies, in internal control over financial reporting that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the Company's financial reporting.

- Deficiency – A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis.

| Control Environment | Material Weakness |
|---|---|
| **Control Deficiency:** | The company did not maintain an effective control environment due to the following individual material weaknesses in the control environment:<br><br>- Management does not have processes and controls in place demonstrating appropriate tone at the top to ensure appropriate standards of conduct at the Company are in place.<br><br>- Management does not have processes and controls in place holding individuals accountable for their internal control related responsibilities |
| **Potential Effect:** | Lack of appropriate control environment could result in material misstatements due to error or fraud. |

1.

Exhibit F.1

| Control Environment | Material Weakness |
|---|---|
| **Recommendation:** | We recommend management take action to demonstrate and communicate the importance of a control environment that achieves the principles as set forth in the COSO framework. |

| Deficiency Remediation Implementation and Monitoring | Material Weakness |
|---|---|
| **Control Deficiency:** | Management does not have a sufficient process in place to implement corrective actions for internal control deficiencies and to track whether corrective actions remediate the deficiencies in a timely and sufficient manner. |
| **Potential Effect:** | Lack of appropriate remediation and tracking of status of material weaknesses could result in material misstatements. |
| **Recommendation:** | We recommend management take action to remediate material weaknesses and implement a tracking and reporting process that clearly outlines corrective action plans and timelines. |

| IT General Controls | Material Weakness |
|---|---|
| **Control Deficiency:** | Management has not established formal Information Technology General Controls (ITGCs) over IDMS.  Specifically,<br><br>• There is not a formal user provisioning control or periodic system access review control.<br><br>• There is a segregation of duties issue related to the system administrator being part of the Accounting department.<br><br>• There is a segregation of duties issue related to the system administrator being part of the payroll department<br><br>• Management has no knowledge of the vendor's controls over the application given no SOC report is available. |
| **Potential Effect:** | Inappropriate monitoring of system access could result in segregation of duties being bypassed which could result in misappropriation of assets, fraudulent financial reporting, and data completeness and accuracy issues. |
| **Recommendation:** | We recommend that management implement formalized controls to manage financially significant applications.  Management is currently in the process of formalizing these controls. |

| Accounting and Financial Reporting Matters | Material Weakness |
|---|---|
| **Control Deficiency:** | We identified a material weakness over accounting and financial reporting.  The following control deficiencies are individually or in combination a material weakness over accounting and financial reporting.<br><br>• Management has not designed controls to ensure reconciling items are timely addressed.  This was evidenced by stale reconciling items within cash clearing accounts and errors within parts inventory accounts.  (Material Weakness Individually.)<br><br>• The review control over accounting for income taxes was not sufficiently precise to identify errors within the tax calculation and allocations between taxable entities.  (Material Weakness Individually.) |

2.

Exhibit F.1

| Accounting and Financial Reporting Matters | Material Weakness |
|---|---|
| | • Management has not appropriately designed and implemented controls over inventory.  There were a number of errors identified within inventory such lack of controls to identify needed reclassifications from inventory to charge offs, inventory recorded to the general ledger that the Company did not have possession of, and lack of review of repossession related accounts to ensure proper accounting and valuation of repossessions in process.(Significant deficiency individually)<br><br>• Management did not appropriately monitor and evaluate capitalized expenses to determine if amounts continue to meet criteria to remain capitalized and offset with proceeds from the IPO. |
| Effects: | Lack of properly designed internal controls over financial reporting can result in the misstatement of financial statements due to error or fraud. |
| Recommendation: | Based on our observations, the board of directors and senior management should reinforce their expectations at the various levels of the company regarding the importance of internal controls.<br><br>Documenting and identifying both internal and external risks is critical to the appropriate identification of processes and controls to ensure accurate financial reporting.  Risks are present in every company and a strong risk assessment process and appropriately designed and operating controls can minimize the impact of those risks. |

| Related Party Transactions | Material Weakness |
|---|---|
| Control Deficiency: | There is not a formalized control to identify and disclose related party transactions or over the completeness of the related party listing.  Additionally, the activity within the related party receivable account is not properly monitored and there is not a precise review procedure in place for executive activity on the corporate credit card to verify business expenses were for a proper business purpose. |
| Potential Effect: | Material errors may exist over the accounting for related party transactions. |
| Recommendation: | We recommend controls over related party transactions including controls over the mixed use American Express used by certain executives be implemented. |

| Fair Value of Finance Receivables Estimate | Material Weakness |
|---|---|
| Control Deficiency: | Management has not implemented appropriate review controls over the fair value calculation for finance receivables.<br><br>• There is not sufficient evidence of review over the fair value model including review of inputs and tie out to the financial statements.  There is also no formal process for analyzing qualitative and quantitative inputs necessary to understand the estimation uncertainty and the sensitivity of significant assumptions for evaluation of their outcomes over financial condition.  (Material weakness individually) |

Exhibit F.1

| Fair Value of Finance Receivables Estimate | Material Weakness |
|---|---|
| | • In addition, there is no formal documentation maintained over model access.  No change management process or change log is in place.  There is no evidence of model governance. (Material weakness individually) |
| **Potential Effect:** | Fair value estimate could be materially misstated or potential bias may exist within the assumptions within the model. |
| **Recommendation:** | We recommend management implement internal controls over the fair value inputs and assumptions as well as the model. |

| Account Setup of Finance Receivables | Significant Deficiency |
|---|---|
| **Control Deficiency:** | Management did not design sufficient manual controls to mitigate the risk posed by material weaknesses in ITGCs surrounding the IDMS application to ensure all new finance receivables received a post-close review for accuracy. |
| **Potential Effect:** | Incorrect account level information in the system may create material misstatements in the valuation of finance receivables or assets may be misappropriated due to input of new loans that do not exist. |
| **Recommendation:** | We recommend management implement a formal, documented control at a sufficient level of precision to ensure all accounts are reviewed in the post-close process. |

This report is intended solely for the information and use of the Audit Committee, Board of Directors, management and others within the organization and regulatory agencies and is not intended to be and should not be used by anyone other than these specified parties.

CROWE LLP

Crowe LLP

Dallas, Texas
July 31, 2023

4.

# Tricolor Audit Committee of the Board of Directors _REDACTED

November 2, 2023



TRICOLOR HOLDINGS – Proprietary & Confidential

1

# Meeting Agenda

| Audit Committee("AC") of the Board of Directors | | |
|---|---|---|
| Date: November 2, 2023 | | |
| Time: 3PM ET / 2 PM CT / 12 PM PT | | |
| Location: Irving, TX or ZOOM | | |
| **Members:** | | |
| **Kathryn Petralia, Chair** | | |
| **Dick Anderson** | | |
| **Christian Donohue** | | |
| | | |
| The Meeting Minutes (item 1) is the item presented for approval. | | |
| | | |

| Topic | Action | Presenter |
|---|---|---|
| 1. **Meeting Minutes** | **APPROVAL** | **J. Kollar** |
| 2. **Management Letter Review** | **Discussion** | **M. Lewis / J. Kollar** |
| 3. **2023 Audit and Audit Firm** | **Discussion** | **J. Kollar/ AC** |
| 4. **Financing Update** | **Discussion** | **J. Kollar** |
| 5 | | |
| 6 | | |
| 7 | | |
| 8. Other Business | Discussion | Chair and AC |
| 9. Executive Session | Discussion | Chair and AC |
| | | |
| | | |



TRICOLOR HOLDINGS – Proprietary & Confidential

2

# Management Letter Review

# 2022 Audit Material Weaknesses Remediation Plan



TRICOLOR HOLDINGS – Proprietary & Confidential

3

# 2022 Audit Material Weaknesses

| Material Weakness Identified | Crowe Recommendation | Remediation Plan | Status | Action Required | Estimated Completion |
|---|---|---|---|---|---|
| Management does not have processes and controls in place demonstrating appropriate tone at the top to ensure appropriate standards of conduct at the Company are in place.<br><br>Management does not have processes and controls in place holding individuals accountable for their internal control related responsibilities. | Management take action to demonstrate and communicate the importance of a control environment that achieves the principles as set forth in the COSO framework. | Executive team develops and puts in place controls to ensure tone at the top and accountability is present/evidenced in the control environment, which are approved by the audit committee and/or board of directors. | In Progress | • Board of directors develops and sets executive goals aligned with internal control objectives.<br>• Board of directors develops and documents formal conduct policies for the executive team, including compensation and expenses.<br>• Board of directors and/or audit committee members reviews executive team activity monthly. | TBD |
| Management does not have a sufficient process in place to implement corrective actions for internal control deficiencies and to track whether corrective actions remediate the deficiencies in a timely and sufficient manner. | Management take action to remediate material weaknesses and implement a tracking and reporting process that clearly outlines corrective action plans and timelines. | Accounting to continue to track and report on weaknesses, obtaining concrete timelines when possible, and reports to the audit committee quarterly. | In Progress | None | TBD |

| Material Weakness Identified | Crowe Recommendation | Remediation Plan | Status | Action Required | Estimated Completion |
|---|---|---|---|---|---|
| Management has not established formal ITGCs over IDMS. Specifically,<br>• There is not a formal user provisioning control or periodic system access review control.<br>• There is a segregation of duties issue related to the system administrator being part of the Accounting Department.<br>• There is a segregation of duties issue related to the system administrator being part of the payroll department.<br>• Management had no knowledge of the vendor's controls over the application given no SOC report is available. | Management implement formalized controls to manage financially significant applications. Management is currently in the process of formalizing these controls. | Engage vendor to identify opportunities and timeline for addressing gaps in ITGCs. Specifically,<br><br>• Requested formal user provisioning controls<br>• SOC report<br><br>To address segregation of duties weaknesses identified, management will have Tricolor's IT department perform regular reviews to ensure admin access to the system is restricted to the IT department only. | In Progress | Continue to work with the vendors (Tekzenit and IDMS); however timeline and effectiveness is not reliable currently.<br><br>Vendors have communicated their willingness to address the concerns, but their product update roadmap does not have definitive milestones currently to address the weaknesses in ITGCs. | TBD |



# 2022 Audit Material Weaknesses

| Material Weakness Identified | Crowe Recommendation | Remediation Plan | Status | Action Required | Estimated Completion |
|---|---|---|---|---|---|
| *Accounting and financial reporting*<br><br>Management has not designed controls to ensure reconciling items are timely addressed. This was evidenced by stale reconciling items within cash clearing accounts and errors within parts inventory accounts. | The board of directors and senior management should reinforce their expectations at the various levels of the company regarding the importance of internal controls.<br><br>Documenting and identifying both internal and external risks is critical to the appropriate identification of processes and controls ensure accurate financial reporting. Risks are present in every company and a strong risk assessment process and appropriately designed and operating controls can minimize the impacts of those risks. | Accounting team to implement ARCS transaction matching in Oracle to automate clearing account reconciliations. | In Progress | 2 of 3 phase I accounts are implemented. Cash clearing (largest weakness) is currently being worked on with vendors.<br><br>Phase II will be designed and developed by Q1 2024. | Q1 2024 |
| *Accounting and financial reporting*<br><br>The review control over accounting for income taxes was not sufficiently precise to identify errors within the tax calculation and allocations between taxable entities. | | Improve the documentation and vendor capabilities to address areas of weakness in the preparation of the tax provision and returns process. | Complete | *Completed*<br>Hire a firm (BDO) with stronger competencies and require the vendor to formalize the documentation process over the tax provision. | Completed Q3 2023 |

| Material Weakness Identified | Crowe Recommendation | Remediation Plan | Status | Action Required | Estimated Completion |
|---|---|---|---|---|---|
| There is not a formalized control to identify and disclose related party transactions or over the completeness of the related party listing. Additionally, the activity within the related party receivable account is not properly monitored and there is not a precise review procedure in place for executive activity on the corporate credit card to verify business expenses were for proper business purposes. | Controls over related party transactions including controls over the mixed use American Express used by certain executives be implemented. | Board of directors, audit committee and executive team develop and put in place controls to ensure related party transactions are monitored and a precise review is performed. Specifically,<br>• D&O questionnaires are filled out completely and reviewed timely<br>• Executive team expenses are reviewed monthly by the board and/or audit committee<br>• Delegation of Authority is formally documented and all significant business relationships / contracts are reviewed and approved by the board<br>• Formal documentation of policies and procedures | In Progress | • Board of directors and management develops and sets policies and procedures.<br>• Board of directors and/or audit committee members reviews executive team activity monthly.<br>• Related party balances are minimized (i.e. paid off monthly).<br>• Vendor review of significant contracts is performed by an independent committee on a regular basis.<br>• D&O questionnaires are required at least annually, with periodic reporting policies required of all board and executive team members. Policies are developed to create accountability. | TBD |



# 2022 Audit Material Weaknesses

| Material Weakness Identified | Crowe Recommendation | Remediation Plan | Status | Action Required | Estimated Completion |
|---|---|---|---|---|---|
| *Fair value of finance receivables*<br><br>There is not sufficient evidence of review over the fair value model including review of inputs and tie out to the financial statements. There is also no formal process for analyzing qualitative and quantitative inputs necessary to understand the estimation uncertainty and the sensitivity of significant assumptions for evaluation of their outcomes over financial condition. | Management implement internal controls over the fair value inputs and assumptions as well as the model. | Engage a third-party to develop and/or review the fair value calculation quarterly.<br><br>Improve documentation over the model, its assumptions, and the controls in place. | In Progress | Obtain quotes from third-party vendors to outsource the development and review of the model, at least quarterly.<br><br>Require third-party to formally document the model's calculations, assumptions, and access controls in place. | TBD |
| *Accounting and Financial Reporting*<br><br>There is no formal documentation maintained over model access. No change management process or change log is in place. There is no evidence of model governance. | | Establish and document a change management process.<br><br>Develop the model in a more robust platform with formalized controls and access restrictions.<br><br>Establish an independent fair value model review committee to document and review changes quarterly. | In Progress | Obtain quotes from third-party vendors to migrate the model from the excel-based calculation used currently to a platform with integrated access controls.<br><br>Identify and establish an independent committee to review and approve the model calculations, inputs, and assumptions by formally documenting all changes in a change management log. | TBD |



**JPMorgan Chase - Tricolor Auto Acceptance LLC**
**Cash Application Test**
**As of January 31, 2024**

**Exhibit H.1**

| # | Account No. | Last Payment Date per Data Tape | Payment Amount | Commission | Net Amount | Payment Type | Agree to Deposit Detail? (Y/N) | Batch Amount | Batch Date | Bank Account | Batch Deposit per Bank | Deposit Date per Bank | Amount Applied to System | Date Applied to System | Lag - Batch to Deposit | Lag - System to Deposit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | P100015 | 01/17/24 | $ 720 | $ 6 | $ 714 | PNM | Y | 277,924 | 01/17/24 | WF-7276 | $ 277,924 | 01/22/24 | $ 720 | 01/17/24 | 3 | 3 |
| 23 | P100075 | 01/26/24 | 352.00 | 1.99 | 350.01 | PNM | Y | 633,551 | 01/26/24 | WF-7276 | 2,282,864 | 01/31/24 | 352.00 | 01/26/24 | 3 | 3 |
| 15 | P100886 | 01/18/24 | 440.00 | 3.39 | 436.61 | PNM | Y | 255,761 | 01/31/24 | WF-7276 | 255,761 | 02/05/24 | 440.00 | 01/31/24 | 3 | 3 |
| 18 | P102312 | 01/03/24 | Information not provided | | | | | | | | | | | | | |
| 16 | P102616 | 01/29/24 | 339.00 | 2.61 | 336.39 | PNM | Y | 384,600 | 01/29/24 | WF-7276 | 384,600 | 02/01/24 | 339.00 | 01/29/24 | 3 | 3 |
| 14 | P104333 | 01/23/24 | 542.00 | 1.99 | 540.01 | PNM | Y | 280,824 | 01/23/24 | WF-7276 | 280,824 | 01/26/24 | 542.00 | 01/24/24 | 3 | 2 |
| 8 | P104415 | 01/27/24 | 483.00 | 3.72 | 479.28 | PNM | Y | 1,405,343 | 01/27/24 | WF-7276 | 2,282,864 | 01/31/24 | 483.00 | 01/27/24 | 2 | 2 |
| 9 | P105074 | 12/27/23 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | P105075 | 01/20/24 | 384.00 | 2.96 | 381.04 | PNM | Y | 1,374,740 | 01/20/24 | WF-7276 | 2,298,784 | 01/24/24 | 384.00 | 01/20/24 | 2 | 2 |
| 6 | P105487 | 01/19/24 | 485.00 | 3.73 | 481.27 | PNM | Y | 650,347 | 01/19/24 | WF-7276 | 2,298,784 | 01/24/24 | 485.00 | 01/19/24 | 3 | 3 |
| 10 | P105505 | 01/19/24 | 365.00 | 2.81 | 362.19 | PNM | Y | 650,347 | 01/19/24 | WF-7276 | 2,298,784 | 01/24/24 | 365.00 | 01/19/24 | 3 | 3 |
| 7 | P105594 | 01/19/24 | 473.00 | 3.64 | 469.36 | PNM | Y | 650,347 | 01/19/24 | WF-7276 | 2,298,784 | 01/24/24 | 473.00 | 01/19/24 | 3 | 3 |
| 2 | P106227 | 01/19/24 | 369.00 | 2.84 | 366.16 | PNM | Y | 650,347 | 01/19/24 | WF-7276 | 2,298,784 | 01/24/24 | 369.00 | 01/19/24 | 3 | 3 |
| 11 | P106700 | 01/08/24 | 954.00 | 7.35 | 946.65 | PNM | Y | 361,941 | 01/08/24 | WF-7276 | 361,941 | 01/11/24 | 954.00 | 01/08/24 | 3 | 3 |
| 12 | P106760 | 01/19/24 | 947.00 | 7.29 | 939.71 | PNM | Y | 650,347 | 01/19/24 | WF-7276 | 2,298,784 | 01/24/24 | 947.00 | 01/19/24 | 3 | 3 |
| 4 | P107472 | 01/21/24 | 411.00 | 3.16 | 407.84 | PNM | Y | 273,697 | 01/21/24 | WF-7276 | 2,298,784 | 01/24/24 | 411.00 | 01/21/24 | 2 | 2 |
| 3 | P107570 | 01/30/24 | 454.00 | 3.50 | 450.50 | PNM | Y | 267,881 | 01/30/24 | WF-7276 | 267,881 | 02/02/24 | 389.00 | 01/30/24 | 3 | 3 |
| 5 | P107662 | 01/19/24 | 432.00 | 3.33 | 428.67 | PNM | Y | 650,347 | 01/19/24 | WF-7276 | 2,298,784 | 01/24/24 | 432.00 | 01/19/24 | 3 | 3 |
| 21 | P98828 | 01/27/24 | 413.00 | 3.18 | 409.82 | PNM | Y | 1,405,343 | 01/27/24 | WF-7276 | 2,282,864 | 01/31/24 | 413.00 | 01/27/24 | 2 | 2 |
| 22 | P99610 | 12/20/23 | Information not provided | | | | | | | | | | | | | |
| 25 | R100513 | 12/20/23 | Information not provided | | | | | | | | | | | | | |
| 13 | R100855 | 01/23/24 | 248.00 | 1.91 | 246.09 | PNM | Y | 280,824 | 01/23/24 | WF-7276 | 280,824 | 01/26/24 | 248.00 | 01/23/24 | 3 | 3 |
| 17 | R101482 | 01/17/24 | Information not provided | | | | | | | | | | | | | |
| 20 | R98694 | 12/27/23 | 193.00 | 1.49 | 191.51 | PNM | Y | 262,468 | 12/27/23 | WF-7276 | 262,468 | 01/02/24 | 193.00 | 12/27/23 | 3 | 3 |
| 19 | R99713 | 01/29/24 | 857.00 | 6.60 | 850.40 | PNM | Y | 384,600 | 01/29/24 | WF-7276 | 384,600 | 02/01/24 | 857.00 | 01/29/24 | 3 | 3 |

**JPM - Tricolor Auto Acceptance LLC**
**Repossession Test**
**As of January 31, 2024**

Exhibit I.1

| CBIZ Control | Account No. | Account No. | Date of Charge-Off | Amount Charged-Off | Reason for Charge-Off | Current Principal Balance | Repo Date | Repossessed per Tape? (Y/N) | Date of Repossession |
|---|---|---|---|---|---|---|---|---|---|
| 1 | P82007-10 | P82007 | 10/19/23 | $ 41,473 | Past Due Payment | $0 | 09/18/23 | N | 09/18/23 |
| 2 | P80490-10 | P80490 | 11/09/23 | 41,253 | Past Due Payment | 0 | 09/28/23 | N | 09/28/23 |
| 3 | P84617-1 | P84617 | 09/28/23 | 39,303 | Past Due Payment | 0 | 08/21/23 | N | 08/21/23 |
| 4 | P81960-1 | P81960 | 10/18/23 | 36,090 | Past Due Payment | 0 | 10/10/23 | N | 10/10/23 |
| 5 | P62895-1 | P62895 | 02/13/23 | 34,519 | Past Due Payment | 0 | 01/07/23 | N | 01/07/23 |
| 6 | P50379-10 | P50379 | 02/20/23 | 32,941 | Past Due Payment | 0 | 01/09/23 | N | 01/09/23 |
| 7 | R62314-1 | R62314 | 01/16/23 | 32,153 | Past Due Payment | 0 | 12/17/22 | N | 12/17/22 |
| 8 | R53686-10 | R53686 | 01/16/23 | 28,478 | Past Due Payment | 0 | 10/06/22 | N | 10/06/22 |
| 9 | P52801-10 | P52801 | 01/11/23 | 27,131 | Past Due Payment | 0 | 09/03/22 | N | 09/03/22 |
| 10 | P54722-1 | P54722 | 02/21/23 | 25,602 | Past Due Payment | 0 | 12/21/22 | N | 12/21/22 |

**JPM - Tricolor Auto Acceptance LLC**
**Repossession Test**
**As of January 31, 2024**

**Exhibit I.1**

| CBIZ Control | Account No. | Charge-Off Lag | Recovery on Repo? (Y/N) | Vehicle Value | Recovery per Data Tape | Repo Proceeds per Ledger | Recovery % | Gain (Loss) on Recovery | Comments |
|---|---|---|---|---|---|---|---|---|---|
| 1 | P82007-10 | 31 | Y | $ 26,739 | $ 26,739 | $ 26,739 | 64% | $ - | |
| 2 | P80490-10 | 42 | Y | 27,860 | 27,860 | 27,860 | 68% | - | |
| 3 | P84617-1 | 38 | Y | 27,225 | 27,225 | 27,225 | 69% | - | |
| 4 | P81960-1 | 8 | Y | 27,718 | 27,718 | 27,718 | 77% | - | |
| 5 | P62895-1 | 37 | Y | 26,250 | 26,250 | 26,250 | 76% | - | |
| 6 | P50379-10 | 42 | Y | 20,190 | 20,190 | 20,190 | 61% | - | |
| 7 | R62314-1 | 30 | Y | 32,153 | 32,153 | 32,153 | 100% | - | |
| 8 | R53686-10 | 102 | Y | 14,287 | 14,287 | 14,287 | 50% | - | |
| 9 | P52801-10 | 130 | Y | 16,657 | 16,657 | 16,657 | 61% | - | |
| 10 | P54722-1 | 62 | Y | 11,000 | 11,000 | 11,000 | 43% | - | |

67%
43%

Exhibit M.1

TRICOLOR FUNDING SPV 4 LLC
MONTHLY SERVICER REPORT

$ Amounts in USD

**DATES**

| | | | |
|---|---|---|---|
| Facility Closing Date: | 11/13/2020 | Collection Period Begin Date: | 9/1/2022 |
| Commitment Termination Date: | 11/13/2021 | Collection Period End Date: | 9/30/2022 |
| Final Maturity Date: | 5/15/2028 | Collection Period Number: | 23 |

| | | | |
|---|---|---|---|
| Determination Date: | 10/9/2022 | Interest Period Begin Date: | 9/1/2022 |
| Payment Date: | 10/17/2022 | Interest Period End Date: | 9/30/2022 |
| | | Number of Days in Interest Period: | 30 days |

**LOAN INFORMATION**

| | |
|---|---|
| Aggregate Commitment Amount | $ 150,000,000.00 |
| Total Drawn Amount at the beginning of the Funding Request: | $ 77,896,615.81 |
| Principal Balance of Eligible Pledged Contracts at end of Funding Request: | $ 105,236,840.15 |
| Borrowing Base Availability at end of Funding Request: | $ 71,561,051.30 |
| Borrowing Base Payments Availability at Beginning of Funding Request: | $ - |
| Unused Availability at end of Funding Request | $ - |

**REPORT DATE INFORMATION**

**Receivables Balance and Borrowing Base**

| | | |
|---|---|---|
| Beginning Principal Balance | $ | 115,684,595.07 |
| New Contracts Pledged | $ | 577,925.12 |
| Collections allocable to principal | $ | 1,117,207.55 |
| Securitization Release | $ | - |
| Write-offs | $ | 3,458,110.71 |
| **Ending Principal Balance** | $ | 111,687,201.93 |
| Defaulted Receivables | $ | - |
| Other Ineligible Receivables | $ | 6,450,361.78 |
| Aggregate Ineligible Receivables | | 6,450,361.78 |
| **Eligible Receivables** | | 105,236,840.15 |
| Excess Concentration Amount | | - |
| **Net Eligible Receivables** | | 105,236,840.15 |

| | Advance Rate | Borrowing Base |
|---|---|---|
| Advance Rate | 68.00% | 71,561,051.30 |
| **Totals** | 68.00% | 71,561,051.30 |

**Note Balance**

| | Total |
|---|---|
| Beginning of Collection Period Loans Outstanding | 77,896,615.81 |
| Increases in Loans Outstanding during collection period | $ - |
| Decreases in Loans Outstanding during current collection period | $ 2,803,143.80 |
| **End of Collection Period Loans Outstanding** | 75,093,472.01 |
| Monthly Principal Payment Amount due | 3,532,420.71 |
| TAST2022-1 Securitization | $ - |
| Increase to Loans Outstanding after Collection Period prior to Payment Date | $ - |
| Note Balance after the Payment Date | 71,561,051.30 |

| | |
|---|---|
| **Collateral Coverage Ratio** | **68.0%** |

Exhibit M.1

TRICOLOR FUNDING SPV 4 LLC
MONTHLY SERVICER REPORT

$ Amounts in USD

**Available Funds**

| | | | |
|---|---|---:|---:|
| Interest | $ | 1,240,212.97 | 1,255,770.62 |
| Principal | $ | 1,117,207.55 | |
| Release Amount | | 0.00 | |
| Liquidation Proceeds | $ | 1,454,133.56 | |
| Insurance Proceeds | | 0.00 | |
| Recoveries | | 485,456.35 | |
| Payments from Hedging Agreements and Deferred Down Payments | | 0.00 | |
| Other | | 0.00 | |
| **Collections** | | 4,297,010.43 | |
| Investment Earnings - Collection Account | | 0.00 | |
| **Total Available Funds** | | 4,297,010.43 | |

**Collateral Statistics**

| Delinquency Information | | Receivables Balance |
|---|---|---:|
| Current | $ | 95,214,846.04 |
| 31 - 60 days delinquent | $ | 11,203,224.77 |
| 61 - 90 days delinquent | $ | 3,443,303.72 |
| 91+ days delinquent | $ | 1,825,827.40 |
| 120+ days and Charged off Losses | $ | - |
| | | |
| Average Daily Pool Balance | $ | 61,787,701.60 |

| | Rate | Amount |
|---|---|---|
| **Servicing Fee** | 3.00% | 289,211.49 |

2

Exhibit M.1

TRICOLOR FUNDING SPV 4 LLC
MONTHLY SERVICER REPORT

$ Amounts in USD

**CALCULATIONS**

| Portfolio - Servicing Covenants | Vintage | CNL Trigger | Current Actual | Compliance | Net Principal Balance | |
|---|---|---|---|---|---|---|
| | **Current Month** | **1 Month Prior** | **2 Months Prior** | **3-Month Average** | **Trigger** | **Compliance** |
| 3-Month Rolling Average Net Loss-to-Liquidation Ratio | 23.31% | 26.57% | 23.08% | 24.32% | | |
| Overcollateralization Increase Event Trigger | | | | | 30.00% | Yes |
| Termination Event Trigger | | | | | 35.00% | Yes |
| 3-Month Rolling Average Extension Ratio | 2.89% | 1.80% | 1.26% | 1.98% | | |
| Overcollateralization Increase Event Trigger | | | | | 5.75% | Yes |
| Termination Event Trigger | | | | | 7.00% | Yes |
| 3-Month Rolling Average Delinquency Ratio | 4.72% | 3.81% | 4.81% | 4.45% | | |
| Overcollateralization Increase Event Trigger | | | | | 7.50% | Yes |
| Termination Event Trigger | | | | | 10.50% | Yes |
| Serviced Portfolio 3-Month Rolling Average Net Loss-to-Liquidation Ratio | 18.43% | 14.87% | 12.25% | 15.18% | | |
| Overcollateralization Increase Event Trigger | | | | | 30.00% | Yes |
| Termination Event Trigger | | | | | 35.00% | Yes |
| Serviced Portfolio 3-Month Rolling Average Extension Ratio | 2.54% | 2.16% | 2.00% | 2.23% | | |
| Overcollateralization Increase Event Trigger | | | | | 5.75% | Yes |
| Termination Event Trigger | | | | | 7.00% | Yes |
| Serviced Portfolio 3-Month Rolling Average Delinquency Ratio | 5.13% | 4.52% | 4.63% | 4.76% | | |
| Overcollateralization Increase Event Trigger | | | | | 7.50% | Yes |
| Termination Event Trigger | | | | | 10.50% | Yes |
| Excess Spread Percentage | | | | | | |
| Termination Event Trigger | 8.70% | | | | 8.25% | Yes |

| | |
|---|---|
| **Are Step-Up Credit Enhancement Trigger Event in compliance?** | **Yes** |
| **Are Termination Event triggers in compliance?** | **Yes** |

3

Exhibit M.1

TRICOLOR FUNDING SPV 4 LLC
MONTHLY SERVICER REPORT

$ Amounts in USD

**Servicing Covenants Calculations**
SPV4 Portfolio

| | September-22 | August-22 | July-22 |
|---|---|---|---|
| *Calculation of Net Loss-to-Liquidation Ratio* | | | |
| (a) The aggregate Principal Balance of all Receivables that became Defaulted Receivables during such Collection Period, minus (b) the aggregate Liquidation Proceeds received in respect of all Defaulted Receivables during such Collection | | | |
| Period | 1,518,521 | 2,723,602 | 1,046,951 |
| Aggregate Principal Balance of all Receivables that became Defaulted Receivables during such Collection Period and (b) the aggregate amount of all Collections in respect of principal on the Receivables during such Collection Period | 6,514,908 | 10,252,358 | 4,535,456 |
| **Net Loss-to-Liquidation Ratio** | 23.31% | 26.57% | 23.08% |
| | | | |
| *Calculation of Extension Ratio* | September-22 | August-22 | July-22 |
| | | | |
| Aggregate number of Receivables that became Extended Receivables during such Collection Period | 136 | 87 | 54 |
| Aggregate number of Receivables on the last day of such Collection Period | 4,713 | 4,835 | 4,302 |
| **Extension Ratio** | 2.89% | 1.80% | 1.26% |
| | | | |
| Calculation of Delinquency Ratio | September-22 | August-22 | July-22 |
| | | | |
| Aggregate principal balance of all Serviced Portfolio Delinquent Receivables as of the last day of such month | 5,269,131 | 4,408,204 | 4,880,211 |
| | | | |
| Aggregate principal balance of all Serviced Portfolio Receivables as of the last day of such month | 111,687,202 | 115,684,595 | 101,441,115 |
| **Delinquency Ratio** | 4.72% | 3.81% | 4.81% |

Serviced Portfolio

| | September-22 | August-22 | July-22 |
|---|---|---|---|
| *Calculation of Net Loss-to-Liquidation Ratio - Serviced Portfolio* | | | |
| (a) The aggregate principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month, minus (b) the aggregate Serviced Portfolio Liquidation Proceeds received in respect of all Serviced Portfolio Defaulted Receivables during such month | 7,994,692 | 7,665,759 | 5,185,659 |
| Aggregate principal balance of all Serviced Portfolio Receivables that became Serviced Portfolio Defaulted Receivables during such month plus (b) the aggregate amount of all collections in respect of principal on the Serviced Portfolio Receivables received during such month | 43,383,640 | 51,557,524 | 42,332,854 |
| **Net Loss-to-Liquidation Ratio** | 18.43% | 14.87% | 12.25% |
| | | | |
| *Calculation of Extension Ratio - Serviced Portfolio* | September-22 | August-22 | July-22 |
| | | | |
| Aggregate number of Receivables that became Extended Receivables during such Collection Period | 1,004 | 836 | 757 |
| Aggregate number of Receivables on the last day of such Collection Period | 39,499 | 38,765 | 37,853 |
| **Extension Ratio** | 2.54% | 2.16% | 2.00% |
| | | | |
| *Calculation of Delinquency Ratio - Serviced Portfolio* | September-22 | August-22 | July-22 |
| | | | |
| Aggregate principal balance of all Serviced Portfolio Delinquent Receivables as of the last day of such month | 38,362,308 | 32,859,300 | 32,457,363 |
| | | | |
| Aggregate principal balance of all Serviced Portfolio Receivables as of the last day of such month | 747,210,150 | 727,532,612 | 700,826,118 |
| **Delinquency Ratio** | 5.13% | 4.52% | 4.63% |

4

Exhibit M.1

TRICOLOR FUNDING SPV 4 LLC
MONTHLY SERVICER REPORT

$ Amounts in USD

<u>Excess Spread</u>

| *Calculation of Excess Spread Percentage* | September-22 | August-22 | July-22 |
|---|---|---|---|
| Weighted Average APR of all Receivables | 16.32% | 16.23% | 16.22% |
| Servicing Fee Rate | 3.00% | 3.00% | 3.00% |
| Usage Fee Rate | 3.50% | 3.50% | 3.50% |
| Backup Servicing Fee Rate | 0.08% | 0.08% | 0.07% |
| Collateral Custodian Fee Rate | 0.04% | 0.06% | 0.06% |
| Interest rate cap | 1.00% | 1.00% | 1.00% |
| **Excess Spread Percentage** | 8.70% | 8.59% | 8.59% |

**PAYMENT WATERFALL**

| **Total Available Funds** | | $ | **4,297,010.43** |
|---|---|---|---|

| **Section 2.07** | | Amounts Due | Amounts Paid | Shortfall |
|---|---|---|---|---|
| (i) | *First, to the Servicer, accrued and unpaid Servicing Fees* | $ 289,211.49 | $ 289,211.49 | $ - |
| (ii) | *Second, pro rata, (a) to the extent not paid for by Tricolor, to the Backup Servicer, the accrued and unpaid Backup Servicing Fee and any out-of-pocket expenses and indemnities owed to the Backup Servicer, (b) to the Successor Servicer, any unpaid Transition Expenses payable pursuant to Section 7.14(e), (c) to the Collateral Custodian, the Collateral Custodian Fee and any out-of-pocket expenses and indemnities due to the Collateral Custodian* | $ 7,031.81 | $ 7,031.81 | $ - |
| (iii) | *Third, to the Administrative Agent for distribution to the Lenders, pro rata, in accordance with their Invested Percentage, the Senior Monthly Interest and Fees* | $ 439,378.99 | $ 439,378.99 | $ - |
| (iv) | *Fourth, to the Administrative Agent for distribution to the Lenders, pro rata, in accordance with their Invested Percentage, the Monthly Principal Payment Amount* | $ 3,532,420.71 | $ 3,532,420.71 | $ - |
| (v) | *Fifth, if a Partial Expiration Event has occurred, to reduce pro rata the portion of the Loans Outstanding constituting the Lender Advances of any Non-Extending Lender to zero* | $ - | $ - | $ - |
| (vi) | *Sixth, to the Administrative Agent for distribution to the Lenders, pro rata, in accordance with their Invested Percentage, the Subordinated Monthly Interest and Fees* | $ - | $ - | $ - |
| (vii) | *Seventh, pro rata, to the extent not previously paid in clause (ii) above, to (a) the Backup Servicer, any Backup Servicing Fee, expenses and indemnities owed to the Backup Servicer, (b) the Collateral Custodian, the fees, expenses and indemnities owed to the Collateral Custodian and (c) the Account Bank, the Account Bank Fee, expenses and indemnities due to the Account Bank* | $ - | $ - | $ - |
| (viii) | *Eighth, pro rata, to the Affected Parties or the Indemnified Parties, all other Aggregate Unpaids (other than the principal amount of the Loans Outstanding) then due under this Agreement to them; and* | $ - | $ - | $ - |
| (ix) | *Ninth, any remaining amount to the Borrower* | $ 28,967.43 | $ 28,967.43 | $ - |
| | | $ 4,297,010.43 | $ 4,297,010.43 | $ - |

5

Exhibit M.1

TRICOLOR FUNDING SPV 4 LLC
MONTHLY SERVICER REPORT

$ Amounts in USD

**CONCENTRATION LIMIT DATA**

| Concentration Limit | Calculation in Pool | Allowed | | Concentration Limit Amount |
|---|---|---|---|---|
| UPB Texas Resident | 76.7% | 80.0% Max Allowed | OK | $ - |
| UPB California Resident | 21.2% | 40.0% Max Allowed | OK | $ - |
| UPB non Texas or California Resident | 2.1% | 10.0% Max Allowed | OK | $ - |
| UPB ER from single dealer % of Pool | 7.3% | 10.0% Max Allowed | OK | $ - |
| UPB LTV ER | 23.9% | 32.5% Max Allowed | OK | $ - |
| UPB Non-FICO | 59.5% | 65.0% Max Allowed | OK | $ - |
| UPB FICO below 500 | 4.0% | 7.5% Max Allowed | OK | $ - |
| E UPB ER E grade % of pool | 0.1% | 1.5% Max Allowed | OK | $ - |
| D UPB ER D&E grade % of pool | 0.6% | 3.0% Max Allowed | OK | $ - |
| C UPB ER <B grade % of pool | 12.9% | 30.0% Max Allowed | OK | $ - |
| UPB Time Obligor at Residence less than | 1.8% | 12.5% Max Allowed | OK | $ - |
| UPB Ganas Ya! | 8.6% | 10.0% Max Allowed | OK | $ - |
| UPB Ride Now | – | 1.0% Max Allowed | OK | $ - |
| UPB Income < $2,000 | 0.17% | 5.0% Max Allowed | OK | $ - |
| UPB Original term >60 | 9.75% | 10.0% Max Allowed | OK | $ - |
| UPB Original term >66 | 0.43% | 3.0% Max Allowed | OK | $ - |
| UPB Indirect Receivables | 0.00% | 1.5% Max Allowed | OK | $ - |
| WA LTV ER | 127.9% | 135.0% Max Allowed | OK | $ - |
| WA Non-Zero FICO not to be less than | 578 | 560 Min Allowed | OK | $ - |
| WA Combined Income | $ 6,248 | $ 3,750 Min Allowed | OK | $ - |
| WA PTI ER | 12.1% | 17.0% Max Allowed | OK | $ - |
| WA DTI ER | 26.8% | 32.5% Max Allowed | OK | $ - |
| | | Excess Concentration Amount | | $ - |

**OFFICER CERTIFICATION**

All information set forth herein and delivered is complete and accurate.

IN WITNESS WHEREOF, I__Jerome A. Kollar_____, ___CFO_____, of Tricolor Auto Acceptance and Tricolor Funding SPV 4, LLC  have executed this Servicer's Certificate as of the Monthly Report set forth above.

Signature: _____

IN WITNESS WHEREOF, I__Daniel Chu_____, ___CEO_____, of Tricolor Auto Acceptance and Tricolor Funding SPV 4, LLC have executed this Servicer's Certificate as of the Monthly Report set forth above.

Signature:_____

Date:_10/9/2022

6

PERMANENT FILE                                                              **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

**Record of Changes**

| Date | Description of Change |
|------|----------------------|
| November 11, 2022 | Document created by CBIZ MHM, LLC. |
| February 23, 2024 | Document created by CBIZ MHM, LLC |

**The following is a master file containing all previous discussion of existing policies and procedures noted within various sections of the engagement scope:**

**UNDERWRITING / CREDIT APPROVAL**

Policies and Procedures

Underwriting is a functional department within Tricolor and is responsible for executing the credit decision process, approval, revision, and verifying applicant information.  Additionally, underwriting team members must collect and manage applicant documentation, manage stipulations to dealerships, and prepare applicant information for related credit decision evidence for processing in Funding and Loan Servicing. Tricolor's Underwriting program is designed to analyze collected data and assess the risk involved.

To ensure compliance with applicable laws and regulations, the Underwriting Program includes a variety of processes and software that are used when reviewing an application.

The Credit Risk department monitors Underwriting decisions through Credit Risk Management and Loss Forecasting.  Credit Risk is required to monitor, report, and escalate areas such as:

- Underwriting exceptions
- Verification failures
- Grade changes
- Credit policy compliance

Credit Approval Process

All consumers financing a vehicle purchase with Tricolor must complete a Credit Application as defined by Tricolor Risk.  All applications must be received in electronic or written form and conform to the minimum data required to correctly process a credit decision including:

- Verifiable Identity
- Demographic Information
- Employment and Income
- Residence
- Vehicle Insurance Coverage
- Other Customer Information

Upon receiving a signed credit application, the applicant authorizes a credit check.  Underwriting will attempt to pull the credit history for all applicants and any co-applicant(s) through one or more national credit rating agencies (CRA's).   Underwriting is required to verify the identity of the applicant(s) including co-applicants before the system can automatically generate a credit grade.

The Tricolor Holdings credit risk model consists of three different separate models: No FICO, High FICO, and Low FICO.  Each of the three models utilize application data and credit bureau attributes (in the case of a FICO Base borrower), including customer's employment and residence history to compliment the

PERMANENT FILE                                                                                    **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

extensive non-traditional attributes collected in the application process.  The system automatically generates a credit grade to the submitted application based on the proprietary risk logic as provided by Tricolor Risk.  The credit grade assignment process is fully automated in the Tricolor Holdings credit decision engine ("CDE").  Underwriting does not have access to, nor can it influence, the credit grade decision.

Grade is then assigned based upon the submitted information with grades of A+, A, B, C, D, and E.

All applicants are screened for OFAC alerts/events and for Red Flags Rules.

Underwriting will then work with sales associates at Tricolor Holding dealerships retail hubs to communicate the Credit Grade and support the negotiation sales process with the customer.  Underwriting and Sales will jointly work toward the objective of fitting the consumer to the right vehicle and providing risk-based financing for selected collateral.  Underwriting is authorized to adjust deal terms within policy limits.

All financing deal terms submitted for approval to Underwriting are reviewed by Underwriting for credit approval.  If there is any exception to the credit policy, the deal terms will be routed to appropriate approval authority.  During the approval process, Underwriting must also attempt to verify relevant information presented on the credit application prior to the sale of the vehicle.  This activity typically occurs while the applicant is present in a Tricolor Holdings dealership.  The result of each verification is noted in the applicant's file.

After a vehicle is sold and loan contracts are complete, Underwriting will attempt to verify all remaining information presented on the credit application and necessary information on the completed contract. Underwriting will attempt to complete all remaining verifications in the shortest time frame possible with all verification attempt activity ceasing after 30 calendar days.  In the event that income is not verified at the time of delivery of vehicle, the following flowchart illustrates the process to the extent verification of income fails or the income provided at the time of application changes post verification:



If required verifications are unable to be completed within the 30-day post sale timeframe, the file is required to be reviewed by Underwriting for a verification waiver exception in order to be cleared for funding.  Files with approved verification waiver exceptions will be marked as an exception in the LOS system and will include the details of one or more compensating factors considered in support of the waiver.

To the extent that any information provided on the Credit Application changes post-verification, the Underwriter enters the new information in the loan origination system.  The system triggers an automatic re-grading of the application based on the verified data.  After the system re-grade, the Underwriter shall review the updated credit parameters to determine if the loan application falls within established credit matrix requirements and if not, will follow the Operating or Global Limit policy exception requirements.  In the event the updated information results in a lower grade, the new grade is assigned to the application within the LOS prior to funding and the loan application is flagged and classified as High Risk in loan servicing.

Upon completion of verification and after final credit approval, Underwriting must ensure all applications are locked for editing and cannot be modified subsequently by Underwriting associates.  Immutable applications are necessary to ensure the original credit terms are preserved for risk management and monitoring.

Security Procedures

In addition to the system-generated credit grade assignment process which is unable to be influenced by an Underwriting team member, Tricolor's Holding Risk department serves as a second line of defense to monitor Underwriting decisions through Credit Risk Management and Loss Forecasting.  The Tricolor Holdings Risk department is required to monitor, report and escalate:

- Underwriting exceptions
- Verification Waivers
- Grade changes
- Credit policy compliance

Additionally, the Company monitors customer accounts to verify that the customer has the insurance required by the contract.  If insurance monitoring shows that the customer does not have the required insurance (for example, the insurance has expired or been cancelled, or the deductible amount does not comply with the contract requirements), the Company will contact the customer to resolve the issue.  If the Company is unable to do so, it may purchase the required insurance on accounts if the contract and law permits it.  If loan servicing has no contact with the customer which includes the mail outs and calls after 14 days, the collateral protection insurance will be force placed.

Every active account must have adequate insurance coverage, CPI will be force place if customer does not provide sufficient coverage required by Tricolor Holdings.  If the customer refuses to pay CPI the Company will not apply a payment to CPI.  The customer must agree to pay CPI.

The Applicant must maintain liability insurance coverage at all times, as required by applicable law.  If the borrower indicates on the credit application that insurance coverage is in place, the appropriate verification procedures will be done.  If the applicant is not able to provide evidence of adequate insurance coverage, then the applicant must accept Tricolor coverage before the sale can be finalized.

Regarding the Retail Installment Contract, the Company will verify that the contract is documented on an approved form.  In addition, the original contract must be pre-printed or stamped as original and completed in full and signed by each buyer.  Verification is completed to determine that there are no strikethroughs, blank spaces, or handwritten changes present.  The contract is also reviewed to determine the APR, terms, and payment amount accurately reflects the approved credit and that the vehicle description and VIN must match.

If an optional insurance or a guaranteed auto protection ("GAP") product is financed in the contract, the contract must separately itemize the insurance or GAP product and include the disclosures as required by state and federal law, as applicable, to exclude such charge from being included in the finance charge.

Lastly, the "Itemization of Amount Financed" must be complete and match the values and items provided in the ancillary documents for aftermarket products and the buyer's order for the price of the vehicle and any accessories.

If the Exception Notice for the FICO credit score was provided or was not properly completed, the staff will resolve the discrepancy and complete corrected documents, as necessary.  The staff will make a note in the applicant's file about what was incorrect, and subsequently corrected.  If corrected documents are not submitted, the applicable contract will not be eligible for consummation and the Underwriting Department will send an adverse action letter to the customer.  If corrected documents are submitted, the contract will be eligible for consummation.

No applicant is required to enroll in an automatic payment program (i.e., the payment is automatically deducted from the customer's deposit account prior to each payment due date) as a condition of credit. Enrollment is strictly voluntary.

All files are stored digitally in the loan origination system and/or the loan servicing system and all original copies are returned to the borrower.  For items where it is required to obtain physical copies (titles, title applications, etc.) copies are sent and maintained by the corporate office.

Ancillary Products

Per inquiry, the Company offers Collateral Protection Insurance ("CPI"), which is designed to satisfy the insurance requirement of the loan agreement and to protect the creditor's interest in the vehicle securing the agreement.  CPI provides single interest coverage and does not directly protect the interest of the borrower in the same manner that their own physical damage insurance policy would.

The Company does not finance GAP insurance, extended warranties, GPS, or any additional ancillary products.  Ancillary products are financed by third parties, and not by Tricolor.

Journal Entry

The Journal Entry for a loan origination, per management, is as follows:

| Finance Receivable | | |
|---|---|---|
| **Account** | **Debit** | **Credit** |
| Finance Receivable | X | |
| Cash/Trade for Down Pmt | X | |
| Revenue (sale price of car) | | X |
| | | |
| Cost of Goods Sold | X | |
| Inventory | | X |

Credit Scoring

As previously mentioned, the Tricolor Holdings credit risk model consists of three separate models which are described below:

PERMANENT FILE                                                                                    **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

- <u>No FICO Model</u> - No or limited credit history at the credit bureau.   The Company relies on verified loan applications and third-party data vendors (Lexis Nexis) for input information.  Major variables are type of work, length of residence, payment method, age of SSN, etc.
- <u>Low FICO Model</u> - Focus on customers with FICO at or below 530.  The Company uses verified loan applications, bureau attributes, and Lexis Nexis as information sources.  Major variables are worst delinquent status, number of collections, credit utilization, recent account opening, FICO, checking account, eviction history, etc.
- <u>High FICO Model</u> - Focus on customers with FICO over 530.  The company uses verified loan applications, bureau attributes, and Lexis Nexis as information sources.  Major variables are length of credit history, payment method, FICO, delinquent accounts, collection balance, age of collection accounts, etc.

The three models lead to the AI Model focus on all customers regardless of credit status.  The model leverages state-of-the-art deep learning neural network and proprietary algorithms.

Refer to Section K of this Report regarding the verification of titles and perfection.

Documents to be included with the deal jackets, in addition to the contract, must include the following:

1. Permission to Record
2. Purchase Agreement
3. Retail Installment Sales Contract
4. Notice to Cosigner (if Applicable)
5. Credit Score Disclosure Notice
6. Agreement to Maintain Insurance
7. CPI addendum & PDI disclosure (if applicable OSI needed)
8. Application for title
9. Power of attorney (sold unit)
10. County of title Issuance
11. Odometer Disclosure
12. Trade in title or payoff form (if applicable)
13. Trade equity disclosure
14. Power of attorney (trade-in)
15. Privacy Policy
16. GPS Disclosure
17. Airbag Disclosure
18. Texas Hindering Secured Creditors
19. Buyers Guide
20. Tri-Warranty Contract
21. We Owe
22. Arbitration Agreement
23. Text and Email Disclosure
24. Customer Receipts (down payment/cpi)
25. ETAG receipt (dealers copy only)
26. License Receipt
27. Purchase documentation on Sold Vehicle

The deal jacket must contain Company's deal jacket checklist, completed and signed by Company, together with all applicable documents.  The deal jacket checklist  identifies all of the documents that

PERMANENT FILE                                                                                              **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

Company must include in the deal jacket.  If the checklist was not included in the deal jacket, but all Required Documentation was included in the deal jacket, the contract is still eligible for consummation.

Acceptable forms of verifications are noted in the table below (Prepared by the Company):

| Element | Allowable Verification Sources (at least one item from list) |
|---|---|
| **Proof of ID (minimum requirement)** | 1. US Government photo ID/DL- current or no more than 30 days expired.<br>2. Nonexpired Foreign passport<br>3. Nonexpired Foreign photo ID<br>4. Nonexpired Permanent Resident Card<br>5. Nonexpired Matricula Consular Card |
| **Proof of Residence (minimum requirement)** | 1. Credit Bureau<br>2. Utility Bill in customer's name- No more than 60 days old.<br>3. Current Homeowners or Renters Insurance Card<br>4. Conference call between Landlord, Customer, and Underwriter. For apartments, the verification must be conducted by calling the apartment complex.<br>5. Copy of lease or purchase contract. |
| **Proof of Income (minimum requirement)** | 1. Two Recent Paycheck Stubs- last 60 days and showing Year to Date. If a paycheck date is in January, December paycheck stub or W2.<br>2. Decision Logic<br>3. Online bank account printed statement(s).<br>4. Recent bank statement going back min. of 60 days.<br>5. Letter from employer.<br>6. Notarized letter from customer (for cash-income based borrower)<br>7. Conference Call between Employer, Customer, and Underwriter.<br><br>Cash-based borrowers with deposits into a bank account are required to have a conference call with the Underwriter to identify deposit type (e.g., employment, income, loan proceeds, tax refund, gift, etc.) |
| **Length of Residence** | 1. Credit Bureau<br>2. Verbal Verification with Landlord<br>3. Public Records Search |
| **Proof of Insurance** | 1. Declaration Page<br>2. Online Verification<br>3. Insurance Card and Online Verification |
| **Proof of Checking Account** | 1. Decision Logic or online (account open more than 30 days)<br>2. Recent bank statement (up to 60 days aged)<br>3. Copy of bank card or personal check.<br>4. Conference call with Customer, Financial Institution, and Underwriter. |
| **Proof of Direct Deposit** | 1. Decision Logic or Online Banking<br>2. Paycheck Stub<br>3. Recent Bank Statement (issued within 60 days) |
| **Proof of Check Payment** | 1. Decision Logic or Online Banking<br>2. Paycheck Stubs for last 60 days<br>3. Recent Bank Statement (issued within 60 days)<br>4. Conference call with Customer, Employer, and Underwriter. |

PERMANENT FILE                                                                                    **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

Customers with a FICO score at or above 680 are exempt from proof of checking account.  More specifically, they are exempt from providing proof of direct deposit or check payment.

The Chief Risk Officer is responsible for the oversight and execution of all Credit Risk Management and Underwriting activities.

The VP of Underwriting is responsible for the day-to-day management and oversight of Underwriting and Verification associates and the end-to-end underwriting processes.  Additionally, the Director of Underwriting documents that support new loans inspected for proper form, completeness, and accuracy.

Underwriting Associates are responsible for reviewing credit applications, related information and completed retail installment contracts for compliance to policies and procedures.  Underwriting associates are held accountable for the outcome of all underwriting decisions and results of verifications within Tricolor Holdings.

Verification associates are responsible for verifying information presented on the credit application and retail installment contract.  Verification associates are held accountable for execution of the verification process.

All exceptions or Customer Correction Letters must be approved by the Finance and Insurance Manager before 30 days.  The Finance and Insurance Manager will coordinate with the Legal and Compliance departments, and the Fair Lending Officer, to maintain a list of acceptable exceptions and permissible Customer Correction Letters that may be accessed in loan origination system.

When an exception is granted, the justifications therefor are to be clearly detailed in the applicant's file.

The Finance and Insurance Manager will ensure that all exceptions are logged and tracked.  The Finance and Insurance manager will monitor and analyze the frequency, types, and use of exceptions such that Company may:

1. Understand how exceptions are being used,
2. Determine whether the exceptions are appropriate, and
3. Determine whether there is a need to:

   a. Adjust policies and procedures (e.g., frequently used exceptions can indicate an inadequate policy),
   b. Increase or adjust training (e.g., to train how the exceptions should be applied),
   c. Discipline for inappropriate exceptions, and/or
   d. Otherwise respond.

The Finance and Insurance Manager or Audit Department will conduct random secondary exception reviews conducted no less than annually to ensure exceptions are consistent with the provisions of the credit policy.

Underwriting is authorized to make exceptions to credit and underwriting policy through adherence to both Global and Operating Limits.  The limits are set by Tricolor Risk and are based on the risk tolerance of the organization.  Risk tolerance is governed by expected losses in conjunction with risk culture and business objectives.  Global Limits form the boundaries for exceptions by grade and Operating Limits allow flexibility toward market competitiveness while upholding liquidity risk, credit risk, market risk and operational risk.

PERMANENT FILE                                                              **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

When an underwriter determines that the circumstances of a loan application warrant an exception, justification in support of the exception decision will be detailed in the applicant's loan file. The Loan Operating System ("LOS") will also be updated to identify a file that was closed with one or more exception(s) through an update to the exception field and may also be classified as a High-Risk loan for purposes of servicing, depending on the nature of the exception.

Operating Limits are set to allow for more flexibility in underwriting and control for market risk, operational risk and liquidity risk. The Underwriters, Director of Underwriting, Chief Risk Officer, or authorized executive is required to approve Operating Limit Exceptions.

Management asserted that the quality of the Credit Department is adequate to handle the credit function for the legal entity.

The Company does not purchase loans at a discount.

**SERVICING / COLLECTIONS**

Policies and Procedures

The Company provides its customers with several types of modifications to existing contracts based on specific need:

*Due Date Change and Payment Frequency Change*: Typically provided in cases where the customer has a payroll/employment change, resulting in a switch of net income receipt from bi-weekly to semi-monthly, etc. The customer must provide proof of their change in accompaniment with the request. In this modification, an account must either be current or paid immediately to make the account current prior to implementation and cannot be completed within the first 45 days of the contract's existence.

*Payment Extensions / Deferments*: Provided for customers that may require vehicle repairs, have medical bills, or a family emergency. This modification will move up to 30 days' worth of scheduled payments to the end of the loan term, resulting in an increased total finance charge. Furthermore, the deferment may apply to delinquent accounts in addition to current ones. In order to be eligible for a deferment, the customer must have a minimum of six months' worth of consecutive pay history from the origination of the contract, still be employed, and have valid insurance. Only one deferment can be applied to an account over each calendar year, and no more than three deferments can be applied during the life of the entire contract. Exceptions are eligible with a supervisor's approval.

*Promise to Pay*: In cases of brief delinquency (less than 10 days), a customer may voluntarily offer a promise to pay, in which the originally scheduled amount can be paid within five business days. If the payment is made on-time, the temporary Current status is extended as usual. If the customer fails to pay the aforementioned promised amount, the delinquency status reverts to the original payment schedule.

*Temporary Payment Reduction*: In lieu of a deferment, a customer with a current account balance may also ask for a reduction in payments over the course of the greater of three months or six payments. The temporary payment may not be less than 45% of the contractually agreed payment and will be voided of the reduced payments are missed in any capacity (i.e. the original account payment schedule will be re-implemented). Similar stipulations will apply as the deferment process; however, additional customer/Company paperwork and signatures are required for the modification to be established.

*Amendments*:  Established for customers with outstanding balances of less than $2,500 at the time of the original term expiration.  Payment amounts established within the original contract remain the same, and all amounts are brought current at the time the amendment is established.

In the aftermath of Hurricane Harvey in 2017, the Company also established a Disaster Relief Policy, which is reviewed in tandem with the Servicing and Collections policies on an annual basis.  The policy states that, in the event that a State of Emergency/Disaster has been declared within an account holder's jurisdiction, deferments may be applied without restrictions to the number of payments made prior to deferment, nor the number of deferments applied.  Furthermore, the resulting deferment agreement does not require a customer's signature.  As discussed within the Modification Test sub-section, this policy has been implemented significantly as a result of the ongoing COVID-19 pandemic.

Payment Processing

The Company's Loan Servicing department are the sole employees with access to input data on the current IDMS servicing platform (implemented in March 2020) and have limited access to the Company's Triconet Credit Decision Engine ("CDE") underwriting platform.  CDE allows Servicing staff to upload any insurance or additional required documentation (proof of income, residence, etc.) to complete the underwriting process.  The processing of payment via agent is completed within the PayNearMe vendor application and customer authorization is required with every transaction.  The handling of cash specific to customer payments is controlled entirely by the Finance and Accounting departments.

Delinquencies

The formal policies set forth by the Company include guidance for all collection-related staff regarding customer contact.  Specific details include all guidelines established as part of the Fair Debt Collection Practices Act ("FDCPA").  Wording within the policy specifically cites that the Company has chosen to comply with the FDCPA, despite no law requiring them to do so.  The consultants noted within testing that all customer communications, including Company attempts that were unsuccessful, were documented within IDMS and its predecessor, AutoStar.

When an account is delinquent for less than 15 days past due date, the Account Manager assigned to the customer will conduct policy-established collection efforts.  After 15 days past due, and up to 30 days past due, the account's monitoring is escalated to a Team Lead (senior collector) for additional attempts at dialogue with the customer, including the offering of Promises to Pay and appropriate modification options.  If, upon 30 days past due, no communication has been established with the customer, the account is reviewed by our Loss Mitigation department for repossession assignment.  First Payment Defaults will also be immediately recommended for repossession if no communication is established within the first 15 days of delinquency.

Bankruptcy

The Company policy has established that upon confirmation of a customer's active bankruptcy filing the account is marked with a bankruptcy flag, collection efforts cease, and the account is managed by the Legal Specialty.

Charge-Offs

PERMANENT FILE                                                                    **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

The Company provided the consultants with a copy of the Charge-Off Policy, which was effective December 5, 2019.  All changes must be approved prior to the Risk Committee prior to implementation. Per the policy, at least one of the following criteria must be met for an account to be charged-off:

- The receivables are between 60 and 120 days past due.  After 120 days past due, an account is automatically charged-off.
- The customer has returned the vehicle voluntarily and a mutual release is signed.
- A repossession has been completed and 20 days have passed since a strict foreclosure letter has been sent to the customer.
- A repossession has been completed and 10 days have passed since notice has been sent to the customer, and the customer has paid over 60% in principal back to the Company.
- A vehicle was involved in an accident, with a total loss claim paid, and the vehicle salvage was retained either by the insurance company or Tricolor.
- A loan that is in bankruptcy or has a legal matter.

All potential charge-offs are presented to, and must be approved by, the Chief Financial Officer and Chief Operating Officer unanimously, after additional consultation is provided by the Vice Presidents of Loan Servicing.  Please refer to the Repossessions Section of this Report for specific discussion of policies and procedures related to the repossession of vehicles.

Aging of receivables, which are automatically updated within the IDMS platform, are generated on an as-needed basis, but are included within Servicing-based reporting to management on a monthly basis.  In addition, a static pool summary is also included in reporting to determine riskier vintages and modeling subsequent underwriting.

Per policy and discussions with management, Tricolor retains control of all delinquent and/or charged-off receivables.  Attempts to collect on the receivables immediately cease after charge-off.

Aging of Accounts

Receivables, per both the data tape and servicing records, are aged based on the existing contractual terms.  Per policy and discussions with management, payment due dates that determine the aging of receivables are not relieved until principal, interest, and fees associated with the payment are relieved by customer remittance.  All payments are applied to the earliest outstanding due date.  Partial payments of less than 90% or within more than $40 of the required amount do not result in the re-aging of receivables, with the exception of modifications discussed earlier within this section.  Delinquencies presented within the data tape are comprised of the entire receivables balance.

Paid Ahead Accounts

Accounts that make payments in excess of the balances of payments due in subsequent periods will have relieved the payment due date (i.e. an $800 payment on a current account typically owing $400 will relieve the current payment and the next payment due).

Non-Accrual Accounts

Per discussions with management, no receivables are placed in non-accrual status.  Charged-off receivables are removed entirely from the Company's receivables base, and only exist as a "WRITE-OFF" status on the data tape/internal reporting platforms.

PERMANENT FILE                                                                  **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

---

**BOARDING OF ACCOUNTS/BILLING**

Per inquiry, the Credit Manager oversees the boarding of new borrower accounts and the boarding of new loan originations into CDE and the dealer management system, IDMS.   Most information is integrated into IDMS from CDE after verifications are completed and approved by Underwriting.   Contracts are then created from IDMS by the manager.  Additionally, underwriters will verify what information in CDE is correct and matches the information in IDMS.   Post-closing personnel will pull copies of the contract from the document portal and then verify information per the contract matches information in the systems. Information that was imported from CDE into IDMS, and any information subsequently added, is used for customer servicing and collections.

Management stated that the Company's loan servicing systems properly capture the respective ancillary and other authorized fees (late fees, etc.).  Refer to the Servicing Section C of this Report for more on the methods and rates used in determining late fee charges.

Refer to the Credit & Underwriting Section of this Report for the consultants' inquiry and testing of whether loan originations and subsequent account activity were recorded accurately, completely, and only once in individual borrower accounts.

Per management, as part of the closing process, all duplicate VINs are reviewed and the balance that is no longer applicable is charged-off.

**CASH MANAGEMENT**

Policies and Procedures

Per discussions with management, the Company does not have a formalized cash control / payment processing policy outside of what is discussed within the Servicing and Collections handbook.  Within the handbook, all aspects and instructions pertaining to cash application within the IDMS platform are discussed but maintains no accounting-specific discussion or instructions.  Per management, cash control policy is governed independently by the accounting department.

Management stated that, as a whole, the Company receives very little cash.  All the cash received is deposited into the nearest Wells Fargo bank branch by a team member at the dealership.  All other payments are either made through third parties such as PayNearMe, which provides access to deposit cash or make bank transfers from kiosks at various public spaces (supermarkets, retailers, etc.).  All payment processing is handled by Loan Servicing employees, who have no access to bank accounts or accounting systems.  The Company does not directly receive wires or ACH payments in from customers.

Bank reconciliations are prepared daily, with a two-to-three-day lag in order to allow for the processing and batch payments of debit/credit card transactions between customer payment and receipt within the bank statement. [cash deposits may be a longer lag due to deposits made once a week. All reconciliations are prepared by accounting staff, and subsequently approved by the Accounting Manager and VP of Accounting.

All cash disbursements are controlled by the Director of Finance, Chief Financial Officer, and VP of Accounting.  All non-repetitive wires require a two-party authorization among these three employees.  At any given time, between two to three additional accounting staff may have the ability to modify repetitive wires, but still require subsequent authorization to initiate the final transaction.  The accounting staff that prepare bank reconciliations do not have the ability to initiate any bank transactions.

## REPOSSESSIONS

Repossession Process

The repossession process can begin as early as 30 days of delinquency for a customer, depending on the level of communication successfully reached between collection staff and the customer.  Once primary collection efforts have been exhausted, the Loss Mitigation team will place the account out for repossession. Recovery Database Network (RDN) is the vendor application we use for direct repossession vendor assignments.  All units are equipped with a mandatory GPS device, which highly increases the recovery rates.  Upon the Company's receipt of a vehicle and its subsequent servicing, a customer will be given a mailed correspondence indicating the state required redemption period in which they can relieve any outstanding delinquent balance and repossession expenses to receive the car back.  If this requirement is not met, the account is charged-off, and the vehicle is either retained by affiliated dealerships or, if the car no longer meets minimum quality standards, sold at auction.

Vehicles that have been retained by affiliates do not pay the Company any cash for the vehicle itself.  Instead, the third-party Manheim book value, based on quality of the vehicle and tracked specifically by VIN, is utilized to account for any "proceeds" incurred.  The initial loss on the loan is debited as a Loss on Loan (less any deferred sales taxes) and credited to the Note Receivable.  Immediately thereafter, the Company posts two parallel transactions as follows:

| Account Name | DR | CR |
|---|---|---|
| Inventory | X | |
| Loss on Loan | | X |
| | | |
| Interco. AR/AP - Affiliate | X | |
| Inventory | | X |

The SPVs that hold the receivable assets will post recoveries to their month-end reporting, from which cash proceeds from the various trust entities held by Tricolor affiliates will transfer cash via waterfall in the subsequent reporting period.  Accordingly, actual cash proceeds will not be posted to the SPV until one to three weeks after posting to the payment ledger. In rare instances where the vehicle has been sold to a third-party auction, cash received is immediately posted to the SPV as recovery proceeds.

The Company has accounted for recovery trending and estimated recovery values per Manheim Market Reports within its Fair Value measurements since their inception.

## INSURANCE AND TITLE TRACKING

Insurance Management

The applicant must maintain liability insurance coverage at all times, as required by applicable law.  If the applicant is not able to provide evidence of adequate insurance coverage, then the borrower must accept Tricolor coverage before the sale can be finalized.

The Company monitors customer accounts to verify that the customer has the insurance required by the contract.  If insurance monitoring shows that the customer does not have the required insurance (for example, the insurance has expired or been cancelled, or the deductible amount does not comply with the contract requirements), staff will contact the customer to resolve the issue.  If the staff is unable to do so, the Company may purchase the required insurance on accounts if the contract and law permits it.  The

Company will follow the laws of the following states related to force placed insurance under the following circumstances.

The Company will also force place insurance when the borrower's policy has expired.  However, it was noted that the borrower must sign an agreement at the point of origination to force place the insurance and the cost is based on the schedule below:

| Tricolor Auto | Ganas Auto | Ganas Ya |
|---|---|---|
| Weekly- $ 30 | Weekly- $ 30 | Weekly- $ 18 |
| Bi-Weekly- $ 60 | Bi-Weekly- $ 60 | Bi-Weekly- $ 36 |
| Semi- Monthly- $ 65 | Semi- Monthly- $ 65 | Semi- Monthly- $ 39 |
| Monthly- $ 130 | Monthly- $ 130 | Monthly- $ 78 |

Exceptions as to force CPI insurance are when a loan balance is at or below $3000 "Low Balance Threshold" or recent sale pending insurance verification or placement.

Berkshire administers a damage coverage program on behalf of the Company for customers of the Company who wish to have damage coverage.  Tricolor collects monthly premiums from customers and submits these premiums to Berkshire.  Of these premiums, a percentage of premiums (15% prior to October 1, 2019 and 13% after said date) represent administrative costs paid to Berkshire.  The remaining amounts are placed into a reserve account used to pay off claims.  Any amount of claims that exceed the reserve account is the Company's responsibility.  At the end of each quarter, the Company is entitled to any excess in the reserve account not used to pay off claims, less a reserve amount based on average claims as determined by Berkshire.

Revenue associated with premiums paid and related administrative costs for Berkshire are recognized in the month collected, as the collateral protection plan insurance does not cover term, but rather month-to-month.  Claims expense, which is limited to the prior month damage claims are expenses, net of the deductible in the month incurred.  A data extract of the Company's entire portfolio is sent to the service provider weekly to update their system of record.

Insurance documents are submitted prior to vehicle sale but changes and updates can be sent to OCIS and the accounts are updated accordingly.

The Company issues Notice of Required Insurance to the borrower for account that do not have and active insurance policy.  For some recent vehicle sales, insurance is pending verification.

Title Management

Title applications and registrations are completed electronically through WebDealer.  Applications include scanned images of the required documents necessary to process the title application including, but not limited to, the evidence of ownership (e.g., MCO, out of state title, Texas title, etc.), Form 130-U, odometer disclosure statement, Dealer's Reassignment and Vehicle Inspection Report ("VIR").  Title applications are then submitted electronically to county tax assessor-collector's offices.

PERMANENT FILE                                                                    **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

## ACCOUNTING

Revenue Recognition

*Vehicle Sales*

Vehicle sales beginning January 1, 2019 per implementation of Topic ASC 606 at the point in time when the delivery performance obligation is satisfied and over time as the warranty obligation is consumed by the customer.  Recognition of vehicle sales includes obtaining the executed sales contract, delivery of the vehicle, collection of the down payment and arranging of the secured financing.  The sales contracts have a fixed price and revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring goods or services.  Revenues are recorded net of taxes collected from customers and remitted to governmental agencies.

*Service Revenue*

Automotive service is a single performance obligation that includes both parts and labor associated with the service.  Payment for automotive work is typically due upon completion of the service which is generally completed within a short period of time from contract inception.  The transaction price for automotive services are based on the number of parts used, the number of hours applied and standard hourly labor rates.  The Company satisfies their performance obligations, transfers control, and recognizes revenue over time for automotive repair services.  Payment is typically due at the time of sale, or within a short period of time following the sale.

*Interest Income on Finance Receivables*

Interest income on finance receivables under fair value accounting is recognized by the Company on a level yield basis using their internal rate of return.  Cash received is applied first against interest income and then reduces the carrying value of the receivables.

*Collateral Protection Insurance Premiums*

The Company provides collateral protection coverage via Berkshire Risk Services, LLC.  Revenue associated with these premiums and related administrative costs are recognized in the month collected. Claims filed by policy holders are recognized as a period cost based on the prior month damage charges less deductible.  Revenue from insurance contracts was not covered in the scope of Topic ASC 606 Revenue Recognition and therefore does not apply.

Provision for Credit Losses

There is credit loss provision per se, as it reports these as reductions in the estimate of cash to be received in computing interest income using the level yield method.  The credit losses included in the level yield calculation is management's best estimate based on historical loss trends.   Any changes in these estimates influences the change in carrying value of the finance receivables which is measured at month end.  Any change in fair value passes through the consolidated income statement via change in mark to finance receivables measured at fair value.

PERMANENT FILE                                                                                    **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

Reversal of Finance Charges

The Company does not reverse finance charges, as it reports interest income on a level yield basis using fair value accounting.  Any reversals would be a month-end adjustment in the carrying value of the financed receivables.  This typically would flow through as a charge against income hitting the mark to financed receivables measured at fair value in the income statement.

Initial Direct Costs and Origination Fees

Initial direct costs and origination fees under fair value accounting is expensed as incurred flowing through the consolidated income statement as a period cost.

**REVIEW OF COMPUTER SYSTEMS AND CONTROLS**

Per discussion with management, the following was noted related to the Company's computer systems and controls as of the date of the Report:

The Company uses primarily cloud-based software which has service level agreements and the responsibility of the provider.  In addition, the company outsources network support through a third party with significant resources.

Critical IT and Product Development Systems & Applications Portfolio: {elapsed ages need to increase]

| Critical Application Systems | Elapsed Age | Hosting |
|---|---|---|
| Oracle | 2 years | External / Cloud |
| DealerSocket iDMS | 10 months | External / Cloud |
| Omnique | 10 months | External / Cloud |
| Triolor.net CRM / CDE | 7+ years | In house –Datacenter Colo |
| SecureClose | 5 Years | External / Cloud |
| Power BI | 1 years | External / Cloud |
| Compli –Compliance Tool | 6 years | External / Cloud |
| ADP –payroll | 5 years | External / Cloud |
| Five 9 | 11 Months | External / Cloud |
| PBX Voice System | 10 Years | In house –Datacenter Colo |
| Rapid Recon | 4+ Years | External / Cloud |
| Office 365 | 2 Years | External / Cloud |

PERMANENT FILE                                                                    **Exhibit PF.1**
TRICOLOR AUTO ACCEPTANCE, LLC AND TRICOLOR FUNDING SPV 4 LLC

Critical IT and Product Development Third Party Partners & Support:

| IT Third Party Partners | Services |
|---|---|
| Tekzenit | IT Infra / Apps Level 2 & 3 Support |
| Microsoft | Office 365, Azure, MS Teams, Power BI |
| AWS | User & Server File Shares |
| Brevall | Enterprise Voice Support |
| Cisco | Enterprise WAN / LAN Equipment |
| Dell | Enterprise PC Equipment |
| Five9 | Virtual Cloud Calls Services |
| Intugo | Mexico GDL IT Equipment Support |
| Network Solutions, Go Daddy | Domain Name Registrar |
| DealerSocket | Finance, Sales |
| AT&T, Verizon, Comcast, Spectrum, TierPoint | WAN Internet Service Providers |
| Fusion, EarthLink, Call Source | Voice Line Providers |
| Ninjio, Accudata, SecureWorks | Security Support Partners |
| Adobe | Media Cloud Services |
| Oracle | Financials Cloud Services |
| Phenx.io | Partner for AI development |

IT Service Support Governance:

*Incident Management (IM)*

- Creation, Categorize and Prioritize
- Triage, Resolve, Assignment, Service Level Agreement (SLA)
- Resolution and Incident Analysis
- Critical Incident Management
- Critical Incident Management Flowchart
- IT/Business Notifications

*Root Cause Analysis (RCA) & Strategic Corrective Actions (SCA)*

- Problem Management Roles
- Problem Management Process Flowchart
- Problem Management Governance

*Change Management (CM)*

- Goal, Definition and Benefits
- Change Management Roles
- Change Control Process
- Change Management Types
- Change Management Flowchart

*Executive Briefing Reporting*

- IT Services Delivery Review Metrics Report. Daily and Monthly
- Operation Review Meeting Report Monthly
- IT Infrastructure Service Business Performance Review Monthly

Management stated that Company employees in the Information Technologies ("IT") Department perform incompatible functions due to the size of the staff.  The Company's IT Department has code management software to track changes and does quarterly reviews of the software.  The Accounting Department balances incoming and outgoing cash daily, Account Executives perform daily reviews of customer positions, and daily incoming and outgoing cash and with various other statistics that are sent to management.

Cybersecurity

The Company implemented a cybersecurity plan as of June 2022.

The Tricolor Cybersecurity Program will enable Tricolor to protect brand integrity and customers value and ensure continuity of business operations. Tricolor is committed to a security governance model that enables our investment and commitment to protect our business and intellectual property and ensures the availability, integrity, and confidentiality of Tricolor information assets.

Secure Infrastructure

- Security development of web-facing applications
- Secure development of internal applications
- Inaccurate and incomplete asset inventory
- Security infrastructure configuration: AD Domains, Firewalls, VPN

Threat & Vulnerability Management

- Limited visibility into applicable threats and vulnerabilities

Data Protection

- Unauthorized users accessing sensitive information due to excessive privileges

Identity & Access Management

- Inadequate role-based access and entitlements

Governance, Risk Management, & Compliance

- Improve security risk assessment and controls framework
- Limited information security training and awareness
- Limited visibility into third-party security controls and environment
- Informal and ad hoc security policies and procedures

The Company does maintain insurance coverage for business interruptions or general services interruption.  The consultants reviewed the policy and noted it to be comprehensive and current.

Per management, the Company's ability to mark the loan receivable is that the loan can only be assigned to one portfolio in the system and the company utilizes SQL databases to tag and report transactional activity for monthly servicer reports and reporting.  The SQL process also can only have one tag.  The system tracks original final scheduled loan receivable transaction payment date and terms and any modifications or deferrals with notes and logs.

Management's opinion as to their IT Department is that it is sufficient in capacity and technological advancement to adequately support contract processing and servicing.