# EXHIBIT 5

If you are not the intended recipient of this message, please do not distribute or copy the information contained in this e-mail, but instead delete and destroy all copies of this e-mail.

Attached please find an electronic copy of the offering memorandum, dated April 29, 2022 (the "Offering Memorandum") relating to the Notes (as such term is defined therein) being issued by Tricolor Auto Securitization Trust 2022-1 (the "Issuer").

The Offering Memorandum is highly confidential and does not constitute an offer to any person other than the recipient or to the public generally to subscribe for or otherwise acquire the Notes.  The Offering Memorandum is not an offer to sell the Notes and is not a solicitation of an offer to buy the Notes in any jurisdiction where such offer or sale is not permitted.

Distribution of the Offering Memorandum to any person other than (i) the person receiving this electronic copy from Tricolor Auto Receivables 2 LLC or agents on its behalf and (ii) any person retained to advise the person receiving this electronic transmission with respect thereto (each, an "Authorized Recipient") is unauthorized.  Any photocopying, disclosure or alteration of the contents of the Offering Memorandum, and any forwarding of a copy of the Offering Memorandum or any portion thereof by any means to any person other than an Authorized Recipient, is unauthorized.  By accepting delivery of the Offering Memorandum, the recipient agrees to the foregoing.

**OFFERING MEMORANDUM**                                                                    **CONFIDENTIAL**



**$212,130,000**
**Tricolor Auto Securitization Trust 2022-1**
Issuer

**$125,560,000 3.30% Class A Asset Backed Notes**
**$13,470,000 4.34% Class B Asset Backed Notes**
**$13,980,000 4.71% Class C Asset Backed Notes**
**$25,140,000 5.38% Class D Asset Backed Notes**
**$21,160,000 7.79% Class E Asset Backed Notes**
**$12,820,000 9.80% Class F Asset Backed Notes**

————————————

**Tricolor Auto Receivables 2 LLC**              **Tricolor Auto Acceptance, LLC**
Depositor                                   Sponsor, Servicer and Administrator

————————————

Distributions on the Notes will be made on the 15th day of each month or, if not a Business Day, on the next Business Day, beginning on May 16, 2022. The main sources for payment of the Notes will be a pool of sub-prime motor vehicle retail installment sale contracts, certain payments under the Receivables and monies on deposit in a Reserve Fund. Credit enhancement will consist of overcollateralization resulting from the excess, if any, of the unpaid Principal Balance of the Receivables (plus, during the Prefunding Period, the amount on deposit in the Prefunding Account) over the Note Balance of the Notes, excess spread on the Receivables, a Reserve Fund and the subordination of each class of Notes, if any, that is junior in its right to receive payments of principal and interest to such class of Notes.

Tricolor Auto Acceptance, LLC will agree to use the net proceeds from the sale of the Notes to fund or acquire new auto loans made by the Originators to borrowers within an underserved target population that meet certain eligibility criteria as described under "*Use of Proceeds*" in this Offering Memorandum.

The Notes will represent obligations of the Issuer only and will not represent interests in or obligations of Tricolor Auto Receivables 2 LLC, Tricolor Auto Acceptance, LLC or any of their respective affiliates.

————————————

**You should consider carefully the risk factors beginning on page 26.**

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THESE SECURITIES OR DETERMINED THAT THIS OFFERING MEMORANDUM IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE NOTES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ARE BEING OFFERED AND SOLD ONLY TO (1) QUALIFIED INSTITUTIONAL BUYERS IN RELIANCE ON RULE 144A UNDER THE SECURITIES ACT AND (2) IN THE CASE OF INITIAL SALES OF THE NOTES, TO INSTITUTIONAL "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT. THE NOTES ARE NOT TRANSFERABLE EXCEPT TO QUALIFIED INSTITUTIONAL BUYERS OR CERTAIN OTHER ENTITIES, EACH IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED UNDER "NOTICE TO INVESTORS".**

The Issuer is being structured so as not to constitute a "covered fund" for purposes of the Volcker Rule under the Dodd-Frank Act. In making this determination, the Issuer will be relying on the exclusion or exemption from the definition of "investment company" contained in Section 3(c)(5) of the Investment Company Act of 1940, as amended, although other exclusions or exemptions may also be available to the Issuer.

The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part. It is expected that delivery of the Notes, in book-entry form, will be made through the facilities of The Depository Trust Company on or about May 4, 2022 against payment in immediately available funds.

————————————

*Bookrunner and Structuring Agent*                                    *Co-Manager*

**J.P. Morgan**                                                  **Barclays**

————————————

The date of this Offering Memorandum is April 29, 2022.

**TABLE OF CONTENTS**

| | Page |
|---|---|
| NOTICE TO INVESTORS: UNITED KINGDOM | 4 |
| Prohibition on Sales to UK Retail Investors | 4 |
| Other UK Offering Restrictions | 4 |
| UK MiFIR Product Governance | 4 |
| Other UK Regulatory Restrictions | 4 |
| NOTICE TO INVESTORS: EUROPEAN ECONOMIC AREA | 5 |
| Prohibition on Sales to EU Retail Investors | 5 |
| Other EEA Offering Restrictions | 5 |
| MiFID II Product Governance | 5 |
| INFORMATION AS TO PLACEMENT IN THE UNITED STATES | 5 |
| EU SECURITIZATION REGULATION AND UK SECURITIZATION REGULATION | 6 |
| AVAILABLE INFORMATION | 6 |
| IMPORTANT NOTICE ABOUT INFORMATION IN THIS OFFERING MEMORANDUM | 6 |
| READING THIS OFFERING MEMORANDUM | 8 |
| FORWARD-LOOKING STATEMENTS | 8 |
| NOTICE TO INVESTORS | 9 |
| AVAILABLE INFORMATION | 12 |
| TRANSACTION OVERVIEW | 14 |
| Structural Diagram | 14 |
| Flow of Funds | 15 |
| SUMMARY | 16 |
| Principal Parties | 16 |
| Terms of the Securities | 16 |
| Important Dates | 17 |
| Interest Rates | 17 |
| Principal Payments | 18 |
| Priority of Distributions | 18 |
| Credit Enhancement | 20 |
| Optional Redemption | 21 |
| Events of Default | 22 |
| Property of the Issuer | 22 |
| Servicing and Servicer Compensation | 23 |
| Ratings | 24 |
| Tax Status | 24 |
| ERISA Considerations | 24 |
| Certain Investment Company Act Considerations | 24 |
| U.S. Credit Risk Retention | 24 |
| EU Securitization Regulation and UK Securitization Regulation | 25 |
| RISK FACTORS | 26 |
| USE OF PROCEEDS | 51 |
| THE ISSUER | 53 |
| Limited Purpose and Limited Assets | 53 |
| Capitalization | 54 |
| THE DEPOSITOR | 54 |

| | Page |
|---|---|
| THE TRUSTEES, THE CUSTODIAN AND THE BACKUP SERVICER | 54 |
| The Owner Trustee | 54 |
| The Indenture Trustee and the Custodian | 55 |
| The Backup Servicer | 56 |
| THE TRUST PROPERTY | 56 |
| TRICOLOR AUTO ACCEPTANCE, LLC | 57 |
| General | 57 |
| Administrator | 58 |
| Tricolor's Securitization Program | 58 |
| TRICOLOR'S AUTOMOBILE FINANCING PROGRAM | 58 |
| General | 58 |
| Underwriting | 60 |
| Sales Taxes | 61 |
| Credit Scoring Models | 61 |
| Loan Servicing and Collections | 61 |
| Repossessions | 62 |
| Charge-offs | 63 |
| Extensions | 63 |
| Restructures | 63 |
| Insurance Coverage | 63 |
| Warranty | 64 |
| Allocation of Receivable Payments | 64 |
| Delinquency and Loss Information | 64 |
| THE RECEIVABLES | 67 |
| General | 67 |
| Information in this Offering Memorandum | 67 |
| Eligibility Criteria | 67 |
| Characteristics of the Receivables | 69 |
| STATIC POOL DATA | 77 |
| WEIGHTED AVERAGE LIVES OF THE NOTES | 77 |
| DESCRIPTION OF THE NOTES | 83 |
| General | 83 |
| Securities Law Restrictions | 83 |
| Delivery of Notes | 83 |
| Payments of Interest | 84 |
| Payments of Principal | 84 |
| Credit Enhancement | 86 |
| Optional Redemption | 88 |
| Notes Owned by the Issuer, the Depositor, the Servicer and their Affiliates | 88 |
| Limitation on Right to Institute Bankruptcy Proceedings | 88 |
| Events of Default | 88 |
| Rights Upon Event of Default | 89 |
| Book-Entry Registration | 90 |
| APPLICATION OF AVAILABLE FUNDS | 93 |
| Sources of Funds for Distributions | 93 |
| Distributions | 94 |
| U.S. CREDIT RISK RETENTION | 96 |

|  | Page |
|---|---|

DESCRIPTION OF THE TRANSACTION
DOCUMENTS ....................................................99
  Sale and Assignment of the Receivables.............99
  Accounts..................................................100
  Servicing ................................................101
  Servicing Compensation.................................102
  Investor Reports .......................................102
  Fees and Expenses.......................................102
  Statements to Noteholders..............................103
  Compliance Statements ..................................104
  Certain Other Matters Regarding the
    Servicer ...............................................105
  Events of Servicing Termination........................105
  Rights Upon Event of Servicing
    Termination.............................................106
  Waiver of Past Defaults.................................106
  Replacement of Trustees, Custodian and
    Backup Servicer ........................................107
  Amendment ..............................................108
  Termination ............................................110
  The Administration Agreement...........................111
MATERIAL LEGAL ASPECTS OF THE
RECEIVABLES...............................................111
  General ..................................................111
  Security Interests in the Financed Vehicles.......111
  Enforcement of Security Interests in
    Financed Vehicles ......................................113
  Certain Bankruptcy Considerations and
    Matters Relating to Bankruptcy ....................114
  Consumer Protection Laws ..............................114
  Other Matters...........................................116
  The Dodd-Frank Act ....................................116
UNITED STATES FEDERAL INCOME TAX
CONSIDERATIONS .......................................119
  Tax Characterization of the Issuer....................119
  Tax Consequences to U.S. Holders ....................120
  Tax Consequences to Non-U.S. Holders...........122
  Foreign Account Tax Compliance.....................124
  Backup Withholding and Information
    Reporting ...............................................124
  U.S. State and Local and Non-U.S. Tax
    Consequences...........................................124
  Certain United States Federal Income Tax
    Documentation Requirements.......................124
ERISA CONSIDERATIONS ................................125
  Special Considerations Applicable to
    Insurance Company General Accounts.........126
RATINGS.....................................................127
PLAN OF DISTRIBUTION.................................127
  General ..................................................127
  European Economic Area................................128
  United Kingdom.........................................128
LEGAL MATTERS .........................................128
GLOSSARY ...................................................130

|  | Page |
|---|---|

Appendix A - Static Pool Information...................A-1

**NOTICE TO INVESTORS: UNITED KINGDOM**

**Prohibition on Sales to UK Retail Investors**

THE NOTES ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO, AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO, ANY UK RETAIL INVESTOR IN THE UK.  FOR THESE PURPOSES, A "UK RETAIL INVESTOR" IS A PERSON WHO IS ONE (OR MORE) OF THE FOLLOWING: (1) A RETAIL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2 OF COMMISSION DELEGATED REGULATION (EU) 2017/565, AS IT FORMS PART OF UK DOMESTIC LAW BY VIRTUE OF THE EUWA AND AS AMENDED; (2) A CUSTOMER WITHIN THE MEANING OF THE PROVISIONS OF THE FSMA AND ANY RULES OR REGULATIONS MADE UNDER THE FSMA (SUCH RULES AND REGULATIONS AS AMENDED) TO IMPLEMENT DIRECTIVE (EU) 2016/97, WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT, AS DEFINED IN POINT (8) OF ARTICLE 2(1) OF REGULATION (EU) NO 600/2014, AS IT FORMS PART OF UK DOMESTIC LAW BY VIRTUE OF THE EUWA AND AS AMENDED; OR (3) NOT A QUALIFIED INVESTOR, AS DEFINED IN ARTICLE 2 OF THE UK PROSPECTUS REGULATION, KNOWN AS A "UK QUALIFIED INVESTOR". CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY THE UK PRIIPS REGULATION FOR OFFERING OR SELLING THE NOTES OR OTHERWISE MAKING THEM AVAILABLE TO UK RETAIL INVESTORS IN THE UK HAS BEEN PREPARED; AND THEREFORE OFFERING OR SELLING THE NOTES OR OTHERWISE MAKING THEM AVAILABLE TO ANY UK RETAIL INVESTOR IN THE UK MAY BE UNLAWFUL UNDER THE UK PRIIPS REGULATION.

**Other UK Offering Restrictions**

THIS OFFERING MEMORANDUM IS NOT A PROSPECTUS FOR PURPOSES OF THE UK PROSPECTUS REGULATION.  THIS OFFERING MEMORANDUM HAS BEEN PREPARED ON THE BASIS THAT ANY OFFER OF THE NOTES IN THE UK WILL ONLY BE MADE TO A LEGAL ENTITY WHICH IS A UK QUALIFIED INVESTOR.  ACCORDINGLY, ANY PERSON MAKING OR INTENDING TO MAKE AN OFFER IN THE UK OF THE NOTES WHICH ARE THE SUBJECT OF THE OFFERING CONTEMPLATED IN THIS OFFERING MEMORANDUM MAY ONLY DO SO WITH RESPECT TO UK QUALIFIED INVESTORS. NEITHER THE ISSUER, THE DEPOSITOR NOR ANY INITIAL PURCHASER HAS AUTHORIZED, NOR DO THEY AUTHORIZE, THE MAKING OF ANY OFFER OF NOTES IN THE UK OTHER THAN TO UK QUALIFIED INVESTORS.

**UK MiFIR Product Governance**

ANY DISTRIBUTOR SUBJECT TO THE UK MIFIR PRODUCT GOVERNANCE RULES THAT IS OFFERING, SELLING OR RECOMMENDING THE NOTES IS RESPONSIBLE FOR UNDERTAKING ITS OWN TARGET MARKET ASSESSMENT IN RESPECT OF THE NOTES AND DETERMINING APPROPRIATE DISTRIBUTION CHANNELS.  NEITHER THE ISSUER, THE DEPOSITOR NOR (EXCEPT AS REGARDS ITSELF OR AGENTS ACTING ON ITS BEHALF, TO THE EXTENT RELEVANT) ANY INITIAL PURCHASER MAKES ANY REPRESENTATIONS OR WARRANTIES AS TO A DISTRIBUTOR'S COMPLIANCE WITH THE UK MIFIR PRODUCT GOVERNANCE RULES.

**Other UK Regulatory Restrictions**

IN THE UK, THIS OFFERING MEMORANDUM IS BEING COMMUNICATED ONLY TO, AND IS DIRECTED ONLY AT, PERSONS, KNOWN AS "RELEVANT PERSONS", THAT ARE (1) PERSONS HAVING PROFESSIONAL EXPERIENCE IN MATTERS RELATING TO INVESTMENTS AND QUALIFYING AS INVESTMENT PROFESSIONALS UNDER ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (FINANCIAL PROMOTION) ORDER 2005, AS AMENDED, KNOWN AS THE "ORDER", (2) HIGH NET WORTH COMPANIES AND OTHER ENTITIES OR PERSONS FALLING WITHIN ARTICLE 49(2)(A) TO (D) OF THE ORDER OR (3) ANY OTHER PERSON TO WHOM THIS OFFERING MEMORANDUM MAY OTHERWISE LAWFULLY BE COMMUNICATED OR CAUSED TO BE COMMUNICATED.  THIS OFFERING MEMORANDUM AND ITS CONTENTS ARE CONFIDENTIAL AND SHOULD NOT BE DISTRIBUTED, PUBLISHED OR REPRODUCED (IN WHOLE OR IN PART) OR

4

DISCLOSED BY RECIPIENTS TO ANY PERSON IN THE UK OTHER THAN A RELEVANT PERSON. ANY INVESTMENT OR INVESTMENT ACTIVITY TO WHICH THIS OFFERING MEMORANDUM RELATES, INCLUDING THE NOTES, IS AVAILABLE IN THE UK ONLY TO RELEVANT PERSONS AND WILL, IN THE UK, BE ENGAGED IN ONLY WITH RELEVANT PERSONS. THIS OFFERING MEMORANDUM MUST NOT BE ACTED ON OR RELIED ON BY PERSONS IN THE UK WHO ARE NOT RELEVANT PERSONS.

### NOTICE TO INVESTORS: EUROPEAN ECONOMIC AREA

**Prohibition on Sales to EU Retail Investors**

THE NOTES ARE NOT INTENDED TO BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO, AND SHOULD NOT BE OFFERED, SOLD OR OTHERWISE MADE AVAILABLE TO, ANY EU RETAIL INVESTOR IN THE EEA. FOR THESE PURPOSES, AN "EU RETAIL INVESTOR" IS A PERSON WHO IS ONE (OR MORE) OF THE FOLLOWING: (1) A RETAIL CLIENT AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF MIFID II; (2) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE (EU) 2016/97 (AS AMENDED), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (3) NOT A QUALIFIED INVESTOR, AS DEFINED IN ARTICLE 2 OF THE EU PROSPECTUS REGULATION, KNOWN AS AN "EU QUALIFIED INVESTOR". CONSEQUENTLY, NO KEY INFORMATION DOCUMENT REQUIRED BY THE EU PRIIPS REGULATION FOR OFFERING OR SELLING THE NOTES OR OTHERWISE MAKING THEM AVAILABLE TO EU RETAIL INVESTORS IN THE EEA HAS BEEN PREPARED; AND THEREFORE OFFERING OR SELLING THE NOTES OR OTHERWISE MAKING THEM AVAILABLE TO ANY EU RETAIL INVESTOR IN THE EEA MAY BE UNLAWFUL UNDER THE EU PRIIPS REGULATION.

**Other EEA Offering Restrictions**

THIS OFFERING MEMORANDUM IS NOT A PROSPECTUS FOR PURPOSES OF THE EU PROSPECTUS REGULATION. THIS OFFERING MEMORANDUM HAS BEEN PREPARED ON THE BASIS THAT ANY OFFER OF THE NOTES IN THE EEA WILL ONLY BE MADE TO A LEGAL ENTITY WHICH IS AN EU QUALIFIED INVESTOR. ACCORDINGLY, ANY PERSON MAKING OR INTENDING TO MAKE AN OFFER IN THE EEA OF THE NOTES WHICH ARE THE SUBJECT OF THE OFFERING CONTEMPLATED IN THIS OFFERING MEMORANDUM MAY ONLY DO SO WITH RESPECT TO EU QUALIFIED INVESTORS. NEITHER THE ISSUER, THE DEPOSITOR NOR ANY INITIAL PURCHASER HAS AUTHORIZED, NOR DO THEY AUTHORIZE, THE MAKING OF ANY OFFER OF NOTES IN THE EEA OTHER THAN TO EU QUALIFIED INVESTORS.

**MiFID II Product Governance**

ANY DISTRIBUTOR SUBJECT TO MIFID II THAT IS OFFERING, SELLING OR RECOMMENDING THE NOTES IS RESPONSIBLE FOR UNDERTAKING ITS OWN TARGET MARKET ASSESSMENT IN RESPECT OF THE NOTES AND DETERMINING APPROPRIATE DISTRIBUTION CHANNELS FOR THE PURPOSES OF THE MIFID II PRODUCT GOVERNANCE RULES UNDER THE DELEGATED DIRECTIVE. NEITHER THE ISSUER, THE DEPOSITOR NOR (EXCEPT AS REGARDS ITSELF OR AGENTS ACTING ON ITS BEHALF, TO THE EXTENT RELEVANT) ANY INITIAL PURCHASER MAKES ANY REPRESENTATION OR WARRANTY AS TO A DISTRIBUTOR'S COMPLIANCE WITH THE DELEGATED DIRECTIVE.

### INFORMATION AS TO PLACEMENT IN THE UNITED STATES

THIS OFFERING MEMORANDUM IS HIGHLY CONFIDENTIAL AND HAS BEEN PREPARED BY THE ISSUER SOLELY FOR USE IN CONNECTION WITH THE SALE OF THE NOTES. EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF AND

DOES NOT CONSTITUTE AN OFFER TO ANY OTHER PERSON OR TO THE PUBLIC GENERALLY TO SUBSCRIBE FOR OR OTHERWISE ACQUIRE THE NOTES.  DISTRIBUTION OF THIS OFFERING MEMORANDUM TO ANY PERSONS OTHER THAN THE OFFEREE AND THOSE PERSONS, IF ANY, RETAINED TO ADVISE SUCH OFFEREE WITH RESPECT THERETO IS UNAUTHORIZED AND ANY DISCLOSURE OF ANY OF THEIR CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF THE ISSUER, IS PROHIBITED.  EACH PROSPECTIVE INVESTOR IN THE UNITED STATES, BY ACCEPTING DELIVERY OF THIS OFFERING MEMORANDUM, AGREES TO THE FOREGOING.

THE NOTES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE SECURITIES ACT, OR ANY STATE SECURITIES LAW.  EACH INVESTOR IN THE OFFERED NOTES MUST BE A "QUALIFIED INSTITUTIONAL BUYER" UNDER RULE 144 UNDER THE SECURITIES ACT OR, IN THE CASE OF INITIAL SALES OF THE NOTES, AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT.  FOR A DESCRIPTION OF CERTAIN RESTRICTIONS ON TRANSFER, SEE "NOTICE TO INVESTORS".

## EU SECURITIZATION REGULATION AND UK SECURITIZATION REGULATION

NONE OF THE SPONSOR, THE DEPOSITOR, ANY ORIGINATOR, THE ISSUER, THE INDENTURE TRUSTEE, THE INITIAL PURCHASERS, THEIR RESPECTIVE AFFILIATES NOR ANY OTHER PARTY TO THE TRANSACTIONS DESCRIBED IN THIS OFFERING MEMORANDUM INTENDS, OR WILL BE REQUIRED UNDER THE TRANSACTION DOCUMENTS, TO RETAIN A MATERIAL NET ECONOMIC INTEREST IN THE SECURITIZATION CONSTITUTED BY THE ISSUANCE OF THE NOTES, OR TO TAKE ANY OTHER ACTION WITH REGARD TO SUCH TRANSACTION, IN A MANNER PRESCRIBED OR CONTEMPLATED BY THE EU SECURITIZATION REGULATION OR THE UK SECURITIZATION REGULATION.  IN PARTICULAR, NO SUCH PERSON UNDERTAKES TO TAKE ANY ACTION, OR REFRAIN FROM TAKING ANY ACTION, FOR PURPOSES OF, OR IN CONNECTION WITH, COMPLIANCE BY ANY PERSON WITH ANY APPLICABLE REQUIREMENT OF, THE EU SECURITIZATION REGULATION OR THE UK SECURITIZATION REGULATION.  IN ADDITION, THE ARRANGEMENTS DESCRIBED UNDER "U.S. CREDIT RISK RETENTION" HAVE NOT BEEN STRUCTURED WITH THE OBJECTIVE OF ENSURING COMPLIANCE BY ANY PERSON WITH ANY APPLICABLE REQUIREMENT OF THE EU SECURITIZATION REGULATION OR THE UK SECURITIZATION REGULATION.  CONSEQUENTLY, THE NOTES MAY NOT BE A SUITABLE INVESTMENT FOR INVESTORS WHO ARE SUBJECT TO THE EU SECURITIZATION REGULATION OR THE UK SECURITIZATION REGULATION.  PROSPECTIVE INVESTORS SHOULD REFER FOR FURTHER INFORMATION TO "RISK FACTORS—EU SECURITIZATION REGULATION AND UK SECURITIZATION REGULATION".

## AVAILABLE INFORMATION

TO PERMIT COMPLIANCE WITH RULE 144A IN CONNECTION WITH THE SALE OF THE NOTES, THE ISSUER, UPON THE REQUEST OF A NOTEHOLDER OR NOTE OWNER, WILL BE REQUIRED TO FURNISH TO THAT NOTEHOLDER OR NOTE OWNER AND ANY PROSPECTIVE INVESTOR DESIGNATED BY SUCH NOTEHOLDER OR NOTE OWNER THE INFORMATION REQUIRED TO BE DELIVERED UNDER RULE 144A(D)(4) UNDER THE SECURITIES ACT IF AT THE TIME OF THE REQUEST THE ISSUER IS NOT A REPORTING COMPANY UNDER SECTION 13 OR SECTION 15(D) OF THE EXCHANGE ACT, OR EXEMPT FROM REPORTING PURSUANT TO RULE 12G3-2(B) UNDER THE EXCHANGE ACT.

## IMPORTANT NOTICE ABOUT INFORMATION IN THIS OFFERING MEMORANDUM

THE NOTES DO NOT REPRESENT OBLIGATIONS OF TRICOLOR, THE DEPOSITOR, THE INDENTURE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES (OTHER THAN THE ISSUER).  THE NOTES ARE NOT INSURED OR GUARANTEED BY ANY GOVERNMENTAL AGENCY OR INSTRUMENTALITY, OR BY ANY OTHER PERSON OR ENTITY.  THE NOTES ARE PAYABLE SOLELY FROM THE ASSETS OF THE ISSUER, AND PROSPECTIVE INVESTORS SHOULD MAKE AN INVESTMENT DECISION BASED UPON AN ANALYSIS OF THE SUFFICIENCY OF THE FOREGOING.

THIS OFFERING MEMORANDUM HAS BEEN PREPARED FROM INFORMATION FURNISHED BY THE DEPOSITOR AND TRICOLOR AND FROM OTHER SOURCES.  NOTWITHSTANDING ANY INVESTIGATION THAT THE INITIAL PURCHASERS MAY HAVE CONDUCTED WITH RESPECT TO THE INFORMATION CONTAINED HEREIN, THE INITIAL PURCHASERS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.  NOTHING HEREIN SHALL BE DEEMED TO CONSTITUTE SUCH A REPRESENTATION OR WARRANTY AS TO THE FUTURE PERFORMANCE OF TRICOLOR, THE DEPOSITOR, THE INDENTURE TRUSTEE, THE CUSTODIAN, THE OWNER TRUSTEE, THE BACKUP SERVICER, THE ISSUER, THE RECEIVABLES OR THE NOTES.  THE DELIVERY OF THIS OFFERING MEMORANDUM AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION CONCERNING THE NOTES OTHER THAN AS CONTAINED HEREIN AND, IF GIVEN OR MADE, ANY SUCH OTHER INFORMATION OR REPRESENTATION SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED.

THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM IS FURNISHED ON A CONFIDENTIAL BASIS AND MAY NOT BE REPRODUCED IN WHOLE OR IN PART.

THIS OFFERING MEMORANDUM IS PERSONAL TO THE PROSPECTIVE INVESTOR AND HAS BEEN PREPARED BY THE DEPOSITOR SOLELY FOR USE IN CONNECTION WITH THE OFFERING OF THE NOTES.  DELIVERY OF THIS OFFERING MEMORANDUM TO ANY PERSON OTHER THAN THE PROSPECTIVE INVESTOR AND THOSE PERSONS, IF ANY, RETAINED TO ADVISE SUCH PROSPECTIVE INVESTOR WITH RESPECT TO THE POSSIBLE OFFER AND SALE OF THE NOTES IS UNAUTHORIZED, AND ANY DISCLOSURE OF ANY OF ITS CONTENTS IS STRICTLY PROHIBITED.  A PROSPECTIVE INVESTOR SHALL NOT BE ENTITLED TO, AND MUST NOT RELY ON, THIS OFFERING MEMORANDUM UNLESS IT WAS FURNISHED TO SUCH PROSPECTIVE INVESTOR DIRECTLY BY THE DEPOSITOR OR ITS AGENTS.  EACH PROSPECTIVE INVESTOR, BY ACCEPTING DELIVERY OF THIS OFFERING MEMORANDUM, AGREES (i) TO COMPLY WITH THE FOREGOING, (ii) NOT TO MAKE COPIES OF THIS OFFERING MEMORANDUM, (iii) NOT TO FURNISH THIS OFFERING MEMORANDUM OR ITS CONTENTS TO ANY OTHER PERSON (OTHER THAN ITS ADVISERS AS AFORESAID) AND (iv) TO RETURN THIS OFFERING MEMORANDUM TO THE DEPOSITOR OR AN INITIAL PURCHASER IMMEDIATELY UPON REQUEST.

THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM.

BY ACCEPTING DELIVERY OF THIS OFFERING MEMORANDUM, EACH PROSPECTIVE INVESTOR REPRESENTS THAT IT HAS SUFFICIENT KNOWLEDGE AND EXPERIENCE IN FINANCIAL AND BUSINESS MATTERS TO BE ABLE TO EVALUATE THE RISKS AND MERITS OF THE INVESTMENT REPRESENTED BY THE PURCHASE OF THE NOTES.  THE PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES.

EACH PURCHASER OF NOTES MUST COMPLY WITH ALL APPLICABLE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION IN WHICH IT PURCHASES, OFFERS OR SELLS SUCH NOTES AND MUST OBTAIN ANY CONSENT, APPROVAL OR PERMISSION REQUIRED FOR THE

7

PURCHASE, OFFER OR SALE BY IT OF THE NOTES UNDER THE LAWS AND REGULATIONS IN FORCE IN ANY JURISDICTION TO WHICH IT IS SUBJECT OR IN WHICH IT MAKES SUCH PURCHASES, OFFERS OR SALES AND NEITHER INITIAL PURCHASER SHALL HAVE ANY RESPONSIBILITY THEREFOR.

THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THE NOTES NOR AN OFFER OF THE NOTES TO ANY PERSON IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER WOULD BE UNLAWFUL.

UNDER CERTAIN CIRCUMSTANCES, AN INVESTMENT IN THE NOTES BY OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN OR OTHER RETIREMENT ARRANGEMENT SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE INTERNAL REVENUE CODE MIGHT GIVE RISE TO A PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA AND MIGHT BE SUBJECT TO EXCISE TAX UNDER SECTION 4975 OF THE INTERNAL REVENUE CODE. ACCORDINGLY, INVESTORS WILL BE DEEMED OR REQUIRED TO MAKE CERTAIN REPRESENTATIONS REGARDING ERISA, SECTION 4975 OF THE INTERNAL REVENUE CODE AND ANY APPLICABLE SIMILAR LAW. NEITHER THE CLASS E NOR THE CLASS F NOTES MAY BE PURCHASED BY SUCH PLANS OR BY BENEFIT PLAN ENTITIES SUBJECT TO SIMILAR LAW. SEE "NOTICE TO INVESTORS" AND "ERISA CONSIDERATIONS".

THE OBLIGATIONS OF THE PARTIES TO THE TRANSACTIONS REFERRED TO HEREIN ARE SET FORTH IN, AND GOVERNED BY, THE TRANSACTION DOCUMENTS DESCRIBED HEREIN, AND ALL OF THE STATEMENTS AND INFORMATION CONTAINED HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO SUCH TRANSACTION DOCUMENTS. THIS OFFERING MEMORANDUM CONTAINS SUMMARIES, WHICH THE DEPOSITOR BELIEVES TO BE ACCURATE, OF CERTAIN OF THE TRANSACTION DOCUMENTS, BUT FOR A COMPLETE DESCRIPTION OF THE RIGHTS AND OBLIGATIONS SUMMARIZED HEREIN, REFERENCE IS HEREBY MADE TO THE ACTUAL TRANSACTION DOCUMENTS.

_____

## READING THIS OFFERING MEMORANDUM

This Offering Memorandum provides information about the Issuer and the terms and conditions that apply to the Notes. We suggest that you read this Offering Memorandum in its entirety.

We include cross-references to sections herein where you can find further related discussions. Refer to the Table of Contents to locate the referenced sections.

The Glossary lists definitions of certain terms used in this Offering Memorandum.

You should rely only on information on the Notes provided in this Offering Memorandum. We have not authorized anyone to provide you with different information.

_____

## FORWARD-LOOKING STATEMENTS

Any projections, expectations and estimates contained in this Offering Memorandum are not purely historical in nature but are forward-looking statements based upon information and certain assumptions that Tricolor and the Depositor consider reasonable, subject to uncertainties as to circumstances and events that have not as yet taken place and are subject to material variation. None of Tricolor, the Depositor or the Issuer has any obligation to update or otherwise revise any forward-looking statements, including statements regarding changes in economic conditions, portfolio or receivable performance or other circumstances or developments that may arise after the date of this Offering Memorandum.

_____

8

**NOTICE TO INVESTORS**

Because of the following restrictions, each investor is advised to consult legal counsel prior to making an offer, resale, pledge or other transfer of the Notes.  The Notes have not been and will not be registered under the Securities Act or the securities laws of any jurisdiction.  Consequently, the Notes are not transferable other than pursuant to an exemption from the registration requirements of the Securities Act and satisfaction of certain other provisions of the Indenture.  Resales of the Notes may be made only pursuant to Rule 144A.

The Notes offered and sold to QIBs in reliance on Rule 144A initially will be represented by one or more Rule 144A Global Notes.  The Notes offered and sold to IAIs will be represented by one or more IAI Global Notes.

Any ownership interest represented by a beneficial interest in a Rule 144A Global Note or IAI Global Note may be transferred to another entity who wishes to hold the Notes in the form of a beneficial interest in a Rule 144A Global Note; provided, that the applicable transferor and transferee are deemed to have represented and warranted that such transfer is being made to a transferee that the transferor reasonably believes is a QIB in a transaction meeting the requirements of Rule 144A.

Each purchaser of Notes, other than the Initial Purchasers, will be deemed to have represented and agreed as follows (terms used herein that are defined in Rule 144A or Regulation D are used herein as defined therein):

(1)      It is (i)(a) a "qualified institutional buyer" within the meaning of Rule 144A purchasing for its own account or for the account of another QIB or (b) only in the case of the initial investors in the Notes purchasing pursuant to the offering made under this Offering Memorandum, an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act purchasing for its own account and (ii) aware that the sale of the Notes to it is being made in reliance on Rule 144A or another exemption from the registration requirements of the Securities Act.

(2)      It understands that (i) the Notes have not been and will not be registered under the Securities Act or registered or qualified under any applicable State securities laws, (ii) none of the Issuer, the Indenture Trustee, the Note Registrar nor any other entity will be obligated to register or qualify the Notes and (iii) no interest in the Notes may be reoffered, resold, pledged or otherwise transferred unless (a) such Notes are registered pursuant to the Securities Act and registered or qualified pursuant to any applicable State securities laws or (b) such interest is reoffered, resold, pledged or otherwise transferred to (1) a person whom the holder desiring to effect such transfer reasonably believes is a QIB in a transaction meeting the requirements of Rule 144A purchasing for its own account or the account of a QIB, whom the holder has informed that the reoffer, resale, pledge or other transfer is being made in reliance on Rule 144A, or (2) the Issuer and its affiliates.

(3)      Each transferee with respect to the Class F Notes agrees and acknowledges that no legal or beneficial interest in all or any portion of any such Class F Note may be transferred directly or indirectly to an individual, corporation, partnership or other person unless such transferee provides the Note Registrar and paying agent with a properly completed IRS Form W-9, and/or such other form and information, in each case satisfactory to the Note Registrar and paying agent, that no United States federal income tax withholding is required on payments to the Class F Noteholders; and if such form or other information is not provided, then any such purported transfer shall be void and of no effect.  Each Noteholder of a Class F Note must be a United States person as defined in Section 7701(a)(30) of the Internal Revenue Code and provide an IRS Form W-9 as requested by the paying agent or as otherwise required under the Indenture.  The paying agent shall not make payments to foreign holders or foreign entities of Class F Notes at any time from the Receivables.  Notwithstanding any provision to the contrary herein, no sale or transfer of a Class E Note or Class F Note shall be permitted (including by pledge or hypothecation), and no such sale or transfer shall be effective under the Indenture if the sale or transfer thereof increases the number of beneficial owners of the Certificates, Class E Noteholders and Class F Noteholders, collectively, to more than 95.  If a Noteholder or Note Owner of a Class E Note or Class F Note is a Flow-Through Entity, by its purchase of a Class E Note and/or Class F Note it shall be deemed to represent that (i) less than 50% of the value of the assets owned by such Flow-Through Entity

9

are comprised of Certificates, Class E Notes and Class F Notes and (ii) it is not a principal purpose of the Flow-Through Entity holding the Class E Note and/or Class F Note to satisfy the 95-holder limitation set forth above. In addition, each Noteholder or Note Owner of a Class E Note or Class F Note will be deemed to represent that no special allocation of income, gain, loss, deduction or credit from the Class E Notes and/or Class F Notes will be made among the beneficial owners of such Flow-Through Entity. If a purchaser of a Class E Note or a Class F Note is acting as a nominee or in a similar capacity, it represents and agrees that no beneficial owner for which it is acting as a nominee owns less than the minimum denomination for such Note.

(4)     With respect to Notes other than the Class E Notes and the Class F Notes, either (i) it is not and, so long as it holds such Notes or any interest therein, will not be an "employee benefit plan" subject to the fiduciary responsibility provisions of Title I of ERISA, a plan, individual retirement account or other arrangement that is subject to Section 4975 of the Internal Revenue Code or Similar Laws, or an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement or any person who is directly or indirectly purchasing or holding such Notes or interest therein on behalf of, as fiduciary of, as trustee of, or with assets of any such plan, account or arrangement or (ii) its purchase, holding and disposition of such Notes or any interest therein do not and will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code or a violation of any applicable Similar Laws. With respect to the Class E Notes and the Class F Notes, it is not and, so long as it holds such Notes or any interest therein, will not be an "employee benefit plan" subject to the fiduciary responsibility provisions of Title I of ERISA, a plan, individual retirement account or other arrangement that is subject to Section 4975 of the Internal Revenue Code or Similar Laws, or an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement or any person who is directly or indirectly purchasing or holding such Notes or interest therein on behalf of, as fiduciary of, as trustee of, or with assets of any such plan, account or arrangement. See *"ERISA Considerations"*.

(5)     It understands that all Global Notes will bear a legend to the following effect, unless the Note Registrar determines otherwise in accordance with the Indenture and in compliance with applicable law:

"THIS NOTE HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. THE HOLDER HEREOF, BY PURCHASING THIS NOTE OR AN INTEREST THEREIN, IS DEEMED TO REPRESENT TO THE ISSUER, TRICOLOR AUTO RECEIVABLES 2 LLC (THE "DEPOSITOR") AND THE INDENTURE TRUSTEE THAT IT (A) IS A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QIB") AND IS ACQUIRING SUCH NOTE FOR ITS OWN ACCOUNT OR AS A FIDUCIARY OR AGENT FOR OTHERS (WHICH OTHERS ALSO ARE QIBS) TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A OR (B) ONLY IN THE CASE OF THE INITIAL INVESTORS IN THE NOTES, IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT (AN "ACCREDITED INVESTOR") AND IS ACQUIRING SUCH NOTE FOR ITS OWN ACCOUNT.

NO SALE, PLEDGE OR OTHER TRANSFER OF THIS NOTE MAY BE MADE BY ANY PERSON UNLESS (A) SUCH NOTES ARE REGISTERED PURSUANT TO THE SECURITIES ACT AND REGISTERED OR QUALIFIED PURSUANT TO ANY APPLICABLE STATE SECURITIES LAWS OR (B) SUCH INTEREST IS SOLD, PLEDGED OR TRANSFERRED (1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QIB PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QIB IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, WHOM THE HOLDER HAS INFORMED THAT THE OFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A OR (2) TO THE ISSUER AND ITS AFFILIATES

10

PURSUANT TO THE INDENTURE.  SUCH HOLDER IS DEEMED TO AGREE THAT IT WILL DELIVER TO EACH PERSON TO WHOM THIS NOTE OR AN INTEREST HEREIN IS TO BE TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.  THE INDENTURE CONTAINS A PROVISION REQUIRING THAT ANY TRANSFER NOT IN COMPLIANCE WITH THE FOREGOING IS NOT TO BE GIVEN EFFECT.  EACH TRANSFEREE ACCEPTING A BENEFICIAL INTEREST IN THIS NOTE PURSUANT TO CLAUSE (B)(1) ABOVE IS DEEMED TO REPRESENT TO THE ISSUER, THE DEPOSITOR AND THE INDENTURE TRUSTEE THAT IT IS A QIB PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF ANOTHER QIB.

EACH NOTEHOLDER OR NOTE OWNER, BY ACCEPTANCE OF THIS NOTE OR AN INTEREST IN THIS NOTE, WILL BE DEEMED TO HAVE AGREED TO PROVIDE THE ISSUER AND THE INDENTURE TRUSTEE WITH SUCH NOTEHOLDER TAX IDENTIFICATION INFORMATION AND, TO THE EXTENT APPLICABLE, SUCH NOTEHOLDER FATCA INFORMATION AS REQUIRED UNDER THE INDENTURE.  IN ADDITION, EACH HOLDER OF THIS NOTE OR AN INTEREST HEREIN WILL BE DEEMED TO UNDERSTAND THAT THE INDENTURE TRUSTEE AND ANY OTHER AGENT OF THE ISSUER MAY WITHHOLD INTEREST AND PRINCIPAL PAYABLE WITH RESPECT TO THIS NOTE (WITHOUT ANY CORRESPONDING GROSS-UP) ON ANY NOTEHOLDER OR BENEFICIAL OWNER OF AN INTEREST IN THIS NOTE TO THE EXTENT REQUIRED BY APPLICABLE LAW IN THE EVENT SUCH HOLDER OR OWNER FAILS TO COMPLY WITH THE FOREGOING REQUIREMENTS.”

(6)     With respect to all classes of Notes other than the Class E Notes and the Class F Notes, it understands that such Notes will bear a legend to the following effect, unless the Note Registrar determines otherwise in accordance with the Indenture and in compliance with applicable law:

“THE HOLDER OF THIS NOTE OR ANY INTEREST HEREIN WILL BE DEEMED TO HAVE REPRESENTED THAT EITHER (A) IT IS NOT AND, SO LONG AS IT HOLDS THIS NOTE OR ANY INTEREST HEREIN, WILL NOT BE, AN “EMPLOYEE BENEFIT PLAN” SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED (“ERISA”), A PLAN, INDIVIDUAL RETIREMENT ACCOUNT OR OTHER ARRANGEMENT THAT IS SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE “INTERNAL REVENUE CODE”), OR PROVISIONS UNDER ANY OTHER FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAWS OR REGULATIONS THAT ARE SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE INTERNAL REVENUE CODE (COLLECTIVELY, “SIMILAR LAWS”), OR AN ENTITY WHOSE UNDERLYING ASSETS ARE CONSIDERED TO INCLUDE “PLAN ASSETS” OF ANY SUCH PLAN, ACCOUNT OR ARRANGEMENT (EACH, A “PLAN”), OR ANY PERSON WHO IS DIRECTLY OR INDIRECTLY PURCHASING OR HOLDING THIS NOTE OR ANY INTEREST HEREIN ON BEHALF OF, AS FIDUCIARY OF, AS TRUSTEE OF, OR WITH ASSETS OF ANY PLAN OR (B) THE PURCHASE, HOLDING AND DISPOSITION OF THIS NOTE OR ANY INTEREST HEREIN DOES NOT AND WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE INTERNAL REVENUE CODE OR A SIMILAR VIOLATION OF ANY APPLICABLE SIMILAR LAWS.”

(7)     With respect to the Class E Notes and the Class F Notes, it understands that such Notes will bear a legend to the following effect, unless the Note Registrar determines otherwise in accordance with the Indenture and in compliance with applicable law:

“THE HOLDER OF THIS NOTE OR ANY INTEREST HEREIN WILL BE DEEMED TO HAVE REPRESENTED THAT IT IS NOT AND, SO LONG AS IT HOLDS THIS NOTE OR ANY INTEREST HEREIN, WILL NOT BE, AN “EMPLOYEE BENEFIT PLAN” SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF TITLE I OF THE EMPLOYEE

11

RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN, INDIVIDUAL RETIREMENT ACCOUNT OR OTHER ARRANGEMENT THAT IS SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), OR PROVISIONS UNDER ANY OTHER FEDERAL, STATE, LOCAL, NON-U.S. OR OTHER LAWS OR REGULATIONS THAT ARE SIMILAR TO THE PROHIBITED TRANSACTION PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE INTERNAL REVENUE CODE, OR AN ENTITY WHOSE UNDERLYING ASSETS ARE CONSIDERED TO INCLUDE "PLAN ASSETS" OF ANY SUCH PLAN, ACCOUNT OR ARRANGEMENT (EACH, A "PLAN"), OR ANY OTHER PERSON WHO IS DIRECTLY OR INDIRECTLY PURCHASING OR HOLDING THIS NOTE OR ANY INTEREST HEREIN ON BEHALF OF, AS FIDUCIARY OF, AS TRUSTEE OF, OR WITH ASSETS OF ANY PLAN."

(8)     With respect to the Class F Notes, it understands that such Notes will bear a legend to the following effect, unless the Note Registrar determines otherwise in accordance with the Indenture and in compliance with applicable law:

"THIS NOTE MAY ONLY BE TRANSFERRED OR HELD BY A BENEFICIAL OWNER THAT IS A UNITED STATES PERSON WITHIN THE MEANING OF CODE SECTION 7701(A)(30) ("UNITED STATES PERSON").  THE PROSPECTIVE BENEFICIAL OWNER OF THIS NOTE WILL BE DEEMED TO HAVE REPRESENTED, WARRANTED AND COVENANTED THAT (A) IT IS A UNITED STATES PERSON, (B) IT WILL NOT USE SUCH NOTE AND WILL NOT ALLOW SUCH NOTE TO BE USED AS COLLATERAL FOR THE ISSUANCE OF ANY SECURITIES THAT COULD CAUSE THE ISSUER TO BECOME TAXABLE AS A CORPORATION FOR U.S. FEDERAL INCOME TAX PURPOSES AND (C) IT WILL NOT TAKE ANY ACTION AND WILL NOT ALLOW ANY ACTION TO BE TAKEN THAT COULD CAUSE THE ISSUER TO BECOME TAXABLE AS A CORPORATION FOR U.S. FEDERAL INCOME TAX PURPOSES.  ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE."

(9)     With respect to all Notes other than the Class F Notes, it acknowledges that such Notes will bear a legend to the following effect, unless the Note Registrar determines otherwise in accordance with this Indenture and in compliance with Applicable Law:

"THE FAILURE TO PROVIDE THE ISSUER AND THE INDENTURE TRUSTEE WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE, OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN THE IMPOSITION OF U.S. FEDERAL WITHHOLDING OR BACK-UP WITHHOLDING UPON PAYMENTS TO THE HOLDER IN RESPECT OF THIS NOTE."

(10)    It has been furnished with all requested information regarding (a) the Notes and distributions thereon, (b) the Indenture and (c) all related matters.

_____

### AVAILABLE INFORMATION

Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the

Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available.  Questions and requests for information may be directed to:

<table>
<tr><td>Tricolor Auto Acceptance, LLC</td><td>J.P. Morgan Securities LLC</td></tr>
<tr><td>6021 Connection Drive, 4th Floor</td><td>383 Madison Avenue, 8th Floor</td></tr>
<tr><td>Irving, Texas 75039</td><td>New York, New York 10179</td></tr>
<tr><td>(214) 271-0640</td><td>(212) 834-4154</td></tr>
</table>

In addition, the Depositor will provide without charge to each holder of Notes, on request of any such Noteholder, copies of the Transaction Documents.  Requests for such copies should be directed to the Depositor at its address above.

To permit compliance with Rule 144A in connection with resales of the Notes, the Depositor (on behalf of the Issuer) will furnish upon request to a holder and to any prospective purchaser designated by that holder, the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request, the Issuer is not a reporting company under Section 13 or Section 15(d) of the Exchange Act.

The Depositor has furnished or will furnish a Form ABS-15G to the SEC pursuant to Rule 15Ga-2 of the Exchange Act, which is available on the SEC's internet site under the Depositor's CIK number which is 0001757871.

**TRANSACTION OVERVIEW**

This transaction overview briefly describes certain major structural components, the relationship among the parties and the flow of funds prior to the acceleration of the Notes after the occurrence of an Event of Default (other than an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty by the Issuer). It does not contain all of the information that you need to consider in making your investment decision. You should carefully read this entire Offering Memorandum.

**Structural Diagram**



_____
* The Certificates are not being offered hereby.

14

**Flow of Funds**

The following chart provides a simplified overview of the priority of distributions that are applicable on each Distribution Date for so long as the Notes have not been accelerated following the occurrence of an Event of Default (other than an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty by the Issuer).  Except in the limited circumstances described in this Offering Memorandum, principal payments on the Notes will be paid sequentially, first, to the Class A Notes until they have been paid in full, second, to the Class B Notes until they have been paid in full, third, to the Class C Notes until they have been paid in full, fourth, to the Class D Notes until they have been paid in full, fifth, to the Class E Notes until they have been paid in full and sixth, to the Class F Notes until they have been paid in full.  See *"Summary—Priority of Distributions"*, *"Description of the Notes—Payments of Principal"* and *"Application of Available Funds—Distributions"*.



15

## SUMMARY

This summary describes the main terms of the offering of the Notes.  This summary does not contain all of the information that may be important to you.  To fully understand the terms of the offering of the Notes, you need to read this Offering Memorandum in its entirety.

**Principal Parties**

*Issuer*

Tricolor Auto Securitization Trust 2022-1, a Delaware statutory trust.  The Issuer will issue the Notes.  The Issuer will be the sole party responsible for the payment of the Notes.  The Issuer's principal assets will be a pool of sub-prime motor vehicle retail installment sale contracts secured by used automobiles, light-duty trucks, sport utility vehicles and vans and certain rights under the Transaction Documents to which it is a party.  The Initial Receivables will be acquired by the Issuer on the Closing Date and the Subsequent Receivables are expected to be acquired on subsequent dates during the Prefunding Period.

*Depositor*

Tricolor Auto Receivables 2 LLC, a Delaware limited liability company that is a wholly owned subsidiary of Tricolor Auto Acceptance, LLC.  The Depositor will sell the Receivables to the Issuer.

*Sponsor, Servicer and Administrator*

Tricolor Auto Acceptance, LLC, a Delaware limited liability company that is a wholly-owned indirect subsidiary of Tricolor Holdings, LLC, a Delaware limited liability company.  Tricolor is the Sponsor of the transaction described herein.  Tricolor purchased or will purchase the Receivables from the Originators and will sell them to the Depositor.  Tricolor will service the Receivables on behalf of the Issuer and will perform administrative obligations of the Issuer under the Transaction Documents.

*Originators*

The Receivables were or will be originated by Tricolor Auto Group, LLC, Tricolor California Auto Group, LLC and Flexi Compras, LLC.  Each Originator is a Delaware limited liability company that is a wholly-owned indirect subsidiary of Tricolor Holdings and an affiliate of Tricolor.

*Indenture Trustee and Custodian*

Wilmington Trust, National Association, a national banking association, will serve as Indenture Trustee pursuant to the Indenture and as Custodian pursuant to the Sale and Servicing Agreement.

*Backup Servicer*

Vervent Inc., a Delaware corporation, will serve as Backup Servicer pursuant to the Sale and Servicing Agreement.  The Backup Servicer will receive monthly pool data, confirm certain data on the monthly Investor Reports and, unless another Successor Servicer is appointed pursuant to the Sale and Servicing Agreement, the Backup Servicer will be obligated to become Successor Servicer if Tricolor resigns or is terminated as Servicer for any reason.

*Owner Trustee*

Wilmington Trust Company, a Delaware trust company, will serve as Owner Trustee pursuant to the Trust Agreement.

**Terms of the Securities**

*The Notes*

The Issuer will issue six classes of asset backed notes pursuant to the Indenture.  The Notes will be designated as the "Class A Notes", the "Class B Notes", the "Class C Notes", the "Class D Notes", the "Class E Notes" and the "Class F Notes".

Each class of Notes will have the initial principal amount, Interest Rate and Final Scheduled Distribution Date listed below:

| Class | Initial Principal Amount | Interest Rate | Final Scheduled Distribution Date |
|---|---|---|---|
| Class A | $125,560,000 | 3.30% | February 18, 2025 |
| Class B | $13,470,000 | 4.34% | May 15, 2025 |
| Class C | $13,980,000 | 4.71% | August 15, 2025 |
| Class D | $25,140,000 | 5.38% | January 15, 2026 |
| Class E | $21,160,000 | 7.79% | August 16, 2027 |
| Class F | $12,820,000 | 9.80% | July 16, 2029 |

The Notes will bear interest at the rates set forth above and interest will be calculated in the manner described below under *"—Interest Rates"*.

Each class of Notes will be issued in book-entry form. The Class A Notes, Class B Notes, Class C Notes and Class D Notes will be issued in minimum denominations of $100,000 and integral multiples of $1,000 in excess thereof. The Class E Notes will be issued in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof. The Class F Notes will be issued in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof. The Depositor or an affiliate thereof may initially retain some or all of one or more classes of Notes.

The Notes will be secured solely by a pool of subprime motor vehicle retail installment sale contracts and the other assets of the Issuer which are described below under *"—Property of the Issuer"*.

### The Certificates

The Issuer will issue Tricolor Auto Securitization Trust 2022-1 Certificates to the Depositor or an affiliate thereof. The Certificates are not being offered by this Offering Memorandum. The Certificates will not have a principal balance and will not bear interest. Any information provided in this Offering Memorandum regarding the characteristics of the Certificates is provided only to enhance your understanding of the Notes. All distributions in respect of the Certificates will be subordinated to payments on the Notes.

**Important Dates**

### Initial Cutoff Date

The Cutoff Date with respect to the Initial Receivables (*i.e.*, the Receivables transferred to the Issuer on the Closing Date) will be the close of business on March 31, 2022. The Issuer will be entitled to all amounts collected on or in respect of the Initial Receivables after the Initial Cutoff Date.

### Subsequent Cutoff Date

The Cutoff Date with respect to Subsequent Receivables (*i.e.*, the Receivables transferred to the Issuer during the Prefunding Period) will be the opening of business on the day that is four Business Days prior to the related date of transfer.

The Issuer will receive amounts collected on or in respect of the Receivables after their respective Cutoff Dates.

### Closing Date

The Closing Date will be on or about May 4, 2022.

### Distribution Dates

The 15th day of each month (or, if the 15th day is not a Business Day, the next succeeding Business Day). The first Distribution Date will be May 16, 2022.

### Record Dates

On each Distribution Date, the Issuer will make payments to holders of the Notes as of the related Record Date. The Record Date will be the Business Day immediately preceding such Distribution Date (or in the case of the first Distribution Date, the Closing Date) or, if the Notes have been issued in fully registered, certificated form, the last Business Day of the preceding month.

### Collection Period

The Collection Period for each Distribution Date will be the calendar month immediately preceding the calendar month in which that Distribution Date occurs or, for the first Distribution Date, the period beginning at the Initial Cutoff Date and ending at the close of business on April 30, 2022.

**Interest Rates**

The Issuer will pay interest on each class of Notes at the rate specified above under *"—Terms of the Securities—The Notes"* on each Distribution Date. Interest will accrue on a "30/360" basis and will accrue from and including the 15th day of the calendar month preceding a Distribution Date (or from and including the Closing Date, in the case of the first Distribution Date) to but excluding the 15th day of the calendar month in which such Distribution Date occurs (assuming each month has 30 days).

The holders of the Notes of each class will receive accrued interest at the Interest Rate for that class.

Interest payments on the Notes will be paid sequentially in alphabetical order (*i.e.*, first to the Class A Notes, second to the Class B Notes, third to the Class C Notes, fourth to the Class D Notes, fifth to the Class E Notes and sixth to the Class F Notes). Interest accrued but not paid on any Distribution Date will be due on the immediately succeeding Distribution Date, together with, to the extent permitted by applicable law, interest on that unpaid interest at the related Interest Rate.

17

**Principal Payments**

On each Distribution Date prior to the acceleration of the Notes and the occurrence of an Event of Default (other than an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty of the Issuer) under the Indenture, from the amounts allocated to the holders of the Notes to pay principal described in clauses (4), (6), (8), (10), (12), (14) and (16) below under *"—Priority of Distributions"*, the Issuer will pay principal of the Notes in the following order of priority:

(1)    *first,* to the Class A Notes until they have been paid in full;

(2)    *second,* to the Class B Notes until they have been paid in full;

(3)    *third,* to the Class C Notes until they have been paid in full;

(4)    *fourth,* to the Class D Notes until they have been paid in full;

(5)    *fifth,* to the Class E Notes until they have been paid in full; and

(6)    *sixth,* to the Class F Notes until they have been paid in full.

If a Distribution Date is a Final Scheduled Distribution Date for a class of Notes as specified above under *"—Terms of the Securities—The Notes"*, all principal and interest with respect to such class of Notes will be payable in full (if not previously paid).

Principal payments on the Notes will be paid sequentially in alphabetical order (*i.e.*, first to the Class A Notes, second to the Class B Notes, third to the Class C Notes, fourth to the Class D Notes, fifth to the Class E Notes and sixth to the Class F Notes), except that if the amount on deposit in the Prefunding Account at the end of the Prefunding Period exceeds $100,000, such remaining Prefunding Account funds will be distributed pro rata as principal payments on the Notes. Accordingly, if due to losses, insufficient Net Liquidation Proceeds and Recoveries or otherwise, the property of the Issuer proves to be insufficient to repay the principal of the Notes in full, it is possible that certain classes of Notes with higher payment priorities will be paid, partially or in full, and that the losses will be fully borne by the classes of Notes with lower payment priorities (*i.e.*, with a lower

alphabetical order beginning with the most junior class of Notes then outstanding).

If the Notes are accelerated following the occurrence of an Event of Default, the Issuer will pay principal of the Notes as described below under *"—Priority of Distributions"*.

**Priority of Distributions**

On each Distribution Date, unless the Notes have been accelerated following the occurrence of an Event of Default (other than an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty of the Issuer), Available Funds for the related Collection Period, consisting of (i) Available Collections received on or in respect of the Receivables during such Collection Period and (ii) any amounts withdrawn from the Reserve Fund in respect of the Required Payment Amount, will be distributed in the following amounts and order of priority:

(1)    pro rata, to (a) the Servicer, the Total Servicing Fee for the related Collection Period and, to the extent the Servicer has not reimbursed itself or to the extent not retained by the Servicer, other amounts relating to mistaken deposits, postings or checks returned for insufficient funds (including Collateral Protection Insurance Payments), (b) any Successor Servicer, Transition Costs not to exceed $150,000 (including boarding fees) in the aggregate for all Distribution Dates, and (c) the State of Texas, any Texas Deferred Sales Tax Payments due to the State of Texas;

(2)    to the extent not previously paid by the Servicer, pro rata, to the Trustees, the Custodian and the Backup Servicer, any accrued and unpaid fees, expenses and indemnities then due to them, in each case including without limitation, amounts from prior years which were in excess of the applicable cap or annual limit for any calendar year or otherwise not paid; provided, that such expenses and indemnities shall be subject to an aggregate limit for any calendar year equal to (x) $210,000 for the Owner Trustee, the Indenture Trustee and the Custodian, collectively, and (y) $40,000 for the Backup Servicer;

(3)    to pay interest due on the Class A Notes;

(4)    to pay principal in an amount equal to the amount by which the Class A Note Balance exceeds the sum of the Pool Balance (*i.e.,* the aggregate Principal Balance of the Receivables) and, during the Prefunding Period, the amount on deposit in

18

the Prefunding Account, in each case as of the last day of the related Collection Period; provided, however, that on and after the Final Scheduled Distribution Date for the Class A Notes, such amount will not be less than the amount that is necessary to reduce the Class A Note Balance to zero;

(5)    to pay interest due on the Class B Notes;

(6)    to pay principal, after giving effect to any principal payments made under clause (4) above, in an amount equal to the amount by which the sum of the Class A Note Balance and the Class B Note Balance exceeds the sum of the Pool Balance and, during the Prefunding Period, the amount on deposit in the Prefunding Account, in each case as of the last day of the related Collection Period; provided, however, that on and after the Final Scheduled Distribution Date for the Class B Notes, such amount will not be less than the amount that is necessary to reduce the Class B Note Balance to zero;

(7)    to pay interest due on the Class C Notes;

(8)    to pay principal, after giving effect to any principal payments made under clauses (4) and (6) above, in an amount equal to the amount by which the sum of the Class A Note Balance, the Class B Note Balance and the Class C Note Balance exceeds the sum of the Pool Balance and, during the Prefunding Period, the amount on deposit in the Prefunding Account, in each case as of the last day of the related Collection Period; provided, however, that on and after the Final Scheduled Distribution Date for the Class C Notes, such amount will not be less than the amount that is necessary to reduce the Class C Note Balance to zero;

(9)    to pay interest due on the Class D Notes;

(10)    to pay principal, after giving effect to any principal payments made under clauses (4), (6) and (8) above, in an amount equal to the amount by which the sum of the Class A Note Balance, the Class B Note Balance, the Class C Note Balance and the Class D Note Balance exceeds the sum of the Pool Balance and, during the Prefunding Period, the amount on deposit in the Prefunding Account, in each case as of the last day of the related Collection Period; provided, however, that on and after the Final Scheduled Distribution Date for the Class D Notes, such amount will not be less than the amount that is

necessary to reduce the Class D Note Balance to zero;

(11)    to pay interest due on the Class E Notes;

(12)    to pay principal, after giving effect to any principal payments made under clauses (4), (6), (8) and (10) above, in an amount equal to the amount by which the sum of the Class A Note Balance, the Class B Note Balance, the Class C Note Balance, the Class D Note Balance and the Class E Note Balance exceeds the sum of the Pool Balance and, during the Prefunding Period, the amount on deposit in the Prefunding Account, in each case as of the last day of the related Collection Period; provided, however, that on and after the Final Scheduled Distribution Date for the Class E Notes, such amount will not be less than the amount that is necessary to reduce the Class E Note Balance to zero;

(13)    to pay interest due on the Class F Notes;

(14)    to pay principal, after giving effect to any principal payments made under clauses (4), (6), (8), (10) and (12) above, in an amount equal to the amount by which the sum of the Class A Note Balance, the Class B Note Balance, the Class C Note Balance, the Class D Note Balance, Class E Note Balance and the Class F Note Balance exceeds the sum of the Pool Balance and, during the Prefunding Period, the amount on deposit in the Prefunding Account, in each case as of the last day of the related Collection Period; provided, however, that on and after the Final Scheduled Distribution Date for the Class F Notes, such amount will not be less than the amount that is necessary to reduce the Class F Note Balance to zero;

(15)    the amount, if any, necessary to fund the Reserve Fund up to the Reserve Fund Required Amount, into the Reserve Fund;

(16)    to pay principal, after giving effect to any principal payments made under clauses (4), (6), (8), (10), (12) and (14) above, in an amount equal to the lesser of (a) the Note Balance of the Notes and (b) the amount by which (i) the sum of the Note Balance of the Notes and the Target Overcollateralization Amount, described below under *"—Credit Enhancement— Overcollateralization"*, exceeds (ii) the Pool Balance and, during the Prefunding Period, the amount on deposit in the Prefunding Account, in

19

each case as of the last day of the related Collection Period;

(17) pro rata, based on amounts due, any fees, expenses, indemnities and Transition Costs then due to the Trustees, the Custodian, the Backup Servicer and any Successor Servicer in excess of any applicable caps or annual limitations on such amounts described in clauses (1) and (2) above; and

(18) any remaining amounts pro rata, to the holders of the Risk Retained Certificates and the Non-Risk Retained Certificates, according to their respective Certificate Percentage Interests.

For purposes of these distributions of principal on any Distribution Date, except as otherwise set forth above, the principal amount of a class of Notes will be calculated as of the immediately preceding Distribution Date after giving effect to all payments made on such preceding Distribution Date, or, in the case of the first Distribution Date, as of the Closing Date.

All amounts distributed in respect of principal of the Notes will be paid in the manner and priority described above under *"—Principal Payments"*.

If the Notes are accelerated following the occurrence of an Event of Default, the fees, expenses and indemnities of the Trustees, the Custodian and the Backup Servicer will be payable in full prior to the payment of interest or principal on the Notes.

On each Distribution Date following the acceleration of the Notes after the occurrence of an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty of the Issuer, Available Funds will be distributed as described above, except that the amount of principal distributed pursuant to clause (16) will also include all remaining Available Funds until all Notes have been paid in full and there will be no limitation of expenses, indemnities and Transition Costs under clauses (1) and (2), above.

On each Distribution Date following the acceleration of the Notes after the occurrence of an Event of Default (other than an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty of the Issuer), Available Funds will be paid as described under *"Application of Available Funds— Distributions—After the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant,*

*Agreement, Representation or Warranty of the Issuer)".*

**Credit Enhancement**

*General*

Credit enhancement for the Notes will consist of overcollateralization, excess spread, the Reserve Fund and subordination of each class of subordinated Notes, if any, that is junior in its right to receive payments of principal and interest to such class of Notes.

If Available Collections and any available credit enhancement, are insufficient to make required payments of principal on the Notes, losses will be borne in reverse order of payment priority (*i.e.*, starting with the most junior class of Notes then outstanding). The seniority of the Notes will be determined based on alphabetical order, with the Class A Notes being the most senior class of Notes and the Class F Notes being the most junior class of Notes.

In addition, except in the limited circumstances described in this Offering Memorandum, each class of subordinated Notes will only receive principal payments after each class of Notes senior to that class of Notes has been paid in full, exposing such subordinated Noteholders to potential losses.

*Overcollateralization*

Overcollateralization represents the amount by which the Pool Balance (plus, during the Prefunding Period, the amount on deposit in the Prefunding Account) exceeds the Note Balance of the Notes. On the Closing Date, the initial amount of overcollateralization will be equal to approximately $35,500,481 (*i.e.*, approximately 17.30% of the Initial Cutoff Date Pool Balance).

As more fully described under *"Description of the Notes—Credit Enhancement—Overcollateralization",* on each Distribution Date, excess cash flow, if any, will be available after any required deposit to the Reserve Fund to build and maintain the Target Overcollateralization Amount. The Target Overcollateralization Amount on any Distribution Date will equal 19.30% of the sum of (a) the Initial Cutoff Date Pool Balance and (b) the aggregate Principal Balance of all Subsequent Receivables as of the applicable Subsequent Cutoff Dates.

*Excess Spread*

Excess spread for a Collection Period will generally equal (i) the amount of interest collections on the Receivables during such Collection Period minus (ii) the sum of Senior Issuer Expenses, interest payments on the Notes and the amount, if any, required to be deposited into the Reserve Fund so that the amount on deposit therein equals the Reserve Fund Required Amount on the related Distribution Date. To the extent available, any excess spread will be applied on each Distribution Date to make payments of principal on the Notes to the extent necessary to reach and maintain the Targeted Overcollateralization Amount.

*Reserve Fund*

The Servicer will establish with the Indenture Trustee, in the name of the Issuer for the benefit of the Noteholders, a Reserve Fund that will be initially funded on the Closing Date with a deposit by the Depositor of an amount equal to approximately $3,078,067 (*i.e.,* approximately 1.50% of the Initial Cutoff Date Pool Balance). On each Subsequent Receivables Purchase Date, the Depositor will deposit into the Reserve Fund an amount equal to 1.50% of the Principal Balance of the related Subsequent Receivables as of the related Subsequent Cutoff Date.

If Available Collections for any Distribution Date are insufficient to cover the sum of (i) Senior Issuer Expenses (excluding any amounts owed to Tricolor or an affiliate thereof), (ii) interest on the Notes, (iii) the amount necessary to reduce (a) the Note Balance of the Notes to (b) the sum of the Pool Balance and the amount, if any, on deposit in the Prefunding Account in each case as of the last day of the related Collection Period, and (iv) the amount necessary to reduce the principal amount of any class of Notes to zero on its Final Scheduled Distribution Date, amounts on deposit in the Reserve Fund will be withdrawn to cover such shortfall.

On each Distribution Date, Available Collections remaining after payment of the amounts described in clauses (1) through (14) above under *"—Priority of Distributions"* will be deposited into the Reserve Fund to maintain the Reserve Fund Required Amount. The Reserve Fund Required Amount will equal 1.50% of the sum of (i) the Initial Cutoff Date Pool Balance and (ii) the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; provided, that the amount on deposit in the Reserve Fund will not exceed the Note Balance of the Notes after giving effect to the payments described in

clauses (1) through (14) above under *"—Priority of Distributions"*. On any Distribution Date on which the amount on deposit in the Reserve Fund, together with Available Collections, equals or exceeds the sum of the Note Balance of the Notes, accrued and unpaid interest thereon and all Issuer Expenses, all such amounts will be applied up to the amounts necessary to retire the Notes and pay all such fees, expenses and indemnities.

*Subordination*

Each class of Notes that is lower in priority of payment provides credit support to those classes of Notes having higher priority of payment relative to that class. Consequently, to the extent that the assets of the Issuer do not generate enough cash to satisfy the Issuer's obligations, any resulting losses will be absorbed as follows:

(1)    *first*, by the holders of the Class F Notes, to the extent then outstanding;

(2)    *second*, by the holders of the Class E Notes, to the extent then outstanding;

(3)    *third*, by the holders of the Class D Notes, to the extent then outstanding;

(4)    *fourth*, by the holders of the Class C Notes, to the extent then outstanding;

(5)    *fifth*, by the holders of the Class B Notes, to the extent then outstanding; and

(6)    *sixth*, by the holders of the Class A Notes, to the extent then outstanding.

**Optional Redemption**

The Servicer will have the option to purchase the Receivables on any Distribution Date following the last day of a Collection Period as of which the Note Balance is 10.0% or less of the initial Note Balance of the Notes as of the Closing Date. The purchase price will not be less than an amount that, together with other Available Funds, equals or exceeds the Note Balance of the Notes, accrued and unpaid interest thereon and all Issuer Expenses without regard to any related caps and annual limitations.

**Events of Default**

Events of Default under the Indenture will consist of:

- a default in the payment of interest on the Controlling Class of Notes subject to a cure period of five days;

- a default in the payment of the principal of any Note on its Final Scheduled Distribution Date;

- a default in the observance or performance of any other material covenant or agreement of the Issuer made in the Indenture (other than a default in the payment of the interest or principal on any Note when due, subject to the grace period described above for payment of interest) and such default not having been cured for a period of 30 days (or for such longer period, not in excess of 60 days, as may be reasonably necessary to remedy such default; provided, that such default is capable of remedy within 60 days) after written notice thereof has been given to the Issuer by the Depositor or the Indenture Trustee or to the Issuer, the Depositor and the Indenture Trustee by the holders of Notes evidencing not less than 25% of the Note Balance of the Controlling Class of Notes;

- any representation or warranty made by the Issuer in the Indenture or in any certificate delivered pursuant thereto or in connection therewith having been incorrect in any material adverse respect as of the time made and such incorrectness not having been cured for a period of 30 days (or for such longer period, not in excess of 60 days, as may be reasonably necessary to remedy such default; provided, that such default is capable of remedy within 60 days) after written notice thereof has been given to the Issuer by the Depositor or the Indenture Trustee or to the Issuer, the Depositor and the Indenture Trustee by the holders of Notes evidencing not less than 25% of the Note Balance of the Controlling Class of Notes; and

- certain events of bankruptcy, insolvency, receivership or liquidation of the Issuer or its property.

The Controlling Class of Notes will be the class of Notes with the highest alphabetical designation. Thus, the Controlling Class of Notes will be (i) the Class A Notes so long as any Class A Notes are outstanding, (ii) if no Class A Notes are outstanding, the Class B Notes so long as any Class B Notes are outstanding, (iii) if no Class A Notes or Class B Notes are outstanding, the Class C Notes so long as any Class C Notes are outstanding, (iv) if no Class A Notes, Class B Notes or Class C Notes are outstanding, the Class D Notes so long as any Class D Notes are outstanding, (v) if no Class A Notes, Class B Notes, Class C Notes or Class D Notes are outstanding, the Class E Notes so long as any Class E Notes are outstanding, and (vi) if no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes are outstanding, the Class F Notes so long as any Class F Notes are outstanding.

**Property of the Issuer**

*General*

The property of the Issuer will primarily include a pool of sub-prime motor vehicle retail installment sale contracts, which are secured by used automobiles, light-duty trucks, sport utility vehicles and vans, collections on or in respect of the Receivables received after the applicable Cutoff Date, security interests in the related Financed Vehicles, certain rights under the Transaction Documents to which it is a party and all proceeds of the foregoing. See *"The Trust Property"* for a further description of the assets of the Issuer.

*The Receivables*

The Receivables have been or will be (in the case of the Subsequent Receivables) originated by the Originators in accordance with Tricolor's credit policies. The Receivables have been or will have been made primarily to borrowers who have experienced prior credit difficulties, a limited or adverse credit history or low income.

*Initial Receivables*

The aggregate principal balance as of the Initial Cutoff Date of the Initial Receivables sold to the Issuer on the Closing Date will be approximately $205,204,481. The composition of the Initial Receivables as of the Initial Cutoff Date was as follows:

| | |
|---|---|
| Aggregate Principal Balance: | $205,204,480.60 |
| Number of Receivables: | 9,500 |
| Average Amount Financed: | $22,737.06 |
| Average Principal Balance: | $21,600.47 |
| Average Principal Balance (Range) | $4,065.23 to $38,476.11 |
| Weighted Average Contract Rate[(1)]: | 15.89% |
| Contract Rate (Range): | 6.88% to 25.91% |
| Weighted Average Original Term[(1)]: | 58 months |
| Original Term (Range): | 36 months to 71 months |
| Weighted Average Remaining Term[(1)(2)]: | 54 months |
| Remaining Term (Range)[(2)]: | 17 months to 73 months |
| Weighted Average Wholesale LTV[(1)(3)] | 126.66% |
| Non-Zero Weighted Average FICO® Score[(1)(4)]: | 600 |

[(1)]  Weighted by the Principal Balance as of the Initial Cutoff Date.
[(2)]  Based on the number of scheduled monthly payments remaining.
[(3)]  The wholesale loan-to-value ratio, or Wholesale LTV, is calculated using the total Amount Financed, which may include taxes, title fees and ancillary products over the value of the Financed Vehicle at the time the motor vehicle is financed. The Financed Vehicle value at origination is determined by using NADA or Kelly Blue Book "Trade-In" prices, or, in certain cases, vehicle sales price, for used motor vehicles. Wholesale LTV was not available or could not be calculated on certain Receivables at the time of application.
[(4)]  FICO® scores generated by credit reporting agencies. Tricolor utilizes TransUnion, Equifax or Experian credit reports depending on location of the obligor. FICO® scores were unavailable for some obligors at the time of application of the related Receivable. The FICO® score with respect to any Receivable with co-obligors is the primary obligor's FICO® score at the time of application. FICO® is a registered trademark of Fair Isaac & Co.

### Subsequent Receivables

During the Prefunding Period, the Issuer may use the funds, if any, on deposit in the Prefunding Account to acquire additional Receivables from the Depositor for an amount equal to the product of 82.70% and the aggregate Principal Balance of such Subsequent Receivables as of the related Subsequent Cutoff Date on each Subsequent Receivables Purchase Date, which shall occur no more than once per week. In addition, on each Subsequent Receivables Purchase Date, the Depositor will also deposit an amount equal to the product of 1.50% and the Principal Balance of each Subsequent Receivable as of the related Subsequent Cutoff Date into the Reserve Fund, which will be deemed to be a capital contribution to the Issuer.

Subsequent Receivables must meet the eligibility criteria that will be specified in the Receivables Purchase Agreement and in the Sale and Servicing Agreement as described herein.

### Prefunding Account and Prefunding Period

On the Closing Date, the Prefunding Account Deposit, equal to $42,426,000 of the net proceeds from the sale of the Notes, will be deposited in the Prefunding Account. This amount will represent approximately 16.54% of the sum of (i) the Initial Cutoff Date Pool Balance and (ii) the expected aggregate initial principal balance of the Subsequent Receivables as of their related Subsequent Cutoff Dates.

During the Prefunding Period, the Issuer may use the funds, if any, on deposit in the Prefunding Account to acquire additional Receivables from the Depositor as specified under "—Subsequent Receivables" above. The Prefunding Period will begin on the Closing Date and will end on the earliest to occur of:

- July 31, 2022;

- the date on which the amount in the Prefunding Account is less than $100,000; and

- the occurrence of an Event of Default or Event of Servicing Termination.

On the first Distribution Date following the end of the Prefunding Period, the Indenture Trustee at the direction of the Issuer will withdraw any funds remaining on deposit in the Prefunding Account and distribute them as principal payments, to the Noteholders, pursuant to the Sale and Servicing Agreement. If such remaining funds are less than or equal to $100,000, they will be paid to Noteholders sequentially; however, if such remaining funds exceed $100,000, they will be distributed pro rata to each class of Notes (based on the initial Note Balance of each class of Notes as of the Closing Date) as principal payments on each class of the Notes.

### Servicing and Servicer Compensation

Tricolor's responsibilities as Servicer will include, among other things, collection of payments, realization on the Receivables and the Financed Vehicles, selling or otherwise disposing of Defaulted Receivables, monitoring the performance of the Receivables and remitting Texas Deferred Sale Tax Payments to the State of Texas.

The Servicer will receive the following fees as payment for its services on each Distribution Date:

(1)    A Servicing Fee, equal to the product of (a) the Pool Balance as of the beginning of the related

23

Collection Period (or, in the case of the first Distribution Date, as of the Initial Cutoff Date), (b) 3.00% and (c) 1/12; and

(2)    A Supplemental Servicing Fee, equal to all administrative fees, expenses and charges paid by or on behalf of obligors, including late fees, prepayment fees and liquidation fees collected on the Receivables during the related Collection Period (exclusive of fees or expenses related to extensions or restructures).

## Ratings

It is a condition to issuance that each class of Notes shall receive at least the following ratings by Kroll Bond Rating Agency, LLC:

| Class | Rating |
|-------|--------|
| Class A | AAA (sf) |
| Class B | AA- (sf) |
| Class C | A (sf) |
| Class D | BBB (sf) |
| Class E | BB (sf) |
| Class F | B+ (sf) |

A rating is not a recommendation to purchase, hold or sell the related Notes, inasmuch as a rating does not comment as to market price or suitability for a particular investor.  The ratings of the Notes address the likelihood of the payment of principal of and interest on the Notes according to their terms.  A rating agency rating the Notes may, in its discretion, lower or withdraw its rating in the future as to any class of Notes.  No party to the Transaction Documents will be responsible for monitoring any changes to the ratings on the Notes.

## Tax Status

In the opinion of Sidley Austin LLP, for United States federal income tax purposes, (i) the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes will, and the Class E Notes should, be characterized as debt if and to the extent held by one or more persons other than the beneficial owner of the equity in the Issuer or by an affiliate of such beneficial owner for such purposes, (ii) the Issuer will not be characterized as an association (or a publicly traded partnership) taxable as a corporation, and (iii) although the matter is not free from doubt, the Issuer should not be treated as engaged in a trade or business in the United States.  Sidley Austin LLP will not be opining on the likelihood as to whether the Class F Notes will be characterized as debt for United States federal income tax purposes.

If you purchase Notes, you agree by your purchase that you will treat the Notes as indebtedness for United States federal income tax purposes.

## ERISA Considerations

The Class A Notes, Class B Notes, Class C Notes and Class D Notes may generally be purchased by or with plan assets of employee benefit and other benefit plans and individual retirement accounts, subject to the considerations discussed under *"ERISA Considerations"*.  Investors who are employee benefit or other benefit plans or individual retirement accounts should consult their ERISA and tax advisors before making an investment in the Class A Notes, Class B Notes, Class C Notes or Class D Notes.  Neither the Class E Notes nor the Class F Notes may be purchased by or with plan assets of employee benefit or other benefit plans or individual retirement accounts subject to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code or to Similar Laws.  Each investing employee benefit or other benefit plan or individual retirement account, and each person investing on behalf of or with plan assets of such a plan, will be deemed to make certain representations.

## Certain Investment Company Act Considerations

The Issuer is being structured so as not to constitute a "covered fund" for purposes of the Volcker Rule under the Dodd-Frank Act.  In making this determination, the Issuer will be relying on the exclusion or exemption from the definition of "investment company" contained in Section 3(c)(5) of the Investment Company Act of 1940, as amended, although other exclusions or exemptions may also be available to the Issuer.

## U.S. Credit Risk Retention

The risk retention regulations in Regulation RR of the Exchange Act require Tricolor, in its capacity as Sponsor of the securitization transaction described in this Offering Memorandum, either directly or through its majority-owned affiliates, to retain an economic interest in the credit risk of the Receivables of at least 5.0%.  This credit risk retention requirement is expected to be met by the Depositor (as a wholly-owned subsidiary of the Sponsor) retaining a portion of the Certificates, which is intended to represent an "eligible horizontal residual interest" under Regulation RR.  See *"U.S. Credit Risk Retention"* for more information regarding the manner in which the risk retention regulations are expected to be satisfied.

**EU Securitization Regulation and UK Securitization Regulation**

None of the Sponsor, the Depositor, any Originator, the Issuer, the Indenture Trustee, the Initial Purchasers, their respective affiliates nor any other party to the transactions described in this Offering Memorandum intends, or will be required under the transaction documents, to retain a material net economic interest in the securitization constituted by the issuance of the Notes, or to take any other action with regard to such transaction, in a manner prescribed or contemplated by the EU Securitization Regulation or the UK Securitization Regulation.  In particular, no such person undertakes to take any action, or refrain from taking any action, for purposes of, or in connection with, compliance by any person with any applicable requirement of, the EU Securitization Regulation or the UK Securitization Regulation.  In addition, the arrangements described under *"U.S. Credit Risk Retention"* have not been structured with the objective of ensuring compliance by any person with any applicable requirement of the EU Securitization Regulation or the UK Securitization Regulation.

Consequently, the Notes may not be a suitable investment for investors who are subject to the EU Securitization Regulation or the UK Securitization Regulation.  As a result, the price and liquidity of the Notes in the secondary market may be adversely affected.

Prospective investors are responsible for analyzing their own legal and regulatory position and are advised to consult with their own advisors regarding the suitability of the Notes for investment and the scope, applicability and compliance requirements of the EU Securitization Regulation and the UK Securitization Regulation.  See *"Risk Factors — EU Securitization Regulation and UK Securitization Regulation".*

**RISK FACTORS**

You should consider the following risk factors prior to any purchase of Notes.

**The COVID-19 pandemic has affected the financial markets and may adversely affect the performance and market value of, and/or limit your ability to resell, your Notes. ......................**

The coronavirus (COVID-19) pandemic has adversely affected businesses, economies and financial markets worldwide, including adversely affecting the operations of businesses, decreasing consumer mobility and activity, disrupting supply chains and causing significant economic volatility and disruption of the international financial markets, resulting in increased market volatility and diminished economic growth expectations. The COVID-19 pandemic is causing significant uncertainty in the global financial markets, but it is not possible to predict the ultimate scope of the pandemic, including additional outbreaks or the ultimate effect it may have on the global economy or the global financial markets, including the economy or financial markets of the United States.

This pandemic has led (and may continue to lead) to a disruption in the United States economy of uncertain severity and duration, including widespread quarantines, business interruptions and closures, travel restrictions, employee furloughs and significantly increased unemployment. In many states and cities, the COVID-19 pandemic resulted in a virtual cessation of all non-essential economic activities as the federal government, as well as various state and local governments, adopted a number of emergency measures, declarations and recommendations, including providing social distancing guidelines, imposing "shelter-in-place" and "safer-at-home" directives and required the closure of certain non-essential businesses. While many of these activities have restarted and most of these restrictions have been eased, unemployment remains higher than pre-pandemic levels in certain areas of the United States while other areas are experiencing labor shortages, and large portions of the United States economy have not recovered to where they were prior to the onset of the COVID-19 pandemic. The COVID-19 pandemic (or any additional outbreaks or future epidemics or pandemics) could adversely affect the ability or willingness of obligors to pay their Receivables, as well as Tricolor's business, results of operation and financial condition (which, in turn, could adversely affect Tricolor's ability to service the Receivables) and could cause sustained increased volatility in or further disruption of the financial markets in the United States, which may continue for an extended period of time or indefinitely. Any of the foregoing events could result in losses on your Notes and/or affect your ability to resell your Notes.

In response to the COVID-19 pandemic, while the Federal Reserve has reduced benchmark interest rates and established business, consumer and employer financial assistance programs and the U.S. government has implemented other measures in response to the economic effects of the COVID-19 pandemic, including providing trillions of dollars in several relief packages, the likelihood or ability of such measures to reduce the volatility in the domestic financial markets or the effect of such measures on the longer-term national economic downturn cannot be predicted. Moreover, the economic output in the United States has been diminished by the COVID-19

pandemic, and no assurances can be given as to the timing or extent of recovery by the United States economy.

As a result of the COVID-19 pandemic and the resulting volatility in the economy, Tricolor experienced an increase in delinquencies on its total portfolio of motor vehicle installment sale contracts. Tricolor experienced an increase in requests for extensions and modifications early in the COVID-19 pandemic; however, the level of requests has since normalized and returned to pre-pandemic levels. Tricolor reviews each request individually and has granted a number of such requests. Further, Tricolor temporarily suspended involuntary repossession activities nationwide, but has since resumed repossession activity. Additionally, Tricolor modified its customary servicing practices by temporarily waiving late fees. Tricolor has since resumed its regular operation. Although the frequency of requests for extensions and modifications has declined, a worsening of the COVID-19 pandemic and future outbreaks, epidemics and pandemics may occur at any time, which could again lead to an increase in requests from obligors for extensions and modifications. The foregoing actions may negatively affect the cash generated by, and the timing of the receipt of, the Receivables and the Financed Vehicles.

As a result of the financial and economic disruptions related to the COVID-19 pandemic (including through additional outbreaks or other epidemics or pandemics), the future of delinquency rates and repossession rates are unclear and it is possible that losses may increase, while recovery rates on repossessed vehicles may decrease, in each case potentially significantly, over the historical delinquency and credit loss information and static pool information contained in this Offering Memorandum. It is also possible that a higher percentage of obligors will seek protection under applicable bankruptcy or debtor relief laws than Tricolor's historical experience. In the case of the Receivables, if not otherwise covered by applicable credit enhancement, these losses ultimately could affect the availability of funds for distribution to you.

The COVID-19 pandemic and ensuing economic and financial disruption have at times adversely affected both the supply of and demand for both new and used vehicles. Early in the COVID-19 pandemic, some state and local governments restricted the ability of motor vehicle loan servicers to repossess vehicles in the normal course of business. State and local governments also imposed restrictions that for a period of time substantially reduced the number of physical auctions of used vehicles, which in turn substantially reduced the number of, and prices for, vehicles sold at auction. The initial reduction of repossessions as a result of the COVID-19 pandemic and the limited availability of used car auctions for the sale of repossessed vehicles initially resulted in an industrywide delay in recoveries, as well as a decrease in the amount of recoveries, for defaulted motor vehicles. As a result, while the auction market has since recovered from a volume and pricing perspective, if Financed Vehicles are repossessed by Tricolor at a time while auction markets are not functioning fully, the resulting sale proceeds are likely to be lower than expected, which could result in increased losses on defaulted Receivables.

As a result of the foregoing, the historical delinquency and credit loss information appearing under *"Tricolor's Automobile Financing Program— Delinquency and Loss Information"* may not accurately predict the rates of delinquencies and credit losses that could occur with respect to the Receivables. In particular, unlike the relief options previously offered by

27

Tricolor in response to natural disasters that were relatively limited in geographic scope, the COVID-19 pandemic has affected obligors nationwide and it is possible that it will have a materially more significant effect on the performance of Tricolor's total portfolio of motor vehicle installment sale contracts for the retail financing of new and used motor vehicles.  The ultimate effect of the COVID-19 pandemic could ultimately exceed that of the most severe historical natural disasters reflected in the historical delinquency and credit loss information appearing in this Offering Memorandum.  Consequently, increased delinquencies and losses could be experienced by the Receivables, such increases could be substantial and payments on the Notes could be adversely affected.

Moreover, in addition to the foregoing, the COVID-19 pandemic (or future outbreaks or other epidemics or pandemics) may also have the effect of heightening many of the other risks in this section, including those relating to the ability of sub-prime obligors to make payments on the Receivables and the performance, geographic concentration of the obligors, market value, credit ratings and secondary market liquidity of the Notes.

**Changes in immigration patterns, policy and enforcement could adversely affect your Notes.......................**

Many of Tricolor's customers are immigrants and some may not be U.S. citizens.  Tricolor follows appropriate customer identification procedures as required by law, including accepting government issued picture identification that may be issued by non-U.S. governments, as permitted by the USA PATRIOT Act, but Tricolor does not verify the immigration status of its customers, which it believes is consistent with industry best practices and is not required by law and may be illegal in some States, including California.  In addition, in Texas and California, the two States in which Tricolor purchases the most auto receivables, a U.S. driver's license is not required to purchase and obtain a title and registration for a motor vehicle or obtain insurance covering the motor vehicle and in those states Tricolor does not require that the related obligor possesses a valid U.S. driver's license.

In addition, if Tricolor or its competitors receive negative publicity around making loans to undocumented immigrants, it may draw additional attention from regulatory bodies or consumer advocacy groups, all of which may adversely affect Tricolor's financial condition, business affairs or business prospects.  While Tricolor's credit models look to approve customers who have stability of residency and employment, it is possible that a significant change in immigration patterns, policy or enforcement could cause some obligors under the Receivables to emigrate from the U.S., either voluntarily or involuntarily, or slow the flow of new immigrants to the U.S.  Such emigration or reduction in immigration, as applicable, could result in increased delinquencies and losses on the Receivables or a decrease in future originations.  Changes in U.S. immigration laws or more vigorous enforcement of such laws by regulatory agencies, or changes in laws that make it more difficult or less desirable for immigrants to work in the U.S., could result in increased delinquencies and losses on the Receivables or a decrease in future originations.  There can be no assurance that a significant change in U.S. immigration patterns, policy, laws or enforcement will not occur.  Any such change could (i) have a material adverse effect on Tricolor's financial condition, business affairs or business prospects, which in turn could have a material adverse effect on its ability to meet its obligations under the

28

|  | Transaction Documents, and (ii) increase the likelihood that you may experience losses with respect to your Notes. |
|---|---|
| **Disruptions in loan servicing and collection activities performed by the Servicer's nearshore outsourcing center may adversely affect the servicing of the Receivables ......** | Tricolor performs most of its loan servicing and collections activities in its nearshore outsourcing center in Guadalajara, Mexico.  The call center in Guadalajara is connected to Tricolor's voice and data network which is hosted in Dallas, Texas with backup redundancy.  In the event of any disruption to its operations in Mexico, Tricolor can redirect all inbound and outbound call traffic immediately to its corporate headquarters in Dallas, Texas.  In the event the disruption was prolonged, Tricolor has an established relationship with a local staffing firm in order to rapidly increase its headcount in Dallas, Texas.  Depending on the severity and extent of the disruption, Tricolor may engage an alternative nearshore outsourcing partner in Mexico. Notwithstanding the foregoing, any disruption in the operations of the nearshore outsourcing center, for whatever reason, or delays in engaging the local staffing firm or an alternative nearshore outsourcing provider, could adversely affect the servicing of the Receivables, and subsequently could result in losses on your Notes. |
| **You may not be able to sell your Notes, and you may have to hold them to maturity even though you may want to sell ....................** | No secondary market for the Notes currently exists and the Initial Purchasers will not be obligated to establish a secondary market in the Notes.  The Initial Purchasers and other brokers and dealers may also be unwilling or unable to publish quotations for the Notes or otherwise facilitate trading of the Notes due to regulatory developments or otherwise.  Any secondary market maintained by an Initial Purchaser may be affected or terminated at any time. Irrespective of the effects of the COVID-19 pandemic, it is doubtful that a meaningful secondary market for your Notes will develop, or that, if one does develop, it will provide you with liquidity of investment or continue for the life of your Notes.  Additionally, deterioration in economic conditions in connection with weakening U.S., European and other world economies, high unemployment and job insecurity, rising government debt levels, the further withdrawal of government intervention in the financial markets, changes in expectations of inflation, economic dislocation and other unanticipated consequences resulting from Russia's invasion of Ukraine and potential political instability in other parts of the world, including Eastern Europe and Asia, could materially affect price volatility and liquidity of the Notes.  As a result, you must be prepared to bear the risk of holding the Notes for as long as they are outstanding.  Should you decide to sell your Notes, you may be unable to obtain the price that you wish to receive and you may suffer a loss. |
|  | While conditions in the financial markets and the secondary markets improved following the 2008 financial crisis and prior to the COVID-19 pandemic, there can be no assurance that future events will not occur that could similarly adversely affect the liquidity of the secondary market.  The COVID-19 pandemic has at times significantly reduced liquidity in the asset-backed securities secondary market.  If a lack of liquidity in the secondary market reoccurs, or continues for an extended period of time due to the |

COVID-19 pandemic, it could adversely affect the market value of your Notes and/or limit your ability to resell your Notes.

Restrictions on transfer may reduce liquidity. The Notes will not be registered under the Securities Act or qualified under any State or foreign securities laws. The Notes may not be resold except to qualified institutional buyers or to the Issuer and its affiliates. Each purchaser will be deemed to have made the representations set forth under *"Notice to Investors"*.

Over the past several years, the global financial markets have experienced increased volatility due to uncertainty surrounding the level and sustainability of the sovereign debt of various countries. Concerns regarding sovereign debt may spread to other countries at any time. There can be no assurance that this uncertainty relating to the sovereign debt of various countries will not lead to further disruption of the financial and credit markets in the United States, which could result in losses on your Notes.

Additionally, continuing events in the global financial markets, including the failure, acquisition or government seizure of several major financial institutions, the establishment of government bailout programs for financial institutions, problems related to subprime mortgages and other financial assets, the de-valuation of various assets in secondary markets, the forced sale of asset-backed and other securities as a result of the de-leveraging of structured investment vehicles, hedge funds, financial institutions and other entities, government regulation, increased capital requirements for financial institutions, the lowering of ratings on certain asset-backed securities and other market disruptions, such as those that have occurred, or may in future occur, as a result of the UK's withdrawal from the EU, or in connection with regional or worldwide epidemics or pandemics, have caused or may in the future cause a significant reduction in liquidity in the secondary market for asset-backed securities. Any of these events could affect the performance or market value of your Notes and your ability to sell your Notes in the secondary market. Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit or interest rate risk, such as the Notes.

**Principal may be paid on certain classes of Notes before interest is paid on other classes....................** If on any Distribution Date the outstanding principal amount of the Notes exceeds the Pool Balance as of the last day of the related Collection Period, a payment of principal, to the extent available, will be made to the holders of the most senior outstanding class or classes of Notes to eliminate that undercollateralization. Furthermore, if any class of Notes has an outstanding principal amount on its Final Scheduled Distribution Date, a payment of principal, to the extent available, will be made to the holders of that class of Notes on that Distribution Date to reduce its Note Balance to zero. Certain of these principal payments will be made before interest payments are made on certain subordinated classes of Notes on that Distribution Date. As a result, there may not be enough cash available to pay the interest on certain subordinated classes of Notes on that Distribution Date. The failure to pay interest on any subordinated class of Notes on any Distribution Date will not be an Event of Default unless such subordinated class of Notes is the controlling class of Notes on that Distribution Date (which will be the class of outstanding Notes with the highest alphabetical designation).

30

**You may suffer losses because you have limited control over the Issuer's actions and conflicts between classes of Notes may occur .................................** If an Event of Default under the Indenture has occurred and the Notes have been accelerated, the Indenture Trustee may, and at the direction of a specified percentage of the Controlling Class of Notes (which will be the class of outstanding Notes with the highest alphabetical designation) will, take one or more of the actions specified in the Indenture relating to the property of the Issuer.  In addition, the Majority Noteholders, or the Indenture Trustee acting on behalf of the Majority Noteholders, under certain circumstances, will have the right to waive Events of Servicing Termination or to terminate the Servicer.  The interests of the Controlling Class of Notes may differ from the interests of the other classes of Notes, and the holders of the Controlling Class of Notes will not be required to consider the effect of their actions on the holders of the other classes of Notes.  The holders of each class of subordinated Notes will have only limited rights to direct remedies under the Indenture and will not have the ability to waive Events of Servicing Termination or to terminate the Servicer until each class of Notes with a higher alphabetical designation has been paid in full.

**The Initial Purchasers and their respective affiliates may have conflicts of interest with the interests of Noteholders................** Affiliates of each of the Initial Purchasers have entered into, and the Initial Purchasers or one or more of their respective affiliates may subsequently from time to time enter into, credit facilities or other financial transactions with Tricolor or its affiliates.  The activities of the Initial Purchasers and their respective affiliates may result in certain conflicts of interest.  As a result of any such relationships, and prospective relationships, the interests of an Initial Purchaser and its affiliates may not be aligned with the interests of Noteholders.  The Initial Purchasers and their respective affiliates may also invest or take long or short positions in securities or instruments, including the Notes, that may be different from positions held by other Noteholders.  Any voting or consent rights could be exercised by them in a manner that may be adverse to your interests as a Noteholder of one or more classes of the Notes.  In addition, the ownership of any Notes by an Initial Purchaser or its affiliates could adversely affect the development of a market for such Notes. If any of this were to occur, the interests of the Initial Purchasers and their respective affiliates may not be aligned with the interests of other Noteholders.

**The Issuer's assets are limited and are the only assets available to pay your Notes..........................** The Notes represent indebtedness of the Issuer and will not be insured or guaranteed by Tricolor, the Depositor, any of their respective affiliates or any other person or entity.  The only source of payment on your Notes will be Available Collections received on the Receivables and, if and to the extent available, the credit enhancement described in this Offering Memorandum.  Therefore, you must rely solely on the assets of the Issuer for repayment of your Notes.  If these assets are insufficient, you may suffer losses on your Notes.

31

**The Issuer's assets consist mainly of motor vehicle retail installment sale contracts made to sub-prime borrowers ...............**

The Issuer's assets consist mainly of sub-prime receivables originated under Tricolor's lending programs designed to serve consumers who have limited access to traditional motor vehicle financing. There is a high degree of risk associated with sub-prime borrowers. The typical sub-prime borrower may have had previous financial difficulties, a limited or adverse credit history or low income and/or an inability to provide adequate down payments. Because the motor vehicle retail installment sale contracts constituting the Receivables were or will be made to consumers who are unable to meet the credit standards imposed by most traditional motor vehicle financing sources, Tricolor charges interest on the Receivables at higher rates than those charged by many traditional financing sources. While Tricolor's underwriting guidelines are designed to establish that, notwithstanding such factors, the obligor is a reasonable credit risk under their existing circumstances, receivables of sub-prime borrowers such as those securing the Notes therefore entail significantly higher risk and are likely to experience higher levels of delinquencies, defaults and net losses than contracts made with borrowers who are not sub-prime borrowers. In addition, the typical Tricolor borrower possesses less and sometimes far less or even no previous financial history than would normally be the case for other typical subprime borrowers.

The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts. Additionally, credit scores purport only to be a measurement of the relative degree of risk a borrower represents to a lender (*i.e.,* a borrower with a higher credit score is statistically expected to be less likely to default than a borrower with a lower score). Neither the Depositor, Tricolor nor any other party to the Transaction Documents will make any representation or warranty as to any obligor's current credit score (or whether any previous credit score accurately reflects such obligor's current financial situation), the performance of his or her Receivable or that a particular credit score should be relied upon as a basis for an expectation that a Receivable will be paid in accordance with its terms. Consequently, no accurate prediction can be made of how the Receivables will perform based on credit scores or other similar measures.

**Market factors may reduce the value of used Financed Vehicles, which could result in increased losses on the Receivables ..............**

Vehicles that are repossessed are typically sold at vehicle auctions as used vehicles. The pricing of used vehicles is affected by supply and demand for such vehicles, which in turn is affected by consumer tastes, economic factors, fuel costs, the introduction and pricing of new car models and other factors, such as the introduction of new vehicle sales incentives, manufacturer recalls and legislation relating to emissions and fuel efficiency. Decisions by a manufacturer with respect to new vehicle production, pricing and incentives may affect used vehicle prices, particularly those for the same or similar models. Adverse conditions affecting one or more automotive manufacturers, including the temporary suspension of manufacturing as a result of the COVID-19 pandemic (including as a result of disruptions in the supply chain) and recalls, may negatively affect used vehicle prices for vehicles manufactured by that company. Certain actions that manufacturers may take

32

or have taken, such as General Motors' elimination of its Saturn and Pontiac brands, may adversely affect consumer demand for, and values of, used motor vehicles produced by these companies, which may depress the prices at which repossessed motor vehicles may be sold or delay the timing of these sales. Early in the COVID-19 pandemic, many motor vehicle dealerships were required to temporarily close or restrict their operations and consumer demand for both new and used vehicles has varied. A decrease in demand for used vehicles, including if an unusually high number of used vehicles come off lease in a particular period, or decline in the prices at which the related vehicles may be sold relative to current vehicle prices, is likely to result in increased losses on the Receivables.

**Inadequate insurance on Financed Vehicles may cause losses on the Receivables** .............. Each Receivable requires the related obligor to maintain physical damage insurance that insures the obligor against loss or damage to the related Financed Vehicle during the term of the Receivable. Obligors can elect to purchase collateral protection insurance from a third party provider in order to meet the requirements of the related Receivable. Tricolor monitors whether an obligor is maintaining the required insurance over the term of the related Receivable. In the event there is a lapse in coverage from an obligor's third party insurer, the Servicer may elect to force place collateral protection insurance coverage; however, the resulting premium will not be added to the Principal Balance of the related Receivable.

To the extent insurance coverage is not maintained by obligors or such coverage lapses, then insurance recoveries may be limited in the event of losses to a Financed Vehicle, which may affect the amount of Available Collections and may result in losses on your Notes.

**Vehicle recalls could adversely affect the performance of the Receivables** .................................. Obligors on Receivables secured by Financed Vehicles affected by a vehicle recall may be more likely to be delinquent in, or default on, payments on their Receivables. Significant increases in the inventory of used vehicles subject to a recall may also depress the prices at which repossessed vehicles may be sold or delay the timing of those sales. If the default rate on the Receivables increases and the price at which the related Financed Vehicles may be sold declines, you may experience losses with respect to your Notes. If any of these events materially affects collections on the Receivables, you may experience delays in payments or suffer losses on your Notes.

**Geographic concentrations of Receivables may increase concentration risks** ....................... Adverse economic conditions, including high unemployment, consumer perceptions of the economy, decreases in business activity, an increase in interest rates or an increase in inflation, high gas prices and energy costs, governmental directives or other factors, including natural disasters such as hurricanes, floods, fires and other extreme weather conditions, delays in tax refunds, acts of war, crime, terrorism, cyber-attacks, power outages, epidemics and pandemics, affecting any State or region could increase the delinquency, default or net loss experience of the Receivables if there is a significant concentration of Receivables relating to borrowers located in the affected State or region. Major medical expenses, divorce, death or other issues could affect borrowers' willingness or ability to make payments on their auto loans. In addition, there have been predictions that climate change

33

may lead to an increase in the frequency of natural disasters and extreme weather conditions, with certain states bearing a greater risk of the adverse effects of climate change, which could increase the risks related to geographic concentration of the Receivables.  Based on the Principal Balances of the Initial Receivables as of the Initial Cutoff Date, borrowers with respect to approximately 71.89% and 25.37% of the Initial Cutoff Date Pool Balance were located in the States of Texas and California, respectively.  Accordingly, adverse economic conditions or other factors, including hurricanes, floods and other extreme weather conditions and the effect of COVID-19 and other epidemics or pandemics, particularly affecting these States or other geographic regions could result in increased risk of losses on your Notes.  No other State accounts for more than 10.00% of the Initial Receivables by Principal Balance as of the Initial Cutoff Date.

**Excessive prepayments and defaults on Receivables with higher Contract Rates may adversely affect your Notes.......**

Interest collections that are in excess of the required interest payments on the Notes and required Issuer Expenses could be used to cover realized losses on Defaulted Receivables.  Interest collections depend among other things on the Contract Rate of the Receivables.  The Receivables have a range of Contract Rates.  Excessive prepayments and defaults on Receivables with relatively higher Contract Rates may adversely affect your Notes by reducing such available interest collections in the future.

**The Targeted Overcollateralization Amount may not be reached or maintained.....................................**

The amount of overcollateralization is expected to increase over time to the Target Overcollateralization Amount as excess collections are applied to make principal payments on the Notes in an amount greater than the decrease in the Principal Balances of the Receivables.  There can be no assurance, however, that Targeted Overcollateralization Amount will be reached or maintained or that the Receivables will generate sufficient collections to pay the Notes in full.  If the Targeted Overcollateralization Amount is not reached or maintained, you may experience losses with respect to your Notes.

**The amount on deposit in the Reserve Fund will be limited and subject to depletion.......................**

On each Distribution Date, the amount on deposit in the Reserve Fund will be used to fund the payment of Senior Issuer Expenses (excluding amounts due to Tricolor or an affiliate thereof) and monthly interest and distributions of principal to Noteholders to maintain parity and to pay off each class of Notes on its Final Scheduled Distribution Date if payments received on or in respect of the Receivables, including amounts recovered in connection with the repossession and sale of Financed Vehicles that secure Defaulted Receivables, are not sufficient to pay such amounts.  There can be no assurance, however, that the amount on deposit in the Reserve Fund will be sufficient on any Distribution Date to assure payment of your Notes.  If the Receivables experience higher losses than were projected in determining the amount required to be on deposit in the Reserve Fund, the amount on deposit in the Reserve Fund may be less than projected.  If collections on the Receivables, including any amounts allocable to overcollateralization, and the amount on deposit in the Reserve Fund are not sufficient on any Distribution Date to pay in full Senior Issuer Expenses and the monthly interest and certain distributions of principal due on that Distribution Date, you may experience

34

payment delays with respect to your Notes.  If the amount of that insufficiency is not offset by excess collections on or in respect of the Receivables on subsequent Distribution Dates, you may experience losses with respect to your Notes.

**An economic downturn may adversely affect the performance of the Receivables .........................**

For several years following the 2008 financial crisis, the United States experienced a period of continued economic slowdown and may experience a similar period in the future.  The COVID-19 pandemic has greatly diminished economic output in the United States, and no assurances can be given as to what extent the United States economy will recover from the recession brought on by the COVID-19 pandemic.  Such periods may adversely affect the performance and market value of your Notes.  Increasing prices and inflation, high or rising unemployment and lack of available credit may lead to increased delinquencies, defaults, repossessions and losses on motor vehicle loans.  Such slowdowns may also be accompanied by decreased consumer demand for motor vehicles and declining values of motor vehicles, which could weaken collateral coverage and increase the amount of a loss upon an event of default by the obligor under the related Receivable.  Additionally, increases in the inventory of used motor vehicles during a continued period of economic slowdown could also depress the prices at which repossessed motor vehicles may be sold.

High gasoline prices, unstable real estate values, reset of adjustable rate mortgages to higher interest rates, increasing unemployment levels, general levels of availability of consumer credit or other factors that affect consumer confidence or disposable income could also increase loss frequency and decrease consumer demand for motor vehicles as well as weaken collateral values on certain types of motor vehicles.  Because Tricolor focuses predominantly on sub-prime borrowers, the actual rates of delinquencies, defaults, repossessions and losses on the Receivables are likely to be higher than those experienced in the general motor vehicle finance industry and could be dramatically affected by a general economic downturn.

In addition to an economic slowdown, the asset-backed securities market, along with credit markets in general, may experience disruptions.  These disruptions could result in the tightening of the credit markets, which may slow the expected rate of prepayment of Receivables generally.  If losses on the Receivables increase and the expected rate of prepayment decreases, the yields on the Notes will be relatively more sensitive to losses on the Receivables.  If the actual rate and amount of losses exceed your expectations, the yield to maturity on your Notes may be lower than anticipated, and you could suffer a loss.

The continuing effect of the COVID-19 pandemic, as well as any future outbreaks or other epidemics or pandemics, could adversely affect delinquencies and losses on the Receivables, and subsequently could result in losses on your Notes.

**You may experience a loss on your Notes as the result of armed conflict and terrorist activities.....**

The long-term economic effect of the United States' military operations in the Middle East and other parts of the world, as well as the possible response to these operations, terrorist activities and tensions in those and other regions of the world, including Europe and in Asia, remains uncertain but could have a material adverse effect on general economic conditions, consumer confidence,

35

market liquidity and the performance of the Receivables.  You should consider the possible effects of these events on the delinquency, default and prepayment experience of the Receivables.  Under the Servicemembers Civil Relief Act, members of the military on active duty, including reservists, who have entered into an obligation, such as a motor vehicle installment sales contract for the purchase of a vehicle, before entering into military service may be entitled to reductions in interest rates to 6% and a stay of foreclosure and similar actions.  In addition, pursuant to the laws of various States, including California, under certain circumstances payments on motor vehicle retail installment sale contracts such as the Receivables of residents of such States who are called into active duty with the National Guard or military reserves will automatically be deferred.  No information can be provided as to the number of Receivables that may be affected.  If an obligor's obligation to repay a Receivable is reduced, adjusted or extended, or if State legislation impairs the Servicer's ability to repossess the related Financed Vehicle during a borrower's period of active duty status, the Servicer will not be required to advance such amounts.  Any resulting shortfalls in interest or principal will reduce the amount available for distribution on your Notes.

**You may suffer losses if the Receivables are sold following an Event of Default** ............................

If the Notes have been accelerated following the occurrence of an Event of Default, the Indenture Trustee, acting at the direction of the holders of the Majority Noteholders, may sell the Receivables and prepay the Notes if certain conditions are satisfied as described under *"Description of the Notes – Rights Upon Event of Default"*.  If the proceeds from any such sale of the Receivables are insufficient to pay the full principal amount of your Notes, you may experience losses with respect to your Notes.

**The rate of prepayments on the Receivables could cause you to be paid earlier or later than you expect, which may adversely affect your yield to maturity** ........

Your Notes may amortize more quickly than expected for a variety of reasons.  All Receivables, by their terms, may be prepaid at any time.  Prepayments include:

- prepayments in whole or in part by the obligor;

- liquidations due to default;

- partial payments with proceeds from physical damage, theft, credit life and credit disability insurance policies;

- required purchases of Receivables by the Servicer or repurchases of Receivables by the Depositor for specified breaches of their respective representations, warranties or covenants;

- an optional repurchase of the Receivables by the Servicer when the Note Balance is 10.0% or less of the initial Note Balance of the Notes as of the Closing Date;

- principal payments to Noteholders in connection with the overcollateralization of the Notes, which could cause a faster amortization of the Notes than of the Receivables; and

36

- payment of the Prefunding Account Amount as an additional payment of principal at the end of the Prefunding Period.

The rate of prepayments cannot be predicted and may be influenced by a variety of factors, including changes in economic and social conditions. The fact that obligors generally may not sell or transfer the Financed Vehicles securing the Receivables without the Servicer's consent may also influence the rate of prepayments.

In any of these cases, you may be repaid principal on the Notes at a different rate than you expect and you may not be able to reinvest the principal repaid to you at a rate of return that is at least equal to the rate of return on your Notes.

If you purchase a Note at a premium based on your expectations as to its maturity or weighted average life, and the Note is repaid earlier than you expected, your yield will be reduced and you may not recover the premium you paid. Similarly, if you purchase a Note at a discount based on your expectations as to its maturity or weighted average life, and the Note matures later than you expected, your yield will be lower than you anticipated.

**You may experience reduced returns on your Notes resulting from distribution of amounts in the Prefunding Account ...............**    On one or more occasions during the Prefunding Period, the Issuer may purchase Receivables from the Depositor, which, in turn, will acquire these Receivables from Tricolor, with funds on deposit in the Prefunding Account. The ability of Tricolor to originate sufficient numbers of Subsequent Receivables may be affected by a variety of social and economic factors including interest rates, unemployment levels, the rate of inflation and consumer perception of economic conditions generally. You will receive as a prepayment of principal any amounts remaining in the Prefunding Account that have not been used to purchase Receivables by the end of the Prefunding Period. Depending on the amount of such remaining funds, they will be distributed either sequentially or pro rata among the classes of Notes. It is anticipated that the aggregate principal amount of Subsequent Receivables acquired by the Issuer during the Prefunding Period will not be exactly equal to the Prefunding Account Deposit and that therefore there will be at least a nominal amount of principal prepaid to Noteholders.

This prepayment of principal could have the effect of shortening the weighted average lives of your Notes. The inability of the Depositor to obtain Receivables meeting the requirements for sale to the Issuer will increase the likelihood of a prepayment of principal. In addition, you will bear the risk that you may be unable to reinvest any principal prepayment at yields at least equal to the yield on your Notes.

**The bankruptcy of Tricolor may cause your payments to be reduced or delayed .......................**    In some circumstances, a bankruptcy of Tricolor may reduce payments to you. Tricolor has structured the transaction described herein such that, if Tricolor were to become bankrupt, the Receivables sold to the Issuer are not expected to be treated as property of Tricolor's bankruptcy estate. The steps taken to guard the Receivables against bankruptcy include the creation of both the Issuer and the Depositor as special purpose entities that are owned by Tricolor and the transfer of the Receivables to the Issuer. Each of the Issuer and the Depositor is required by its formative documents to be operated in such a

37

manner as to minimize the risk that it would be consolidated with Tricolor in the event of Tricolor's bankruptcy. Tricolor believes that its transfer of the Receivables to the Depositor is structured so that it should be treated as an absolute and unconditional assignment and transfer and that the Receivables should not, if Tricolor were to become bankrupt, become property of Tricolor's bankruptcy estate. Furthermore, Tricolor believes that the Issuer and the Depositor will be operated in a manner that minimizes the likelihood that the assets of the Issuer or the Depositor would be consolidated with those of Tricolor in the event of Tricolor's bankruptcy.

However, in the event of an insolvency of Tricolor, a court or bankruptcy trustee could attempt to:

- recharacterize the transfer of the Receivables by Tricolor to the Depositor and/or by the Depositor to the Issuer as a borrowing by Tricolor from the Issuer or the Noteholders, secured by a pledge of the Receivables; or

- consolidate the assets of the Depositor and/or the Issuer with those of Tricolor because Tricolor will own the equity interests of the Depositor (which, in turn, will own the equity interests in the Issuer).

If a recharacterization attempt is successful, a court could elect to accelerate payment of the Notes and liquidate the Receivables. A recharacterization attempt, even if unsuccessful, could result in delays in payments to you.

**A voluntary bankruptcy of the Issuer or the Depositor could reduce or delay Receivable payments ......................................**

While both the Issuer and the Depositor have been structured as special purpose entities, with formative documents that include provisions that are intended to reduce the likelihood of a bankruptcy filing, these entities are not bankruptcy-proof. The limited liability company agreement of the Depositor requires the unanimous vote of the board of managers, including the independent manager, in order to approve a bankruptcy filing. The Trust Agreement will require that each Certificateholder approve a bankruptcy filing. Nevertheless, should these persons determine that it is in the best interests of such entity to file for bankruptcy (and should the Issuer be eligible), these entities could voluntarily become bankrupt. If so, then payments could be reduced or delayed as a result of the bankruptcy process.

**Transfer of servicing may delay payments to you ............................**

Tricolor will be required to deposit in the Collection Account all collections on or in respect of the Receivables received by it within two Business Days of identification. If Tricolor were to cease servicing the Receivables, delays in processing payments on the Receivables and information regarding payments with respect to the Receivables could occur. In the event that Tricolor resigns or is terminated as Servicer, the Backup Servicer or another entity appointed by the Indenture Trustee at the direction of the Majority Noteholders will succeed the Servicer and become the Successor Servicer as described herein. The transfer of servicing to a Successor Servicer may result in a material disruption in the performance of the Servicer's duties, which would likely result in increased delays and disruptions in collections on the Receivables. This could delay payments to you. The Transaction Documents will contain provisions that could result in the termination of Tricolor's servicing rights. There is no guarantee that a Successor Servicer would be able to service the Receivables with the same capability and degree of skill as Tricolor. As a

result of the foregoing, you may experience delays and/or reductions in the interest and principal payments on your Notes.

**Failure of the Servicer's information technology systems and nearshore outsourcing could result in inaccurate or late Investor Reports ..........................**

Tricolor uses certain management information systems and nearshore outsourcing to manage its loan portfolio.  These systems and nearshore outsourcing are subject to damage or interruption from:

- power loss, computer systems failures and internet, telecommunications or data network failures;

- operator negligence or improper operation by, or supervision of, employees;

- improper or unanticipated impacts to changes within the system;

- physical and electronic loss of data or security breaches, misappropriation and similar events;

- computer viruses;

- intentional acts of vandalism or cybercrime; and

- storms, hurricanes and other extreme weather conditions and fires, floods and other natural disasters.

In addition, the software that the Servicer uses in daily operations may contain errors that could cause the information network to fail or produce inaccurate data.  Any failure of the Servicer's systems or nearshore outsourcing, for whatever reason, could result in an interruption in operations and result in inaccurate or untimely delivery to the Indenture Trustee of the monthly servicer reports.  Because the Indenture Trustee will make monthly distributions and distribute monthly Investor Reports based on the information provided to it in the servicer reports, any such failure of the Servicer's systems or any other causes resulting in an inaccurate or untimely servicer report would result in inaccurate distributions to the Noteholders or inaccurate or untimely Investor Reports.

**The Servicer's operational systems and security systems could be affected by cyber incidents and other disruptions that may result in losses on your Notes ..............................................**

The Servicer collects and stores certain personal and financial information from customers, employees and other third parties.  Any interruptions or losses in the Servicer's information processing capabilities, which could arise from unknown sources or, among other things, security breaches or cyber-attacks involving the Servicer's systems or facilities or the systems or facilities of its service providers, could expose the Servicer to a risk of loss of personally identifiable information of customers, employees and third parties or other proprietary or competitively sensitive information, business interruptions, regulatory scrutiny, actions and penalties, litigation, reputational harm, a loss of confidence and other financial and non-financial costs.

39

In addition, the Servicer relies on information technology networks and systems, including mobile devices, some of which are managed by third-party service providers, to process, transmit, and store electronic information that is important to the servicing of the Receivables. Despite security measures, the Servicer is at risk for interruptions, outages, and compromises of operational systems (including business, financial, accounting, product development, consumer receivables or data processing), whether caused by a cyber-attack, security breach, or other reasons (e.g., a natural disaster, fire, or overburdened infrastructure system). Such incidents could materially disrupt the Servicer's operational systems and its ability to perform its obligations under the Transaction Documents, including its collection activities with respect to the Receivables. Moreover, the Servicer has been and continues to be subject to the threat of a range of cyber-attacks, and such attacks will continue and evolve in the future, which may cause cyber incidents to be more difficult to detect for periods of time. The Servicer's networks could also be affected by the negligence or misconduct of insiders or third parties who have access to the Servicer's networks and systems. The Servicer employs capabilities, processes, and other security measures designed to reduce and mitigate the risk of cyber-attacks. However, such preventative measures cannot provide absolute security and may not be sufficient in all circumstances or mitigate all potential risks. If the Servicer experiences any interruptions or losses in its information processing capabilities, its ability to service the receivables may be materially and adversely affected, resulting in an increased risk of loss on the Notes.

**The inability of Tricolor to obtain additional financing could adversely affect its business and ability to perform under the Transaction Documents ...............**

The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital and complete securitizations or other structured finance transactions. Notwithstanding the COVID-19 pandemic, Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors. In addition, terms related to new or additional financing may not be favorable to Tricolor. Tricolor's inability to obtain additional financing could ultimately result in default under its credit agreements or otherwise have an adverse effect on its business and ability to meet its debt payment obligations. If Tricolor is unable to renew, extend or replace borrowings required to fund its operations, its ability to satisfy its obligations with respect to the Receivables, including its obligation to repurchase certain of the Receivables in certain events would be materially and adversely affected. Furthermore, the ability of Tricolor, as Servicer, to satisfy its obligations with respect to the Receivables could be impaired, resulting in delays and losses caused by the inability of Tricolor, as Servicer, to realize upon the related Financed Vehicles in a timely fashion. These delays and losses ultimately could affect the availability of funds for distribution to you.

40

If Tricolor should be unable to continue as a going concern, it could be unable to perform its obligations as Servicer and could be unable to fulfill its purchase/repurchase obligations with respect to certain Receivables with respect to which it has breached its representations, warranties or servicing covenants under the Receivables Purchase Agreement or the Sale and Servicing Agreement. Tricolor's inability to fulfill any such purchase/repurchase obligations could result in increased levels of losses and decreased levels of recoveries on the Receivables. As a result of the foregoing, you may experience delays and/or reductions in the interest and principal payments on your Notes.

**There can be no assurance that the use of proceeds of the Notes will be suitable for the investment requirements of certain environmentally or sustainability focused investors. .**

The Depositor will agree to use the net proceeds from the sale of the Notes to acquire auto loans from the Originators that meet certain eligibility criteria described under *"Use of Proceeds—Tricolor Social ABS Framework"*. Prospective investors should carefully review the information set out in this Offering Memorandum regarding the use of the net proceeds and must determine for themselves the relevance of such information for the purpose of any investment in the Notes, together with any other investigation such investor deems necessary. In particular, no assurance is given by the Issuer, the Depositor, the Sponsor, the Servicer, any Originator, any initial purchaser or any other party to the transaction described in this Offering Memorandum that the use of such net proceeds will satisfy (or will continue to satisfy), whether in whole or in part, any present or future investor expectations, requirements, standards, or other investment criteria or guidelines with which such investor or its investments are required to comply, whether by any present or future applicable law or regulation or by its own by-laws or other governing rules or investment portfolio mandates, ratings mandates or criteria, standards, or other independent expectations, including with regard to any direct or indirect environmental, sustainability or social impact of any investment in the Notes or the use of the related net proceeds by the Depositor.

Although the Depositor will agree to use the net proceeds from the sale of the notes to acquire auto loans that meet certain eligibility criteria described under "*Use of Proceeds*" in this Offering Memorandum, it will not constitute an event of default under the Indenture if (i) the Depositor or any other transaction party were to fail to comply with such agreement or (ii) any opinion or certification, as described under *"Use of Proceeds—Tricolor Social ABS Framework"* in this Offering Memorandum, were withdrawn. Any failure by the Depositor to comply with its agreement to use the net proceeds from the sale of the Notes for such purposes, and any failure of the Notes or such use of net proceeds to meet, or to continue to meet, the investment requirements of certain environmentally or sustainability focused investors may adversely affect the value and trading price of the Notes, and may have consequences for certain investors with portfolio mandates to invest in securities to be used for a particular purpose.

**There is no legal, regulatory, or market definition of or standardized criteria for what constitutes a "social", "green", "sustainable" or other equivalently labeled investment or use of proceeds, and any such designations made by third parties with respect to the Notes may not be suitable for the investment criteria of an investor. ........................................**

There is currently no clear definition (legal, regulatory or otherwise) of, or market consensus as to what constitutes, a "social", "green", "sustainable" or other equivalently labeled investment or use of proceeds, or as to what precise attributes are required for an investment or use of proceeds to be defined as "social", "green", "sustainable" or such other equivalent label, nor can any assurance be given that a clear definition or consensus will develop over time. As a result, no assurance can be provided to potential investors that the Notes or the use of the net proceeds from the sale of the Notes, as described in this Offering Memorandum, will meet any or all investor expectations regarding such "social," "green," sustainable," or other equivalently labeled objectives.

No assurance or representation is given as to the suitability or reliability for any purpose whatsoever of any opinion or certification of the Issuer, the Sponsor or any third-party (whether or not solicited by the Issuer, the Sponsor or any of their affiliates), including the second party opinion described under "*Use of Proceeds—Tricolor Social ABS Framework*" in this Offering Memorandum, and, in particular, with respect to the proposed use of the proceeds of the sale of the Notes for the purpose of fulfilling any environmental, sustainability, social or other criteria. For the avoidance of doubt, any such opinion or certification is not, nor shall be deemed to be, incorporated in and/or form part of this Offering Memorandum. Any such opinion or certification is not, nor should be deemed to be, a recommendation by the Issuer, the Sponsor, the Depositor, any Initial Purchaser or any other person to buy, sell or hold the Notes. Any such opinion or certification is only current as of the date that opinion or certification was initially issued. Prospective investors must determine for themselves the relevance of any such opinion or certification, the information contained therein, and the provider of such opinion or certification for the purpose of any investment in the Notes. Any withdrawal of any such opinion or certification or any additional opinion or certification may have a material adverse effect on the value of the Notes or result in adverse consequences for certain investors with mandates to invest in securities to be used for a particular purpose.

**A reduction, withdrawal or qualification of the ratings on your Notes or the issuance of an unsolicited rating on your Notes may adversely affect your Notes .............................................**

It is a condition to the issuance of the Notes that they receive the ratings set forth under *"Summary—Ratings"* from KBRA, which will be hired by Tricolor to rate the Notes. Ratings initially assigned to the Notes will be paid for by Tricolor. No assurance can be made that the ratings initially assigned to the Notes by KBRA will not be reduced, withdrawn or qualified. Tricolor is not aware that any other national recognized statistical rating organization has assigned ratings to the Notes. SEC rules provide that the payment of fees by the sponsor, the issuer or an underwriter or initial purchaser to rating

agencies to issue or maintain a credit rating on asset-backed securities is a conflict of interest for rating agencies. In the view of the SEC, this conflict is particularly acute because arrangers of asset-backed securities transactions provide repeat business to the rating agencies.

Under SEC rules aimed at enhancing transparency, objectivity and competition in the credit rating process, information provided by Tricolor or the Initial Purchasers to a hired nationally recognized statistical rating organization for the purpose of assigning or monitoring the ratings on the Notes is required to be made available to each non-hired nationally recognized statistical rating organization in order to make it possible for non-hired nationally recognized statistical rating organizations to assign unsolicited ratings to the Notes. An unsolicited rating could be assigned at any time, including prior to the closing date. None of the Depositor, Tricolor, the Initial Purchasers or any of their respective affiliates will have any obligation to inform you of any unsolicited ratings assigned to the Notes. Consequently, prospective investors should monitor whether an unsolicited rating of one or more classes of Notes has been assigned by a non-hired nationally recognized statistical rating organization and should consult with their financial and legal advisors regarding the effect of the assignment of an unsolicited rating to a class of Notes. Nationally recognized statistical rating organizations, including KBRA, may have different methodologies, criteria, models and requirements. If any non-hired nationally recognized statistical rating organization assigns unsolicited ratings to the Notes, there can be no assurance that the unsolicited ratings will not be lower than the ratings provided by KBRA, which could adversely affect the market value of your Notes and/or limit your ability to resell your Notes. If any non-hired nationally recognized statistical rating organization releases any adverse market commentary on the Notes (even without assigning a rating on the Notes), this could have a similar adverse effect. In addition, if Tricolor fails to make available to the non-hired nationally recognized statistical rating organizations any information provided to KBRA for the purpose of assigning or monitoring the ratings on the Notes, KBRA could withdraw their respective ratings on the Notes, which could adversely affect the market value of your Notes and/or limit your ability to resell your Notes.

Furthermore, Congress or the SEC may determine that any nationally recognized statistical rating organization that assigns ratings to the Notes no longer qualifies as a nationally recognized statistical rating organization for purposes of the federal securities laws and that determination may also have an adverse effect on the market price of the Notes.

Prospective investors in the Notes are urged to make their own evaluation of the creditworthiness of the Receivables and the credit enhancement on the Notes and to not rely solely on the ratings on the Notes.

**The consumer finance industry regulatory environment could materially adversely affect Tricolor**......................................... The Dodd-Frank Act provides for enhanced regulation of financial institutions and non-bank finance companies such as Tricolor, derivatives and asset-backed securities offerings and enhanced oversight of credit rating agencies. The Dodd-Frank Act also created the CFPB, an agency responsible for administering and enforcing the laws and regulations for consumer financial products and services. The supervisory and examination authority of the CFPB includes the largest non-bank auto lenders, but does not currently cover

43

Tricolor. While Tricolor is not currently subject to regulation and supervision by the CFPB, Tricolor is subject to regulation and supervision by the Texas Office of Consumer Credit Commissioner, which licenses and regulates non-depository lenders in Texas.

The Dodd-Frank Act affects the offering, marketing and regulation of consumer financial products and services and has increased regulation of the securitization and derivatives markets. The CFPB has supervision, examination and enforcement authority over the consumer financial products and services of certain non-depository institutions and their respective affiliates.

Compliance with the implementing regulations under the Dodd-Frank Act and the oversight of the SEC, the CFPB and other applicable governmental entities has imposed costs on, created operational constraints for and placed limits on pricing of consumer products with respect to finance companies such as Tricolor. The requirements imposed by the Dodd-Frank Act, as well as evolving regulatory interpretations and enhanced regulatory scrutiny, may have a significant future adverse effect on the servicing of the Receivables, on Tricolor's securitization program or on the regulation and supervision of Tricolor, the Depositor or the Issuer. No assurance can be given that existing and/or new regulations will not adversely affect the marketability of asset-backed securities such as the Notes, the servicing of the Receivables, Tricolor's securitization program or the regulation or supervision of Tricolor.

Tricolor is subject to various regulatory, financial and other requirements in the jurisdictions in which it operates. Tricolor has been, and may become, involved from time to time, in reviews, investigations and proceedings, and information gathering requests, by government and self-regulatory agencies, including the CFPB, State attorneys general and the Texas Office of Consumer Credit Commissioner.

Tricolor may also be served with subpoenas or requests relating to its origination, underwriting and securitization of auto loans or similar or related topics. Any of such events could result in the imposition of damages, fines or civil or criminal claims and/or penalties. No assurances can be given that the ultimate outcome of any such event would not have a material adverse effect on Tricolor, its ability to service the Receivables or its ability to perform its duties under the Transaction Documents. Additionally, any such outcome could adversely affect the marketability or liquidity of your Notes.

The financial services industry is likely to see increased disclosure obligations, restrictions on pricing and enforcement proceedings. Compliance with applicable laws is costly and can affect operating results, as processes, procedures, controls and infrastructure are required to support applicable requirements. Compliance may also create operational constraints and impose limits on pricing, as financial services industry laws are designed primarily to protect consumers. The failure to comply could result in significant statutory civil and criminal penalties, monetary damages, attorneys' fees and costs, possible revocation of licenses and damage to reputation, brand and customer relationships. In response to the COVID-19 pandemic, federal, state and local governments have enacted, and may continue to enact, laws, regulations executive orders or other guidance affecting consumer obligations (that could include or affect the Receivables) that allow obligors to forgo making scheduled payments for specified periods of time, require receivable modifications (*e.g.*, waiving accrued interest), preclude creditors from exercising certain rights or taking certain actions with

44

respect to collateral (including the repossession or liquidation of financed vehicles), or mandate limited operations or temporary closures of companies (including Tricolor) or its vendors as "non-essential businesses" or otherwise. Tricolor cannot predict how the regulatory responses to the COVID-19 pandemic or any future epidemic or pandemic will affect its business, including its liquidity and the ability of the Depositor to access the capital markets. For a description of the Order entered into by Tricolor and the United States regarding certain matters in dispute between them regarding certain provisions of the Fair Credit Reporting Act, see *"Tricolor Auto Acceptance, LLC—General"*.

Recent interpretations of regulations implementing the Military Lending Act indicate that previously originated retail auto loans that include credit-related ancillary products (*i.e.*, guaranteed asset protection, credit life and similar credit products) may need to comply with the requirements of the Military Lending Act. Regulations implementing the Military Lending Act limit the military annual percentage rate, adjust arbitration rules and require additional disclosures. Financial services industry groups are seeking further clarification on these interpretations. Although not expected to be material at this time, if these interpretations are ultimately unchanged, it could adversely affect the cash flows relating to such auto loans available for the Issuer.

**U.S. Department of Justice auto finance company investigations could materially adversely affect your Notes** .....................................

Certain auto finance companies (other than Tricolor) involved in the origination and securitization of subprime auto loans have received subpoenas from the U.S. Department of Justice as part of an industry-wide investigation relating to possible civil proceedings for potential violations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989.

No assurances can be given that the ultimate outcome of this investigation or any resulting proceeding would not have a material adverse effect on Tricolor or any of its affiliates, the ability of Tricolor to service the Receivables or the ability of Tricolor to perform its duties under the Transaction Documents. Additionally, any such outcome could adversely affect the marketability or liquidity of your Notes.

**Interests of other persons in the Receivables or Financed Vehicles could reduce the funds available to make payments on your Notes** .

Financing statements under the UCC will be filed reflecting the sale of the Receivables by Tricolor to the Depositor and by the Depositor to the Issuer. Each of Tricolor and the Depositor will mark its accounting records to reflect its sale of the Receivables and the Receivables will be delivered to the Custodian. The Custodian will maintain possession of the physical motor vehicle retail installment sale contracts evidencing the Receivables and will not segregate or mark the contracts and loans as belonging to the Issuer. Another person could acquire an interest in Receivables evidenced by a physical motor vehicle retail installment sale contract that is superior to the Issuer's interest in those Receivables by obtaining physical possession of the motor vehicle retail installment sale contracts representing those Receivables without knowledge of the assignment of the Receivable to the Issuer. If another person acquires an interest in a Receivable that is superior to the Issuer's interest, some or all of the collections on that Receivable may not be available to make payment on your Notes.

45

Additionally, if another person acquires an interest in a Financed Vehicle that is superior to the Issuer's security interest in that Financed Vehicle, some or all of the proceeds from the sale of the Financed Vehicle may not be available to make payments on your Notes.

The Issuer's security interest in the Financed Vehicles could be impaired for one or more of the following reasons:

- Tricolor or the Depositor might fail to perfect its security interest in a Financed Vehicle;

- another person may acquire an interest in a Financed Vehicle that is superior to the Issuer's security interest through fraud, forgery, negligence or error because the Servicer will not amend the certificate of title or ownership to identify the Issuer as the new secured party;

- the Issuer may not have a security interest in the Financed Vehicles in certain States because the certificates of title to the Financed Vehicles will not be amended to reflect assignment of the security interest to the Issuer;

- holders of some types of liens, such as tax liens or mechanics' liens, may have priority over the Issuer's security interest; and

- the Issuer may lose its security interest in vehicles confiscated by the government.

Tricolor will be obligated to repurchase from the Issuer any Receivable sold by it to the Issuer as to which a perfected security interest in the name of Tricolor in the Financed Vehicle securing the Receivable did not exist as of the date such Receivable was transferred to the Issuer. Tricolor will not, however, be required to repurchase a Receivable if a perfected security interest in its name in the related Financed Vehicle has not been perfected in the Issuer or if the security interest in the Financed Vehicle or the Receivable becomes impaired after the Receivable is sold to the Issuer. If the Issuer does not have a perfected security interest in a Financed Vehicle, its ability to realize on such Financed Vehicle following a default under the related Receivable may be adversely affected and some or all of the collections on that Financed Vehicle may not be available to make payment on your Notes.

**The characteristics of the Initial Receivables as of the Initial Cutoff Date may differ from the characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates..............**

The Subsequent Receivables to be sold to the Issuer on Subsequent Receivables Purchase Dates during the Prefunding Period may have characteristics that differ somewhat from the characteristics of the Receivables as of the Initial Cutoff Date described herein, although such differences are not expected to be material. The characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates are not expected to differ materially from the characteristics of the Receivables as of the Initial Cutoff Date, and each Subsequent Receivable must satisfy the eligibility criteria described herein. You must not assume that the characteristics of the Subsequent Receivables sold to the Issuer during the Prefunding Period will be identical to the characteristics of the Receivables described herein.

46

**Retention of any Notes by the Depositor or an affiliate could adversely affect the market value of, and/or limit your ability to resell, your Notes ..........................**  Some or all of one or more classes of Notes may be retained by the Depositor or conveyed to an affiliate of the Depositor.  The market for any such retained Notes may be less liquid than would otherwise be the case and, if any retained notes are subsequently sold in the secondary market, it could reduce demand for other Notes of that class, which could adversely affect the market value of, and/or limit your ability to resell, the Notes of such class.  Additionally, if any retained Notes are subsequently sold in the secondary market, the voting power of the Noteholders of the outstanding Notes may be diluted.

**Transfer restrictions on the Notes could adversely affect the market value of your Notes and/or limit your ability to resell your Notes .....................................**  The Notes have not been registered under the Securities Act or under the securities or blue sky laws of any state, and are being issued and sold in reliance on exemptions from registration provided by these laws.  The Notes may only be transferred to, or for the account of, "qualified institutional buyers" (as defined in Rule 144A under the Securities Act), in compliance with Rule 144A under the Securities Act.  In addition, transferees of the Notes will be deemed to have made certain representations and warranties, as described under *"Notice to Investors"*.  These transfer restrictions could adversely affect the market value of your Notes and limit your ability to resell your Notes.  Therefore, you should be prepared to hold your Notes to maturity.

**The Class E Notes and the Class F Notes may be characterized as equity and not debt for United States federal income tax purposes...........................................**  The Depositor expects that the Class E Notes will receive a rating of BB (sf) by KBRA and that the Class F Notes will receive a rating of B (sf) by KBRA, which such ratings address the likelihood of the receipt by the Class E Noteholders and the Class F Noteholders of all payments to which they are entitled to by the Final Scheduled Distribution Date of the Class E Notes and the Class F Notes, respectively.  Sidley Austin LLP, United States federal income tax counsel, will opine that for United States federal income tax purposes, the Class E Notes should be characterized as a debt if and to the extent held by one or more persons other than the beneficial owner of the equity in the Issuer or by an affiliate of such beneficial owner for such purposes and will not be opining on the likelihood as to whether the Class F Notes will be characterized as debt for United States federal income tax purposes.  By their purchase of Notes, holders of Notes will agree to treat all of the Notes (including the Class E Notes and the Class F Notes) as debt for United States federal income tax purposes.

If the IRS successfully asserted that the Class E Notes and/or the Class F Notes did not represent debt for United States federal income tax purposes, a holder of such Notes likely would be treated as owning an interest in a partnership, and a different set of United States federal income tax provisions may apply.  For example, certain holders of the Class E Notes or the Class F Notes may be subject to withholding on interest and principal payable with respect to such Notes (without any corresponding gross-up).  Prospective

47

investors are encouraged to consult their tax advisors to determine the particular tax consequences applicable to an investment in the Class E Notes and the Class F Notes.  For more information on such treatment, see *"United States Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Possible Alternative Treatments of the Notes"*.

**If the Class E Notes or the Class F Notes are recharacterized as equity, Non-U.S. Holders of such Notes may be subject to withholding....................................**

If the Class E Notes, Class F Notes or any other class or classes of Notes were to be characterized by the IRS as equity in the Issuer and the Issuer is treated as a partnership for United States federal income tax purposes, the Issuer may be required to withhold on income allocable to a holder of recharacterized Notes if such holder is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code and if such income is effectively connected to a United States trade or business of such holder.  In addition, the Issuer could be liable for failing to withhold on any recharacterized Notes that are held by Non-U.S. Holders, thereby reducing the cash flow that would otherwise be available to make payments on all classes of Notes.  To avoid such potential liability for the Issuer, each holder of a Class F Note will be required to be a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code that provides the Issuer with an IRS Form W-9.  There can be no assurance, however, that a Class F Note or any other class or classes of Notes that are recharacterized as described above will not be held by a Non-U.S. Holder that treats the income as effectively connected to a United States trade or business.

**If the Class E Notes are recharacterized as equity, payments of interest to Non-U.S. Holders will not qualify as portfolio interest for United States federal income tax purposes and will be subject to withholding....................................**

Subject to exceptions applicable to certain types of interest and subject to the discussion under *"United States Federal Income Tax Considerations—Tax Consequences to Non-U.S. Holders"*, payments of interest to Non-U.S. Holders of the Notes that are characterized as debt for United States federal income tax purposes will generally be considered "portfolio interest" for United States federal income tax purposes and thus will not be subject to United States federal income tax or withholding tax.  If the Class E Notes are recharacterized by the IRS as the equity in the Issuer, holders of the Class E Notes may be considered to be receiving interest payments from the underlying Receivables and such payments may be considered not to be in "registered form" as defined in Section 163(f) of the Internal Revenue Code and applicable Treasury Regulations.  Thus, such interest payments may not qualify as "portfolio interest" for United States federal income tax purposes and such payments to Non-U.S. Holders of the Class E Notes (recharacterized as equity in the Issuer) will be subject to a withholding tax at a rate of 30%, unless (i) the rate is reduced or eliminated pursuant to an applicable tax treaty or (ii) such payments are treated as effectively connected with the conduct of a trade or business within the United States and, in either case, the appropriate statement has been provided.  Prospective investors in the Class E Notes who are Non-U.S. Holders are urged to consult their tax advisors regarding any potential withholding that may be applicable.  For more information on such

48

|  |  |
|---|---|
| | treatment, see *"United States Federal Income Tax Considerations—Tax Consequences to Non-U.S. Holders—Possible Alternative Characterization of the Notes"*. |
| **EU Securitization Regulation and UK Securitization Regulation……………………** | The EU SR Rules impose certain restrictions and obligations with regard to securitizations (as such term is defined for purposes of the EU Securitization Regulation), including certain requirements that are imposed on EU Institutional Investors.  The EU SR Rules are in force throughout the EU; and the EU Securitization Regulation is expected also to be implemented in the non-EU member states of the EEA. |

In addition, the UK SR Rules impose certain restrictions and obligations with regard to securitizations (as such term is defined for purposes of the UK Securitization Regulation), including certain requirements that are imposed on UK Institutional Investors.

Any SR Investor is required (amongst other things), prior to investing in a securitization, to verify certain matters, including that (a) certain credit-granting requirements are satisfied, (b) the originator, sponsor or original lender retains on an ongoing basis a material net economic interest in the securitization which, in any event, will not be less than 5%, in accordance with the EU SR Rules or the UK SR Rules (as applicable to the relevant SR Investor), and discloses that risk retention, and (c) the originator, sponsor or securitization special purpose entity has, where applicable, made available information in accordance with the EU SR Rules or the UK SR Rules (as applicable).

If any SR Investor fails to comply with any applicable requirement of the EU SR Rules or the UK SR Rules, it may be subject (where applicable) to an additional regulatory capital charge with respect to any securitization position acquired by it or on its behalf, and it may be subject to other regulatory sanctions or required to take corrective action.

No Transaction party, nor any other entity, intends, or will be required under the Transaction Documents, to retain a material net economic interest in the securitization constituted by the issuance of the Notes, or to take any other action with regard to such transaction, in a manner prescribed or contemplated by the EU SR Rules or the UK SR Rules.  In particular, no such person undertakes to take any action, or refrain from taking any action, for purposes of, or in connection with, compliance by any person with any applicable requirement of the EU SR Rules or the UK SR Rules.

In addition, the arrangements described under *"U.S. Credit Risk Retention"* have not been structured with the objective of ensuring compliance by any person with the requirements of the EU SR Rules or the UK SR Rules.

Consequently, the Notes may not be a suitable investment for SR Investors.  As a result, the price and liquidity of the Notes in the secondary market may be adversely affected.  Prospective investors are responsible for analyzing their own legal and regulatory position and are advised to consult with their own advisors regarding the suitability of the Notes for investment and the scope, applicability and compliance requirements of the EU SR Rules and the UK SR Rules.

**Compliance with U.S. Credit Risk Retention Rules could adversely affect the Sponsor…….**

As more fully described under *"U.S. Credit Risk Retention"*, Tricolor expects to comply with Regulation RR by the Depositor, or another majority-owned affiliate of Tricolor, retaining the Risk Retained Certificates and by Tricolor causing the Reserve Fund to be established.  Neither the Depositor nor any other majority-owned affiliate of Tricolor will obtain financing with respect to the Risk Retained Certificates unless such financing provides for full recourse to Tricolor or such majority-owned affiliate and such financing otherwise complies with Regulation RR.  If any such financing requires the grant of a security interest in the Risk Retained Certificates and results in the financing counterparty having enforcement rights and remedies in the case of default, such enforcement rights may include the right to appropriate or sell the Risk Retained Certificates.  In carrying out any such rights and remedies, the financing counterparty would not be required to have regard for Regulation RR and any such sale may therefore cause Tricolor to not be in compliance with Regulation RR.  Tricolor's expected compliance with Regulation RR is based in part on its subjective determinations of appropriate inputs and assumptions required to calculate the fair value of the "ABS interests" comprised of the Notes and the Certificates.  No assurances can be given that Tricolor will not be subject to enforcement actions or other litigation notwithstanding its intent to comply with Regulation RR, nor can there be any assurance that Tricolor will not be subject to penalties arising out of a regulator's or court's retrospective determination of Tricolor's retention of all or a portion of the Risk Retained Certificates through the Depositor, or another majority-owned affiliate of Tricolor, does not in fact comply with Regulation RR.

50

**USE OF PROCEEDS**

**General**

Tricolor will sell the Initial Receivables and certain related property to the Depositor.  The Depositor in turn will transfer the Initial Receivables and such related property to the Issuer in exchange for the Notes and the Certificates.  As more fully described below, the Depositor will use the net proceeds from the sale of the Notes to (1) purchase the Initial Receivables from Tricolor, (2) deposit an amount equal to the Prefunding Account Deposit into the Prefunding Account, which will be used to purchase Subsequent Receivables during the Prefunding Period, (3) deposit an amount equal to the Reserve Fund Deposit into the Reserve Fund and (4) pay for certain expenses incurred in connection with the issuance and sale of the Notes.  It is anticipated that Subsequent Receivables will be purchased by the Issuer on one or more Subsequent Receivables Purchase Dates during the Prefunding Period.

The net proceeds to be received by the Depositor and its affiliates may be applied to pay down certain debt facilities of Tricolor and its affiliates and for other general corporate purposes.  Certain of such debt facilities are owed to one or more of the Initial Purchasers or their affiliates or entities for which their affiliates act as administrators and/or provide liquidity lines, so a portion of the proceeds that is used to pay warehouse debt may be paid to the Initial Purchasers or its affiliates.

**Tricolor Social ABS Framework**

*Use of Proceeds.*  Tricolor intends for the Notes to be issued in accordance with the Social Bond Principles, as updated in June 2021.  These principles are voluntary guidelines that were developed by an industry working group administered by the ICMA and are intended to promote integrity in the social bond market through recommendations relating to transparency, disclosure and reporting.

In accordance with the Tricolor Social ABS Framework March 2022, on the Closing Date, Tricolor expects the net proceeds of the sale of the Notes to be allocated solely to fund the acquisition of auto loans to borrowers within the target population, which will consist of the financially underserved population that lacks equitable access to essential services, and are therefore, marginalized, due to the fact that they (1) are credit invisible (i.e. have no FICO® score) or (2) are low income.

The origination of auto loans to the Target Population and the acquisition of the related Receivables by the Issuer comprises an Eligible Social Project with the objective of expanding financial inclusion by enabling (1) access to essential services through responsible lending products; and (2) socioeconomic advancement and empowerment with respect to equitable access to financing opportunities and reduction of income inequality.

*Loan Evaluation and Selection Process.*  A subcommittee of Tricolor's Credit Risk Committee, comprised of the Tricolor's CEO, CFO, Chief Credit Officer and other senior executives, will be responsible for reviewing and approving (1) each Eligible Social Project, (2) each Eligible Loan for inclusion in the related securitization transaction, including TAST 2022-1, (3) each annual report on use of proceeds and (4) each impact report.  In addition, Tricolor's Credit Risk Committee will be responsible for (1) reviewing each post-issuance external verification report, (2) monitoring ongoing social bond market practices and (3) seeking to ensure that all Eligible Loans comply with Tricolor's underwriting guidelines.

*Social Bond Eligibility Criteria.*  The Framework sets forth Tricolor's criteria for originating Eligible Loans in accordance with each Eligible Social Project.  "Eligible Loans" must meet the following eligibility criteria (collectively, the "Social Bond Eligibility Criteria"):

- Eligible Social Product Category:  Expand financial inclusion by enabling (1) access to essential services through responsible lending products; and (2) socioeconomic advancement and empowerment with respect to equitable access to financing opportunities and reduction of income inequality.

- Eligibility Criteria:  Loans providing access to essential services for the purchase and financing of motor vehicles to the target population consists of consumers with 100% of the loans originated to obligors: (1) with no FICO® or (2) who are low-income.  "Low income" means that the customer's

income is less than or equal to 80% of the median county income or less than or equal to 200% of the federal poverty threshold as defined by the Community Reinvestment Act (CRA), the Federal Housing Finance Agency (FHFA), which includes Freddie Mac, and the United States Department of Health and Human Services (HHS).

- Social Risks:  The target population is subject to greater social risks because (1) their no FICO® status is prohibitive to access mainstream financial services, subjecting them to alternative financial services at much higher costs; and (2) their low income and consequently, low level of liquidity leaves them unprepared to deal with any financial emergency.

- Environmental Risks:  All loans are collateralized by high quality vehicles with a significantly (1) lower age and mileage and (2) higher acquisition cost than otherwise available to this segment of the population. 100% of the vehicles which are transacted undergo a rigorous inspection and reconditioning process, Tricolor administers a state-regulated inspection to certify that all vehicles satisfy the emission standards federal vehicle emission standards are set through a combination of legislative mandates enacted by Congress through the Clean Air Act (CAA), and executive regulations managed nationally by the Environmental Protection Agency (EPA), which tightened requirements as recently as 2021.

Tricolor's Social Bond Eligibility Criteria are subject to change consistent with Tricolor's environmental, social and governance policies and the Social Bond Principles.

*Management of Proceeds.*  Tricolor intends to allocate the net proceeds of the Notes to acquire previously originated Eligible Loans from existing warehouse facilities and well as purchase newly originated Eligible Loans, consistent with the Social Bond Eligibility Criteria detailed in the Framework and the other eligibility criteria for Receivables set forth in this Offering Memorandum during the Prefunding Period.  The net proceeds from the sale of the Notes allocated for such activity will be deposited into the Prefunding Account held and managed by the Indenture Trustee pending their use to purchase new Eligible Loans during the Prefunding Period.  The look-back period for an Eligible Loan to be included in the TAST 2022-1 transaction will be 36 months before the Initial Cutoff Date.

*Post-Issuance Reporting.*

Allocation Reporting.  On an annual basis, until the net proceeds from the sale of the Notes have been fully allocated, and on a timely basis in case of material developments, Tricolor intends to publish an annual sustainability report on its website that will include:

- The amount of remaining net proceeds from the sale of the Notes that have been allocated to Eligible Loans, subject to confidentiality considerations; and

- The outstanding amount of net proceeds from the sale of the Notes yet to be allocated to Eligible Loans at the end of the reporting period, where applicable; though it is not expected for any net proceeds to remain unallocated at the time of the first published annual sustainability report.

Impact Reporting**.**  In addition, subject to any applicable confidentiality obligations and to the extent feasible, for as long as the Notes remain outstanding, Tricolor intends to publish on its website, on a quarterly basis and on a timely basis in the case of material developments, information with respect to the TAST 2022-1 Receivables in connection with the following social impact objectives:  (1) access to affordable credit, (2) access to quality, dependable and essential services and (3) socioeconomic advancement.  For each reporting date, Tricolor intends to provide actual data with respect to each of these three objectives as a comparison to the expected results to demonstrate the social impact of the proceeds of the sale of the Notes.

*External Review and Second Party Opinion.*  Tricolor will request a qualified independent external reviewer to verify and provide third-party assurance with respect to the allocation of the net proceeds of the Notes

with the Framework. This review will be carried out annually and Tricolor will post the external review report on its website.

The ICMA does not provide certification as to whether any particular bonds constitute "Social Bonds" and no regulatory body has made such a certification as to the Notes.  However, Tricolor has retained S&P Global to assess its Framework to determine its alignment with the Social Bond Principals. S&P Global has completed its analysis and will issue a second party opinion regarding the Framework prior to the Closing Date that will be available on its website.  The second party opinion is expected to conclude, among other things, that the use of proceeds, process for project evaluation and selection, management of proceeds, and reporting guidelines of the Framework are each aligned or strongly aligned, as applicable, with the relevant component of the Social Bond Principals.

The information and materials found on Tricolor's website, including without limitation the aforementioned impact reports, annual use of proceeds reports and the second party opinion, are not part of or incorporated by reference into this Offering Memorandum or any other report or filing made with the SEC or any other governmental authority by Tricolor, the Depositor or the Issuer.

## THE ISSUER

**Limited Purpose and Limited Assets**

The Depositor formed Tricolor Auto Securitization Trust 2022-1, a Delaware statutory trust, on March 2, 2022.  The Issuer will not engage in any activity other than:

- acquiring, holding and managing the Receivables and the other assets of the Issuer;

- issuing the Securities;

- using (or permitting the Depositor to use) the proceeds of the sale of the Notes to (1) purchase the Initial Receivables on the Closing Date, (2) fund the Reserve Fund and the Prefunding Account, (3) pay the organizational, start-up and transactional expenses of the Issuer and (4) pay the balance to the Depositor;

- pledging the Receivables and other assets of the Issuer to the Indenture Trustee pursuant to the Indenture;

- entering into and performing its obligations under the Transaction Documents, including purchasing Subsequent Receivables during the Prefunding Period;

- making payments on the Notes and distributions on the Certificates; and

- engaging in those activities, including entering into agreements, that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

If the various protections provided to the Noteholders by available credit enhancement (overcollateralization, excess spread, the Reserve Fund and subordination of each class of Notes, if any, that is junior in its right to receive payments of principal and interest to each more senior class of Notes) are insufficient, the Issuer will have to rely solely upon payments by obligors under the Receivables and the proceeds from the repossession and sale of Financed Vehicles that secure Defaulted Receivables to make payments on the Notes.  In connection with the exercise of remedies in relation to Defaulted Receivables, various factors, such as the Issuer not having perfected security interests in the Financed Vehicles in all States or State and federal laws protecting defaulting consumers from repossession of their Financed Vehicles, may affect the Servicer's ability to repossess and sell the Financed Vehicles securing such Defaulted Receivables, and thus may reduce the proceeds which the Issuer can distribute to Noteholders.  See *"Material Legal Aspects of the Receivables"*.

The Issuer's principal offices are in care of Wilmington Trust Company, as Owner Trustee, at 1100 North Market Street, Rodney Square North, Wilmington, Delaware 19890-1605, Attention: Corporate Trust Administration.  The Issuer's fiscal year ends on December 31.

## Capitalization

The following table illustrates the expected capitalization of the Issuer as of the Closing Date, as if the issuance and sale of the Notes had taken place on such date:

|  |  |  |
|---|---|---|
| Class A Notes............................................................ | $ | 125,560,000 |
| Class B Notes............................................................ |  | 13,470,000 |
| Class C Notes............................................................ |  | 13,980,000 |
| Class D Notes............................................................ |  | 25,140,000 |
| Class E Notes ............................................................ |  | 21,160,000 |
| Class F Notes ............................................................ |  | 12,820,000 |
| Overcollateralization.............................................. |  | 35,500,481 |
| Reserve Fund Deposit ............................................. |  | 3,078,067 |
| Total............................................................ | $ | 250,708,548 |

The Issuer will not issue any debt other than the Notes or issue any securities other than the Notes and the Certificates.

## THE DEPOSITOR

Tricolor Auto Receivables 2 LLC, a Delaware limited liability company, is the Depositor.  The sole equity member of the Depositor is Tricolor.  The Depositor's address is 6021 Connection Drive, 4th Floor, Irving, Texas 75039.  Its telephone number is (214) 271-0640.

The Depositor was formed for the limited purpose of purchasing receivables from Tricolor, transferring receivables to the Issuer and special purpose entities similar to the Issuer and engaging in any activities incidental or necessary for this purpose.  The Depositor will not retain any interest in any receivables so purchased and transferred and will have no ongoing servicing obligations or responsibilities with respect to any such receivables and no administrative obligations with respect to the Issuer or any special purpose entities similar to the Issuer.

The Depositor will purchase the Receivables from Tricolor pursuant to the Receivables Purchase Agreement and will sell the Receivables to the Issuer pursuant to the Sale and Servicing Agreement.  If it is discovered that the Depositor has breached a representation or warranty with respect to a Receivable under the Sale and Servicing Agreement, the Depositor will be required to repurchase the affected Receivable from the Issuer if the interest of the Noteholders therein is materially and adversely affected by such breach.  In this case, Tricolor will be obligated to repurchase the affected Receivable from the Depositor pursuant to the Receivables Purchase Agreement.

The Depositor does not have, is not required to have and is not expected in the future to have, any significant assets.  As of the date of this Offering Memorandum, the Depositor is not a party to any legal proceeding that could be reasonably expected to have a material impact on the Issuer or the interests of the Noteholders.

## THE TRUSTEES, THE CUSTODIAN AND THE BACKUP SERVICER

### The Owner Trustee

Wilmington Trust Company, the Owner Trustee, is a Delaware non-depository trust company originally incorporated in 1901. On July 1, 2011, Wilmington Trust Company filed an amended charter which changed its status from a Delaware banking corporation to a Delaware non-depository trust company.  Wilmington Trust Company's principal place of business is located at 1100 North Market Street, Wilmington, Delaware 19890. Wilmington Trust Company is an affiliate of Wilmington Trust, National Association and both Wilmington Trust Company and WTNA are subsidiaries of M&T Bank Corporation.  Since 1998, Wilmington Trust Company has

served as owner trustee in numerous asset-backed securities transactions involving pools of motor vehicle receivables.

Wilmington Trust Company is subject to various legal proceedings that arise from time to time in the ordinary course of business. Wilmington Trust Company does not believe that the ultimate resolution of any of these proceedings will have a materially adverse effect on its services as Owner Trustee.

Wilmington Trust Company has provided the above information for purposes of this Offering Memorandum. Other than the above two paragraphs, Wilmington Trust Company has not participated in the preparation of, and is not responsible for, any other information contained herein.

**The Indenture Trustee and the Custodian**

WTNA will be the Indenture Trustee under the Indenture and the Custodian under the Sale and Servicing Agreement. WTNA is a national banking association with trust powers incorporated under the federal laws of the United States. The Indenture Trustee's principal place of business is located at 1100 North Market Street, Wilmington, Delaware 19890. WTNA is an affiliate of Wilmington Trust Company and both WTNA and Wilmington Trust Company are subsidiaries of M&T Bank Corporation. Since 1998, WTNA has served as indenture trustee in numerous asset-backed securities transactions.

WTNA is subject to various legal proceedings that arise from time to time in the ordinary course of business. WTNA does not believe that the ultimate resolution of any of these proceedings will have a materially adverse effect on its services as Indenture Trustee.

WTNA has provided the above information for purposes of this Offering Memorandum. Other than the above two paragraphs, WTNA has not participated in the preparation of, and is not responsible for, any other information contained herein.

The Servicer, the Depositor and their respective affiliates may maintain normal commercial banking relationships with WTNA and its affiliates. The fees and expenses of the Indenture Trustee and the Custodian may be paid by the Servicer under the Sale and Servicing Agreement and, to the extent not so paid, will be paid in accordance with the priority of payments described under *"Application of Available Funds—Distributions"*.

The Issuer and the Servicer will indemnify the Owner Trustee, the Indenture Trustee and the Custodian and each of their respective officers, directors, employees and agents against any and all loss, liability or expense (including attorneys' fees and expenses and any court costs), including those incurred in connection with any action, claim or suit brought to enforce the right of the Owner Trustee, the Indenture Trustee or the Custodian, as the case may be, to indemnification, incurred by each of them in connection with the acceptance or the administration of the Issuer and the performance of its duties under the Transaction Documents. The Issuer and the Servicer will not be required to indemnify against any loss, liability or expense incurred by the Indenture Trustee, the Owner Trustee or the Custodian as a result of any such entity's own willful misconduct, gross negligence or bad faith.

Each of the Indenture Trustee or the Custodian will be obligated to perform only those duties that are specifically assigned to it in the Transaction Documents to which it is a party and in the case of the Indenture Trustee, also in the Trust Agreement. The Indenture Trustee and the Custodian may conclusively rely on certificates and opinions furnished to it in accordance with the Indenture and the Sale and Servicing Agreement. The Indenture will not require the Indenture Trustee to expend or risk its own funds or otherwise incur financial liability if it has reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk is not reasonably assured to it. The Indenture Trustee will not be liable for any error of judgment made by it in good faith in the absence of willful misconduct or negligence. The Indenture Trustee will not be liable with respect to any action it takes or omits to take pursuant to directions from the Noteholders in accordance with the Indenture. See *"Description of the Notes"* for more information regarding the Indenture Trustee's duties under the Indenture and *"Description of the Transaction Documents—Replacement of Trustees, Custodian and Backup Servicer—The Indenture Trustee, The Custodian and The Backup Servicer"* for information regarding the Indenture Trustee's resignation, removal and replacement.

**The Backup Servicer**

Vervent Inc. will be the Backup Servicer under the Sale and Servicing Agreement.  Vervent is headquartered in San Diego, California and has been in business for more than 30 years, offering financial servicing support.  It is the only company in its class to receive a Morningstar MOR ABS 1 ranking for three consecutive years with a forecast of 'stable' which is the highest certification for mitigated operational risk and overall excellence in loan servicing.  Vervent began servicing mobile home loans in 1986, consumer (non-mortgage) loans in 2008, small business and commercial loans and leases in 2005, and credit cards in 2017; and offers consumer and commercial loan and lease servicing, backup servicing and call center services.  Vervent's business model focuses on future-built technology, stringent compliance protocols and proactive, AI-powered service.  Vervent was formed in July 2019 when First Associates Loan Servicing, LLC and Portfolio Financial Servicing Company combined operations to form a single servicing organization as a result of First Associates Loan Servicing, LLC's successful investment round with Stone Point Capital.

Vervent has provided the above information for purposes of this Offering Memorandum.  Other than the immediately preceding paragraph, Vervent has not participated in the preparation of, and is not responsible for, any other information contained herein.

The Servicer, the Depositor and their respective affiliates may maintain normal business relationships with Vervent and its affiliates.  The fees and expenses of the Backup Servicer may be paid by the Servicer under the Sale and Servicing Agreement and, to the extent not so paid, will be paid in accordance with the priority of payments described under *"Application of Available Funds—Distributions"*.

The Issuer and the Servicer will indemnify the Backup Servicer and its officers, directors, employees and agents against any and all loss, liability or expense (including attorneys' fees and expenses and any court costs), including those incurred in connection with any action, claim or suit brought to enforce the right of the Backup Servicer to indemnification, incurred by each of them in connection with the acceptance or the administration of the Issuer and the performance of its duties under the Transaction Documents.  The Issuer and the Servicer will not be required to indemnify against any loss, liability or expense incurred by the Backup Servicer as a result of its own willful misconduct, gross negligence or bad faith.

The Backup Servicer will be obligated to perform only those duties that are specifically assigned to it in the Transaction Documents to which it is a party.  See *"Description of the Transaction Documents—Replacement of Trustees, Custodian and Backup Servicer—The Indenture Trustee, The Custodian and The Backup Servicer"* for information regarding the Backup Servicer's resignation, removal and replacement.

## THE TRUST PROPERTY

The Trust Property will include, among other things:

- the Receivables and payments made on the Receivables after the applicable Cutoff Date;

- the security interests in the Financed Vehicles granted by obligors under the Receivables;

- the Collection Account, the Note Payment Account, the Reserve Fund, the Prefunding Account and amounts on deposit therein;

- any proceeds of recourse rights against the related Originator that sold a Receivable to Tricolor;

- any proceeds from claims on physical damage, credit life and disability insurance policies covering the Financed Vehicles or the obligors;

- the Receivable files;

- all rights under the Transaction Documents, including the right to require the Depositor to repurchase Receivables from the Issuer; and

- all proceeds from the items described above.

56

Pursuant to the Indenture, the Issuer will pledge the Trust Property to the Indenture Trustee for the benefit of the Noteholders.

## TRICOLOR AUTO ACCEPTANCE, LLC

**General**

Tricolor Auto Acceptance, LLC is a Delaware limited liability company established in 2010 and certified by the United States Department of Treasury as a Community Development Financial Institution in 2019.  Tricolor's corporate offices are located at 6021 Connection Drive, 4th Floor, Irving, Texas 75039, and its telephone number is (214) 271-0640.  As of February 28, 2022, Tricolor had 1,050 employees, 863 U.S. based and 187 Mexico based through a nearshore company.  Tricolor services all motor vehicle retail installment sale contracts that it purchases.  Tricolor is the Sponsor of the transaction described herein and will be the Servicer.

The Initial Receivables were originated and the Subsequent Receivables will be originated by Tricolor Auto Group, LLC, a Delaware limited liability company, Tricolor California Auto Group, LLC, a Delaware limited liability company and Flexi Compras Autos LLC, a Texas limited liability company, each a wholly-owned subsidiary of Tricolor Holdings LLC and an affiliate of Tricolor, and subsequently were acquired by Tricolor.  The Depositor will purchase the Receivables from Tricolor pursuant to the Receivables Purchase Agreement and will sell the Receivables to the Issuer pursuant to the Sale and Servicing Agreement.  If it is discovered that the Depositor has breached a representation or warranty with respect to a Receivable under the Sale and Servicing Agreement, the Depositor will be required to repurchase the affected Receivable from the Issuer if the interest of the Noteholders therein is materially and adversely affected by such breach.  In this case, Tricolor will be obligated to repurchase the affected Receivable from the Depositor pursuant to the Receivables Purchase Agreement.

As of December 31, 2021, Tricolor serviced a portfolio of approximately 30,800 auto loans with an aggregate outstanding balance of approximately $527 million.

Under the Sale and Servicing Agreement, Tricolor will service the Receivables and will be compensated for acting as the Servicer.  The Servicer's activities consist primarily of collecting and processing customer payments, responding to customer inquiries, initiating contact with customers who are delinquent in payment of any installment, maintaining the security interests in the Financed Vehicles, arranging for the repossession and liquidation of the Financed Vehicles, pursuing deficiencies when necessary and remitting Texas Deferred Sales Taxes to the State of Texas.

As a consumer finance company, Tricolor is subject to various consumer claims and litigation seeking damages and statutory penalties, based upon, among other things, usury, disclosure inaccuracies, wrongful repossession, violations of bankruptcy stay provisions, certificate of title disputes, fraud, breach of contract and discriminatory treatment of credit applicants.  Some litigation against Tricolor and its affiliates could take the form of class action complaints by consumers.  As the assignee of motor vehicle installment sale contracts originated by the Originators, Tricolor and its affiliates may also be named as a co-defendant in lawsuits filed by consumers principally against the Originators.  The damages and penalties claimed by consumers in these types of matters can be substantial.  The relief requested by the plaintiffs varies but can include requests for compensatory, statutory and punitive damages.  As of the date of this Offering Memorandum, neither Tricolor nor either Originator is subject to litigation that individually or in the aggregate is expected to have a material adverse effect on the Noteholders.

In September 2015, Tricolor and the United States entered into the Order to resolve certain matters in dispute between them regarding the "Furnisher Rule" provisions of the Fair Credit Reporting Act.  The Order required Tricolor to pay a civil penalty of $82,777 and to undertake certain activities to address issues identified in the Order related to customer account information Tricolor provides to consumer reporting agencies.  Tricolor has completed all of the requirements due to be completed within the Order.  None of the terms and conditions of the Order have had, or are expected to have, a material adverse effect on Tricolor's operations or jeopardize Tricolor's loan origination or loan servicing activities.  See *"Risk Factors—The regulatory environment in which the consumer finance industry operates could have a material adverse effect on Tricolor"*.

**Administrator**

Tricolor will enter into an Administration Agreement with the Issuer and the Indenture Trustee pursuant to which it will act as Administrator and will agree to provide certain notices and to perform other administrative obligations required to be provided or performed by the Issuer or the Owner Trustee.

**Tricolor's Securitization Program**

The Tricolor securitization program, which involves the term securitization of sub-prime automobile retail installment sale contracts with a legal structure that is generally similar to the transaction described herein, began in June 2013 and completed seven other transactions from 2014 through 2021. This is the eighth securitization that Tricolor has sponsored. Tricolor expects that in the future it will from time to time sponsor additional securitizations of auto loans in which the Depositor will serve as depositor and newly-formed Delaware statutory trusts will serve as issuers.

The transaction documents for the previous pools of retail installment sale contracts securitized by Tricolor contain covenants requiring repurchase of receivables for certain breaches of representations and warranties. During the past year, no demands were made to repurchase for breach of any such representation or warranty.

As of the date of this Offering Memorandum, no prior transaction has experienced any event of default or servicer termination event or otherwise been accelerated due to the occurrence of an early amortization or other performance triggering event. Tricolor has not taken any action out of the ordinary to prevent such an occurrence. Neither Tricolor nor the Issuer can guarantee that there will not be any events of default or servicer termination events in the future.

**TRICOLOR'S AUTOMOBILE FINANCING PROGRAM**

**General**

Founded in 2007, Tricolor has created the leading technology-driven platform to provide inclusive and responsible credit to the underserved Hispanic consumer, providing our customers with a financially responsible path to purchasing a vehicle. Tricolor is committed to "doing well by doing good" and our mission and platform in turn, empowers our customers' mobility, both financially and physically. We leverage a deep data-driven understanding of our consumer assembled from over 22 million unique insights together with a rigorous application of artificial intelligence to score those who have not been provided a score under traditional underwriting models, or in other words, to "score the unscorable." Because of this data-driven technology, Tricolor serves consumers who are typically unable to obtain financing from traditional lending sources such as credit unions, banks, and captive auto finance companies. Our differentiated value proposition integrates a direct-to-consumer retail automotive model with a tech-enabled lending platform making Tricolor the nation's largest used vehicle retailer and lender for the Hispanic consumer. Tricolor sells and finances high-quality, certified used motor vehicles through its branded dealerships, in the large and highly fragmented used vehicle sales and financing market. Through its branded dealerships, Tricolor provides its customers with a comprehensive end-to-end solution for their automotive needs, including the sale, financing, and maintenance of their vehicle. Through the utilization of advanced data analytics and technology, Tricolor advances financial inclusion to a highly underserved market through the offering of responsible, affordable, credit-building auto loans to individuals with no or limited credit history.

As of the date of this Offering Memorandum, Tricolor has disbursed over $1.5 billion across over 85,000 credit-building loans.

Tricolor is certified by the U.S. Department of the Treasury as a CDFI since 2019. CDFIs must have a primary mission of promoting community development, providing financial products and services, serving one or more defined target markets, and maintaining accountability to the communities they server.

Funding for Tricolor's lending activities and operations is principally derived through internally generated profit from operations, private placements of Tricolor's equity securities and through the issuance of asset-backed bonds secured by a pool of its installment loans. Tricolor utilizes loan warehouse facilities to finance the principal

58

amount of most of the loans it makes to its customers, using its own inventory as collateral. The proceeds generated from the sale of such loans drive Tricolor's business and are used to originate additional loans.

Tricolor manages its portfolio from its corporate headquarters in Dallas, Texas, as well as nearshore servicing and collections in Guadalajara, Mexico. Over the past fifteen years, Tricolor has developed a vertically-integrated business model to provide its target market with the ability to acquire quality used vehicles through the execution of twelve fundamental principles and centralized processes:

*Industry Leadership in the Subprime Auto Sales and Finance Market.* Tricolor has distinguished its brand within the "buy here-pay here" segment. Tricolor is a leading used vehicle retailer in the United States focusing on the integrated sale and financing of vehicles to the underserved Hispanic market. Tricolor focuses its operations in geographical areas with a significant Hispanic population. The majority of Tricolor's retail stores are located in urban areas in Texas and California, which have high concentrations of Hispanics and income levels below average, where the vast majority of households are likely credit invisible. Tricolor intends to expand its geographic footprint in southern California through its affiliated brand, Ganas Auto Group, entering into new markets in Nevada, New Mexico and Arizona and increasing sales in existing markets in Texas. Tricolor believes that with the processes it has developed, it has the ability to scale efficiently and achieve store profitability in most markets within six to 12 months from inception of a store.

*Targeted and Innovative Marketing.* Tricolor utilizes an innovative, targeted and comprehensive digital strategies to focus on its ability to provide quality vehicles and financing to its target market. The digital campaigns are designed to generate purposeful engagement and more meaningful conversion, through leveraging rich customer data and centered around a "jobs-to-be-done" framework.

*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience.

*End-to-End Solution for Customers.* Tricolor provides its customers with a comprehensive end-to-end solution for their automotive needs, including the sale, financing, and maintenance of their vehicles. To serve its customers, Tricolor sells quality used vehicles with affordable down payments and installment payments, and provides after sale support with its free limited warranty program. To facilitate customer payments, Tricolor has expanded its customer payment channels to enable its customers to make payments online, by phone or at alternative retail and other locations nationwide. A small number of customer payments are taken at Tricolor dealerships and Tricolor directs those customers to make payments through the expanded payment channels.

*Integrated, Centralized Business Model.* Tricolor has developed a business model that integrates its vehicle acquisition, reconditioning, sales, underwriting and finance, loan servicing and after sale support activities, which enables it to effectively manage its value proposition. In addition, Tricolor has centralized the key components of each of these functions and has implemented artificial intelligence/machine learning in key areas to create greater efficiency, end-to-end. Tricolor believes that its integrated business model and centralized operations creates a consistent customer service, while providing it with a scalable platform for growth while creating long term value.

*Vehicle Acquisition, Vehicle Reconditioning and Distribution.* Tricolor acquires motor vehicles primarily from used vehicle auctions and national rental car companies. Its centralized supply chain strategy takes into account many factors, including customer preferences, wholesale value, age, mileage, condition, costs of reconditioning, and buyer affordability. Subsequent to acquisition, vehicles are transported to one of Tricolor's nine reconditioning facilities, where Tricolor performs a rigorous multi-point inspection for safety and operability. Six of Tricolor's reconditioning facilities are located in Texas and three are located in California. On average, Tricolor spends approximately $2,000 in reconditioning costs per vehicle sold, including parts and labor. Upon passing its quality assurance testing, Tricolor determines the distribution of vehicles to its dealerships based on current inventory mix and levels, along with sales patterns at each dealership.

*Vehicle Sales.* Tricolor utilizes targeted digital marketing programs and a lead generation department to promote its brand and attract customers to its dealerships. Customers are guided through the buying process by

59

Tricolor's trained sales personnel who focus on presenting its value proposition, the superior quality of its inventory, and financing terms.  In addition, Tricolor established Tricolor Financial in 2021 to provide franchise dealers with the ability to transact incremental sales to Tricolor's target customer.

*Sophisticated and Proprietary Information-Based Systems and Strategies.*  Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business.  Tricolor uses advanced data science in its credit scoring system to decision customers into six credit grades based on historical loan performance.  Tricolor gathers data on its customers that covers three main categories: (a) personal information such as identification and residence, (b) employment information such as type, length of employment and income and (c) financial information such as credit history, source of down payment, open loans and insurance.  Tricolor uses its proprietary AI technology as an alternative to traditional credit scores in an effort to assess the creditworthiness of this otherwise marginalized, underserved, yet rapidly growing segment of the United States population.  The credit grades are used to determine down payments, payment terms, and interest rates.  Tricolor believe its ability to quantify each customer's risk profile allows it to better predict loan performance, maintain the quality of its loan portfolio, and enhance its servicing and collections activities.

*Underwriting and Finance.*  Using information provided as part of the credit application process, Tricolor's centralized proprietary credit decisioning engine inclusive or artificial intelligence/machine learning, or CDE, determines a customer's credit grade and the corresponding financing terms.

*Loan Servicing.*  Tricolor executes all processes related to the management of its loan portfolio, from collections to insurance tracking to repossessions.  Tricolor use behavioral models designed to predict payment habits, as well as automated dialer and messaging systems to enhance collection efficiency.

*After Sale Support.*  As part of the sale price, Tricolor provides a limited warranty covering the power train and heating and cooling systems on each vehicle it sells.

*Systems and Databases are Configured for High Availability and Disaster Recovery.*  High availability is achieved through the use of server and database clustering and redundancy at multiple hardware layers.  All of the databases and systems of Tricolor are backed up on a regular basis.  Tricolor has a comprehensive disaster recovery plan in place to cover intermittent or extended periods of interruption in one or more of its critical systems.  Tricolor periodically tests its disaster recovery procedures.

As more fully described under *"Material Legal Aspects of the Receivables—Consumer Protection Laws"*, Tricolor's business is subject to various State and federal laws and regulations, including State laws and regulations which require licensing.  Tricolor and the Originators have all licenses required by their respective businesses, including dealer and finance licenses required by the States of Texas, California and Nevada.

**Underwriting**

Tricolor focuses on serving the needs of the Hispanic consumer.  Tricolor provides financing for substantially all of the used vehicles it sells at its dealerships through motor vehicle retail installment sale contracts utilizing a centralized underwriting process.  The foundation for underwriting these loans is Tricolor's credit decisioning engine or "CDE" developed from its own historical loan performance.

In connection with each sale, Tricolor requires the customer to complete a credit application.  Upon entering the customer information into the CDE, a credit grade is generated for each customer, ranging from A+ (best) to E (worst), which is used by the dealership personnel to match the appropriate vehicle with the required deal terms and the customer's needs.  The customer's credit grade and type of vehicle determine the term, installment payment and minimum down payment amount.  The interest rate charged is a function of the customer's credit grade and down payment.

Tricolor's risk management team establishes these terms and the centralized verification team validates the pertinent information on the customers' credit application before approving the loan, including employment, residence, proof of insurance and identity.  Tricolor's risk personnel manage the credit mix of its portfolio of auto loans on a company-wide basis.  This group is also responsible for monitoring the origination and underwriting

60

processes, providing underwriting training to appropriate dealerships personnel, monitoring loan servicing, and static-pool tracking of portfolio loss performance and profitability.

Many of Tricolor's customers are immigrants and some may not be U.S. citizens. Tricolor follows appropriate customer identification procedures as mandated by law, including accepting government issued picture identification that may be issued by non-U.S. governments, as permitted by the USA PATRIOT Act, but Tricolor does not verify the immigration status of its customers, which is not required by law and which Tricolor believes is consistent with industry best practices. In Texas, Nevada, New Mexico, Arizona and California, the States in which Tricolor originates all of its auto receivables, a U.S. driver's license is not required to purchase and obtain a title and registration for a motor vehicle or obtain insurance covering the motor vehicle.

Since January 2021, Tricolor has started a project to transition to a third-party decision engine called GDS Link. This will expand the underwriting's capability of servicing customers and enable additional third-party data vendors for credit scoring model. The transition started in Q2 2021 and is expected to be completed by the end of Q3 2022. The underwriting process and credit quality are expected to be similar to CDE.

**Sales Taxes**

*General.* In most jurisdictions, including Texas, Nevada, New Mexico, Arizona and California, a sales tax is levied on motor vehicle sales and is payable by the purchaser. Except as described under *"Texas Deferred Sales Taxes"*, the amount financed may include sales taxes paid by the purchaser.

*Texas Deferred Sales Taxes.* The law in Texas requires automobile dealers to collect sales tax from the purchaser at the time of sale on all transactions, except in cases where the dealer finances all or part of the purchase price. In this case, sales tax is amortized over the term of the loan and due only on amounts collected. The amount financed under a seller financed motor vehicle retail installment sale contract in Texas does not include the sales tax amounts. In the event of a default, sales tax is not due on the uncollected amounts. A transfer to a "related finance company" registered with the Texas Comptroller does not accelerate payment of the sales tax. Each of Tricolor, the Depositor and the Issuer is registered with the Texas Comptroller as a related finance company of the Texas Originator. The Servicer will remit, or cause to be remitted, to the appropriate county tax office in Texas all Texas Deferred Sales Tax Payments received. The portion of any payments received on the Receivables representing Texas Deferred Sales Tax Payments will not constitute Available Funds and will not be available to make payments to Noteholders. Such payments need not be deposited into the Collection Account.

**Credit Scoring Models**

Tricolor has dedicated, and will continue to dedicate, substantial resources to developing, maintaining, and updating its risk models and CDE that are focused on predicting the credit risk of its borrowers. Tricolor has engaged highly respected, trained and experienced analysts to develop its CDE. Many companies use FICO® scores as a standard metric to assess the credit risk of customers. In contrast, Tricolor has over seven years of credit scoring modeling experience in developing scoring models that are more predictive with the Hispanic consumer. Tricolor's scoring models also include the use of alternative data sources along with traditional credit bureau data which enhance the ability to separate the credit risk levels into different categories.

Tricolor believes its ability to quantify a customer's risk profile based upon historical data, breadth of data, and sophisticated modeling techniques, allows it to better predict loan performance, manage the blended quality of Tricolor's portfolio of loans, and obtain appropriate risk adjusted returns. The first credit scoring model was deployed in September 2012. Since then, four subsequent generations of credit scoring models have been implemented. The most recent credit scoring model was implemented in November 2020. The credit scoring models have evolved over time and leverage data collected from prior models, as well as added the implementation of a state-of-the-art artificial intelligence/machine learning algorithm allowing them to become more sophisticated in identifying the credit risk of Tricolor's customers.

**Loan Servicing and Collections**

Upon completion of a sale and origination of a receivable, the receivable is added to the Servicer's loan servicing and collection platform within its dealer management system. This collection system was custom

developed specifically for seller financed loans and provides the transparency and tools necessary to effectively and efficiently service the receivables. The Servicer uses a centralized collections approach and does not have collectors located at its dealerships.

Early delinquencies are managed through the use of an automated dialer, interactive voice response (IVR), SMS messaging system to provide optimum collection efficiency for early delinquencies. The early delinquencies are managed by the Servicer's nearshore collections team in Guadalajara, Mexico and Dallas, Texas, all of which is overseen by the domestic collections management team located in Dallas, Texas. The majority of more serious delinquencies are managed by the Servicer's Dallas, Texas collections personnel. In addition, the same personnel handle all back-end collections using a strategic process. Both facilities manage the Servicer's specialty groups such as bankruptcy, repossession, and insurance. Collectors focus their efforts on obtaining customer payments and educating customers on payment options. All collector calls are recorded and recorded calls are randomly selected for quality review. Tricolor installs an anti-theft/GPS unit on all financed vehicles. For collection purposes, these devices assist the Servicer in locating financed vehicles and assist the Servicer in repossessing vehicles more effectively when collection efforts have been exhausted. These units can also be utilized by the customer to locate a stolen vehicle. These units do not include starter-interrupt functionality.

Tricolor has developed and implemented its strategy to perform most of its loan servicing and collections activities in its nearshore outsourcing center in Guadalajara, Mexico. Tricolor also maintains 41 people in loan servicing in its corporate headquarters in Dallas, Texas. The call center in Guadalajara is connected to Tricolor's robust voice and data network which is hosted in Dallas, Texas with backup redundancy. In the event of any disruption to its operations in Mexico, Tricolor can redirect all inbound and outbound call traffic immediately to its corporate headquarters in Dallas, Texas. In the event the disruption was prolonged, Tricolor has an established relationship with a local staffing firm in order to rapidly increase its headcount in Dallas, Texas. Depending on the severity and extent of the disruption, Tricolor may, but will not be obligated to, engage an alternative nearshore outsourcing partner in Mexico. See *"Risk Factors—Disruptions in the loan servicing and collections activities performed by the Servicer's nearshore outsourcing center may adversely affect the performance of the Receivables"*.

**Repossessions**

Involuntary repossessions occur after all collection techniques have been unable to bring the account current, there is no customer contact, the customer deals in bad faith, or if the vehicle is deemed to be in danger of being damaged, destroyed or hidden. Voluntary repossessions occur when customers voluntarily surrender a vehicle due to the inability to continue making payments.

Tricolor utilizes a forwarding agency with an extensive network of qualified and licensed third party repossession agents throughout the country. These agents are assigned repossession rights to recover the vehicles at Tricolor's direction and transport recovered vehicles, in most cases, to Tricolor. Tricolor will sell repossessed financed vehicles in a commercially reasonable manner as determined in its good faith and reasonable judgment.

Upon repossession of the vehicle, a legal notice containing redemption instructions is sent. If the borrower foregoes the opportunity to redeem the vehicle, it is sold. Tricolor inspects the vehicle and performs any necessary recondition or repairs to prepare it for sale.

Tricolor will agree to use its reasonable best efforts to maximize collections on the related financed vehicles, consistent with its customary servicing practices. Consistent with its customary servicing practices, once Tricolor determines eventual payment in full is unlikely, Tricolor will typically repossess the related financed vehicle. Tricolor will agree to sell repossessed financed vehicles consistent with its customary servicing practices, which may include sales at commercial vehicle auctions or to affiliates of Tricolor, in each case in a commercially reasonable manner as determined by Tricolor in its good faith and reasonable judgment. For repossessed financed vehicles sold to affiliates of Tricolor, Tricolor will maintain a file documenting the commercial reasonableness of each such sale with contemporaneous wholesale pricing reports from industry recognized sources, in addition to any documents relevant to Tricolor's determination of the value of such financed vehicle at the time of sale.

**Charge-offs**

Tricolor's policy generally requires that a receivable be charged-off under the following circumstances:

- the receivable is 120 or more days past due at the end of a month;

- the customer is in a bankruptcy proceeding; or

- if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan.

Historically, Tricolor has not pursued any deficiencies remaining after repossession and sale of the related financed vehicle or after full charge-off of the related auto loan and does not foresee this policy changing even though the deficiency to the extent practicable and legally permitted can be pursued. Borrowers may be contacted, and when warranted by circumstances, Tricolor (or an agent acting on its behalf) establishes repayment schedules that are monitored until the deficiencies are either paid in full, a settlement agreement is reached or collection becomes impractical to pursue.

**Extensions**

Consistent with its normal procedures, Tricolor may, in its discretion, arrange with the borrower on a receivable to extend or modify the payment schedule. Extensions may be granted to a current or delinquent borrower to cure a short-term cash flow problem. Extensions are granted on an individual basis, and in the sole discretion of Tricolor and are monitored and approved by a loan servicing supervisor. Key components of the extension guidelines generally include:

- maximum of three monthly equivalent total lifetime extensions;

- minimum of six month's consecutive pay history from the date of sale; and

- the extension must bring the receivable current.

Extensions are reported and monitored closely. Upon an extension, the related receivable is no longer considered delinquent.

**Restructures**

Restructures modifying the auto loan's term are only authorized with management approval. Permitted restructures generally consist of an additional six to 12 months being added to the term of the auto loan and then re-amortized. A maximum of two lifetime restructure per auto loan is allowed. No modifications to a receivable's principal balance are permitted.

**Natural Disaster Policy**

In the event of a declared disaster, Tricolor must comply with state regulations regarding the deferment process. Tricolor is required to deliver the deferment agreement to the customer but it is not required to obtain the customer's signature, if (1) the customer resides in an area designated as a state of disaster and (2) the deferment occurs before the state of disaster has been terminated by executive order or by expiration. Under excruciating circumstances, Tricolor can deviate from standard deferment policy requirements as it relates to the number of payments made or the number of deferments applied.

**Insurance Coverage**

Each motor vehicle retail installment sale contract requires the borrower to keep the financed vehicle fully insured against theft. All borrowers are required to obtain and provide evidence that they carry physical damage insurance in amounts required by applicable State law on the related financed vehicles. The borrower can elect to purchase collateral protection insurance from a third party provider or from Tricolor in order to meet the requirements of the retail installment sale contract. Borrowers participating in the collateral protection insurance

program make separate payments, one in satisfaction of the scheduled auto loan payment and one in satisfaction of the Collateral Protection Insurance Payment.  If a borrower remits a single payment in satisfaction of both the scheduled payment and the Collateral Protection Insurance Payment and does not specify how the payment is to be allocated, the remitted funds will be allocated first to pay interest and second to pay principal up to the scheduled principal amount with the remainder allocated to the Collateral Protection Insurance Payment.  Any funds allocated to the Collateral Protection Insurance Payment in respect of Financed Vehicles will not be included in Available Collections and need not be deposited in the Collection Account.  Any proceeds of paid claims with respect to collateral protection insurance are applied to reduce the principal balance of the applicable auto loan.  Tricolor monitors whether the borrower is maintaining the required insurance.  In the event there is a lapse in coverage from the borrower's third party insurer, Tricolor may elect to force place collateral protection insurance coverage; however, the resulting premium is not added to the principal balance of the related motor vehicle retail installment sale contract.  The requirement for insurance is waived by Tricolor at any time the outstanding principal balance on a receivable is less than $2,000.

**Warranty**

In 2013, the Originators began providing at no additional charge a TriGarantia® limited warranty for power train and heating and cooling systems coverage.  The TriGarantia® warranty is a 12 month/12,000 mile limited warranty.  Tricolor has offered no warranties or service contracts outside of this limited warranty.

**Allocation of Receivable Payments**

Interest under each Receivable is calculated each day on the basis of the Principal Balance of that Receivable on that day whereby the amount of an obligor's fixed level installment payment which is allocated to interest is equal to the product of the Contract Rate on the Receivable multiplied by the elapsed time period (which is expressed as a fraction of a year) multiplied by the remaining Principal Balance after the preceding Receivable payment.  The remainder of the obligor's payment amount is allocated to reduce the Principal Balance.  Accordingly, if an obligor pays a fixed monthly installment before its due date, the portion of the payment allocable to interest for the period since the preceding payment will be less than it would have been had the payment been made on the contractual due date and the portion of the payment applied to reduce the Principal Balance of the Receivable will be correspondingly greater.  Conversely, if an obligor pays a fixed monthly installment after its contractual due date, the portion of such payment allocable to interest for the period since the preceding payment will be greater than it would have been had the payment been made when due and the portion of such payment applied to reduce the Principal Balance of the Receivable will be correspondingly less.

**Delinquency and Loss Information**

Set forth below is delinquency and credit loss information relating to Tricolor's total portfolio of motor vehicle retail installment sale contracts for the retail financing of used motor vehicles.  Tricolor's delinquency and credit loss performance may vary from period to period based on average age or seasoning of the portfolio, seasonality within the calendar year and the level of extensions granted to obligors (including, for example, increased extensions granted following a natural disaster such as the hurricanes occurring in Texas and Florida in August and September 2017 and epidemics or pandemics such as the COVID-19 pandemic), as well as general economic factors.

Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date.  Tricolor expenses losses directly against income in the month incurred.  For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible.

Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, has been fairly consistent over the past few years.  The portfolio losses have improved since the introduction of better credit grades at the beginning of 2016 and the focus on converting a higher percentage of loans to better credit grade customers.  The losses for origination vintages during 2019 through 2021 are lower than prior vintages at a similar month on book, mostly due to the better separation of customers' credit qualities and more favorable loan term structure for high credit quality customers.  Correspondingly, net losses have improved significantly from 2016 to

64

2020, while recoveries have also improved to 65%. Tricolor does not believe the delinquency or collections rates have been materially impacted by the COVID-19 stimulus checks received by their customers. Tricolor estimates that, at the most, 50% of its customers may have qualified for COVID-19 stimulus checks although there did not appear to be any noticeable material or significant change in delinquency rates post stimulus expiration.

The following statistics include receivables with a variety of payment and other characteristics that may not correspond to the Receivables purchased or to be purchased by the Issuer. As a result, there can be no assurance that the delinquency and credit loss experience with respect to the Receivables purchased or to be purchased by the Issuer will correspond to the delinquency and credit loss experience of the receivables servicing portfolio set forth in the following tables. The percentages in these tables may not add up to 100% due to rounding.

### Delinquency Experience[1]

| | As of March 31, | | | | |
| | 2022 | | | 2021 | |
| | Dollars | Percent | | Dollars | Percent |
|---|---|---|---|---|---|
| Principal Amount of Outstanding Receivables[2] | $ 588,878,073 | | | $ 381,935,758 | |
| Delinquencies[3] | | | | | |
| 31-60 days | $ 27,953,122 | 4.75% | | $ 17,828,435 | 4.67% |
| 61-90 days | $ 13,308,046 | 2.26% | | $ 10,817,220 | 2.83% |
| 91 days or more | $ 8,842,272 | 1.50% | | $ 4,962,171 | 1.30% |
| Total 31+ Delinquencies[4] | $ 50,103,440 | 8.51% | | $ 33,607,827 | 8.80% |
| Total 61+ Delinquencies[4] | $ 22,150,318 | 3.76% | | $ 15,779,391 | 4.13% |

[1] The information does not include certain portfolio purchases by Tricolor.

[2] All amounts and percentages are based on the principal balances of the retail installment sale contracts.

[3] Delinquencies include bankruptcies and repossessions.

[4] The sum of the delinquencies may not equal the Total 31+ Delinquencies and Total 61+ Delinquencies due to rounding.

| | As of December 31, | | | | | | | | | |
| | 2021 | | 2020 | | 2019 | | 2018 | | 2017 | |
| | Dollars | Percent | Dollars | Percent | Dollars | Percent | Dollars | Percent | Dollars | Percent |
|---|---|---|---|---|---|---|---|---|---|---|
| Principal Amount of Outstanding Receivables[2] | $526,461,466 | | $340,772,326 | | $275,505,417 | | $220,904,917 | | $185,242,763 | |
| Delinquencies[3] | | | | | | | | | | |
| 31-60 days | $ 31,386,094 | 5.96% | $ 29,197,637 | 8.57% | $ 15,068,736 | 5.47% | $ 9,546,753 | 4.32% | $ 7,245,111 | 3.91% |
| 61-90 days | $ 14,730,666 | 2.80% | $ 9,905,876 | 2.91% | $ 7,968,002 | 2.89% | $ 4,285,227 | 1.94 % | $ 5,292,946 | 2.86% |
| 91 days or more | $ 9,077,636 | 1.72% | $ 6,709,973 | 1.97% | $ 5,656,613 | 2.05% | $ 2,366,710 | 1.07% | $ 3,562,014 | 1.92% |
| Total 31+ Delinquencies[4] | $ 55,194,395 | 10.48% | $ 45,813,486 | 13.44% | $ 28,693,351 | 10.41% | $ 16,198,689 | 7.33% | $ 16,100,071 | 8.69% |
| Total 61+ Delinquencies[4] | $ 23,808,302 | 4.52% | $ 16,615,848 | 4.88% | $ 13,624,615 | 4.95% | $ 6,651,937 | 3.01% | $ 8,854,960 | 4.78% |

[1] Information relating to portfolio balance and delinquency experience relates to originations and performance of receivables before May 31, 2021. Includes receivables that have been sold but are still being serviced by Tricolor.

[2] All amounts and percentages are based on the principal balances of the retail installment sale contracts. Principal balances include some portion of accrued interest.

[3] Delinquencies include bankruptcies and repossessions.

[4] The sum of the delinquencies may not equal the Total 31+ Delinquencies and Total 61+ Delinquencies due to rounding.

## Net Loss Experience[1]

| | For the Three Months Ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Period-End Principal Outstanding[2] | $ 588,878,073 | $ 381,935,758 |
| Average Month End Amount Outstanding During the Period[2] | $ 563,674,578 | $ 362,713,448 |
| Net Charge-Offs[3] | $ 16,208,906 | $ 9,739,943 |
| Net Charge-Offs as a Percentage of Period-End Principal Outstanding[3][4] | 11.01% | 10.20% |
| Net Charge-Offs as a Percentage of Average Month-End Amount Outstanding[3][4] | 11.50% | 10.74% |

[1]    The information does not include certain portfolio purchases by Tricolor.

[2]    All amounts and percentages are based on the principal balances of the retail installment sale contracts.

[3]    Net charge-offs represent the net principal balance of receivables determined to be uncollectible in the period from dispositions of the related vehicles.  Net charge-offs include expenses associated with collection, repossession or disposition of the related vehicle.

[4]    Results for the three months ended March 31, 2021 and March 30, 2022 are annualized and are not necessarily indicative of a full year's actual results.

| | For the Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2021** | **2020** | **2019** | **2018** | **2017** |
| Period-End Principal Outstanding[2] | $526,461,466 | $340,772,326 | $275,505,417 | $220,904,917 | $185,242,763 |
| Average Month End Amount Outstanding During the Period[2] | $439,462,107 | $310,354,544 | $248,464,313 | $210,072,797 | $170,213,131 |
| Net Charge-Offs[3] | $47,457,393 | $36,043,608 | $33,681,863 | $35,070,409 | $28,689,393 |
| Net Charge-Offs as a Percentage of Period-End Principal Outstanding[3] | 9.01% | 10.58% | 12.23% | 15.88% | 15.49% |
| Net Charge-Offs as a Percentage of Average Month-End Amount Outstanding[3] | 10.80% | 11.61% | 13.56% | 16.69% | 16.85% |

[1]    Information relating to portfolio balance and delinquency experience relates to originations and performance of receivables before March 31, 2022.  Includes receivables that have been sold but are still being serviced by Tricolor.

[2]    All amounts and percentages are based on the principal balances of the retail installment sale contracts.  Principal balances include some portion of accrued interest.

[3]    Net charge-offs represent the net principal balance of receivables determined to be uncollectible in the period from dispositions of the related vehicles.  Net charge-offs include expenses associated with collection, repossession or disposition of the related vehicle.

**THE RECEIVABLES**

**General**

The Issuer will own a pool of Receivables consisting of motor vehicle retail installment sale contracts purchased by Tricolor from the Originators, and secured by security interests in the Financed Vehicles financed by those contracts.  On the Closing Date, (1) Tricolor will sell the Initial Receivables to the Depositor pursuant to the Receivables Purchase Agreement, (2) the Depositor will transfer the Initial Receivables to the Issuer pursuant to the Sale and Servicing Agreement and (3) the Issuer will pledge the Initial Receivables to the Indenture Trustee pursuant to the Indenture.  During the Prefunding Period, on one or more Subsequent Receivables Purchase Dates, the Issuer will acquire Subsequent Receivables using the funds in the Prefunding Account.  Such Subsequent Receivables will be pledged to the Indenture Trustee pursuant to the Indenture on the related Subsequent Receivables Purchase Date.  Any amount remaining in the Prefunding Account at the end of the Prefunding Period will be distributed as a principal prepayment, as described under *"Description of the Transaction Documents— Accounts"*.  The Depositor expects that the amount in the Prefunding Account will be less than $100,000 by July 31, 2022.  No expenses incurred in connection with the selection and acquisition of the Receivables will be payable from the proceeds of the issuance of the Notes.

Other than the Indenture Trustee, as secured party under the Indenture, no party will have any material direct or contingent claim on any Receivable.

**Information in this Offering Memorandum**

The information in this Offering Memorandum is based on the Initial Receivables as of the Initial Cutoff Date.  The aggregate Principal Balance as of the Initial Cutoff Date of the Receivables sold to the Issuer on the Closing Date will be approximately $205,204,481.

**Eligibility Criteria**

The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria.  Each Receivable to be transferred to the Issuer on the Closing Date or during the Prefunding Period will be required to satisfy each of the criteria for transfer to the Issuer as of the applicable Cutoff Date, including that, as of the applicable Cutoff Date:

- each Receivable shall not be more than 30 days delinquent as of such Cutoff Date and was not a Defaulted Receivable as of such Cutoff Date;

- each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment;

- each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least three months and not more than 73 months;

- each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $4,000 and not more than $40,000;

- each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 6.50% and not more than 25.99%;

- each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments;

- each Receivable was originated in the United States and was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding;

- each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents;

- each Receivable has an obligor that has a billing address in, or is domiciled in, the United States;

- each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred;

- each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts;

- each Receivable constitutes "tangible chattel paper" under the UCC;

- each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person;

- no Financed Vehicle was held in repossession as of such Cutoff Date;

- each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title;

- no Subsequent Receivable will cause the weighted average Contract Rate (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Subsequent Receivables to be less than 15.25%;

- no Subsequent Receivable will cause the weighted average FICO® score only for those obligors having a FICO® score at the time of application (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Receivables to be less than 575;

- no Subsequent Receivable will cause the weighted average original term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 60 months;

- no Subsequent Receivable will cause the weighted average remaining term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 57 months;

- in any given month during the Prefunding Period, the aggregate Principal Balance of all Subsequent Receivables having (1) an Internal Risk Grade of "D" has not equaled or exceeded 2% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates and (2) an Internal Risk Grade of "E" has not equaled or exceeded 1% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates;

- the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A+" will be at least 13.0% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates;

- the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A" will be at least 28.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; and

- the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "B" will be at least 34.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates.

68

No procedures that are materially adverse to the Noteholders will be used to select the Receivables sold to the Issuer on the Closing Date or during the Prefunding Period.

**Characteristics of the Receivables**

The following tables set forth information with respect to the Initial Receivables as of the close of business on the Initial Cutoff Date.  The percentages below are calculated based on the Initial Cutoff Date Pool Balance, unless otherwise noted.  The Receivables sold to the Issuer on the Closing Date will consist of the Initial Receivables.  Because Subsequent Receivables will be originated after the Initial Cutoff Date, following their conveyance to the Issuer, the characteristics of the Receivables, including the Subsequent Receivables, will vary somewhat from those of the Initial Receivables.  While the characteristics of the Receivables transferred to the Issuer on each Subsequent Receivables Purchase Date will differ somewhat from the information set forth in these tables, we anticipate that the variations will not be significant.

**Composition of the Initial Receivables**
**as of the Initial Cutoff Date**

|  | Total |
|---|---|
| Aggregate Principal Balance | $205,204,480.60 |
| Number of Receivables | 9,500 |
| Average Amount Financed | $22,737.06 |
| Average Principal Balance | $21,600.47 |
| Average Principal Balance (Range) | $4,065.23 to $38,476.11 |
| Weighted Average Contract Rate[1] | 15.89% |
| Contract Rate (Range) | 6.88% to 25.91% |
| Weighted Average Original Term[1] | 58 months |
| Original Term (Range) | 36 months to 71 months |
| Weighted Average Remaining Term[1][2] | 54 months |
| Remaining Term (Range) | 17 months to 73 months |
| Weighted Average Wholesale LTV[1][3] | 126.66% |
| Non-Zero Weighted Average FICO® Score[1][4] | 600 |

[1]    Weighted by the Principal Balance as of the Initial Cutoff Date.

[2]    Based on the number of scheduled monthly payments remaining.

[3]    The Wholesale LTV is calculated using the total Amount Financed, which may include taxes, title fees and ancillary products over the value of the Financed Vehicle at the time the motor vehicle is financed.  The Financed Vehicle value at origination is determined by using NADA or Kelly Blue Book "Trade-In" prices, or, in certain cases, vehicle sales price, for used motor vehicles.  Wholesale LTV was not available or could not be calculated on certain Receivables at the time of application.

[4]    FICO® scores generated by credit reporting agencies.  Tricolor utilizes TransUnion, Equifax or Experian credit reports depending on location of the obligor.  FICO® scores were unavailable for some obligors at the time of application of the related Receivable.  The FICO® score with respect to any Receivable with co-obligors is the primary obligor's FICO® score at the time of application.

A FICO®* score is a measurement determined by Fair Isaac Corporation using information collected by the major credit bureaus to assess credit risk.  Data from an independent credit reporting agency, such as a FICO® score, is one of several factors that may be used by Tricolor in its credit scoring system to assess the credit risk associated with each applicant.  See *"Tricolor's Automobile Financing Program—Underwriting"*.  FICO® scores are intended to show the likelihood that an individual might default on a debt based on past credit history.  An individual's credit history may not reliably predict his or her future creditworthiness.  Additionally, the reliability of the credit scoring the FICO® scores provide is limited by the accuracy of the data contained within the credit bureau files.  Accordingly, FICO® scores should not necessarily be relied upon as a meaningful predictor of the performance of the Receivables.

---

* FICO® is a federally registered service mark of Fair Isaac Corporation.

**Distribution of the Initial Receivables by FICO® Score
as of the Initial Cutoff Date[1][3]**

| FICO® Score Range | Number of Receivables | Percentage of Total Number of Receivables[2] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[2] |
|---|---|---|---|---|
| No Score | 6,516 | 68.59% | $  142,062,971.18 | 69.23% |
| Less than or equal to 450 | 49 | 0.52 | 854,715.20 | 0.42 |
| 451 – 475 | 67 | 0.71 | 1,160,673.21 | 0.57 |
| 476 – 500 | 106 | 1.12 | 2,028,119.58 | 0.99 |
| 501 – 525 | 148 | 1.56 | 2,925,789.70 | 1.43 |
| 526 – 550 | 386 | 4.06 | 7,570,510.36 | 3.69 |
| 551 – 575 | 498 | 5.24 | 9,995,349.32 | 4.87 |
| 576 – 600 | 433 | 4.56 | 9,066,617.10 | 4.42 |
| 601 – 625 | 399 | 4.20 | 9,126,114.69 | 4.45 |
| 626 – 650 | 295 | 3.11 | 6,902,837.37 | 3.36 |
| 651 – 675 | 196 | 2.06 | 4,598,099.94 | 2.24 |
| 676 – 700 | 130 | 1.37 | 2,988,622.29 | 1.46 |
| Greater than 700 | 277 | 2.92 | 5,924,060.66 | 2.89 |
| Total | 9,500 | 100.00% | $  205,204,480.60 | 100.00% |

[1]   The FICO® score with respect to any Receivable with co-obligors is the primary obligor's FICO® score at the time of application.

[2]   Percentages may not add up to 100.00% due to rounding.

[3]   FICO® scores generated by credit reporting agencies.  Tricolor utilizes TransUnion, Equifax or Experian credit reports depending on location of the obligor.  FICO® scores were unavailable for some obligors at the time of application of the related Receivable.  The FICO® score with respect to any Receivable with co-obligors is the primary obligor's FICO® score at the time of application.

**Distribution of the Initial Receivables by Wholesale LTV[1][3]
as of the Initial Cutoff Date**

| Wholesale LTV Range | Number of Receivables | Percentage of Total Number of Receivables[2] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[2] |
|---|---|---|---|---|
| Less than 90.00% | 224 | 2.36% | $  3,071,006.48 | 1.50% |
| 90.00% – 99.99% | 319 | 3.36 | 6,294,605.89 | 3.07 |
| 100.00% – 109.99% | 1,012 | 10.65 | 24,040,780.35 | 11.72 |
| 110.00% – 119.99% | 1,902 | 20.02 | 46,578,869.75 | 22.70 |
| 120.00% – 129.99% | 1,962 | 20.65 | 43,443,687.60 | 21.17 |
| 130.00% – 139.99% | 1,844 | 19.41 | 38,832,377.79 | 18.92 |
| 140.00% – 149.99% | 1,126 | 11.85 | 23,181,760.86 | 11.30 |
| 150.00% – 159.99% | 653 | 6.87 | 12,144,784.07 | 5.92 |
| 160.00% and greater | 458 | 4.82 | 7,616,607.81 | 3.71 |
| Total | 9,500 | 100.00% | $  205,204,480.60 | 100.00% |

[1]   Wholesale LTV is calculated using the total amount financed, which may include taxes, title fees and ancillary products over the value of the motor vehicle at the time the motor vehicle is financed.  The motor vehicle value at origination is determined by using NADA or Kelly Blue Book "Trade-In" prices, or, in certain cases, vehicle sales price, for used motor vehicles.

[2]   Percentages may not add up to 100.00% due to rounding.

[3]   The weighted average Wholesale LTV of the Receivables, weighted by Principal Balance as of the Initial Cutoff Date, was 126.66%.

70

**Distribution of the Initial Receivables by Original Term to Maturity
as of the Initial Cutoff Date**[2]

| Original Term Range | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| 36 months ........................... | 4 | 0.04% | $ 29,132.03 | 0.01% |
| 37 months to 48 months ..... | 465 | 4.89 | 5,255,315.83 | 2.56 |
| 49 months to 60 months ..... | 8,265 | 87.00 | 178,336,458.58 | 86.91 |
| 61 months to 72 months ..... | 766 | 8.06 | 21,583,574.16 | 10.52 |
| Total ......................... | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

[1]    Percentages may not add up to 100.00% due to rounding.

[2]    The weighted average original term of the Receivables, weighted by Principal Balance as of the Initial Cutoff Date, was 58 months.

**Distribution of the Initial Receivables by Remaining Term to Maturity
as of the Initial Cutoff Date**[2]

| Remaining Term Range | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| 13 months to 24 months.... | 35 | 0.37% | $ 233,481.09 | 0.11% |
| 25 months to 36 months.... | 183 | 1.93 | 1,948,513.10 | 0.95 |
| 37 months to 48 months.... | 898 | 9.45 | 14,276,557.19 | 6.96 |
| 49 months to 60 months.... | 7,983 | 84.03 | 176,597,332.62 | 86.06 |
| 61 months to 72 months.... | 400 | 4.21 | 12,116,317.23 | 5.90 |
| 73 months to 84 months.... | 1 | 0.01 | 32,279.37 | 0.02 |
| Total.......................... | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

[1]    Percentages may not add up to 100.00% due to rounding.

[2]    The weighted average remaining term of the Receivables, weighted by Principal Balance as of the Initial Cutoff Date, was 54 months.

**Distribution of the Initial Receivables by Original Principal Balance
as of the Initial Cutoff Date**

| Original Principal Balance Range | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| $5,000.01 – $10,000.00....... | 185 | 1.95% | $     1,490,023.69 | 0.73% |
| $10,000.01 – $15,000.00..... | 923 | 9.72 | 11,088,906.02 | 5.40 |
| $15,000.01 – $20,000.00..... | 2,160 | 22.74 | 36,355,299.65 | 17.72 |
| $20,000.01 – $25,000.00..... | 2,820 | 29.68 | 60,475,497.21 | 29.47 |
| $25,000.01 – $30,000.00..... | 1,933 | 20.35 | 50,334,108.69 | 24.53 |
| $30,000.01 – $35,000.00..... | 1,357 | 14.28 | 41,208,287.76 | 20.08 |
| $35,000.01 and greater........ | 122 | 1.28 | 4,252,357.58 | 2.07 |
| Total ............................. | 9,500 | 100.00% | $   205,204,480.60 | 100.00% |

[1]    Percentages may not add up to 100.00% due to rounding.

**Distribution of the Initial Receivables by Principal Balance
as of the Initial Cutoff Date**

| Principal Balance Range | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| $500.01 – $5,000.00 ............. | 5 | 0.05% | $        23,115.22 | 0.01% |
| $5,000.01 – $10,000.00 ........ | 308 | 3.24 | 2,568,831.10 | 1.25 |
| $10,000.01 – $15,000.00 ...... | 1,067 | 11.23 | 13,783,069.46 | 6.72 |
| $15,000.01 – $20,000.00 ...... | 2,485 | 26.16 | 43,847,394.04 | 21.37 |
| $20,000.01 – $25,000.00 ...... | 2,779 | 29.25 | 62,443,453.90 | 30.43 |
| $25,000.01 – $30,000.00 ...... | 1,930 | 20.32 | 52,961,740.32 | 25.81 |
| $30,000.01 – $35,000.00 ...... | 869 | 9.15 | 27,512,374.58 | 13.41 |
| $35,000.01 and greater ......... | 57 | 0.60 | 2,064,501.98 | 1.01 |
| Total ............................. | 9,500 | 100.00% | $   205,204,480.60 | 100.00% |

[1]    Percentages may not add up to 100.00% due to rounding.

**Distribution of the Initial Receivables by State of Origination
as of the Initial Cutoff Date**

| State of Origination | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date [1] |
|---|---|---|---|---|
| Texas .................................... | 6,911 | 72.75% | $   147,514,388.74 | 71.89% |
| California............................. | 2,334 | 24.57 | 52,051,863.23 | 25.37 |
| Nevada................................. | 144 | 1.52 | 3,181,167.79 | 1.55 |
| Other[2]................................. | 111 | 1.17 | 2,457,060.84 | 1.20 |
| Total................................. | 9,500 | 100.00% | $   205,204,480.60 | 100.00% |

[1]    Percentages may not add up to 100.00% due to rounding.

[2]    Each State included in the "Other" category accounted for less than 1.00% of the Initial Cutoff Date Pool Balance.

72

**Distribution of the Initial Receivables by Contract Rate
as of the Initial Cutoff Date[2]**

| Contract Rate Range | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| 6.000% - 6.999%................ | 1 | 0.01% | $ 27,706.19 | 0.01% |
| 7.000% - 7.999%................ | 151 | 1.59 | 3,125,128.70 | 1.52 |
| 8.000% - 8.999%................ | 176 | 1.85 | 3,912,830.78 | 1.91 |
| 9.000% - 9.999%................ | 304 | 3.20 | 7,067,498.31 | 3.44 |
| 10.000% - 10.999%............ | 299 | 3.15 | 7,020,954.14 | 3.42 |
| 11.000% - 11.999%............ | 275 | 2.89 | 7,182,372.51 | 3.50 |
| 12.000% - 12.999%............ | 515 | 5.42 | 13,406,540.47 | 6.53 |
| 13.000% - 13.999%............ | 1,002 | 10.55 | 24,891,111.31 | 12.13 |
| 14.000% - 14.999%............ | 1,358 | 14.29 | 31,112,395.77 | 15.16 |
| 15.000% - 15.999%............ | 737 | 7.76 | 15,337,192.51 | 7.47 |
| 16.000% - 16.999%............ | 485 | 5.11 | 11,563,544.13 | 5.64 |
| 17.000% - 17.999%............ | 728 | 7.66 | 16,004,160.56 | 7.80 |
| 18.000% - 18.999%............ | 1,337 | 14.07 | 28,448,321.92 | 13.86 |
| 19.000% - 19.999%............ | 900 | 9.47 | 16,535,215.87 | 8.06 |
| 20.000% - 20.999%............ | 387 | 4.07 | 6,823,593.84 | 3.33 |
| 21.000% - 21.999%............ | 155 | 1.63 | 2,393,014.57 | 1.17 |
| 22.000% - 22.999%............ | 259 | 2.73 | 4,398,727.83 | 2.14 |
| 23.000% - 23.999%............ | 275 | 2.89 | 4,037,482.43 | 1.97 |
| 24.000% - 24.999%............ | 138 | 1.45 | 1,739,229.24 | 0.85 |
| 25.000% - 25.999%............ | 18 | 0.19 | 177,459.52 | 0.09 |
| Total .............................. | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

[1] Percentages may not add up to 100.00% due to rounding.

[2] The weighted average Contract Rate of the Receivables, weighted by Principal Balance as of the Initial Cutoff Date, was 15.89%.

73

**Distribution of the Initial Receivables by Model Year
as of the Initial Cutoff Date**

| Model Year | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as o the Initial Cutoff Date [1] |
|---|---|---|---|---|
| 2004 ..................................... | 1 | 0.01% | $ 15,602.25 | 0.01% |
| 2006 ..................................... | 3 | 0.03 | 32,858.05 | 0.02 |
| 2007 ..................................... | 4 | 0.04 | 53,223.34 | 0.03 |
| 2008 ..................................... | 7 | 0.07 | 79,611.37 | 0.04 |
| 2009 ..................................... | 18 | 0.19 | 235,298.47 | 0.11 |
| 2010 ..................................... | 37 | 0.39 | 498,821.02 | 0.24 |
| 2011 ..................................... | 91 | 0.96 | 1,223,215.13 | 0.60 |
| 2012 ..................................... | 132 | 1.39 | 1,676,298.31 | 0.82 |
| 2013 ..................................... | 268 | 2.82 | 4,023,049.22 | 1.96 |
| 2014 ..................................... | 1,660 | 17.47 | 34,869,195.34 | 16.99 |
| 2015 ..................................... | 2,621 | 27.59 | 58,677,662.13 | 28.59 |
| 2016 ..................................... | 2,093 | 22.03 | 45,335,591.48 | 22.09 |
| 2017 ..................................... | 1,523 | 16.03 | 34,501,982.97 | 16.81 |
| 2018 ..................................... | 776 | 8.17 | 18,154,065.50 | 8.85 |
| 2019 ..................................... | 250 | 2.63 | 5,482,346.72 | 2.67 |
| 2020 ..................................... | 16 | 0.17 | 345,659.30 | 0.17 |
| Total.................................. | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

[1]    Percentages may not add up to 100.00% due to rounding.

**Distribution of the Initial Receivables by Origination Quarter
as of the Initial Cutoff Date**

| Origination Quarter | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| 2020 1st Q ............................ | 4 | 0.04% | $ 64,005.65 | 0.03% |
| 2020 2nd Q........................... | 94 | 0.99 | 1,248,894.48 | 0.61 |
| 2020 3rd Q ........................... | 179 | 1.88 | 2,605,080.48 | 1.27 |
| 2020 4th Q........................... | 96 | 1.01 | 1,469,028.30 | 0.72 |
| 2021 1st Q ........................... | 53 | 0.56 | 995,177.02 | 0.48 |
| 2021 2nd Q........................... | 195 | 2.05 | 4,491,138.24 | 2.19 |
| 2021 3rd Q ........................... | 2,789 | 29.36 | 57,674,490.74 | 28.11 |
| 2021 4th Q........................... | 3,544 | 37.31 | 78,655,660.02 | 38.33 |
| 2022 1st Q ........................... | 2,546 | 26.80 | 58,001,005.67 | 28.26 |
| Total.................................. | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

[1]    Percentages may not add up to 100.00% due to rounding.

74

**Distribution of the Initial Receivables by Manufacturer
as of the Initial Cutoff Date**

| Manufacturer | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| Chevrolet.............................. | 1,569 | 16.52% | $ 38,894,627.80 | 18.95% |
| Ford...................................... | 1,556 | 16.38 | 35,079,689.70 | 17.09 |
| Nissan ................................. | 1,256 | 13.22 | 22,669,396.63 | 11.05 |
| Ram...................................... | 806 | 8.48 | 22,061,325.07 | 10.75 |
| Honda................................... | 615 | 6.47 | 13,198,617.49 | 6.43 |
| Toyota.................................. | 615 | 6.47 | 12,687,458.10 | 6.18 |
| Dodge................................... | 600 | 6.32 | 11,272,803.49 | 5.49 |
| Hyundai................................ | 551 | 5.80 | 9,194,334.37 | 4.48 |
| Kia ...................................... | 466 | 4.91 | 8,239,652.69 | 4.02 |
| Jeep ..................................... | 336 | 3.54 | 7,083,274.29 | 3.45 |
| GMC .................................... | 259 | 2.73 | 6,870,779.89 | 3.35 |
| Mazda .................................. | 141 | 1.48 | 2,900,348.20 | 1.41 |
| Chrysler................................ | 134 | 1.41 | 2,481,963.88 | 1.21 |
| Other[2] ................................. | 596 | 6.27 | 12,570,209.00 | 6.13 |
| Total ................................. | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

[1] Percentages may not add up to 100.00% due to rounding.

[2] Each vehicle make included in the "Other" category accounted for less than 1.00% of the Initial Cutoff Date Pool Balance.

**Distribution of the Initial Receivables by Original Mileage
as of the Initial Cutoff Date**

| Original Mileage Range | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| 0 miles – 24,999 miles .............. | 6 | 0.06% | $ 124,899.16 | 0.06% |
| 25,000 miles – 49,999 miles ..... | 262 | 2.76 | 5,569,535.81 | 2.71 |
| 50,000 miles – 74,999 miles ..... | 1,237 | 13.02 | 26,816,912.34 | 13.07 |
| 75,000 miles – 99,999 miles ..... | 3,404 | 35.83 | 74,242,863.16 | 36.18 |
| 100,000 miles – 124,999 miles . | 3,333 | 35.08 | 72,824,314.01 | 35.49 |
| 125,000 miles – 149,999 miles . | 1,081 | 11.38 | 22,904,895.24 | 11.16 |
| 150,000 miles – 174,999 miles . | 137 | 1.44 | 2,146,470.67 | 1.05 |
| 175,000 miles – 199,999 miles | 35 | 0.37 | 506,258.52 | 0.25 |
| 200,000 miles and greater ......... | 5 | 0.05 | 68,331.69 | 0.03 |
| Total....................................... | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

[1] Percentages may not add up to 100.00% due to rounding.

75

**Distribution of the Initial Receivables by Internal Risk Grade At Application
as of the Initial Cutoff Date**

| Internal Risk Grade At Application | Number of Receivables | Percentage of Total Number of Receivables[1] | Principal Balance as of the Initial Cutoff Date | Percentage of Aggregate Principal Balance as of the Initial Cutoff Date[1] |
|---|---|---|---|---|
| A+ | 1,304 | 13.73% | $ 31,077,988.74 | 15.14% |
| A | 3,394 | 35.73 | 77,946,191.55 | 37.98 |
| B | 3,646 | 38.38 | 77,242,257.67 | 37.64 |
| C | 1,046 | 11.01 | 17,734,797.63 | 8.64 |
| D | 79 | 0.83 | 904,485.50 | 0.44 |
| E | 31 | 0.33 | 298,759.51 | 0.15 |
| Total | 9,500 | 100.00% | $ 205,204,480.60 | 100.00% |

---

[1]    Percentages may not add up to 100.00% due to rounding.

**STATIC POOL DATA**

Static pool information is included as Appendix A to this Offering Memorandum.  The static pool data included in Appendix A relates to vintage originations by Tricolor.  The vintage originations include all motor vehicle retail installment sale contracts purchased by Tricolor to finance the retail purchase of motor vehicles during the relevant periods.

Appendix A contains data as to cumulative net losses for receivables purchased by Tricolor.  Cumulative net loss performance is presented by vintage origination quarter on a monthly basis since the first quarter of 2009.  We cannot assure you that the cumulative net loss performance of the Receivables owned by the Issuer will be comparable to the historical cumulative net loss performance of any of the vintage pools included in Appendix A.  In this regard, you should note how the characteristics of the receivables in those vintage pools differ from the characteristics of the Receivables.  Such differences, along with the varying economic conditions applicable to those vintage pools, may make it unlikely that the Receivables will perform in the same way that any of those pools has performed.

**WEIGHTED AVERAGE LIVES OF THE NOTES**

The following information is given solely to illustrate the effect of prepayments of the Receivables on the weighted average lives of the Notes under the stated assumptions and is not a prediction of the prepayment rate that might actually be experienced by the Receivables.

Prepayments can be made on any of the Receivables at any time.  If prepayments are received on the Receivables, their actual weighted average lives may be shorter than their weighted average lives would be if all payments were made as scheduled and no prepayments were made.  Prepayments on the Receivables may include monies received from Defaulted Receivables due to default and proceeds from credit life, credit disability and casualty insurance policies.

The rate of payment of principal of the Notes will depend on the rate of payment, and the rate of prepayments, of principal on the Receivables.  It is possible that the final payment on any class of Notes could occur significantly earlier than the Final Scheduled Distribution Date for that class of Notes.  Any risk resulting from early payment of the Notes will be borne solely by the Noteholders.

Prepayments on motor vehicle receivables can be measured relative to a prepayment standard or model.  The model used in this Offering Memorandum, the Absolute Prepayment Model, or "ABS", represents an assumed rate of prepayment each month relative to the original number of receivables in a pool of receivables.  ABS further assumes that all of the receivables are the same size and amortize at the same rate and that each receivable in each month of its life will either be paid as scheduled or be prepaid in full.  For example, in a pool of receivables originally containing 10,000 receivables, a 1% ABS rate means that 100 receivables prepay each month.  ABS does not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of assets, including the Receivables.

The rate of payment of principal of each class of Notes will depend on the rate of payment (including prepayments) of the Principal Balance of the Receivables.  For this reason, final distributions in respect of the Notes could occur significantly earlier than their respective Final Scheduled Distribution Dates.  The Noteholders will exclusively bear any reinvestment risk associated with early payment of their Notes.

The ABS Tables captioned "Percent of Initial Note Balance at Various ABS Percentages" have been prepared on the basis of the following assumptions:

- the Receivables prepay in full at the specified constant percentage of ABS monthly, with no defaults, losses or repurchases;

- each scheduled monthly payment on the Receivables is made on the last day of each month and each month has 30 days, commencing in April 2022;

- the initial principal amount of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes are equal to the initial principal amounts set forth on the cover page of this Offering Memorandum;

- interest accrues on the Class A Notes at 3.42% per annum, the Class B Notes at 5.01% per annum, the Class C Notes at 5.34% per annum, the Class D Notes at 5.81% per annum, the Class E Notes at 7.88% per annum and the Class F Notes at 9.36% per annum, in each case on the basis of a 360-day year consisting of twelve 30-day months (or in the case of the first Interest Period, on the basis of a period of 11 days divided by 360);

- payments on the Notes are made on the 15th day of each month commencing in May 2022;

- the Notes are purchased on May 4, 2022;

- the scheduled monthly payment for each Receivable was calculated in such a way that each Receivable would amortize in a manner that will be sufficient to repay the Principal Balance of that Receivable by its indicated remaining term to maturity;

- the Servicer exercises its Optional Purchase Right at the earliest opportunity, except as otherwise indicated in the row entitled "Weighted Average Life to Maturity (Years)" in the table "Percent of Initial Note Balance by Various ABS Percentages";

- principal will be paid on each class of the Notes on each Distribution Date as necessary to build and maintain the Target Overcollateralization Amount;

- the Servicer receives a Servicing Fee equal to 3.00% per annum of the Pool Balance as of the beginning of the related Collection Period;

- the Indenture Trustee receives a monthly fee of $1,500, the Backup Servicer receives a monthly fee of $3,000, the Owner Trustee receives a monthly fee of $500 and all other fees and expenses are equal to zero;

- investment income amounts equal zero;

- an amount equal to the related Reserve Fund Deposit is deposited by the Depositor into the Reserve Fund with respect to the (a) the Initial Receivables, on the Closing Date, and (b) the Subsequent Receivables, on the related Subsequent Receivable Purchase Date; and

- no Event of Default or Event of Servicing Termination occurs.

The ABS Tables indicate the projected weighted average life of each class of Notes and set forth the percent of the initial principal amount of each class of Notes that is projected to be outstanding after each of the Distribution Dates shown at various constant ABS percentages.

The ABS Tables also assume that the Receivables have been aggregated into hypothetical pools with all of the Receivables within each such pool having the following characteristics and that the level scheduled monthly payment for each of the pools (which is based on the aggregate Principal Balance of the Receivables in each pool, Contract Rate and remaining number of payments to maturity) will be such that each pool will be fully amortized by the end of its remaining number of payments to maturity.

78

| Pool | Aggregate Outstanding Principal Balance | Weighted Average Contract Rate | Weighted Average Original Term to Maturity (in months) | Weighted Average Remaining Term to Maturity (in months) | Assumed Cutoff Date |
|------|------|------|------|------|------|
| 1......... | $ 233,481.09 | 20.429% | 41 | 22 | March 31, 2022 |
| 2......... | 710,806.72 | 19.044% | 46 | 28 | March 31, 2022 |
| 3......... | 1,237,706.38 | 17.004% | 49 | 34 | March 31, 2022 |
| 4......... | 3,740,389.96 | 17.831% | 52 | 40 | March 31, 2022 |
| 5......... | 10,536,167.23 | 16.820% | 53 | 46 | March 31, 2022 |
| 6......... | 94,270,479.76 | 16.355% | 57 | 52 | March 31, 2022 |
| 7......... | 82,326,852.86 | 15.356% | 59 | 57 | March 31, 2022 |
| 8......... | 12,148,596.60 | 14.047% | 65 | 62 | March 31, 2022 |
| 9......... | 17,100,373.38 | 15.250% | 60 | 60 | April 30, 2022 |
| 10....... | 17,100,373.38 | 15.250% | 60 | 60 | May 31, 2022 |
| 11....... | 17,100,373.38 | 15.250% | 60 | 60 | June 30, 2022 |
|  | $256,505,600.74 |  |  |  |  |

The actual characteristics and performance of the Receivables will differ from the assumptions used in constructing the ABS Tables. The assumptions used are hypothetical and have been provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the Receivables will prepay at a constant level of ABS until maturity or that all of the Receivables will prepay at the same level of ABS. Moreover, the diverse terms of Receivables within each of the hypothetical pools could produce slower or faster principal payments than indicated in the ABS Tables at the various constant percentages of ABS specified, even if the weighted average Contract Rates, weighted average original number of payments to maturity and weighted average remaining number of payments to maturity of the Receivables are as assumed. Any difference between such assumptions and the actual characteristics and performance of the Receivables, or actual prepayment experience, will affect the percentages of initial amounts outstanding over time and the weighted average life of each class of Notes.

The following ABS Tables have been prepared based on the assumptions described above (including the assumptions regarding the characteristics and performance of the Receivables which will differ from the actual characteristics and performance of the Receivables) and should be read in conjunction therewith. The weighted average life of a Note is determined by multiplying the amount of each principal payment on the Note by the number of years from the Closing Date to the related Distribution Date, adding the results and dividing the sum by the initial principal amount of the Note.

**Percent of Initial Note Balance at Various ABS Percentages**

| Distribution Date | Class A Notes | | | | | | Class B Notes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.50% | 1.00% | 1.40% | 1.70% | 2.00% | 2.30% | 0.50% | 1.00% | 1.40% | 1.70% | 2.00% | 2.30% |
| Closing Date | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| May 2022 | 95.54 | 94.68 | 93.97 | 93.41 | 92.85 | 92.26 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| June 2022 | 91.16 | 89.40 | 87.95 | 86.82 | 85.66 | 84.47 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| July 2022 | 86.43 | 83.75 | 81.52 | 79.80 | 78.03 | 76.21 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| August 2022 | 82.75 | 79.05 | 76.00 | 73.63 | 71.21 | 68.73 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| September 2022 | 79.11 | 74.46 | 70.61 | 67.64 | 64.60 | 61.48 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| October 2022 | 75.46 | 69.89 | 65.27 | 61.72 | 58.07 | 54.33 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| November 2022 | 71.80 | 65.34 | 59.98 | 55.86 | 51.63 | 47.30 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| December 2022 | 68.14 | 60.81 | 54.75 | 50.07 | 45.29 | 40.38 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| January 2023 | 64.48 | 56.31 | 49.56 | 44.36 | 39.03 | 33.57 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| February 2023 | 60.80 | 51.83 | 44.42 | 38.71 | 32.87 | 26.88 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| March 2023 | 57.12 | 47.38 | 39.34 | 33.14 | 26.80 | 20.30 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| April 2023 | 53.43 | 42.96 | 34.31 | 27.65 | 20.83 | 13.85 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| May 2023 | 49.74 | 38.57 | 29.34 | 22.24 | 14.97 | 7.52 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| June 2023 | 46.04 | 34.20 | 24.43 | 16.90 | 9.20 | 1.31 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| July 2023 | 42.33 | 29.86 | 19.57 | 11.65 | 3.54 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 55.63 |
| August 2023 | 38.62 | 25.56 | 14.77 | 6.48 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 81.26 | 0.24 |
| September 2023 | 34.90 | 21.28 | 10.04 | 1.39 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 30.52 | 0.00 |
| October 2023 | 31.17 | 17.04 | 5.37 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 66.39 | 0.00 | 0.00 |
| November 2023 | 27.44 | 12.82 | 0.76 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 20.63 | 0.00 | 0.00 |
| December 2023 | 23.71 | 8.65 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 64.77 | 0.00 | 0.00 | 0.00 |
| January 2024 | 19.97 | 4.50 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 23.08 | 0.00 | 0.00 | 0.00 |
| February 2024 | 16.22 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2024 | 12.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 65.77 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2024 | 8.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 28.23 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2024 | 4.97 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2024 | 1.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2024 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 76.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2024 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 41.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2024 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| October 2024 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Weighted Average Life to Call (Years) | 1.07 | 0.87 | 0.75 | 0.67 | 0.61 | 0.55 | 2.30 | 1.94 | 1.69 | 1.52 | 1.37 | 1.24 |
| Weighted Average Life to Maturity (Years) | 1.07 | 0.87 | 0.75 | 0.67 | 0.61 | 0.55 | 2.30 | 1.94 | 1.69 | 1.52 | 1.37 | 1.24 |

| Distribution Date | Class C Notes | | | | | | Class D Notes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.50% | 1.00% | 1.40% | 1.70% | 2.00% | 2.30% | 0.50% | 1.00% | 1.40% | 1.70% | 2.00% | 2.30% |
| Closing Date | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| May 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| June 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| July 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| August 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| September 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| October 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| November 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| December 2022 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| January 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| February 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| March 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| April 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| May 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| June 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| July 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| August 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| September 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 48.06 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| October 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 81.53 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 98.40 |
| November 2023 | 100.00 | 100.00 | 100.00 | 100.00 | 34.67 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 70.78 |
| December 2023 | 100.00 | 100.00 | 100.00 | 76.60 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 93.81 | 43.88 |
| January 2024 | 100.00 | 100.00 | 100.00 | 34.16 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 68.93 | 17.70 |
| February 2024 | 100.00 | 100.00 | 82.68 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 95.87 | 44.66 | 0.00 |
| March 2024 | 100.00 | 100.00 | 43.80 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 73.25 | 21.03 | 0.00 |
| April 2024 | 100.00 | 100.00 | 5.58 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 51.13 | 0.00 | 0.00 |
| May 2024 | 100.00 | 91.36 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 82.21 | 29.51 | 0.00 | 0.00 |
| June 2024 | 100.00 | 55.88 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 61.69 | 8.40 | 0.00 | 0.00 |
| July 2024 | 100.00 | 20.75 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 41.56 | 0.00 | 0.00 | 0.00 |
| August 2024 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 92.21 | 21.82 | 0.00 | 0.00 | 0.00 |
| September 2024 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 73.17 | 2.54 | 0.00 | 0.00 | 0.00 |
| October 2024 | 72.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 54.35 | 0.00 | 0.00 | 0.00 | 0.00 |
| November 2024 | 38.58 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 35.75 | 0.00 | 0.00 | 0.00 | 0.00 |
| December 2024 | 4.82 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 17.37 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2025 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 83.89 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2025 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 65.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2025 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 46.41 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2025 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 27.73 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2025 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 9.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2025 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Weighted Average Life to Call (Years) | 2.54 | 2.17 | 1.89 | 1.71 | 1.54 | 1.40 | 2.89 | 2.51 | 2.21 | 2.00 | 1.80 | 1.64 |
| Weighted Average Life to Maturity (Years) | 2.54 | 2.17 | 1.89 | 1.71 | 1.54 | 1.40 | 2.89 | 2.51 | 2.21 | 2.00 | 1.80 | 1.64 |

81

| Distribution Date | Class E Notes | | | | | | Class F Notes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0.50% | 1.00% | 1.40% | 1.70% | 2.00% | 2.30% | 0.50% | 1.00% | 1.40% | 1.70% | 2.00% | 2.30% |
| Closing Date.............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| May 2022................... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| June 2022................... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| July 2022 ................... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| August 2022 .............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| September 2022......... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| October 2022............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| November 2022......... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| December 2022 ......... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| January 2023 ............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| February 2023 ........... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| March 2023 .............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| April 2023 ................ | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| May 2023................... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| June 2023................... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| July 2023 ................... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| August 2023 .............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| September 2023......... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| October 2023............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| November 2023......... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| December 2023 ......... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| January 2024 ............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| February 2024 ........... | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 90.82 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| March 2024 .............. | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 61.52 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| April 2024 ................ | 100.00 | 100.00 | 100.00 | 100.00 | 97.65 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 |
| May 2024................... | 100.00 | 100.00 | 100.00 | 100.00 | 71.09 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 |
| June 2024................... | 100.00 | 100.00 | 100.00 | 100.00 | 45.31 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 |
| July 2024 ................... | 100.00 | 100.00 | 100.00 | 85.53 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 | 0.00 |
| August 2024 .............. | 100.00 | 100.00 | 100.00 | 61.72 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 | 0.00 |
| September 2024......... | 100.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 |
| October 2024............. | 100.00 | 100.00 | 80.60 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 |
| November 2024......... | 100.00 | 100.00 | 58.66 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 |
| December 2024 ......... | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| January 2025 ............. | 100.00 | 99.07 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| February 2025 ........... | 100.00 | 77.79 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| March 2025 .............. | 100.00 | 56.92 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| April 2025 ................ | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| May 2025................... | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| June 2025................... | 88.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| July 2025 ................... | 66.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| August 2025 .............. | 44.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 100.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| September 2025......... | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Weighted Average Life to Call (Years)........... | 3.28 | 2.89 | 2.56 | 2.32 | 2.13 | 1.91 | 3.36 | 2.95 | 2.61 | 2.36 | 2.20 | 1.95 |
| Weighted Average Life to Maturity (Years).... | 3.30 | 2.94 | 2.61 | 2.37 | 2.14 | 1.94 | 3.58 | 3.24 | 2.91 | 2.65 | 2.40 | 2.17 |

## DESCRIPTION OF THE NOTES

**General**

The Issuer will issue the Notes under the Indenture.  The following summary describes material terms of the Notes and the Indenture.  The summary does not purport to be complete and is subject to all the provisions of the Notes and the Indenture.

**Securities Law Restrictions**

The Notes have not been registered under the Securities Act or registered or qualified under any State securities laws.  Neither the Issuer, any other Transaction Party nor any other entity will be required to so register or qualify the Notes or to provide registration rights to any investor therein.

Each purchaser of Notes, other than the Initial Purchasers, will be deemed to have represented and agreed that it is (i)(a) a "qualified institutional buyer" within the meaning of Rule 144A purchasing for its own account or for the account of another QIB and (b) only in the case of the initial investors in the Notes purchasing pursuant to the offering made under this Offering Memorandum, an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act purchasing for its own account and (ii) aware that the sale of the Notes to it is being made in reliance on Rule 144A or another exemption from the registration requirements of the Securities Act.  After the initial placement of the Notes to investors pursuant to the offering made under this Offering Memorandum, no interest in the Notes may be reoffered, resold, pledged or otherwise transferred unless (a) the Notes are registered pursuant to the Securities Act and registered or qualified pursuant to any applicable State securities laws or (b) such interest is reoffered, resold, pledged or otherwise transferred to (1) a person whom the holder desiring to effect such transfer reasonably believes is a QIB in a transaction meeting the requirements of Rule 144A purchasing for its own account or the account of another QIB, whom the holder has informed that the reoffer, resale, pledge or other transfer is being made in reliance on Rule 144A, or (2) the Issuer and its affiliates.

Purchasers of Notes in book-entry form will be deemed to make the representations set forth under "*Notice to Investors*".

If a transfer of any definitive Note is to be made without registration under the Securities Act, then the Note Registrar will be required to refuse to register such transfer unless it receives such certifications as may be required by the Issuer.  If a transfer of any interest in a Note is to be made without registration of the related class of Notes under the Securities Act, then the Note Owner desiring to effect such transfer will be deemed to make the representations set forth under "*Notice to Investors*".

Any investor desiring to effect a transfer of any Note or interest therein without registration under the Securities Act and registration or qualification under applicable State securities laws will be required to, and by acceptance of its Notes or interests therein will be deemed to have agreed, to indemnify the Issuer, the Indenture Trustee and the Note Registrar against any liability that may result if the transfer is not exempt from such registration and/or qualification or is not made in accordance with such federal and State laws.

**Delivery of Notes**

The Class A Notes, Class B Notes, Class C Notes and Class D Notes will be issued in minimum denominations of $100,000 and integral multiples of $1,000 in excess thereof.  The Class E Notes will be issued in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof.  The Class F Notes will be issued in minimum denominations of $500,000 and integral multiples of $1,000 in excess thereof.  The Notes will initially be issued only in book-entry form.  See *"—Book-Entry Registration"* for a further discussion of the book-entry registration system.

83

**Payments of Interest**

*General*

Interest on each class of Notes will accrue at the respective per annum interest rate set forth below and will be due on each Distribution Date to the Noteholders of record as of the related Record Date. Interest will accrue at the applicable Interest Rate on a "30/360" basis from and including the 15th day of the prior calendar month (or from and including the Closing Date, in the case of the first Distribution Date) to but excluding the 15th day of the current calendar month (assuming each month has 30 days). The interest accruing on a class of Notes during an Interest Period will accrue on the outstanding principal amount of such class of Notes as of the end of the prior Distribution Date, or, in the case of the first Distribution Date, from and including the Closing Date.

The Notes will bear interest at the following Interest Rates:

- in the case of the Class A Notes, 3.30% per annum;

- in the case of the Class B Notes, 4.34% per annum;

- in the case of the Class C Notes, 4.71% per annum;

- in the case of the Class D Notes, 5.38% per annum;

- in the case of the Class E Notes, 7.79% per annum; and

- in the case of the Class F Notes, 9.80% per annum.

*Calculation of Interest*

The interest due on the Notes, as applicable, on each Distribution Date will be an amount equal to the product of:

- the Note Balance of that class of Notes as of the preceding Distribution Date (or, in the case of the first Distribution Date, from and including the Closing Date), after giving effect to all principal payments made with respect to that class of Notes on that preceding Distribution Date;

- the Interest Rate applicable to that class of Notes; and

- 30 (or 11 in the case of the first Distribution Date, assuming a Closing Date of May 4, 2022) divided by 360.

*Unpaid Interest Accrues.* Interest accrued as of any Distribution Date but not paid on such Distribution Date will be due on the next Distribution Date, together with interest on such amount at the Interest Rate applicable to that class (to the extent lawful).

*Priority of Interest Payments.* The Issuer will pay interest on the Notes on each Distribution Date with Available Funds in accordance with the priorities set forth under *"Application of Available Funds—Distributions"*.

If amounts available to make interest payments on a class of Notes are less than the full amount of interest due on that class of Notes on a Distribution Date, the related Noteholders will receive their ratable share of that amount, based on the aggregate amount of interest due on that date on such class of Notes.

An Event of Default will occur if the full amount of interest due on the Controlling Class of Notes is not paid within five days of the related Distribution Date. See *"—Rights Upon Event of Default"*.

**Payments of Principal**

*Priority and Amount of Principal Payments.* On each Distribution Date, Noteholders will receive principal, to the extent funds are available, in an amount generally equal to the excess, if any, of:

84

- the Note Balance of the Notes as of the close of business on the preceding Distribution Date (or, in the case of the first Distribution Date, as of the Closing Date), after giving effect to all payments made on that preceding Distribution Date and the Target Overcollateralization Amount; over

- the sum of (i) the Pool Balance and (ii) during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related Collection Period.

On each Distribution Date, all Available Funds allocated to payments of principal of the Notes as described under *"Application of Available Funds—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"* will be aggregated and will be paid out of the Note Payment Account in the following amounts and order of priority:

(1)    first, to the Class A Notes until the Class A Note Balance has been reduced to zero;

(2)    second, to the Class B Notes until the Class B Note Balance has been reduced to zero;

(3)    third, to the Class C Notes until the Class C Note Balance has been reduced to zero;

(4)    fourth, to the Class D Notes until the Class D Note Balance has been reduced to zero;

(5)    fifth, to the Class E Notes until the Class E Note Balance has been reduced to zero; and

(6)    sixth, to the Class F Notes until the Class F Note Balance has been reduced to zero.

On the first Distribution Date following the end of the Prefunding Period, any remaining amount on deposit in the Prefunding Account will be distributed to Noteholders in the same manner as described in the preceding paragraph, except that if such amount exceeds $100,000, it will be distributed pro rata to each class of Notes based on the initial Note Balance of each class of Notes as of the Closing Date.

Notwithstanding the foregoing:

- in no event will the principal paid in respect of a class of Notes exceed the unpaid Note Balance of that class of Notes; and

- if the Notes have been accelerated following the occurrence of an Event of Default, and the Trust Property is sold or otherwise liquidated, the fees, expenses and indemnities due to the Servicer or Successor Servicer, the Trustees, the Custodian, the Backup Servicer and any Successor Servicer will be paid without limitation prior to the payment of interest or principal to the holders of the Notes, which will reduce the amount of Available Funds that are allocated to pay principal of the Notes.

All payments in respect of the Certificates will be subordinated to payments on the Notes.

*Final Scheduled Distribution Dates.*  The Note Balance of any class of Notes, to the extent not previously paid, will be due on the Final Scheduled Distribution Date for that class.  The Final Scheduled Distribution Dates for the Notes are as follows:

- February 18, 2025 for the Class A Notes;

- May 15, 2025 for the Class B Notes;

- August 15, 2025 for the Class C Notes;

- January 15, 2026 for the Class D Notes;

- August 16, 2027 for the Class E Notes; and

- July 16, 2029 for the Class F Notes.

85

The date on which each class of Notes is paid in full is expected to be earlier than the Final Scheduled Distribution Date for that class and could be significantly earlier depending upon the rate at which the Principal Balances of the Receivables are paid.  See *"Weighted Average Lives of the Notes"* for a further discussion of Receivable prepayments.

**Credit Enhancement**

*General*

Credit enhancement for the Notes will be provided by:

- overcollateralization, which is the amount by which the Pool Balance (plus, during the Prefunding Period, the amount on deposit in the Prefunding Account) exceeds the Note Balance of the Notes;

- the application of excess spread, which is the amount by which the interest paid by the obligors exceeds the interest accrued on the Notes and Senior Issuer Expenses;

- amounts on deposit in the Reserve Fund; and

- the subordination of each class of Notes, if any, that is junior in its right to receive payments of principal and interest to the related class of Notes.

*Overcollateralization*

Overcollateralization will be measured on each Distribution Date as being the amount by which the Pool Balance as of the last day of the related Collection Period (plus, during the Prefunding Period, the Prefunding Account Amount as of the last day of such Collection Period) exceeds the Note Balance of the Notes as of such Distribution Date (after giving effect to payments made to Noteholders on such Distribution Date).  The initial amount of overcollateralization is expected to be equal to approximately $35,500,481 (*i.e.,* approximately 17.30% of the Initial Cutoff Date Pool Balance).

On any Distribution Date, to the extent Available Collections for such Distribution Date are sufficient after the payment of all senior amounts payable on such Distribution Date, the amount of overcollateralization will be increased to, and then maintained at, the Target Overcollateralization Amount.  The Target Overcollateralization Amount will generally adjust each Distribution Date based on decreases in the Pool Balance as of the last day of the related Collection Period due to actual payments (including prepayments) of principal made on the Receivables and losses on Defaulted Receivables.  To increase the amount of overcollateralization on any Distribution Date and reach the Target Overcollateralization Amount, the Issuer will be required to make principal payments on the Notes greater than the amount of principal of the Receivables paid by obligors during the related Collection Period.  The amount of this payment will be funded primarily from excess spread that is not otherwise used to make the Required Payment Amount or fund the Reserve Fund on the related Distribution Dates.

*Excess Spread*

Excess spread for any Distribution Date generally will be the amount by which collections of interest on the Receivables during the related Collection Period exceed the sum of the Senior Issuer Expenses, the aggregate Interest Distributable Amount for each class of Notes and any amount required to be deposited into the Reserve Fund so that the funds on deposit therein equal the Reserve Fund Required Amount.  Any excess spread will be applied on each Distribution Date, as a component of Available Funds, as described in *"Application of Available Funds—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"*, to increase over time the amount of overcollateralization as of any Distribution Date to the Target Overcollateralization Amount.  Generally, excess spread will also provide a source of funds to absorb any losses on the Receivables and reduce the likelihood of losses on the Notes.

86

*Reserve Fund*

The Servicer will establish and maintain the Reserve Fund as an Eligible Account with the Indenture Trustee in the name of the Issuer for the benefit of the Noteholders. Amounts on deposit in the Reserve Fund may be withdrawn, to the extent necessary, to fund any deficiencies in the Required Payment Amount on each Distribution Date.

The Depositor will deposit an amount equal to the Reserve Fund Deposit in the Reserve Fund, with respect to (i) the Initial Receivables, on the Closing Date and (ii) the Subsequent Receivables, on each related Subsequent Receivables Purchase Date. On each Distribution Date, the Indenture Trustee will deposit, or cause to be deposited, in the Reserve Fund, from Available Collections during the related Collection Period that are not used on that Distribution Date to pay the Required Payment Amount, the amount, if any, by which the Reserve Fund Required Amount for that Distribution Date exceeds the amount on deposit in the Reserve Fund on that Distribution Date, after giving effect to all required withdrawals from the Reserve Fund on that Distribution Date. The Reserve Fund Required Amount will be equal to 1.50% of the sum of (a) the Initial Cutoff Date Pool Balance and (b) the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; provided, that the amount on deposit in the Reserve Fund will not exceed the Note Balance of the Notes after giving effect to the payments described in clauses (1) through (14) under *"Application of Available Funds—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"*.

On each Determination Date, the Servicer will determine the Reserve Fund Draw Amount, if any, for the related Distribution Date. If the Reserve Fund Draw Amount for any Distribution Date is greater than zero, the Indenture Trustee will withdraw, or cause to be withdrawn, from the Reserve Fund, an amount equal to the lesser of the Reserve Fund Draw Amount and the amount on deposit in the Reserve Fund, and transfer the amount withdrawn to the Collection Account. If the amount required to be withdrawn from the Reserve Fund to cover shortfalls in funds on deposit in the Collection Account exceeds the amount on deposit in the Reserve Fund, a temporary shortfall in the amounts distributed to the Noteholders could result. In addition, depletion of the Reserve Fund ultimately could result in losses on your Notes. See *"Risk Factors—The amount on deposit in the Reserve Fund will be limited and subject to depletion"*.

If the sum of Available Collections and the Reserve Fund Amount on any Distribution Date equals or exceeds the Note Balance, accrued and unpaid interest on the Notes and all Issuer Expenses, all such amounts will be applied up to the amounts necessary to retire the Notes and pay such amounts due.

After the payment in full, or the provision for such payment, of all accrued and unpaid interest on the Notes, the principal amount of the Notes and all Issuer Expenses, any funds remaining on deposit in the Reserve Fund will be paid to the Certificateholders.

*Subordination*

A class of Notes that is lower in priority of payment provides credit support to those classes of Notes having higher priority of payment relative to that class. Consequently, to the extent that the Trust Property does not generate enough cash to satisfy the Issuer's obligations, including the obligation to make payments to Noteholders, payments of any Available Funds that would otherwise be made to the Certificateholders will first be eliminated and any additional losses will then be absorbed by the Notes in reverse priority as follows:

- *first*, by the holders of the Class F Notes, to the extent then outstanding;

- *second*, by the holders of the Class E Notes, to the extent then outstanding;

- *third*, by the holders of the Class D Notes, to the extent then outstanding;

- *fourth*, by the holders of the Class C Notes, to the extent then outstanding;

- *fifth*, by the holders of the Class B Notes, to the extent then outstanding; and

- *sixth*, by the holders of the Class A Notes, to the extent then outstanding.

87

**Optional Redemption**

On any Distribution Date following the last day of a Collection Period on which the Note Balance is 10.0% or less of the initial Note Balance of the Notes as of the Closing Date, in order to avoid excessive administrative expense, the Servicer will be permitted, at its option, to purchase the Trust Property (other than the Accounts) from the Issuer, at a price not less than an amount sufficient to pay the Note Balance of the Notes plus accrued and unpaid interest thereon and all Issuer Expenses, without regard to any annual caps or similar limitations on payment. If the Servicer exercises such option, all amounts on deposit in the Reserve Fund will be withdrawn from the Reserve Fund and deposited in the Collection Account.

As a result, any Notes that are still outstanding at such time as the Servicer exercises such purchase option will be redeemed in whole, but not in part. This redemption will cause the early retirement of the redeemed Notes. The redemption price payable by the Servicer in connection with the exercise of such purchase option will not be less than an amount that, together with Available Funds, must equal or exceed the Note Balance of the Notes being redeemed, plus accrued and unpaid interest and all Issuer Expenses, without regard to any annual caps or similar limitations on payment. Notice of any such redemption will be given by the Servicer to the Indenture Trustee not later than ten days prior to the planned redemption date.

**Notes Owned by the Issuer, the Depositor, the Servicer and their Affiliates**

In determining whether the Noteholders have given any request, demand, authorization, direction, notice, consent or waiver under any Transaction Document, Notes owned by the Issuer, any other obligor upon the Notes, the Depositor, the Servicer or any of their respective affiliates shall be disregarded and deemed not to be outstanding unless all of the Notes of the related class or classes making, and required to make, the request, demand, authorization, direction, notice, consent or waiver are owned by the Issuer, any other obligor upon the Notes, the Depositor, the Servicer or any of their respective affiliates.

Upon any sale or transfer of any Note (or interest therein) that was retained by the Issuer or a person considered the same person as the Issuer for United States federal income tax purposes as of the Closing Date, if for tax or other reasons it may be necessary to track any such Note (for example, if the Notes are issued with OID), tracking conditions such as requiring separate CUSIPs may be required by the Issuer as a condition to such transfer and the Issuer shall provide prior written notice of such sale or transfer and tracking condition to the Indenture Trustee. The Issuer shall provide or cause to be provided to the Noteholders such information or reports as required by the Internal Revenue Code, including relating to interest, OID and market discount or premium. The Issuer will supply to the Indenture Trustee, at the time and in the manner required by applicable Treasury Regulations, for further distribution to the related Noteholders, and to the extent required by applicable Treasury Regulations, information with respect to any OID, including any information or calculation with respect thereto and shall be entitled to conclusively rely on any information or calculation in connection therewith.

**Limitation on Right to Institute Bankruptcy Proceedings**

Each Trustee and each Securityholder, by accepting the related Securities or a beneficial interest therein, will covenant that it will not at any time institute against the Issuer any bankruptcy, reorganization or similar proceeding under any federal or State bankruptcy or similar law; provided, that the foregoing shall not prohibit a Trustee from filing a proof of claim in any such proceeding instituted by any other person.

**Events of Default**

The occurrence and continuance of any of the following events will constitute an "Event of Default" under the Indenture:

- a default in the payment of interest when it becomes due and payable on the Controlling Class of Notes, which default remains uncured for a period of five Business Days;

- a default in the payment of principal on any Note on its Final Scheduled Distribution Date;

- a default in the observance or performance of any material covenant or agreement of the Issuer made in the Indenture or in any other Transaction Document (other than a covenant or agreement, a default in the observance or performance of which is specifically dealt with elsewhere in the

88

Indenture or another Transaction Document) and such default is not cured for a period of 30 days (or for such longer period, not in excess of 60 days, as may be reasonably necessary to remedy such default; provided, that such default is capable of remedy within 60 days and the Issuer has commenced, or will promptly commence and pursue, all reasonable efforts to remedy such default) after written notice thereof has been given to the Issuer by the Depositor or the Indenture Trustee or to the Issuer, the Depositor and the Indenture Trustee, by the holders of Notes representing at least 25% of the Note Balance of the Controlling Class of Notes;

- any representation, warranty or written statement of the Issuer made in the Indenture or in any other Transaction Document or in any certificate, report or other writing delivered pursuant to or in connection with the Indenture or any other Transaction Document proving to have been incorrect in any material adverse respect as of the time when it was made, and the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured for a period of 30 days (or for such longer period, not in excess of 60 days, as may be reasonably necessary to remedy such default; provided that such default is capable of remedy within 60 days and the Issuer has commenced, or will promptly commence and pursue, all reasonable efforts to remedy such default) after the giving of written notice thereof to the Issuer by the Depositor or the Indenture Trustee or to the Issuer, the Depositor and the Indenture Trustee, by the holders of Notes representing at least 25% of the Note Balance of the Controlling Class of Notes; and

- the occurrence of an Insolvency Event with respect to the Issuer.

**Rights Upon Event of Default**

If an Event of Default has occurred and is continuing, the Indenture Trustee shall, if so requested in writing by the Majority Noteholders, declare that the Notes are immediately due and payable. Any such declaration of the acceleration of the Notes may be rescinded by the Majority Noteholders at any time before a judgment or decree for payment of the amount due has been obtained by the Indenture Trustee if (1) the Issuer has paid or deposited with the Indenture Trustee funds to pay all payments of principal of and interest on the Notes and all other amounts that would have been due if the Event of Default giving rise to the declaration of acceleration had not occurred, as well as any sums paid or advanced by the Indenture Trustee, the reasonable expenses of the Indenture Trustee and its counsel and any other outstanding fees and expenses of the Issuer, and (2) all other Events of Default, other than the nonpayment of the Note Balance of the Notes that has become due solely by the acceleration, have been cured or waived.

After the acceleration of the Notes following the occurrence of an Event of Default, the Indenture Trustee may, or at the written direction of the Majority Noteholders, shall, exercise certain remedies with respect to the Issuer and the Trust Property, which may include liquidating the Trust Property in whole or in part, on any date or dates following such acceleration. The Indenture Trustee may not cause the liquidation of the Trust Property unless (1) the Event of Default is a default in the payment of principal on a class of Notes on its Final Scheduled Distribution Date or interest on the Controlling Class of Notes or (2)(a) Noteholders representing 100% of the Note Balance of the Notes consent thereto, (b) the proceeds of such sale or liquidation distributable to the Noteholders will be sufficient to discharge in full all amounts then due and unpaid on the Notes for principal and interest or (c) the Indenture Trustee determines that the Trust Property will not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if the Notes had not been accelerated and the Indenture Trustee obtains the consent of Noteholders representing at least $66\frac{2}{3}\%$ of the Note Balance if the Notes.

If the Trust Property is sold after the acceleration of the Notes following the occurrence of an Event of Default, the Indenture Trustee will apply or cause to be applied the proceeds of that sale as described under *"Application of Available Funds—Distributions— After the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)".*

**Book-Entry Registration**

*General*

All Global Notes will be issued in book-entry form through the facilities of DTC, Euroclear and Clearstream. Investors' interests in the Global Notes will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. As a result, Clearstream and Euroclear will hold positions on behalf of their customers or participants through their respective depositaries, which in turn will hold the positions in accounts as DTC Participants.

Investors electing to hold their Notes through DTC will follow the settlement practices that apply to United States corporate debt obligations. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Notes through Clearstream or Euroclear accounts will follow the settlement procedures that apply to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

Secondary market trading between DTC Participants will be settled using the procedures applicable to United States asset backed securities in same-day funds. Secondary market trading between Clearstream Customers or Euroclear Participants will be settled using the procedures applicable to conventional eurobonds in same-day funds.

Subject to the restrictions on transfer set forth under *"Notice to Investors"*, the Notes held in fully registered, certificated form may be presented or surrendered for registration of transfer or exchange at the offices of the Note Registrar. Every Note presented or surrendered for transfer or exchange must (if so required by the Note Registrar) be duly endorsed by, or be accompanied by a written instrument in form satisfactory to the Note Registrar duly executed by, the holder thereof or its attorney duly authorized in writing. No service charge will be imposed for any transfer or exchange of Notes, but the Indenture Trustee or the Note Registrar may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith. The Indenture Trustee will initially serve as Note Registrar.

Prior to due presentment for registration of transfer, the Issuer, the Indenture Trustee and any agent of any of them may treat the person in whose name any Note is registered as the owner of such Note for the purpose of receiving payments thereon and for all other purposes whatsoever, and none of the Issuer, the Indenture Trustee or any agent of any of them will be affected by notice to the contrary.

*Global Clearance and Settlement Procedures*

*Trading Between DTC Seller and Clearstream or Euroclear Purchaser.* When Notes are to be transferred from the account of a DTC Participant to the account of a Clearstream Customer or a Euroclear Participant, the purchaser will send instructions to Clearstream or Euroclear through a Clearstream Customer or Euroclear Participant at least one business day prior to settlement. Clearstream or Euroclear, as the case may be, will instruct the respective depositary to receive the Notes against payment. Payment will include interest accrued on the Notes from and including the last Distribution Date to and excluding the settlement date. Payment will then be made by the respective depositary to the DTC Participant's account against delivery of the Notes. After settlement has been completed, the Notes will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream Customer's or Euroclear Participant's account. The credit will appear the next day (European time) and the cash debit will be back-valued to, and the interest on the Notes will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (that is, the trade fails), the Clearstream or Euroclear cash debit will be valued instead as of the actual settlement date.

Clearstream Customers and Euroclear Participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing this is to pre-position funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement

90

occurring within Clearstream or Euroclear.  Under this approach, they may take on credit exposure to Clearstream or Euroclear until the Notes are credited to their accounts one day later.

As an alternative, if Clearstream or Euroclear has extended a line of credit to them, Clearstream Customers or Euroclear Participants can elect not to pre-position funds and allow that credit line to be drawn upon to finance settlement.  Under this procedure, Clearstream Customers or Euroclear Participants purchasing Notes would incur overdraft charges for one day, assuming they cleared the overdraft when the Notes were credited to their accounts.  However, interest on the Notes would accrue from the value date.  Therefore, in many cases the investment income on the Notes earned during that one-day period may substantially reduce or offset the amount of any overdraft charges, although this result will depend on each Clearstream Customer's or Euroclear Participant's particular cost of funds.

Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for sending Notes to the respective depositary for the benefit of Clearstream Customers or Euroclear Participants.  The sale proceeds will be available to the DTC seller on the settlement date.  Thus, to the DTC Participant, a cross-market transaction will settle no differently than a trade between two DTC Participants.

*Trading Between Clearstream or Euroclear Seller and DTC Purchaser.*  Due to time zone differences in their favor, Clearstream Customers and Euroclear Participants may employ their customary procedures for transactions in which Notes are to be transferred by the respective clearing system, through the respective depositaries, to a DTC Participant.  The seller will send instructions to Clearstream or Euroclear through a Clearstream Customer or Euroclear Participant at least one business day prior to settlement.  In these cases, Clearstream or Euroclear will instruct the respective depositaries, as appropriate, to deliver the Notes to the DTC Participant's account against payment.  Payment will include interest accrued on the Notes from and including the last Distribution Date to and excluding the settlement date.  The payment will then be reflected in the account of the Clearstream Customer or Euroclear Participant the following day, and receipt of the cash proceeds in the Clearstream Customer's or Euroclear Participant's account would be back-valued to the value date, which would be the preceding day, when settlement occurred in New York.  Should the Clearstream Customer or Euroclear Participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation may extinguish any overdraft charges incurred over that one-day period.  If settlement is not completed on the intended value date, that is, the trade fails, receipt of the cash proceeds in the Clearstream Customer's or Euroclear Participant's account would instead be valued as of the actual settlement date.

Investors should note that, notwithstanding the foregoing description, DTC, Clearstream and Euroclear Participants are under no obligation to perform or continue to perform the foregoing procedures and such procedures may be discontinued at any time.  Investors should review the procedures of DTC, Clearstream and Euroclear for clearing, settlement and withhold tax procedures applicable to their purchase of Notes.

*Book-Entry and Definitive Notes*

Notes initially issued in book-entry form will thereafter be issued as definitive Notes to applicable Note Owners or their nominees, rather than to DTC or its nominee, if (i) the Servicer advises the Indenture Trustee in writing that DTC is no longer willing or able to properly discharge its responsibilities as depository with respect to such Notes and the Servicer is unable to locate a qualified successor or (ii) after the occurrence of an Event of Default, owners of Book-Entry Notes representing at least 51% of the Note Balance of a Class of Notes advise the Indenture Trustee and the DTC Participants through DTC in writing that the continuation of a book-entry system through DTC is no longer in the best interest of such Note Owners.  Upon the occurrence of either of the foregoing events, the Indenture Trustee will be required to notify, in accordance with DTC's procedures, all DTC Participants (as identified in a listing of DTC Participant accounts to which each class of Book-Entry Notes is credited) of the availability of such definitive Notes.  Upon surrender by DTC of the Book-Entry Notes, together with instructions for re-registration, the Indenture Trustee or other designated party will be required to issue to the Note Owners identified in such instructions the definitive Notes to which they are entitled, and thereafter the holders of such definitive Notes will be recognized as Noteholders under the Indenture.

Each Note Owner is deemed, by virtue of its acquisition of an interest in Book-Entry Notes, to agree to comply with the transfer requirements described under *"Notice to Investors"*.

91

If, under the terms of the Indenture, it is necessary to determine whether any person is a Note Owner, the Indenture Trustee will be required to make such determination based on a certificate of such person which will specify, in reasonable detail satisfactory to the Indenture Trustee, the class and Note Balance of the Book-Entry Note beneficially owned, the value of such person's interest in such Note and any intermediaries through which such person's interest in such Book-Entry Note is held; provided, however, that the Indenture Trustee is not to knowingly recognize such person as a Note Owner if such person, to the knowledge of certain specified officers of the Indenture Trustee, acquired its interest in a Book-Entry Note in violation of the transfer requirements described under *"Notice to Investors"*, or if such person's certification that it is a Note Owner is in direct conflict with information obtained by the Indenture Trustee from DTC and/or the DTC Participants with respect to the identity of a Note Owner.

In the event DTC's rules and procedures conflict with the provisions of the Indenture or any other Transaction Document and cause a breach of any such document by the Indenture Trustee, the Indenture Trustee will not be liable for any losses or damages of any person incurred in connection therewith provided the Indenture Trustee has made a good faith effort to comply with the provisions in the Indenture.

Payments on the Book-Entry Notes will be made on each Distribution Date by the Indenture Trustee to DTC.  DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC Participants in accordance with DTC's normal procedures.  Each DTC Participant will be responsible for disbursing such payments to the Note Owners that it represents and to each financial intermediary for which it acts as agent. Each such financial intermediary will be responsible for disbursing funds to the Note Owners of the Book-Entry Notes that it represents.  Under a book-entry format, Note Owners may experience some delay in their receipt of payments, since such payments will be forwarded by the Indenture Trustee to Cede & Co., DTC's nominee. Payments on Notes held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream Customers or Euroclear Participants, as applicable, in accordance with the relevant system's rules and procedures, to the extent received by the relevant depositary.  Such payments will be subject to tax reporting in accordance with relevant U.S. tax laws and regulations.  Because DTC can only act on behalf of financial intermediaries, who in turn act on behalf of Note Owners, the ability of a Note Owner to pledge Book-Entry Notes to persons or entities that do not participate in the DTC system, or otherwise take actions in respect of such Book-Entry Notes, may be limited due to the lack of physical notes for such Book-Entry Notes.  In addition, issuance of the Book-Entry Notes in book-entry form may reduce the liquidity of such Notes in the secondary market since certain potential investors may be unwilling to purchase securities for which they cannot obtain physical notes.

## APPLICATION OF AVAILABLE FUNDS

### Sources of Funds for Distributions

The funds available to the Issuer to make payments on the Notes on each Distribution Date will come from Available Funds, which will be the only funds that will be used to make payments to Noteholders on each Distribution Date, except that in the first Distribution Date following the termination of the Prefunding Period, any remaining funds in the Prefunding Account at the end of the Prefunding Period will be distributed to Noteholders as set forth under *"Description of the Transaction Documents—Accounts",* in the priority and order set forth under *"Description of the Notes—Payments of Principal".* The calculation of the funds available to make payments on the Notes (other than any remaining amount in the Prefunding Account at the end of the Prefunding Period) is set forth in the definition of Available Funds under *"Glossary".*

The following chart shows the sources of Available Funds for each Distribution Date:



**Distributions**

*Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)*

On each Distribution Date, unless the Notes have been accelerated following the occurrence of an Event of Default (other than an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty of the Issuer), the Servicer will instruct the Indenture Trustee to make the following distributions on such Distribution Date from Available Funds for the related Collection Period and any amounts withdrawn from the Reserve Fund in respect of the Required Payment Amount, in the following amounts and order of priority:

(1)     pro rata, to (a) the Servicer, the Total Servicing Fee for the related Collection Period and, to the extent the Servicer has not reimbursed itself or to the extent not retained by the Servicer, other amounts relating to mistaken deposits, postings or checks returned for insufficient funds (including Collateral Protection Insurance Payments), (b) any Successor Servicer, Transition Costs not to exceed $150,000 (including boarding fees) in the aggregate for all Distribution Dates and (c) the State of Texas, any Texas Deferred Sales Tax Payments due to the State of Texas;

(2)     to the extent not previously paid by the Servicer, pro rata, to the Trustees, the Custodian and the Backup Servicer, any accrued and unpaid fees, expenses and indemnities then due to each of them, in each case including without limitation, amounts from prior years which were in excess of the applicable cap or annual limit for any calendar year or otherwise not paid; provided, that such expenses and indemnities shall be subject to an aggregate limit for any calendar year equal to (x) $210,000 for the Owner Trustee, the Indenture Trustee and the Custodian, collectively, and (y) $40,000 for the Backup Servicer;

(3)     to the Note Payment Account, the Interest Distributable Amount payable on the Class A Notes;

(4)     to the Note Payment Account, to make a payment of principal in an amount equal to the First Priority Principal Distributable Amount;

(5)     to the Note Payment Account, the Interest Distributable Amount payable on the Class B Notes;

(6)     to the Note Payment Account, to make a payment of principal in an amount equal to the Second Priority Principal Distributable Amount;

(7)     to the Note Payment Account, the Interest Distributable Amount payable on the Class C Notes;

(8)     to the Note Payment Account, to make a payment of principal in an amount equal to the Third Priority Principal Distributable Amount;

(9)     to the Note Payment Account, the Interest Distributable Amount payable on the Class D Notes;

(10)    to the Note Payment Account, to make a payment of principal in an amount equal to the Fourth Priority Principal Distributable Amount;

(11)    to the Note Payment Account, the Interest Distributable Amount payable on the Class E Notes;

(12)    to the Note Payment Account, to make a payment of principal in an amount equal to the Fifth Priority Principal Distributable Amount;

(13)    to the Note Payment Account, the Interest Distributable Amount payable on the Class F Notes;

(14)    to the Note Payment Account, to make a payment of principal in an amount equal to the Sixth Priority Principal Distributable Amount;

(15)     to the Reserve Fund, an amount necessary to increase the amount on deposit in the Reserve Fund to the Reserve Fund Required Amount;

(16)     to the Note Payment Account, to make a payment of principal in an amount equal to the Regular Principal Distributable Amount;

(17)     pro rata, based on amounts due, to the Trustees, the Custodian, the Backup Servicer and any Successor Servicer, any fees, expenses, indemnities and Transition Costs then due that are in excess of any applicable caps or limitations on such amounts in clauses (1) and (2); and

(18)     pro rata, to the holders of the Risk Retained Certificates and the Non-Risk Retained Certificates, according to their respective Certificate Percentage Interests, all remaining Available Funds.

Each payment of principal referred to above shall be made in the priority and order set forth under *"Description of the Notes—Payments of Principal"*.

In addition, if Available Collections and the Reserve Fund Amount on any Distribution Date equals or exceeds the Note Balance of the Notes, accrued and unpaid interest thereon and all Issuer Expenses, all such amounts will be applied up to the amount necessary to retire the Notes and pay such amounts due.

On each Distribution Date following the acceleration of the Notes after the occurrence of an Event of Default related solely to a breach of a covenant, agreement, representation or warranty of the Issuer, Available Funds will be distributed as described under *"—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"*, except that the Regular Principal Distributable Amount will include all remaining Available Funds until the Note Balance of all Notes has been reduced to zero and there will be no caps or limitations on the amount of expenses, indemnities and Transition Costs otherwise set forth in clauses (1) and (2) of *"—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"*.

*After the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)*

On each Distribution Date following the acceleration of the Notes after the occurrence of an Event of Default (other than an Event of Default related solely to a breach of a covenant, agreement, representation or warranty of the Issuer) and the acceleration of the Notes or upon liquidation of the Trust Property, Available Funds will not be distributed in accordance with the priorities set forth under *"—Distributions— Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"* but will instead be distributed in accordance with the following order of priority:

(1)     pro rata, to the Servicer, the Trustees, the Custodian, the Backup Servicer and any Successor Servicer, the amounts due and owing to such entities, pursuant to the priorities set forth in clauses (1) and (2) of *"—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"*, without regard to any caps or limitations on any such amounts set forth in clauses (1) and (2) of *"—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)"*;

(2)     to the Class A Noteholders, accrued and unpaid interest on the Class A Notes;

(3)     to the Class A Noteholders, principal of the Class A Notes, until the Class A Note Balance has been reduced to zero;

(4)     to the Class B Noteholders, accrued and unpaid interest on the Class B Notes;

(5)     to the Class B Noteholders, principal of the Class B Notes, until the Class B Note Balance has been reduced to zero;

95

(6)        to the Class C Noteholders, accrued and unpaid interest on the Class C Notes;

(7)        to the Class C Noteholders, principal of the Class C Notes, until the Class C Note Balance has been reduced to zero;

(8)        to the Class D Noteholders, accrued and unpaid interest on the Class D Notes;

(9)        to the Class D Noteholders, principal of the Class D Notes, until the Class D Note Balance has been reduced to zero;

(10)        to the Class E Noteholders, accrued and unpaid interest on the Class E Notes;

(11)        to the Class E Noteholders, principal of the Class E Notes, until the Class E Note Balance has been reduced to zero;

(12)        to the Class F Noteholders, accrued and unpaid interest on the Class F Notes;

(13)        to the Class F Noteholders, principal of the Class F Notes, until the Class F Note Balance has been reduced to zero; and

(14)        to the Certificateholders, all remaining Available Funds.

## U.S. CREDIT RISK RETENTION

The risk retention regulations set forth in Regulation RR of the Exchange Act require the Sponsor, either directly or through its majority-owned affiliates, to retain an economic interest in the credit risk of the Receivables. Tricolor expects to satisfy the obligations of the Sponsor under Regulation RR by causing its wholly-owned subsidiary, the Depositor, to retain the Risk Retained Certificates, which are expected to represent an "eligible horizontal residual interest" under Regulation RR. To satisfy the relevant conditions of Regulation RR, the fair value of the "eligible horizontal residual interest" to be retained by the Sponsor or its majority-owned affiliate, must, as of the Closing Date, equal at least 5.0% of all "ABS interests" (within the meaning of Regulation RR) in the Issuer issued as part of the securitization transaction. The Risk Retained Certificates that the Depositor will retain in accordance with Regulation RR is expected to represent 53.20% of the Certificates and at least 5.00% of the fair value of the Notes and the Certificates as of the Closing Date.

The Certificates will represent the residual interest in the Issuer and therefore will represent the rights to the overcollateralization, amounts in the Reserve Fund and excess cash flow, in all cases to the extent those amounts are eligible for distribution in accordance with the Transaction Documents and are not needed to make payments on the Notes or cover losses on the Receivables on a given Distribution Date. Because the Certificates will be subordinated to the Notes and will only be entitled to amounts that are not needed on a Distribution Date to make payments on the Notes or to make other required payments or deposits according to the priorities of payments described under *"Application of Available Funds—Distributions"*, the Certificates will absorb all losses on the Receivables by reduction of, first, the excess cash flow, second, the overcollateralization and, third, the amounts in the Reserve Fund, before any losses are incurred by the Notes. The Reserve Fund is not intended to qualify as an "eligible horizontal cash residual account" under Regulation RR. See *"Description of the Notes"* for a description of other material terms of the Certificates and *"Description of the Notes—Credit Enhancement"* for a description of the credit enhancement available for the Notes, including the excess cash flow, overcollateralization and Reserve Fund.

The fair value of the Risk Retained Certificates is expected to be approximately $11,691,886, which is expected to be 5.0% of the sum of the fair value of the Notes and the Certificates on the Closing Date. The Depositor will retain 100% of the Risk Retained Certificates on the Closing Date. The Depositor, or another majority-owned affiliate of the Sponsor, intends to retain the Risk Retained Certificates until the later of (i) two years from the Closing Date, (ii) the date the Pool Balance is one-third or less of the Initial Cutoff Date Pool Balance, (iii) and the date the Note Balance of the Notes is one-third or less of the initial Note Balance of the Notes.

For purposes of determining compliance with Regulation RR, the fair values of the Notes and the Certificates are as follows:

96

| Class | Interest Rates | Fair Values | Fair Values (as a percentage) |
|---|---|---|---|
| Class A | 3.30% | $125,555,819 | 53.70% |
| Class B | 4.34% | $13,468,163 | 5.76% |
| Class C | 4.71% | $13,978,557 | 5.98% |
| Class D | 5.38% | $25,018,682 | 10.70% |
| Class E | 7.79% | $21,056,625 | 9.01% |
| Class F | 9.80% | $12,756,201 | 5.46% |
| Certificates[*] | | | |
|    Risk Retained | | $11,691,886 | 5.00% |
|    Non-Risk Retained | | $10,285,344 | 4.40% |
| Total……………………. | | $233,811,277 | 100.00% |

[*]    The Certificates are a single class of securities with a pro rata payment priority and otherwise identical characteristics that comprise a single "ABS Interest" and are issued as two separate securities merely to facilitate compliance with Regulation RR.

The expected fair value of the Notes and the Certificates was determined using observable and unobservable inputs within a discounted cash flow model in accordance with the fair value assessment described with ASC 820.  The observable inputs include the characteristics of the Notes and the Receivables and the transaction structure, all as described in this Offering Memorandum.  The unobservable inputs include expected prepayments, charge-offs and recoveries on the Receivables based on historical performance of securitized pools of auto receivables and stable macro-economic conditions.  The estimated amortization schedule of the Receivables provided a series of monthly cash flows that was then discounted to derive the fair value of the Certificates.

In measuring fair value, the use of observable and unobservable inputs and their significance in measuring fair value are reflected in the fair value hierarchy assessment established by ASC 820, with Level 1 inputs favored over Level 3 inputs:

- Level 1 – inputs include quoted prices for identical assets and are the most observable;

- Level 2 – inputs include quoted prices for similar assets and observable inputs such as interest rates and yield curves; and

- Level 3 – inputs include data not observable in the market and reflect management judgment about the assumptions market participants would use in pricing the asset.

The fair value of the Notes is categorized within Level 2 of the hierarchy assessment of ASC 820, reflecting the use of inputs derived from prices for similar assets.  The fair value of the Certificates is categorized within Level 3 of the hierarchy assessment, as inputs to the fair value calculation are generally not observable.

In addition to the assumptions that appear under *"Weighted Average Lives of the Notes"*, Tricolor made the following assumptions in the discounted cash flow model:

- Note interest accrues at the rates described above on a "30/360" basis.

- Fees payable to the Servicer, the Custodian, the Backup Servicer, the Owner Trustee and the Indenture Trustee are forecasted in accordance with Tricolor's cash flow model and paid in accordance with under *"Application of Available Funds"*.

- The Receivables prepay at a rate of 0.50% ABS.  This prepayment rate includes only voluntary prepayments by borrowers.

- Recoveries on defaulted receivables are forecasted at a rate of 60.00% of the defaulted receivable balance and a time to recovery of three months.

97

- Receivables are charged off three months following default.

- The Receivables experience a lifetime cumulative net loss rate of 17.30% as a percentage of the Initial Cutoff Date Pool Balance and the aggregate principal balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates.

- A default timing curve that assumes that 50.00% of defaults occur in the first year after the Initial Cutoff Date, 30.00% of defaults occur in the second year after the Initial Cutoff Date, 15.00% of defaults occur in the third year after the Initial Cutoff Date and 5.00% of defaults occur in the fourth year after the Initial Cutoff Date.

- The Servicer does not exercise its Optional Redemption right.

- the Certificate cash flows are discounted at 15%.

Tricolor developed these inputs and assumptions considering the following factors:

- The lifetime cumulative net loss assumption was determined by Tricolor based on the composition of the pool for this securitization, trends in used motor vehicle values, and broader economic conditions.  The cumulative net loss assumption represents the expected cumulative Defaulted Receivables reduced by expected Net Liquidation Proceeds and Recoveries.

- The discount rate is estimated to reflect the credit exposure of the Certificates.  Due to a lack of an actively traded market in residual interests, the discount rate was derived using qualitative factors that consider the first-loss exposure and credit risk of the Receivables.

- The recovery rate and recovery lag are estimated based on the performance of prior securitized pools and some of the assumptions employed by the Rating Agency.

Tricolor believes that the inputs and assumptions described above are all of the inputs and assumptions that could have a significant impact on the fair value calculations described above and provide a prospective Noteholder with information that is sufficient to evaluate the fair value calculation.  The fair value of the Notes and the Certificates was calculated based on the assumptions described above, including the assumptions regarding the characteristics and performance of the Receivables, that will differ from the actual characteristics and performance of the Receivables.  Consequently, the present value of the projected cash flows on the Certificates is expected to vary from the discounted actual cash flows on the Certificates, and you should not assume that the fair value of the Certificates will be equal to or greater than the present value of the actual cash flows on the Certificates.

The Sponsor will recalculate the fair value of the Notes and the Certificates following the Closing Date to reflect the issuance of the Notes and any material changes in the methodology or inputs and assumptions described above.  The first Investor Report will disclose (1) the fair value of the Risk Retained Certificates as a percentage of the Certificates as of the Closing Date; (2) the fair value of the Risk Retained Certificates as a percentage of the sum of the fair value of the Notes and the Certificates as of the Closing Date; (3) the total of the amounts in clauses (1) and (2) above; (4) the fair value, as a percentage of the sum of the fair value of the Notes and Certificates, and dollar amount of the eligible horizontal residual interest retained on the Closing Date, based on the amount and sale prices of the Notes; (5) the fair value, as a percentage of the sum of the fair value of the Notes and Certificates, and the dollar amount of the eligible horizontal residual interest that the Sponsor is required to retain; and (6) a description of any material changes in the methodology or inputs and assumptions that were used to calculate the fair values of the Notes and the Certificates.

In no event will any of the Trustees, the Backup Servicer, the Custodian or the Successor Servicer (1) have any responsibility to monitor compliance with or enforce compliance with the credit risk retention requirements for asset-backed securities or other rules or regulations relating to risks retention or (2) be charged with knowledge of such rules, or be liable to any Noteholder, Certificateholder, the Sponsor or any other person for violation of such rules now or hereinafter in effect.

**DESCRIPTION OF THE TRANSACTION DOCUMENTS**

The following summary describes the material terms of the Receivables Purchase Agreement, the Sale and Servicing Agreement, the Indenture and the Trust Agreement.  This summary does not claim to be complete and is subject to all the provisions of the Transaction Documents.

**Sale and Assignment of the Receivables**

Pursuant to the Receivables Purchase Agreement, Tricolor will sell and assign to the Depositor, without recourse, its entire interest in and to the Receivables, its security interest in the Financed Vehicles, its rights to receive all payments on, or proceeds from, the related Receivables to the extent paid after the applicable Cutoff Date and the Receivable files.  Each Initial Receivable transferred by Tricolor to the Depositor on the Closing Date will be identified in a schedule to the Receivables Purchase Agreement.  During the Prefunding Period, pursuant to the Receivables Purchase Agreement, Tricolor and the Depositor may execute one or more Subsequent Receivables Purchase Assignments, pursuant to which Tricolor will sell and assign to the Depositor, without recourse, its entire interest in and to certain Subsequent Receivables, its security interest in the related Financed Vehicles, its rights to receive all payments on, or proceeds from, such Subsequent Receivables to the extent paid after the applicable Cutoff Date and the related Receivable files.  Each Subsequent Receivable so assigned will be identified in a schedule to the related Subsequent Receivables Purchase Assignment.  On each Subsequent Receivables Purchase Date, the Depositor will cause an amount equal to the Reserve Fund Deposit for the related Subsequent Receivables to be deposited into the Reserve Fund.

Pursuant to the Sale and Servicing Agreement, the Depositor will sell and assign to the Issuer, without recourse, its entire interest in and to the Receivables, its security interest in the Financed Vehicles and its rights to receive all payments on, or proceeds from, the related Receivables to the extent paid or payable after the applicable Cutoff Date and the Receivable files.  Each Initial Receivable transferred by the Depositor to the Issuer on the Closing Date will be identified in a schedule to the Receivables Purchase Agreement.  During the Prefunding Period, pursuant to the Sale and Servicing Agreement, Tricolor, the Depositor and the Issuer may execute one or more Subsequent Receivables Assignments, pursuant to which the Depositor will sell and assign to the Issuer, without recourse, its entire interest in and to certain Subsequent Receivables, its security interest in the related Financed Vehicles and its rights to receive all payments on, or proceeds from, such Subsequent Receivables to the extent paid after the applicable Cutoff Date and the related Receivable files.  Each Subsequent Receivable so assigned will be identified in a schedule to the related Subsequent Receivables Assignment.

Tricolor will agree in the Receivables Purchase Agreement to repurchase from the Issuer any Receivable as to which Tricolor has breached a representation or warranty if that breach materially and adversely affects the interest of the Depositor, the Issuer or any Noteholder in that Receivable and Tricolor has not cured that breach on or before the last day of the Collection Period which includes the 45th day after the date on which Tricolor becomes aware of, or receives written notice of, such breach.  Tricolor will repurchase such Receivable as of the last day of such Collection Period by depositing an amount equal to the Purchase Amount into the Collection Account on the related Deposit Date.  The Depositor will assign to the Issuer, pursuant to the Sale and Servicing Agreement, all of its rights under the Receivables Purchase Agreement, including its right to cause Tricolor to repurchase Receivables as to which there has been a breach of a representation or warranty.  The repurchase obligation of Tricolor under the Receivables Purchase Agreement, as assigned to the Issuer under the Sale and Servicing Agreement, will constitute the sole remedy available to the Depositor, the Issuer, the Trustees and the Noteholders for any uncured breach of a representation or warranty relating to the Receivables as contained in the Receivables Purchase Agreement.

Tricolor and the Depositor each will make representations and warranties regarding the Receivables pursuant to (i) the Receivables Purchase Agreement and, if applicable, one or more Subsequent Receivables Purchase Assignments and (ii) the Sale and Servicing Agreement and, if applicable, one or more Subsequent Receivables Assignments, respectively.  These representations and warranties will include the representations and warranties set forth under *"The Receivables—Eligibility Criteria"* and will pertain to specific characteristics of the Receivables, including the origination of the Receivables, the obligors of the Receivables, the accuracy and legality of the records, computer tapes and schedules containing information regarding the Receivables, the related Financed Vehicles and the security interests in the Receivables granted to the Depositor, the Issuer and the Indenture Trustee.

Upon discovery of a breach by the Depositor of any of the representations and warranties with respect to the Receivables under the Sale and Servicing Agreement, the Depositor will be required to notify each other party to

99

the Sale and Servicing Agreement of such breach, and Tricolor will be required to repurchase from the Issuer any Receivable in which the interests of the Issuer are materially and adversely affected by such breach that has not been cured by the last day of the Collection Period which includes the 45th day after the date on which Depositor becomes aware of, or receives written notice of, such breach.  Tricolor will repurchase such Receivable from the Issuer as of the last day of such Collection Period by depositing an amount equal to the Purchase Amount into the Collection Account on the related Deposit Date.

The foregoing repurchase obligations of Tricolor under the Receivables Purchase Agreement, as assigned to the Issuer under the Sale and Servicing Agreement, will constitute the sole remedy available to the Issuer, the Trustees and the Noteholders for any uncured breach of a representation or warranty relating to the Receivables.

**Accounts**

The Servicer will establish the Collection Account and the Note Payment Account with the Indenture Trustee, and maintain such accounts in the name of, the Issuer on behalf of the Noteholders.  All payments made on or in respect of the Receivables will be required to be transferred by the Servicer, within two Business Days of identification, to the Collection Account.  Amounts that are released from the Collection Account for distribution to Noteholders will be deposited to the Note Payment Account and distributions to the Noteholders will be made from the Note Payment Account.

The Servicer will also establish the Reserve Fund with the Indenture Trustee and maintain it in the name of the Issuer on behalf of the Noteholders.  Amounts may be released from the Reserve Fund in the manner set forth under *"Description of the Notes—Credit Enhancement—Reserve Fund"*.

The Servicer will also establish with the Indenture Trustee, and maintain in the name of the Issuer on behalf of the Noteholders, the Prefunding Account.  On the Closing Date, an amount equal to the Prefunding Account Deposit will be deposited from the proceeds of the sale of the Notes into the Prefunding Account.  In order to acquire Subsequent Receivables on a Subsequent Receivables Purchase Date during the Prefunding Period, certain conditions precedent must be satisfied and the Subsequent Receivables must satisfy the eligibility criteria similar to the Receivables transferred to the Issuer on the Closing Date as well as additional eligibility criteria that will be specified in the Receivables Purchase Agreement and the Sale and Servicing Agreement as described herein.  The amount of funds withdrawn from the Prefunding Account for the acquisition of Subsequent Receivables on a Subsequent Receivables Purchase Date will be equal to the aggregate Subsequent Receivable Purchase Price for each such Subsequent Receivable.  The amount on deposit in the Prefunding Account will not be available to cover losses on or in respect of the Receivables.

The Prefunding Period will begin on the Closing Date and will end on the earliest to occur of (i) July 31, 2022, (ii) the date on which Prefunding Account Amount is less than $100,000 and (iii) the occurrence of an Event of Default under the Indenture or an Event of Servicing Termination.  On the first Distribution Date following the end of the Prefunding Period, the Indenture Trustee will withdraw any Prefunding Account Amount and deposit those funds in the Note Payment Account for distribution to the Noteholders on the first Distribution Date following the termination of the Prefunding Period.  These funds will be distributed in the priority and order set forth under *"Description of the Notes—Payments of Principal"*.  The Depositor expects that the Prefunding Account Amount will be less than $100,000 by July 31, 2022.

*General*

Each Account will be required to be an Eligible Account.  In the event that any Account no longer is an Eligible Account, the Servicer will be required to, with the Indenture Trustee's assistance if necessary, transfer the related account or accounts within five Business Days to an account that is an Eligible Account.

Funds on deposit in the Collection Account, the Reserve Fund and the Prefunding Account may be invested by the Indenture Trustee at the written direction of the Servicer in eligible investments selected by the Servicer that meet certain requirements of the Rating Agency.  All such investments will be required to mature or have the ability to be liquidated on the Deposit Date immediately preceding the first Distribution Date after the making of such investment.  No eligible investments may be purchased at a premium.

100

**Servicing**

Tricolor, in its capacity as Servicer, will be responsible for managing, administering, servicing and making collections on the Receivables.  The Servicer's activities consist primarily of collecting and processing customer payments, responding to customer inquiries, initiating contact with customers who are delinquent in payment of an installment, maintaining the security interests in the Financed Vehicles and remitting Texas Deferred Sales Tax Payments to the State of Texas and arranging for the repossession of the Financed Vehicles, liquidation of the Financed Vehicles and pursuit of deficiencies when necessary.  The Servicer will make reasonable efforts to collect all payments due under the Receivables and will, consistent with the Sale and Servicing Agreement, follow the collection practices and procedures it follows with respect to comparable motor vehicle retail installment sale contracts that it owns or services for itself or others.

To assure uniform quality in servicing the Receivables and to reduce administrative costs, the Servicer will service and administer the Receivables.  The Receivables and other documents relating thereto will be delivered to the Custodian, who will maintain physical or electronic possession thereof, as custodian on behalf of the Issuer.  The Custodian will hold the Receivables in a secure, fire resistant vault and will clearly identify the Receivables on its system as being separate from all other records maintained by the Custodian at the same location.  To assure uniform quality in servicing the Receivables, as well as to facilitate servicing and save administrative costs, the Receivables and other documents relating thereto will not be physically segregated from other similar documents that are in the Custodian's possession or otherwise stamped or marked to reflect the transfer to the Issuer.  The obligors under the Receivables will not be notified of the transfer.  UCC financing statements reflecting the sale and assignment of the Receivables by the Depositor to the Issuer will, however, be filed, and the Servicer's accounting records and computer systems will be marked to reflect such sale and assignments.

Because the Receivables will not be stamped or otherwise marked to reflect the assignment to the Issuer, if a subsequent purchaser were to obtain physical possession of one or more of the Receivables without knowledge of the assignment, the Issuer's interest in the Receivables could be defeated.  Similarly, due to administrative burden and expense, the certificates of title to the Financed Vehicles will not be amended or reissued to note their sale by Tricolor to the Depositor or their sale by the Depositor to the Issuer or the grant of a security interest in the Financed Vehicles to the Indenture Trustee by the Issuer.  Because the certificates of title will not be amended, the Issuer may not have a perfected security interest in Financed Vehicles originated in some States.  See *"Material Legal Aspects of the Receivables"*.

The Servicer may, in its sole discretion but consistent with its normal practices and procedures, extend the payment schedule applicable to any Receivable for credit-related reasons; provided, however, that if the extension of a payment schedule causes a Receivable to remain outstanding after the last day of the Collection Period preceding the Final Scheduled Distribution Date for the Class F Notes, the Servicer will, pursuant to the Sale and Servicing Agreement, purchase that Receivable for an amount equal to the Purchase Amount as of the last day of the Collection Period which includes the 45th day after the date of discovery by or notice to the Servicer of such extension but in no event later than the last day of the Collection Period prior to the Final Scheduled Distribution Date for the Class F Notes.  The purchase obligation of the Servicer under the Sale and Servicing Agreement will constitute the sole remedy available to the Issuer, the Trustees and the Securityholders for any extension of a payment schedule that causes a Receivable to remain outstanding after the Collection Period preceding the Final Scheduled Distribution Date for the Class F Notes.

Tricolor will agree to sell repossessed financed vehicles consistent with its customary servicing practices, which may include sales at commercial vehicle auctions or to affiliates of Tricolor, in each case in a commercially reasonable manner as determined by Tricolor in its good faith and reasonable judgment.  For repossessed financed vehicles sold to affiliates of Tricolor, Tricolor will maintain a file documenting the commercial reasonableness of each such sale with contemporaneous wholesale pricing reports from industry recognized sources, in addition to any documents relevant to Tricolor's determination of the value of such financed vehicle at the time of sale.

Tricolor will have the right to delegate all or any of its servicing duties to its affiliates or other third parties or to contract with unrelated third parties to perform any of its servicing duties.  The Servicer may utilize third party agents in connection with its usual collection activities, such as repossessions and pursuing deficiency balances.  The fees and expenses of any third party agent will be as agreed between the Servicer and its third party agent and none of the Indenture Trustee, the Custodian, the Backup Servicer, the Issuer or the Securityholders will have any

101

responsibility for those fees and expenses.  No delegation by the Servicer of any of its duties shall relieve the Servicer of its responsibility with respect to such duties.

**Servicing Compensation**

The Servicer will be entitled to receive the Total Servicing Fee on each Distribution Date.  The Total Servicing Fee will be paid only to the extent of the funds deposited into the Collection Account with respect to the related Collection Period, plus, in the event that the Servicer is neither Tricolor or an affiliate, funds, if any, deposited into the Collection Account from the Reserve Fund.

The Servicing Fee will compensate the Servicer for performing the functions of a third-party servicer of the Receivables for the Issuer.  These functions will include collecting and posting all payments, responding to obligor inquiries on the related Receivables, investigating delinquencies, sending billing statements to obligors, reporting tax information to obligors, monitoring the collateral, paying collection and disposition costs with respect to Defaulted Receivables, administering the Receivables, accounting for collections and furnishing statements to the Indenture Trustee with respect to distributions, paying certain taxes, paying any Texas Deferred Sales Tax Payments due to the State of Texas, paying accounting fees, paying outside auditor fees and paying data processing costs.  If a successor Servicer other than the Backup Servicer is appointed to act as Servicer, the Servicing Fee of such successor Servicer may be greater than the Servicing Fee that Tricolor and the Backup Servicer are entitled to receive as the Servicer if the Majority Noteholders have provided their prior consent to such increase.

**Investor Reports**

On or before each Determination Date, the Servicer will deliver an Investor Report to the Depositor, the Seller, the Trustees and the Backup Servicer.  The Investor Report will specify, among other things:

- information necessary to permit the Indenture Trustee to make distributions on the related Distribution Date;

- all the information necessary for the Indenture Trustee to be able to produce the statements to Noteholders described herein; and

- the amount of collections received on or in respect of the Receivables during the related Collection Period.

**Fees and Expenses**

The Issuer will be obligated to pay the Servicing Fee to the Servicer and, if not previously paid, the fees, expenses and indemnified amounts of the Trustees, the Custodian, and the Backup Servicer, subject to certain caps, before it pays any amounts due on the Notes and other liabilities.  The following table illustrates this arrangement.  In addition, the Servicer will be required to pay the fees and expenses of the accountants in delivering their annual attestation report and the fee of the Administrator.  The fees described below will not change following an Event of Default, except that if any entity other than Tricolor or the Backup Servicer becomes the Servicer, the Servicing Fee may be increased, subject to certain limitations described under *"—Servicing Compensation"* and certain expenses of the Issuer may be higher following an Event of Default and the appointment of a Successor Servicer.

102

| Fee | General Purpose of the Fee | Amount or Calculation of Fee |
| --- | --- | --- |
| Servicing Fee | Compensation to the Servicer for services provided pursuant to the Transaction Documents. | If Tricolor or the Backup Servicer is the Servicer, with respect to any Collection Period, the product of (1) 3.00%, (2) the Pool Balance as of the opening of business on the first day of the related Collection Period (or, in the case of the first Distribution Date, as of the Initial Cutoff Date) and (3) one-twelfth. If a successor Servicer other than the Backup Servicer is the Servicer, the Servicing Fee may be increased. |
| Indenture Trustee Fee | Compensation to the Indenture Trustee in its capacity as Indenture Trustee for services provided pursuant to the Transaction Documents. | $1,500.00 monthly. |
| Custodian Fee | Compensation to the Custodian for services provided pursuant to the Transaction Documents | Per file charge, including a monthly storage fee of $0.08 per file. |
| Owner Trustee Fee | Compensation to the Owner Trustee for services provided pursuant to the Trust Agreement. | $500.00 monthly. |
| Backup Servicer Fee | Compensation to the Backup Servicer for services provided pursuant to the Transaction Documents. | With respect to any Collection Period, initially, $3,500.00 monthly (or if the Pool Balance as of the opening of business on the first day of the related Collection Period is equal to or less than $250,000,000, $3,000.00 monthly). |

The expenses of the Servicer will be reimbursed as described under *"—Servicing Compensation"*.

**Statements to Noteholders**

On or prior to each Distribution Date, the Indenture Trustee will make the Investor Report, that it receives from the Servicer for the related Distribution Date and that details information required under the Transaction Documents, available to the Noteholders. The Investor Report will include the following information regarding the Notes on the related Distribution Date:

(1)    the amount of the distribution(s) allocable to interest for each class of Notes;

(2)    the amount of the distribution(s) allocable to principal for each class of Notes, the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount, the Third Priority Principal Distributable Amount, the Fourth Priority Principal Distributable Amount, the Fifth Priority Principal Distributable Amount, the Sixth Priority Principal Distributable Amount and the Regular Principal Distributable Amount;

(3)    the Note Balance and Pool Factor for each class of Notes, after taking into account all payments to be made on such Distribution Date;

(4)    the related Interest Carryover Shortfall Amount, if any;

(5)    the Servicing Fee paid and/or due but unpaid for the related Collection Period;

103

(6)     the Pool Balance as of the close of business on the last day of the related Collection Period;

(7)     the Reserve Fund Amount, the Reserve Fund Required Amount and the Reserve Fund Draw Amount;

(8)     the aggregate amount of overcollateralization as of the last day of the related Collection Period, after taking into account all payments to be made on such Distribution Date;

(9)     the amount of the aggregate realized losses on the Receivables, if any, for the preceding Collection Period and the Cumulative Net Loss Ratio;

(10)    the aggregate Purchase Amounts for Receivables, if any, that were repurchased by the Depositor or the Servicer during the related Collection Period;

(11)    the aggregate number of Receivables that are (a) more than 30 days but fewer than 60 days Delinquent, (b) more than 59 days but fewer than 90 days Delinquent, (c) more than 89 days but fewer than 120 days Delinquent and (d) in repossession during the related Collection Period; and

(12)    for Distribution Dates during the Prefunding Period, the Prefunding Account Amount.

The Pool Factor for each class of Notes will be a seven-digit decimal, which the Servicer will compute prior to each distribution.  The Pool Factor indicates the Note Balance of a class of Notes as of the applicable Distribution Date (after giving effect to payments to be made on such Distribution Date), as a fraction of the initial Note Balance of that class of Notes.  The Servicer will compute the Pool Factor for each class of Notes and each Distribution Date.  Each Pool Factor will be initially 1.0000000, and thereafter will decline to reflect reductions in the Note Balance of the applicable class of Notes.

 A Noteholder's portion of the Note Balance of a class of Notes will be equal to the product of:

•       the aggregate outstanding principal amount of the Notes of that class, held by that Noteholder; and

•       the applicable Pool Factor.

Unless and until definitive Notes are issued, the Indenture Trustee will make available reports to Cede & Co., as registered holder of the Notes and the nominee of DTC on the Issuer's behalf.  The Indenture Trustee will make available each month to each Noteholder the above information (and certain other documents, reports and information regarding the Receivables provided by the Servicer from time to time) via the Indenture Trustee's internet website with the use of a password provided by the Indenture Trustee.  The Indenture Trustee's internet website will be located at www.wilmingtontrustconnect.com or at such other address as the Indenture Trustee shall notify the Noteholders from time to time.  For assistance with regard to this service, you can call the Indenture Trustee's Corporate Trust Office at (866) 829-1928.

After the end of each calendar year, within the required time period, the Indenture Trustee will furnish to each person who at any time during the calendar year was a Noteholder, to the extent required by the Internal Revenue Code, a statement as to the aggregate amounts of interest and principal paid to the Noteholder and any other information as the Depositor deems necessary to enable the Noteholder to prepare its tax returns.

The Indenture Trustee shall be entitled to conclusively rely on the information within any Investor Report and will have no duty to verify or re-calculate any information therein.

**Compliance Statements**

The Sale and Servicing Agreement will provide for the delivery of an annual statement signed by an officer of the Servicer to the effect that the Servicer has fulfilled its material obligations under the Transaction Documents throughout the preceding calendar year, except as specified in the statement.  If a Successor Servicer assumes the servicing duties under the Transaction Documents, each such Successor Servicer will provide a separate annual statement.

Pursuant to the Sale and Servicing Agreement, a firm of independent certified public accountants will furnish to the Indenture Trustee on or before June 30 of each calendar year, beginning June 30, 2023, a statement to the effect that they have attested to the assertion of authorized officers of the Servicer that the servicing was conducted in compliance with certain applicable provisions of the Sale and Servicing Agreement in all material respects during the immediately preceding calendar year.

**Certain Other Matters Regarding the Servicer**

The Servicer may not resign from its obligations and duties as Servicer, except upon determination that the performance by the Servicer of its duties is no longer permissible under applicable law. No resignation will become effective until a Successor Servicer has assumed the Servicer's servicing obligations and duties under the Sale and Servicing Agreement.

The Servicer will not be liable to the Noteholders for taking any action or for refraining from the taking of any action, or for errors in judgment; provided, however, that the Servicer will not be protected against any liability that would otherwise be imposed by reason of a breach of its obligations, willful misfeasance, bad faith or negligence (excluding errors in judgment) in the performance of duties. The Servicer will have no obligation to appear in, prosecute, or defend any legal action that is not incidental to its servicing responsibilities and that, in its opinion, may cause it to incur any expense or liability.

Any entity into which the Servicer may be merged or consolidated, or any entity resulting from any merger or consolidation to which the Servicer is a party, or any entity succeeding to the business of the Servicer or, an entity in each of the prior cases that assumes the obligations of the Servicer, will be the Servicer.

**Events of Servicing Termination**

Any of the following events will constitute an Event of Servicing Termination under the Sale and Servicing Agreement:

- the Servicer's failure to deliver to the Indenture Trustee the Investor Report for any Collection Period, which failure continues unremedied beyond the earlier of two Business Days following the date such Investor Report was required to be delivered and the related Distribution Date, in each case after a responsible officer of the Servicer has knowledge thereof or after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or the holders of Notes representing at least 25% of the Note Balance of the Controlling Class of Notes;

- the Servicer's failure to make any required payment or deposit under the Sale and Servicing Agreement, which failure continues unremedied beyond the earlier of three Business Days following the date such payment or deposit was due and, in the case of a payment or deposit to be made no later than a Distribution Date or a Deposit Date, such Distribution Date or Deposit Date, as applicable, in each case after a responsible officer of the Servicer has knowledge thereof or after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or the holders of Notes representing at least 25% of the Note Balance of the Controlling Class of Notes;

- the Servicer's failure to observe or perform in any respect any other covenant or agreement under the Sale and Servicing Agreement, which failure (i) materially and adversely affects the rights of the Noteholders and (ii) continues unremedied for a period of 45 days after a responsible officer of the Servicer has knowledge thereof or 45 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or the holders of Notes representing at least 25% of the Note Balance of the Controlling Class of Notes;

- any representation, warranty or written statement of the Servicer made in the Sale and Servicing Agreement, or in any certificate, report or other writing delivered pursuant thereto (other than any representation or warranty relating to a Receivable that has been purchased by the Servicer) proving to have been incorrect in any material respect as of the time when the same shall have

105

been made, and the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured for a period of 45 days after a responsible officer of the Servicer has knowledge thereof or 45 days after the date on which written notice of such circumstance or condition, requiring the same to be eliminated or cured, shall have been given to the Servicer by the Indenture Trustee or the holders of Notes representing at least 25% of the Note Balance of the Controlling Class of Notes; or

- the occurrence of certain Insolvency Events with respect to the Servicer.

**Rights Upon Event of Servicing Termination**

If an Event of Servicing Termination has occurred and remains unremedied, the Indenture Trustee, acting at the written direction of the Majority Noteholders, shall terminate all of the Servicer's rights and obligations under the Sale and Servicing Agreement. If, however, Tricolor is the Servicer, a bankruptcy trustee or similar official has been appointed for the Servicer, and no Event of Servicing Termination other than that appointment has occurred and is continuing, the bankruptcy trustee or similar official may have the power to prevent the Indenture Trustee or such Noteholders from effecting a transfer of servicing.

If Tricolor is the Servicer that is terminated or that resigns, then the Backup Servicer, or any other successor Servicer appointed by the Indenture Trustee (acting at the direction of the Majority Noteholders pursuant to the Sale and Servicing Agreement), will succeed to all the responsibilities, duties and liabilities of the Servicer, except as otherwise set forth in the Sale and Servicing Agreement. The Backup Servicer may, if it is unwilling to act, or will, if it is legally unable to act as Successor Servicer, appoint, or, at the expense of the Issuer, petition a court of competent jurisdiction to appoint, an entity that is otherwise eligible to be the successor to the terminated Servicer under the Sale and Servicing Agreement. The Backup Servicer will not be relieved of its duties as Successor Servicer until a newly appointed servicer shall have assumed the obligations and duties of the terminated Servicer under the Sale and Servicing Agreement.

If the terminated Servicer is not Tricolor, the Indenture Trustee (acting at the direction of the Majority Noteholders) will appoint a successor Servicer or petition a court of competent jurisdiction to do so, subject to satisfaction of the criteria to be set forth in the Sale and Servicing Agreement.

Any successor to Tricolor as Servicer will succeed to all the responsibilities, duties and liabilities of Tricolor under the Sale and Servicing Agreement, except as otherwise set forth in the Sale and Servicing Agreement, and any Successor Servicer other than the Backup Servicer may be entitled to additional compensation as agreed upon by the Indenture Trustee and the Successor Servicer as will be set forth in the Sale and Servicing Agreement, which compensation may in the aggregate be greater than the Servicing Fee that Tricolor is entitled to receive as Servicer, subject to certain limitations described under *"—Servicing Compensation"*. The transfer of servicing to a Successor Servicer may result in a material disruption in the performance of the Servicer's duties, which could result in delays and/or disruptions in collections on the Receivables and delays and/or reductions in payments on the Notes.

The Successor Servicer will be authorized and empowered by the Sale and Servicing Agreement to execute and deliver, on behalf of the terminated Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement of the Receivables and related documents to show the Indenture Trustee (or the Issuer if the Notes have been paid in full) as lienholder or secured party on the related certificates of title of the Financed Vehicles or otherwise. The terminated Servicer will cooperate with the Successor Servicer and with the Indenture Trustee in effecting the termination of the responsibilities and rights of the terminated Servicer under the Sale and Servicing Agreement.

Any Transition Costs owing to the Successor Servicer will be payable by the Issuer as described under *"Application of Available Funds—Distributions"*.

**Waiver of Past Defaults**

The Majority Noteholders may, on behalf of all Securityholders, waive any Event of Servicing Termination under the Sale and Servicing Agreement and its consequences, except an Event of Servicing Termination consisting

106

of a failure to make any required deposits to or payments in accordance with the Sale and Servicing Agreement.  No waiver of a default by the Servicer in the performance of its obligations under the Sale and Servicing Agreement will impair the rights of Securityholders with respect to any subsequent or other Event of Servicing Termination.

**Replacement of Trustees, Custodian and Backup Servicer**

*The Owner Trustee*

The Owner Trustee may resign at any time under the Trust Agreement by giving 30 days' prior written notice to the Administrator and the Depositor.  If no successor Owner Trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation, the resigning Owner Trustee may petition any court of competent jurisdiction for the appointment of a successor Owner Trustee.

Additionally, the Administrator or the Depositor may remove the Owner Trustee if at any time (i) the Owner Trustee ceases to be eligible in accordance with the Trust Agreement, (ii) the Owner Trustee is legally unable to act as Owner Trustee, (iii) the Owner Trustee is adjudged bankrupt or insolvent, (iv) a receiver is appointed for the Owner Trustee or its property, or if any public officer takes charge or control of the Owner Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, (v) the Owner Trustee fails to comply with its obligations related to assisting the Depositor with reporting under the Exchange Act or (vi) the Owner Trustee otherwise becomes incapable of acting.  Upon the Owner Trustee's resignation or removal, the Administrator will be required to promptly appoint a successor Owner Trustee acceptable to the Depositor.

*The Indenture Trustee*

Under the Indenture, the Indenture Trustee may resign at any time upon notice to the Issuer, the Depositor and the Noteholders.  The Majority Noteholders may remove the Indenture Trustee without cause by at least 30 days' prior written notice to the Indenture Trustee, the Issuer, the Depositor and the Rating Agency of such removal and, following such removal, may appoint a successor Indenture Trustee.  Additionally, the Issuer may and will be required to remove the Indenture Trustee if (i) at any time, the Indenture Trustee shall cease to be eligible under the Indenture, (ii) the Indenture Trustee is adjudged to be bankrupt or insolvent, (iii) a receiver or other public officer takes charge of the Indenture Trustee or its property or (iv) the Indenture Trustee otherwise becomes incapable of acting.

If the Indenture Trustee resigns or is removed, the Administrator will be required to promptly appoint a successor Indenture Trustee and will be required to promptly transfer the Accounts to an institution that meets the eligibility requirements set forth in the Indenture.  Additionally, if the Indenture Trustee ceases to be eligible under the Indenture, any Noteholder may petition a court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

*The Custodian*

If the Indenture Trustee resigns or is terminated as Indenture Trustee under the Indenture, the appointment of the Indenture Trustee as Custodian under the Sale and Servicing Agreement will be terminated.  The Majority Noteholders may remove the Custodian without cause by at least 30 days' prior written notice to the Indenture Trustee, the Depositor and the Servicer of such removal and, following such removal, may appoint a successor Indenture Trustee in accordance with the terms of the Indenture to act as Custodian.

*The Backup Servicer*

Prior to the time the Backup Servicer receives notice that it will become a Successor Servicer pursuant to the Sale and Servicing Agreement, the Backup Servicer may resign, by written notice to the other parties thereto, if it does not receive payment of its fees or expenses or any other amounts required to be made to it under the terms of the Sale and Servicing Agreement, which failure continues unremedied for a period of 30 days after written notice of such failure shall have been given to the Issuer.

Except as described in the foregoing paragraph, under the Sale and Servicing Agreement, the Backup Servicer may not resign from its obligations and duties as Backup Servicer, except upon determination that the performance by the Backup Servicer of its duties is no longer permissible under applicable law.  No such resignation

of the Backup Servicer will be effective until the Backup Servicer has delivered to the Depositor and the Trustees notice of such determination, the Rating Agency Condition has been satisfied and a successor entity has assumed the responsibilities and obligations of the Backup Servicer under the Sale and Servicing Agreement.  Additionally, prior to an appointment of the Backup Servicer as successor Servicer, the Indenture Trustee will be required to, at the direction of the Majority Noteholders, without cause, upon not less than 30 days' written notice, terminate the rights and obligations of the Backup Servicer.

If the Backup Servicer replaces the Servicer upon the Servicer's resignation or termination, the Backup Servicer shall be successor in all respects except as expressly set forth in the Sale and Servicing Agreement to the Servicer in its capacity as Servicer under the Sale and Servicing Agreement and will be subject to the termination provisions relating to the Servicer under the Sale and Servicing Agreement, as described under *"—Events of Servicing Termination"*.

**Amendment**

*Receivables Purchase Agreement*

The Receivables Purchase Agreement may be amended by the parties thereto without the consent of the Securityholders to cure any ambiguity, to correct or supplement any provision in the Receivables Purchase Agreement that may be inconsistent with any other provision therein or with this Offering Memorandum or to add any other provisions arising under the Receivables Purchase Agreement or the Sale and Servicing Agreement; provided, however, that except for an amendment intended to make the Receivables Purchase Agreement consistent with this Offering Memorandum, no such amendment may in any material respect adversely affect the interests of any Noteholder, as evidenced by either (1) satisfaction of the Rating Agency Condition with respect thereto or delivery of an officer's certificate to the Indenture Trustee to that effect or (2) delivery to the Indenture Trustee of an opinion of counsel (which counsel shall not be in-house counsel to the Depositor, the Servicer or any of their respective affiliates) or an officer's certificate to the Indenture Trustee to that effect.

The Receivables Purchase Agreement may also be amended for any other purpose, by the parties thereto with the consent of the Indenture Trustee and the Majority Noteholders.  However, no such amendment may reduce the percentage of the Noteholders required to consent to any amendment without the consent of all holders of Notes then outstanding.

*Sale and Servicing Agreement*

The Sale and Servicing Agreement may be amended by the parties thereto without the consent of the Noteholders to, among other things, cure any ambiguity or to correct or supplement any provision in the Sale and Servicing Agreement that may be inconsistent with any other provision therein or with this Offering Memorandum.  However, except for an amendment intended to make the Sale and Servicing Agreement consistent with the description thereof in this Offering Memorandum, no such amendment may, in any material respect adversely affect the interests of any Noteholder, as evidenced by either (1) satisfaction of the Rating Agency Condition with respect thereto or delivery of an officer's certificate to the Indenture Trustee to that effect or (2) delivery to the Indenture Trustee of an opinion of counsel (which counsel shall not be in-house counsel to the Depositor, the Servicer or any of their respective affiliates) or an officer's certificate indicating that such amendment will not materially adversely affect the interests of any Noteholder.

The Sale and Servicing Agreement may also be amended by the parties thereto with the consent of the Majority Noteholders in order to add, change or eliminate any provisions of the Sale and Servicing Agreement or of modifying in any manner the rights of the Noteholders.  However, no such amendment (1) will be permitted without satisfaction of the Rating Agency Condition with respect thereto and delivery to the Indenture Trustee of an opinion of counsel (which counsel shall not be in-house counsel to the Depositor, the Servicer or any of their respective affiliates) to the effect that such amendment will not cause the Issuer to be characterized for United States federal income tax purposes as an association or publicly traded partnership taxable as a corporation or otherwise have any material adverse effect on the United States federal income taxation of any Notes outstanding or any Noteholder, delivered to the Depositor and the Trustees and (2) may increase or reduce in any manner, or accelerate or delay the timing of, collections of payments on Receivables or distributions that are required to be made for the benefit of the Noteholders or reduce the percentage of the Noteholders required to consent to any amendment, unless the holders of all Notes affected by the amendment provide their consent.

*Indenture*

The Indenture may be amended by the Issuer and the Indenture Trustee, without the consent of the Noteholders but with prior written notice to the Rating Agency for any of the following purposes:

(1)    to correct or amplify the description of any property at any time subject to the lien of the Indenture, or better to assure, convey and confirm unto the Indenture Trustee any property subject or required to be subjected to the lien of the Indenture, or to subject to the lien of the Indenture additional property;

(2)    to evidence the succession, in compliance with the applicable provisions hereof, of another person to the Issuer and the assumption by any such successor of the covenants of the Issuer in the Indenture and in the Notes contained;

(3)    to add to the covenants of the Issuer for the benefit of the Noteholders, or to surrender any right or power herein conferred upon the Issuer;

(4)    to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee;

(5)    to cure any ambiguity, to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein or in any supplemental indenture or in (a) this Offering Memorandum or to add any provisions to or change in any manner or eliminate any of the provisions of the Indenture which will not be inconsistent with other provisions of the Indenture or this Offering Memorandum or (b) any other Transaction Document with respect to matters or questions arising under the Indenture or in any supplemental indenture; or

(6)    to evidence and provide for the acceptance of the appointment under the Indenture by a successor trustee with respect to the Notes and to add to or change any of the provisions of the Indenture as shall be necessary to facilitate the administration of the trusts under the Indenture by more than one trustee, pursuant to the requirements of the Indenture.

However, except for a supplemental indenture intended to make the Indenture consistent with this Offering Memorandum, no such supplemental indenture (1) will materially adversely affect the interests of any Noteholder and (2) will be permitted unless (a) the Rating Agency Condition shall have been satisfied with respect to such action or (b) an opinion of counsel is delivered to the Indenture Trustee to the effect that such supplemental indenture will not (i) cause the Issuer to be characterized for United States federal income tax purposes as an association or publicly traded partnership taxable as a corporation or (ii) otherwise have any material adverse effect on the United States federal income taxation of any Notes outstanding or any Noteholder.

The Indenture may also be amended by the Issuer and the Indenture Trustee, with the consent of the Majority Noteholders, for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Indenture or of modifying in any manner the rights of the Noteholders under the Indenture, provided that the Rating Agency Condition shall be satisfied or an opinion of counsel (which counsel shall not be in-house counsel to the Depositor, the Servicer or any of their respective affiliates) to the effect that such amendment will not cause the Issuer to be characterized for United States federal income tax purposes as an association or publicly traded partnership taxable as a corporation or otherwise have any material adverse impact on the federal income taxation of any Notes outstanding or any Noteholder has been delivered to the Indenture Trustee.  However, the amendment may not, among other things, increase or reduce in any manner or accelerate or delay the timing of distributions that are required to be made to the Noteholders, reduce the percentage of the Noteholders required to consent to the amendment or to direct the Issuer to sell or liquidate the Trust Property, impair the right to institute suit for the enforcement of the provisions of the Indenture or permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture, unless the holders of all Notes materially and adversely affected by the amendment provide their consent.

*Trust Agreement*

Certain modifications to the Trust Agreement, provided they do not materially adversely affect the interests of the Securityholders, as evidenced by satisfaction of the Rating Agency Condition or an opinion of counsel (which counsel shall not be in-house counsel to the Depositor, the Servicer or any of their respective affiliates), may be made by the Depositor and the Owner Trustee, without the consent of any Securityholder, including:

- to cure any ambiguity, to correct or supplement any provision herein that may be inconsistent with any other provision in the Trust Agreement or in this Offering Memorandum;

- for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Trust Agreement which will not be inconsistent with other provisions of the Trust Agreement; and

- to add provisions necessary to prevent any application of the Treasury Regulations under Section 385 of the Internal Revenue Code (including any subsequent or successor provision) that would result in the recharacterization of any of the Notes as equity.

Other than for an amendment intended to make the Trust Agreement consistent with this Offering Memorandum, however, it is a condition to effecting an amendment to the Trust Agreement without the consent of Securityholders, the Owner Trustee must receive an opinion of counsel (which counsel shall not be in-house counsel to the Servicer or the Depositor) delivered to the Indenture Trustee must indicate that such amendment will not materially adversely affect the interests of any Securityholder and will not cause the Issuer to be characterized for United States federal income tax purposes as an association or publicly-traded partnership taxable as a corporation or otherwise have any material adverse effect on the United States federal income taxation of any Notes outstanding or outstanding Certificates.

Except for amendments intended to make the Trust Agreement consistent with the description thereof in this Offering Memorandum, modifications to the Trust Agreement, to the extent that they materially adversely affect the interests of the Noteholders or the Certificateholders require the consent of the Majority Noteholders and holders of Certificates representing not less than 51% of the aggregate Certificate Percentage Interests, for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Trust Agreement or of modifying in any manner the rights of the Noteholders under the Trust Agreement.  Any such amendment that would, among other things, change the amount or timing of payments to the Noteholders or the Certificateholders will require the consent of the adversely affected Securityholders.

*Amendments Affecting the Trustees or the Backup Servicer*

Any amendment to the Trust Agreement, Indenture, Sale and Servicing Agreement or Administration Agreement that affects the Owner Trustee, the Indenture Trustee or the Backup Servicer shall require the written consent of such affected party.

**Termination**

Satisfaction and discharge of the Indenture will occur when certain certifications and opinions of counsel have been delivered to the Depositor and the Indenture Trustee, the Issuer has paid or caused to be paid all other amounts payable by the Issuer under the Indenture and the other Transaction Documents and either (i) all Notes authenticated and delivered (other than destroyed, lost or stolen Notes that have been replaced or repaid and other than Notes for which payment has been provided for, in each case, in accordance with the provisions of the Indenture) have been delivered to the Indenture Trustee for cancellation or (ii) all Notes not delivered to the Indenture Trustee for cancellation have become due and payable and the Issuer has deposited cash or direct obligations of, or obligations guaranteed by, the United States in an amount sufficient to discharge the entire indebtedness of such Notes when due to the Final Scheduled Distribution Date or redemption date (if Notes have been called for redemption pursuant to the Indenture), as the case may be.

Following the satisfaction and discharge of the Indenture and the payment in full of the principal and interest on the Notes, the Certificateholders will succeed to the rights of the Noteholders under the Sale and

110

Servicing Agreement and the Indenture Trustee shall continue to carry out its obligations thereunder with respect to the Certificateholders.

**The Administration Agreement**

Tricolor will be the Administrator of the Issuer under the Administration Agreement. The Administrator will provide notices on behalf of the Issuer and perform all administrative obligations of the Issuer under the Transaction Documents. These obligations include obtaining and preserving the Issuer's qualification to do business where necessary, notifying the Rating Agency and the Indenture Trustee of Events of Default, maintaining the books and records, monitoring the Issuer's obligations for the satisfaction and discharge of the Indenture, causing the Servicer to comply with its duties and obligations under the Sale and Servicing Agreement, causing the Indenture Trustee to notify the Noteholders of the redemption of their Notes, and preparing and filing the documents necessary to release property from the lien of the Indenture. The Administrator will be entitled to receive a monthly administration fee as compensation for the performance of its obligations under the Administration Agreement, which fee will be paid by the Servicer.

**MATERIAL LEGAL ASPECTS OF THE RECEIVABLES**

**General**

The Receivables are "tangible chattel paper", as defined in the UCC. Under the UCC, for most purposes, a sale of chattel paper is treated in a manner similar to a transaction creating a security interest in chattel paper. Tricolor and the Depositor will cause financing statements to be filed with the appropriate governmental authorities to perfect the interest of the Depositor, the Issuer and the Indenture Trustee in the Receivables. The Depositor will take all action that is required to perfect the rights of the Indenture Trustee or the Owner Trustee, as applicable, and the Issuer in the Receivables. However, the Receivables will not be stamped, or otherwise marked, to indicate that they have been sold to the Issuer. If, through inadvertence or otherwise, another party purchases or takes a security interest in the Receivables for new value in the ordinary course of business and takes possession of the Receivables without actual knowledge of the Issuer's interest, the purchaser or secured party will acquire an interest in the Receivables superior to the interest of the Issuer. The Depositor and the Servicer will be obligated to take those actions which are necessary to protect and perfect the Issuer's and the Indenture Trustee's interest in the Receivables and their proceeds.

**Security Interests in the Financed Vehicles**

Motor vehicle retail installment sale contracts such as the Receivables evidence the credit sale of motor vehicles by dealers to obligors; the contracts and loans also constitute personal property security agreements and include grants of security interests in the related vehicles under the UCC. Perfection of security interests in motor vehicles is generally governed by State certificate of title statutes or by the motor vehicle registration laws of the State in which each vehicle is located. In most States, a security interest in a motor vehicle is perfected by notation of the secured party's lien on the vehicle's certificate of title.

Tricolor will be obligated to have taken all actions necessary under the laws of the State in which a Financed Vehicle is located to perfect its security interest in the Financed Vehicle securing the related Receivable purchased by it from the related Originator, including, where applicable, by having a notation of its lien recorded on the vehicle's certificate of title or, if appropriate, by perfecting its security interest in the related Financed Vehicles under the UCC. Because the Servicer will continue to service the Receivables, the obligors on the Receivables will not be notified of the sales from Tricolor to the Depositor or from the Depositor to the Issuer, and no action will be taken to record the transfer of the security interest from Tricolor to the Depositor or from the Depositor to the Issuer by amendment of the certificates of title for the Financed Vehicles or otherwise.

The Receivables Purchase Agreement will provide that Tricolor will assign to the Depositor its interests in the Financed Vehicles securing the Receivables assigned by Tricolor to the Depositor. With respect to the Issuer, the Sale and Servicing Agreement will provide that the Depositor will assign its interests in the Financed Vehicles securing the related Receivables to the Issuer. Because of the administrative burden and expense, however, none of Tricolor, the Depositor, the Servicer or either Trustee will amend any certificate of title to identify either the Depositor or the Issuer as the new secured party on the certificate of title relating to a Financed Vehicle nor will any entity execute and file any transfer instrument. In most States, the assignment is an effective conveyance of the

111

security interest without amendment of any lien noted on the related certificates of title and the new secured party succeeds to Tricolor's rights as the secured party as against creditors of the obligor. In some States, in the absence of such endorsement and delivery, the Depositor, the Issuer and the Indenture Trustee may not have a perfected security interest in the Financed Vehicle. In that event or if Tricolor did not obtain a perfected first priority security interest in the Financed Vehicle, the only recourse of the Issuer would be against the obligor on an unsecured basis or, if Tricolor did not obtain a perfected security interest in the Financed Vehicle, against Tricolor pursuant to its repurchase obligation. If there are any Financed Vehicles as to which Tricolor has failed to obtain a perfected first priority security interest, the security interest would be subordinate to, among others, holders of perfected security interests, and subsequent purchasers of the Financed Vehicles would take possession free and clear of that security interest.

In those States in which the assignments under the Receivables Purchase Agreement and the Sale and Servicing Agreement will be effective to convey the security interest of Tricolor in a Financed Vehicle without amendment of any lien noted on the vehicle's certificate of title, the Issuer's security interest could be defeated through fraud or negligence because the Issuer will not be listed as legal owner on the related certificate of title. Moreover, in other States, in the absence of an amendment and re-registration, a perfected security interest in the Financed Vehicles may not have been effectively conveyed to the Issuer. In most of those other States, however, in the absence of fraud, forgery or administrative error by State recording officials, the notation of Tricolor's lien on the certificate of title will be sufficient to protect the Issuer against the rights of subsequent purchasers of a Financed Vehicle or subsequent creditors who take a security interest in a Financed Vehicle. To avoid the administrative burden and expense, no action will be taken to record the transfer of the security interest in a Financed Vehicle from Tricolor to the Depositor or from the Depositor to the Issuer by amendment of the certificate of title for the Financed Vehicle or otherwise.

UCC financing statements will be filed with respect to the transfer of (1) Tricolor's security interest in the Financed Vehicles to the Depositor, (2) the Depositor's security interest in the Financed Vehicles to the Issuer, and (3) the Issuer's security interest in the Financed Vehicles to the Indenture Trustee will be filed. In the Receivables Purchase Agreement, Tricolor will represent and warrant to the Depositor, who will in turn assign its rights under that agreement to the Issuer under the Sale and Servicing Agreement, that Tricolor obtained a perfected first priority security interest in each Financed Vehicle prior to its sale and assignment of the related Receivable. If there are any Financed Vehicles as to which Tricolor failed to obtain a first priority perfected security interest, its security interest would be subordinate to, among others, subsequent purchasers of that Financed Vehicle or subsequent creditors who take a perfected security interest in that Financed Vehicle. The failure, however, would constitute a breach of Tricolor's representations and warranties under the Receivables Purchase Agreement. Accordingly, unless the breach was cured, Tricolor would be required to repurchase the related Receivable from the Issuer.

In most States, a perfected security interest in a vehicle continues for four months after the vehicle is moved to a new State from the one in which it is initially registered and thereafter until the owner re-registers the vehicle in the new State. A majority of States require surrender of the related certificate of title to re-register a vehicle. In those States that require a secured party to hold possession of the certificate of title to maintain perfection of the security interest, the secured party would learn of the re-registration through the request from the obligor under the related installment sales contract to surrender possession of the certificate of title. In the case of vehicles registered in States providing for the notation of a lien on the certificate of title but not possession by the secured party, the secured party would receive notice of surrender from the State of re-registration if the security interest is noted on the certificate of title. Thus, the secured party would have the opportunity to re-perfect its security interest in the vehicles in the State of relocation. These procedural safeguards will not, however, protect the secured party if, through fraud, forgery or administrative error, the obligor procures a new certificate of title that does not list the secured party's lien. Additionally, in States that do not require a certificate of title for registration of a vehicle, re-registration could defeat perfection. In the ordinary course of servicing the Receivables, the Servicer will take steps to effect re-perfection upon receipt of notice of re-registration or information from the obligor as to relocation. Similarly, when an obligor sells a Financed Vehicle, the Servicer must surrender possession of the certificate of title or will receive notice as a result of its lien and accordingly will have an opportunity to require satisfaction of the related Receivable before release of the lien. Under the Sale and Servicing Agreement, the Servicer will be obligated to take appropriate steps, at its own expense, to maintain perfection of the security interests in the Financed Vehicles.

Some States permit the release of a lien on a vehicle upon the presentation by the dealer, obligor or persons other than the Servicer to the applicable State registrar of liens of various forms of evidence that the debt secured by

112

the lien has been paid in full.  For example, the State of New York passed legislation allowing a dealer of used motor vehicles to have the lien of a prior lienholder in a motor vehicle released, and to have a new certificate of title with respect to that motor vehicle reissued without the notation of the prior lienholder's lien, upon submission to the Commissioner of the New York Department of Motor Vehicles of evidence that the prior lien has been satisfied.  It is possible that, as a result of fraud, forgery, negligence or error, a lien on a Financed Vehicle could be released without the prior payment in full of the related Receivable.

In most States, liens for repairs performed on a motor vehicle and liens for unpaid taxes take priority over a perfected security interest, even a first priority perfected security interest, in the vehicle.  The Internal Revenue Code also grants priority to certain federal tax liens over a perfected security interest in a motor vehicle.  The laws of certain States and federal law permit the confiscation of motor vehicles by governmental authorities under certain circumstances if used in unlawful activities, which may result in the loss of a secured party's perfected security interest in a confiscated vehicle.  Tricolor will represent and warrant to the Depositor in the Receivables Purchase Agreement, and the Depositor will in turn assign its rights under the Receivables Purchase Agreement to the Issuer in the Sale and Servicing Agreement that, as of the related Cutoff Date, it has no knowledge of any liens or claims that have been filed, including liens for work, labor, materials or unpaid taxes, relating to a Financed Vehicle that are prior to, or equal or coordinate with, Tricolor's security interest in such Financed Vehicle created by the related Receivable.  If this representation and warranty is breached and not cured with respect to a Financed Vehicle, Tricolor will be required to repurchase the related Receivable from the Issuer.  A prior or equal lien for repairs or taxes could, however, arise at any time during the term of a Receivable.  No notice will be given to the Trustees or the Securityholders in the event such a lien or confiscation arises, and any prior or equal lien arising after the Closing Date for the Issuer would not give rise to a repurchase obligation.

**Enforcement of Security Interests in Financed Vehicles**

The Servicer on behalf of the Issuer may take action to enforce its security interest by repossession and resale of the Financed Vehicles securing the Receivables.  The actual repossession may be contracted out to third party contractors.  Under the UCC and laws applicable in most States, a creditor can repossess a motor vehicle securing a loan or contract by voluntary surrender, "self-help" repossession that is "peaceful" or, in the absence of voluntary surrender and the ability to repossess without breach of the peace, by judicial process.  Following a default by the obligor, some jurisdictions require that the obligor be notified of the default and be given a time period within which to cure the default prior to repossession.  Generally, this right of cure may only be exercised on a limited number of occasions during the term of the related contract or loan.  In addition, the UCC and other State laws require the secured party to provide the obligor with reasonable notice of the date, time and place of any public sale and/or the date after which any private sale of the collateral may be held.  The obligor has the right to redeem the collateral prior to actual sale by paying the secured party the unpaid principal balance of the obligation, accrued interest plus reasonable expenses for repossessing, holding and preparing the collateral for disposition and arranging for its sale, plus, in some jurisdictions, reasonable attorneys' fees or in some States, by payment of delinquent installments or the unpaid balance.

The proceeds of resale of repossessed vehicles generally will be applied first to the expenses of resale and repossession and then to the satisfaction of the indebtedness.  While some States impose prohibitions or limitations on deficiency judgments if the net proceeds from resale do not cover the full amount of the indebtedness, a deficiency judgment can be sought in those States that do not prohibit or limit those judgments.  In addition to the notice requirement, the UCC requires that every aspect of the sale or other disposition, including the method, manner, time, place and terms, be "commercially reasonable".  Generally, courts have held that when a sale is not "commercially reasonable", the secured party loses its right to a deficiency judgment.  In addition, the UCC permits the debtor or other interested party to recover for any loss caused by noncompliance with the provisions of the UCC.  Also, prior to a sale, the UCC permits the debtor or other interested person to prohibit the secured party from disposing of the collateral if it is established that the secured party is not proceeding in accordance with the "default" provisions under the UCC.  The deficiency judgment would, however, be a personal judgment against the obligor for the shortfall, and a defaulting obligor can be expected to have very little capital or sources of income available following repossession.  Therefore, in many cases, it may not be useful to seek a deficiency judgment or, if one is obtained, it may be settled at a significant discount or be uncollectible.

113

Occasionally, after resale of a repossessed vehicle and payment of all expenses and indebtedness, there is a surplus of funds. In that case, the UCC requires the creditor to remit the surplus to any holder of a subordinate lien with respect to the vehicle or if no lienholder exists, the UCC requires the creditor to remit the surplus to the obligor.

**Certain Bankruptcy Considerations and Matters Relating to Bankruptcy**

Tricolor and the Depositor each intend, and Tricolor will represent and warrant to the Depositor in the Receivables Purchase Agreement, that the transfer of Receivables from Tricolor to the Depositor constitutes a sale of the Receivables rather than a pledge of the Receivables to secure indebtedness of Tricolor. Tricolor and the Depositor will take steps in structuring the transactions contemplated hereby (1) so that the transfer of the Receivables from Tricolor to the Depositor and from the Depositor to the Issuer constitutes a sale, rather than a pledge of the Receivables to secure indebtedness of Tricolor or the Depositor, as the case may be, and (2) to reduce the risk that a bankruptcy filing with respect to Tricolor would adversely affect the Notes or that the Depositor would become a debtor in a voluntary or involuntary bankruptcy case, although there can be no assurance that payments on the Securities will not be delayed or reduced as a result of a bankruptcy proceeding. These steps include:

- a reasoned opinion of counsel on the Closing Date delivered to the Depositor, stating that, subject to various assumptions and qualifications, in the event of a bankruptcy filing with respect to Tricolor, the assets and liabilities of the Depositor would not properly be substantively consolidated with the assets and liabilities of Tricolor; and

- specific provisions in the limited liability company agreement of the Depositor restricting its activities and requiring it to follow specific operating procedures designed to support its treatment as an entity separate from Tricolor.

If, however, Tricolor or the Depositor were to become a debtor under the Bankruptcy Code or similar insolvency laws, it is possible that a creditor or trustee in bankruptcy of Tricolor or the Depositor, as the case may be, as debtor-in-possession, may argue that the sale of the Receivables by Tricolor or the Depositor, as the case may be, was a pledge of the Receivables rather than a sale. This position, if presented to or accepted by a court, could result in a delay in or reduction of distributions to the Noteholders. In addition, if a transfer of Receivables from Tricolor to the Depositor is treated as a pledge rather than a sale, a tax or government lien on the property of Tricolor arising before the transfer of a Receivable to the Depositor may have priority over the Depositor's interest in that Receivable.

**Consumer Protection Laws**

Numerous federal and State consumer protection laws and related regulations impose substantial requirements upon creditors and servicers involved in consumer finance. These laws include the Truth-in-Lending Act, the Rees-Levering Act, the Equal Credit Opportunity Act, the Federal Trade Commission Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Magnuson-Moss Warranty Act, the CFPB's Regulations B and Z, the Servicemembers Civil Relief Act, the Military Families Relief Act, State adaptations of the National Consumer Act and of the Uniform Consumer Credit Code and State motor vehicle installment sale acts, retail installment sales acts and other similar laws. Many States have adopted "lemon laws" which provide redress to consumers who purchase a vehicle that remains out of compliance with its manufacturer's warranty after a specified number of attempts to correct a problem or a specified time period. Also, the laws of certain States impose finance charge ceilings and other restrictions on consumer transactions and require contract disclosures in addition to those required under federal law. These requirements impose specific statutory liabilities upon creditors who fail to comply with their provisions. In some cases, this liability could affect the ability of an assignee such as the Indenture Trustee or the Issuer to enforce consumer finance contracts such as the Receivables or make the assignee liable to the obligor for any violation by the lender.

The Consumer Financial Protection Act of 2010, enacted as part of the Dodd-Frank Act, created the CFPB, a federal agency that is responsible for administering and enforcing the laws and regulations applicable to consumer financial products and services. The CFPB is responsible for implementing and enforcing various federal consumer protection laws and supervising certain depository institutions and non-depository institutions offering financial products and services to consumers, including automobile loans and retail automobile leases. In 2015, the CFPB

enacted rules that expand the scope of the CFPB's supervisory and examination authority to include larger participants in the auto lending and leasing markets, which currently do not cover Tricolor. The CFPB is also conducting fair lending examinations of automobile lenders, and their dealer markup and compensation policies. In addition, the CFPB has conducted investigations concerning certain other automobile lending and servicing practices, including the sale of extended warranties, credit insurance and other add-on products. If any of these practices were found to violate the Equal Credit Opportunity Act or other applicable laws, Tricolor could be obligated to repurchase from the Issuer any Receivable that fails to comply with applicable law or modify its servicing practices. In addition, the Sponsor and the Issuer could also possibly be subject to claims by the obligors on those contracts and any relief granted by a court or the CFPB could potentially adversely affect the Issuer.

By establishing supervisory power over nonbank lenders, the CFPB will be authorized to conduct comprehensive and rigorous on-site examinations that could result in enforcement actions, fines, regulatory mandated process, procedure or product-related changes or consumer refunds if violations of law are found. The CFPB announced that, among other things, its examinations of auto finance companies will evaluate the fairness of the marketing and disclosure of auto financing terms, the accuracy of information provided to credit bureaus, the fairness of debt collection practices and compliance with the Equal Credit Opportunity Act and other consumer protections. While Tricolor is not currently subject to regulation and supervision by the CFPB, Tricolor is subject to regulation and supervision by the Texas Office of Consumer Credit Commissioner, which licenses and regulates non-depository lenders in Texas.

The so-called "Holder-in-Due-Course Rule" of the Federal Trade Commission has the effect of subjecting a seller, and certain related lenders and their assignees, in a consumer credit transaction to all claims and defenses which the obligor in the transaction could assert against the seller of the goods. Liability under the Holder-in-Due-Course Rule is limited to the amounts paid by the obligor under the contract or loan, and the holder of the contract or loan may also be unable to collect any balance remaining due thereunder from the obligor. The Holder-in-Due-Course Rule is generally duplicated by the Uniform Consumer Credit Code, other State statutes or the common law in certain States.

Most of the Receivables will be subject to the requirements of the Holder-in-Due-Course Rule. Accordingly, the Issuer, as holder of the Receivables, will be subject to any claims or defenses that the purchaser of a Financed Vehicle may assert against the related Originator. Such claims are limited to a maximum liability equal to the amounts paid by the obligor on the related Receivable. Claims not based on the Holder-in-Due-Course Rule, such as assignee direct liability for Truth-in-Lending Act violations apparent on the face of the required disclosure statement, may not be so limited.

If an obligor were successful in asserting any such claim or defense as described in the two immediately preceding paragraphs, such claim or defense would constitute a breach of a representation and warranty under the Receivables Purchase Agreement and the Sale and Servicing Agreement, and would create an obligation of Tricolor to repurchase the related Receivable unless the breach were cured.

Under most State motor vehicle dealer licensing laws, dealers of motor vehicles are required to be licensed to sell motor vehicles at retail sale. Under Texas law, both sellers and holders of retail installment contracts are required to have a motor vehicle sales finance license. In a securitization transaction, the licensing requirement under Texas law may be fulfilled either by the issuer or by the servicer that is responsible for servicing the contracts included in the property of the issuer. Each of Tricolor Auto Group, LLC, as Originator, and Tricolor Auto Acceptance, LLC, as Servicer of the Receivables included in the property of the Issuer, has a Texas motor vehicle sales finance license. In addition, with respect to used vehicles, the Federal Trade Commission's Rule on Sale of Used Vehicles requires that all sellers of used vehicles prepare, complete and display a "Buyer's Guide" which explains the warranty coverage for those vehicles. Furthermore, Federal Odometer Regulations promulgated under the Motor Vehicle Information and Cost Savings Act requires that all sellers of used vehicles furnish a written statement signed by the seller certifying the accuracy of the odometer reading. If either Originator is not properly licensed or if either a Buyer's Guide or an odometer disclosure statement was not provided to the purchaser of a vehicle, the purchaser may be able to assert a defense against the related Originator.

Courts have applied general equitable principles to secured parties pursuing repossession or litigation involving deficiency balances. These equitable principles may have the effect of relieving an obligor from some or all of the legal consequences of a default.

115

In several cases, consumers have asserted that the self-help remedies of secured parties under the UCC and related laws violate the due process protection of the Fourteenth Amendment to the Constitution of the United States. Courts have generally either upheld the notice provisions of the UCC and related laws as reasonable or have found that the creditor's repossession and resale do not involve sufficient State action to afford constitutional protection to consumers.

Under the Receivables Purchase Agreement, Tricolor will warrant to the Depositor, who will in turn assign its rights under the Receivables Purchase Agreement to the Issuer under the Sale and Servicing Agreement, that each Receivable complies as of the related Cutoff Date with all requirements of law in all material respects. Accordingly, if an obligor has a claim against the Issuer for violation of any law and that claim materially and adversely affects the Issuer's interest in a Receivable, the violation would constitute a breach of the warranties of Tricolor under the Receivables Purchase Agreement and would create an obligation of Tricolor to repurchase the Receivable unless the breach is cured.

**Other Matters**

In addition to the laws limiting or prohibiting deficiency judgments, numerous other statutory provisions, including the Bankruptcy Code and related State laws, may interfere with or affect the ability of a creditor to realize upon collateral or enforce a deficiency judgment. For example, in a Chapter 13 proceeding under the Bankruptcy Code, a court may prevent a creditor from repossessing a motor vehicle and, as part of the rehabilitation plan, reduce the amount of the secured indebtedness to the market value of the motor vehicle at the time of bankruptcy, as determined by the court, leaving the party providing financing as a general unsecured creditor for the remainder of the indebtedness. A bankruptcy court may also reduce the monthly payments due under the related contract or loan or change the rate of interest and time of repayment of the indebtedness.

Under the Servicemembers Civil Relief Act, an obligor who enters the military service after the origination of that obligor's receivable (including an obligor who is a member of the National Guard or is in reserve status at the time of the origination of the obligor's receivable and is later called to active duty) (i) is entitled to have the interest rate reduced and capped at 6% per annum for the duration of the military service, (ii) may be entitled to a stay of proceedings on foreclosures and similar actions and (iii) may have the maturity of the receivable extended, or the payments lowered and the payment schedule adjusted. In addition, pursuant to California law, under certain circumstances California residents called into active duty with the National Guard or the reserves can defer payments on motor vehicle installment sale contracts, including the Receivables. Application of either of the two foregoing acts or similar acts under the laws of other States would adversely affect, for an indeterminate period of time, the ability of the Servicer to foreclose on an affected Receivable during the obligor's period of active duty status. Thus, if that Receivable goes into default, there may be delays and losses occasioned by the inability to exercise the Issuer's rights with respect to the Receivable and the related Financed Vehicle in a timely fashion.

Furthermore, Subtitle F of Section 670 of the John Warner National Defense Authorization Act for Fiscal 2007 (codified at 10 U.S.C. § 49), subject to certain exemptions for the financing of the purchase of vehicles, (1) places a cap on annual interest rates of 36% on loans made to U.S. military personnel, (2) creates restrictive conditions under which a member of the U.S. military or such person's dependents may be extended credit and (3) prohibits restrictions on prepaying loans made to members of the U.S. military.

**The Dodd-Frank Act**

*Orderly Liquidation Authority*

The Dodd-Frank Act established the OLA under which the FDIC is authorized to act as receiver of a financial company and its subsidiaries. OLA differs from the Bankruptcy Code in several respects. In addition, because the legislation remains subject to clarification through FDIC regulations and has yet to be applied by the FDIC in any receivership, it is unclear what effect these provisions will have on any particular company, including Tricolor, the Depositor, the Issuer or any of their respective creditors.

116

*Potential Applicability to Tricolor, the Depositor and the Issuer*

There is uncertainty about which companies will be subject to OLA rather than the Bankruptcy Code.  For a company to become subject to OLA, the Secretary of the Treasury (in consultation with the President of the United States) must determine, among other things, that:

- the company is in default or in danger of default;

- the failure of the company and its resolution under the Bankruptcy Code would have serious adverse effects on financial stability in the United States;

- no viable private sector alternative is available to prevent the default of the company; and

- an OLA proceeding would avoid or mitigate these effects.

On June 4, 2013, the FDIC approved a rule regarding the criteria for determining which non-bank financial companies fall under the definition of "predominantly engaged in activities that are financial in nature or incidental thereto".  The definition includes companies that derive at least 85% of their revenues from activities defined as financial in nature under the Bank Holding Company Act.  Such a designation may subject these companies to OLA if, among other things, as described above, it is determined that the failure of the company and its resolution under otherwise applicable law would have serious adverse effects on financial stability in the United States.

There can be no assurance that the OLA provisions would not be applied to Tricolor, although we expect that OLA will be used only very rarely.  The Depositor or the Issuer could, under certain circumstances, also be subject to OLA.

*FDIC's Avoidance Power Under OLA*

The provisions of OLA relating to preferential transfers differ from those of the Bankruptcy Code.  If Tricolor were to become subject to OLA, there is an interpretation under OLA that previous transfers of receivables by Tricolor or the Depositor perfected for purposes of State law and the Bankruptcy Code could nevertheless be avoided as preferential transfers, with the result that the Receivables securing the Notes could be reclaimed by the FDIC and Noteholders may have only an unsecured claim against Tricolor or the Depositor, as applicable.

In December 2010, the Acting General Counsel of the FDIC issued an advisory opinion which concluded that the treatment of preferential transfers under OLA was intended to be consistent with, and should be interpreted in a manner consistent with, the related provisions under the Bankruptcy Code.  Based on this opinion, the transfer of the Receivables by Tricolor would not be avoidable by the FDIC as a preference under OLA.  In July 2011, the FDIC adopted a final regulation which, among other things, codified the advisory opinion.  Based on the regulation, a transfer of Receivables perfected by the filing of a UCC financing statement against Tricolor or the Depositor and the Issuer as provided in the applicable Transaction Documents would not be avoidable by the FDIC as a preference under the OLA.

*FDIC's Repudiation Power Under OLA*

If the FDIC is appointed receiver of a company under OLA, the FDIC would have the power to repudiate any contract to which the company was a party, if the FDIC determined that performance of the contract was burdensome and that repudiation would promote the orderly administration of the company's affairs.

In January 2011, the Acting General Counsel of the FDIC issued an advisory opinion confirming:

- that nothing in the Dodd-Frank Act changes the existing law governing the separate existence of separate entities under other applicable law, or changes the enforceability of standard contractual provisions meant to foster the bankruptcy-remote treatment of special purpose entities such as the Depositor and the Issuer; and

117

- that, until the FDIC adopts a regulation addressing the application of the FDIC's powers of repudiation under OLA, the FDIC will not exercise its repudiation authority to reclaim, recover or recharacterize as property of a company in receivership or the receivership assets transferred by that company prior to the end of the applicable transition period of any such future regulation, provided that such transfer satisfies the conditions for the exclusion of such assets from the property of the estate of that company under the Bankruptcy Code.

Tricolor and the Depositor intend that the sale of the Receivables by Tricolor to the Depositor will constitute a "true sale" between separate legal entities under applicable State law. As a result, Tricolor believes that the FDIC would not be able to recover the Receivables using its repudiation power.

The advisory opinion does not bind the FDIC and could be modified or withdrawn in the future, and there can be no assurance that future regulations or subsequent FDIC actions in an OLA proceeding involving Tricolor, the Depositor or the Issuer would not be contrary to this opinion.

Regardless of whether the transfers under the Receivables Purchase Agreement and the Sale and Servicing Agreement are respected as legal true sales, as receiver for Tricolor, the Depositor or the Issuer, the FDIC could, among other things:

- require the Issuer, as assignee of Tricolor and the Depositor, to go through an administrative claims procedure to establish its rights to payments collected on the related Receivables;

- if the Issuer were a covered subsidiary, require the Indenture Trustee for the Notes to go through an administrative claims procedure to establish its rights to payment on the Notes;

- request a stay of legal proceedings to liquidate claims or otherwise enforce contractual and legal remedies against Tricolor or a covered subsidiary, including the Issuer;

- if the Issuer were a covered subsidiary, assert that the Indenture Trustee was subject to a 90-day stay on its ability to liquidate claims or otherwise enforce contractual and legal remedies against the Issuer;

- repudiate Tricolor's ongoing servicing obligations under a Sale and Servicing Agreement such as its duty to collect and remit payments or otherwise service the Receivables; or

- prior to any such repudiation of the Sale and Servicing Agreement, prevent the Indenture Trustee or the Noteholders from appointing a Successor Servicer.

If the FDIC, as receiver for Tricolor, the Depositor or the Issuer, were to take any of the actions described above, payments on the Notes would be delayed and may be reduced.

If the Issuer were placed in receivership under OLA, the FDIC would have the power to repudiate the Notes. In that case, the FDIC would be required to pay compensatory damages that are no less than the principal amount of the Notes plus accrued interest as of the date the FDIC was appointed receiver and, to the extent that the value of the property that secured the Notes is greater than the principal amount of the Notes and any accrued interest through the date of repudiation or disaffirmance, such accrued interest.

*The Volcker Rule*

Section 619 of the Dodd-Frank Act and its implementing regulations, commonly known as the "Volcker Rule", prevent "banking entities" from (1) engaging in proprietary trading, (2) acquiring or retaining any equity, partnership or other ownership interest in or sponsoring a "covered fund" and (3) entering into certain relationships with a "covered fund". A "covered fund" does not include an issuer that may rely on an exclusion or exemption from the definition of "investment company" under the Investment Company Act other than the exclusions contained in Sections 3(c)(1) or 3(c)(7) of the Investment Company Act.

118

The Issuer is being structured so as not to constitute a "covered fund" for purposes of the Volcker Rule.  In making this determination, the Issuer will be relying on the exclusion or exemption from the definition of "investment company" contained in Section 3(c)(5) of the Investment Company Act, although other exclusions or exemptions may also be available to the Issuer.  Investors that constitute "banking entities" should consult their own legal advisors regarding the effects of the Volcker Rule on any investment in the Notes.

## UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following is a summary of the material United States federal income tax consequences of the purchase, ownership and disposition of Notes to investors who purchase their Notes in an initial distribution and who hold the Notes as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code.  The summary does not purport to deal with all United States federal income tax consequences applicable to all categories of Noteholders, some of which may be subject to special rules.  For example, it does not discuss the tax treatment of Noteholders that are insurance companies, regulated investment companies, dealers in securities, holders that hold their Notes as part of a hedge, straddle, "synthetic security" or other integrated transaction for United States federal income tax purposes and holders whose functional currency is not the United States dollar.

The following summary is based upon current provisions of the Internal Revenue Code, Treasury regulations promulgated thereunder and judicial or ruling authority, all of which are subject to change, which changes may be retroactive.  The Issuer will be provided with an opinion of Sidley Austin LLP, as United States federal income tax counsel, regarding certain United States federal income tax matters discussed below.  A legal opinion, however, is not binding on the IRS or the courts.  No ruling on any of the issues discussed below will be sought from the IRS.  Moreover, there are no cases or IRS rulings on similar transactions involving interests issued by an issuer with terms similar to those of the Notes.  The IRS may disagree with all or a part of the discussion below.  We suggest that prospective investors consult their own tax advisors in determining the United States federal, State, local, foreign and any other tax consequences to them of the purchase, ownership and disposition of the Notes.

As used herein, the term "U.S. Holder" means a beneficial owner of a Note that is for United States federal income tax purposes (1) an individual that is a citizen or resident of the United States, (2) a corporation (including an entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States or any State, (3) an estate, the income of which is subject to United States federal income taxation regardless of its source or (4) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust.  Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts which were in existence on August 20, 1996 and were treated as United States persons under the Internal Revenue Code and applicable Treasury regulations thereunder prior to such date that elect to continue to be so treated also shall be considered U.S. Holders.  A "Non-U.S. Holder" means a beneficial owner of a Note other than a U.S. Holder or entity treated as a partnership for United States federal income tax purposes.

Except where otherwise specified, the following summary relates only to U.S. Holders.  If a partnership (including for this purpose any entity treated as a partnership for United States federal income tax purposes) is a beneficial owner of Notes, the treatment of a partner in the partnership will generally depend upon the status of the partner and upon the activities of the partnership.  A Noteholder that is a partnership and partners in such partnership are encouraged to consult their tax advisors about the United States federal income tax consequences of holding and disposing of its Notes.

### Tax Characterization of the Issuer

Sidley Austin LLP, United States federal income tax counsel to the Issuer, will deliver its opinion on the Closing Date that the Issuer will not be an association (or a publicly traded partnership) taxable as a corporation for United States federal income tax purposes, and although the matter is not free from doubt, the Issuer should not be treated as engaged in a trade or business in the United States.  Therefore, the Issuer itself will not be subject to tax for United States federal income tax purposes.  This opinion will be based on the assumption that the terms of the Trust Agreement and related documents will be complied with and that certain other conditions are met.

119

If, despite the expectations described above, the Issuer were treated as an association or a publicly traded partnership taxable as a corporation for United States federal income tax purposes, the Issuer would be subject to corporate income tax on its taxable income. The Issuer's taxable income would include all its income on the Receivables and may possibly be reduced by its interest expense on the Notes. Any corporate income tax could materially reduce cash available to make payments on the Notes.

If the Issuer were classified as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes, then, unless the Issuer elects otherwise, taxes arising from audit adjustments are required to be paid by the Issuer rather than by its partners. The parties responsible for the tax administration of the Issuer will have the authority to utilize, and intend to utilize, any available exceptions so that the persons treated as the Issuer's partners, to the fullest extent possible, rather than the Issuer itself, will be liable for any taxes arising from audit adjustments to the Issuer's taxable income if the Issuer is treated as a partnership.

**Tax Consequences to U.S. Holders**

*Treatment of the Notes as Indebtedness*. The Depositor will agree, and the Noteholders and beneficial owners of Notes will agree by their purchase of Notes or beneficial interests therein, as the case may be, to treat the Notes as debt for United States federal income tax purposes. In the opinion of Sidley Austin LLP, assuming compliance with all of the provisions of applicable Transaction Documents relevant to such opinion, the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes will, and the Class E Notes should, be classified as debt for United States federal income tax purposes if and to the extent held by one or more persons other than the beneficial owner of 100% of the equity of the Issuer or by an affiliate of such beneficial owner for such purposes. Sidley Austin LLP will not be opining on the likelihood as to whether the Class F Notes will be classified as debt for United States federal income tax purposes. The discussion below assumes, other than as discussed under "Possible Alternative Treatments of the Notes", that this characterization is correct.

*Original Issue Discount, etc*. It is possible that one or more classes of Notes may be offered with OID. In general, OID is the excess of the stated redemption price at maturity of a debt instrument over its issue price, unless that excess is no more than a *de minimis* amount (*i.e.*, 1/4% of their principal amount multiplied by their weighted average maturities included in their term). A Note's stated redemption price at maturity is the aggregate of all payments required to be made under the Note through maturity except qualified stated interest. Qualified stated interest is generally interest that is unconditionally payable in cash or property, other than debt instruments of the issuing entity, at fixed intervals of one year or less during the entire term of the instrument at specified rates. The issue price will be the first price at which a substantial amount of Notes are sold, excluding sales to bond holders, brokers or similar persons acting as underwriters, placement agents or wholesalers. If a Note were treated as being issued with OID that is not *de minimis*, a U.S. Holder would be required to include OID in income as interest over the term of the Note under a constant yield method. In general, OID must be included in income in advance of the receipt of cash representing that income. Thus, each cash distribution would be treated as an amount already included in income, to the extent OID has accrued as of the date of the interest distribution and is not allocated to prior distributions, or as a repayment of principal. This treatment would have no significant effect on U.S. Holders using the accrual method of accounting. Cash method U.S. Holders may, however, be required to report income on the Notes in advance of the receipt of cash attributable to that income. The determination of full years to maturity and the accrual of OID, if any, should be made using a reasonable prepayment assumption pursuant to Section 1272(a)(6) of the Internal Revenue Code. To date, the IRS has not issued any guidance under Section 1272(a)(6) of the Internal Revenue Code. Even if a Note has OID falling within the *de minimis* exception, the U.S. Holder must include that OID in income, as capital gain, proportionately as principal payments are made on that Note. We suggest that you consult your tax advisor as to the operation of these rules.

*Interest Income on the Notes*. If a Note is considered to have been issued without OID, the stated interest paid on such Note will be taxable to a U.S. Holder as ordinary interest income when received or accrued in accordance with the U.S. Holder's method of tax accounting.

*Market Discount*. A U.S. Holder that purchases a Note for an amount that is less than its issue price will be treated as having purchased the Note at a "market discount", unless the amount of market discount is less than a specified *de minimis* amount. Under the market discount rules, a holder is required to treat any payment of SRPM and any gain realized on the sale, exchange, retirement or other disposition of the Note as ordinary income to the

120

extent of the lesser of (1) the amount of such payment or realized gain or (2) the market discount that has not previously been included in income and is treated as having accrued on such Note at the time of the payment or disposition.  Market discount is considered to accrue ratably during the period from the date of acquisition to the maturity date of the Note, unless the holder elects to accrue market discount on a constant yield basis.

A U.S. Holder may be required to defer the deduction of all or a portion of the interest paid or accrued on any indebtedness incurred or continued to purchase or carry a Note with market discount until the maturity of the Note or certain earlier dispositions, because unless a holder elects to take market discount into income currently, a current deduction is only allowed to the extent the interest expense exceeds the market discount.  If such election is made with respect to a Note, then the holder will be deemed to have elected to include market discount currently with respect to all market discount debt instruments that the investor acquired on the first day of the taxable year to which the election applies and acquires thereafter.

*Premium*.  If a U.S. Holder purchases a Note for an amount that is greater than the sum of all amounts of SRPM payable on the Note after the purchase date, such holder is considered to have purchased the Note with "amortizable bond premium" equal in amount to such excess.  A holder may elect to amortize such premium using a constant yield method over the remaining term of the Note and may offset interest otherwise required to be included in respect of the Note during any taxable year by the amortized amount of such excess for the taxable year.  If such election is made with respect to a Note, then the holder will be deemed to have elected to amortize bond premium with respect to all premium debt instruments that the investor acquired on the first day of the taxable year to which the election applies and acquires thereafter.

*Sale or Other Disposition*.  If a U.S. Holder sells a Note, it will recognize gain or loss in an amount equal to the difference between the amount realized on the sale and its adjusted tax basis in the Note.  The adjusted tax basis of a Note to a particular U.S. Holder will equal the U.S. Holder's cost for the Note, increased by any discount previously included by the U.S. Holder in income with respect to the Note and decreased by the amount of bond premium, if any, previously amortized and by the amount of principal payments previously received by the U.S. Holder with respect to the Note.  Any gain or loss will be capital gain or loss if the Note was held as a capital asset, excluding accrued interest and accrued market discount not previously included in income.  Any capital gain recognized upon a sale, exchange or other disposition of a Note will be long-term capital gain if the U.S. Holder's holding period is more than one year and will be short-term capital gain if the U.S. Holder's holding period is one year or less.  The deductibility of capital losses is subject to certain limitations.  Prospective investors should consult with their own tax advisors concerning the United States federal income tax consequences of the sale, exchange or other disposition of a Note.

*Tax on Net Investment Income*.  Certain non-corporate U.S. Holders are subject to a 3.8% tax, in addition to regular tax on income and gains, on some or all of their "net investment income", which generally will include interest, OID and market discount realized on a Note and any net gain recognized upon a disposition of a Note.  U.S. Holders should consult their tax advisors regarding the applicability of this tax in respect of their Notes.

*Possible Alternative Treatments of the Notes*.  Sidley Austin LLP will opine that for United States federal income tax purposes, the Class E Notes should be characterized as debt if and to the extent held by one or more persons other than the beneficial owner of the equity in the Issuer or by an affiliate of such beneficial owner for such purposes and will not be opining on the likelihood as to whether the Class F Notes will be characterized as debt for United States federal income tax purposes.  If the IRS successfully asserted that the Class E Notes, the Class F Notes or any other class or classes of Notes did not represent debt for United States federal income tax purposes, those Notes might be treated as equity interests in the Issuer.  If so treated, the Issuer might be treated as a publicly traded partnership taxable as a corporation for United States federal income tax purposes with potentially adverse tax consequences.  If treated as a publicly traded partnership taxable as a corporation, the Issuer would not be able to reduce its taxable income by deductions for interest expense on any Notes recharacterized as equity and would therefore reduce amounts that would otherwise be available for distribution to the other holders of the Notes.  Alternatively, and more likely in the view of Sidley Austin LLP, the Issuer would be treated as a publicly traded partnership that would not be taxable as a corporation because it would meet certain qualifying income or ownership tests.  If a U.S. Holder were treated as owning an equity interest in such a partnership, the partnership itself would not be subject to United States federal income tax; rather each partner would be taxed individually on its respective distributive share of the partnership's income, gain, loss, deductions and credits.  The amount, timing and characterization of types of income and deductions for a U.S. Holder might differ if the Notes were held to

constitute partnership interests, rather than indebtedness.  Such differences may result in adverse tax consequences for certain Noteholders.  For example, cash basis Noteholders might be required to report income when it accrues to the partnership rather than when it is received by the Noteholders.  U.S. Holders would be taxed on the partnership income regardless of when distributions are made to them.  Payments on the Notes treated as equity interests in such a partnership would probably be treated as guaranteed payments, which could result in adverse tax consequences to certain holders.  For example, income to certain tax-exempt entities, including pension funds, would be "unrelated business taxable income", income to foreign holders could be subject to United States federal withholding tax, and individual holders might be subject to certain limitations on their ability to deduct their share of Issuer Expenses.  In addition, the audit rules for partnerships require taxes arising from audit adjustments to be paid by the partnership rather than by its partners or members unless the partnership elects otherwise.  If applicable, the parties responsible for the tax administration of the Issuer will have the authority to utilize, and intend to utilize, any available exceptions so that the persons treated as the Issuer's partners, to the fullest extent possible, rather than the Issuer itself, will be liable for any taxes arising from audit adjustments to the Issuer's taxable income if the Issuer is treated as a partnership.  Since the Issuer will treat the Notes as indebtedness for United States federal income tax purposes, except to the extent such Notes are beneficially owned or treated as beneficially owned by the Depositor or its affiliates for such purposes, the Issuer will not attempt to satisfy the tax reporting requirements that would apply under this alternative characterization of the Notes.

*Tax Regulations for Related-Party Note Acquisitions*.  The United States Treasury and the IRS issued Treasury Regulations under Section 385 of the Internal Revenue Code that address the debt or equity treatment of instruments held by certain parties related to the Issuer.  In particular, in certain circumstances, a note that otherwise would be treated as debt is treated as stock for United States federal income tax purposes during periods in which the note is held by an applicable related party (generally based on a group of corporations or controlled partnerships connected through 80% direct or indirect ownership links).  Although there is no present intent to sell the Certificates representing equity interests in the Issuer, to the extent that the Issuer sells the Certificates in the future, the Trust Agreement and such other Transaction Documents as required may be amended without the consent of the Noteholders to address the Treasury Regulations under Section 385 of the Internal Revenue Code and prevent their application to the Notes.  Prospective investors should note that the Treasury Regulations are complex and we urge you to consult your tax advisors regarding the possible effects of the rules.

**Tax Consequences to Non-U.S. Holders**

Subject to the discussion below concerning foreign account tax compliance and backup withholding, interest payments made, or accrued, to a beneficial owner who is a Non-U.S. Holder that is an individual or corporation for United States federal income tax purposes generally will be considered "portfolio interest", and generally will not be subject to United States federal income tax and withholding if the interest is not effectively connected with the conduct of a trade or business within the United States by the Non-U.S. Holder and the Non-U.S. Holder (1) is not actually or constructively a "10 percent shareholder" of the Issuer or the Depositor (including a holder of 10% of the outstanding Certificates, if any), a "controlled foreign corporation" with respect to which the Issuer or the Depositor is a "related person" within the meaning of the Internal Revenue Code or a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business and (2) provides the Indenture Trustee or other person who is otherwise required to withhold United States tax with respect to the Notes with an appropriate statement, on the applicable IRS Form W-8 or a similar form, signed under penalty of perjury, certifying that the beneficial owner of the Note is a Non-U.S. Holder and providing the Non-U.S. Holder's name and address.  In the case of a Non-U.S. Holder that is an individual or a corporation (or an entity treated as such for United States federal income tax purposes), if a Note is held through a securities clearing organization or certain other financial institutions, the organization or institution may provide the relevant signed statement to the withholding agent; in that case, however, the signed statement must be accompanied by a copy of the applicable IRS Form W-8 or substitute form provided by the Non-U.S. Holder that owns the Note.  If a Non-U.S. Holder does not satisfy these requirements, then it will be subject to withholding tax unless it provides a properly executed (1) applicable IRS Form W-8 claiming an exemption from or reduction in withholding under the benefit of a tax treaty or (2) IRS Form W-8ECI stating that interest paid is not subject to withholding tax because it is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States.  If income from the interest is effectively connected income, the Non-U.S. Holder, although exempt from the withholding tax discussed above, will be subject to United States federal income tax on that interest at graduated rates.  In addition, if the Non-U.S. Holder is a foreign corporation, it will be subject to a branch profits tax equal to 30% of its "effectively connected earnings and profits" within the meaning of the Internal Revenue Code for the taxable year, as adjusted

122

for certain items, unless it qualifies for a lower rate or an exemption under an applicable tax treaty.  A Non-U.S. Holder other than an individual or corporation (or an entity treated as such for United States federal income tax purposes) holding the Notes on its own behalf may have substantially increased reporting requirements.  In particular, in the case of Notes held by a foreign partnership or foreign trust, the partners or beneficiaries, as the case may be, may be required to provide certain additional information.

Any capital gain realized on the sale, redemption, retirement or other taxable disposition of a Note by a Non-U.S. Holder will be exempt from United States federal income and withholding tax, provided that (1) the gain is not effectively connected with the conduct of a trade or business in the United States by the Non-U.S. Holder and (2) in the case of an individual Non-U.S. Holder, the Non-U.S. Holder is not present in the United States for 183 days or more in the taxable year and does not otherwise have a "tax home" within the United States.

If you are a Non-U.S. Holder of Notes, you are encouraged to consult your own tax advisor in determining the United States federal, State, local, non-U.S. and other tax consequences to you of the purchase, ownership and disposition of the Notes.

*Possible Alternative Characterization of the Notes.*  As discussed under *"—Tax Consequences to U.S. Holders—Possible Alternative Treatments of the Notes"*, it is possible that a holder of a Note could be treated as owning an equity interest in a partnership.  Sidley Austin LLP will opine that for United States federal income tax purposes, (1) the Class E Notes should be characterized as debt if and to the extent held by one or more persons other than the beneficial owner of the equity in the Issuer or by an affiliate of such beneficial owner for such purposes and (2) although the matter is not free from doubt, the Issuer should not be treated as engaged in a trade or business in the United States.  Sidley Austin LLP will not be opining on the likelihood as to whether the Class F Notes will be characterized as debt for United States federal income tax purposes.  If the Class E Notes, the Class F Notes or any other class or classes of Notes were to be characterized by the IRS as equity in the Issuer, holders of such Notes may be considered to be receiving interest payments from the underlying Receivables and such payment may be considered not to be in "registered form" as defined in Section 163(f) of the Internal Revenue Code and applicable Treasury Regulations.  Thus, interest payments to a Non-U.S. Holder of such Notes may become subject to U.S. withholding tax.  Such withholding tax would reduce the amount of payments to the Non-U.S. Holders of any such recharacterized class of Notes.  Further, the IRS could assert a withholding tax on interest payments distributed to such holders prior to the recharacterization.  Should the amounts required to be withheld exceed the amounts that are then available for distribution to such Non-U.S. Holders, amounts that would otherwise be available for distribution to the other holders of the Notes may be used to pay such remaining withholding tax.  Any resulting delays in payment or losses may be suffered by the later maturing outstanding class or classes of Notes even if payment was made in full to an earlier maturity class or classes of Notes.  Depending on the circumstances, a Non-U.S. Holder might be required to file a United States individual or corporate income tax return, as the case may be, and it is possible that (1) such person may be subject to tax (and withholding) on its allocable interest at regular U.S. tax rates and, in the case of a corporation, a 30% branch profits tax rate (unless reduced or eliminated pursuant to an applicable tax treaty) or (2) gross income allocated to such person may be subject to 30% withholding tax (*i.e.*, unreduced by any interest deductions or other expenses) unless reduced or eliminated pursuant to an applicable tax treaty.

If the Class E Notes, the Class F Notes or any other class or classes of Notes were to be characterized by the IRS as equity in the Issuer and the Issuer is treated as a partnership for United States federal income tax purposes, the Issuer may be required to withhold on income allocable to a holder of recharacterized Notes if such holder is not a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code and if such income is effectively connected to a United States trade or business of such holder.  Although the activities of the Issuer should not cause it to be engaged in a United States trade or business, to avoid such potential liability for the Issuer, each holder of a Class F Note is required to be a "United States person" within the meaning of Section 7701(a)(30) of the Internal Revenue Code that provides the Issuer with an IRS Form W-9.  There can be no assurance, however, that a Class F Note will not be held by a Non-U.S. Holder that treats the income as effectively connected to a United States trade or business.  In addition, a transferor of a recharacterized Note could be subject to withholding on the amount realized on its disposition of such Note if it is (1) a foreign person within the meaning of Section 1446(f)(2) of the Internal Revenue Code or (2) not a foreign person within the meaning of Section 1446(f)(2) of the Internal Revenue Code and it fails to deliver to the transferee prior to the transfer of such note, a properly completed certificate, in a form reasonably acceptable to the transferee, stating, under penalty of perjury, its U.S. taxpayer identification number and that it is not a foreign person.  A transferee that fails to withhold on such a

123

transferor could be subject to withholding on distributions on the recharacterized Notes.  In addition, the Issuer could be liable for failing to withhold on any recharacterized Notes that are held by Non-U.S. Holders, thereby reducing the cash flow that would otherwise be available to make payments on all classes of Notes.  Prospective investors are urged to consult with their tax advisors.

**Foreign Account Tax Compliance**

Foreign financial institutions (which include financial intermediaries, hedge funds, private equity funds, mutual funds, securitization vehicles and any other investment vehicles regardless of their size) must comply with information reporting rules with respect to their U.S. account holders, and absent compliance, investors may bear a U.S. withholding tax on certain payments made to them.  Generally, if a foreign financial institution does not comply with these reporting requirements, "withholdable payments" made after a certain date to the noncomplying entity will be subject to a 30% withholding tax.  For this purpose, withholdable payments are U.S.-source payments otherwise subject to nonresident withholding tax (such as interest).  This withholding tax will apply regardless of whether the payment would otherwise be exempt from U.S. nonresident withholding tax (*e.g.*, under the portfolio interest exemption).

Prospective purchasers are urged to consult with their tax advisors regarding these provisions.

**Backup Withholding and Information Reporting**

The Indenture Trustee will be required to report annually to the IRS and to each Noteholder the amount of interest paid on the Notes, and any amount of interest withheld for United States federal income tax purposes, except as to exempt Noteholders (for example, tax-exempt organizations, qualified pension and profit-sharing trusts, individual retirement accounts or nonresident aliens who provide certification as to their status).  Each Noteholder who is not an exempt Noteholder will be required to provide to the Indenture Trustee, under penalty of perjury, a certificate containing the Noteholder's name, address, correct United States federal taxpayer identification number and a statement that the Noteholder is not subject to backup withholding.  Should such a Noteholder fail to provide the required certification, the Indenture Trustee will be required to withhold the tax from interest otherwise payable to the Noteholder and pay the withheld amount to the IRS.

**U.S. State and Local and Non-U.S. Tax Consequences**

You should consider the State and local tax consequences of the purchase, ownership and disposition of the Notes.  Such tax laws may differ substantially from the corresponding United States federal income tax law, and this discussion does not purport to describe any aspect of the tax laws of any State or locality.  Therefore, you are encouraged to consult with your own tax advisors as to the various State and local tax consequences of an investment in the Notes.

**Certain United States Federal Income Tax Documentation Requirements**

A beneficial owner of Notes holding its interest in such Notes through Clearstream, Euroclear or DTC will be subject to the 30% U.S. withholding tax described under *"—Tax Consequences to Non-U.S. Holders"* that generally applies to payments of interest, including payments of accrued OID, on debt issued by United States persons (as described in the Internal Revenue Code), unless:

- each clearing system, bank or other financial institution that holds customers' Notes in the ordinary course of its trade or business in the chain of intermediaries between such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements; and

- such beneficial owner complies with applicable certification requirements.

This summary does not deal with all aspects of United States federal income tax withholding that may be relevant to Non-U.S. Holders of the Notes as well as the application of the withholding regulations.  You are encouraged to consult your own tax advisors for specific advice regarding the holding and disposing of the Notes.

**ERISA CONSIDERATIONS**

Subject to the requirements herein, the Notes (other than the Class E Notes and the Class F Notes) may, in general, be purchased by, on behalf of or with "plan assets" of Plans.  Under the Plan Assets Regulation, the assets of the Issuer would be treated as plan assets of a "Benefit Plan Investor" as defined in the Plan Assets Regulation if such Benefit Plan Investor acquired an "equity interest" in the Issuer and none of the exceptions contained in the Plan Assets Regulation were applicable.  An equity interest is defined in the Plan Assets Regulation as any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features.  While there is little guidance on the subject under the Plan Assets Regulation, the Issuer believes the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes should be treated as "indebtedness" and not as "equity interests" for purposes of the Plan Assets Regulation, because such Notes:

- are expected to be treated as indebtedness under applicable local law and as described under *"United States Federal Income Tax Considerations"* will, in the opinion of United States federal income tax counsel to the Issuer, be treated as debt, rather than equity, for United States federal income tax purposes; and

- should *not* be deemed to have any "substantial equity features".

However, the treatment of the Class E Notes and the Class F Notes is less clear for purposes of the Plan Assets Regulation.

Section 406 of ERISA and Section 4975 of the Internal Revenue Code prohibit a pension, profit sharing or other employee benefit or other plan (such as an individual retirement account and certain types of Keogh plans) that is subject to the fiduciary responsibility provisions of Title I of ERISA or to Section 4975 of the Internal Revenue Code from engaging in certain transactions involving plan assets with persons that are "parties in interest" under ERISA or "disqualified persons" under the Internal Revenue Code with respect to the plan.  Certain governmental plans and church plans, although not subject to Section 406 of ERISA or Section 4975 of the Internal Revenue Code, may be subject to a Similar Law that imposes similar requirements.  A violation of these "prohibited transaction" rules may generate excise tax and other liabilities under ERISA and the Internal Revenue Code (or liabilities under Similar Laws) for these parties in interest or disqualified persons.

The acquisition and holding of Notes of any class by or on behalf of a Benefit Plan Investor could be considered to give rise to a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code if the Issuer, the Owner Trustee, the Indenture Trustee, the Depositor, the Servicer, any Initial Purchaser, a holder of 50% or more of the equity interests in the Issuer or any of their respective affiliates is or becomes a "party in interest" or a "disqualified person" (as defined in ERISA and the Internal Revenue Code, respectively) with respect to such Benefit Plan Investor.

Depending on the relevant facts and circumstances, certain prohibited transaction exemptions may apply to the purchase or holding of the Notes—for example, PTCE 96-23, which exempts certain transactions effected on behalf of a Benefit Plan Investor by an "in-house asset manager"; PTCE 95-60, which exempts certain transactions by insurance company general accounts; PTCE 91-38, which exempts certain transactions by bank collective investment funds; PTCE 90-1, which exempts certain transactions by insurance company pooled separate accounts; and PTCE 84-14, which exempts certain transactions effected on behalf of a Benefit Plan Investor by a "qualified professional asset manager".  In addition, the service provider exemption provided by Section 408(b)(17) of ERISA and Section 4975(d)(20) of the Internal Revenue Code may apply to the purchase or holding of the Notes.  There can be no assurance that any of these exemptions will apply with respect to any Benefit Plan Investor's investment in the Notes, or that an exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Each investor in a Note, other than a Class E Note or a Class F Note, by its acceptance of such Note or a beneficial interest therein, will be deemed to represent either that it is not and, so long as it holds such Note or any interest therein, will not be a Plan, and is not and, so long as it holds such Note or any interest therein, will not be investing on behalf of or with plan assets of a Plan, or that its acquisition, holding and disposition of such Note do not and will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code or a violation of any applicable Similar Law.  The Issuer will not offer the

125

Class E Notes and the Class F Notes to Plans because of the possibility that they may be regarded as "equity interests" for purposes of the Plan Assets Regulation.

Each investor who invests in either a Class E Note or Class F Note, by its acceptance of such Note or a beneficial interest therein, will be deemed to represent that it is not and, so long as it holds such Note or any interest therein, will not be a Plan, and it is not and, so long as it holds such Note or any interest therein, will not be investing on behalf of or with plan assets of a Plan.

ERISA also imposes certain duties on persons who are fiduciaries of Benefit Plan Investors subject to ERISA, including the requirements of investment prudence and diversification, and the requirement that such a Plan's investments be made in accordance with the documents governing the plan.  Under ERISA, any person who exercises any authority or control respecting the management or disposition of, or who renders investment advice for a fee (direct or indirect) with respect to, the assets of a plan subject to ERISA is considered to be a fiduciary of the plan.

A fiduciary of a Plan considering the purchase of Notes should consult its tax and/or legal advisors regarding the possibility of exemptive relief from the prohibited transaction rules and similar laws and other issues and their potential consequences.  Moreover, each Plan fiduciary should determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in the Notes is appropriate for the Plan, taking into account the overall investment policy of the Plan and the composition of the Plan's investment portfolio.

Because the Transaction Parties may receive certain benefits in connection with the sale of the Notes, the purchase of Notes using plan assets of a Benefit Plan Investor subject to ERISA or Section 4975 of the Internal Revenue Code over which any of such parties has discretionary authority or control or renders "investment advice" (within the meaning of Section 3(21) of ERISA or Section 4975 of the Internal Revenue Code and applicable regulations) for a fee (direct or indirect) with respect to such plan assets, or is the employer or other sponsor of the plan, may be deemed to be a violation of the prohibited transaction rules of Part 4, Subtitle 8, Title I of ERISA or Section 4975 of the Internal Revenue Code for which no exemption may be available (or might otherwise constitute a violation of fiduciary responsibilities under Title I of ERISA).  Accordingly, any investor considering a purchase of Notes using plan assets of such a Benefit Plan Investor should consult with its counsel if any of the Transaction Parties has investment authority or administrative discretion or provides advice for a direct or indirect fee with respect to such assets or is an employer maintaining or contributing to the plan.

The sale of Notes to a Plan is in no respect a representation by the Issuer or any Initial Purchases that this investment meets all relevant legal requirements with respect to investments by Plans generally or any particular Plan, or that this investment is appropriate for such Plans generally or any particular such Plan.

Additionally, each Benefit Plan Investor and any fiduciary who invests in a Note will be deemed to represent that unless a prohibited transaction exemption applies, no Transaction Party (1) has provided any investment recommendation or investment advice on which it has relied upon in connection with the Benefit Plan Investor's decision to invest in the Notes or (2) is acting as a fiduciary within the meaning of Section 3(21) of ERISA or Section 4975 of the Internal Revenue Code, or regulations thereunder, to the Benefit Plan Investor or the fiduciary in connection with the Benefit Plan Investor's acquisition of the Notes.

**Special Considerations Applicable to Insurance Company General Accounts**

The Small Business Job Protection Act of 1996 added Section 401(c) of ERISA relating to the status of the assets of insurance company general accounts under ERISA and Section 4975 of the Internal Revenue Code.  Under Section 401(c), the Department of Labor published general account regulations providing guidance on which assets held by the insurer constitute "plan assets" for purposes of the fiduciary responsibility provisions of ERISA and Section 4975 of the Internal Revenue Code.  The general account regulations do not exempt from treatment as "plan assets" assets in an insurance company's general account that support insurance policies issued to Plans after December 31, 1998.  The plan asset status of insurance company separate accounts is unaffected by Section 401(c) of ERISA, and separate account assets continue to be treated as the plan assets of any Benefit Plan Investor invested in a separate account.  Investors considering the purchase of Notes on behalf of an insurance company general account should consult their legal advisors regarding the effect of the general account regulations on the purchase. The general account regulations should not, however, adversely affect the applicability of PTCE 95-60.

126

The ERISA considerations set forth above are only intended as a summary and may not be applicable depending upon a Plan's specific facts and circumstances. Plan fiduciaries should consult their own advisors with respect to the advisability of an investment in the Notes, and potentially adverse consequences of such investment, including without limitation, the possible effects of changes in applicable laws.

## RATINGS

It is a condition to issuance that the Notes receive ratings from the Rating Agency at least as high as those set forth under *"Summary—Ratings"*. The Rating Agency will monitor its ratings using its normal surveillance procedures. The Rating Agency may change or withdraw an assigned rating at any time. No party to the Transaction Documents will be responsible for monitoring any changes to the ratings on the Notes.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time for any reason. No person or entity will be obligated to provide any additional credit enhancement with respect to the Notes. Any withdrawal of a rating may have an adverse effect on the liquidity and market price of the Notes. The ratings assigned to the Notes address the likelihood of the receipt by the Noteholders of all distributions to which the Noteholders are entitled by their respective Final Scheduled Distribution Dates. The ratings assigned to the Notes do not represent any assessment of the likelihood that principal prepayments might differ from those originally anticipated or address the possibility that Noteholders might suffer a lower than anticipated yield.

We cannot assure you that the Rating Agency will not lower or withdraw its ratings on the Notes or that a nationally recognized statistical ratings organization other than the Rating Agency will rate the Notes.

## PLAN OF DISTRIBUTION

### General

Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers.

The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale.

The Notes have not been and will not be registered under the Securities Act, or the securities laws of any State or other jurisdiction, and may not be offered or sold except as set forth above. Resales of the Notes will be restricted as described under *"Notice to Investors"* and *"Description of the Notes—Book-Entry Registration"*.

Neither the Depositor nor the Issuer is registered as "investment company" under the Investment Company Act. The Note Purchase Agreement will contain a representation and warranty to the Initial Purchasers that the Depositor and the Issuer rely on Section 3(c)(5) of the Investment Company Act for its exemption from registration, and that other exemptions may also be available. Furthermore, the Issuer is being structured so as not to constitute a "covered fund" for purposes of the Volcker Rule.

In the ordinary course of business, the Initial Purchasers and their respective affiliates may engage in investment banking and commercial banking transactions with Tricolor, the Depositor and their respective affiliates. See *"Use of Proceeds—General"*. Some or all of one or more classes of Notes may initially be sold to one or more affiliates of the Depositor. Such Notes may be sold, subject to the requirements set forth in the Indenture, from time to time to purchasers directly by the Depositor or such affiliates or through broker-dealers or agents who may receive compensation in the form of discounts, concessions or commissions from the Depositor or the purchasers of such Notes. Further, one or both of the Initial Purchaser or their respective affiliates may be holding, buying or

127

selling interests in motor vehicle loan contracts similar to the Receivables or in credit default swaps or similar derivatives related to such similar receivables, may be limiting origination of or not originating such similar receivables or may be taking long or short positions with respect to securities backed by such similar receivables. Such activities may result in conflicts of interest and, consequently, the interest of the Initial Purchasers or their respective affiliates may not be aligned with the interests of investors in the Notes.

Tricolor and the Depositor will agree to jointly and severally indemnify the Initial Purchasers, their respective officers and directors and certain entities controlling the Initial Purchasers (within the meaning of the Securities Act) against certain liabilities, including certain liabilities under the Securities Act, or to contribute to payments that the Initial Purchasers may be required to make in respect thereof.

Investors will be required to make certain representations with respect to their ability to invest in the Notes, as described under *"Notice to Investors"*.

## European Economic Area

Each Initial Purchaser will represent and agree that it has not offered, sold or otherwise made available, and will not offer, sell or otherwise make available, any Notes which are the subject of the offering contemplated by this Offering Memorandum to any EU Retail Investor in the EEA. For the purposes of this provision: (a) an "EU Retail Investor" is a person who is one (or more) of the following: (i) a retail client, as defined in point (11) of Article 4(1) of MiFID II; (ii) a customer within the meaning of Directive (EU) 2016/97 (as amended), where that customer would not qualify as a professional client, as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor, as defined in Article 2 of Regulation (EU) 2017/1129 (as amended); and (b) "offer" includes the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe for the Notes.

## United Kingdom

### *Prohibition on Sales to UK Retail Investors*

Each Initial Purchaser will represent and agree that it has not offered, sold or otherwise made available, and will not offer, sell or otherwise make available, any Notes which are the subject of the offering contemplated by this Offering Memorandum to any UK Retail Investor in the UK. For the purposes of this provision: (a) a "UK Retail Investor" is a person who is one (or more) of the following: (i) a retail client, as defined in point (8) of Article 2 of Commission Delegated Regulation (EU) 2017/565, as it forms part of UK domestic law by virtue of the EUWA and as amended; (ii) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA (such rules and regulations as amended) to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014, as it forms part of UK domestic law by virtue of the EUWA and as amended; or (iii) not a qualified investor as defined in Article 2 of Regulation (EU) 2017/1129, as it forms part of UK domestic law by virtue of the EUWA and as amended; and (b) "offer" includes the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe for the Notes.

### *Other UK Regulatory Restrictions*

Each Initial Purchaser will represent and agree that (1) it has only communicated or caused to be communicated, and will only communicate or cause to be communicated, an invitation or inducement to engage in investment activity (within the meaning of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which Section 21(1) of the FSMA does not apply to the Issuer or the Depositor and (2) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Notes in, from or otherwise involving, the UK.

## LEGAL MATTERS

Certain legal matters relating to the Notes, including certain United States federal income tax matters, will be passed upon for Tricolor, the Depositor and the Issuer by Sidley Austin LLP, San Francisco, California, and by Beard Kultgen Brophy Bostwick & Dickson PLLC. Certain legal matters relating to the Issuer governed by

Delaware law will be passed upon for the Depositor and the Issuer by Richards, Layton & Finger P.A.  Morgan, Lewis & Bockius LLP, New York, New York will act as counsel for the Initial Purchasers.

## GLOSSARY

Set forth below is a list of certain defined terms used in this Offering Memorandum.

*"ABS"* means the Absolute Prepayment Model which is used to measure prepayments on receivables and described under *"Weighted Average Lives of the Notes"*.

*"Accounts"* means the Collection Account, the Note Payment Account, the Reserve Fund and the Prefunding Account.

*"Administration Agreement"* means the Administration Agreement, dated as of April 1, 2022, among the Administrator, the Depositor, the Issuer and the Indenture Trustee, as amended, restated, supplemented or otherwise modified from time to time.

*"Administrator"* means Tricolor, in its capacity as administrator under the Administration Agreement, and its successors in such capacity.

*"Amount Financed"* means, with respect to any Receivable, the aggregate amount loaned toward the purchase price of the related Financed Vehicle and any related costs, including amounts advanced at the time the Receivable is originated for accessories, insurance premiums, service contracts, car club and warranty contracts and other items customarily financed as part of motor vehicle retail installment sale contracts, and related costs; provided, however, that the Amount Financed does not include any Texas Deferred Sales Taxes or collateral protection insurance premiums.

*"ASC 820"* means FASB Accounting Standards Codification 820, Fair Value Measurements and Disclosures.

*"Available Collections"* means, for any Distribution Date, the sum of the following amounts with respect to the related Collection Period:

- all obligor payments relating to interest and principal received by the Servicer with respect to the Receivables during such Collection Period that were received after the related Cutoff Dates, other than Supplemental Servicing Fees;

- all Net Liquidation Proceeds, Insurance Proceeds (with respect to Receivables that are not Defaulted Receivables) and Recoveries received with respect to the Receivables during such Collection Period;

- all net investment earnings on amounts on deposit in the Collection Account, the Reserve Fund and the Prefunding Account;

- amounts in excess of the Reserve Fund Required Amount that are released from the Reserve Fund and deposited into the Collection Account;

- Purchase Amounts of each Receivable that became a Purchased Receivable during such Collection Period;

- all prepayments received with respect to the Receivables during such Collection Period attributable to any refunded item included in the Amount Financed of a Receivable, including amounts received as a result of proceeds received under physical damage and theft insurance policies;

- proceeds from exercise by the Servicer of its Optional Purchase Right or liquidation of the Trust Property following an Event of Default and acceleration of the Notes under the Indenture; and

- any Prefunding Account Amount remaining after the end of the Prefunding Period;

provided, however, that Available Collections will exclude all Texas Deferred Sales Tax Payments, all Collateral Protection Insurance Payments and all payments and proceeds (including Net Liquidation Proceeds and Recoveries)

130

received with respect to any Purchased Receivable the Purchase Amount of which has been included in Available Collections for a prior Collection Period.

*"Available Funds"* means with respect to any Distribution Date and the related Collection Period, Available Collections plus the Reserve Fund Draw Amount, if any, for such Distribution Date.

*"Backup Servicer"* means Vervent, in its capacity as Backup Servicer under the Sale and Servicing Agreement, and its successors in such capacity.

*"Bank Holding Company Act"* means the Bank Holding Company Act of 1956, as amended.

*"Bankruptcy Code"* means Title 11 of the United States Code, 11 U.S.C. § 101 *et. seq.*, as amended.

*"Benefit Plan Investor"* means a "benefit plan investor" as defined in the Plan Assets Regulation.

*"Book-Entry Notes"* means Notes initially issued in book-entry form.

*"Business Day"* means any day other than a Saturday, a Sunday, a legal holiday or other day on which commercial banking institutions or trust companies located in Wilmington, Delaware, Dallas, Texas, Los Angeles, California, Buffalo, New York or New York, New York are authorized or obligated by law, executive order or governmental decree to be closed.

*"CDE"* means Tricolor's proprietary credit decisioning engine.

*"CDFI"* means Community Development Financial Institution.

*"Certificate Percentage Interest"* means, with respect to a Certificate, the percentage specified on such Certificate as the Certificate Percentage Interest, which percentage represents the beneficial interest of the holder of such Certificate in the Issuer.

*"Certificate Registrar"* means WTNA, in its capacity as Certificate Registrar under the Trust Agreement, and its successors in such capacity.

*"Certificateholders"* means the registered holders of the Certificates.

*"Certificates"* means the Risk Retained Certificates and the Non Risk Retained Certificates, in each case representing a beneficial interest of a Certificateholder in the assets of the Issuer.

*"CFPB"* means the Consumer Financial Protection Bureau, and its successors.

*"Class A Note Balance"* means, as of any date, the Note Balance of the Class A Notes.

*"Class A Notes"* means the 3.30% Class A Asset Backed Notes of the Issuer.

*"Class B Note Balance"* means, as of any date, the Note Balance of the Class B Notes.

*"Class B Notes"* means the 4.34% Class B Asset Backed Notes of the Issuer.

*"Class C Note Balance"* means, as of any date, the Note Balance of the Class C Notes.

*"Class C Notes"* means the 4.71% Class C Asset Backed Notes of the Issuer.

*"Class D Note Balance"* means, as of any date, the Note Balance of the Class D Notes.

*"Class D Notes"* means the 5.38% Class D Asset Backed Notes of the Issuer.

*"Class E Note Balance"* means, as of any date, the Note Balance of the Class E Notes.

*"Class E Notes"* means the 7.79% Class E Asset Backed Notes of the Issuer.

*"Class F Note Balance"* means, as of any date, the Note Balance of the Class F Notes.

*"Class F Notes"* means the 9.80% Class F Asset Backed Notes of the Issuer.

*"Clearstream"* means Clearstream, Luxembourg, S.A., and its successors.

*"Clearstream Customer"* means a participating organization of Clearstream.

*"Closing Date"* means on or about May 4, 2022.

*"Collateral Protection Insurance Payment"* means the amount necessary to reimburse the Servicer for the related premium on the collateral protection insurance policy obtained by the Servicer at the direction of the borrower with respect to the related Financed Vehicle.

*"Collection Account"* means the account established by the Servicer with the Indenture Trustee in the name of the Issuer pursuant to the Sale and Servicing Agreement for the benefit of the Securityholders into which all payments other than Texas Deferred Sales Tax Payments and Collateral Protection Insurance Payments made on or in respect of the Receivables will be transferred.

*"Collection Period"* means, with respect to any Distribution Date, the immediately preceding calendar month; provided, that the Collection Period with respect to the first Distribution Date shall be the period beginning at the Initial Cutoff Date and ending at the close of business on April 30, 2022.

*"Contract Rate"* means, with respect to any Receivable, the annual percentage rate of interest stated in such Receivable.

*"Controlling Class"* means (i) if any Class A Notes are outstanding, the Class A Notes, (ii) if no Class A Notes are outstanding and any Class B Notes are outstanding, the Class B Notes, (iii) if no Class A Notes or Class B Notes are outstanding and any Class C Notes are outstanding, the Class C Notes, (iv) if no Class A Notes, Class B Notes or Class C Notes are outstanding and any Class D Notes are outstanding, the Class D Notes, (v) if no Class A Notes, Class B Notes, Class C Notes or Class D Notes are outstanding and any Class E Notes are outstanding, the Class E Notes, and (vi) if no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes are outstanding and any Class F Notes are outstanding, the Class F Notes.

*"Corporate Trust Office"* means the office of the Indenture Trustee at which at any particular time its corporate trust business shall be administered, which office at the date of execution of the Indenture is located at 1100 North Market Street, Wilmington, Delaware 19890-0001, Attn: Corporate Trust Administration, or at such other address as the Indenture Trustee may designate from time to time by written notice to the Noteholders, the Servicer, the Administrator and the Issuer, or the principal corporate trust office of any successor Indenture Trustee at the address designated by such successor Indenture Trustee by written notice to the Noteholders and the Issuer.

*"Cram Down Loss"* means, with respect to any Receivable that has not become a Defaulted Receivable, if a court of appropriate jurisdiction in an insolvency proceeding issued an order reducing the amount owed on the Receivable or otherwise modifying or restructuring the scheduled payments to be made on the Receivable, an amount equal to (i) the excess of such Principal Balance of such Receivable immediately prior to the order over such Principal Balance as reduced and (ii) if such court issued an order reducing the effective interest rate on such Receivable, the excess of the Principal Balance of such Receivable immediately prior to such order over such Receivable's net present value (using as the discount rate the higher of the related Contract Rate or the rate of interest, if any, specified by such court in such order) of the scheduled payments as so modified or restructured. A Cram Down Loss shall be deemed to have occurred on the related order's issuance date.

*"Cumulative Net Loss Rate"* means, with respect to the static pool information set forth on Appendix A to this Offering Memorandum and any calendar quarter, the rate, expressed as a percentage (i) the numerator of which is (a) the aggregate Cram Down Losses from the static pool period plus (b) the aggregate Principal Balance of all Defaulted Receivables, in each case for the period from the static pool period through the end of such calendar quarter, minus (c) the amount of all Net Liquidation Proceeds and Recoveries received by the Servicer during the period from the static pool period through the end of such calendar quarter and (ii) the denominator of which is the original principal balance for all originations in that static pool period.

*"Cumulative Net Loss Ratio"* means, with respect to any Collection Period, the ratio, expressed as a percentage, of (i)(a) the aggregate Cram Down Losses on all Receivables plus (b) the aggregate Principal Balance of all Defaulted Receivables, in each case for the period from the Initial Cutoff Date through the end of such Collection Period, minus (c) the amount of all Net Liquidation Proceeds and Recoveries received by the Servicer during the period from the Initial Cutoff Date through the end of such Collection Period to (ii) the sum of (a) the Initial Cutoff Date Pool Balance and (b) the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates.

*"Custodian"* means the Indenture Trustee acting in its capacity as custodian under the Sale and Servicing Agreement.

*"Cutoff Date"* means, with respect to (i) an Initial Receivable, the Initial Cutoff Date and (ii) a Subsequent Receivable, the related Subsequent Cutoff Date.

*"Defaulted Receivable"* means, with respect to any Collection Period, a Receivable for which, as of the last day of such Collection Period, (i) 10% or more of any scheduled payment remains unpaid for more than 120 days at the end of each Collection Period, (ii) the related obligor is bankrupt or the subject of a bankruptcy proceeding, (iii) the related Financed Vehicle has been repossessed and the Servicer has liquidated or sold such Financed Vehicle and the Servicer has made a final determination of any deficiency owed under such Receivable or the Servicer has held such Financed Vehicle in its repossession inventory for more than 90 days, or (iv) has been or is required to be charged-off or is deemed uncollectible by the Servicer in accordance with the Servicer's credit and collection policy then in effect. The Principal Balance of any Receivable that becomes a Defaulted Receivable will be deemed to be zero as of the date it becomes a Defaulted Receivable.

*"Delegated Directive"* means Directive (EU) 2017/593, as amended.

*"Delinquent"* means, with respect to any Receivable and any Collection Period, a Receivable that is not a Defaulted Receivable and for which, as of the last day of such Collection Period, 10% or more of any payment remains unpaid for more than 30 days from the original due date for such payment.

*"Deposit Date"* means, for any Distribution Date, the Business Day immediately preceding such Distribution Date.

*"Depositor"* means Tricolor Auto Receivables 2 LLC, and its successors.

*"Determination Date"* means, with respect to any Distribution Date, the fourth Business Day prior to such Distribution Date (or in the case of the initial Distribution Date, the second Business Day prior to the initial Distribution Date).

*"Distribution Date"* means the 15th day of each month or, if such day is not a Business Day, the following Business Day, beginning May 16, 2022.

*"Dodd-Frank Act"* means the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203, H.R. 4173), as amended.

*"DTC"* means The Depository Trust Company, and its successors.

*"DTC Participant"* means an account holder at DTC.

*"EEA"* means the European Economic Area.

*"Eligible Account"* means either (i) a segregated deposit account over which the Indenture Trustee or the Owner Trustee, as the case may be, has sole signature authority, maintained with in the corporate trust department of either Trustee or (ii) an account that is a segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States or any State, or any domestic branch of a foreign bank, having corporate trust powers and acting as trustee for funds deposited in the account; provided that, in each case (a) the securities of the related depository institution has a credit rating from a nationally recognized statistical rating organization which signifies investment grade and (b) such depository institution's deposits are insured by the FDIC.

133

*"Eligible Social Project"* means an "eligible social project" as described under the Social Bond Principles.

*"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended.

*"Euroclear"* means the Euroclear system operated by Euroclear Bank, S.A./N.V., and its successors.

*"Euroclear Participant"* means an account holder at Euroclear.

*"EU"* means the European Union.

*"EU Institutional Investors"* means, in summary (i) credit institutions and investment firms, as defined in and for purposes of Regulation (EU) No 575/2013, as amended (and including certain consolidated affiliates of such credit institutions and, in certain cases, of such investment firms), (ii) insurance undertakings and reinsurance undertakings as defined in Directive 2009/138/EC, as amended, (iii) alternative investment fund managers, as defined in Directive 2011/61/EU, as amended, that manage or market alternative investment funds in the EU, (iv) certain internally-managed investment companies authorized in accordance with Directive 2009/65/EC, and managing companies as defined in that Directive, and (v) with certain exceptions, institutions for occupational retirement provision falling within the scope of Directive (EU) 2016/2341, and certain investment managers and authorized entities appointed by such institutions.

*"EU PRIIPs Regulation"* means Regulation (EU) No 1286/2014, as amended.

*"EU Prospectus Regulation"* means Regulation (EU) 2017/1129, as amended.

*"EU Securitization Regulation"* means Regulation (EU) 2017/2402, as amended.

*"EU SR Rules"* means the EU Securitization Regulation, together with all regulatory technical standards and/or implementing technical standards, and all official guidance, applicable in relation thereto, and any applicable national implementation measures, in each case as amended.

*"EUWA"* means the European Union (Withdrawal) Act 2018 of the UK, as amended.

*"Event of Default"* will have the meaning set forth in the Indenture and summarized under *"Description of the Notes—Events of Default"*.

*"Event of Servicing Termination"* will have the meaning set forth in the Sale and Servicing Agreement and summarized under *"Description of the Transaction Documents—Events of Servicing Termination"*.

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended.

*"FDIC"* means the Federal Deposit Insurance Corporation, and its successors.

*"Fifth Priority Principal Distributable Amount"* means, with respect to any Distribution Date, (i) the excess, if any, of the sum of the Class A Note Balance, the Class B Note Balance, the Class C Note Balance, the Class D Note Balance and the Class E Note Balance on that Distribution Date (before giving effect to any payments to be made on that Distribution Date) over the sum of (a) the Pool Balance and (b) during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related Collection Period, minus (ii) the sum of the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount, the Third Priority Principal Distributable Amount and the Fourth Priority Principal Distributable Amount; provided, however, that on and after the Final Scheduled Distribution Date for the Class E Notes, the Fifth Priority Principal Distributable Amount will not be less than the amount that is necessary to reduce the Class E Note Balance to zero.

*"Final Scheduled Distribution Date"* has the meaning for each class of Notes set forth under *"Description of the Notes—Payments of Principal—Final Scheduled Distribution Dates"*.

*"Financed Vehicle"* means, with respect to any Receivable, the automobile, light-duty truck, sport utility vehicle or van, together with all accessions thereto, securing the related obligor's indebtedness under such Receivable.

134

"*First Priority Principal Distributable Amount*" means, with respect to any Distribution Date, the excess, if any, of the Class A Note Balance on that Distribution Date (before giving effect to any payments to be made on that Distribution Date) over the sum of (i) the Pool Balance and (ii) during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related Collection Period; provided, however, that on and after the Final Scheduled Distribution Date for the Class A Notes, the First Priority Principal Distributable Amount will not be less than the amount that is necessary to reduce the Class A Note Balance to zero.

"*Flow-Through Entity*" means a person who is a partnership, grantor trust or S corporation for United States federal income tax purposes.

"*Fourth Priority Principal Distributable Amount*" means, with respect to any Distribution Date, (i) the excess, if any, of the sum of the Class A Note Balance, the Class B Note Balance, the Class C Note Balance and the Class D Note Balance on that Distribution Date (before giving effect to any payments to be made on that Distribution Date) over the sum of (a) the Pool Balance and (b) during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related Collection Period, minus (ii) the sum of the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount and the Third Priority Principal Distributable Amount; provided, however, that on and after the Final Scheduled Distribution Date for the Class D Notes, the Fourth Priority Principal Distributable Amount will not be less than the amount that is necessary to reduce the Class D Note Balance to zero.

"*Framework*" means the Tricolor Social ABS Framework March 2022.

"*FSMA*" means the Financial Services and Markets Act 2000, as amended.

"*Global Notes*" means any Note offered or sold to an IAI.

"*IAI*" means an institutional "accredited investor" under Rule 501(a)(1), (2), (3) or (7) under the Securities Act.

"*IAI Global Note*" means any Note offered and sold to an IAI.

"*ICMA*" means the International Capital Markets Association.

"*Indenture*" means the Indenture, dated as of April 1, 2022, between the Issuer and the Indenture Trustee, as amended, restated, supplemented or otherwise modified from time to time.

"*Indenture Trustee*" means WTNA, in its capacity as indenture trustee under the Indenture, and its successors in such capacity.

"*Initial Cutoff Date*" means the close of business on March 31, 2022.

"*Initial Cutoff Date Pool Balance*" means the Pool Balance as of the Initial Cutoff Date.

"*Initial Purchasers*" means J.P. Morgan Securities LLC and Barclays Capital Inc.

"*Initial Receivable*" means a Receivable transferred by the Depositor to the Issuer on the Closing Date.

"*Insolvency Event*" means, with respect to any entity, certain events of insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings with respect to such entity and certain actions by such entity indicating its insolvency, reorganization under bankruptcy proceedings or inability to pay its obligations (which, if involuntary, remain unstayed for more than 60 days).

"*Insurance Proceeds*" means proceeds paid by any insurer under a comprehensive and collision or limited dual interest insurance relating to a Receivable, other than funds used for the repair of the related Financed Vehicle or otherwise released to the related obligor in accordance with normal servicing procedures, after reimbursement to the Servicer for expenses recoverable under the related insurance policy.

"*Interest Carryover Shortfall Amount*" means, with respect to any Distribution Date and a class of Notes, the excess, if any, of the Interest Distributable Amount for that class of Notes on the immediately preceding

135

Distribution Date over the amount in respect of interest that is actually deposited in the Note Payment Account with respect to that class of Notes on that preceding Distribution Date, plus, to the extent permitted by applicable law, interest on the amount of interest due but not paid to holders of that class of Notes on that preceding Distribution Date at the applicable Interest Rate.

*"Interest Distributable Amount"* means, with respect to any class of Notes and any Distribution Date, the sum of the Monthly Interest Distributable Amount for such class of Notes for such Distribution Date and the Interest Carryover Shortfall Amount, if any, for such class of Notes, calculated as of such Distribution Date.

*"Interest Period"* means, with respect to any Distribution Date, the period from and including the 15th day of the immediately preceding month (or, in the case of the first Distribution Date, from and including the Closing Date) to but excluding the 15th day of the month in which the related Distribution Date occurs (assuming each month has 30 days).

*"Interest Rate"* means, with respect to any class of Notes, the interest rate for that class of Notes set forth under *"Description of the Notes—Payments of Interest—General"*.

*"Internal Revenue Code"* means the Internal Revenue Code of 1986, as amended.

*"Investment Company Act"* means the Investment Company Act of 1940, as amended.

*"Investor Report"* means the monthly certificate prepared by the Servicer described under *"Description of the Transaction Documents —Investor Reports"*.

*"IRS"* means the Internal Revenue Service, and its successors.

*"Issuer"* means Tricolor Auto Securitization Trust 2022-1, a Delaware statutory trust, and its successors.

*"Issuer Expenses"* means, with respect to any Distribution Date and the related Collection Period, all fees, expenses and indemnities of the Servicer (including the Total Servicing Fee), the Trustees, the Custodian, the Backup Servicer and any Successor Servicer.

*"KBRA"* means Kroll Bond Rating Agency, LLC.

*"Majority Noteholders"* means, holders of Notes representing not less than 51% of the Note Balance of the Controlling Class of Notes.

*"MiFID II"* means Directive 2014/65/EU, as amended.

*"Monthly Interest Distributable Amount"* means, with respect to any Distribution Date and any class of Notes, the interest accrued at the respective Interest Rate during the applicable Interest Period, which shall accrue on a "30/360 basis" on the Note Balance of such class of Notes as of the end of the prior Distribution Date (or, in the case of the first Distribution Date, as of the Closing Date).

*"Net Liquidation Proceeds"* means, with respect to a Defaulted Receivable and the Collection Period during which it became a Defaulted Receivable, an amount (which shall not be less than zero) equal to (i) all amounts realized from whatever source (including Insurance Proceeds) with respect to such Defaulted Receivable minus (ii) the sum of (a) reasonable expenses incurred by the Servicer in connection with the collection of such Receivable and the repossession and disposition of the related Financed Vehicle (to the extent not previously reimbursed to the Servicer and exclusive of overhead) and (b) any amounts required by law to be refunded to the related obligor with respect to such Receivable.

*"Non-Risk Retained Certificates"* means (i) Certificates with a Certificate Percentage Interest of 46.80% as of the Closing Date, and (ii) Certificates that as of the Closing Date are Risk Retained Certificates but, pursuant to Regulation RR, are no longer required to be retained by the Depositor or another majority-owned affiliate of Tricolor.

*"Non-U.S. Holder"* has the meaning set forth under *"United States Federal Income Tax Considerations"*.

136

*"Note Balance"* means, as of any date, the outstanding principal amount of a particular class or classes of Notes or of all of the Notes, as indicated by the context.

*"Note Owners"* means beneficial owners of Notes held in book-entry form.

*"Note Payment Account"* means the account established by the Indenture Trustee into which amounts released from the Collection Account for distribution to the Noteholders will be deposited.

*"Note Purchase Agreement"* means the Note Purchase Agreement, dated April 29, 2022, among the Depositor, Tricolor and J.P. Morgan Securities, LLC, as representative of the Initial Purchasers, as amended, restated, supplemented or otherwise modified from time to time.

*"Note Registrar"* means the Indenture Trustee, as registrar for the Notes under the Indenture.

*"Noteholders"* means the registered holders of the Notes.

*"Notes"* means, collectively, the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes.

*"OID"* means original issue discount.

*"OLA"* means the Orderly Liquidation Authority.

*"Optional Purchase Right"* means the Servicer's right to purchase all remaining Receivables from the Issuer on any Distribution Date following the last day of a Collection Period as of which the Note Balance is equal to or less than 10.0% of the sum of initial Note Balance of each class of Notes as of the Closing Date.

*"Order"* means the Stipulated Final Judgment and Order for Civil Penalties, Permanent Injunction, and Other Equitable Relief entered into by Tricolor and the United States on September 16, 2015, as amended.

*"Originators"* means Tricolor Auto Group, LLC, Tricolor California Auto Group, LLC and Flexi Compras LLC, each, a Delaware limited liability company, and their respective successors.

*"Owner Trustee"* means Wilmington Trust Company, not in its individual capacity but solely as owner trustee under the Trust Agreement, and its successors in such capacity.

*"Plan"* means an employee benefit or other plan or arrangement (such as an individual retirement account or Keogh plan) that is subject to the fiduciary responsibility provisions of Title I of ERISA, Section 4975 of the Internal Revenue Code or any Similar Laws.

*"Plan Assets Regulation"* means ERISA Section 3(42) and U.S. Department of Labor regulation 29 C.F.R. Section 2510.3-101, relating to Benefit Plan Investors and assets thereof, in each case as amended.

*"Pool Balance"* means, as of any date of determination, the aggregate Principal Balance of the Receivables, excluding all Defaulted Receivables and all Purchased Receivables.

*"Pool Factor"* means, for each class of Notes, a seven-digit decimal, which the Servicer will compute prior to each Distribution Date, indicating the remaining Note Balance of such class as of such Distribution Date as a fraction of the initial Note Balance of such class.

*"Prefunding Account"* means the account established by the Servicer with the Indenture Trustee in the name of the Issuer pursuant to the Sale and Servicing Agreement for the benefit of the Securityholders.

*"Prefunding Account Amount"* means, with respect to any day, the amount on deposit in the Prefunding Account on such day.

*"Prefunding Account Deposit"* means an amount equal to $42,426,000, representing approximately 16.54% of the sum of (i) the Initial Cutoff Date Pool Balance and (ii) the expected aggregate initial Principal Balance of the Subsequent Receivables.

*"Prefunding Period"* means the period from the Closing Date until the earliest of (i) July 31, 2022, (ii) the date on which the amount in the Prefunding Account is less than $100,000 and (iii) the occurrence of an Event of Default or an Event of Servicing Termination.

*"Principal Balance"* means, with respect to any Receivable as of any date of determination, an amount equal to (i) the Amount Financed minus (ii) the sum of (a) that portion of all amounts received on or prior to that date and allocable to principal using the simple interest method (as described in the definition of the term "Simple Interest Receivable"), (b) any prepayment applied to reduce the principal balance of such Receivable and (c) any Cram Down Losses for such Receivable accounted for as of such date; provided, however, that the Principal Balance of a Defaulted Receivable will be zero as of the last day of the Collection Period during which it became a Defaulted Receivable and the Principal Balance of a Purchased Receivable will be zero as of the last day of the Collection Period during which it became a Purchased Receivable.

*"PTCE"* means Prohibited Transaction Class Exemption.

*"Purchase Amount"* means, with respect to any Purchased Receivable, the Principal Balance and all accrued and unpaid interest on such Receivable at the related Contract Rate through the last day of the Collection Period of repurchase, after giving effect to the receipt of any monies collected (from whatever source) on such Receivable, if any.

*"Purchased Receivable"* means a Receivable purchased as of the close of business on the last day of a Collection Period (i) by the Depositor or the Servicer as a result of a breach of a representation or warranty or servicing covenant or (ii) by the Servicer in connection with the exercise of the Optional Purchase Right.

*"Purchaser"* means a qualified purchaser of a Note meeting the requirements set forth under *"Notice to Investors"*.

*"QIB"* means a *"qualified institutional buyer"* under Rule 144A.

*"Rating Agency"* means KBRA. If KBRA or its successor no longer maintains a rating on the Notes, Rating Agency shall mean any nationally recognized statistical rating organization or other comparable person designated by the Issuer to replace such entity, written notice of which designation shall have been given to the Depositor, the Servicer and the Trustees.

*"Rating Agency Condition"* means, with respect to the Rating Agency and any proposed action or request, according to the then-current policies of the Rating Agency for that action or request, the Issuer has given ten Business Days' prior notice to the Rating Agency.

*"Receivable"* means a motor vehicle retail installment sale contract securing the Notes.

*"Receivables Purchase Agreement"* means the Receivables Purchase Agreement, dated as of April 1, 2022, between Tricolor and the Depositor, as amended, supplemented or otherwise modified from time to time.

*"Record Date"* means, with respect to any Distribution Date, the close of business on the Business Day immediately preceding such Distribution Date (or in the case of the first Distribution Date, the Closing Date) or, with respect to any Notes that have been issued in fully registered, certificated form, the last Business Day of the preceding month.

*"Recoveries"* means, with respect to any Collection Period following the Collection Period in which a Receivable became a Defaulted Receivable, all amounts received by the Servicer, from whatever source (including Insurance Proceeds) with respect to such Defaulted Receivable during such Collection Period, minus the sum of (i) expenses incurred by the Servicer in connection with the collection of such Defaulted Receivable and the repossession and disposition of the related Financed Vehicle (in each case to the extent not previously reimbursed to the Servicer) and (ii) all payments required by law to be remitted to the related obligor.

*"Regular Principal Distributable Amount"* means, with respect to any Distribution Date, an amount equal to either (i) if the Notes have not been accelerated after the occurrence of an Event of Default relating solely to a breach of a covenant, agreement, representation or warranty of the Issuer, the lesser of (a) the Note Balance of the Notes on that Distribution Date (after giving effect to any payments of principal made to Noteholders on that

Distribution Date) and (b) an amount equal to (1) the excess of (A) the sum of the Note Balance of the Notes on that Distribution Date (before giving effect to any payments of principal to be made to Noteholders on that Distribution Date) and the Target Overcollateralization Amount, over (B) the sum of the Pool Balance and, during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related Collection Period, minus (2) the sum of the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount, the Third Priority Principal Distributable Amount, the Fourth Priority Principal Distributable Amount, the Fifth Priority Principal Distributable Amount and the Sixth Priority Principal Distributable Amount and (ii) if the Notes have been accelerated following the occurrence of an Event of Default solely relating to a breach of a covenant, agreement, representation or warranty of the Issuer, the Note Balance of the Notes (after giving effect to all other payments made on that Distribution Date).

"*Regulation D*" means Regulation D under the Securities Act, as amended.

"*Regulation RR*" means Regulation RR under the Exchange Act, as amended.

"*Required Payment Amount*" means, for any Distribution Date, the aggregate amount to be applied on that Distribution Date in accordance with clauses (1) through (14) under "*Application of Available Funds—Distributions—Prior to the Acceleration of the Notes Following an Event of Default (other than an Event of Default Relating Solely to a Breach of a Covenant, Agreement, Representation or Warranty of the Issuer)*".

"*Reserve Fund*" means the account established by the Servicer and held by the Indenture Trustee in the name of and on behalf of the Issuer pursuant to the Sale and Servicing Agreement.

"*Reserve Fund Amount*" means, with respect to any Distribution Date, the amount on deposit in and available for withdrawal from the Reserve Fund, after giving effect to all deposits to and withdrawals from the Reserve Fund on the preceding Distribution Date (or, in the case of the first Distribution Date, the Closing Date).

"*Reserve Fund Deposit*" means, with respect to (i) the Initial Receivables, an amount equal to 1.50% of the Initial Cutoff Date Pool Balance and (ii) any Subsequent Receivables, an amount equal to 1.50% of the aggregate Principal Balance of such Subsequent Receivables as of the related Subsequent Cutoff Date.

"*Reserve Fund Draw Amount*" means, with respect to any Distribution Date, the lesser of:

- the amount, if any, by which the Required Payment Amount for that Distribution Date exceeds the Available Collections for that Distribution Date; and

- the Reserve Fund Amount for that Distribution Date;

provided, however, that the Reserve Fund Draw Amount shall equal the Reserve Fund Amount if (a) the sum of Available Collections and the Reserve Fund Amount equals or exceeds the sum of the Note Balance of the Notes, accrued and unpaid interest thereon and all Issuer Expenses on such Distribution Date or (b) the Pool Balance is zero on the last day of the related Collection Period.

"*Reserve Fund Required Amount*" means, with respect to any Distribution Date, an amount equal to 1.50% of the sum of (i) the Initial Cutoff Date Pool Balance and (ii) the principal balance of all Subsequent Receivables as of the related Subsequent Cutoff Dates; provided, however, that the Reserve Fund Required Amount will not exceed the Note Balance of the Notes after giving effect to the distributions of principal made on such Distribution Date.

"*Risk Retained Certificates*" means Certificates with a Certificate Percentage Interest of 53.20% as of the Closing Date that, pursuant to Regulation RR, must be retained by the Depositor or another majority-owned affiliate of Tricolor until the later of (i) two years from the Closing Date, (ii) the date the Pool Balance is one-third or less of the Initial Cutoff Date Pool Balance, (iii) and the date the Note Balance of the Notes is one-third or less of the initial Note Balance of the Notes.

"*Rule 144A*" means Rule 144A under the Securities Act.

"*Rule 144A Global Note*" means any Note offered and sold pursuant to Rule 144A.

*"Sale and Servicing Agreement"* means the Sale and Servicing Agreement, dated as of April 1, 2022, among the Issuer, the Servicer, the Seller, the Depositor, the Indenture Trustee, the Custodian and the Backup Servicer, as amended, supplemented or otherwise modified from time to time.

*"SEC"* means the Securities and Exchange Commission, and its successors.

*"Second Priority Principal Distributable Amount"* means, with respect to any Distribution Date, (i) the excess, if any, of the sum of the Class A Note Balance and the Class B Note Balance on that Distribution Date (before giving effect to any payments to be made on that Distribution Date) over the sum of (a) the Pool Balance and (b) during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related Collection Period, minus (ii) the First Priority Principal Distributable Amount; provided, however, that on and after the Final Scheduled Distribution Date for the Class B Notes, the Second Priority Principal Distributable Amount will not be less than the amount that is necessary to reduce the Class B Note Balance to zero.

*"Securities"* means the Notes and the Certificates.

*"Securities Act"* means the Securities Act of 1933, as amended.

*"Securityholders"* means the Noteholders and the Certificateholders.

*"Seller"* means Tricolor, in its capacity as seller of the Receivables under the Receivables Purchase Agreement, and its successors in such capacity.

*"Senior Issuer Expenses"* means, with respect to any Distribution Date, all Issuer Expenses that are senior in right of payment to interest and principal on the Notes.

*"Servicer"* means Tricolor, as servicer under the Sale and Servicing Agreement, and its successors in such capacity.

*"Servicing Fee"* means the fee payable to the Servicer on each Distribution Date for servicing the Receivables during the related Collection Period, equal to the product of (i) 1/12, (ii) 3.00% and (iii) the Pool Balance as of the beginning of the related Collection Period (or, in the case of the first Distribution Date, the Initial Cutoff Date Pool Balance).

*"Similar Laws"* means provisions under any United States federal, State, local or non-U.S. laws or regulations that are similar to the prohibited transaction provisions of Section 406 of ERISA or Section 4975 of the Internal Revenue Code.

*"Simple Interest Receivable"* means a Receivable as to which interest is calculated each day on the basis of the actual Principal Balance of that Receivable on that day whereby the amount of an obligor's fixed level installment payment which is allocated to interest is equal to the product of the fixed interest rate on the Receivable (which is typically the Contract Rate) multiplied by the elapsed time period (which is expressed as a fraction of a year) multiplied by the remaining Principal Balance after the preceding Receivable payment. The remainder of the obligor's payment amount is allocated to reduce the Principal Balance. Accordingly, if an obligor pays a fixed monthly installment before its due date, the portion of the payment allocable to interest for the period since the preceding payment will be less than it would have been had the payment been made on the contractual due date and the portion of the payment applied to reduce the Principal Balance of the Receivable will be correspondingly greater. Conversely, if an obligor pays a fixed monthly installment after its contractual due date, the portion of such payment allocable to interest for the period since the preceding payment will be greater than it would have been had the payment been made when due and the portion of such payment applied to reduce the Principal Balance of the Receivable will be correspondingly less, in which case a larger portion of the Principal Balance may be due on the final scheduled payment date.

*"Sixth Priority Principal Distributable Amount"* means, with respect to any Distribution Date, (i) the excess, if any, of the sum of the Class A Note Balance, the Class B Note Balance, the Class C Note Balance, the Class D Note Balance, the Class E Note Balance and the Class F Note Balance on that Distribution Date (before giving effect to any payments to be made on that Distribution Date) over the sum of (a) the Pool Balance and (b) during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related

140

Collection Period, minus (ii) the sum of the First Priority Principal Distributable Amount, the Second Priority Principal Distributable Amount, the Third Priority Principal Distributable Amount, the Fourth Priority Principal Distributable Amount and the Fifth Priority Principal Distributable Amount; provided, however, that on and after the Final Scheduled Distribution Date for the Class F Notes, the Sixth Priority Principal Distributable Amount will not be less than the amount that is necessary to reduce the Class F Note Balance to zero.

"*Social Bond Principles*" means the Social Bond Principles, as updated in June 2021, developed by an industry working group administered by the ICMA.

"*Sponsor*" means Tricolor, in its capacity as sponsor of the securitization transaction described in this Offering Memorandum, and its successors.

"*SR Investor*" means an EU Institutional Investor or a UK Institutional Investor.

"*SRPM*" means stated redemption price at maturity.

"*State*" means any of the 50 states of the United States or the District of Columbia.

"*Subsequent Cutoff Date*" means, with respect to a Subsequent Receivable, the opening of business on the day that is four Business Days prior to the related Subsequent Receivables Purchase Date.

"*Subsequent Receivable*" means a Receivable acquired by and transferred by the Depositor to the Issuer during the Prefunding Period.

"*Subsequent Receivable Purchase Price*" means, with respect to a Subsequent Receivable, the product of 82.70% and the Principal Balance of such Subsequent Receivable as of the related Subsequent Cutoff Date.

"*Subsequent Receivables Assignment*" means an executed Subsequent Receivables Assignment substantially in the form provided as an exhibit to the Sale and Servicing Agreement.

"*Subsequent Receivables Purchase Assignment*" means an executed Subsequent Receivables Purchase Assignment substantially in the form provided as an exhibit to the Receivables Purchase Agreement.

"*Subsequent Receivables Purchase Date*" means each Business Day (occurring not more than once per week) during the Prefunding Period on which Subsequent Receivables are purchased by the Issuer.

"*Successor Servicer*" means the Backup Servicer or another entity appointed pursuant to the Sale and Servicing Agreement, at the direction of the Majority Noteholders, to act as Servicer following the resignation or removal of the initial Servicer.

"*Supplemental Servicing Fee*" means, with respect to any Distribution Date, an amount payable to the Servicer equal to all administrative fees, expenses and charges paid by or on behalf of obligors under the Receivables, including late fees, prepayment fees and liquidation fees, in each case that were collected during the related Collection Period (exclusive of fees or expenses related to extensions or restructures).

"*Target Overcollateralization Amount*" means, with respect to any Distribution Date, 19.30% of the sum of (a) the Initial Cutoff Date Pool Balance and (b) the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates.

"*Target Population*" means, in connection with the Framework, the financially underserved population that lacks equitable access to essential services, and are therefore, marginalized, due to the fact that they (i) are credit invisible (i.e. have no FICO® score) or (ii) are low income.

"*Texas Deferred Sales Tax Payments*" means a payment made by an obligor under a Receivable originated in Texas to the Issuer or the Servicer in respect of a Texas Deferred Sales Tax.

"*Texas Deferred Sales Taxes*" means, with respect to Receivables originated in Texas, the portion of Texas sales taxes payable by an obligor over the life of such Receivable.

141

*"Third Priority Principal Distributable Amount"* means, with respect to any Distribution Date, (i) the excess, if any, of the sum of the Class A Note Balance, the Class B Note Balance and the Class C Note Balance on that Distribution Date (before giving effect to any payments to be made on that Distribution Date) over the sum of (a) the Pool Balance and (b) during the Prefunding Period, the Prefunding Account Amount, in each case as of the last day of the related Collection Period, minus (ii) the sum of the First Priority Principal Distributable Amount and the Second Priority Principal Distributable Amount; provided, however, that on and after the Final Scheduled Distribution Date for the Class C Notes, the Third Priority Principal Distributable Amount will not be less than the amount that is necessary to reduce the Class C Note Balance to zero.

*"Total Servicing Fee"* means, with respect to any Distribution Date, the Servicing Fee, the Supplemental Servicing Fee and any accrued but unpaid Servicing Fee and Supplemental Servicing Fee for one or more prior Collection Periods.

*"Transaction Documents"* means the Trust Agreement, the Receivables Purchase Agreement, the Indenture, the Sale and Servicing Agreement, the Administration Agreement and the Note Purchase Agreement.

*"Transaction Parties"* means the Issuer, the Seller, the Depositor, the Servicer, the Sponsor, the Trustees, the Custodian and the Backup Servicer.

*"Transition Costs"* means the reasonable costs and expenses (including reasonable attorneys' fees but excluding overhead) incurred or payable by the Successor Servicer in connection with the transfer of servicing to a Successor Servicer (whether due to termination, resignation or otherwise), including allowable compensation of employees and overhead costs incurred or payable in connection with the transfer of the Receivable files or any amendment to the Sale and Servicing Agreement required in connection with the transfer of servicing.

*"Tricolor"* means Tricolor Auto Acceptance, LLC, and its successors.

*"Tricolor Holdings"* means Tricolor Holdings, LLC, a Delaware limited liability company, and its successors.

*"Trust Agreement"* means the Amended and Restated Trust Agreement, dated as of April 1, 2022, among the Depositor, the Owner Trustee and the Certificate Registrar, as amended, supplemented or otherwise modified from time to time.

*"Trust Property"* has the meaning set forth under *"The Trust Property"*.

*"Trustees"* means the Owner Trustee and the Indenture Trustee.

*"UCC"* means the Uniform Commercial Code, as in effect in the applicable jurisdiction.

*"UK"* means the United Kingdom.

*"UK Institutional Investors"* means, in summary (i) insurance undertakings and reinsurance undertakings as defined in the FSMA; (ii) occupational pension schemes as defined in the Pension Schemes Act 1993 that have their main administration in the UK, and certain fund managers of such schemes; (iii) AIFMs as defined in the Alternative Investment Fund Managers Regulations 2013 which market or manage AIFs (as defined in such Regulations) in the UK; (iv) UCITS as defined in the FSMA, which are authorized open ended investment companies as defined in the FSMA, and management companies as defined in the FSMA; (v) FCA investment firms as defined in Regulation (EU) No 575/2013 as it forms part of UK domestic law by virtue of the EUWA and as amended (the "UK CRR"); and (vi) CRR firms as defined in the UK CRR (and including certain consolidated affiliates of such CRR firms).

*"UK MIFIR Product Governance Rules"* means the FCA Handbook Product Intervention and Product Governance Sourcebook.

*"UK PRIIPs Regulation"* means Regulation (EU) No 1286/2014, as it forms part of UK domestic law by virtue of the EUWA and as amended.

*"UK Prospectus Regulation"* means Regulation (EU) 2017/1129, as it forms part of UK domestic law by virtue of the EUWA and as amended.

*"UK Securitization Regulation"* means Regulation (EU) 2017/2402, as it forms part of UK domestic law by virtue of the EUWA and as amended (including by the Securitisation (Amendment) (EU Exit) Regulations 2019).

*"UK SR Rules"* means the UK Securitization Regulation, together with all technical standards, and all official guidance, applicable in relation thereto, in each case as amended.

*"U.S. Holder"* has the meaning set forth under *"United States Federal Income Tax Considerations"*.

*"Vervent"* means Vervent Inc., a Delaware corporation, and its successors.

*"Volcker Rule"* means the regulations adopted to implement Section 619 of the Dodd-Frank Act, as amended.

*"Wholesale LTV"* means, with respect to a Receivable, the total Amount Financed, which may include taxes, title fees and ancillary products over the value of the related Financed Vehicle at the time of origination.  The motor vehicle value at origination is determined by using NADA or Kelly Blue Book "Trade-In" prices, or, in certain cases, vehicle sales price, for used motor vehicles.

*"Wilmington Trust Company"* means Wilmington Trust Company, and its successors.

*"WTNA"* means Wilmington Trust, National Association, and its successors.

143

**Static Pool Information – Tricolor Originations**
**Quarterly Cumulative Net Loss Rates**

| Total Amount Financed | $6,916,235 | $6,401,691 | $5,387,749 | $4,945,896 | $8,808,774 | $7,013,662 | $6,505,307 | $6,493,350 | $12,964,744 | $12,127,130 |
|---|---|---|---|---|---|---|---|---|---|---|
| Months Seasoned | 2009 1st Quarter | 2009 2nd Quarter | 2009 3rd Quarter | 2009 4th Quarter | 2010 1st Quarter | 2010 2nd Quarter | 2010 3rd Quarter | 2010 4th Quarter | 2011 1st Quarter | 2011 2nd Quarter |
| 0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| 1 | 0.53% | 0.37% | 0.37% | 0.44% | 0.37% | 0.73% | 0.66% | 0.31% | 0.34% | 0.51% |
| 2 | 1.48% | 2.06% | 1.72% | 2.62% | 2.33% | 1.86% | 2.05% | 2.15% | 1.30% | 1.74% |
| 3 | 2.35% | 3.66% | 3.91% | 3.99% | 3.04% | 2.79% | 3.76% | 3.39% | 2.47% | 2.91% |
| 4 | 3.21% | 5.25% | 5.77% | 5.40% | 4.92% | 3.48% | 4.71% | 5.13% | 3.88% | 4.33% |
| 5 | 4.61% | 6.31% | 7.74% | 6.05% | 6.86% | 5.16% | 5.76% | 6.15% | 5.74% | 5.86% |
| 6 | 5.86% | 7.96% | 9.22% | 6.84% | 8.58% | 6.97% | 7.20% | 7.30% | 6.82% | 7.10% |
| 7 | 7.52% | 9.99% | 10.77% | 8.09% | 9.93% | 7.92% | 7.97% | 8.50% | 8.12% | 8.07% |
| 8 | 8.19% | 10.84% | 11.56% | 9.06% | 11.46% | 9.06% | 8.84% | 9.41% | 9.45% | 8.93% |
| 9 | 8.66% | 11.78% | 12.22% | 10.15% | 12.43% | 10.00% | 9.58% | 10.24% | 10.35% | 10.43% |
| 10 | 9.42% | 12.51% | 12.61% | 11.26% | 13.48% | 10.50% | 10.52% | 11.05% | 11.60% | 11.27% |
| 11 | 10.22% | 13.01% | 13.24% | 12.06% | 14.31% | 11.35% | 11.83% | 11.53% | 13.02% | 11.72% |
| 12 | 11.05% | 13.26% | 13.44% | 12.41% | 14.94% | 12.28% | 12.03% | 12.16% | 14.07% | 12.33% |
| 13 | 11.73% | 13.91% | 13.71% | 13.85% | 15.63% | 13.06% | 12.84% | 12.84% | 14.81% | 12.71% |
| 14 | 11.92% | 14.46% | 13.82% | 14.22% | 15.82% | 13.13% | 13.55% | 14.03% | 15.66% | 13.27% |
| 15 | 12.15% | 15.15% | 14.12% | 14.90% | 16.15% | 13.42% | 13.86% | 14.72% | 16.43% | 13.98% |
| 16 | 12.84% | 15.61% | 14.31% | 15.43% | 16.78% | 13.76% | 13.97% | 15.10% | 16.80% | 14.70% |
| 17 | 13.05% | 16.01% | 14.72% | 15.72% | 17.02% | 14.03% | 14.57% | 15.26% | 17.22% | 15.02% |
| 18 | 13.43% | 16.11% | 14.88% | 16.03% | 17.53% | 14.66% | 14.89% | 16.11% | 18.01% | 15.28% |
| 19 | 13.81% | 16.25% | 14.88% | 16.17% | 17.88% | 14.75% | 15.26% | 16.23% | 18.47% | 15.68% |
| 20 | 14.05% | 16.33% | 15.33% | 16.17% | 18.14% | 15.48% | 15.48% | 16.53% | 18.62% | 15.81% |
| 21 | 14.17% | 16.65% | 15.39% | 16.44% | 18.51% | 16.23% | 15.67% | 16.58% | 18.78% | 15.92% |
| 22 | 14.36% | 16.74% | 15.53% | 16.61% | 18.63% | 16.36% | 15.90% | 16.64% | 18.93% | 16.16% |
| 23 | 14.44% | 16.84% | 15.66% | 16.77% | 18.88% | 16.54% | 16.13% | 16.71% | 19.12% | 16.24% |
| 24 | 14.53% | 16.84% | 15.71% | 16.87% | 18.97% | 16.54% | 16.24% | 16.71% | 19.50% | 16.34% |
| 25 | 14.57% | 16.84% | 15.76% | 16.87% | 19.03% | 16.71% | 16.34% | 16.76% | 19.70% | 16.34% |
| 26 | 14.65% | 17.00% | 15.84% | 17.08% | 19.16% | 16.77% | 16.39% | 16.98% | 19.85% | 16.49% |
| 27 | 14.78% | 17.08% | 15.81% | 17.08% | 19.21% | 16.81% | 16.50% | 16.98% | 19.87% | 16.57% |
| 28 | 14.85% | 17.25% | 16.07% | 17.08% | 19.41% | 16.87% | 16.55% | 17.02% | 19.97% | 16.59% |
| 29 | 14.85% | 17.25% | 16.07% | 17.08% | 19.44% | 16.87% | 16.65% | 17.06% | 20.09% | 16.65% |
| 30 | 14.94% | 17.25% | 16.07% | 17.08% | 19.44% | 16.87% | 16.80% | 17.06% | 20.16% | 16.71% |
| 31 | 14.96% | 17.29% | 16.07% | 17.10% | 19.50% | 16.87% | 16.80% | 17.06% | 20.23% | 16.75% |
| 32 | 14.96% | 17.29% | 16.08% | 17.18% | 19.57% | 17.00% | 16.80% | 17.06% | 20.40% | 16.80% |
| 33 | 14.97% | 17.29% | 16.16% | 17.21% | 19.57% | 17.02% | 16.80% | 17.08% | 20.45% | 16.81% |
| 34 | 14.97% | 17.36% | 16.16% | 17.24% | 19.62% | 17.09% | 16.80% | 17.08% | 20.60% | 16.83% |
| 35 | 14.97% | 17.37% | 16.16% | 17.24% | 19.62% | 17.09% | 16.80% | 17.08% | 20.63% | 16.84% |
| 36 | 15.04% | 17.37% | 16.16% | 17.24% | 19.66% | 17.09% | 16.88% | 17.08% | 20.66% | 16.89% |
| 37 | 15.04% | 17.37% | 16.16% | 17.24% | 19.66% | 17.09% | 16.91% | 17.08% | 20.71% | 16.92% |
| 38 | 15.05% | 17.37% | 16.16% | 17.24% | 19.68% | 17.09% | 16.91% | 17.10% | 20.71% | 16.93% |
| 39 | 15.06% | 17.37% | 16.16% | 17.24% | 19.68% | 17.09% | 16.91% | 17.11% | 20.74% | 16.94% |
| 40 | 15.08% | 17.37% | 16.16% | 17.24% | 19.68% | 17.09% | 16.91% | 17.11% | 20.74% | 16.95% |
| 41 | 15.08% | 17.37% | 16.16% | 17.24% | 19.68% | 17.09% | 16.92% | 17.11% | 20.74% | 16.96% |
| 42 | 15.08% | 17.37% | 16.16% | 17.24% | 19.68% | 17.13% | 16.93% | 17.11% | 20.74% | 16.96% |
| 43 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.13% | 16.93% | 17.11% | 20.74% | 16.97% |
| 44 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.13% | 16.94% | 17.11% | 20.77% | 16.97% |
| 45 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.13% | 16.94% | 17.11% | 20.79% | 16.97% |
| 46 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.13% | 16.94% | 17.11% | 20.81% | 16.97% |
| 47 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.13% | 16.94% | 17.11% | 20.81% | 16.97% |
| 48 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.19% | 16.94% | 17.11% | 20.80% | 16.97% |
| 49 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.19% | 16.94% | 17.11% | 20.80% | 16.97% |
| 50 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.19% | 16.94% | 17.11% | 20.80% | 16.97% |
| 51 | 15.08% | 17.37% | 16.16% | 17.24% | 19.67% | 17.19% | 16.94% | 17.11% | 20.80% | 16.97% |
| 52 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.94% | 17.11% | 20.80% | 16.97% |
| 53 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.94% | 17.11% | 20.80% | 16.97% |
| 54 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.95% | 17.11% | 20.80% | 16.97% |
| 55 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.95% | 17.11% | 20.80% | 16.97% |
| 56 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.95% | 17.11% | 20.80% | 16.97% |
| 57 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.95% | 17.11% | 20.80% | 16.97% |
| 58 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.95% | 17.11% | 20.80% | 16.97% |
| 59 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.95% | 17.11% | 20.80% | 16.97% |
| 60 | 15.08% | 17.37% | 16.17% | 17.24% | 19.67% | 17.19% | 16.95% | 17.11% | 20.80% | 16.97% |

| Total Amount Financed | $12,667,657 | $11,054,290 | $20,111,018 | $15,939,771 | $15,362,870 | $15,261,031 | $27,449,689 | $20,496,776 | $22,375,825 | $16,713,013 |
|---|---|---|---|---|---|---|---|---|---|---|
| Months Seasoned | 2011 3rd Quarter | 2011 4th Quarter | 2012 1st Quarter | 2012 2nd Quarter | 2012 3rd Quarter | 2012 4th Quarter | 2013 1st Quarter | 2013 2nd Quarter | 2013 3rd Quarter | 2013 4th Quarter |
| 0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.03% | 0.00% | 0.00% |
| 1 | 0.52% | 0.13% | 0.47% | 0.24% | 0.47% | 0.25% | 0.19% | 0.66% | 0.68% | 0.51% |
| 2 | 2.04% | 2.07% | 2.55% | 1.72% | 2.16% | 1.67% | 1.69% | 2.19% | 2.00% | 1.87% |
| 3 | 3.70% | 3.43% | 4.00% | 3.56% | 4.46% | 3.67% | 3.85% | 3.91% | 3.69% | 4.40% |
| 4 | 5.57% | 4.60% | 5.83% | 4.59% | 6.31% | 5.22% | 5.94% | 5.72% | 5.56% | 6.56% |
| 5 | 6.96% | 5.67% | 7.55% | 6.43% | 7.99% | 7.10% | 7.87% | 7.26% | 7.56% | 8.52% |
| 6 | 7.87% | 6.74% | 8.91% | 7.76% | 9.06% | 7.91% | 9.52% | 8.90% | 10.00% | 10.11% |
| 7 | 8.98% | 7.59% | 9.75% | 8.91% | 10.05% | 9.26% | 11.20% | 10.20% | 11.70% | 10.85% |
| 8 | 9.97% | 8.03% | 10.52% | 9.76% | 11.32% | 10.41% | 12.47% | 11.61% | 12.93% | 11.97% |
| 9 | 10.53% | 8.99% | 11.73% | 10.61% | 12.18% | 11.45% | 13.66% | 12.47% | 13.93% | 13.20% |
| 10 | 11.38% | 9.61% | 12.53% | 11.12% | 13.06% | 12.26% | 14.60% | 13.42% | 14.72% | 14.25% |
| 11 | 11.97% | 10.45% | 13.17% | 11.75% | 13.71% | 13.17% | 15.82% | 14.44% | 15.56% | 15.37% |
| 12 | 12.33% | 10.92% | 13.94% | 12.53% | 14.73% | 13.75% | 16.76% | 15.10% | 16.40% | 16.24% |
| 13 | 12.96% | 11.51% | 14.33% | 13.09% | 15.34% | 14.65% | 17.52% | 15.72% | 17.31% | 17.07% |
| 14 | 13.68% | 11.94% | 14.64% | 13.94% | 16.06% | 15.57% | 18.25% | 16.32% | 17.87% | 18.02% |
| 15 | 14.21% | 12.57% | 14.96% | 14.34% | 16.52% | 16.41% | 18.76% | 16.62% | 18.42% | 18.85% |
| 16 | 14.62% | 12.94% | 15.50% | 14.54% | 17.26% | 17.25% | 19.21% | 17.15% | 18.90% | 19.19% |
| 17 | 15.10% | 13.23% | 15.79% | 14.77% | 17.67% | 18.02% | 19.64% | 17.59% | 19.74% | 19.86% |
| 18 | 15.39% | 13.40% | 15.94% | 15.15% | 17.93% | 18.27% | 19.86% | 18.03% | 20.48% | 20.18% |
| 19 | 15.80% | 13.61% | 16.30% | 15.52% | 18.64% | 18.66% | 20.21% | 18.30% | 21.05% | 20.43% |
| 20 | 16.01% | 13.85% | 16.69% | 15.85% | 18.89% | 19.09% | 20.75% | 18.56% | 21.45% | 20.91% |
| 21 | 16.15% | 13.95% | 17.22% | 16.05% | 19.28% | 19.61% | 20.98% | 19.03% | 21.77% | 21.50% |
| 22 | 16.42% | 13.95% | 17.39% | 16.31% | 19.43% | 19.79% | 21.21% | 19.30% | 21.97% | 21.95% |
| 23 | 16.50% | 14.12% | 17.48% | 16.53% | 19.46% | 20.03% | 21.54% | 19.49% | 22.16% | 22.19% |
| 24 | 16.58% | 14.26% | 17.69% | 16.72% | 19.79% | 20.34% | 21.91% | 19.56% | 22.33% | 22.58% |
| 25 | 16.74% | 14.35% | 17.94% | 16.89% | 20.15% | 20.52% | 22.02% | 19.76% | 22.51% | 22.90% |
| 26 | 16.90% | 14.78% | 18.06% | 17.06% | 20.35% | 20.57% | 22.32% | 19.93% | 22.83% | 23.25% |
| 27 | 16.95% | 14.87% | 18.16% | 17.28% | 20.52% | 20.87% | 22.56% | 20.07% | 23.09% | 23.50% |
| 28 | 17.01% | 15.02% | 18.21% | 17.50% | 20.65% | 21.02% | 22.87% | 20.24% | 23.34% | 23.82% |
| 29 | 17.05% | 15.11% | 18.34% | 17.62% | 20.79% | 21.18% | 22.93% | 20.51% | 23.57% | 23.94% |
| 30 | 17.14% | 15.18% | 18.46% | 17.84% | 20.88% | 21.32% | 23.11% | 20.71% | 23.81% | 24.13% |
| 31 | 17.33% | 15.35% | 18.63% | 17.93% | 20.91% | 21.40% | 23.24% | 20.94% | 23.97% | 24.26% |
| 32 | 17.45% | 15.35% | 18.73% | 18.02% | 20.95% | 21.44% | 23.38% | 21.08% | 24.14% | 24.40% |
| 33 | 17.50% | 15.35% | 18.82% | 18.07% | 20.97% | 21.48% | 23.48% | 21.32% | 24.18% | 24.46% |
| 34 | 17.50% | 15.43% | 18.86% | 18.12% | 20.97% | 21.50% | 23.53% | 21.43% | 24.26% | 24.74% |
| 35 | 17.55% | 15.44% | 18.95% | 18.19% | 21.09% | 21.65% | 23.64% | 21.43% | 24.35% | 24.76% |
| 36 | 17.57% | 15.45% | 19.04% | 18.30% | 21.09% | 21.67% | 23.68% | 21.58% | 24.58% | 24.92% |
| 37 | 17.67% | 15.51% | 19.11% | 18.33% | 21.24% | 21.69% | 23.83% | 21.61% | 24.66% | 25.14% |
| 38 | 17.67% | 15.55% | 19.12% | 18.37% | 21.29% | 21.69% | 23.85% | 21.69% | 24.72% | 25.24% |
| 39 | 17.67% | 15.55% | 19.16% | 18.38% | 21.31% | 21.70% | 23.87% | 21.69% | 24.84% | 25.29% |
| 40 | 17.69% | 15.57% | 19.14% | 18.47% | 21.31% | 21.77% | 23.93% | 21.74% | 24.92% | 25.48% |
| 41 | 17.73% | 15.57% | 19.19% | 18.52% | 21.32% | 21.77% | 23.95% | 21.77% | 25.01% | 25.66% |
| 42 | 17.73% | 15.57% | 19.29% | 18.52% | 21.36% | 21.75% | 23.99% | 21.78% | 25.05% | 25.70% |
| 43 | 17.73% | 15.57% | 19.38% | 18.57% | 21.37% | 21.74% | 24.03% | 21.78% | 25.24% | 25.74% |
| 44 | 17.73% | 15.57% | 19.41% | 18.63% | 21.38% | 21.75% | 24.06% | 21.78% | 25.26% | 25.74% |
| 45 | 17.73% | 15.57% | 19.41% | 18.67% | 21.40% | 21.75% | 24.08% | 21.80% | 25.27% | 25.80% |
| 46 | 17.76% | 15.57% | 19.41% | 18.67% | 21.43% | 21.75% | 24.08% | 21.80% | 25.27% | 25.82% |
| 47 | 17.76% | 15.57% | 19.43% | 18.69% | 21.44% | 21.78% | 24.09% | 21.82% | 25.34% | 25.82% |
| 48 | 17.76% | 15.57% | 19.46% | 18.69% | 21.44% | 21.78% | 24.15% | 21.88% | 25.36% | 25.82% |
| 49 | 17.76% | 15.57% | 19.46% | 18.69% | 21.45% | 21.81% | 24.16% | 21.88% | 25.36% | 25.85% |
| 50 | 17.76% | 15.57% | 19.46% | 18.69% | 21.45% | 21.81% | 24.17% | 21.88% | 25.38% | 25.85% |
| 51 | 17.76% | 15.57% | 19.46% | 18.69% | 21.47% | 21.83% | 24.17% | 21.92% | 25.38% | 25.85% |
| 52 | 17.76% | 15.57% | 19.46% | 18.72% | 21.47% | 21.83% | 24.17% | 21.95% | 25.38% | 25.87% |
| 53 | 17.76% | 15.57% | 19.46% | 18.72% | 21.47% | 21.83% | 24.17% | 21.95% | 25.38% | 25.87% |
| 54 | 17.76% | 15.57% | 19.46% | 18.73% | 21.47% | 21.83% | 24.19% | 21.96% | 25.38% | 25.88% |
| 55 | 17.76% | 15.57% | 19.46% | 18.73% | 21.47% | 21.83% | 24.19% | 21.96% | 25.38% | 25.90% |
| 56 | 17.76% | 15.57% | 19.48% | 18.75% | 21.47% | 21.83% | 24.19% | 21.97% | 25.38% | 25.90% |
| 57 | 17.76% | 15.57% | 19.48% | 18.75% | 21.47% | 21.83% | 24.19% | 21.97% | 25.38% | 25.90% |
| 58 | 17.76% | 15.57% | 19.49% | 18.75% | 21.47% | 21.83% | 24.19% | 21.97% | 25.38% | 25.91% |
| 59 | 17.76% | 15.51% | 19.50% | 18.75% | 21.47% | 21.83% | 24.19% | 21.97% | 25.38% | 25.94% |
| 60 | 17.76% | 15.51% | 19.50% | 18.75% | 21.47% | 21.83% | 24.19% | 21.97% | 25.38% | 25.94% |

A-2

| Total Amount Financed | $31,375,640 | $20,079,269 | $20,395,500 | $17,446,512 | $32,983,005 | $25,916,509 | $23,053,933 | $18,401,755 | $33,450,564 | $29,881,765 |
|---|---|---|---|---|---|---|---|---|---|---|
| Months Seasoned | 2014 1st Quarter | 2014 2nd Quarter | 2014 3rd Quarter | 2014 4th Quarter | 2015 1st Quarter | 2015 2nd Quarter | 2015 3rd Quarter | 2015 4th Quarter | 2016 1st Quarter | 2016 2nd Quarter |
| 0 | 0.00% | 0.03% | 0.09% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.08% | 0.00% |
| 1 | 0.51% | 0.61% | 1.01% | 1.53% | 0.48% | 0.73% | 0.67% | 0.40% | 0.58% | 0.44% |
| 2 | 1.40% | 1.94% | 2.11% | 3.23% | 1.94% | 1.70% | 2.19% | 1.81% | 1.60% | 1.60% |
| 3 | 2.85% | 3.56% | 4.21% | 4.92% | 3.59% | 3.20% | 4.14% | 3.35% | 3.16% | 2.77% |
| 4 | 4.59% | 5.21% | 5.97% | 6.39% | 5.42% | 5.25% | 5.96% | 4.74% | 4.88% | 4.40% |
| 5 | 6.64% | 6.90% | 7.18% | 7.46% | 7.08% | 7.57% | 7.53% | 6.42% | 7.01% | 6.48% |
| 6 | 8.53% | 8.27% | 8.75% | 8.69% | 9.09% | 9.25% | 9.21% | 7.67% | 8.61% | 7.83% |
| 7 | 10.22% | 9.13% | 9.83% | 10.24% | 11.85% | 10.39% | 10.79% | 8.99% | 10.66% | 8.77% |
| 8 | 11.40% | 10.55% | 11.16% | 11.77% | 13.44% | 11.53% | 12.07% | 9.82% | 12.00% | 9.73% |
| 9 | 12.94% | 11.85% | 11.95% | 12.88% | 14.84% | 12.87% | 13.63% | 11.04% | 13.18% | 10.79% |
| 10 | 13.87% | 12.96% | 13.13% | 14.35% | 16.47% | 14.35% | 15.01% | 12.52% | 14.12% | 12.04% |
| 11 | 15.26% | 13.82% | 13.73% | 15.65% | 17.13% | 15.45% | 16.13% | 13.82% | 15.36% | 12.80% |
| 12 | 16.41% | 14.38% | 14.84% | 16.57% | 18.49% | 16.29% | 17.51% | 14.85% | 16.57% | 13.97% |
| 13 | 17.31% | 15.28% | 16.04% | 17.40% | 19.08% | 17.52% | 18.42% | 15.68% | 17.79% | 14.82% |
| 14 | 18.14% | 16.19% | 16.64% | 18.21% | 19.72% | 18.39% | 19.36% | 16.92% | 18.54% | 15.57% |
| 15 | 18.90% | 16.78% | 17.44% | 19.32% | 20.19% | 19.19% | 20.25% | 17.60% | 18.97% | 16.12% |
| 16 | 19.33% | 17.38% | 18.13% | 20.29% | 20.81% | 20.16% | 20.93% | 18.64% | 19.76% | 16.70% |
| 17 | 20.12% | 17.97% | 18.91% | 21.55% | 21.22% | 21.03% | 21.53% | 18.97% | 20.68% | 17.24% |
| 18 | 21.05% | 18.72% | 19.63% | 22.32% | 21.78% | 21.57% | 22.00% | 19.54% | 21.46% | 17.58% |
| 19 | 21.55% | 19.06% | 20.18% | 23.00% | 22.34% | 22.12% | 22.60% | 20.06% | 22.13% | 18.02% |
| 20 | 22.07% | 19.42% | 20.75% | 23.50% | 22.63% | 22.79% | 23.32% | 20.63% | 22.47% | 18.33% |
| 21 | 22.67% | 20.04% | 20.99% | 24.12% | 23.01% | 23.30% | 23.92% | 21.22% | 22.73% | 18.91% |
| 22 | 22.99% | 20.50% | 21.72% | 24.36% | 23.37% | 23.73% | 24.35% | 21.58% | 23.08% | 19.50% |
| 23 | 23.24% | 20.96% | 22.14% | 24.54% | 23.69% | 24.21% | 24.70% | 21.88% | 23.32% | 19.85% |
| 24 | 23.67% | 21.13% | 22.34% | 24.99% | 24.17% | 24.61% | 25.21% | 22.09% | 23.66% | 20.03% |
| 25 | 23.99% | 21.51% | 22.88% | 25.29% | 24.55% | 24.93% | 25.75% | 22.45% | 24.00% | 20.28% |
| 26 | 24.19% | 21.71% | 23.29% | 25.44% | 25.06% | 25.34% | 26.13% | 22.55% | 24.32% | 20.43% |
| 27 | 24.72% | 21.86% | 23.49% | 25.58% | 25.52% | 25.48% | 26.33% | 22.93% | 24.56% | 20.63% |
| 28 | 24.91% | 22.02% | 23.64% | 25.91% | 25.98% | 25.63% | 26.49% | 23.29% | 24.91% | 21.03% |
| 29 | 24.98% | 22.25% | 23.90% | 26.26% | 26.25% | 25.68% | 26.66% | 23.63% | 25.10% | 21.22% |
| 30 | 25.28% | 22.38% | 24.15% | 26.54% | 26.37% | 25.86% | 26.98% | 23.78% | 25.27% | 21.40% |
| 31 | 25.61% | 22.54% | 24.34% | 26.76% | 26.56% | 25.93% | 27.02% | 23.78% | 25.50% | 21.51% |
| 32 | 25.77% | 22.71% | 24.61% | 26.87% | 26.77% | 26.13% | 27.19% | 23.89% | 25.66% | 21.54% |
| 33 | 25.84% | 22.91% | 24.70% | 26.97% | 26.87% | 26.23% | 27.31% | 24.17% | 25.92% | 21.70% |
| 34 | 25.98% | 23.05% | 24.98% | 27.15% | 27.03% | 26.34% | 27.39% | 24.19% | 26.05% | 21.82% |
| 35 | 26.17% | 23.10% | 25.06% | 27.26% | 27.25% | 26.39% | 27.49% | 24.27% | 26.13% | 21.83% |
| 36 | 26.33% | 23.20% | 25.18% | 27.37% | 27.38% | 26.52% | 27.55% | 24.35% | 26.24% | 21.88% |
| 37 | 26.57% | 23.31% | 25.18% | 27.38% | 27.52% | 26.55% | 27.58% | 24.35% | 26.29% | 21.94% |
| 38 | 26.76% | 23.50% | 25.27% | 27.42% | 27.59% | 26.55% | 27.65% | 24.38% | 26.34% | 21.94% |
| 39 | 26.90% | 23.57% | 25.31% | 27.42% | 27.63% | 26.60% | 27.67% | 24.45% | 26.40% | 22.00% |
| 40 | 26.98% | 23.63% | 25.35% | 27.44% | 27.66% | 26.73% | 27.68% | 24.51% | 26.44% | 22.05% |
| 41 | 27.05% | 23.69% | 25.38% | 27.50% | 27.66% | 26.79% | 27.78% | 24.53% | 26.45% | 22.07% |
| 42 | 27.07% | 23.71% | 25.39% | 27.53% | 27.77% | 26.85% | 27.80% | 24.54% | 26.46% | 22.07% |
| 43 | 27.10% | 23.78% | 25.43% | 27.53% | 27.82% | 26.90% | 27.80% | 24.55% | 26.51% | 22.10% |
| 44 | 27.16% | 23.80% | 25.43% | 27.59% | 27.85% | 26.94% | 27.80% | 24.59% | 26.56% | 22.13% |
| 45 | 27.20% | 23.82% | 25.48% | 27.61% | 27.88% | 26.97% | 27.80% | 24.59% | 26.58% | 22.14% |
| 46 | 27.20% | 23.86% | 25.48% | 27.62% | 27.88% | 26.97% | 27.80% | 24.59% | 26.61% | 22.14% |
| 47 | 27.21% | 23.85% | 25.49% | 27.66% | 27.92% | 26.98% | 27.81% | 24.63% | 26.62% | 22.17% |
| 48 | 27.22% | 23.85% | 25.49% | 27.70% | 27.92% | 26.98% | 27.83% | 24.66% | 26.63% | 22.20% |
| 49 | 27.23% | 23.89% | 25.52% | 27.73% | 27.95% | 26.98% | 27.89% | 24.72% | 26.65% | 22.24% |
| 50 | 27.23% | 23.89% | 25.53% | 27.73% | 27.96% | 27.00% | 27.91% | 24.72% | 26.65% | 22.24% |
| 51 | 27.23% | 23.89% | 25.53% | 27.73% | 27.97% | 27.00% | 27.91% | 24.76% | 26.66% | 22.24% |
| 52 | 27.23% | 23.89% | 25.53% | 27.74% | 27.97% | 27.02% | 27.91% | 24.76% | 26.66% | 22.24% |
| 53 | 27.24% | 23.89% | 25.53% | 27.74% | 27.98% | 27.02% | 27.92% | 24.79% | 26.73% | 22.26% |
| 54 | 27.25% | 23.92% | 25.53% | 27.74% | 28.01% | 27.03% | 27.94% | 24.80% | 26.74% | 22.27% |
| 55 | 27.25% | 23.92% | 25.54% | 27.74% | 28.01% | 27.03% | 27.94% | 24.81% | 26.74% | 22.27% |
| 56 | 27.25% | 23.93% | 25.54% | 27.75% | 28.01% | 27.04% | 27.94% | 24.81% | 26.75% | 22.28% |
| 57 | 27.27% | 23.93% | 25.54% | 27.75% | 28.01% | 27.04% | 27.95% | 24.83% | 26.75% | 22.28% |
| 58 | 27.27% | 23.95% | 25.54% | 27.76% | 28.01% | 27.04% | 27.94% | 24.84% | 26.75% | 22.29% |
| 59 | 27.27% | 23.95% | 25.54% | 27.76% | 28.02% | 27.04% | 27.94% | 24.85% | 26.75% | 22.29% |
| 60 | 27.27% | 23.95% | 25.54% | 27.79% | 28.02% | 27.04% | 27.94% | 24.85% | 26.75% | 22.29% |

| Total Amount Financed | $34,976,552 | $29,888,058 | $36,081,920 | $32,730,434 | $34,945,847 | $33,770,055 | $46,983,837 | $42,120,404 | $46,573,328 | $33,328,642 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Months Seasoned** | **2016 3rd Quarter** | **2016 4th Quarter** | **2017 1st Quarter** | **2017 2nd Quarter** | **2017 3rd Quarter** | **2017 4th Quarter** | **2018 1st Quarter** | **2018 2nd Quarter** | **2018 3rd Quarter** | **2018 4th Quarter** |
| 0 | 0.01% | 0.07% | 0.03% | 0.06% | 0.02% | 0.01% | 0.00% | 0.00% | 0.01% | 0.00% |
| 1 | 0.61% | 0.93% | 0.57% | 0.61% | 0.13% | 0.07% | 0.01% | 0.08% | 0.18% | 0.26% |
| 2 | 1.75% | 2.32% | 1.91% | 1.98% | 1.08% | 0.21% | 0.22% | 0.52% | 1.11% | 1.01% |
| 3 | 3.12% | 4.09% | 3.89% | 3.27% | 1.85% | 1.23% | 0.64% | 1.30% | 2.14% | 2.18% |
| 4 | 4.70% | 5.90% | 5.94% | 5.05% | 2.56% | 2.73% | 1.91% | 2.92% | 3.42% | 3.80% |
| 5 | 6.79% | 7.32% | 7.79% | 6.29% | 4.65% | 4.20% | 3.65% | 4.41% | 4.74% | 5.46% |
| 6 | 8.58% | 8.61% | 9.37% | 7.52% | 7.27% | 5.18% | 5.38% | 6.22% | 6.34% | 6.72% |
| 7 | 9.63% | 10.04% | 10.75% | 8.50% | 8.54% | 6.74% | 7.37% | 7.73% | 8.27% | 8.35% |
| 8 | 10.63% | 10.83% | 12.39% | 9.65% | 9.78% | 7.99% | 9.37% | 8.56% | 9.63% | 9.74% |
| 9 | 12.15% | 11.85% | 13.38% | 11.36% | 10.56% | 9.40% | 10.67% | 9.80% | 10.65% | 10.49% |
| 10 | 12.95% | 12.79% | 14.40% | 12.72% | 11.61% | 10.97% | 11.99% | 10.97% | 11.53% | 11.50% |
| 11 | 13.92% | 13.62% | 16.09% | 13.69% | 12.67% | 12.38% | 13.05% | 11.96% | 12.40% | 12.48% |
| 12 | 14.61% | 14.17% | 17.51% | 14.51% | 13.67% | 13.38% | 14.08% | 12.70% | 13.09% | 13.32% |
| 13 | 15.53% | 14.77% | 18.24% | 15.31% | 14.51% | 14.29% | 15.03% | 13.19% | 13.74% | 14.25% |
| 14 | 16.12% | 15.36% | 19.03% | 16.54% | 15.48% | 15.11% | 15.71% | 13.65% | 14.51% | 14.61% |
| 15 | 16.69% | 16.09% | 19.72% | 17.24% | 16.27% | 15.84% | 16.30% | 14.47% | 14.97% | 15.08% |
| 16 | 17.18% | 16.71% | 20.54% | 18.08% | 17.11% | 16.50% | 16.81% | 14.91% | 15.43% | 15.26% |
| 17 | 17.60% | 17.38% | 21.28% | 19.15% | 17.56% | 17.00% | 17.32% | 15.45% | 15.64% | 15.59% |
| 18 | 18.06% | 18.22% | 22.12% | 19.62% | 18.19% | 17.34% | 17.83% | 15.82% | 15.88% | 15.65% |
| 19 | 18.42% | 18.59% | 22.81% | 20.03% | 18.59% | 17.61% | 18.39% | 16.11% | 16.07% | 15.78% |
| 20 | 19.07% | 18.94% | 23.64% | 20.31% | 18.95% | 18.08% | 18.95% | 16.33% | 16.23% | 15.85% |
| 21 | 19.44% | 19.43% | 24.40% | 20.81% | 19.20% | 18.62% | 19.27% | 16.52% | 16.47% | 16.03% |
| 22 | 19.78% | 19.65% | 24.71% | 21.03% | 19.41% | 19.08% | 19.83% | 16.58% | 16.55% | 16.58% |
| 23 | 20.39% | 20.06% | 24.97% | 21.37% | 19.72% | 19.30% | 20.32% | 16.74% | 16.60% | 16.83% |
| 24 | 20.49% | 20.45% | 25.31% | 21.60% | 19.96% | 19.58% | 20.82% | 16.72% | 16.65% | 17.08% |
| 25 | 20.83% | 20.76% | 25.60% | 21.73% | 20.18% | 19.74% | 21.15% | 16.81% | 16.91% | 17.52% |
| 26 | 21.14% | 21.14% | 25.80% | 21.87% | 20.50% | 20.16% | 21.63% | 16.92% | 17.03% | 17.79% |
| 27 | 21.21% | 21.31% | 26.04% | 22.03% | 20.70% | 20.38% | 21.83% | 17.03% | 17.27% | 17.97% |
| 28 | 21.39% | 21.42% | 26.23% | 22.31% | 20.90% | 20.73% | 21.89% | 17.15% | 17.51% | 18.22% |
| 29 | 21.58% | 21.58% | 26.36% | 22.45% | 21.00% | 21.01% | 21.98% | 17.42% | 17.70% | 18.39% |
| 30 | 21.78% | 21.72% | 26.63% | 22.66% | 21.18% | 21.29% | 22.12% | 17.62% | 17.87% | 18.47% |
| 31 | 21.86% | 21.90% | 26.78% | 22.83% | 21.37% | 21.48% | 22.38% | 17.75% | 17.98% | 18.59% |
| 32 | 22.00% | 21.98% | 26.84% | 23.06% | 21.64% | 21.58% | 22.58% | 17.87% | 18.07% | 18.72% |
| 33 | 22.02% | 22.03% | 26.94% | 23.18% | 21.71% | 21.79% | 22.74% | 17.97% | 18.13% | 18.84% |
| 34 | 22.07% | 22.10% | 27.02% | 23.28% | 21.78% | 21.95% | 22.81% | 18.08% | 18.20% | 18.93% |
| 35 | 22.14% | 22.16% | 27.14% | 23.40% | 21.94% | 22.02% | 22.95% | 18.15% | 18.23% | 18.97% |
| 36 | 22.28% | 22.25% | 27.26% | 23.46% | 22.09% | 22.05% | 23.08% | 18.24% | 18.26% | 19.00% |
| 37 | 22.30% | 22.29% | 27.38% | 23.50% | 22.15% | 22.10% | 23.14% | 18.28% | 18.31% | 19.06% |
| 38 | 22.34% | 22.33% | 27.42% | 23.54% | 22.19% | 22.19% | 23.24% | 18.29% | 18.30% | 19.11% |
| 39 | 22.39% | 22.42% | 27.44% | 23.68% | 22.26% | 22.21% | 23.24% | 18.35% | 18.37% | 19.14% |
| 40 | 22.49% | 22.48% | 27.49% | 23.70% | 22.38% | 22.27% | 23.27% | 18.38% | 18.38% | |
| 41 | 22.52% | 22.48% | 27.55% | 23.77% | 22.40% | 22.30% | 23.31% | 18.42% | 18.38% | |
| 42 | 22.54% | 22.53% | 27.61% | 23.80% | 22.42% | 22.32% | 23.33% | 18.41% | 18.38% | |
| 43 | 22.56% | 22.56% | 27.65% | 23.85% | 22.43% | 22.36% | 23.37% | 18.41% | | |
| 44 | 22.55% | 22.58% | 27.71% | 23.86% | 22.45% | 22.37% | 23.39% | 18.41% | | |
| 45 | 22.54% | 22.61% | 27.74% | 23.87% | 22.46% | 22.37% | 23.40% | 18.41% | | |
| 46 | 22.56% | 22.67% | 27.72% | 23.88% | 22.47% | 22.37% | 23.42% | | | |
| 47 | 22.59% | 22.68% | 27.73% | 23.88% | 22.47% | 22.36% | 23.39% | | | |
| 48 | 22.60% | 22.68% | 27.75% | 23.88% | 22.47% | 22.36% | 23.39% | | | |
| 49 | 22.65% | 22.72% | 27.76% | 23.89% | 22.46% | 22.35% | | | | |
| 50 | 22.66% | 22.74% | 27.78% | 23.89% | 22.46% | 22.34% | | | | |
| 51 | 22.68% | 22.74% | 27.78% | 23.89% | 22.46% | 22.34% | | | | |
| 52 | 22.67% | 22.75% | 27.78% | 23.89% | 22.46% | | | | | |
| 53 | 22.68% | 22.76% | 27.78% | 23.90% | 22.46% | | | | | |
| 54 | 22.68% | 22.76% | 27.79% | 23.90% | 22.46% | | | | | |
| 55 | 22.68% | 22.76% | 27.79% | 23.91% | | | | | | |
| 56 | 22.68% | 22.76% | 27.77% | 23.91% | | | | | | |
| 57 | 22.68% | 22.75% | 27.77% | 23.91% | | | | | | |
| 58 | 22.68% | 22.75% | 27.78% | | | | | | | |
| 59 | 22.68% | 22.75% | 27.78% | | | | | | | |
| 60 | 22.68% | 22.75% | 27.78% | | | | | | | |

A-4

| Total Amount Financed | $46,996,918 | $47,723,311 | $56,982,851 | $47,717,921 | $61,629,806 | $63,005,542 | $60,086,819 | $57,193,718 | $92,213,480 | $105,140,420 |
|---|---|---|---|---|---|---|---|---|---|---|
| Months Seasoned | 2019 1st Quarter | 2019 2nd Quarter | 2019 3rd Quarter | 2019 4th Quarter | 2020 1st Quarter | 2020 2nd Quarter | 2020 3rd Quarter | 2020 4th Quarter | 2021 1st Quarter | 2021 2nd Quarter |
| 0 | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.01% | 0.00% |
| 1 | 0.18% | 0.01% | 0.09% | 0.02% | 0.02% | 0.01% | 0.05% | 0.07% | 0.11% | 0.12% |
| 2 | 0.99% | 0.50% | 0.34% | 0.23% | 0.14% | 0.05% | 0.29% | 0.28% | 0.34% | 0.39% |
| 3 | 1.70% | 1.63% | 1.12% | 0.90% | 1.01% | 0.42% | 0.69% | 0.70% | 0.64% | 0.78% |
| 4 | 3.05% | 2.69% | 2.45% | 3.16% | 2.72% | 1.55% | 1.87% | 1.62% | 1.41% | 1.85% |
| 5 | 4.54% | 4.31% | 5.01% | 5.13% | 4.00% | 2.99% | 3.32% | 3.53% | 2.73% | 3.67% |
| 6 | 6.22% | 5.97% | 6.92% | 7.10% | 5.18% | 4.18% | 4.91% | 4.60% | 3.69% | 5.48% |
| 7 | 7.92% | 7.75% | 8.65% | 8.29% | 6.71% | 5.42% | 5.76% | 5.86% | 4.74% | 7.25% |
| 8 | 9.33% | 9.02% | 10.08% | 8.76% | 7.84% | 6.55% | 6.90% | 6.90% | 5.79% | 8.22% |
| 9 | 10.19% | 10.27% | 11.06% | 9.40% | 8.72% | 7.37% | 7.96% | 7.50% | 6.71% | 8.54% |
| 10 | 11.59% | 11.48% | 11.96% | 10.13% | 9.55% | 8.27% | 8.99% | 8.32% | 7.57% | |
| 11 | 12.54% | 12.12% | 12.34% | 10.97% | 10.29% | 9.38% | 9.66% | 9.23% | 8.09% | |
| 12 | 13.54% | 12.75% | 12.71% | 11.81% | 10.93% | 10.15% | 10.51% | 9.88% | 8.29% | |
| 13 | 13.89% | 13.26% | 13.20% | 12.30% | 11.77% | 11.15% | 11.39% | 10.45% | | |
| 14 | 14.33% | 13.54% | 13.84% | 12.80% | 12.53% | 11.79% | 12.26% | 10.92% | | |
| 15 | 14.61% | 13.84% | 14.26% | 13.29% | 13.59% | 12.31% | 12.85% | 11.11% | | |
| 16 | 14.55% | 14.19% | 14.65% | 13.97% | 14.34% | 12.94% | 13.33% | | | |
| 17 | 14.62% | 14.76% | 15.04% | 14.46% | 14.93% | 13.32% | 13.63% | | | |
| 18 | 14.82% | 15.36% | 15.38% | 14.89% | 15.39% | 13.79% | 13.73% | | | |
| 19 | 15.26% | 15.65% | 15.83% | 15.25% | 15.66% | 14.12% | | | | |
| 20 | 15.53% | 15.92% | 16.26% | 15.71% | 16.00% | 14.31% | | | | |
| 21 | 15.85% | 16.24% | 16.67% | 16.00% | 16.34% | 14.42% | | | | |
| 22 | 16.06% | 16.63% | 17.03% | 16.33% | 16.47% | | | | | |
| 23 | 16.48% | 16.83% | 17.32% | 16.53% | 16.56% | | | | | |
| 24 | 16.73% | 17.22% | 17.50% | 16.65% | 16.59% | | | | | |
| 25 | 17.04% | 17.54% | 17.71% | 16.75% | | | | | | |
| 26 | 17.25% | 17.67% | 17.82% | 16.93% | | | | | | |
| 27 | 17.60% | 17.86% | 17.99% | 17.03% | | | | | | |
| 28 | 17.73% | 18.06% | 18.13% | | | | | | | |
| 29 | 17.86% | 18.20% | 18.22% | | | | | | | |
| 30 | 18.08% | 18.25% | 18.26% | | | | | | | |
| 31 | 18.28% | 18.34% | | | | | | | | |
| 32 | 18.42% | 18.39% | | | | | | | | |
| 33 | 18.49% | 18.42% | | | | | | | | |
| 34 | 18.61% | | | | | | | | | |
| 35 | 18.66% | | | | | | | | | |
| 36 | 18.68% | | | | | | | | | |

A-5

| Total Amount Financed | $107,618,810 | $113,203,479 | $38,895,122 |
|---|---|---|---|
| **Months Seasoned** | **2021 3rd Quarter** | **2021 4th Quarter** | **2022 1st Quarter** |
| 0 | 0.03% | 0.00% | 0.00% |
| 1 | 0.17% | 0.07% | |
| 2 | 0.45% | 0.23% | |
| 3 | 0.77% | 0.41% | |
| 4 | 1.87% | | |
| 5 | 3.01% | | |
| 6 | 3.46% | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |

A-6

# $212,130,000
# Tricolor Auto Securitization Trust 2022-1
Issuer

———————

## Tricolor Auto Receivables 2 LLC
Depositor

## Tricolor Auto Acceptance, LLC
Sponsor, Servicer and Administrator

———————

| | |
|---|---|
| **$125,560,000** | **3.30% Class A Asset Backed Notes** |
| **$13,470,000** | **4.34% Class B Asset Backed Notes** |
| **$13,980,000** | **4.71% Class C Asset Backed Notes** |
| **$25,140,000** | **5.38% Class D Asset Backed Notes** |
| **$21,160,000** | **7.79% Class E Asset Backed Notes** |
| **$12,820,000** | **9.80% Class F Asset Backed Notes** |

———————

## OFFERING MEMORANDUM

———————

You should rely only on the information contained in this Offering Memorandum. The Depositor has not authorized anyone to provide you with additional or different information. The Depositor is not offering the Notes in any jurisdiction in which the offer is not permitted.

| *Bookrunner and Structuring Agent* | | *Co-Manager* |
|---|---|---|
| **J.P. Morgan** | | **Barclays** |

**April 29, 2022**