# EXHIBIT A

*Execution Version*

$223,970,000

TRICOLOR AUTO SECURITIZATION TRUST 2023-1

$138,940,000 6.48% Class A Asset Backed Notes
$12,400,000  6.84% Class B Asset Backed Notes
$14,980,000  7.24% Class C Asset Backed Notes
$23,790,000  8.56% Class D Asset Backed Notes
$19,450,000  13.45% Class E Asset Backed Notes
$14,410,000  16.00% Class F Asset Backed Notes

TRICOLOR AUTO RECEIVABLES 2 LLC
Depositor

TRICOLOR AUTO ACCEPTANCE, LLC
Sponsor

NOTE PURCHASE AGREEMENT

February 9, 2023

J.P. Morgan Securities LLC
        as Representative of the
        Initial Purchasers
383 Madison Ave, 8th Floor
New York, New York 10179

Ladies and Gentlemen:

Tricolor Auto Acceptance, LLC, a Delaware limited liability company ("Tricolor" or the "Sponsor"), proposes to cause Tricolor Auto Securitization Trust 2023-1, a Delaware statutory trust (the "Issuer"), to issue (a) $138,940,000 aggregate principal amount of 6.48% Class A Asset Backed Notes (the "Class A Notes"), $12,400,000 aggregate principal amount of 6.84% Class B Asset Backed Notes (the "Class B Notes"), $14,980,000 aggregate principal amount of 7.24% Class C Asset Backed Notes (the "Class C Notes"), $23,790,000 aggregate principal amount of 8.56% Class D Asset Backed Notes (the "Class D Notes"), $19,450,000 aggregate principal amount of 13.45% Class E Asset Backed Notes (the "Class E Notes"), and $14,410,000 aggregate principal amount of 16.00% Class F Asset Backed Notes (the "Class F Notes" and, collectively with the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, and the Class E Notes, the "Notes") pursuant to the terms of an indenture, to be dated as of February 1, 2023 (the "Indenture"), between the Issuer and Wilmington Trust, National Association ("WTNA"), as indenture trustee (in such capacity, the "Indenture Trustee"), and (b) Asset Backed Certificates (the "Certificates" and, collectively with the Notes, the "Securities"), pursuant to the terms of an amended and restated trust agreement, dated as of February 1, 2023 (the "Trust Agreement"), between Tricolor Auto Receivables 2 LLC, a Delaware limited liability company (the "Depositor") and Wilmington Trust Company ("Wilmington Trust"), as owner

trustee (in such capacity, the "Owner Trustee"). The Depositor, a wholly-owned affiliate of Tricolor, intends to retain on the Closing Date (as defined in Section 2(b)) a portion of the Certificates which constitutes at least 5% of the fair value of all of the Notes and the Certificates, pursuant to the requirements of the final rules contained in Regulation RR, 17 C.F.R. §246.1, *et seq.*, implementing the credit risk retention requirements of Section 15G of the Exchange Act.

Each of Tricolor and the Depositor are sometimes referred to herein as a "Tricolor Entity", and together as the "Tricolor Entities". Capitalized terms used herein that are not otherwise defined shall have the meanings ascribed thereto in the Indenture.

Tricolor proposes to cause the Depositor to sell the Notes in the respective amounts set forth on Schedule I hereto, to the initial purchasers set forth on Schedule I hereto (the "Initial Purchasers") for whom J.P. Morgan Securities LLC is acting as representative (the "Representative"). Upon issuance, the Notes will be secured mainly by a pool of subprime motor vehicle installment sale contracts (the "Receivables").

The Depositor will acquire the Receivables from Tricolor pursuant to the terms of a receivables purchase agreement, to be dated as of February 1, 2023 (the "Receivables Purchase Agreement"), between Tricolor, as seller (in such capacity, the "Seller"), and the Depositor, as purchaser. The Receivables will be acquired by the Issuer from the Depositor pursuant to the terms of a sale and servicing agreement, dated as of February 1, 2023 (the "Sale and Servicing Agreement"), among the Issuer, Tricolor, as servicer (in such capacity, the "Servicer"), the Seller, the Depositor, the Indenture Trustee, WTNA, as custodian (in such capacity, the "Custodian"), and Vervent, Inc., as backup servicer (in such capacity, the "Backup Servicer").

The Receivables will be serviced on behalf of the Issuer by the Servicer, the Backup Servicer will agree to perform certain backup servicing functions with respect to the Receivables, and the Custodian will agree to take custody of the Receivables and certain related documents, in each case pursuant to the terms of the Sale and Servicing Agreement.

Pursuant to an Administration Agreement, to be dated as of February 1, 2023 (the "Administration Agreement"), among Tricolor, as administrator (in such capacity, the "Administrator"), the Depositor, the Issuer and the Indenture Trustee, the Administrator will agree to perform various administrative functions on behalf of the Issuer.

This Agreement, the Indenture, the Trust Agreement, the Receivables Purchase Agreement, the Sale and Servicing Agreement, and the Administration Agreement are collectively referred to herein as the "Transaction Documents."

The sale of the Notes to the Initial Purchasers, and the offer and sale of the Notes by the Initial Purchasers, will each be made without registration of the Notes under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon one or more exemptions from the registration requirements of the Securities Act. The Initial Purchasers intend to offer the Notes for sale to Persons who are (i) "qualified institutional buyers" ("QIBs") within the meaning of Rule 144A under the Securities Act ("Rule 144A") except that with respect to the Class E and Class F Notes, no sales or transfers may be to investors who are not U.S. Persons and any such

transfer or sale shall be deemed to be null and void and (ii) solely with respect to the initial transfer of the Notes from the Depositor to the Initial Purchasers, institutional "accredited investors" ("IAIs") within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act. The Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Class F Notes will each initially be represented by one or more global notes registered in the name of Cede & Co., the nominee of The Depository Trust Company ("DTC"). The interests of beneficial owners of the Notes will be represented by book entries on the records of DTC and direct or indirect participating members thereof. Definitive notes evidencing the Notes will be available to owners of the Notes only under the limited circumstances specified in the Indenture.

In connection with the sale of the Notes, the Depositor has prepared and delivered to the Initial Purchasers a preliminary offering memorandum, dated February 2, 2023 (the "Preliminary Offering Memorandum"), and has prepared and delivered, or will prepare and deliver, to the Initial Purchasers, on or promptly after the date hereof, a final offering memorandum, to be dated as of the Time of Sale (collectively with any documents incorporated by reference therein, the "Final Offering Memorandum"), in each case relating to the sale of the Notes.

At or prior to 1:05 p.m. (EST) on February 9, 2023, which is the time and date the first Contract of Sale (as defined below) for the Notes was entered into, as designated by the Initial Purchasers (the "Time of Sale"), the following information was prepared (collectively, the "Time of Sale Information"): the Preliminary Offering Memorandum and the Marketing Materials (as defined below).

As used herein, the term "Contract of Sale" shall have the meaning given to such term in Rule 159 under the rules and regulations of the U.S. Securities and Exchange Commission (the "Commission") under the Securities Act ("Rule 159" and the "Securities Act Regulations", respectively). Any reference herein to the Preliminary Offering Memorandum or the Final Offering Memorandum shall be deemed to refer to and include the documents incorporated by reference therein on or before the issue date of the Preliminary Offering Memorandum or the Final Offering Memorandum, as the case may be, and any reference herein to the terms "amend", "amendment" or "supplement" with respect to the Preliminary Offering Memorandum or the Final Offering Memorandum shall be deemed to refer to and include any document after the issue date of the Preliminary Offering Memorandum or the Final Offering Memorandum, as the case may be, and on or prior to the Closing Date incorporated therein by reference.

If, subsequent to the Time of Sale and prior to the Closing Date, the Time of Sale Information or the Final Offering Memorandum included an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the Initial Purchasers terminate their respective then-existing Contracts of Sale and enters into new Contracts of Sale with investors in the Notes, then the definition of "Time of Sale Information" will be deemed to refer to the information conveyed to investors at the time of entry into such new Contracts of Sale, in an amended Preliminary Offering Memorandum, in amended Marketing Materials or in an amended Final Offering Memorandum, as applicable, approved by the Initial Purchasers (which approval shall not be unreasonably withheld) that corrects such material misstatements or

omissions in accordance with Section 3(d) hereof, and the defined term "Time of Sale" will be deemed to refer to the time and date on which such new Contracts of Sale were entered into.

The Depositor hereby confirms that it has authorized the Initial Purchasers to offer the Notes, prior to the date hereof, in the manner contemplated by the Time of Sale Information and the Final Offering Memorandum, and confirms that it has authorized the Initial Purchasers to use the Time of Sale Information and the Final Offering Memorandum in connection therewith. As used herein, the term "Material Adverse Effect" means, as to any Person, a material adverse effect on the condition (financial or otherwise), business, properties, assets, results of operations or prospects of such Person and its subsidiaries (taken as a whole) or a material adverse effect on (i) the ability of such entity to perform its obligations under the Transaction Documents to which it is a party, (ii) the validity or enforceability of this Agreement or any other Transaction Document to which it is a party, or (iii) with respect to the Issuer, the Issuer's ownership interest in the Receivables, or the Indenture Trustee's security interest in the Receivables.

As used herein, the term "Repayment Event" means, with respect to a Tricolor Entity, any event or condition which gives the holder of any note, debenture or other evidence of indebtedness (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by such Tricolor Entity, and the term "Agreements and Instruments" means, with respect to a Tricolor Entity, any obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, deed of trust, loan or credit agreement, note, lease or other agreement or instrument to which such Tricolor Entity is a party or by which it may be bound, or to which any of its properties, operations or assets is subject.

Section 1.  Representations and Warranties.

(a)      Representations and Warranties of the Depositor.  The Depositor represents and warrants to the Initial Purchasers as of the date hereof, as of the Time of Sale and as of the Closing Date (except to the extent otherwise set forth below), and agrees with the Initial Purchasers as follows:

(i)      The Depositor has been duly formed and is validly existing as a limited liability company under the laws of the State of Delaware, and all filings required at the date hereof under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.) (the "LLC Act") with respect to the due formation and valid existence of the Depositor as a limited liability company have been made; the Depositor is duly qualified or registered as a foreign limited liability company to transact business and is in good standing in each jurisdiction in which such qualification or registration is required, whether by reason of the character of its properties or the nature of its activities, except where the failure to so qualify or register or to be in good standing could not reasonably be expected to result in a Material Adverse Effect with respect to the Depositor or any of its Affiliates; and the Depositor has all requisite power and authority to own, lease and operate its properties and to conduct its business as described in the Preliminary Offering Memorandum and the Final Offering Memorandum and to enter into and perform its obligations under each Transaction Document to which it is a party (collectively, the "Depositor Transaction Documents") and the Securities.

(ii)    This Agreement has been duly authorized, executed and delivered by the Depositor.

(iii)    As of the Closing Date, each Depositor Transaction Document has been duly authorized, executed and delivered by the Depositor, and, assuming the due authorization, execution and delivery thereof by the other parties thereto, will constitute a valid and binding agreement of the Depositor, enforceable against it in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and except as enforcement thereof is subject to general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(iv)    The Depositor is not in violation of its limited liability company agreement or in default in the performance or observance of any Agreement and Instrument with respect to it; and the execution, delivery and performance by the Depositor of the Depositor Transaction Documents and the Securities, the consummation of the transactions contemplated herein or therein, in the Preliminary Offering Memorandum or in the Final Offering Memorandum (including the sale of the Notes to the Initial Purchasers pursuant to the terms of this Agreement and the use of proceeds therefrom as described under the headings "Use of Proceeds" in the Preliminary Offering Memorandum and the Final Offering Memorandum) and compliance by it with its obligations hereunder and thereunder have been duly and validly authorized by all necessary action and do not and will not, whether with or without the giving of notice or passage of time or both, conflict with or constitute a material breach of, a material default or Repayment Event under, or result in the creation or imposition of any lien, mortgage, pledge, charge, encumbrance, adverse claim or other security interest (collectively, "Liens") upon any of its property or assets pursuant to the Depositor Transaction Documents or its Agreements and Instruments except for Liens permitted by the Transaction Documents, nor will any such execution, performance, delivery, performance or other action result in a Material Adverse Effect with respect to the Depositor or any violation of the provisions of its limited liability company agreement or any applicable law, statute, rule, regulation, judgment, order, writ or decree of any government, government instrumentality or court, domestic or foreign, having jurisdiction over the Depositor or any of its assets, properties or operations.

(v)    There is no action, suit, proceeding, inquiry or investigation before or brought by any court or governmental agency or body, domestic or foreign, now pending or, to the knowledge of the Depositor, threatened, against or affecting the Depositor which is or which might reasonably be expected to result in a Material Adverse Effect with respect to the Depositor or the transactions contemplated by the Transaction Documents or the issuance of the Securities; and, except as disclosed in the Preliminary Offering Memorandum and the Final Offering Memorandum, there are no pending legal or governmental proceedings to which the Depositor is a party or of which any of its properties or assets is the subject, including ordinary routine litigation incidental to the business, which (individually or in the aggregate) could reasonably be expected to result in a Material Adverse Effect with respect to the Depositor or materially adversely affect the Noteholders.

(vi)    No filing with, or authorization, approval, consent, license, order, registration, qualification or decree of, any court, governmental authority or agency or any other person is necessary in connection with (A) the issuance of the Securities or the offering and sale of the Notes, (B) the authorization, execution, delivery and performance by the Depositor of the Depositor Transaction Documents or (C) the consummation by the Depositor of the transactions contemplated hereby or thereby, except such as have been obtained and are in full force and effect as of the Closing Date.

(vii)    The Depositor possesses such permits, licenses, approvals, consents and other authorizations (collectively, "Governmental Licenses") issued by the appropriate federal, state, local or foreign regulatory agencies or bodies necessary to conduct the business now operated by it; the Depositor is in compliance in all material respects with the terms and conditions of all such Governmental Licenses; all of such Governmental Licenses are valid and in full force and effect; and the Depositor has not received any notice of proceedings relating to the revocation or modification of any such Governmental Licenses.

(viii)    The representations and warranties of the Depositor in each Depositor Transaction Document are true and correct in all material respects and are hereby incorporated by reference herein and restated for the benefit of the Initial Purchasers with the same effect as if set forth in full herein.

(ix)    The Depositor is solvent and has adequate capital for its business and undertakings.

(b)    <u>Representations and Warranties of the Sponsor</u>.  The Sponsor represents and warrants to the Initial Purchasers as of the date hereof, as of the Time of Sale and as of the Closing Date that the representations and warranties of the Depositor set forth in Section 1(a) are true and correct and further represents and warrants to and agrees with the Initial Purchasers as follows:

(i)    The Sponsor has been duly formed and is validly existing as a limited liability company under the laws of the State of Delaware, and all filings required at the date hereof under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.) (the "LLC Act") with respect to the due formation and valid existence of the Sponsor as a limited liability company have been made; the Sponsor is duly qualified or registered as a foreign limited liability company to transact business and is in good standing in each jurisdiction in which such qualification or registration is required, whether by reason of the character of its properties or the nature of its activities, except where the failure to so qualify or register or to be in good standing could not reasonably be expected to result in a Material Adverse Effect with respect to the Sponsor or any of its Affiliates; and the Sponsor has all requisite power and authority to own, lease and operate its properties and to conduct its business as described in the Preliminary Offering Memorandum and the Final Offering Memorandum and to enter into and perform its obligations under each Transaction Document to which it is a party (collectively, the "Sponsor Transaction Documents") and the Securities.

(ii)    This Agreement has been duly authorized, executed and delivered by the Sponsor.

(iii)    As of the Closing Date, each Sponsor Transaction Document has been duly authorized, executed and delivered by the Sponsor, and, assuming the due authorization, execution and delivery thereof by the other parties thereto, will constitute a valid and binding agreement of the Sponsor, enforceable against the Sponsor in accordance with its terms, except as the enforcement thereof may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and except as enforcement thereof is subject to general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(iv)    The Sponsor is not in violation of its limited liability company agreement or in default in the performance or observance of any Agreement and Instrument with respect to it; and the execution, delivery and performance by the Sponsor of the Sponsor Transaction Documents, the consummation of the transactions contemplated herein or therein, in the Preliminary Offering Memorandum or in the Final Offering Memorandum and compliance by it with its obligations hereunder and thereunder have been duly and validly authorized by all necessary action and do not and will not, whether with or without the giving of notice or passage of time or both, conflict with or constitute a material breach of, a material default or Repayment Event under, or result in the creation or imposition of any Lien upon any of its property or assets pursuant to the Sponsor Transaction Documents or its Agreements and Instruments except for Liens permitted by the Transaction Documents, nor will any such execution, performance, delivery, performance or other action result in a Material Adverse Effect with respect to the Sponsor or any violation of the provisions of limited liability company agreement or any applicable law, statute, rule, regulation, judgment, order, writ or decree of any government, government instrumentality or court, domestic or foreign, having jurisdiction over the Sponsor or any of its assets, properties or operations.

(v)    There is no action, suit, proceeding, inquiry or investigation before or brought by any court or governmental agency or body, domestic or foreign, now pending or, to the knowledge of the Sponsor, threatened, against or affecting either Tricolor Entity or the Issuer which is or which might reasonably be expected to result in a Material Adverse Effect with respect to such Person or the transactions contemplated by the Transaction Documents; and, except as disclosed in the Preliminary Offering Memorandum and the Final Offering Memorandum, there are no pending legal or governmental proceedings to which a Tricolor Entity or the Issuer is a party or of which any of its properties or assets is the subject, including ordinary routine litigation incidental to the business, which (individually or in the aggregate) could reasonably be expected to result in a Material Adverse Effect with respect to such Person or materially adversely affect the Noteholders.

(vi)    No filing with, or authorization, approval, consent, license, order, registration, qualification or decree of, any court, governmental authority or agency or any other person is necessary in connection with (A) the issuance of the Securities or the

offering and sale of the Notes, (B) the authorization, execution, delivery and performance by the Sponsor of the Sponsor Transaction Documents or (C) the consummation by the Sponsor of the transactions contemplated hereby or thereby, except such as have been obtained and are in full force and effect as of the Closing Date.

(vii)    The Sponsor possesses such Governmental Licenses issued by the appropriate federal, state, local or foreign regulatory agencies or bodies necessary to conduct the business now operated by it; the Sponsor is in compliance with the terms and conditions of all such Governmental Licenses in all material respects; all of such Governmental Licenses are valid and in full force and effect; and the Sponsor has not received any notice of proceedings relating to the revocation or modification of any such Governmental Licenses.

(viii)    The representations and warranties of the Sponsor in each Sponsor Transaction Document, and the representations and warranties of the Issuer made in each of the Transaction Documents to which it is a party, are true and correct in all material respects and are hereby incorporated by reference herein and restated for the benefit of the Initial Purchasers with the same effect as if set forth in full herein.

(ix)    The Sponsor is solvent and has adequate capital for its business and undertakings.

(x)    The Sponsor has provided a written representation (the "Rule 17g-5 Representation") to the nationally recognized statistical rating organization hired by the Sponsor to rate the Notes (the "Hired NRSRO"), which satisfies the requirements of paragraph (a)(3)(iii) of Rule 17g-5 of the Exchange Act ("Rule 17g-5") and a copy of which has been delivered to the Initial Purchasers. The Sponsor has complied, and has caused the Depositor to comply, with the Rule 17g-5 Representation.

(xi)    The Sponsor is the appropriate entity to comply with all requirements of Regulation RR under the Exchange Act (17 C.F.R. §246.1, et seq.) ("Regulation RR") that are imposed on a "sponsor of a securitization transaction" (as defined in Regulation RR) and the Sponsor has complied with all requirements imposed on the "sponsor of a securitization transaction" (as defined in Regulation RR) through the date hereof in the manner described in the manner described in the Preliminary Offering Memorandum, including making all disclosures required to date. The Sponsor has determined the adequacy of the content of the related disclosure and is solely responsible therefor. The Sponsor or one or more of its majority-owned affiliates (as defined in Regulation RR, a "Majority-Owned Affiliate") will hold, for the period during which it is required to do so under Regulation RR, an "eligible horizontal residual interest" (as defined in Regulation RR) equal to at least 5% of the fair value of all the "ABS interests" (as defined in Regulation RR) in the Issuer issued as part of the transactions contemplated by the Transaction Documents, determined as of the Closing Date (the "Retained Interest"). The Sponsor determined the fair value of the Retained Interest disclosed in the Preliminary Offering Memorandum under the heading "U.S. Credit Risk Retention", and will determine and disclose the fair value of the Retained Interest as of the Closing Date as required by Rule 4(c)(1)(ii) of Regulation RR. The Sponsor has determined, and as of the

Closing Date will determine, the fair value of the Retained Interest based on its own valuation methodology, inputs and assumptions and is solely responsible therefor.

(xii)    As of the date hereof and as of the Closing Date, the information included in any Beneficial Ownership Certification provided by the Tricolor Entities to the Initial Purchasers is true and correct in all material respects. A "Beneficial Ownership Certification" means a certification provided to the Initial Purchasers and required by 31 C.F.R. § 1010.230 (the "Beneficial Ownership Regulation").

(c)    <u>Representations, Warranties and Agreements of the Tricolor Entities</u>.  The Sponsor and the Depositor, jointly and severally, represent and warrant to the Initial Purchasers as of the date hereof, as of the Time of Sale and as of the Closing Date, and agree with the Initial Purchasers as follows:

(i)    (1) The Preliminary Offering Memorandum (excluding any Note pricing information omitted therefrom and any information derived from Note pricing information), (2) the preliminary offering memorandum, dated February 2, 2023, (3) any materials or information provided to potential investors by, or with the approval of, the Tricolor Entities, including any road show presentations made or road show materials provided to investors (whether in person or electronically), (4) any other data, collateral information, computational materials or analytic models provided to potential investors by, or with the approval of, the Tricolor Entities, including, without limitation, the excel file titled "Quarterly CNL for OM", files in ".xlsx" format containing historical and forecasted charge-off rates, loss curves, delinquency rates and prepayment rates, and any structure summary materials sent to Intex Solutions, Inc. (including, for the avoidance of doubt, in ".cdi" and ".sss" formats) or Bloomberg modeling information delivered by the Initial Purchasers (the materials in (2), (3) and (4) are collectively referred to in this Agreement as the "Marketing Materials"), and (4) the Final Offering Memorandum in the form authorized for use by the Initial Purchasers to confirm sales, in each such case (but in the case of the Marketing Materials, when considered together with the Preliminary Offering Memorandum as part of the Time of Sale Information), as of their respective dates and as of the date hereof, did not contain and, as of the Closing Date, will not contain, any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(ii)    Since the respective dates as of which information is given in the Preliminary Offering Memorandum, the other Time of Sale Information and the Final Offering Memorandum, except as otherwise set forth therein, there has been no Material Adverse Effect with respect to the Tricolor Entities.

(iii)    The Notes have been duly authorized and, at the Closing Date, will have been duly executed and, when authenticated, issued and delivered in the manner provided for in the Indenture and delivered against payment of the purchase price therefor as provided in this Agreement, will constitute valid and binding obligations of the Issuer, enforceable against the Issuer in accordance with their terms, except as the enforcement thereof may be subject to or limited by bankruptcy, insolvency, reorganization,

moratorium or similar laws affecting enforcement of creditors' rights generally and except as enforcement thereof is subject to general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law), and will be in the forms contemplated by, and entitled to the benefits of, the Indenture.

(iv)     The Certificates have been duly authorized and, at the Closing Date, will have been duly executed and, when authenticated, issued and delivered in the manner provided for in the Trust Agreement, will be validly issued, fully paid, non-assessable and outstanding and will be in the form contemplated by, and entitled to the benefits of, the Trust Agreement.

(v)     The Securities and the Transaction Documents conform in all material respects to the descriptions thereof and the statements relating thereto contained in the Preliminary Offering Memorandum and the Final Offering Memorandum.

(vi)     As of the Closing Date, (A) the Sponsor will sell to the Depositor good and marketable title to the Receivables listed in the Schedule of Receivables, free and clear of any Lien, and the Depositor will have good and marketable title to the Receivables, free and clear of any Lien, (B) the Depositor will sell to the Issuer good and marketable title to the Receivables listed in the Schedule of Receivables, free and clear of any Lien, and the Issuer will have good and marketable title to the Receivables, free and clear of any Lien, (C) the Issuer will be the sole owner of each Receivable free and clear of Liens, (D) the Issuer's Grant of the Collateral to the Indenture Trustee pursuant to the Indenture will vest in the Indenture Trustee, for the benefit of the Noteholders, a perfected security interest in the Receivables, subject to no prior Liens other than the Lien in favor of the Indenture Trustee under the Indenture, and (E) all taxes, fees and other governmental charges arising in connection with the transactions contemplated by the Transaction Documents and with the sale and delivery of the Receivables, including any amendments thereto and assignments and/or endorsements thereof, have been paid by the Sponsor and the Depositor.

(vii)     Neither the Issuer nor the Depositor is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The Issuer will rely on an exemption or exclusion from the definition of "investment company" under Section 3(c)(5) of the Investment Company Act, although there may be additional exclusions or exemptions available to the Issuer. The Issuer is structured so as not to constitute a "covered fund" under the regulations adopted to implement Section 619 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, commonly known as the "Volcker Rule".

(viii)     Subject to compliance by the Initial Purchasers with the representation and warranty set forth in Section 6(a)(iv), it is not necessary in connection with the offer, sale and delivery of the Notes to the Initial Purchasers and to each subsequent purchaser from the Initial Purchasers in the manner contemplated by this Agreement, the Preliminary Offering Memorandum and the Final Offering Memorandum to register the Securities under the Securities Act, and the Notes will be eligible for resale pursuant to Rule 144A

under the Securities Act when issued pursuant to the Indenture. The Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

(ix)    Neither of the Tricolor Entities nor any Affiliate of the Tricolor Entities has, directly or indirectly, sold, offered for sale or solicited offers to buy or otherwise negotiate in respect of any security (as defined in the Securities Act) the offering of which security will be integrated with the sale of the Notes in a manner which would require the registration of the Notes under the Securities Act.

(x)    No Notes are (i) of the same class (within the meaning of Rule 144A under the Securities Act) as any securities of a Tricolor Entity or any Affiliate listed on a national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), (ii) quoted on any "automated inter-dealer quotation system" (as such term is used in the Exchange Act), or (iii) convertible or exchangeable at an effective conversion premium (calculated as specified in paragraph (a)(6) of Rule 144A) of less than ten percent for securities so listed or quoted.

(xi)    Neither of the Tricolor Entities nor any Affiliate of the Tricolor Entities have received any order or notice from the Commission, any state securities commission, or any other federal, state or foreign government authority or agency thereof preventing or suspending the offering of the Notes or the use of any of the Time of Sale Information or the Final Offering Memorandum and, to the best knowledge of the Tricolor Entities, no such order or notice has been issued and no proceedings for that purpose have been instituted.

(xii)    Neither of the Tricolor Entities nor any Affiliate of the Tricolor Entities have engaged any third-party due diligence services providers to provide any "due diligence services" (as defined in Rule 17g-10(d)(1) under the Exchange Act), other than the independent accountants engaged for the purpose of delivering the Independent Accountants' Report on Applying Agreed-Upon Procedures, dated January 31, 2023 (such independent accountants, the "Accountants", and such report, the "Report"), and the only report generated as a result of such engagement is the Report. A copy of the Form ABS-15G furnished on EDGAR with respect to the Report (the "Form ABS-15G") was provided to the Representative, on behalf of the Initial Purchasers, at least two business days (or such other shorter agreed upon period) prior to the furnishing of such Form ABS-15G on EDGAR. The Report is, as amongst the parties to this Agreement, deemed to have been obtained by the Tricolor Entities pursuant to Rule 15Ga-2(a) and (b) under the Exchange Act.

(xiii)    The Tricolor Entities have timely complied with Rule 15Ga-2 under the Exchange Act, and, to the knowledge of the Tricolor Entities, the Accountants have timely complied with Rule 17g-10 under the Exchange Act.

(xiv)    The Tricolor Entities will comply with the requirements of Rule 15Ga-1 under the Exchange Act.

(xv)    No portion of the Form ABS-15G contains any names, addresses, other personal identifiers or zip codes with respect to any individuals, or any other personally identifiable or other information that would be associated with an individual, including without limitation any "nonpublic personal information" within the meaning of Title V of the Gramm-Leach-Bliley Financial Services Modernization Act of 1999.

(xvi)    Neither of the Tricolor Entities nor any person on their behalf, directly or indirectly (other than the Initial Purchasers and their respective Affiliates, as to whom no representation is made), has engaged, in connection with the offering of the Notes, in any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or sold, offered for sale, solicited offers to buy, or otherwise negotiated or taken any other action in respect of, nor will any of the foregoing, directly or through an agent (other than the Initial Purchasers and their respective Affiliates, as to whom no representation is made), sell, offer for sale, solicit offers to buy, or otherwise negotiate or take any other action in respect of, any security (as defined in the Securities Act) which is or will be integrated (as such term is defined in Rule 502(a) of Regulation D promulgated under the Securities Act) with the sale of the Notes or made offers or sales of any security, or solicited offers to buy any security, under circumstances that would require the registration of the Notes under the Securities Act. None of the Depositor, the Sponsor or any of their respective Affiliates has entered or will enter into any contractual arrangement with respect to the distribution of the Notes except for this Agreement and the other Transaction Documents. None of the Tricolor Entities or their respective Affiliates has paid or agreed to pay to any Person any compensation for soliciting another to purchase any of the Notes (except as contemplated by this Agreement).

(xvii)    There are no contracts, agreements or understandings between a Tricolor Entity or any Affiliate, on the one hand, and any other Person, on the other hand, granting such Person the right to require a Tricolor Entity or any other Person to file a registration statement under the Securities Act with respect to any Notes owned or to be owned by such Person or to include any Notes in any securities registered pursuant to any registration statement filed by a Tricolor Entity or any Affiliate under the Securities Act.

(xviii)    The statements set forth in the Preliminary Offering Memorandum and the Final Offering Memorandum under the heading "United States Federal Income Tax Considerations" fairly summarize the matters described therein.

(xix)    No receiver or liquidator (or similar person) has been appointed in respect of a Tricolor Entity or any Affiliate, or in respect of any part of a Tricolor Entity's or any Affiliate's assets; no resolution, order of any court, regulatory body, governmental body or otherwise, or petition or application for an order, has been passed, made or presented for the winding up or for the protection from creditors of a Tricolor Entity or any Affiliate.

(xx)    Each of the Issuer, the Depositor, and the Sponsor has filed all tax returns (federal, state and local) required to be filed by each such entity and each has paid or made adequate provision for the payment of all taxes, assessments and other

governmental charges then due and payable (including for such purposes, the setting aside of appropriate reserves for taxes, assessments and other governmental charges being contested in good faith).

(xxi)  As of the Closing Date (i) the Depositor has no subsidiaries or divisions other than the Issuer; and (ii) since its formation, the Depositor has operated only under its corporate name and has not changed its name, merged with or into or consolidated with any other corporation and has not been the subject of any proceeding under Title 11, United States Code (Bankruptcy).

(xxii)  No transaction contemplated by the Transaction Documents requires compliance with any "bulk sales" act or similar law.

(xxiii)  Neither of the Tricolor Entities has taken, directly or indirectly, any action designed to cause or to result in, or that has constituted or which might reasonably be expected to constitute, the stabilization or manipulation of the price of any Note to facilitate the sale or re-sale of the Notes.

(xxiv)  No forward-looking statement (within the meaning of Section 27A of the Act and Section 21E of the Exchange Act) contained in the Time of Sale Information has been made or reaffirmed without a reasonable basis or has been disclosed other than in good faith and, on and as of the date of the Final Offering Memorandum and the Closing Date, no forward-looking statement (within the meaning of Section 27A of the Act and Section 21E of the Exchange Act) contained in the Final Offering Memorandum will have been made or reaffirmed without a reasonable basis or will have been disclosed other than in good faith.

(xxv)  No Event of Default or Servicer Termination Event has occurred and is continuing.

(xxvi)  Neither the Sponsor nor any of its Affiliates nor any director or officer of the Sponsor or any of its Affiliates nor, to the knowledge of the Sponsor, any employee, agent, or other Person associated with or acting on behalf of the Sponsor or any of its Affiliates has (i) used any funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government or regulatory official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any applicable law or regulation implementing the Organisation for Economic Co-operation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, or committed an offence under the Bribery Act 2010 of the United Kingdom, or any other applicable anti-bribery or anticorruption laws (collectively, "Anti-Corruption Laws"); or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other

unlawful benefit to a third party, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit to a third party.

(xxvii) The operations of the Sponsor and its Affiliates are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable money laundering statutes of all jurisdictions where the Sponsor or any of its Affiliates conducts business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental or regulatory agency (collectively, the "Anti Money Laundering Laws") and no action, suit or proceeding by or before any court or governmental or regulatory agency, authority or body or any arbitrator involving the Sponsor or any of its Affiliates with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Sponsor, threatened.

(xxviii) Neither the Sponsor nor any of its Affiliates nor any director or officer of the Sponsor or any of its Affiliates nor, to the knowledge of the Sponsor, any employee, agent, or other Person associated with or acting on behalf of the Sponsor or any of its Affiliates is currently the subject or the target of any sanctions administered or enforced by the U.S. Government (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the United Nations Security Council, the European Union, Her Majesty's Treasury, the Swiss State Secretariat for Economic Affairs or other relevant sanctions authority (collectively, "Sanctions"), nor is the Sponsor or any of its Affiliates located, organized or resident in a country or territory that is the subject or the target of Sanctions, currently including, without limitation, Cuba, Iran, North Korea, Sudan, Syria and Crimea (each, for so long as it is the subject or target of Sanctions, a "Sanctioned Country"); and the Sponsor will not directly or indirectly use the proceeds of the offering of the Notes hereunder, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person (i) to fund or facilitate any activities of or business with any Person that, at the time of such funding or facilitation, is the subject or the target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or (iii) in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, initial purchaser, advisor, investor or otherwise) of Sanctions. For the past 5 years, the Sponsor and its Affiliates have not knowingly engaged in and are not now knowingly engaged in any dealings or transactions with any Person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country.

(xxix) The Sponsor has implemented and will maintain in effect and enforce policies and procedures designed in good faith and in a commercially reasonable manner to promote and achieve compliance, by the Sponsor, its Affiliates, directors, officers and employees, with applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(d)      Other than the Time of Sale Information, the Form ABS-15G and the Final Offering Memorandum, none of the Issuer, the Tricolor Entities or any of their respective affiliates or agents has made, used, prepared, authorized, approved or referred to, and will not make, use, prepare, authorize, approve or refer to any "written communication" (as defined in Rule 405 under the Securities Act) that constitutes an offer to sell or solicitation of an offer to buy the Notes. Neither the Depositor nor the Sponsor will disseminate to any potential investor any information relating to the Notes that constitutes a "written communication", other than the Time of Sale Information, the Final Offering Memorandum and the Form ABS-15G, unless the Depositor shall have obtained the prior consent of the Representative.

(e)      Officer's Certificates.  Any certificate signed by any officer of a Tricolor Entity or any of its Affiliates and delivered at the Closing Date to the Initial Purchasers or to counsel for the Initial Purchasers shall be deemed a representation and warranty by such Tricolor Entity or such Affiliate, as the case may be, to the Initial Purchasers as to the matters covered thereby. When used in this Agreement, the term "Affiliate" shall have the meaning assigned by Rule 501(b) of the Securities Act Regulations.

Section 2.  Sale and Delivery to the Initial Purchaser; Closing.

(a)      Purchase of Notes.  On the basis of the representations, warranties and agreements herein contained and subject to the terms and conditions herein set forth, the Depositor agrees to sell to the Initial Purchasers, and the Initial Purchasers agree to purchase from the Depositor, the Notes of each class at a purchase price as set forth in Schedule I hereto (as a percentage of the principal amount of each class of Notes).

(b)      Payment and Delivery.  Payment of the purchase price, and delivery of the Notes shall be made at the offices of Sidley Austin LLP, 555 California Street, San Francisco, California 94104, or at such other place as shall be agreed upon by the Representative and the Depositor, at 10:00 a.m. (New York City time) on February 15, 2023, or such other time after such date as shall be agreed upon by the Representative and the Depositor (such date and time of payment and delivery being called the "Closing Date").

Each class of Notes will initially be represented by one or more global note certificates registered in the name of Cede & Co., as nominee of The Depository Trust Company ("DTC"). The interests of the beneficial owners of the Notes will be represented by book entries on the records of DTC and participating members thereof. Certificates for the Securities shall be made available for examination by the Initial Purchasers in New York, New York not later than 1:00 p.m. (New York City time) on the business day prior to the Closing Date. Delivery of the Notes shall be made against payment of the purchase price therefor by wire transfer of immediately available funds to a bank account designated by the Depositor. The Tricolor Entities will cooperate with the Initial Purchasers and use their best efforts to permit the Notes to be eligible for clearance and settlement through DTC.

Section 3.  Agreements of the Tricolor Entities.  The Tricolor Entities covenant and agree with the Initial Purchaser as follows:

(a)    <u>Notification</u>.   The Tricolor Entities will notify the Initial Purchasers as promptly as reasonably possible, and subsequently confirm the notice in writing (which may be in the form of an e-mail), of the happening of any event occurring within 30 days of the Closing Date which, in the judgment of such Person, makes the Time of Sale Information or the Final Offering Memorandum contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances existing at the time it is delivered or made available to a purchaser, not misleading.

(b)    <u>Notice of Amendments</u>.  The Tricolor Entities will give the Initial Purchasers notice of its intention to prepare any amendment, supplement or revision to either the Preliminary Offering Memorandum or to the Final Offering Memorandum, and the Tricolor Entities will furnish the Initial Purchasers with copies of all such documents a reasonable amount of time prior to its proposed use, and will not use any such document to which the Initial Purchasers or counsel for the Initial Purchasers shall reasonably object.

(c)    <u>Delivery of Offering Documents</u>.  The Tricolor Entities will deliver to the Initial Purchasers, without charge, as many copies of the Preliminary Offering Memorandum, the Final Offering Memorandum and any amendments, supplements or revisions thereto as the Initial Purchasers may reasonably request, and the Tricolor Entities hereby consent to the use of such copies.

(d)    <u>Continued Compliance with Securities Laws</u>.  The Tricolor Entities will comply with the Securities Act and the Securities Act Regulations, the Exchange Act and the Exchange Act Regulations, the Trust Indenture Act and the rules and regulations of the Commission under the Trust Indenture Act so as to permit the completion of the distribution of the Notes as contemplated in this Agreement, the Transaction Documents, the Preliminary Offering Memorandum and the Final Offering Memorandum. If, at any time when the Preliminary Offering Memorandum or the Final Offering Memorandum is to be delivered in connection with a sale of the Notes, any event shall occur or condition shall exist as a result of which it is necessary, in the opinion of counsel for the Initial Purchasers or counsel to the Tricolor Entities, to amend or supplement the Preliminary Offering Memorandum or the Final Offering Memorandum in order that the Preliminary Offering Memorandum or the Final Offering Memorandum, as the case may be, will not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in the light of the circumstances existing at the time it is delivered to a purchaser, or, if it shall be necessary to amend or supplement the Preliminary Offering Memorandum or the Final Offering Memorandum to comply with applicable securities laws, the Tricolor Entities will promptly prepare, subject to the review and approval provisions afforded to the Initial Purchasers described in Section 3(a), such amendment or supplement as may be necessary to correct such statement or omission or to make the Preliminary Offering Memorandum or the Final Offering Memorandum, as the case may be, comply with such securities laws, and the Tricolor Entities will furnish to the Initial Purchasers, without charge, such number of copies of such amendment or supplement as the Initial Purchasers may reasonably request.

(e)     State Securities Law Qualifications.  Each Tricolor Entity will use its best efforts, in cooperation with the Initial Purchasers, in arranging for the registration and qualification of the Notes for offering and sale and the determination of their eligibility for investment, as the case may be, under the laws of such jurisdictions as the Initial Purchasers designate and will continue to assist the Initial Purchasers in maintaining such registrations and qualifications in effect for so long as may be required for the distribution of the Notes and the Tricolor Entities will file such consents to service of process or other documents as may be necessary in order to effect such registrations and qualifications; provided, however, that the Tricolor Entities shall not be obligated to file any general consent to service of process or to qualify as a foreign limited liability company or as a dealer in securities in any jurisdiction in which it is not so qualified or to subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject. The Tricolor Entities will also supply the Initial Purchasers with such information as is necessary for the determination of the legality of the offering and sale of the Notes for investment under the laws of such jurisdictions as the Initial Purchasers may reasonably request. The Tricolor Entities will promptly advise the Initial Purchasers of the receipt by the Tricolor Entities of any notification with respect to the suspension of the qualification of the Notes for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose.

(f)     Use of Proceeds.  The Tricolor Entities shall use the net proceeds received by it from the sale of the Notes in the manner specified in the Preliminary Offering Memorandum and the Final Offering Memorandum under the heading "Use of Proceeds". No proceeds received by the Tricolor Entities in respect of the Notes will be used by the Tricolor Entities to acquire any security in any transaction which is subject to Section 13 or 14 of the Exchange Act.

(g)     Reports, Statements and Certificates.  So long as any Notes are outstanding, the Tricolor Entities shall deliver or cause to be delivered to the Initial Purchasers, as soon as copies become available, copies of (i) each Investor Report delivered to the Indenture Trustee pursuant to Section 3.03 of the Sale and Servicing Agreement, (ii) each annual statement of compliance, annual independent certified public accountants' report and annual opinion of counsel, as soon as such statements, reports and opinions are furnished to the Indenture Trustee or the Owner Trustee, as the case may be, (iii) the Servicer's report on its assessment of compliance with the minimum servicing criteria and the related attestation report delivered pursuant to the Sale and Servicing Agreement, (iv) each material amendment to any Transaction Document, (v) all documents of the Tricolor Entities or the Issuer distributed to the Noteholders and (vi) such other information concerning the Sponsor, the Depositor, the Issuer, the Receivables or the Securities as the Initial Purchasers may reasonably request from time to time.

(h)     Other Securities. For the period beginning on the date of this Agreement and ending 15 days after the Closing Date, unless waived by the Initial Purchasers, none of the Depositor, the Sponsor or any trust originated, directly or indirectly, by the Depositor or the Sponsor will offer to sell or sell notes (other than the Notes) collateralized by, or certificates (other than the Certificates) evidencing an ownership

interest in, receivables generated pursuant to fixed-rate motor vehicle installment sale contracts and installment loans.

(i)    Rule 17g-5 Representation.  The Tricolor Entities will comply with the Rule 17g-5 Representation, other than any breach of the Rule 17g-5 Representation arising from a breach by either Initial Purchaser of the representation, warranty and covenant set forth in Section 6(a)(ii).

(j)    Risk Retention Requirements.  The Sponsor or (to the extent permitted by Regulation RR) a Majority-Owned Affiliate will comply with all requirements imposed on the "sponsor of a securitization transaction" (as defined in Regulation RR) by Regulation RR from and after the date hereof for so long as those requirements are applicable, including making all disclosures required from and after the date hereof. The Sponsor acknowledges that (i) it will determine the adequacy of the content of such disclosures and is solely responsible therefor, and (ii) it is solely responsible for the holding of the Retained Interest for the duration required by Regulation RR (without any impermissible hedging, transfer or financing of the Retained Interest). The Sponsor will provide any required post-closing disclosures to investors in a timely manner and by an appropriate method that does not require any involvement of the Initial Purchasers.

(k)    Registration.  None of the Tricolor Entities or any Affiliate of the Tricolor Entities will sell, offer for sale or solicit offers to buy or otherwise negotiate in respect of any security (as defined in the Securities Act) the offering of which security will be integrated with the sale of the Notes in a manner which would require the registration of the Notes under the Securities Act or would otherwise cause the offer and sale of the Notes pursuant to this Agreement to fail to be entitled to the exemption from registration afforded by Rule 144A under the Securities Act or Section 4(a)(2) of the Securities Act.

(l)    Rule 144A Information.  So long as any of the Notes are "restricted securities" within the meaning of Rule 144 under the Securities Act, the Tricolor Entities shall make available, upon request, to any holder of such Notes in connection with any sale thereof and any prospective purchaser of Notes from such holder the information specified in Rule 144A(d)(4) under the Securities Act (the "Rule 144A Information").

(m)    None of the Tricolor Entities, any Affiliate of the Tricolor Entities or any other Person acting on their behalf shall engage, in connection with the initial re-offer and resale of the Notes by the Initial Purchasers, in any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D under the Act (excluding the reference therein to Rule 506(c)), including, but not limited to, the following: (1) any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio; and (2) any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

Section 4.  <u>Payment of Expenses</u>.

(a)    The Sponsor and the Depositor shall pay all of their own expenses that are reasonable and incident to the performance of their respective obligations under this Agreement, including each of the following: (i) the preparation and printing of the Final Offering Memorandum, the Time of Sale Information, the Form ABS-15G and each amendment or supplement thereto, (ii) the preparation, issuance and delivery of the Notes to the Initial Purchasers and the Certificates to the Depositor, (iii) the fees and expenses of the counsel, accountants and other advisors of the Sponsor, the Depositor and their respective Affiliates in connection with the transactions contemplated by the Transaction Documents, (iv) the qualification of the Notes under state securities laws in accordance with the provisions of Section 3(e), including filing fees and the reasonable fees and disbursements of counsel for the Initial Purchasers in connection therewith, (v) the fees and expenses of the Backup Servicer, the Owner Trustee, and the Indenture Trustee, including the reasonable fees and disbursements of their respective counsels, (vi) the fees and expenses of counsel to the Initial Purchasers, (vii) any fees payable to the Hired NRSRO in connection with the rating of the Notes and (viii) the costs and expenses (including any damages or other amounts payable in connection with legal or contractual liability) associated with the breaking of and re-execution of any Contract of Sale made by an Initial Purchaser caused by a breach of the representation contained in Section 1(c)(i) or as otherwise provided in Section 6(b); provided, however, the applicable Initial Purchaser shall have provided notice to the Depositor prior to breaking and re-executing any Contract of Sale.

(b)    If this Agreement is terminated by the Initial Purchasers in accordance with Section 5(cc) or Section 9(a), the Tricolor Entities shall reimburse the Initial Purchasers for all of its reasonable out-of-pocket expenses, including the reasonable fees and disbursements of counsel for the Initial Purchasers.

Section 5.  <u>Conditions of the Obligations of the Initial Purchaser</u>.  The obligations of the Initial Purchasers to purchase and pay for the Notes are subject to the accuracy of the representations and warranties of the Tricolor Entities contained in Section 1 and in certificates of any officer of the Tricolor Entities or any of their respective Affiliates delivered pursuant to the provisions hereof, to the performance by the Tricolor Entities of their respective covenants and other obligations hereunder, and to the following additional conditions:

(a)    For the period from and after the date of this Agreement until the Closing Date, there shall not have occurred any change, or any development that will result in a change, in the condition, financial or otherwise, or in the earnings, business, operations or prospects, of the Issuer, the Depositor or the Sponsor, from that set forth in the Time of Sale Information or that, in the Initial Purchasers' reasonable judgment, is material and adverse and that makes it, in the Initial Purchasers' reasonable judgment, impracticable or inadvisable to market the Notes on the terms and in the manner contemplated herein and in the Preliminary Offering Memorandum and the Final Offering Memorandum.

(b)    The Initial Purchasers shall have received the Report, in form and substance as previously agreed upon by the Initial Purchasers and otherwise substantially in the form of the draft to which the Initial Purchasers have previously agreed and

otherwise in form and substance satisfactory to the Initial Purchasers and their counsel. At the Closing Date, the Initial Purchasers shall have received from the Accountants two letters, dated as of the date of the Preliminary Offering Memorandum and as of the date of the Final Offering Memorandum, respectively, in form and substance previously agreed upon by the Initial Purchasers, substantially in the form of the drafts to which the Initial Purchasers have previously agreed, and otherwise in form and substance satisfactory to the Initial Purchasers and their counsel.

(c)     The Initial Purchasers shall have received on the Closing Date, from each of the Tricolor Entities, a certificate, dated the Closing Date and signed by an executive officer of such Person, to the effect that, and the Initial Purchasers shall be satisfied that, (i) the representations and warranties of such Person in the Transaction Documents to which it is a party are true and correct in all material respects on and as of the Closing Date as if made on and as of such date (except to the extent they relate to an earlier or later date or time, and then as of such earlier or later date or time), (ii) such Tricolor Entity (A) has complied with all of the agreements and satisfied all of the conditions on its part to be performed or satisfied in this Agreement, and (B) has complied in all material respects with all of the agreements and satisfied all of the conditions on its part to be performed or satisfied in the Transaction Documents required to be performed or satisfied at or prior to the Closing Date, (iii) there has not occurred any change or any development that is likely to result in a material change in the condition, financial or otherwise, or in the earnings, business, operations or prospects of the Sponsor, the Depositor, or any of their respective Affiliates, from that set forth in the Preliminary Offering Memorandum and such other Time of Sale Information or that has had or could reasonably be expected to have a Material Adverse Effect, and (iv) the information contained in the Preliminary Offering Memorandum and the Final Offering Memorandum relating to the Tricolor Entities, and relating to the Receivables, is true and accurate in all material respects and nothing has come to his or her attention that would lead such officer to believe that the Preliminary Offering Memorandum or the Final Offering Memorandum contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading

(d)     The Initial Purchasers shall have received one or more officer's or secretary's certificates, dated the Closing Date, signed by an authorized officer of WTNA, in form and substance satisfactory to counsel for the Initial Purchasers.

(e)     The Initial Purchasers shall have received one or more officer's or secretary's certificates, dated the Closing Date, signed by an authorized officer of Wilmington Trust Company, in form and substance satisfactory to counsel for the Initial Purchasers.

(f)     The Initial Purchasers shall have received the favorable opinion, dated as of the Closing Date, of Sidley Austin LLP, counsel for the Tricolor Entities, in form and substance reasonably satisfactory to counsel for the Initial Purchasers with respect to general corporate, enforceability and security interest matters, and a negative assurance

letter from Sidley Austin LLP with respect to the Preliminary Offering Memorandum and the Final Offering Memorandum.

(g)    The Initial Purchasers shall have received the favorable opinion, dated as of the Closing Date, of Sidley Austin LLP, in form and substance satisfactory to counsel for the Initial Purchasers, regarding the treatment of the transfer of Receivables.

(h)    The Initial Purchasers shall have received the favorable opinion, dated as of the Closing Date, of Sidley Austin LLP, federal income tax counsel for the Tricolor Entities, in form and substance satisfactory to counsel for the Initial Purchasers, substantially to the effect that: (i) the Class A Notes, the Class B Notes, the Class C Notes, and the Class D Notes will, and the Class E Notes should, be characterized as debt if and to the extent held by one or more persons other than the beneficial owner of the equity in the Issuer or by an affiliate of such beneficial owner for such purposes and (ii) the Issuer will not be characterized as an association (or a publicly traded partnership) taxable as a corporation.

(i)    The Initial Purchasers shall have received the favorable opinion, dated as of the Closing Date, of Beard Kultgen Brophy Bostwick & Dickson, PLLC, counsel for the Tricolor Entities, in form and substance reasonably satisfactory to counsel for the Initial Purchasers with respect to general corporate matters.

(j)    The Initial Purchasers shall have received the favorable opinions, dated as of the Closing Date, of Richards, Layton & Finger, P.A., special Delaware counsel for the Tricolor Entities and the Issuer, in form and substance satisfactory to counsel for the Initial Purchasers.

(k)    The Initial Purchasers shall have received the favorable opinions, each dated as of the Closing Date, of Richards, Layton & Finger, P.A., counsel to the Indenture Trustee, in form and substance satisfactory to counsel for the Initial Purchasers.

(l)    The Initial Purchasers shall have received the favorable opinion, dated as of the Closing Date, of Richards, Layton & Finger, P.A., counsel for the Owner Trustee, in form and substance satisfactory to counsel for the Initial Purchasers.

(m)    The Initial Purchasers shall have received the favorable opinion, dated as of the Closing Date, of Morgan, Lewis & Bockius LLP, counsel for the Initial Purchasers, in form and substance satisfactory to the Initial Purchasers.

(n)    The Initial Purchasers shall have received a reliance letter relating to each legal opinion relating to the transaction contemplated hereby rendered to the Hired NRSRO.

(o)    The Notes shall have been assigned the ratings indicated in the Preliminary Offering Memorandum from the Hired NRSRO, and the Depositor shall have delivered to the Initial Purchasers a letter dated the Closing Date from the Hired NRSRO, or other evidence satisfactory to the Initial Purchasers, confirming that the Notes have such ratings; and since the date of this Agreement, there shall not have occurred a

downgrading in the rating assigned to the Notes or any other securities of the Sponsor or any of its Affiliates (excluding previously issued ABS notes) by any nationally recognized statistical rating organization, and no such rating agency shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of the Notes or any other securities of the Sponsor or any of its Affiliates (excluding previously issued ABS notes).

(p)    The Tricolor Entities will, to the extent, if any, that the ratings provided with respect to the Notes by the Hired NRSRO on the Closing Date are conditioned upon the furnishing or the taking of any other actions by the Tricolor Entities or any of their respective Affiliates, furnish such documents and take, or cause to be taken, all such other actions on or prior to the Closing Date.

(q)    The Tricolor Entities shall have timely complied with all requirements of Rule 15Ga-2 under the Exchange Act.

(r)    Each of the Issuer, the Depositor, and the Sponsor shall have obtained all governmental and regulatory authorizations required in connection with the sale of the Notes and the performance of its obligations hereunder and under the Basic Documents to which it is a party.

(s)    Each of the parties to the Transaction Documents shall have executed and delivered the Transaction Documents to which they are parties in the same form and substance as previously presented to and approved by the Initial Purchasers.

(t)    The Initial Purchasers shall have received evidence satisfactory to it that financing statements covering the security interest granted by (i) the Issuer, to the Indenture Trustee, (ii) the Depositor to the Issuer, and (iii) the Sponsor to the Depositor will be duly filed against the appropriate party and in the appropriate filing office as required under the UCC and the Basic Documents.

(u)    The Issuer (or the Administrator on its behalf) shall have delivered to DTC (or an approved custodian therefor) the Notes, duly executed by the Issuer and authenticated by the Indenture Trustee.

(v)    The Issuer shall have executed and delivered to DTC a standard "letter of representations" sufficient to cause DTC to qualify the Notes for inclusion in DTC's book-entry registration and transfer system; and the Notes shall be eligible for clearance and settlement through DTC, Clearstream and Euroclear.

(w)    No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal or state governmental or regulatory authority that would, as of the Closing Date, prevent the issuance or the sale of the Notes; and no injunction or order of any federal or state court shall have been issued that would, as of the Closing Date, prevent the issuance or the sale of the Notes.

(x)    All corporate or limited liability company proceedings and other legal matters incident to the authorization, form and validity of each of the Transaction

Documents and the Final Offering Memorandum, and all other legal matters relating to the Transaction Documents and the transactions contemplated thereby, shall be satisfactory in all material respects to the Initial Purchasers; and the Sponsor and the Depositor shall have furnished to the Initial Purchasers all documents and information that the Initial Purchasers or their counsel may reasonably request to enable them to pass upon such matters.

(y)     The Initial Purchasers shall not have discovered and disclosed to the Depositor or the Sponsor on or prior to the Closing Date that (i) in the opinion of counsel to the Initial Purchasers, the Preliminary Offering Memorandum, as of its date and as of the Closing Date, contained an untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading or (ii) in the opinion of counsel to the Initial Purchasers, the Final Offering Memorandum, or any amendment or supplement thereto, as of its date and as of the Closing Date, contains an untrue statement of material fact or omits to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(z)     Warehouse lien releases related to any applicable Receivables, in form and substance reasonably satisfactory to the Initial Purchasers, shall have been executed.

(aa)     If, prior to the Closing Date, a Beneficial Ownership Certification previously delivered by the Depositor or the Sponsor to the Initial Purchasers ceases to be true and correct in all respects, the Depositor or the Sponsor, as applicable, shall deliver to the Initial Purchasers an updated Beneficial Ownership Certification prior to the Closing Date.

(bb)     Counsel for the Initial Purchasers shall have been furnished with such documents and opinions as it may reasonably require for the purpose of enabling it to pass upon the issuance of the Securities, or in order to evidence the accuracy of any of the representations or warranties or the fulfillment of any of the conditions herein contained; and all proceedings taken by the Tricolor Entities in connection with the foregoing shall be satisfactory in form and substance to counsel for the Initial Purchasers.

(cc)     If any condition specified in this Section shall not have been fulfilled when and as required to be fulfilled, this Agreement may be terminated by the Initial Purchasers by notice to the Depositor at any time at or prior to the Closing Date, and such termination shall be without liability of any party to any other party except as provided in Section 4 and except that Sections 1, 7, 8, 9 and 13 shall survive any such termination and remain in full force and effect.

Section 6.   Written Communications; Communications with Nationally Recognized Statistical Rating Organizations; Representations, Warranties and Covenants of the Initial Purchaser.

(a)      Each Initial Purchaser, severally and not jointly, represents, warrants, covenants and agrees with the Tricolor Entities that:

(i)      Prior to entering into any Contract of Sale, it shall convey the Preliminary Offering Memorandum (or, if after the delivery of the Final Offering Memorandum by the Depositor to the Initial Purchasers, the Final Offering Memorandum) to the prospective investor, and at the time or prior to the time at which any Notes are acquired by such investor, it will have conveyed or delivered a copy of the Final Offering Memorandum to such investor. Each Initial Purchaser shall maintain sufficient records to document its conveyance of the Preliminary Offering Memorandum to the potential investor prior to the formation of the related Contract of Sale and shall maintain such records as required by the Securities Act Regulations.

(ii)      It has not delivered, and will not deliver, any Rating Information to the Hired NRSRO or other nationally recognized statistical rating organization and it has not participated, and will not participate, in any oral communication regarding Rating Information with the Hired NRSRO or any other nationally recognized statistical rating organization without giving prior notice to the Sponsor of such communication. For purposes of this paragraph, "Rating Information" means any information provided to the Hired NRSRO for the purpose of (A) determining the initial credit rating for the Notes, including information about the characteristics of the Receivables, related property and the legal structure of the Notes, and (B) undertaking credit rating surveillance on the Notes, including information about the characteristics and performance of the Receivables and related property.

(iii)      It has not engaged any third-party to provide "due diligence services" (as defined in Rule 17g-10 under the Exchange Act) with respect to the transactions contemplated by this Agreement, it being understood the Accountants have been engaged by the Sponsor and the Depositor for the purpose of providing the Report.

(iv)      It acknowledges that the Notes have not been registered under the Securities Act and may not be offered or sold except in accordance with Rule 144A. Each Initial Purchaser, severally and not jointly, hereby represents and warrants to, covenants and acknowledges and agrees with, the Tricolor Entities that it, or any Person acting on its behalf, has not offered or sold, and will not offer or sell, any Notes except to Persons whom the Initial Purchaser reasonably believes to be QIBs and otherwise in accordance with the terms and conditions set forth in the Preliminary Offering Memorandum and the Final Offering Memorandum.

(v)      It (x) has only communicated or caused to be communicated and, will only communicate or cause to be communicated, an invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000, as amended (the "FSMA")) received by it in connection with the issue

or sale of the Notes in circumstances in which section 21(1) of the FSMA does not apply to the Issuer, and (y) has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Notes in, from or otherwise involving the United Kingdom (the "UK").

(vi)     It has not offered, sold or otherwise made available, and will not offer, sell or otherwise make available, any Notes to any UK Retail Investor in the UK. For the purposes of this provision: (1) the expression "UK retail investor" means a person who is one (or more) of the following: (x) a retail client as defined in point (8) of Article 2 of Commission Delegated Regulation (EU) 2017/565, as it forms part of UK domestic law by virtue of the European Union (Withdrawal) Act 2018 (as amended, the "EUWA") and as amended; (y) a customer within the meaning of the provisions of the FSMA and any rules or regulations made under the FSMA (such rules and regulations as amended) to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014, as it forms part of UK domestic law by virtue of the EUWA and as amended; or (z) not a qualified investor as defined in Article 2 of Regulation (EU) 2017/1129, as it forms part of UK domestic law by virtue of the EUWA and as amended; and (2) the expression "offer" includes the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe for the Notes.

(vii)     It has not offered, sold or otherwise made available, and will not offer, sell or otherwise make available, any Notes to any EU Retail Investor in the European Economic Area. For the purposes of this provision: (1) the expression "EU retail investor" means a person who is one (or more) of the following: means a person who is one (or more) of the following: (x) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, "MiFID II"); (y) a customer within the meaning of Directive (EU) 2016/97 (as amended), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in Regulation (EU) 2017/1129 (as amended); and (2) the expression "offer" includes the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe for the Notes.

(b)     If any of the Sponsor, the Depositor or the Initial Purchasers determines or becomes aware that any "written communication" (as defined in Rule 405 under the Securities Act) (including without limitation the Preliminary Offering Memorandum) (when considered in conjunction with all information conveyed at the time of the Contract of Sale) made or prepared by any of the Sponsor, the Depositor or the Initial Purchasers contains an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading at the time that a Contract of Sale was entered into, and any of the Sponsor, the Depositor or the Initial Purchasers has prepared corrective information, with notice to the other parties, the Initial Purchasers shall deliver such information in a manner reasonably acceptable to each of the other parties, to any person with whom a Contract of Sale was entered into based on such written communication, and such information shall provide any such person with the following:

(i) adequate disclosure of the contractual arrangement;

(ii) adequate disclosure of the person's rights under the existing Contract of Sale at the time termination is sought;

(iii) adequate disclosure of the new information that is necessary to correct the misstatements or omissions in the information given at the time of the original Contract of Sale; and

(iv) a meaningful ability to elect to terminate or not terminate the prior Contract of Sale and to elect to enter into or not enter into a new Contract of Sale.

Any costs or losses incurred in connection with any such termination or reformation shall be subject to Section 4(a).

Section 7. <u>Indemnification</u>.

(a) Each Tricolor Entity agrees to jointly and severally indemnify and hold harmless the Initial Purchasers and their respective directors, officers, employees and agents and each person, if any, who controls the Initial Purchasers within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act as follows, against:

(i) any and all loss, liability, claim, damage and expense whatsoever, as incurred, arising out of any untrue statement or alleged untrue statement of a material fact included in the Preliminary Offering Memorandum (excluding any Note pricing information omitted therefrom and any information derived from Note pricing information) or any other Time of Sale Information, the Form ABS-15G or the Final Offering Memorandum (or any amendment or supplement to any of the foregoing) or the omission or alleged omission therefrom of a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(ii) any and all loss, liability, claim, damage and expense whatsoever, as incurred, to the extent of the aggregate amount paid in settlement of any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or of any claim whatsoever, based upon any such untrue statement or omission, or any such alleged untrue statement or omission; provided that (subject to Section 7(c)) any such settlement is effected with the written consent of the Sponsor and the Depositor;

(iii) any and all loss, liability, claim, damage and expense whatsoever, as incurred, arising out of any breach of any of the representations, warranties or covenants of the Sponsor or the Depositor contained in this Agreement;

(iv) any investigations or information requests from any regulator or government entity relating to whether the transactions contemplated by the Transaction Documents and any related disclosures are in compliance with Regulation RR; and

(v)    any and all expense whatsoever, as incurred (including the fees and disbursements of counsel chosen by the Initial Purchasers), reasonably incurred in investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever, based upon any such untrue statement or omission, or any such alleged untrue statement or omission, to the extent that any such expense is not paid under clause (i), (ii), (iii) or (iv) above; *provided, however*, that such indemnity agreement shall not apply to any loss, liability, claim, damage and expense arising out of any untrue statement or omission, or alleged untrue statement or omission, of a material fact made in reliance upon and in conformity with the Initial Purchasers' Information. The remedies provided for in this subsection are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity;

(b)    Each Initial Purchaser, severally and not jointly, agrees to indemnify and hold harmless each of the Tricolor Entities, the officers and directors of each such Tricolor Entity, and each person who controls each such Tricolor Entity within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, against any and all loss, liability, claim, damage and expense described in the indemnity contained in Section 6(a)(i); provided, however, that each Initial Purchaser will only be liable in any such case only to the extent that any untrue statement or omission, or alleged untrue statement or omission, of a material fact was made in reliance upon and in conformity with the Initial Purchasers' Information. "Initial Purchasers' Information" means the written information furnished by or on behalf of the Initial Purchasers to the Depositor specifically for use in connection with the preparation of the Preliminary Offering Memorandum and the Final Offering Memorandum, which information consists solely of (i) the second sentence in the last paragraph on the front cover and (ii) the second and last sentences in the second paragraph under the heading "Plan of Distribution", in each case on or in the Preliminary Offering Memorandum and the Final Offering Memorandum. The remedies provided for in this subsection are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

(c)    Each indemnified party shall give notice as promptly as reasonably practicable to each indemnifying party of any proceeding commenced against it in respect of which indemnity may be sought hereunder; provided, however, that the failure of any indemnified party to provide such notice to the indemnifying party shall not relieve the indemnifying party of its obligations under this Section 7 except to the extent the indemnifying party did not otherwise have actual notice of such claim and such failure results in the forfeiture by the indemnifying party of substantial rights and defenses. If any such proceeding shall be brought or asserted against an indemnified party and it shall have notified the indemnifying party thereof, the indemnifying party shall retain counsel reasonably satisfactory to the indemnified party (who shall not, without the consent of the indemnified party, be counsel to the indemnifying party) to represent the indemnified party and any others entitled to indemnification or contribution pursuant to this Agreement that the indemnifying party may designate in such proceeding and shall pay the fees and expenses of such proceeding and shall pay the fees and expenses of counsel related to such proceeding, as incurred. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the contrary; (ii) the indemnifying party has

failed within a reasonable time to retain counsel reasonably satisfactory to the indemnified party; (iii) the indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to the indemnifying party; or (iv) the named parties in any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interest between them. It is understood and agreed that the indemnifying party shall not, in connection with any proceeding or related proceeding in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all indemnified parties, and that all such fees and expenses shall be reimbursed as they are incurred. The indemnifying party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify each indemnified party from and against any loss or liability by reason of such settlement or judgment. Notwithstanding the foregoing sentence, if at any time an indemnified party shall have requested that an indemnifying party reimburse the indemnified party for fees and expenses of counsel as contemplated by this Section, the indemnifying party shall be liable for any settlement or any proceeding effected without its written consent if (i) such settlement is entered into more than 30 days after receipt by the indemnifying party of such request and (ii) the indemnifying party shall not have reimbursed the indemnified party in accordance with such request (to the extent such request is consistent with the terms of this Section 7) prior to the date of such settlement. No indemnifying party shall, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification or contribution could be sought under this Section or Section 8 (whether or not the indemnified parties are actual or potential parties thereto), unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party, in form and substance reasonably satisfactory to such indemnified party, from all liability arising out of such litigation, investigation, proceeding or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

(d)    If the indemnification provided for in Section 7 is for any reason unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, liabilities, claims, damages or expenses referred to therein, then each indemnifying party shall contribute to the aggregate amount of such losses, liabilities, claims, damages and expenses incurred by such indemnified party, as incurred, (i) in such proportion as is appropriate to reflect the relative benefits received by the Sponsor and the Depositor on the one hand and the Initial Purchasers on the other hand from the offering of the Notes pursuant to this Agreement or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Sponsor and the Depositor on the one hand and of the Initial Purchasers on the other hand in connection with the statements or omissions or circumstances which resulted in such losses, liabilities, claims, damages or expenses, as well as any other relevant equitable considerations. The obligations of the Sponsor and the Depositor under this Section shall be joint and several.

(e)    The relative benefits received by the Sponsor and the Depositor on the one hand and the Initial Purchasers on the other hand in connection with the offering of the Notes pursuant to this Agreement shall be deemed to be in the same respective proportions as the total net proceeds from the sale of the Notes (before deducting expenses) received by the Depositor and the total discounts and commissions received by the Initial Purchasers, bear to the aggregate initial public offering prices of the Notes. The relative fault of the Sponsor and the Depositor on the one hand and the Initial Purchasers on the other hand shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Sponsor and the Depositor or by the Initial Purchasers and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(f)    The Sponsor, the Depositor and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this Section were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section. The aggregate amount of losses, liabilities, claims, damages and expenses incurred by an indemnified party and referred to above in this Section shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever, based upon any such untrue or alleged untrue statement or omission or alleged omission.

(g)    Notwithstanding the provisions of this Section, no Initial Purchaser shall be required to contribute any amount in excess of the total discounts and commissions received by such Initial Purchaser in respect of the Notes purchased by it and distributed to investors exceeds the amount of any damages which such Initial Purchaser has otherwise been required to pay by reason of any such untrue or alleged untrue statement or omission or alleged omission.

(h)    No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The remedies provided for in this Section are not exclusive and shall not limit any rights or remedies that otherwise may be available to any indemnified party at law or in equity.

(i)    For purposes of this Section 7, each person, if any, who controls an Initial Purchaser within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act shall have the same rights to contribution as such Initial Purchaser, and each person, if any, who controls the Sponsor and the Depositor within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act shall have the same rights to contribution as the Sponsor and the Depositor.

Section 8.   Representations, Warranties and Agreements to Survive Delivery.  All representations, warranties and agreements contained in this Agreement (including, without limitation, Section 7) or in officer's certificates of the Sponsor and the Depositor and their respective Affiliates submitted pursuant hereto shall remain operative and in full force and effect, regardless of any investigation or statement as to the results thereof made by or on behalf of the

DB1/ 133348326.8                                29

Initial Purchasers or any controlling person, or by or on behalf of the Sponsor and the Depositor and their respective Affiliates, and shall survive delivery of the Notes to the Initial Purchasers.

Section 9.  Termination of Agreement.

(a)    This Agreement shall be subject to termination, with respect to the rights and obligations of the Initial Purchasers, in its absolute discretion, by notice given to Sponsor and the Depositor, if (i) after the execution and delivery of this Agreement and prior to the Closing Date (A) trading generally shall have been suspended or materially limited on the New York Stock Exchange, or (B) a general moratorium on commercial banking activities shall have been declared by relevant authorities, or (C) there shall have occurred any outbreak or escalation of hostilities, the declaration by the United States of a national emergency or any calamity or crisis (economic, financial or otherwise) that, in the Initial Purchasers' reasonable judgment, materially and adversely affects financial markets, or (D) there shall have occurred any change in financial markets that, in the Initial Purchasers' reasonable judgment, is material and adverse, or (E) any material adverse change, or any development involving a prospective material adverse change, in or affecting particularly the business or properties of the Issuer, the Depositor, or the Sponsor, and (ii) in the case of any of the events specified in clauses (i)(A) through (E), such event singly or together with any other such event makes it, in the Initial Purchasers' reasonable judgment, impracticable or inadvisable to market the Notes on the terms and in the manner contemplated herein and in the Preliminary Offering Memorandum.

(b)    If this Agreement is terminated pursuant to this Section, such termination shall be without liability of any party to any other party, except as provided in Section 4; provided, however, that Sections 1, 7, 8, 9 and 13 shall survive such termination and remain in full force and effect.

Section 10.  Notices.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication (including electronic mail). Notices to (i) the Representative, on behalf of the Initial Purchasers, shall be directed to it at 383 Madison Avenue, 8th Floor, New York, New York 10179, Attention: Billy Wong; email: billy.m.wong@jpmorgan.com; and (ii) notices to either Sponsor or the Depositor shall be directed to the respective entity at 6021 Connection Drive, 4th Floor, Irving, Texas 75039, Attention: Daniel Chu; email: dchu@tricolor.com; facsimile: (424) 290-2700.

Section 11.  Parties.  This Agreement shall inure to the benefit of and be binding upon the Initial Purchasers, the Sponsor, the Depositor and their respective successors. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person, firm or corporation, other than the Initial Purchasers, the Sponsor, the Depositor and their respective successors and the controlling persons, directors and officers referred to in Section 7 and their heirs and legal representatives any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained. This Agreement and all conditions and provisions hereof are intended to be for the sole and exclusive benefit of the Initial Purchasers, the Sponsor, the Depositor and their respective successors, and the controlling persons, directors and officers referred to in Section 7 and their heirs and legal representatives and for the benefit

of no other person, firm or corporation. No purchaser of Notes from the Initial Purchasers shall be deemed to be a successor by reason merely of such purchase.

Section 12. <u>Fiduciary Duties</u>. Each of the Sponsor and the Depositor, on behalf of itself and its respective Affiliates, hereby acknowledges that in connection with the offering of the Notes and the transactions related thereto, as contemplated herein and in the other Transaction Documents, and the discussions and negotiations of the purchase price thereof set forth in this Agreement: (i) each Initial Purchaser has acted at arms' length, is not an agent of or advisor to, and owes no fiduciary duties to, any of the Issuer, the Sponsor, the Depositor or any other Person, (ii) each Initial Purchaser owes the Issuer, the Sponsor and the Depositor only those contractual duties as are set forth in this Agreement and (iii) the Initial Purchasers may have interests that differ from those of any of the Issuer, the Sponsor and the Depositor. Each of the Issuer, the Sponsor and the Depositor hereby waives to the full extent permitted by applicable law any claims it may have against the Initial Purchasers arising from an alleged breach of fiduciary duty in connection with the offering of the Notes and the transactions related thereto, as contemplated herein and in the other Transaction Documents, including the discussions and negotiations of the purchase price thereof set forth in this Agreement.

Section 13. **<u>GOVERNING LAW</u>. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE RELATIONSHIP OF THE PARTIES, AND/OR THE INTERPRETATION AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ANY OTHERWISE APPLICABLE CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES UNDER THIS AGREEMENT SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS AND EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE COURTS OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE SITTING IN THE BOROUGH OF MANHATTAN, AND APPELLATE COURTS FROM ANY THEREOF IN RESPECT OF ANY CLAIM, DISPUTE OR DIFFERENCE ARISING OUT OF OR IN CONNECTION WITH THIS LETTER. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE ACTIONS OF THE UNDERSIGNED IN THE NEGOTIATION, PERFORMANCE OR ENFORCEMENT HEREOF.**

Section 14. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same instrument. The words "executed," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this transaction shall include, in addition to manually executed signature pages, images of manually executed signatures transmitted by facsimile or other electronic format (including,

DB1/ 133348326.8

31

without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, any electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 15.  Effect of Headings.  The Section headings herein are for convenience only and shall not affect the construction hereof.

Section 16. The Representative. The Representative represents and warrants to the Tricolor Entities that it is duly authorized to enter into this Agreement. The Representative shall act for the Initial Purchasers in connection with this financing, and any action under this Agreement taken by the Representative will be binding upon each Initial Purchaser. In all dealings hereunder, the parties hereto shall be entitled to act and rely upon any statement, request, notice or agreement on behalf of an Initial Purchaser made or given by the Representative.

Section 17.  Recognition of the U.S. Special Resolution Regimes.

(a)    In the event that any Initial Purchaser is a Covered Entity and becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from such Initial Purchaser of this Agreement, and any interest and obligation in or under this Agreement, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime.

(b)    In the event that any Initial Purchaser is a Covered Entity or any BHC Act Affiliate of such Initial Purchaser becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement that may be exercised against such Initial Purchaser are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime.

(c)    For purposes of this Section 17, the following terms shall have the following meanings:

(i)    "BHC Act Affiliate" has the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 U.S.C. § 1841(k).

(ii)    "Covered Entity" means any of the following:

(1)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(2)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(3)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

(iii)    "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

(iv)    "U.S. Special Resolution Regime" means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

[Signature pages follow.]

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this instrument, along with all counterparts, will become a binding agreement among the Sponsor, the Depositor and the Initial Purchasers in accordance with its terms.

Very truly yours,

TRICOLOR AUTO RECEIVABLES 2 LLC,
as Depositor

By: _____

Name:    Jerome A Kollar
Title:    VP and CFO

TRICOLOR AUTO ACCEPTANCE, LLC,
as Sponsor

By: _____

Name:    Jerome A Kollar
Title:    CFO and Vice President

*Note Purchase Agreement*

CONFIRMED AND ACCEPTED,
as of the date first written above:

J.P. MORGAN SECURITIES LLC,
on behalf of itself and as Representative of the
Initial Purchasers

By: _____

    Name:  Matthew Gade
    Title:   Executive Director

*Note Purchase Agreement*

SCHEDULE I

### Class A Notes

| Principal Amount | Initial Purchaser | Purchase Price (%) |
| --- | --- | --- |
| $125,046,000 | J.P. Morgan Securities LLC | 99.18961% |
| $6,947,000 | Barclays Capital Inc. | 99.18961% |
| $6,947,000 | Fifth Third Securities, Inc. | 99.18961% |

### Class B Notes

| Principal Amount | Initial Purchaser | Purchase Price (%) |
| --- | --- | --- |
| $12,400,000 | J.P. Morgan Securities LLC | 99.29296% |

### Class C Notes

| Principal Amount | Initial Purchaser | Purchase Price (%) |
| --- | --- | --- |
| $14,980,000 | J.P. Morgan Securities LLC | 99.28167% |

### Class D Notes

| Principal Amount | Initial Purchaser | Purchase Price (%) |
| --- | --- | --- |
| $23,790,000 | J.P. Morgan Securities LLC | 99.27691% |

### Class E Notes

| Principal Amount | Initial Purchaser | Purchase Price (%) |
| --- | --- | --- |
| $19,450,000 | J.P. Morgan Securities LLC | 99.27672% |

### Class F Notes

| Principal Amount | Initial Purchaser | Purchase Price (%) |
| --- | --- | --- |
| $14,410,000 | J.P. Morgan Securities LLC | 94.56500% |

SA-1