| Summary report: Litera Compare for Word 11.3.1.3 Document comparison done on 4/16/2026 11:33:48 PM | |
|---|---|
| **Style name:** Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** 2026.02.26 Tricolor Securities Fraud Complaint.docx | |
| **Modified filename:** 2026.04.16 Tricolor Securities Fraud First Amended Complaint_CLEAN.docx | |
| **Changes:** | |
| Add | 727 |
| Delete | 540 |
| Move From | 29 |
| Move To | 29 |
| Table Insert | 26 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1351 |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

One William Street Capital Master Fund Ltd., OWS ABS IV, L.P., OWS ABS IV Sub I, LLC, OWS ABS Master Fund, Ltd., OWS ABS Master Fund II, L.P., OWS Credit Opportunity I, LLC, OWS Credit Opportunity Sub I, Ltd., 1WS Credit Income Fund, 1WSCI Sub I, LLC, Clear Haven Investment Fund LP, Clear Haven Investments LLC, Clear Haven Total Return Partners LP, Clear Haven Ultra Short Investment Grade Bond Fund LP, Clear Haven UMF Fund LP, California Insurance Company, Constitution Insurance Company, Florida Casualty Insurance Company, Superior Risk Solutions (SAC) Ltd, Texas Insurance Company, Crescent II Fund, L.P., EF Securities LLC, Ellington Empire Fund LLC, Ellington M Credit Master Fund Ltd., Ellington Private Opportunities Main Master Fund III LP, Ellington Special Relative Value Fund LLC, St. Bernard Opportunity Fund I, Ltd., Advisors' Inner Circle Fund II - Frost Total Return Bond Fund, Frost Credit Fund, Hudson Cove Credit Opportunity Master Fund, L.P., Janus Henderson Asset-Backed Securities ETF, Janus Henderson Income ETF, Janus Henderson Mortgage-Backed Securities ETF, Janus Henderson Multi-Sector Income Fund, Janus Henderson Securitized Income ETF, Guardian Multi-Sector Bond VIP Fund, and Sagicor Life Insurance Company,

       Plaintiffs,

    -against-

JPMorgan Chase Bank, National Association, J.P. Morgan Securities LLC, Barclays Bank PLC, Barclays Capital Inc., Fifth Third Bank, National Association, and Fifth Third Securities, Inc.

       Defendants.

~~Civil Action~~Case No. 1:26-cv-01622

**FIRST AMENDED COMPLAINT**

**(JURY TRIAL DEMANDED)**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................ 2

PARTIES AND GOVERNING CONTRACTS .................................................................. 7

JURISDICTION AND VENUE ...................................................................................... 11

FACTUAL ALLEGATIONS .......................................................................................... ~~11~~12

I.     THE TRICOLOR SECURITIZATION PROCESS AND PARTIES ............................ ~~11~~12

     A.     Tricolor's Auto Lending Business ................................................ ~~11~~12

     B.     The Tricolor Securitizations ...................................................... ~~13~~14

     C.     Defendants~~' Roles In~~ Were Integral To Tricolor's Lending And Securitization Machine ........................................................ ~~16~~17

II.     Tricolor's Pervasive Fraud ...................................................................... ~~19~~22

III.     Defendants Willfully Blind Themselves To Tricolor's Fraud ......................... ~~29~~34

IV.     Defendants Made Material Misrepresentations And Omissions in Connection with the Sale of the Tricolor Trust Notes ............................... ~~38~~45

V.     Plaintiffs Relied Upon Defendants' Material Misrepresentations And Omissions in Connection with their Purchase of the Tricolor Trust Notes .................. 52

     A.     The One William Street Plaintiffs .............................................. 52

     B.     The Clear Haven Plaintiffs ....................................................... 60

     C.     The Frost Plaintiffs ................................................................. 67

     D.     The Hudson Cove Plaintiff ........................................................ 71

     E.     The Janus Henderson Plaintiffs .................................................. 76

     F.     Sagicor .................................................................................. 84

~~V~~VI.     Tricolor Abruptly Collapses And Declares Bankruptcy ............................... ~~45~~89

FIRST CAUSE OF ACTION: ....................................................................................... ~~46~~90

SECOND CAUSE OF ACTION: ................................................................................... ~~53~~97

THIRD CAUSE OF ACTION: ...................................................................................... ~~55~~99

FOURTH CAUSE OF ACTION: ................................................................................... ~~56~~103

FIFTH CAUSE OF ACTION: ....................................................................................... ~~57~~104

SIXTH CAUSE OF ACTION: ....................................................................................... ~~63~~106

SEVENTH CAUSE OF ACTION: ................................................................................. ~~66~~108

EIGHTH CAUSE OF ACTION: .................................................................................... 109

NINTH CAUSE OF ACTION: ...................................................................................... 116

i

TENTH CAUSE OF ACTION: .................................................................................................119

Plaintiffs One William Street Capital Master Fund Ltd., OWS ABS IV, L.P., OWS ABS IV Sub I, LLC, OWS ABS Master Fund, Ltd., OWS ABS Master Fund II, L.P., OWS Credit Opportunity I, LLC, OWS Credit Opportunity Sub I, Ltd., 1WS Credit Income Fund, 1WSCI Sub I, LLC, Clear Haven Investment Fund LP, Clear Haven Investments LLC, Clear Haven Total Return Partners LP, Clear Haven Ultra Short Investment Grade Bond Fund LP, Clear Haven UMF Fund LP, California Insurance Company, Constitution Insurance Company, Florida Casualty Insurance Company, Superior Risk Solutions (SAC) Ltd, Texas Insurance Company, Crescent II Fund, L.P., EF Securities LLC, Ellington Empire Fund LLC, Ellington M Credit Master Fund Ltd., Ellington Private Opportunities Main Master Fund III LP, Ellington Special Relative Value Fund LLC, St. Bernard Opportunity Fund I, Ltd., Advisors' Inner Circle Fund II - Frost Total Return Bond Fund, Frost Credit Fund, Hudson Cove Credit Opportunity Master Fund, L.P., Janus Henderson Asset-Backed Securities ETF, Janus Henderson Income ETF, Janus Henderson Mortgage-Backed Securities ETF, Janus Henderson Multi-Sector Income Fund, Janus Henderson Securitized Income ETF, Guardian Multi-Sector Bond VIP Fund, and Sagicor Life Insurance Company (the "Noteholders") bring this action against defendants JPMorgan Chase Bank, National Association and J.P. Morgan Securities LLC (collectively, "JPMorgan"), Barclays Bank PLC and Barclays Capital Inc. (collectively, "Barclays"), and Fifth Third Bank, National Association and Fifth Third Securities, Inc. (collectively, "Fifth Third") (together, the "Defendants") for damages arising from federal securities fraud in violation of Section 10(b) of the 1934 Securities Exchange Act and SEC Rule 10b-5, state securities fraud in violation of the blue sky laws of Colorado (Colo. Rev. Stat. Ann. § 11-51-501), Florida (Fla. Stat. Ann. § 517.301), and New Jersey (N.J. Stat. Ann. § 49:3-71), and Texas (Tex. Gov't Code Ann. § 4008.052), aiding and abetting state securities fraud in violation of Tex. Gov't Code Ann. §

1

4008.055(c), common law fraud, and actual and constructive fraudulent transfer in violation of 6 Del. C. §§ 1304-1305 and Tex. Bus. & Com. Code §§ 24.005-24.006.  Plaintiffs' claims arise from their investments in seven securitizations: (1) Tricolor Auto Securitization Trust 2022-1 ("TAST 2022-1"); (2) Tricolor Auto Securitization Trust 2023-1 ("TAST 2023-1"); (3) Tricolor Auto Securitization Trust 2024-1 ("TAST 2024-1"); (4) Tricolor Auto Securitization Trust 2024-2 ("TAST 2024-2"); (5) Tricolor Auto Securitization Trust 2024-3 ("TAST 2024-3"); (6) Tricolor Auto Securitization Trust 2025-1 ("TAST 2025-1"); and (7) Tricolor Auto Securitization Trust 2025-2 ("TAST 2025-2") (collectively, the "Tricolor Trusts" or "Securitizations").  Plaintiffs collectively hold over $230270 million in current principal balance of notes (the "Notes") issued by the Tricolor Trusts.  Plaintiffs allege as follows:

## INTRODUCTION

1.	This case arises from the catastrophic collapse of Tricolor Holdings, LLC and its affiliates (together, "Tricolor"), a used car dealer and subprime auto lender that perpetrated a blatant and pervasive fraud for years involving hundreds of millions of dollars of fraudulent auto loans.  Defendants, who financed Tricolor's origination of the auto loans through warehouse lending facilities (the "warehouse lines") and underwrote Tricolor's sale of asset-backed securities, concealed and misrepresented clear evidence of Tricolor's fraudulent conduct in offering materials sent to asset-backed securities investors, including the Plaintiffs.  In doing so, Defendants fueled and perpetuated Tricolor's Ponzi-like fraudfraudulent scheme whereby it inflated the loan collateral that it used to obtain financing and repaid Defendants' warehouse lines using cash derived from the sale of asset-backed securities secured by such loans to new investors.  By August 2025, Tricolor was representing that it held $2.2 billion in loan collateral, but in reality it only had $1.4 billion of loans.  At that point, Tricolor's fraud unraveled and

2

Tricolor abruptly ceased operations and filed for Chapter 7 bankruptcy protection on September 10, 2025.

2.      While Tricolor's public implosion was sudden, Defendants were privately warned for years that it was coming.  Auditors performing due diligence on the loan collateral backing Defendants' warehouse lines in 2022 and 2024 reported numerous alarming issues with Tricolor's loan reporting to Defendants.  Among other startling revelations, 2022 and 2024 audit reports delivered to Defendants showed that nearly half the payments received on a given day were posted to the wrong bank account for the wrong lender, that defaulted loan accounts showed recoveries that were never actually obtained from car repossessions that never actually occurred, and that loan delinquencies were inaccurately reported and aged.  The audits also highlighted Tricolor's pervasive internal control weaknesses, which did not improve between the 2022 and 2024 audits.  At the same time, Tricolor engaged in widespread obstructionist conduct, of which Defendants were aware through the audit process, that prevented the auditors from running down the cause of these widespread and alarming issues.  Most notably, in connection with the 2024 audit, Tricolor refused to provide its master servicer report to the auditor, which was needed to check for double-pledging of loan collateral—despite clear indications that Tricolor was, indeed, engaging in double-pledging.  Based on these findings and others, the auditors implored the Defendants to further investigate the integrity of Tricolor's loan data.

3.      Many of the most troubling auditor revelations came in February 2024, only a few months after the warehouse facility that Defendants JPMorgan Chase Bank, National Association and Barclays Bank PLC provided to Tricolor swelled from $379 million to $693 million.  Having just pumped over $300 million of additional cash into Tricolor, Tricolor's disastrous audit presented a significant dilemma for JPMorgan and Barclays.  Defendants were

3

dependent on Tricolor's securitization pipeline to offload the loan collateral held in their warehouse lines. If they disclosed the evidence they had learned indicating that Tricolor was engaged in fraudulent activity, further securitization efforts would fail and Defendants would be left holding the bag. Defendants also had significant financial incentives to keep the Tricolor's origination and securitization pipelines flowing. As Tricolor's largest warehouse lenders and the investment banks hired to structure and sell Tricolor's securitizations, Defendants earned tens of millions of dollars in fees and interest income each year from their Tricolor relationship. Disclosure of Tricolor's fraud would bring this lucrative business to an immediate halt. Rather than risk a massive loss on their warehouse lines and forfeit the tens of millions of dollars of fees and income derived from Tricolor's fraudulent enterprise, Defendants responded by hiding what they had learned and sticking their heads in the sand to avoid learning more.

4.      Despite the obvious signs of fraud at Tricolor, Defendants barreled forward with their financing and securitization of Tricolor's auto loans. Following the alarming 2022 and 2024 audits, Defendants proceeded to underwrite and sell nearly $2 billion in asset-backed securities (the "Notes") to investors, including more than $1.1 billion since February 2024. In marketing and selling asset-backed securities to investors, Defendants concealed and misrepresented pervasive deficiencies in Tricolor's loan data and Tricolor's utter lack of internal controls. Defendants made detailed representations about the performance and quality of the loan collateral backing the Notes without any disclosure that the data employed for those representations was riddled with errors that painted an overly rosy picture of the collateral. Defendants additionally misrepresented Tricolor as having an experienced management team with a strong operating history, despite knowing that Tricolor was operated without adequate internal controls by individuals who were actively obstructing the Defendants' efforts to perform

4

additional due diligence on the loan collateral. Defendants made no effort to update or change their disclosures following the February 2024 audit. The disclosures for the Securitizations following that audit were materially identical to the disclosures predating that audit. Additionally, in direct contradiction to the audit's findings that Tricolor's recovery data was inaccurate and unreliable, Defendants emphasized Tricolor's strong purported recovery rates on charged-off loans in the Offering Memoranda for the Notes following the audits as well as in contemporaneous materials they prepared such as deal roadshow presentations and in discussions with investors.

5.    Defendant JPMorgan's response to the cascade of red flags about Tricolor's loan collateral was very different when the JPMorgan employees evaluating the evidence of fraud were less personally invested in Tricolor's success. Around the same time as the February 2024 audits, Tricolor hired JPMorgan to assist in an initial public offering. JPMorgan's equity capital markets team did not have the same personal responsibility for JPMorgan's large financial commitment to Tricolor, and was therefore able to operate more objectively than their colleagues who were continuing to support Tricolor's securitization program. They were presented with the same accounting irregularities as JPMorgan's securitization team, and also uncovered that Tricolor's Chief Financial Officer, Jerry Kollar, was previously associated with a large accounting fraud that resulted in a criminal indictment. Faced with clear evidence of fraud at Tricolor, JPMorgan pushed Tricolor's Chief Executive Officer, Daniel Chu, to replace Kollar and ultimately abandoned the IPO. This decision stands in stark contrast to Defendants' continued underwriting of Tricolor's securitization pipeline despite knowledge of the same evidence of fraud.

6.     Plaintiffs are investors that purchased over $230270 million in current principal balance of Notes in Tricolor Trusts from Defendants and others in reliance on the integrity of the statements made by the Underwriter Defendants (J.P. Morgan Securities LLC, Barclays Capital Inc., and Fifth Third Securities, Inc.) in Tricolor's Offering Memoranda for the Tricolor SecuritizationsTrusts.  Those Offering Memoranda represented that the Tricolor-originated loan receivables acquired by each Trust satisfied specific eligibility criteria, that Tricolor had a "highly experienced management team with strong operating track record," and that the receivables' statistical characteristics would not "vary materially" from reported performance data.  Each of these representations—which the Defendants repeated from the first Tricolor SecuritizationTrust in April 2022 through the seventh Tricolor SecuritizationTrust in June 2025—was false.  Plaintiffs would not have purchased their Notes at the prices they paid, or at all, if Defendants had fully and accurately disclosed what they knew about Tricolor's deficient processes and controls, its executives' checkered backgrounds, and the pervasive evidence of fraud in its loan data.  But Plaintiffs did not know about Tricolor's fraud when they invested because the Defendants deliberately concealed it, while affirmatively misrepresenting the quality of Tricolor's team and internal systems and the characteristics of the receivables to be purchased by each Trust.  Defendants did so to protect their massive warehouse facilities with Tricolor, which directly benefitted from sales of loans they owned to the Tricolor Trusts, and to sustain the flow of lucrative fees that Defendants reaped from their services for Tricolor.

7.     When the truth of Tricolor's fraud emerged through Tricolor's bankruptcy and the Chapter 7 Trustee's findings, the price of Plaintiffs' Notes plummeted.  On September 10, 2025, Tricolor filed for Chapter 7 bankruptcy, publicly revealing that its loan portfolio was materially impaired.  On December 15, 2025, the United States Attorney for the Southern District of New

6

York filed an indictment against Tricolor's founder and CEO Daniel Chu alleging, among other wrongdoing, double-pledging loans that Tricolor securitized.  On December 19, 2025, the Chapter 7 Trustee for Tricolor filed a complaint against Chu, Tricolor CFO Jerry Kollar, and other Tricolor executives in the Bankruptcy Court for the Northern District of Texas revealing that it had confirmed that Tricolor engaged in widespread securitization fraud, including the use of "clone loans" and fictitious loan receivables.  In the immediate aftermath of Tricolor's bankruptcy filing, Plaintiffs' Notes became illiquid, and they currently trade for pennies on the dollar.

8.    Plaintiffs bring this action to recover their losses from (1) the Underwriter Defendants, J.P. Morgan Securities LLC, Barclays Capital Inc., and Fifth Third Securities, Inc., who sold them asset-backed securities while concealing and misrepresenting known evidence of Tricolor's fraud; and (2) the Lender Defendants, JPMorgan Chase Bank, National Association, Barclays Bank PLC, and Fifth Third Bank, National Association, who offloaded their exposure to impaired loan collateral by selling it to the Tricolor Trusts for far more than it was actually worth, in transactions that rendered the Tricolor Trusts insolvent from their inception.

**PARTIES AND GOVERNING CONTRACTS**

9.    Plaintiff One William Street Capital Master Fund Ltd. is a Cayman Islands limited company.

10.    Plaintiff OWS ABS IV, L.P. is a Delaware limited partnership.

11.    Plaintiff OWS ABS IV Sub I, LLC is a Cayman Islands limited liability company.

12.    Plaintiff OWS ABS Master Fund, Ltd. is a Cayman Islands limited company.

13.    Plaintiff OWS ABS Master Fund II, L.P. is a Delaware limited partnership.

14.    Plaintiff OWS Credit Opportunity I, LLC is a Delaware limited liability company.

15.    Plaintiff OWS Credit Opportunity Sub I, Ltd. is a Cayman Islands limited company.

16.    Plaintiff 1WS Credit Income Fund is a Delaware statutory trust.

17.    Plaintiff 1WSCI Sub I, LLC is a Cayman Islands limited liability company.

18.    Plaintiff Clear Haven Investment Fund LP is a Delaware limited partnership.

19.    Plaintiff Clear Haven Investments LLC is a Delaware limited liability company.

20.    Plaintiff Clear Haven Total Return Partners LP is a Delaware limited partnership.

21.    Plaintiff Clear Haven Ultra Short Investment Grade Bond Fund LP is a Delaware limited partnership.

22.    Plaintiff Clear Haven UMF Fund LP is a Delaware limited partnership.

23.    Plaintiff California Insurance Company is a California corporation.

24.    Plaintiff Constitution Insurance Company is a New York corporation.

25.    Plaintiff Florida Casualty Insurance Company is a Florida corporation.

26.    Plaintiff Superior Risk Solutions (SAC) Ltd is a Bermuda limited company.

27.    Plaintiff Texas Insurance Company is a Texas corporation.

28.    Plaintiff Crescent II Fund, L.P. is a Delaware limited partnership.

29.    Plaintiff EF Securities LLC is a Delaware limited liability company.

30.    Plaintiff Ellington Empire Fund LLC is a Delaware limited liability company.

31.    ~~30.~~ Plaintiff Ellington M Credit Master Fund Ltd. is a Cayman Islands exempted ~~limited liability~~ company.

32.    ~~31.~~ Plaintiff Ellington Private Opportunities Main Master Fund III L.P. is a Cayman Islands exempted limited partnership.

8

33. ~~32.~~ Plaintiff Ellington Special Relative Value Fund LLC is a Delaware limited liability company.

34. Plaintiff St. Bernard Opportunity Fund I, Ltd. is a Cayman Islands exempted company.

35. Plaintiff Advisors' Inner Circle Fund II - Frost Total Return Bond Fund is a series of the Frost Family of Funds, a Delaware statutory trust.

36. Plaintiff Frost Credit Fund is a series of the Frost Family of Funds, a Delaware statutory trust.

37. ~~33.~~ Plaintiff Hudson Cove Credit Opportunity Master Fund, L.P. is a Cayman Islands limited partnership with its principal place of business in Jersey City, New Jersey.

38. ~~34.~~ Plaintiff Janus Henderson Asset-Backed Securities ETF is a series of Janus Detroit Street Trust, a Delaware statutory trust, with its principal place of business in Denver, Colorado.

39. ~~35.~~ Plaintiff Janus Henderson Income ETF is a series of Janus Detroit Street Trust, a Delaware statutory trust, with its principal place of business in Denver, Colorado.

40. ~~36.~~ Plaintiff Janus Henderson Mortgage-Backed Securities ETF is a series of Janus Detroit Street Trust, a Delaware statutory trust, with its principal place of business in Denver, Colorado.

41. Plaintiff Janus Henderson Multi-Sector Income Fund is a series of Janus Investment Fund, a Massachusetts business trust.

42. ~~37.~~ Plaintiff Janus Henderson Securitized Income ETF is a series of Janus Detroit Street Trust, a Delaware statutory trust, with its principal place of business in Denver, Colorado.

9

43. Plaintiff Guardian Multi-Sector Bond VIP Fund is a series of Guardian Variable Products Trust, a Delaware statutory trust.

44. ~~38.~~ Plaintiff Sagicor Life Insurance Company is a Texas corporation.

45. ~~39.~~ Defendant JPMorgan Chase Bank, National Association (collectively with J.P. Morgan Securities LLC, "JPMorgan") is a national banking association organized and existing under the laws of the United States with its head office in Columbus, Ohio.  JPMorgan Chase Bank, National Association was the Administrative Agent to Tricolor's largest warehouse lending facility, Tricolor Funding SPV 4 LLC ("SPV 4").   JPMorgan Chase Bank, National Association acted as warehouse lender to Tricolor through SPV 4.

46. ~~40.~~ Defendant J.P. Morgan Securities LLC is a Delaware corporation with its principal place of business in New York, New York.  J.P. Morgan Securities LLC acted as an underwriter of all seven Tricolor Trusts, and acted as lead underwriter for five of the seven Tricolor Trusts.

47. ~~41.~~ Defendant Barclays Bank PLC is a United Kingdom public limited company headquartered in London.  Barclays Bank PLC acted as a warehouse lender to Tricolor through SPV 4.

48. ~~42.~~ Defendant Barclays Capital Inc. (collectively with Barclay Bank PLC, "Barclays") is a Connecticut corporation headquartered in New York, New York.  Barclays Capital Inc. was an underwriter of all seven Tricolor Trusts, and acted as lead underwriter for two of the seven Tricolor Trusts.

49. ~~43.~~ Defendant Fifth Third Bank, National Association (collectively with Fifth Third Securities, Inc., "Fifth Third") is headquartered with its principal place of business in Ohio.  Fifth Third Bank, National Association was the Administrative Agent to Tricolor's second

largest warehouse lending facility, Tricolor Funding SPV 6 LLC ("SPV 6").  Fifth Third Bank, National Association acted as warehouse lender to Tricolor through SPV 6.

50.    44. Defendant Fifth Third Securities, Inc. is an Indiana corporation.  Fifth Third Securities, Inc. was an underwriter of five Tricolor Trusts.

51.    45. The Underwriter Defendants underwrote seven Tricolor Trusts: Tricolor Auto Securitization Trust 2022-1 (in or about April 29, 2022); Tricolor Auto Securitization Trust 2023-1 (in or about February 9, 2023); Tricolor Auto Securitization Trust 2024-1 (in or about January 25, 2024); Tricolor Auto Securitization Trust 2024-2 (in or about May 14, 2024); Tricolor Auto Securitization Trust 2024-3 (in or about October 7, 2024); Tricolor Auto Securitization Trust 2025-1 (in or about March 11, 2025); and Tricolor Auto Securitization Trust 2025-2 (in or about June 10, 2025).  JPMorgan served as Bookrunner & Structuring Agent for the initial offering of TAST 2022-1, TAST 2023-1, TAST 2024-2, TAST 2024-3, and TAST 2025-1, and Joint Bookrunner for TAST 2024-1 and TAST 2025-2.  Barclays served as Bookrunner & Structuring Agent for TAST 2024-1 and TAST 2025-2, Joint Bookrunner for TAST 2024-2, TAST 2024-3, and TAST 2025-1, and Co-Manager for TAST 2022-1 and TAST 2023-1.  Fifth Third served as Co-Manager for TAST 2023-1, TAST 2024-2, TAST 2024-3, TAST 2025-1, and TAST 2025-2.

52.    46. Each Tricolor Trust issued Notes which were acquired by investors, including Plaintiffs, for cash.  Each Trust used the investors' cash to purchase Tricolor-originated auto loan receivables from special purpose, bankruptcy-remote entities (the "warehouse SPVs") which held the auto loan receivables as collateral for the Lender Defendants' warehouse lines.  On information and belief, the investors' cash—including Plaintiffs'—flowed immediately from the warehouse SPVs to the Lender Defendants to repay their warehouse loans.  The Lender

Defendants received the following amounts as proceeds of these fraudulent transfers: (1) $212,130,000.00 (in or about April 29, 2022) in respect of Tricolor Auto Securitization Trust 2022-1; (2) $223,970,000.00 (in or about February 9, 2023) in respect of Tricolor Auto Securitization Trust 2023-1; (3) $271,320,000.00 (in or about January 25, 2024) in respect of Tricolor Auto Securitization Trust 2024-1; (4) $276,710,000.00 (in or about May 14, 2024) in respect of Tricolor Auto Securitization Trust 2024-2; (5) $287,550,000.00 (in or about October 7, 2024) in respect of Tricolor Auto Securitization Trust 2024-3; (6) $328,100,000.00 (in or about March 11, 2025) in respect of Tricolor Auto Securitization Trust 2025-1; and (7) $217,180,000.00 (in or about June 10, 2025) in respect of Tricolor Auto Securitization Trust 2025-2.

**JURISDICTION AND VENUE**

53.    47. This Court has subject matter jurisdiction over Defendants pursuant to Section 27 of the Securities and Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337(a). This Court also has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy.

54.    48. This Court has personal jurisdiction over each Defendant.  Each Defendant either maintained its business offices and conducted a substantial part of the events asserted in this complaint in this District or directed its fraudulent activity into this market by selling to Plaintiffs located in this District or by receiving transfers of payments from Plaintiffs located in this District.

55.    49. Venue is proper pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 in that many of the acts, transactions and occurrences alleged herein occurred in this District, and all of the Defendants conducted business here in connection with

the events described herein.    Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce including the mails in connection with the conduct alleged herein.

## FACTUAL ALLEGATIONS

### I.    THE TRICOLOR SECURITIZATION PROCESS AND PARTIES

#### A.    Tricolor's Auto Lending Business

56.    50. Prior to its collapse, Tricolor operated a large chain of vertically integrated used car dealerships targeting Hispanic communities in Texas, Arizona, and California.  Tricolor followed a "buy here, pay here" model where buyers could both purchase used cars and borrow the money necessary to complete the purchase from Tricolor at its dealerships.   Tricolor's customers consisted primarily of high risk borrowers with poor or no credit history.  As such, Tricolor's auto loans were categorized as sub-prime auto loans, with interest rates regularly exceeding 20%.

57.    51. Tricolor funded its loans to used car buyers through revolving lines of credit, called "warehouse lines," with various "warehouse lenders," including the Lender Defendants. To facilitate this process, Tricolor established at least six special purpose, bankruptcy-remote entities (the aforementioned warehouse SPVs) set up to borrow funds from the Lender Defendants between 2018 and September 2025.  The warehouse SPVs used funds borrowed from the Lenders Defendants to purchase auto loans that Tricolor originated at its dealerships. The warehouse SPVs then pledged these purchased loans, the underlying vehicles financed by those loans, and all proceeds thereof back to the warehouse lenders as collateral for the warehouse lines.

13

58. 52. The loan agreements for the warehouse lines permitted the warehouse SPVs to draw funding equal to a percentage of the principal value of loans owned by the warehouse SPV that met certain criteria (the "Eligible Loan Balance"), subject to a maximum loan amount. The JPMorgan-administered SPV 4, for example, permitted borrowing of up to 80% of SPV 4's Eligible Loan Balance. Each warehouse SPV credit agreement refers to this permitted borrowing amount as the "Borrowing Base." In order to draw additional funds, the warehouse SPVs would deliver "Borrowing Base" statements to the warehouse lenders reflecting the Eligible Loan Balance, along with the relevant eligibility characteristics broken out on a loan-by-loan basis. Tricolor therefore had an incentive to sell as many eligible loans as possible to the warehouse SPVs in order to maximize its borrowing capacity.

59. 53. In addition to the Borrowing Base statements, the warehouse SPVs delivered monthly reporting to the warehouse lenders regarding the loan receivables owned by each warehouse SPV, including information about collections, delinquencies, losses, recoveries, and cash flows on an account-level basis. The warehouse lenders were also authorized to audit the loan portfolios reported by the warehouse SPVs for accuracy. The purpose of these audits was to ensure that Tricolor was accurately reporting its Borrowing Base to the warehouse lenders—thereby ensuring that the warehouse lenders had sufficient loan collateral to secure repayment of their outstanding loan balance on the warehouse lines.

60. 54. As discussed in greater detail below, the reporting and audits delivered to the warehouse lenders uncovered glaring evidence of Tricolor's pervasive fraud. Yet the warehouse lenders continued to lend against and securitize Tricolor's loans despite these giant red flags.

14

### B.        The Tricolor Securitizations

61.    55. Once Tricolor had originated a sufficient volume of auto loans through its warehouse lines, it would pool them together and offload those loans into the securitization market.  Securitization is the process by which originators transform illiquid assets into tradeable securities.  The process of securitization begins with the originator assembling a pool of income-generating assets, here auto loans, that share similar characteristics (*e.g.*, credit quality, maturity, and interest rates) that make them suitable for bundling together.  The asset pool, unlike the individual loans that comprise it, generates statistically predictable cash flows that can support fixed income securities.

62.    56. The originator then transfers this asset pool to a special purpose entity (or "SPE") created solely to hold those assets and issue securities backed by the cash flows they generate.  The transfer is structured as a "true sale," thereby legally isolating the securitization assets from the originator's balance sheet and protecting them from the originator's creditors in the event of bankruptcy.

63.    57. The securitization SPE, in turn, issues different "tranches" of securities to investors.  Each tranche has different rights and payment priority—all of which are carefully defined in the SPE's governing agreements.  The SPE uses the proceeds from selling these securities to pay for the transferred assets.  The SPE then retains a servicer to collect payments from the underlying borrowers and distribute cash flows to investors.

64.    Here, Tricolor created the Tricolor Trusts, which, acting through the Depositor (defined below), sold Notes to investors (including the Plaintiffs) and useddirected that the proceeds be used to acquire a pool of auto loan receivables from the warehouse SPVs., which transferred the receivables to the Tricolor Trusts through the Tricolor Servicer (defined below)

and the Depositor.  Specifically: (i) the Tricolor Trusts, acting through the Depositor, sold the Notes to investors, with the Underwriter Defendants marketing the Notes and soliciting investors; (ii) the Tricolor Trusts, again acting through the Depositor, transferred the cash raised from the sale of the Notes through the Tricolor Servicer to the warehouse SPVs; and (iii) in exchange, the warehouse SPVs transferred the receivables through the Tricolor Servicer and the Depositor to the Tricolor Trusts, which held the receivables as collateral for the Notes.  These steps took place simultaneously, and were all part of a single integrated transaction designed to effectuate the sale of the receivables from the warehouse SPVs to the Tricolor Trusts.

65.     The Tricolor Servicer and the Depositor acted as mere conduits for the transfers between the Tricolor Trusts and warehouse SPVs.  The Tricolor Servicer and the Depositor never had dominion or control over either the Tricolor Trust funds that were used to purchase the receivables or the receivables themselves.  To the contrary, the governing documents required the Depositor to immediately transfer the funds raised through sales of the Notes to the Tricolor Servicer, and the Tricolor Servicer to immediately transfer those funds to the Warehouse SPVs. Similarly, the documents required the Tricolor Servicer to immediately transfer the receivables to the Depositor, and the Depositor to immediately transfer those receivables to the Tricolor Trusts.  In other words, while Notes sales proceeds passed, on paper, through the Tricolor Servicer and the Depositor, the economic reality is that the Tricolor Trusts transferred funds raised from sale of the Notes to the warehouse SPVs in exchange for the receivables.

66.     58. Each Tricolor Trust entered into an Indenture with Wilmington Trust, as Indenture Trustee, whereby the Trusts pledged the underlying pool of auto loan receivables to the Indenture Trustee as security for repayment of the Notes.  Under the Indentures, each Tricolor Trust issued Notes denominated Class A Notes, Class B Notes, Class C Notes, and so forth, with

16

different rights to repayment under the Indenture's priority of payments waterfall. The Underwriter Defendants marketed and sold those Notes to third-party investors, including Plaintiffs.

67. 59. To service the auto loan receivables, each Tricolor Trust entered into a Sale and Servicing Agreement with Tricolor Auto Acceptance, LLC (the "Tricolor Servicer"). Under each Sale and Servicing Agreement, the Tricolor Servicer collected interest and principal payments from the underlying auto loan borrowers and undertook recovery efforts, including repossession, when the underlying borrowers defaulted on their payment obligations.

68. 60. Under the Tricolor Trusts' Indentures, income collected on the auto loan receivables (or "Available Collections") is used to pay Trust expenses and interest and principal on the Notes, in the order set forth in the Indentures' priority of payments waterfall. The Sale and Servicing Agreement requires the Tricolor Servicer to administer the priority of payments waterfall by calculating the amounts owed to various parties and instructing the Indenture Trustee on how to distribute Available Collections.

69. 61. The warehouse SPVs, meanwhile, were required to apply the proceeds generated by selling auto loan receivables to the Tricolor Trusts to pay down the amounts owed to the warehouse lenders, thereby freeing up additional borrowing capacity for more auto loan originations. The Credit Agreement for SPV 4, for example, provides that "on the related Securitization Date, the Administrative Agent shall have received, for the benefit of the Lenders, in immediately available funds, and shall then distribute to the applicable entities" sufficient cash to reduce the outstanding loan amount to the Borrowing Base and pay all interest owed on the sold loans. Thus, upon the offering of each Tricolor Trust, the cash proceeds of each offering were contractually required to be transferred to Defendants in their capacity as Lenders.

17

70.    62. At its peak, Tricolor operated warehouse lending facilities with a Borrowing Base in excess of $1.1 billion.  Supercharged by the warehouse lenders' cavalier lending, Tricolor sponsored over $2 billion in asset-backed securitizations between 2022 and 2025.  As auto loan receivables in earlier securitizations paid off, the outstanding balance of Notes for the Tricolor Trusts were reduced through principal repayments.  After accounting for these principal repayments, $945 million of Notes remain outstanding today.  As summary of the original and current principal balance for each of the Tricolor Trusts follows below:

*Table 1: Original and Current Principal Balance of the Tricolor Trust Notes*

| Tricolor Trust | Original Principal Balance ($ 000s) | Current Principal Balance ($ 000s) |
|---|---|---|
| TAST 2022-1 | $212,130 | $16,996 |
| TAST 2023-1 | $223,970 | $47,091 |
| TAST 2024-1 | $271,320 | $109,046 |
| TAST 2024-2 | $276,710 | $134,018 |
| TAST 2024-3 | $287,550 | $168,684 |
| TAST 2025-1 | $328,100 | $264,061 |
| TAST 2025-2 | $217,180 | $205,500 |

71.    63. Plaintiffs, collectively, own over $230270 million in current principal balance of Notes issued by the Tricolor Trusts.  The majority of those Notes were purchased at initial offering from either JPMorgan or Barclays.

**C.    Defendants' Roles In Were Integral To Tricolor's Lending And Securitization Machine**

72.    64. Defendants each played a critical role in Tricolor's lending and securitization machine, facilitating Tricolor's explosive originations growth and rapid expansion into the asset-backed securitization market.

73.    65. Defendants JPMorgan Chase Bank, National Association, Barclays Bank PLC, and Fifth Third Bank, National Association each acted as a warehouse lender to Tricolor

18

financing its loan originations.  JPMorgan and Barclays opened theirits warehouse line, SPV 4, with Tricolor in 2020, andwhile Barclays opened its warehouse line, SPV 5, with Tricolor in 2021.  JPMorgan and Barclays merged their warehouse lines in 2023, with JPMorgan's SPV 4 remaining open as the surviving facility.  Together, and alongside mezzanine warehouse financing that JPMorgan solicited from third-party funds shortly after the February 2024 audit report, the facility ultimately agreedgrew to provide $777 million of warehouse financing.  Fifth Third opened its warehouse line, SPV 6, with Tricolor in 2022, and ultimately agreed to provide an additional $250 million in warehouse financing.  A summary of Tricolor's largest two warehouse lines follows:

*Table 2: Defendants' Roles as Warehouse Lenders and Administrative Agents*

| Warehouse SPV | Administrative Agent | Warehouse Lender(s) | Total Commitment | Years Active |
|---|---|---|---|---|
| SPV 4 | JPMorgan | JPMorgan Chase Bank, National Association; Barclays Bank PLC; Mezzanine Lenders | $777 million | 2020 – September 2025 |
| SPV 6 | Fifth Third | Fifth Third Bank, National Association | $250 million | 2022 – September 2025 |

74.  66. In addition, Defendants J.P. Morgan Securities LLC ("JPM Securities"), Barclays Capital Inc. ("Barclays Capital"), and Fifth Third Securities, Inc. ("Fifth Third Securities") acted as underwriters and initial purchasers of the Notes issued by the Tricolor Trusts.  On five of the seven Tricolor Trusts, JPM Securities acted as structuring agent and lead underwriter, with Barclays Capital acting as co-manager or joint bookrunner.  On two of the seven Tricolor Trusts, Barclays Capital served as structuring agent and lead underwriter, with JPM Securities acting as co-manager or joint bookrunner.  For five of the Tricolor Trusts, Fifth

Third Securities acted as an additional co-manager of the Note sale.  A summary of Defendants'

underwriting roles for the seven Tricolor Trusts follows:

*Table 3: Defendants' Roles as Securitization Underwriters*

| Securitization (Offering Date) | Underwriter |
|---|---|
| TAST 2022-1 (Apr. 29, 2022) | Bookrunner and Structuring Agent: *JPMorgan*<br>Co-Manager: *Barclays* |
| TAST 2023-1 (Feb. 9, 2023) | Bookrunner and Structuring Agent: *JPMorgan*<br>Co-Managers: *Barclays; Fifth Third* |
| TAST 2024-1 (Jan. 29, 2024) | Bookrunner and Structuring Agent: *Barclays*<br>Joint Bookrunner: *JPMorgan* |
| TAST 2024-2 (May 29, 2024) | Bookrunner and Structuring Agent: *JPMorgan*<br>Joint Bookrunner: *Barclays*<br>Co-Manager: *Fifth Third* |
| TAST 2024-3 (Oct. 7, 2024) | Bookrunner and Structuring Agent: *JPMorgan*<br>Joint Bookrunner: *Barclays*<br>Co-Manager: *Fifth Third* |
| TAST 2025-1 (Mar. 11, 2025) | Bookrunner and Structuring Agent: *JPMorgan*<br>Joint Bookrunner: *Barclays*<br>Co-Manager: *Fifth Third* |
| TAST 2025-2 (Jun. 10, 2025) | Bookrunner and Structuring Agent: *Barclays*<br>Joint Bookrunner: *JPMorgan*<br>Co-Manager: *Fifth Third* |

75.    67.  In their roles as warehouse lenders and underwriters of Tricolor's

asset-backed securities, Defendants had access to troves of information regarding Tricolor's

underlying loan pool.  As warehouse lenders, JPMorgan, Barclays, and Fifth Third received a

continuous stream of detailed data from Tricolor regarding the loans that Tricolor originated and

ultimately securitized.  Tricolor provided the warehouse lenders with "borrowing base reports"

multiple times per month, and each time that Tricolor wanted to draw upon additional warehouse

credit funding.  These lengthy and detailed reports contained entries for each loan pledged to the

Lender Defendants' warehouse facilities.  The reports also contained dozens of data points per

loan, including outstanding principal balance, vehicle identification number ("VIN"), and

delinquency status.  In addition, the warehouse lenders received monthly servicer reports

20

summarizing the collateral Tricolor had transferred to the warehouse SPVs.  Like the borrowing base reports, these monthly servicer reports contained ample loan-level information, including account numbers, VINs, payment activity, loan balance, and delinquency status.  The Credit Agreements for the warehouse SPVs also required that Tricolor provide the warehouse lenders with data analysis, such as "analysis of delinquencies and losses" suffered on their respective loan pools.

76.    68.  Beyond this regular reporting, the warehouse lenders had—and exercised—the power to audit Tricolor's operations as administrative agents.  Section 7.06 of the SPV 4 Credit Agreement, for example, authorized the administrative agent, JPMorgan, to audit Tricolor's loan files and internal controls on behalf of all SPV 4 warehouse lenders. The Credit Agreement for each warehouse facility required that the administrative agent share the audit results with participating warehouse lenders.

77.    69.  As underwriters, JPM Securities, Barclays Capital, and Fifth Third Securities received substantial loan levelloan-level data and analysis concerning the performance and characteristics of Tricolor's loan pool, as well Tricolor's loan origination and underwriting practices.  Some of this data was then summarized in offering materials provided to prospective investors in the Securitizations, but the underlying loan data and projections given to the Defendants (in their capacity as Lenders and Underwriters) were not available to investors.

78.    Tricolor lacked the in-house expertise to operate its own securitization program and the market credibility to access investment capital available for asset-backed securities investments.  To address these shortcomings, Tricolor turned to JPMorgan and Barclays, two market-leading banks in the asset-backed financing space, to provide a full-service financing

solution by providing warehouse lending capacity and building out Tricolor's related securitization pipeline to facilitate an exit from warehouse-backed loans.

79.     JPMorgan and Barclays took the lead role in managing all aspects of Tricolor's securitization program.  Tricolor fully depended on JPMorgan and Barclays to dictate the structure and terms on which it would market asset-backed securitizations to purchase loans that JPMorgan's and Barclays's warehouse lending facility funded at origination.  JPMorgan and Barclays employed their market-leading expertise in the structuring and distribution of asset-backed securities to prepare all marketing materials used for the Tricolor securitization program, including the Offering Memoranda presented to investors as their sole source of information regarding the loan pool characteristics for each new Tricolor Trust.

80.     For each securitization where JPMorgan and Barclays, respectively, acted as lead arranger and structuring bank, it prepared and disseminated to investors a deal roadshow, which sliced and diced the loan pool characteristics set forth in the Offering Memorandum for the respective Tricolor Trust, presenting that information in a format that was more digestible for prospective investors, while emphasizing the stability and structural protections supposedly securing repayment of the Tricolor Trust's Notes.  For each securitization where JPMorgan and Barclays, respectively, acted as lead arranger and structuring bank, it also prepared and disseminated to investors a cash flow model for the prospective deal using the loan characteristics drawn from the Offering Memorandum and various projected performance metrics suggested by JPMorgan and/or Barclays as a base case model.  JPMorgan and Barclays sent the cash flow model to prospective investors with the understanding and expectation that the investors would utilize the model to assess the riskiness of the marketed transaction, and use it to run their own risk scenarios to further assess a potential investment.

22

81.     Because Tricolor lacked the sophistication and expertise to prepare the Offering Memorandum, deal roadshow, and cash flow modeling for each transaction, it relied on JPMorgan and Barclays to prepare and disseminate this information in a manner that aligned with investor expectations.  And it relied on JPMorgan and Barclays for access to the deep capital for asset-backed securities investments available from JPMorgan's and Barclays's respective customer bases.  JPMorgan's and Barclays's customers, including Plaintiffs, relied on JPMorgan's and Barclays's implicit and explicit support and sponsoring of Tricolor's asset backed securities program and business more generally when deciding to make investments.  Thus, the success of the Tricolor Trusts was fully dependent on JPMorgan's and Barclays's stamp of approval.  No meaningful securitization program could or would exist without JPMorgan's and Barclays's involvement, and none of the Plaintiffs would have purchased the Notes that the Tricolor Trusts issued on the terms and in the manner that they did without JPMorgan's and Barclays's solicitation and support.

82.     The Defendants, moreover, exercised absolute and complete control over the asset-backed securitization offerings that they structured and sold for Tricolor because they had the ability to shut down Tricolor's business at any time by pulling their warehouse lending facilities—as demonstrated when they did just that in September 2025, shuttering the company. To be clear, not only did Defendants have control and authority over the contents of the Offering Memoranda, they were also the sole parties responsible disseminating the Offering Memoranda to investors.  Through this control, Defendants had the ability to, and in fact did, control the contents of the offering materials that the Underwriter Defendants disseminated for the Tricolor Trusts, including the Offering Memorandum for each deal.

23

## II.    Tricolor's Pervasive Fraud

83.    ~~70.~~ Between 2022 and 2025, Tricolor appeared to be experiencing extraordinary growth as it pumped out hundreds of millions of dollars of auto loan securitizations each year. But all was not as it seemed, and behind closed doors Tricolor was committing a series of brazen frauds on a massive scale.

84.    ~~71.~~ *First*, Tricolor was perpetrating a blatant double-pledging scheme, whereby it purported to pledge a single auto loan as collateral for multiple warehouse credit lines with different banks, and in many cases continued to do so after selling that auto loan into a securitization.    After a detailed analysis, Tricolor's Chapter 7 Trustee identified 31,408 auto loans that were pledged or sold to two or more warehouse SPVs or securitizations.    These double-pledged loans represented $547,928,874 in falsely reported collateral value.

85.    ~~72.~~ Tricolor's accomplished its double-pledging scheme primarily by creating "clone loans."    These loans had modified account IDs but otherwise had all of the same receivable-level attributes, including the same VIN, vehicle make, and vehicle number.    For example, the Chapter 7 Trustee's forensic analysis revealed that a single loan appeared as collateral twice in the same Tricolor warehouse SPV (SPV 6)—with the same vehicle make, model, year, mileage, and principal balance, and an obviously doctored account number—then again in SPV 4 (the JPMorgan facility), and again in TAST 2024-3.[1]    Yet this was a single vehicle and a single loan, and it should not have been possible for Tricolor to pledge it four separate times.    That was especially the case because the warehouse lenders to whom Tricolor

---

[1]    The loan was for a 2018 Ford Fusion (VIN 3FA6P0H75JR262885) with mileage of 101,570 miles, ~~and~~ outstanding principal balance of $14,937, and loan due date of April 15, 2023.  The exact same account number was used for three of the four duplicate accounts, with the exception, the second pledge to SPV 6, making only one change—the addition of a single digit to the end of the number—while otherwise preserving the same account number.

24

pledged this clone loan—JPMorgan, Barclays, and Fifth Third—also structured and underwrote the TAST 2024-3 securitization in which the loan appeared for a fourth time. Had anyone checked the VINs listed for the securitization collateral against the VINs listed for the warehouse loan collateral, Tricolor's fraud would have been obvious.

86.    73. In a particularly flagrant and obvious example of double-pledging, Tricolor caused TAST 2025-2 to include 3,225 auto loan receivables in its collateral pool that were simultaneously reported as owned by TAST 2022-1. Tricolor listed these 3,225 loans, representing more than 25% of TAST 2025-2's loan collateral, as owned by both TAST 2022-1 and TAST 2025-2 at the same time. Tricolor made no attempt to disguise this fact. Despite acting as lead underwriters on both transactions, Barclays Capital and JPM Securities inexplicably failed to notice. Indeed, they instead affirmatively represented, *inter alia*, that each of these receivables had been "originated under a contract that is assignable without the consent of the related obligor or any other person" and was "evidenced by a retail installment sale contract and recorded and assigned certificate of title." Such representations could not be true—the receivables were not available for assignment but instead already owned by another Tricolor Trust. And, compounding the effect of this misrepresentation, the Lender Defendants then received cash proceeds from the issuance of the TAST 2025-2 Notes for collateral that they had already sold to TAST 2022-1.

87.    74. *Second*, Tricolor purported to transfer fictitious loans (made to fictitious borrowers and backed by fictitious cars) to various warehouse lenders and Tricolor Trusts. These fake loans are backed by cars with VINs that are found nowhere in Tricolor's finance receivable records. After a detailed analysis, Tricolor's Chapter 7 Trustee identified 6,960 fictitious auto loans with an outstanding balance of $135,488,888. Together with the

25

double-pledged auto loans, Tricolor's fraud inflated the value of the auto loan receivables that it pledged to the warehouse lenders and sold to the Tricolor Trusts by at least $700 million.

88.    75. *Third*, Tricolor perpetrated a number of other schemes intended to inflate its borrowing base and increase the size of its warehouse loans beyond what the warehouse Credit Agreements permitted.  For example, Tricolor systematically and deliberately misrepresented the delinquency status of loans on Borrowing Base statements sent to the warehouse lenders to make severely delinquent loans that were not eligible collateral for the warehouse lines appear as if they were eligible.  Tricolor separately purported to pledge charged-off loans—those that were so severely delinquent that there was no recovery expected—to collateralize its warehouse lines, treating them as if they were performing loans for purposes of calculating the Borrowing Base. It was this latter tactic that led to Tricolor's final reckoning and downfall, when a junior analyst at one of Tricolor's participating warehouse lenders identified 8,000 charged-off loans included in a Borrowing Base statement that had been reported there for months without ever reducing their outstanding balance—as would be expected of genuine, performing auto loan receivables. Through these additional fraudulent means, Tricolor further inflated its borrowing capacity under the warehouse loans and the proceeds from its sale of Notes issued by the Tricolor Trusts.  The ultimate gap between the value of collateral Tricolor reported to its financing partners ($2.2 billion) and the actual value of collateral originated by Tricolor ($1.4 billion) eventually reached $800 million.

89.    76. Tricolor's fraud was deliberate.  As meticulously documented in both the Chapter 7 Trustee's lawsuit against Daniel Chu and Mr. Chu's indictment, Tricolor executives were unabashed in conversations amongst themselves regarding their double-pledging and

26

manipulation of the warehouse lenders' Borrowing Base, with such discussions dating back to 2018 or earlier.  For example:

(a)     In 2018, Tricolor's CEO, Daniel Chu, instructed its CFO, Jerry Kollar, to (i) pledge ineligible, charged-off loans as collateral for one of its credit facilities, (ii) create a fictitious portfolio company in Tricolor's dealer management system to hold those charged-off loans and conceal that they were non-performing, (iii) arrange for other Tricolor employees to manually enter fake payments from customers on those charged-off loans in its dealer management system, and (iv) pay off those charged-off loans using proceeds from loans secured from other lenders.

(b)     In January 2021, Chu asked Kollar by text message whether there was "anything we can pledge" from one lender to another lender to "get some liquidity."

(c)     In April 2021, Chu texted with Kollar about the need to increase vehicle inventory backing inventory credit lines—which were similar to warehouse lines, but backed by physical vehicles—in order to "move the [$10 million of already] sold units" that continued to be reported as collateral for the inventory lines "off the borrowing base."

(d)     On July 22, 2021, Kollar fretted by text with Chu that if an auditor currently reviewing Tricolor's financials "tr[ies] to [t]ie out" with lender data, it would reveal Tricolor's fraud.

(e)     On July 25, 2022, Chu texted Kollar asking him if he could "work the >60s," referring to auto loan receivables that were more than 60 days

delinquent, and in response to this inquiry Kollar and another Tricolor executive, Ameryn Seibold, manually changed the data field in the borrowing base reports to report loans that were over 60 days delinquent (and therefore ineligible collateral) as less than 60 days delinquent (and therefore eligible collateral).

(f)     On November 16, 2022, Kollar texted Chu that he had increased the borrowing base on one warehouse facility by manipulating the delinquency buckets to increase warehouse lending capacity by an additional $1.3 million.

(g)     On December 12, 2022, Kollar sent a Microsoft Teams message to another Tricolor employee instructing him to alter sales report data being delivered to lender TBK Bank to conceal that Tricolor had sold vehicles listed as collateral for TBK's loan.

(h)     On March 1, 2023, Seibold told another Tricolor executive, David Goodgame, that he was "Taking accounts from SPV6 [the Fifth Third warehouse facility] and pledging on SPV3 [a warehouse facility later rolled into JPMorgan's SPV 4 warehouse facility] to get liquidity out of SPV," to which Goodgame responded with a crying emoji.

(i)     On July 28, 2023, Chu texted Kollar asking him to "reconstruct" a lender's borrowing base to conceal Tricolor's fraud.

(j)     In a September 8, ~~2024~~2023, text exchange, Goodgame told Seibold that Tricolor had maxed out several warehouse facilities, and could not take advantage of one that was not maxed out, SPV 5, because unlike with the

28

other warehouse facilities Tricolor was "trying to keep [SPV 5] relatively clean," with Seibold responding "hopefully after this securitization we can keep [the other facilities] a bit cleaner," to which Goodgame responded "Lol."

(k)     On June 17, 2025, Kollar explicitly instructed another Tricolor employee, over email, to list the same 3,225 loans as owned by both TAST 2022-1 and TAST 2025-2.

90.     77. In August 2025, when JPMorgan raised fraud concerns with Mr. Chu, Chu, Kollar, and other executives conducted a series of phone calls that multiple participants recorded, in which the executives openly admitted knowledge of Tricolor's pervasive fraud.

(a)     In an August 17, 2025, phone call, Chu openly discussed the problem of "how are we gonna fabricate these loans" that were fraudulently included on the borrowing base for the JPMorgan warehouse facility.

(b)     On that same phone call, Chu brainstormed ways to explain the manipulated and false data that Tricolor included on its borrowing base statements.

(c)     On an August 18, 2025, phone call, Chu raged that Seibold's inclusion of $63 million of supposedly performing loans on JPMorgan's borrowing base statement without a payment in 180 days—which, by definition, would make those non-performing—and described Seibold's failure to fraudulently reduce the principal balance of those loans over time as "the stupidest fucking thing [he had] ever heard."

29

(d)    On an August 19, 2025, phone call, Chu recounted how he had tried to appease one lender's concerns the night prior by stating "if we were trying to commit fraud, we wouldn't be so stupid as to keep the same balances on there … Nobody would be that stupid," when in fact, that is exactly what Tricolor had done.

(e)    Towards the end of August 2025, Chu drew comparisons between the failure of lenders to uncover Enron's fraud and the Defendants' failure to uncover Tricolor's fraud.

91.    ~~78.~~ With no doubt that Tricolor intentionally committed fraud, the only question that remains is how the Defendants failed to stop it. Defendants' years-long complicity in Tricolor's fraud can be explained only by their willful blindness to obvious evidence of fraud and immense financial incentives to ignore it.

92.    ~~79.~~ Defendants were incentivized to ignore Tricolor's fraud because it helped preserve the securitization pipeline through which the warehouse SPVs sold their impaired collateral for full value. Loan sales to the Tricolor Trusts were accomplished through a series of simultaneous transactions: (1) the Tricolor Trusts issued Notes to the Tricolor Depositor, Tricolor Auto Receivables 2, LLC ("Tricolor Depositor"), in exchange for the loan collateral; (2) the Tricolor Depositor sold the Notes to the Underwriter Defendants (or the "Initial Purchasers") in exchange for cash, which the Initial Purchasers raised from investors, including the Plaintiffs; (3) the Tricolor Depositor used that cash to purchase the loan receivables that it would deliver to the Tricolor Trusts from the warehouse SPVs; and (4) the warehouse SPVs used the purchase price paid for the loan receivables to pay down the warehouse lines provided by the warehouse lenders. In economic substance, though, the securitization process was quite simple: the Tricolor

30

Trusts used money raised from selling Notes to investors to purchase loan receivables from the warehouse SPVs that then served as collateral for the Notes. The risk and value of those loans moved from the warehouse SPVs to the Tricolor Trusts—and everyone else involved acted strictly as an intermediary to facilitate those transfers, without discretion as to how those assets would move.

93.    80. In each case, the Tricolor Trusts were acquiring bad loans, many of them encumbered by multiple pledges or entirely fictitious, for the price of good loans. Because of these bad loans, the value of the loan collateral that each Tricolor Trust received at issuance was substantially less than the Note proceeds that the Tricolor Trusts used to pay for that loan collateral:

    (a)    On or about May 4, 2022, TAST 2022-1 paid approximately $212 million to the warehouse SPVs and other Tricolor affiliates to acquire 11,894 loans, and the warehouse SPVs used the proceeds raised in selling the loan collateral to repay the Lender Defendants. Of the 11,894 loans that TAST 2022-1 acquired, at least 1,000 were double-pledged at issuance to at least one additional counterparty and certain additional loans were fictitious.

    (b)    On or about January 31, 2023, TAST 2023-1 paid approximately $224 million to the warehouse SPVs and other Tricolor affiliates to acquire 11,724 loans and the warehouse SPVs used the proceeds raised in selling the loan collateral to repay the Lender Defendants. Of the 11,724 loans that TAST 2023-1 acquired, at least 5,800 were double-pledged at issuance to at least one additional counterparty and certain additional loans were fictitious.

(c)      On or about January 31, 2024, TAST 2024-1 paid approximately $271 million to the warehouse SPVs and other Tricolor affiliates to acquire 13,950 loans, and the warehouse SPVs used the proceeds raised in selling the loan collateral to repay the Lender Defendants. Of the 13,950 loans that TAST 2024-1 acquired, at least 9,000 were double-pledged at issuance to at least one additional counterparty and certain additional loans were fictitious.

(d)      On or about May 22, 2024, TAST 2024-2 paid approximately $277 million to the warehouse SPVs and other Tricolor affiliates to acquire 14,293 loans, and the warehouse SPVs used the proceeds raised in selling the loan collateral to repay the Lender Defendants. Of the 14,293 loans that TAST 2024-2 acquired, at least 750 of them were double-pledged at issuance to at least one additional counterparty and certain additional loans were fictitious.

(e)      On or about October 17, 2024, TAST 2024-3 paid approximately $288 million to the warehouse SPVs and other Tricolor affiliates to acquire 13,617 loans, and the warehouse SPVs used the proceeds raised in selling the loan collateral to repay the Lender Defendants. Of the 13,617 loans that TAST 2024-3 acquired, at least 1,000 of them were double-pledged at issuance to at least one additional counterparty and certain additional loans were fictitious.

(f)      On or about March 20, 2025, TAST 2025-1 paid approximately $328 million to the warehouse SPVs and other Tricolor affiliates to acquire

32

18,377 loans, and the warehouse SPVs used the proceeds raised in selling the loan collateral to repay the Lender Defendants.  Of the 18,377 loans that TAST 2025-1 acquired, at least 5,000 of them were double-pledged at issuance to at least one additional counterparty and certain additional loans were fictitious.

(g)    On or about June 18, 2025, TAST 2025-2 paid approximately $217 million to the warehouse SPVs and other Tricolor affiliates to acquire 12,486 loans, and the warehouse SPVs used the proceeds raised in selling the loan collateral to repay the Lender Defendants.  Of the 12,486 loans that TAST 2025-2 acquired, at least 6,850 of them were double-pledged at issuance to at least one additional counterparty, including 3,225 that were previously sold to TAST 2022-1 and pledged as collateral to secure repayment of its Noteholders, and certain additional loans were fictitious.

33

*Table 4: There was Widespread Double-Pledging Within the Tricolor Trusts*[2]



94.     In total, Tricolor deposited 25,356 loans in the seven Tricolor Trusts that were double-pledged to SPV 4.  Similarly, Tricolor deposited at least 1,993 loans in the more recent Tricolor Trusts that were double-pledged to SPV 6.

*Table 5: Most of This Double-Pledging was with Defendants' Warehouse Lines*

| Securitization | Total Loans | Double-Pledged Loans | Double-Pledged with SPV 4 | Double-Pledged with SPV 6 |
|---|---|---|---|---|
| TAST 2022-1 | 11,894 | 4,265 | 1,850 | - |
| TAST 2023-1 | 11,724 | 5,830 | 5,358 | - |
| TAST 2024-1 | 13,950 | 9,032 | 8,930 | - |
| TAST 2024-2 | 14,293 | 769 | 738 | - |
| TAST 2024-3 | 13,617 | 1,082 | 1,026 | 39 |
| TAST 2025-1 | 18,377 | 5,071 | 4,946 | 8 |
| TAST 2025-2 | 12,486 | 6,850 | 2,508 | 1,946 |

---

[2]     Based on currently available analysis performed by Vervent Inc., the Successor Servicer to the Tricolor Trusts after Tricolor's Chapter 7 filing.  Note that the TAST 2022-1 figure includes the 3,225 loans that were subsequently double-pledged to TAST 2025-2.

95. 81. In every single one of these transactions, the Tricolor Trust acquiring the loans was formed by Tricolor and controlled by Chu, Kollar, and other Tricolor executives. As CEO and President, Chu oversaw all aspects of Tricolor's business alongside Kollar, the CFO. This included leading the process for securitizing Tricolor-originated loans, including determining which collateral to pledge to each Tricolor Trust, as illustrated by Kollar's direction, described above, to a subordinate to list 3,225 loans as belonging to both TAST 2022-1 and TAST 2025-2. Chu, Kollar, and other Tricolor executives orchestrated each Tricolor Securitization with the specific intent of perpetuating their fraudulent scheme by causing the Tricolor Trusts to pay off the warehouse lenders for fraudulently double-pledged and fictitious loans at prices that ignored the severely impaired nature of the loan collateral conveyed in return. Because the entire purpose of these transactions was to defraud the Noteholders as creditors of the Tricolor Trusts, and support Chu and Kollar's ongoing Ponzi-like scheme, the transfers made by the Tricolor Trusts to acquire loan collateral from the warehouse SPVs were actual fraudulent transfers. And because the prices paid by the Tricolor Trusts substantially exceeded the value of the loans received, and the transfers rendered the Trusts insolvent, the Trusts' transfers to the warehouse SPVs were constructive fraudulent transfers as well.

## III. Defendants Willfully Blind Themselves To Tricolor's Fraud

96. 82. While Tricolor perpetrated its pervasive fraud, Defendants acted only to protect their gravy train of fees and interest income while avoiding the coming reckoning of their over $1 billion of lending backed by Tricolor's inflated loan inventory. Defendants were repeatedly presented with clear evidence of Tricolor's fraud, did nothing about it, and proceeded to sell securitization after securitization without performing the most basic due diligence to

35

address the obvious signs of pervasive fraud, all while representing to investors that each Trust's collateral had been subject to such diligence.

97.    83. The risk of fraud at Tricolor was apparent from the early days of JPMorgan's warehouse facility.  A 2022 audit delivered to JPMorgan identified "internal control weaknesses related to collateral, servicing, [and] collections."  The audit found "[n]o controls to ensure reconciling items are addressed in a timely manner" and "[i]nsufficient controls surrounding inventory [resulting in] a number of errors identified within inventory such as lack of controls to identify needed reclassifications from inventory to charge offs, inventory recorded to the general ledger that the Company did not have possession of, and lack of review of repossession related accounts to ensure proper accounting and valuation of repossessions in process."  The audit further found "[n]o formal process in place to review the estimation and evaluate the qualitative and quantitative inputs" of Tricolor's loan valuation model, no "documentation maintained over model access, change management process, or change log," and "[n]o formalized control to identify and disclose related party transactions."  In addition, the audit found a "Significant Deficiency" with "Account Setup of Finance Receivables," noting "insufficient manual controls surrounding the IDMS application to ensure all new finance receivables receive a post-close review for accuracy."  "Material weaknesses were also noted in the areas of Control Environment and Deficiency Remediation Implementation and Monitoring."  In other words, Tricolor had none of the internal controls or systems necessary to ensure the integrity of its loan data tape., leading the auditors to conclude that this "[l]ack of appropriate control environment could result in material misstatements due to error or fraud."  The Underwriter Defendants were well aware of these findings, indeed they were directly warned of the risk of fraud, and

nonetheless proceeded with their warehouse facilities, and sale of asset-backed securities, fully aware that Tricolor had cultivated an environment ripe for fraud and abuse.

98.    ~~84.~~ In or around September 2023, after JPMorgan and Barclays consolidated their respective warehouse lines in SPV 4, JPMorgan exercised its audit rights under the SPV 4 Credit Agreement and engaged CBIZ MHM, LLC ("CBIZ") to conduct due diligence on Tricolor's auto loan collateral.  The audit (or the "CBIZ report") dragged on for more than five months, as Tricolor repeatedly obstructed and evaded CBIZ's efforts to perform the agreed-upon due diligence procedures.  As discussed below, CBIZ never completed critical aspects of the due diligence procedures due to Tricolor's stonewalling.  When CBIZ made JPMorgan aware of the meaningful ongoing issues with the audit, JPMorgan management instructed CBIZ to limit its agreed-upon procedures rather than supporting CBIZ in obtaining answers to numerous open and concerning issues identified in its report.  In its report, CBIZ stated, "Scope step was waived based on discussion between JPM and Tricolor management teams for this examination."  On those procedures that CBIZ did complete, the results were nothing short of startling, and further confirmed the 2022 audit's alarming findings.  ~~For months, CBIZ made Defendants aware of the meaningful ongoing issues with the audit and yet Defendants did nothing, instead condoning Tricolor's troubling conduct by agreeing to limit the agreed-upon procedures.~~

99.    ~~85.~~ *First*, CBIZ performed an "aging test" on 25 loan accounts in various stages of delinquency to determine if Tricolor properly reported the aging of these delinquent accounts on its borrowing base statements for the JPMorgan and Barclays warehouse facility.  The test's results confirmed the 2022 audit's findings of widespread reporting issues relating to delinquency, repossessions, and other inventory controls, including the 2022 audit's alarming conclusion that Tricolor had vehicle "inventory recorded to the general ledger that [Tricolor] did

not have possession of." CBIZ determined that 16% of the 25 loans, and 44% of the 9 delinquent loans within that population, were not correctly reported. Two loans were listed as 32 days past due, which would make them eligible collateral for the SPV 4 warehouse facility, when in fact they were both at least 52 days past due, rendering them ineligible. Three loans, including one of the improperly aged loans, were repossessed and therefore no longer outstanding, but continued to be listed on the borrowing base statements as collateral for the warehouse. The CBIZ report further noted that Tricolor responded evasively, dodging requests for additional information for more than five months, and delivering additional materials during the week when the report was due. As a result of Tricolor's evasive conduct, CBIZ "did not have time to get management's comments on reasons for either the aging discrepancies noted above or the reason these three accounts were not marked as repossess[ed], and therefore ineligible, on the data tape." CBIZ therefore recommended that JPMorgan "follow up with management to discuss the reason for these discrepancies and discuss the ultimate accuracy of the data tapes provided by the Company," a troubling remark CBIZ repeated multiple times throughout the report.

100. 86. *Second*, CBIZ performed an "age shifting test" on an additional 25 loan accounts to determine whether Tricolor correctly reported the shifting of those loan accounts from one aging bucket to the next at month end. Again, the test reinforced the 2022 audit's findings that Tricolor lacked the necessary controls required for this shifting to occur properly. CBIZ determined that 20% of the 25 loans, and 63% of the 8 loans within that population that were more than two weeks delinquent, were not properly shifted to the next aging bucket. Tricolor management claimed that these data discrepancies could be explained by a company policy to halt account aging for loans backed by vehicles requiring servicing for more than 30 days. Tricolor was unable to provide any written record of this supposed aging policy, which

38

was not part of Tricolor's formal servicing or collection policies and procedures. Worse yet, even Tricolor's "unwritten policy" excuse could not explain two of the improperly shifted accounts, where Tricolor was unable to provide any record supporting the claim that the vehicle backing the loan was returned for servicing at all, let alone in servicing for more than thirty days. For another of the improperly age-shifted accounts, the servicing notes from two weeks earlier indicate "possibl[e] mechanical issues," but provide no record of the vehicle being placed in servicing.

101.  87. *Third*, CBIZ performed a "charge-off test" on 15 loan accounts to determine whether Tricolor correctly and accurately reported recoveries on charged-off loans. Like the other tests, the test corroborated the 2022 audit's findings that Tricolor lacked "controls to identify needed reclassifications from inventory to charge offs" and "lack of review of repossession related accounts to ensure proper accounting and valuation of repossessions in process." The results revealed multiple anomalies. For the 13 charged-off accounts from CBIZ's sample that reported recoveries, Tricolor admitted that those recovery amounts were an accounting entry, reflecting an index-based wholesale price, not actual recoveries on the vehicles. None of the charged-off accounts were properly reported as repossessed. And, perhaps most startlingly, 2 of the 13 charged-off accounts showing recoveries were on charged-off accounts where the vehicle was never recovered. For these two vehicles, SPV 4 received $47,000 in recoveries from an unidentified source. CBIZ was unable to identify the source of the recoveries on these phantom vehicles, and was never given the opportunity to conduct a further investigation. It appears the SPV 4 warehouse lenders, including Defendants JPMorgan and Barclays, did not care where the money they were receiving was coming from so long as they were "receiving" money.

39

102.    88. *Fourth*, CBIZ performed an "expired accounts test" whereby it looked at 90 accounts that were more than 90 days past maturity but still included in SPV 4's borrowing base report.    As with CBIZ's other analyses, this test confirmed the 2022 audit's findings.    CBIZ discovered that every single one of these accounts was listed as current, and treated as eligible collateral, despite being aged for multiple months and, in many cases, multiple years, without payment.    Tricolor admitted that these charged-off accounts were improperly included in the borrowing base, though they should have been treated as ineligible due to delinquency.    Tricolor blamed the inaccurate data on a "system error" that it claimed it was actively working to correct. Tricolor separately claimed, incredibly, that it expected to recover on these charged-off accounts even though many of them had not been paid in years.

103.    89. *Fifth*, CBIZ uncovered a fundamental disconnect between cash collections on the loan collateral according to SPV 4's servicer reports and cash delivered to the warehouse lenders' master collection accounts.    This disconnect reinforced the 2022 audit's problematic findings that Tricolor lacked controls over its valuation of receivables and related party transactions, including concerns regarding Tricolor's ability to tie out its financial statements. CBIZ performed a "two-day cash test" where it attempted to reconcile cash collections under the servicer reports with deposits in the master collections account, and the results were alarming. CBIZ determined that a material portion of the cash generated on collateral supposedly owned by SPV 4 was deposited in accounts not belonging to SPV 4, whereas substantial cash deposited in SPV 4's accounts came from loans not owned by SPV 4.    On the two days chosen for reconciliation of cash receipts, CBIZ determined that 49% of payments received on January 12, 2024, and 32% of payments received on January 24, 2024, were deposited into an account that did not belong to SPV 4.    On a month-to-month basis, the variance between cash collected per

40

the servicer reports and cash delivered to SPV 4's bank accounts swelled to nearly 65% in some months.  In other words, the principal and interest collections on SPV 4's loan collateral reported on the monthly servicer reports bore no relationship to the actual cash collections in SPV 4's bank account, and loan-specific collections reported on the monthly servicer report often went to bank accounts that did not belong to SPV 4.  The disconnect between loan payments and cash collections in SPV 4's bank accounts was all the more jarring given the express contractual requirement that Tricolor channel loan payments on SPV 4's loans to SPV 4's bank accounts directly—a protocol that Tricolor obviously, and admittedly, was not following.

104.    90. *Sixth*, CBIZ performed a "cash application test" whereby it sought to reconcile cash received on a sample of 25 loan accounts supposedly owned by SPV 4 with actual cash received from those loan accounts according to SPV 4's bank records.  For 20% of the tested accounts, CBIZ was unable to reconcile the cash—in part because Tricolor refused to provide *any* payment information for 4 of the 25 accounts that were supposed to be tested.

105.    91. *Seventh*, Tricolor admitted that recoveries on repossessed loans were tracked to "black book" wholesale values determined pursuant to an index, not to any actual cash recovery on the repossessed loan.  As before, this finding built off of similar results in the 2022 audit known to Defendants.  According to Tricolor, it "internally uses the black book value as the liquidation proceeds value, and those proceeds are included in the waterfall payment to JPM."  Here, again, Tricolor's collections on SPV 4's loans were untethered to the cash flow actually generated by those loan accounts.  And CBIZ made clear that this practice of "recording recoveries when none were received" would "skew any analysis performed to determine expected recoveries."  The CBIZ report thus put Defendants on notice that Tricolor's purported best-in-class recovery rates that Defendants featured heavily in their marketing of the Notes were

41

inflated and unreliable.  Incredibly, JPMorgan management cut off CBIZ's efforts to further investigate Tricolor's improper accounting of loan recoveries upon repossession. by waiving "much of the repossession testing."

106.  92. *Eighth*, Tricolor did not track actual principal collections on loan accounts owned by SPV 4, but instead "backed into" its monthly calculation of principal repayments from, among other factors, its chosen "ending principal balance"—allowing it to make up whatever principal collections fit its borrowing needs in a given month without reference to what it actually collected.

107.  93. Thus, in multiple ways, the CBIZ report provided stark evidence that payments made on loan collateral were not actually tied to payment under the underlying loan accounts.  The cash payments made on the loans did not correspond to the cash payments received by SPV 4's master collections account.  Individual loan receipts could not be traced to SPV 4 collections, and Tricolor refused to provide certain data necessary to perform these reconciliations, even though it was part of the auditor's mandate and was repeatedly flagged as a concern to both Tricolor and JPMorgan in the months before the audit was completed. Collections on repossessed vehicles were fabricated from index values rather than actual recoveries, and Tricolor reported significant cash recoveries on cars that were never recovered. Tricolor's reporting of loan performance and delinquency data was dismally deficient, and Tricolor admitted that it misreported dozens of charged-off loans as performing and current, while failing to properly age numerous other loans.

108.  94. Against this backdrop, the information that Tricolor flatly refused to provide to CBIZ raised yet another flashing warning sign.  Most notably, for purposes of this case, CBIZ

42

agreed to perform detailed diligence to test for any double-pledging of the loan collateral. The

agreed upon procedures on this topic called for CBIZ to:

> Inquire with management regarding the controls in place at the Company over the loans to ensure that loans will only be sold once and there is no double pledging of loans, noting any since the previous examination period ending as of September 30, 2022 through January 31, 2024. Explain how the Company will utilize flags or markers within their system of record to indicate ownership of receivables and avoid the double pledging of collateral. Judgmentally select a sample of 10 loans … and not any instances of double pledging. Contact lead Managing Director for any instances of double pledging noted.
>
> **For the months of September 30, 2022 through January 31, 2024, prepare a schedule by month, noting accounts with duplicate VINs.** For all of the accounts noted as with duplicate VINs as of each month-end … and next due date as of each month-end …. **Note management's reason why accounts in repossession would make a payment. Also, note the payment ~~cam~~came from the Obligor. Notify the Lead Managing Director of the Credit Risk Group to discuss the findings in order to communicate such to the Client.**

109.    ~~95.~~ In the face of clear evidence that cash from the loans was not directly tied to

payments going to the warehouse facilities, the double-pledging inquiry took on greater

significance. Tricolor's failure to tie warehouse loan payments to actual collateral recoveries

raised serious and obvious questions about the integrity of the warehouse SPV's collateral pool,

and whether proceeds of that pool were *actually* being used to repay lending amounts. But the

double-pledging analysis called for in CBIZ's due diligence procedures never happened.

Tricolor blocked any meaningful double-pledging analysis by refusing to provide a master

servicer report of all facilities that would be necessary to test whether double-pledging of loan

collateral had occurred. CBIZ stated in its report, "The consultants did not have a master

servicer report of all facilities to confirm if there was any evidence that the assets were pledged

to a third party." Tricolor's refusal to cooperate with a double-pledging investigation—by its

largest warehouse lender by a wide margin—should have been a five-alarm fire. But Defendants

instead turned a blind eye to Tricolor's deliberate refusal to cooperate with this most

43

fundamental analysis of the integrity of the warehouse lenders' loan collateral, having known about this and related issues for months as the audit dragged on and yet continuing to condone Tricolor's intransigent behavior towards Defendants' own advisors.

110.    96. Not only did the reported deficiencies from the CBIZ report scream for additional investigation; CBIZ itself expressly called for it.  In summarizing its recommended response to multiple deficiencies detailed in the CBIZ report, CBIZ repeatedly suggested that the warehouse lenders further investigate "the reason for the[] discrepancies" and questioned "the ultimate accuracy of the data tapes provided by" Tricolor.  In other words, CBIZ was not provided the information necessary to explain and reconcile the glaring anomalies in Tricolor's reporting of loan data and implored the warehouse lenders to take additional steps to assess the scope and scale of the problem.

111.    CBIZ addressed its report to Alan English, an Executive Director in JPMorgan's ABS conduit and securitization banking group.  The CBIZ report was shared with personnel in JPMorgan's credit department, as well as their counterparts in Barclays's investment banking and credit group.  Consistent with their standard operating procedure, personnel in JPMorgan's and Barclays's investment banking teams, including Mr. English, reviewed the report, observed its startling results, and communicated them to those responsible for managing the Tricolor warehouse lending and securitization programs.  Mr. English worked closely with Brian Honda (an Executive Director at JPMorgan) and Billy Wong (Managing Director in JPMorgan's securitized products group), who were responsible for managing the overall Tricolor relationship, and the warehouse-to-securitization pipeline that JPMorgan and Barclays had created to support and finance Tricolor's business.  As discussed *infra*, Mr. Honda and Mr. Wong commenced efforts to hedge JPMorgan's warehouse exposure shortly after the CBIZ

report was finalized including by trying to sell mezzanine exposure to JPMorgan's and Barclay's warehouse facility.

112.    97. But theThe glaring red flags did not stop with the castigating CBIZ report. Around the same time, Tricolor engaged JPMorgan to lead an initial public offering of the company (the "IPO"). Faced with the same glaring accounting irregularities, lack of internal controls, and evasive management culture, JPMorgan was unwilling to proceed with the planned IPO—deterred by the heightened liability risk presented by federal securities laws applicable to public, but not private, offerings. In reaching its decision to pass on the IPO, JPMorgan uncovered another critical fact that further amplified the many alarm bells raised by the 2022 audit report and the 2024 CBIZ report. Specifically, JPMorgan discovered that Tricolor's CFO, Kollar, was implicated in a fraud that resulted in the criminal indictment and ultimate imprisonment of the chief executive officer at his prior employer. This raised concerns at JPMorgan that were serious enough that JPMorgan pressured Tricolor CEO Daniel Chu to replace Kollar as CFO—but to no avail. Thus, not only was Tricolor's data riddled with obvious evidence of fraudulent conduct, its CFO, the person tasked with managing company finances, was himself an experienced fraudster previously associated with criminal activity and, notwithstanding Kollar's ties to past criminal conduct, Chu was unwilling to replace him.

113.    98. The report that CBIZ delivered to JPMorgan, and JPMorgan's other discoveries about accounting irregularities at Tricolor and Kollar's checkered past, left no doubt that the integrity of Tricolor's loan data was completely compromised, unreliable, and very likely impacted by fraud. Barclays, which was given access to the CBIZ report as a participating lender in the SPV 4 warehouse facility, and Fifth Third, which received a similar CBIZ report for its separate SPV 6 warehouse facility around the same time, were equally presented with the glaring

45

red flags surrounding the integrity of Tricolor's loan data. Yet rather than stopping to address or further investigate the wide-ranging concerns identified in the CBIZ reports, Defendants barreled forward with four more Tricolor Securitizations in the next 18 months, underwriting and selling more than $1.1 billion of asset-backed securities to investors with no knowledge of or access to the startling discoveries that CBIZ presented to Defendants. Making matters worse, Defendants failed to disclose, and instead affirmatively misrepresented, their troubling findings about Tricolor's accounting, data tape integrity, and executive team.

## IV.    Defendants Made Material Misrepresentations And Omissions in Connection with the Sale of the Tricolor Trust Notes

114.    99. Despite unmistakable warnings of Tricolor's fraud—warnings that had been documented in audits, flagged in data anomalies, and revealed in executive background checks—the Underwriter Defendants continued underwriting Tricolor Securitizations. For each Tricolor Trust, the Underwriter Defendants worked with Tricolor to prepare an Offering Memorandum used to sell Notes to third-party investors. As set forth in each Offering Memorandum, the Underwriter Defendants served as "Initial Purchasers" of the Notes issued by the Securitization Trusts, with the authority to "withdraw, cancel or modify" offers and "reject orders in whole or in part." This role carried corresponding obligations. For example, each Underwriter Defendant was required to "be available to answer questions from prospective investors and ... furnish additional information ... necessary to verify the information furnished in" the Offering Memorandum. *E.g.*, TAST 2025-2 Offering Memorandum at 7. This presupposed that Underwriter Defendants were sufficiently knowledgeable about Tricolor, the receivables, and the securitization structure to provide "answers from knowledgeable individuals" enabling investors to make informed purchase decisions. *Id.* The Offering Memoranda further invited investors to contact the Underwriter Defendants "to obtain any

additional information ... necessary to verify the accuracy of the information contained [herein]." *Id.* at 12-13. The lead underwriter's contact information—JPMorgan for TAST 2022-1, TAST 2023-1, TAST 2024-2, TAST 2024-3, and TAST 2025-1; Barclays for TAST 2024-1 and TAST 2025-2—appeared prominently for this purpose. Indeed, the Underwriter Defendants structured each Trust, disseminated each Offering Memorandum to investors including Plaintiffs, created and disseminated additional marketing materials incorporating data and information from each Offering Memorandum (e.g., deal roadshow presentations and cash flow models provided through Intex and BondEdge, securitization analysis software platforms), and reaped an underwriting fee from each offering while their affiliates, the Lender Defendants, were the direct economic beneficiaries of the cash raised by each offering. The Underwriter Defendants also led roadshows in connection with each offering, providing additional information, making further representations about Tricolor and the collateral sold to each Trust, including representations directly contradicted by the 2022 and 2024 audits regarding recovery rates on charged-off and repossessed collateral, and answering investors' questions on an individual basis.

115. ~~100.~~ The Underwriter Defendants, as affiliates of Tricolor's three largest warehouse lenders, had enormous influence and control over Tricolor's activities, and the ability to control the content included (and excluded) from Tricolor's Offering Memoranda. Rather than use their oversight and control to ensure that the Offering Memoranda contained accurate and complete disclosures about the loan collateral for the Tricolor Trusts and the corporate governance at Tricolor itself, the Underwriter Defendants instead ~~facilitated the publication and dissemination of~~ exercised ultimate authority over and disseminated the false and misleading offering materials that misled investors into purchasing Notes issued by the Tricolor Trusts.

116.    ~~101.~~ *First*, the Offering Memoranda included detailed historical delinquency and loss data regarding Tricolor-originated loans dating back to 2019.  The Underwriter Defendants were well aware that Tricolor's loan tape did not accurately report delinquency or loss information.  Both the 2022 and 2024 audits highlighted that recoveries on repossessed vehicles were entirely fabricated based on "black book" value, which was attributed to loans even where Tricolor was unable to recover the vehicle collateral.  The 2022 audit raised as a "Significant Deficiency" that there were "[i]nsufficient manual controls surrounding the IDMS application to ensure all new finance receivables receive a post-close review for accuracy."  And it further identified accounting and financial reporting failures, including a lack of controls to ensure reconciliation of accounting items and numerous "errors identified within inventory such as lack of controls to identify needed reclassifications from inventory to charge offs, inventory recorded to the general ledger that the Company did not have possession of, and lack of review of repossession related accounts to ensure proper accounting and valuation of repossessions in process."  The 2024 audits confirmed the 2022 audits' findings, showing that delinquency data was not properly reported, nor was it properly shifted from month to month, and that numerous heavily delinquent, charged-off loans, rather than being recognized as a total loss, were listed as performing and current.  Moreover, the 2024 audits showed that cash reportedly received on the loan receivables according to Tricolor's servicer reports was not actually being paid to the relevant warehouse facilities master collection account, compromising the integrity of Tricolor's performance data in its entirety.  The Underwriter Defendants failed to disclose any of these facts, and had a duty to disclose all of them so that their dissemination of detailed, but obviously compromised, statistical information about the loan pool would not be false and misleading.

48

117.    ~~102.~~ *Second*, the Offering Memoranda included detailed statistical information regarding the attributes of the loan receivables that would be contributed to each Tricolor Trust.[3] For the same reasons described in the prior paragraph, the Underwriter Defendants were aware that this statistical information was compromised and had a duty to disclose that fact in order to make their disclosure of that data not false and misleading.

118.    ~~103.~~ *Third*, the Offering Memoranda falsely represent that the Tricolor Trust Notes are supported by overcollateralization and excess spread that the Underwriter Defendants knew did not exist, or was at least overstated, because money reported in the master servicer reports was not actually being delivered to the master collections accounts for the warehouse facilities.  According to the 2024 audit of JPMorgan's warehouse facility, half the reported cash on one test date was not delivered to the warehouse facility's master collections account, and payments on many receivables supposedly owned by that facility were sent to unrelated bank accounts.  In light of these findings, the Underwriter Defendants knew that the reported principal balance (for overcollateralization) and anticipated cash flow generated by the receivables (for excess spread) were false, misleading, and could not be relied  upon.  And yet they reported them to prospective investors in the Tricolor Trusts without qualification.

119.    ~~104.~~ *Fourth*, the Offering Memoranda also falsely represented that Tricolor had a "*Highly Experienced Management Team With Strong Operating Track Record*."  This representation is flatly contradicted by both the 2022 and 2024 audits that revealed systematic and pervasive operational and control failures at Tricolor that created an environment ripe for

---

[3]    Because Tricolor contemplated securitizing certain loan receivables originated *after* the Underwriter Defendants delivered the Offering Memorandum for each Tricolor Trust to investors, the Offering Memoranda calculate these detailed loan statistics using a "Statistical Pool" of loans comprised of the loans that Tricolor anticipated selling to the Tricolor Trusts as of a "Statistical Cutoff Date" prior to the date of the Offering Memorandum.

fraud. It is further contradicted by the egregious behavior that Tricolor management engaged in when evading and obstructing the 2024 audits and refusing to provide basic information to the CBIZ auditors that was necessary for them to complete their work. Moreover, at the same time that JPMorgan was falsely assuring prospective investors in the Tricolor Trusts that Tricolor's management team had a "strong operating track record," it privately abandoned its IPO efforts for Tricolor due to concerns about Tricolor's internal controls, and CFO Jerry Kollar's prior business associations with a convicted felon. Through the 2024 audits, the Underwriter Defendants were also aware that a Q1 2023 audit commenced by Ernst & Young had been put on hold back in April 2023 without explanation, and that Tricolor had not conducted an operational audit in the twelve months ending January 31, 2024—despite the overwhelming concerns raised in 2022 about operational, accounting, and control deficiencies at the company. The problems with existing management were known only to Tricolor and the Defendants, and the Underwriter Defendants' failure to disclose those issues, while misrepresenting the management team as highly experienced and with a strong operating history, was fraud.

120. ~~105.~~ On top of all that, the Defendants were, at best, willfully blind to the fact that Tricolor was engaged in a fraudulent, Ponzi-like scheme that involved double-pledging or sale of assets, misrepresentations concerning asset performance, and the intermingling of loan recoveries to manipulate borrowing capacity. Both the 2022 and 2024 audits revealed massively deficient internal controls, inaccurate onboarding and reporting of loan receivables, and pervasive examples of reported cash flow that was either made up or not going to the right account. In each case, auditors flagged Tricolor's lack of cooperation and obstruction of agreed-upon audit procedures. The auditors implored Defendants to investigate these serious issues further to determine their cause and source, while explicitly questioning the integrity of

Tricolor's data tape and reporting. Had Defendants engaged in even the most basic follow-up investigation in the course of their required due diligence as underwriters, they would have uncovered Tricolor's fraudulent scheme.

121. 106. Instead, Defendants did nothing. They did not follow up for an explanation of the pervasive errors in Tricolor's data tape, or the fact that cash reported on the servicer reports as owned by their warehouse facilities was going to unrelated bank accounts—presumably ones belonging to other lenders. Despite the emphasis on testing for double-pledging in the due diligence procedures, they ignored Tricolor's refusal to provide a master servicer report and simply abandoned the double-pledging inquiry altogether without getting any answers or assurances. This decision was particularly galling because double-pledging was the only obvious explanation for why money associated with loans reportedly owned by Defendants' warehouse facilities on the servicer reports was delivered to accounts belonging to other lending facilities.

122. 107. The Defendants did not uncover the full extent of Tricolor's fraud for one reason and one reason only: they did not want to. Those who were privy to the alarming evidence of Tricolor's fraud were the very same people who were profiting, year after year, from the substantial structuring fees, underwriting fees, interest income, and other revenue generated by Tricolor's voracious appetite for financing and rapidly accelerating demand for access to the securitization market. The people who were responsible for guarding the integrity of that securitization market and protecting bondholders were too busy lining to their own pockets to care that that they were actively erecting a house of cards. Instead, the Defendants affirmatively supported Tricolor's overt fraud by structuring each Trust, suppressing or failing to act on clear evidence of serious fraud over several years, marketing the Notes, soliciting investors, and

disseminating Offering Memoranda that they knew to include false and misleading information, and harvesting Notes sales proceeds paid by investors to repay their warehouse lines.

123.    108. The Underwriter Defendants had another powerful incentive to continue the securitization pipeline regardless of what Tricolor's data showed. By the time the 2024 audits came around, Defendants collectively had committed over $750 million under their warehouse facilities to finance Tricolor's fraudulent operation. This total commitment would ultimately grow to over a billion dollars by the time Tricolor's fraud unraveled. As warehouse lenders, the Underwriter Defendants were repaid from securitization proceeds—meaning that every securitization they underwrote reduced their own exposure to Tricolor's fraud by transferring risk to investors. In this way, the Lender Defendants were direct beneficiaries of Plaintiffs' investments, and received full value in exchange for fundamentally impaired collateral. If Tricolor's access to the securitization market was severed, it would be catastrophic for the Lender Defendants' ability to recover on their warehouse lines. That gave Defendants hundreds of millions of reasons to ignore the obvious evidence of fraud that they were presented with.

124.    Tellingly, in the immediate aftermath of the February 2024 audit, JPMorgan conducted efforts to protect its warehouse lending exposure by raising additional warehouse capital for Tricolor from mezzanine lenders in order to avoid losses under its warehouse line, or alternatively, avoid being forced to extend further capital under its own warehouse line. These efforts seemed designed to offload mezzanine warehouse lenders were structurally subordinate to JPMorgan and Barclays on the SPV 4 warehouse facility, and therefore created a buffer of subordinated capital to protect JPMorgan and Barclays from losses resulting from the serious collateral deficiencies they had uncovered in the February 2024 audit. These efforts offloaded a material portion of its JPMorgan's and Barclays's warehouse loan exposure to unsuspecting third

parties before others learned of the alarming evidence of fraud at Tricolor that JPMorgan and Barclays already knew about., while protecting JPMorgan and Barclays against at least the first wave of losses generated by that fraud.  JPMorgan's efforts to offload mezzanine exposure to the warehouse facilities would never have worked if it had stopped selling the Tricolor securitizations because the securitization off-ramp was the primary means of monetizing warehouse loan collateral.  Through these machinations, Defendants foisted the risk they had discovered onto unsuspecting others to ensure that they would not be left holding the bag.

125.    109. Investors in the Tricolor Trusts, including Plaintiffs, had no independent means to verify the Underwriter Defendants' representations or uncover Tricolor's fraudulent activity.  They did not receive the borrowing base reports, servicer reports, audit findings, or loan-level data that the Underwriter Defendants possessed.  They could not compare VINs across facilities to detect double-pledging.  They took the Underwriter Defendants at their word that Tricolor was a fast-growing business with adequate collateral, sound controls, and experienced management. They analyzed the loan portfolio and performance data as given, and on the assumption that it was true, accurate, and complete.  Plaintiffs relied on these representations in deciding to purchase Notes at the prices they paid.  This was true both for purchases made in the initial Note sales byfrom the Underwriter Defendants in the initial offering as well as for purchases made in the secondary market thereafter because the Offering Memoranda remained the most detailed representations madesource of information about the Trusts and their collateral. Indeed, the description of the collateral pool characteristics in each Offering Memorandum, and incorporated into the deal roadshow and cash flow model sent alongside each Offering Memorandum, were the only source of information about characteristics of each collateral pool ever made available to investors.  Plaintiffs never would have purchased Notes hadif they had

53

known that Tricolor's loan data lacked integrity, let alone if they had known Tricolor was operating a fraudulent scheme ~~enabled by~~in which Defendants~~' loose financing~~ recklessly participated.

**V.      Plaintiffs Relied Upon Defendants' Material Misrepresentations And Omissions in Connection with their Purchase of the Tricolor Trust Notes**

      **A.      The One William Street Plaintiffs**

126.    Plaintiffs One William Street Capital Master Fund Ltd., OWS ABS IV, L.P., OWS ABS IV Sub I, LLC, OWS ABS Master Fund, Ltd., OWS ABS Master Fund II, L.P., OWS Credit Opportunity I, LLC, OWS Credit Opportunity Sub I, Ltd., 1WS Credit Income Fund, and 1WSCI Sub I, LLC (the "One William Street Plaintiffs"), delegate investment decisions to their investment adviser, One William Street Capital Management, L.P. ("One William Street").  One William Street utilizes an active strategy based on an analytical and research-based investment process.  One William Street's investment team made the decisions regarding whether to purchase, sell, or hold TAST Notes for the One William Street Plaintiffs.

127.    One William Street's investment team regularly evaluated asset-backed securities, including TAST Notes.  Factors considered by One William Street's investment team included, among other things, collateral performance (e.g., payment delinquency rate, loan charge-off rate and recoveries on charged-off loans, contract interest rate, term to maturity, value of vehicle associated with each auto loan receivable), Tricolor's financial performance, including its risk management and financial controls, and Tricolor's management team.  One William Street then relied on the analysis conducted by its investment team in deciding whether to purchase, sell, or hold TAST Notes.

128.    Prior to Tricolor's bankruptcy, the One William Street Plaintiffs made investments, which they still hold, in four TAST trusts: TAST 2024-1, TAST 2024-2, TAST

2024-3, and TAST 2025-2 (the "One William Street Trusts").  For each of the One William Street Trusts, one or more of the Defendants solicited the One William Street Plaintiffs' investment by sending One William Street an email containing the Offering Memorandum, a deal roadshow prepared by the underwriters for each respective transaction, and a cash flow model prepared by the lead bookrunner and structuring agent for each respective transaction. Specifically, Defendants sent the following solicitations to One William Street.

- An Assistant Vice President at Barclays messaged One William Street on January 18, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-1.

- An Executive Director at JPMorgan messaged One William Street on January 18, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-1.

- A Director at Barclays messaged One William Street on May 8, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-2.

- An Executive Director at JPMorgan messaged One William Street on May 8, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-2.

- A Managing Director at Barclays messaged One William Street on October 2, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-3.

- An Associate at JPMorgan messaged One William Street on October 2, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-3.

- A Vice President at Barclays messaged One William Street on June 4, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-2.

- An Executive Director at JPMorgan messaged One William Street on June 4, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-2.

129.    In each instance, One William Street carefully reviewed all materials that the Defendants provided.  In particular, the description of the loan pool characteristics in the Offering Memorandum, and incorporated into the deal roadshow and cash flow model sent alongside the Offering Memorandum, was the exclusive source of information made available to One William Street to understand the characteristics of the loan collateral backing the proposed securitization.  Neither Defendants nor anyone else made additional information available to Defendants about the loan pool characteristics beyond what the Defendants shared in the Offering Memorandum, deal roadshow, and underwriter cash flow model.  Thus, for example, One William Street did not have access to the "loan tape" that Defendants used to put together the collateral pool characteristics described in the Offering Memorandum, or any other way of checking the accuracy of the Offering Memorandum's description.  The Defendants incorporated the Offering Memorandum's description of the loan characteristics into the deal roadshow that the Defendants sent at the same time.  The deal roadshow, which the Defendants built and circulated to prospective investors, presented the Offering Memorandum's description of the

56

loan pool characteristics in a more digestible format, through stratification tables and charts. The lead bookrunner and structuring agent created a capital structure and waterfall model (the "Underwriting Model"), which provided its assessment of anticipated bond cash flows, which likewise incorporated the loan characteristics from the Offering Memorandum to project future bond cashflows and returns to each Class of Notes.

130. After reviewing and digesting the Offering Memorandum, deal roadshow, and the Underwriting Model that Defendants delivered, One William Street prepared its own cash flow projections to run through the Underwriting Model to assess a possible investment. In preparing its own cash flow projections, One William Street relied on the loan pool characteristics that Defendants provided through the Offering Memorandum and deal roadshow, as well as the Underwriting Model. Using the loan pool characteristics and their own professional judgment and experience with similar collateral pools, One William Street assessed whether the anticipated loan collateral cash flow would be sufficient to cover interest payment and principal repayment of the subordinated notes that the Defendants were marketing for sale to the One William Street Plaintiffs. One William Street chose to invest only after it became comfortable that the loan collateral would support payment of interest and repayment of its Notes, and that it was being compensated adequately for any risk that the loan collateral would not generate sufficient cash flow to repay the Notes.

131. In performing its cash flow modeling, One William Street considered and relied upon various collateral pool characteristics and deal structure inputs, including but not limited to: outstanding pool balance, weighted average coupon, weighted average maturity, loan-to-value assumptions, loan seasoning characteristics, waterfall mechanics, credit enhancement, excess spread, performance triggers, and servicing practices. One William Street relied on data and

57

information provided in the Offering Memorandum and incorporated into the Underwriting Model for each of these loan pool characteristics.

132.    In performing its cash flow modeling, One William Street also considered and stress tested various default and loss assumptions, including projected cumulative net loss curves, default timing curves, recovery rates, and loss severity.  One William Street relied on data provided in the Offering Memorandum and incorporated into the Underwriting Model to settle on the various default and loss assumptions it used to run its cash flow modeling.  As one example, the Offering Memorandum for each deal touted recovery rates of over 60% for defaulted and repossessed loans, which recovery rates were maintained after the COVID-19 pandemic.  Appendix III ¶ 16, IV ¶ 16, V ¶ 16, and VII ¶ 16.  The historical recovery and net loss data presented in the Offering Memorandum and incorporated into the deal roadshow were important inputs for One William Street's analysis, since there were no other sources for this supposedly historical performance data.  One William Street relied on the historical recovery rate and net loss information provided in the Offering Memorandum and incorporated into the deal roadshow and Underwriting Model when performing its cash flow modeling.

133.    In evaluating investments in the One William Street Trusts, One William Street also considered certain qualitative information that Defendants provided in the Offering Memorandum.  In particular, One William Street considered and relied upon Defendants' representation that Tricolor had a "highly experienced management team with [a] strong operating record" in deciding to make its investment.  Had One William Street known that Tricolor's management team, including its CEO Daniel Chu and CFO Jerry Kollar had been associated with a long history of scandals, and that Defendant JPMorgan declined to proceed with an initial public offering of Tricolor stock based, in large part, on questions it had about the

58

integrity of the management team, it would never have invested in the One William Street Trusts. Likewise, One William Street relied on Defendants' representations regarding Tricolor's robust internal systems and controls, and underwriting policies, in deciding to invest. Had One William Street known that Tricolor was, in fact, plagued by serious internal control deficiencies and stuffing the One William Street Trusts with loans that were fictitious and not underwritten at all, it would never have invested in the One William Street Trusts. Finally, One William Street relied on Defendants' representation that Tricolor was adequately capitalized to continue its operations, and would never have invested if it had known that Tricolor was, in fact, over-leveraged due to double pledging and fraud on its warehouse lines.

134. In addition, Defendants had direct communications (by phone, in person, and by email) with One William Street's investment team in which Defendants touted Tricolor and its performance while reiterating and reinforcing to One William Street the same misstatements and omissions contained in the Offering Memoranda. For example, Barclays held a call with One William Street to solicit interest in TAST 2024-1 on October 5, 2023, nearly four months before the offering was completed. In the intervening period, Barclays regularly marketed the Trust to One William Street and made clear that it had control over the offering materials. On December 19, 2023, a Managing Director at Barclays told One William Street that Barclays was preparing a cash flow model to share with OWS "that will be helpful in the structural discussions." Then on January 5, 2024, Barclays followed up with "the strat table breaking out the transaction collateral pool by Internal Risk Grade" and the "pool factor calculation." Again, these communications contain the same misleading information that was ultimately part of the TAST 2024-1 Offering Memorandum—the "Internal Risk Grade" analysis, for example, was included as part of Appendix III ¶ 19 (Data tables under the heading, "Characteristics of the Receivables."). And, as

discussed above, Barclays and JPMorgan each sent the Offering Memorandum on January 18, 2024. One William Street relied on these and other misstatements and omissions by personnel at Defendants JPMorgan and Barclays when they made their investment decisions with respect to TAST Notes.

135.    After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix III ¶¶ 7-21, IV ¶¶ 7-21, V ¶¶ 7-21, and VII ¶¶ 7-21, One William Street ultimately chose to make the following purchases of TAST Notes, which the One William Street Plaintiffs still hold, in the primary offerings for TAST 2024-1, TAST 2024-2, TAST 2024-3, and TAST 2025-2[4]:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 01/25/2024 | Barclays | TAST 2024-1A F | $28,280,000.00 | $99.99 |
| 05/14/2024 | JPMorgan | TAST 2024-2A E | $25,875,000.00 | $99.98 |
| 05/14/2024 | JPMorgan | TAST 2024-2A F | $26,094,000.00 | $100.00 |
| 10/07/2024 | JPMorgan | TAST 2024-3A E | $6,300,000.00 | $99.99 |
| 10/07/2024 | JPMorgan | TAST 2024-3A F | $24,280,000.00 | $100.00 |
| 06/10/2025 | Barclays | TAST 2025-2A E | $1,450,000.00 | $99.99 |

136.    After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix IV ¶¶ 7-21, V ¶¶ 7-21, and VII ¶¶ 7-21, One William Street also chose to make the following secondary market purchases of Notes issued by TAST 2024-2, TAST 2024-3, and TAST 2025-2, each of which occurred before any

---

[4]    A consolidated table of pre-bankruptcy purchases of TAST Notes by Plaintiffs is included at Appendix VIII.

public disclosure of the massive fraud at Tricolor and each of which is still held by the One William Street Plaintiffs:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 10/08/2024 | Other | TAST 2024-3A E | $700,000.00 | $100.39 |
| 06/10/2025 | Other | TAST 2025-2A E | $500,000.00 | $101.13 |
| 06/10/2025 | Other | TAST 2025-2A E | $500,000.00 | $101.19 |
| 06/11/2025 | Other | TAST 2025-2A E | $400,000.00 | $101.25 |
| 06/11/2025 | Other | TAST 2025-2A E | $250,000.00 | $101.55 |
| 08/01/2025 | Other | TAST 2024-2A E | $1,295,000.00 | $104.18 |
| 08/01/2025 | Other | TAST 2024-2A F | $1,426,000.00 | $107.36 |
| 08/01/2025 | Other | TAST 2024-3A E | $700,000.00 | $102.56 |
| 08/01/2025 | Other | TAST 2024-3A F | $700,000.00 | $102.97 |

137.    In these secondary market purchases, most of which occurred within a couple days of the initial offering, One William Street continued to rely upon data regarding loan pool characteristics from the Offering Memorandum because that remained the only data regarding loan pool characteristics available to investors.  Accordingly, One William Street made its secondary market investment decisions on the basis of, and in reliance on, the same information and analysis that it used for its primary market purchases.

**B.    The Clear Haven Plaintiffs**

138.    Plaintiffs Clear Haven Investment Fund LP, Clear Haven Investments LLC, Clear Haven Total Return Partners LP, Clear Haven Ultra Short Investment Grade Bond Fund LP, Clear Haven UMF Fund LP, California Insurance Company, Constitution Insurance Company,

Florida Casualty Insurance Company, Superior Risk Solutions (SAC) Ltd, and Texas Insurance Company (the "Clear Haven Plaintiffs") delegate investment decisions to their investment adviser, Clear Haven Capital Management, LLC ("Clear Haven"). Clear Haven utilizes an active strategy based on an analytical and research-based investment process. Clear Haven's investment team made the decisions regarding whether to purchase, sell, or hold TAST Notes for the Clear Haven Plaintiffs.

139.    Clear Haven's investment team regularly evaluated asset-backed securities, including TAST Notes. Factors considered by Clear Haven's investment team included, among other things, collateral performance (e.g., payment delinquency rate, loan charge-off rate and recoveries on charged-off loans, contract interest rate, term to maturity, value of vehicle associated with each auto loan receivable), Tricolor's financial performance, including its risk management and financial controls, and Tricolor's management team. Clear Haven then relied on the analysis conducted by its investment team in deciding whether to purchase, sell, or hold TAST Notes.

140.    Prior to Tricolor's bankruptcy, the Clear Haven Plaintiffs made investments, which they still hold, in three TAST Trusts: TAST 2024-3, TAST 2025-1, and TAST 2025-2 (the "Clear Haven Trusts"). For each of the Clear Haven Trusts, one or more of the Defendants solicited the Clear Haven Plaintiffs' investment by sending Clear Haven an email containing the Offering Memorandum, a deal roadshow prepared by the underwriters for each respective transaction, and a cash flow model prepared by the lead bookrunner and structuring agent for each respective transaction. Specifically, Defendants sent the following solicitations to Clear Haven.

- A Vice President at Barclays messaged Clear Haven on October 2, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-3.

- A Managing Director at JPMorgan messaged Clear Haven on October 2, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-3.

- A Vice President at Barclays messaged Clear Haven on March 5, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-1.

- A Managing Director at JPMorgan messaged Clear Haven on March 5, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-1.

- A Vice President at Barclays messaged Clear Haven on June 11, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-2.

- A Managing Director at JPMorgan messaged Clear Haven on June 4, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-2.

141.    In each instance, Clear Haven carefully reviewed all materials that the Defendants provided.  In particular, the description of the loan pool characteristics in the Offering Memorandum, and incorporated into the deal roadshow and cash flow model sent alongside the Offering Memorandum, was the exclusive source of information made available to Clear Haven to understand the characteristics of the loan collateral backing the proposed securitization. Neither Defendants nor anyone else made additional information available to Defendants about the loan pool characteristics beyond what the Defendants shared in the Offering Memorandum,

deal roadshow, and underwriter cash flow model.  Thus, for example, Clear Haven did not have access to the "loan tape" that Defendants used to put together the collateral pool characteristics described in the Offering Memorandum, or any other way of checking the accuracy of the Offering Memorandum's description.  The Defendants incorporated the Offering Memorandum's description of the loan characteristics into the deal roadshow that the Defendants sent at the same time.  The deal roadshow, which the Defendants built and circulated to prospective investors, presented the Offering Memorandum's description of the loan pool characteristics in a more digestible format, through stratification tables and charts.  The lead bookrunner and structuring agent created a capital structure and waterfall model (the "Underwriting Model"), which provided its assessment of anticipated bond cash flows, which likewise incorporated the loan characteristics from the Offering Memorandum to project future bond cashflows and returns to each Class of Notes.

142.    After reviewing and digesting the Offering Memorandum, deal roadshow, and the Underwriting Model that Defendants delivered, Clear Haven prepared its own cash flow projections to run through the Underwriting Model to assess a possible investment.  In preparing its own cash flow projections, Clear Haven relied on the loan pool characteristics that Defendants provided through the Offering Memorandum and deal roadshow, as well as the Underwriting Model.  Using the loan pool characteristics and their own professional judgment and experience with similar collateral pools, Clear Haven assessed whether the anticipated loan collateral cash flow would be sufficient to cover interest payment and principal repayment of the subordinated notes that the Defendants were marketing for sale to the Clear Haven Plaintiffs.  Clear Haven chose to invest only after it became comfortable that the loan collateral would support payment of interest and repayment of its Notes, and that it was being compensated

64

adequately for any risk that the loan collateral would not generate sufficient cash flow to repay the Notes.

143. In performing its cash flow modeling, Clear Haven considered and relied upon various collateral pool characteristics and deal structure inputs, including but not limited to: outstanding pool balance, weighted average coupon, weighted average maturity, loan-to-value assumptions, loan seasoning characteristics, waterfall mechanics, credit enhancement, excess spread, performance triggers, and servicing practices. Clear Haven relied on data and information provided in the Offering Memorandum and incorporated into the Underwriting Model for each of these loan pool characteristics.

144. In performing its cash flow modeling, Clear Haven also considered and stress tested various default and loss assumptions, including projected cumulative net loss curves, default timing curves, recovery rates, and loss severity. Clear Haven relied on data provided in the Offering Memorandum and incorporated into the Underwriting Model to settle on the various default and loss assumptions it used to run its cash flow modeling. As one example, the Offering Memorandum for each deal touted recovery rates of over 60% for defaulted and repossessed loans, which recovery rates were maintained after the COVID-19 pandemic. Appendix V ¶ 16, VI ¶ 16, and VII ¶ 16. The historical recovery and net loss data presented in the Offering Memorandum and incorporated into the deal roadshow were important inputs for Clear Haven's analysis, since there were no other sources for this supposedly historical performance data. Clear Haven relied on the historical recovery rate and net loss information provided in the Offering Memorandum and incorporated into the deal roadshow and Underwriting Model when performing its cash flow modeling.

65

145. In evaluating investments in the Clear Haven Trusts, Clear Haven also considered certain qualitative information that Defendants provided in the Offering Memorandum. In particular, Clear Haven considered and relied upon Defendants' representation that Tricolor had a "highly experienced management team with [a] strong operating record" in deciding to make its investment. Had Clear Haven known that Tricolor's management team, including its CEO Daniel Chu and CFO Jerry Kollar had been associated with a long history of scandals, and that Defendant JPMorgan declined to proceed with an initial public offering of Tricolor stock based, in large part, on questions it had about the integrity of the management team, it would never have invested in the Clear Haven Trusts. Likewise, Clear Haven relied on Defendants' representations regarding Tricolor's robust internal systems and controls, and underwriting policies, in deciding to invest. Had Clear Haven known that Tricolor was, in fact, plagued by serious internal control deficiencies and stuffing the Clear Haven Trusts with loans that were fictitious and not underwritten at all, it would never have invested in the Clear Haven Trusts. Finally, Clear Haven relied on Defendants' representation that Tricolor was adequately capitalized to continue its operations, and would never have invested if it had known that Tricolor was, in fact, over-leveraged due to double pledging and fraud on its warehouse lines.

146. In addition, Defendants had direct communications (by phone, in person, and by email) with Clear Haven's investment team in which Defendants touted Tricolor and its performance while reiterating and reinforcing to Clear Haven the same misstatements and omissions contained in the Offering Memoranda. For example, Barclays hosted Clear Haven investment team members at annual trips to see Tricolor's reconditioning facilities, boasting that these facilities were key to Tricolor's purported best-in-class recovery rates on charged-off loans. Similarly, JPMorgan bankers, including Managing Director Billy Wong, pitched Tricolor

to Clear Haven as being best-in-class for "off the run subprime auto" at a 2023 conference in Las Vegas. JPMorgan maintained this support over time and at its highest levels—for example, an Executive Director at JPMorgan sent Clear Haven a non-deal roadshow presentation marketing Tricolor on January 27, 2025. Clear Haven relied on these and other misstatements and omissions by JPMorgan personnel when they made their investment decisions with respect to TAST Notes.

147. After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix V ¶¶ 7-21 and VII ¶¶ 7-21, Clear Haven ultimately chose to make the following purchases of TAST Notes, which the Clear Haven Plaintiffs still hold, in the primary offerings for TAST 2024-3 and TAST 2025-2:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 10/07/2024 | JPMorgan | TAST 2024-3A F | $2,000,000.00 | $100.00 |
| 06/10/2025 | JPMorgan | TAST 2025-2A E | $250,000.00 | $101.55 |
| 06/11/2025 | JPMorgan | TAST 2025-2A E | $1,050,000.00 | $100.00 |

148. After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix VI ¶¶ 7-21, Clear Haven also chose to make the following secondary market purchases of Notes issued by TAST 2025-1, each of which occurred before any public disclosure of the massive fraud at Tricolor and each of which is still held by the Clear Haven Plaintiffs:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 08/08/2025 | Other | TAST 2025-1A D | $2,000,000.00 | $102.69 |
| 08/26/2025 | Other | TAST 2025-1A D | $1,475,000.00 | $102.75 |

149.     In these secondary market purchases, Clear Haven continued to rely upon data regarding loan pool characteristics from the Offering Memorandum because that remained the only data regarding loan pool characteristics available to investors.  While the securities that Clear Haven purchased in the secondary market were seasoned by a few months, the monthly investor reporting for these securities focused on reporting investor cash flows and provided only limited updates on loan pool characteristics. Clear Haven considered the additional information available from the investor reporting only to confirm that the collateral was performing in accordance with its initial projections, at which point it made its secondary market investment decisions on the basis of, and in reliance on, the same information and analysis that it used for its primary market purchases.

### C.      The Frost Plaintiffs

150.     Plaintiffs Advisors' Inner Circle Fund II - Frost Total Return Bond Fund and Frost Credit Fund (the "Frost Plaintiffs") delegate investment decisions to their investment adviser, Frost Investment Advisors, LLC ("Frost").  Frost utilizes an active strategy based on an analytical and research-based investment process.  Frost's investment team made the decisions regarding whether to purchase, sell, or hold TAST Notes for the Frost Plaintiffs.

151.     Frost's investment team regularly evaluated asset-backed securities, including TAST Notes.  Factors considered by Frost's investment team included, among other things, collateral performance (e.g., payment delinquency rate, loan charge-off rate and recoveries on charged-off loans, contract interest rate, term to maturity, value of vehicle associated with each auto loan receivable), Tricolor's financial performance, including its risk management and financial controls, and Tricolor's management team.  Frost then relied on the analysis conducted by its investment team in deciding whether to purchase, sell, or hold TAST Notes.

152.     Prior to Tricolor's bankruptcy, the Frost Plaintiffs made investments, which they still hold, in three TAST Trusts: TAST 2022-1, TAST 2023-1, and TAST 2025-1 (the "Frost Trusts").  For each of the Frost Trusts, one or more of the Defendants solicited the Frost Plaintiffs' investment by sending Frost an email containing the Offering Memorandum, a deal roadshow prepared by the underwriters for each respective transaction, and a cash flow model prepared by the lead bookrunner and structuring agent for each respective transaction. Specifically, Defendants sent the following solicitations to Frost.

- JPMorgan messaged Frost on April 20, 2022, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2022-1.

- JPMorgan messaged Frost on February 2, 2023, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2023-1.

- JPMorgan messaged Frost on March 5, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-1.

153.     In each instance, Frost carefully reviewed all materials that the Defendants provided.  In particular, the description of the loan pool characteristics in the Offering Memorandum, and incorporated into the deal roadshow and cash flow model sent alongside the Offering Memorandum, was the exclusive source of information made available to Frost to understand the characteristics of the loan collateral backing the proposed securitization.  Neither Defendants nor anyone else made additional information available to Defendants about the loan pool characteristics beyond what the Defendants shared in the Offering Memorandum, deal roadshow, and underwriter cash flow model.  Thus, for example, Frost did not have access to the "loan tape" that Defendants used to put together the collateral pool characteristics described in the Offering Memorandum, or any other way of checking the accuracy of the Offering

69

Memorandum's description.    The Defendants incorporated the Offering Memorandum's description of the loan characteristics into the deal roadshow that the Defendants sent at the same time.    The deal roadshow, which the Defendants built and circulated to prospective investors, presented the Offering Memorandum's description of the loan pool characteristics in a more digestible format, through stratification tables and charts.    The lead bookrunner and structuring agent created a capital structure and waterfall model (the "Underwriting Model"), which provided its assessment of anticipated bond cash flows, which likewise incorporated the loan characteristics from the Offering Memorandum to project future bond cashflows and returns to each Class of Notes.

154.    After reviewing and digesting the Offering Memorandum, deal roadshow, and the Underwriting Model that Defendants delivered, Frost prepared its own cash flow projections to run through the Underwriting Model to assess a possible investment.    In preparing its own cash flow projections, Frost relied on the loan pool characteristics that Defendants provided through the Offering Memorandum and deal roadshow, as well as the Underwriting Model.    Using the loan pool characteristics and their own professional judgment and experience with similar collateral pools, Frost assessed whether the anticipated loan collateral cash flow would be sufficient to cover interest payment and principal repayment of the subordinated notes that the Defendants were marketing for sale to the Frost Plaintiffs.    Frost chose to invest only after it became comfortable that the loan collateral would support payment of interest and repayment of its Notes, and that it was being compensated adequately for any risk that the loan collateral would not generate sufficient cash flow to repay the Notes.

155.    In performing its cash flow modeling, Frost considered and relied upon various collateral pool characteristics and deal structure inputs, including but not limited to: outstanding

70

pool balance, weighted average coupon, weighted average maturity, loan-to-value assumptions, loan seasoning characteristics, waterfall mechanics, credit enhancement, excess spread, performance triggers, and servicing practices. Frost relied on data and information provided in the Offering Memorandum and incorporated into the Underwriting Model for each of these loan pool characteristics.

156.    In performing its cash flow modeling, Frost also considered and stress tested various default and loss assumptions, including projected cumulative net loss curves, default timing curves, recovery rates, and loss severity. Frost relied on data provided in the Offering Memorandum and incorporated into the Underwriting Model to settle on the various default and loss assumptions it used to run its cash flow modeling. As one example, the Offering Memorandum for each deal touted recovery rates of over 60% for defaulted and repossessed loans, which recovery rates were maintained after the COVID-19 pandemic. Appendix I ¶ 17, II ¶ 17, and VI ¶ 16. The historical recovery and net loss data presented in the Offering Memorandum and incorporated into the deal roadshow were important inputs for Frost's analysis, since there were no other sources for this supposedly historical performance data. Frost relied on the historical recovery rate and net loss information provided in the Offering Memorandum and incorporated into the deal roadshow and Underwriting Model when performing its cash flow modeling.

157.    In evaluating investments in the Frost Trusts, Frost also considered certain qualitative information that Defendants provided in the Offering Memorandum. In particular, Frost considered and relied upon Defendants' representation that Tricolor had a "highly experienced management team with [a] strong operating record" in deciding to make its investment. Had Frost known that Tricolor's management team, including its CEO Daniel Chu

71

and CFO Jerry Kollar had been associated with a long history of scandals, and that Defendant JPMorgan declined to proceed with an initial public offering of Tricolor stock based, in large part, on questions it had about the integrity of the management team, it would never have invested in the Frost Trusts. Likewise, Frost relied on Defendants' representations regarding Tricolor's robust internal systems and controls, and underwriting policies, in deciding to invest. Had Frost known that Tricolor was, in fact, plagued by serious internal control deficiencies and stuffing the Frost Trusts with loans that were fictitious and not underwritten at all, it would never have invested in the Frost Trusts. Finally, Frost relied on Defendants' representation that Tricolor was adequately capitalized to continue its operations, and would never have invested if it had known that Tricolor was, in fact, over-leveraged due to double pledging and fraud on its warehouse lines.

158. In addition, Defendants had direct communications (by phone, in person, and by email) with Frost's investment team in which Defendants touted Tricolor and its performance while reiterating and reinforcing to Frost the same misstatements and omissions contained in the Offering Memoranda. These and the other aforementioned statements and omissions influenced Frost's investment decisions with respect to TAST Notes, causing Frost to actually rely on Defendants' misstatements and omissions.

159. After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix I ¶¶ 7-22, II ¶¶ 7-22, and VI ¶¶ 7-21, Frost ultimately chose to make the following purchases of TAST Notes, which the Frost Plaintiffs still hold, in the primary offerings for TAST 2022-1, TAST 2023-1, and TAST 2025-1:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 04/29/2022 | JPMorgan | TAST 2022-1A F | $1,000,000.00 | $99.50 |

72

| 04/29/2022 | JPMorgan | TAST 2022-1A F | $4,000,000.00 | $99.50 |
| 02/09/2023 | JPMorgan | TAST 2023-1A F | $1,000,000.00 | $95.27 |
| 02/09/2023 | JPMorgan | TAST 2023-1A F | $11,910,000.00 | $95.27 |
| 03/11/2025 | JPMorgan | TAST 2025-1A A | $7,000,000.00 | $100.00 |
| 03/11/2025 | JPMorgan | TAST 2025-1A E | $500,000.00 | $99.99 |

**D.    The Hudson Cove Plaintiff**

160.    Plaintiff Hudson Cove Credit Opportunity Master Fund, L.P. (the "Hudson Cove Plaintiff") delegates investment decisions to its investment adviser, Hudson Cove Capital Management, LLC ("Hudson Cove").  Hudson Cove utilizes an active strategy based on an analytical and research-based investment process.  Hudson Cove's investment team made the decisions regarding whether to purchase, sell, or hold TAST Notes for the Hudson Cove Plaintiff.

161.    Hudson Cove's investment team regularly evaluated asset-backed securities, including TAST Notes.  Factors considered by Hudson Cove's investment team included, among other things, collateral performance (e.g., payment delinquency rate, loan charge-off rate and recoveries on charged-off loans, contract interest rate, term to maturity, value of vehicle associated with each auto loan receivable), Tricolor's financial performance, including its risk management and financial controls, and Tricolor's management team.  Hudson Cove then relied on the analysis conducted by its investment team in deciding whether to purchase, sell, or hold TAST Notes.

162.    Prior to Tricolor's bankruptcy, the Hudson Cove Plaintiff made an investment, which it still holds, in TAST 2024-3 (the "Hudson Cove Trust").  For this Trust, one or more of the Defendants solicited the Hudson Cove Plaintiff' investment by sending Hudson Cove an

73

email containing the Offering Memorandum, a deal roadshow prepared by the underwriters for each respective transaction, and a cash flow model prepared by the lead bookrunner and structuring agent for each respective transaction. Specifically, Defendants sent the following solicitations to Hudson Cove.

- JPMorgan messaged Hudson Cove on October 2, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-3.

163. Hudson Cove carefully reviewed all materials that the Defendants provided. In particular, the description of the loan pool characteristics in the Offering Memorandum, and incorporated into the deal roadshow and cash flow model sent alongside the Offering Memorandum, was the exclusive source of information made available to Hudson Cove to understand the characteristics of the loan collateral backing the proposed securitization. Neither Defendants nor anyone else made additional information available to Defendants about the loan pool characteristics beyond what the Defendants shared in the Offering Memorandum, deal roadshow, and underwriter cash flow model. Thus, for example, Hudson Cove did not have access to the "loan tape" that Defendants used to put together the collateral pool characteristics described in the Offering Memorandum, or any other way of checking the accuracy of the Offering Memorandum's description. The Defendants incorporated the Offering Memorandum's description of the loan characteristics into the deal roadshow that the Defendants sent at the same time. The deal roadshow, which the Defendants built and circulated to prospective investors, presented the Offering Memorandum's description of the loan pool characteristics in a more digestible format, through stratification tables and charts. The lead bookrunner and structuring agent created a capital structure and waterfall model (the "Underwriting Model"), which provided its assessment of anticipated bond cash flows, which likewise incorporated the loan

74

characteristics from the Offering Memorandum to project future bond cashflows and returns to each Class of Notes.

164.    After reviewing and digesting the Offering Memorandum, deal roadshow, and the Underwriting Model that Defendants delivered, Hudson Cove prepared its own cash flow projections to run through the Underwriting Model to assess a possible investment. In preparing its own cash flow projections, Hudson Cove relied on the loan pool characteristics that Defendants provided through the Offering Memorandum and deal roadshow, as well as the Underwriting Model. Using the loan pool characteristics and their own professional judgment and experience with similar collateral pools, Hudson Cove assessed whether the anticipated loan collateral cash flow would be sufficient to cover interest payment and principal repayment of the subordinated notes that the Defendants were marketing for sale to the Hudson Cove Plaintiff. Hudson Cove chose to invest only after it became comfortable that the loan collateral would support payment of interest and repayment of its Notes, and that it was being compensated adequately for any risk that the loan collateral would not generate sufficient cash flow to repay the Notes.

165.    In performing its cash flow modeling, Hudson Cove considered and relied upon various collateral pool characteristics and deal structure inputs, including but not limited to: outstanding pool balance, weighted average coupon, weighted average maturity, loan-to-value assumptions, loan seasoning characteristics, waterfall mechanics, credit enhancement, excess spread, performance triggers, and servicing practices. Hudson Cove relied on data and information provided in the Offering Memorandum and incorporated into the Underwriting Model for each of these loan pool characteristics.

75

166.    In performing its cash flow modeling, Hudson Cove also considered and stress tested various default and loss assumptions, including projected cumulative net loss curves, default timing curves, recovery rates, and loss severity.  Hudson Cove relied on data provided in the Offering Memorandum and incorporated into the Underwriting Model to settle on the various default and loss assumptions it used to run its cash flow modeling.  As one example, the Offering Memorandum for each deal touted recovery rates of over 60% for defaulted and repossessed loans, which recovery rates were maintained after the COVID-19 pandemic.  Appendix V ¶ 16.  The historical recovery and net loss data presented in the Offering Memorandum and incorporated into the deal roadshow were important inputs for Hudson Cove's analysis, since there were no other sources for this supposedly historical performance data.  Hudson Cove relied on the historical recovery rate and net loss information provided in the Offering Memorandum and incorporated into the deal roadshow and Underwriting Model when performing its cash flow modeling.

167.    In evaluating investments in the Hudson Cove Trust, Hudson Cove also considered certain qualitative information that Defendants provided in the Offering Memorandum.   In particular, Hudson Cove considered and relied upon Defendants' representation that Tricolor had a "highly experienced management team with [a] strong operating record" in deciding to make its investment.  Had Hudson Cove known that Tricolor's management team, including its CEO Daniel Chu and CFO Jerry Kollar had been associated with a long history of scandals, and that Defendant JPMorgan declined to proceed with an initial public offering of Tricolor stock based, in large part, on questions it had about the integrity of the management team, it would never have invested in the Hudson Cove Trust.  Likewise, Hudson Cove relied on Defendants' representations regarding Tricolor's robust internal systems and

controls, and underwriting policies, in deciding to invest.  Had Hudson Cove known that Tricolor was, in fact, plagued by serious internal control deficiencies and stuffing the Hudson Cove Trust with loans that were fictitious and not underwritten at all, it would never have invested in the Hudson Cove Trust.  Finally, Hudson Cove relied on Defendants' representation that Tricolor was adequately capitalized to continue its operations, and would never have invested if it had known that Tricolor was, in fact, over-leveraged due to double pledging and fraud on its warehouse lines.

168.    In addition, Defendants had direct communications (by phone, in person, and by email) with Hudson Cove's investment team in which Defendants touted Tricolor and its performance while reiterating and reinforcing to Hudson Cove the same misstatements and omissions contained in the Offering Memoranda.  These and the other aforementioned statements and omissions influenced Hudson Cove's investment decisions with respect to TAST Notes, causing Hudson Cove to actually rely on Defendants' misstatements and omissions.

169.    After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix V ¶¶ 7-21, Hudson Cove ultimately chose to make the following purchases of TAST Notes, which the Hudson Cove Plaintiff still holds, in the primary offering for TAST 2024-3:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 10/17/2024 | JPMorgan | TAST 2024-3A D | $2,250,000.00 | $100.00 |

E.    **The Janus Henderson Plaintiffs**

170.    Plaintiffs Janus Henderson Asset-Backed Securities ETF, Janus Henderson Income ETF, Janus Henderson Mortgage-Backed Securities ETF, Janus Henderson Multi-Sector Income Fund, and Janus Henderson Securitized Income ETF (the "Janus Henderson Plaintiffs")

delegate investment decisions to their investment adviser, Janus Henderson Investors US LLC ("Janus Henderson").  Plaintiff Guardian Multi-Sector Bond VIP Fund (the "Guardian Plaintiff") delegates investment decisions to Janus Henderson as its investment sub-adviser.  Janus Henderson utilizes an active strategy based on an analytical and research-based investment process.  Janus Henderson's investment team made the decisions regarding whether to purchase, sell, or hold TAST Notes for the Janus Henderson Plaintiffs and the Guardian Plaintiff.

171.    Janus Henderson's investment team regularly evaluated asset-backed securities, including TAST Notes.  Factors considered by Janus Henderson's investment team included, among other things, collateral performance (e.g., payment delinquency rate, loan charge-off rate and recoveries on charged-off loans, contract interest rate, term to maturity, value of vehicle associated with each auto loan receivable), Tricolor's financial performance, including its risk management and financial controls, and Tricolor's management team.  Janus Henderson then relied on the analysis conducted by its investment team in deciding whether to purchase, sell, or hold TAST Notes.

172.    Prior to Tricolor's bankruptcy, the Janus Henderson Plaintiffs and the Guardian Plaintiff made investments, which they still hold, in three TAST Trusts: TAST 2024-1, TAST 2024-2, and TAST 2025-1 (the "Janus Henderson and Guardian Trusts").  For each of the Janus Henderson and Guardian Trusts, one or more of the Defendants solicited the Janus Henderson Plaintiffs and the Guardian Plaintiff's investment by sending Janus Henderson an email containing the Offering Memorandum, a deal roadshow prepared by the underwriters for each respective transaction, and a cash flow model prepared by the lead bookrunner and structuring agent for each respective transaction.  Specifically, Defendants sent the following solicitations to Janus Henderson.

- A Director at Barclays messaged Janus Henderson on January 18, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-1.

- A Vice President at JPMorgan messaged Janus Henderson on January 18, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-1.

- A Director at Barclays messaged Janus Henderson on May 8, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-2.

- A Vice President at JPMorgan messaged Janus Henderson on May 8, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-2.

- A Director at Barclays messaged Janus Henderson on March 5, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-1.

- A Vice President at JPMorgan messaged Janus Henderson on March 5, 2025, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2025-1.

173. In each instance, Janus Henderson carefully reviewed all materials that the Defendants provided. In particular, the description of the loan pool characteristics in the Offering Memorandum, and incorporated into the deal roadshow and cash flow model sent alongside the Offering Memorandum, was the exclusive source of information made available to Janus Henderson to understand the characteristics of the loan collateral backing the proposed securitization. Neither Defendants nor anyone else made additional information available to Defendants about the loan pool characteristics beyond what the Defendants shared in the

Offering Memorandum, deal roadshow, and underwriter cash flow model.  Thus, for example, Janus Henderson did not have access to the "loan tape" that Defendants used to put together the collateral pool characteristics described in the Offering Memorandum, or any other way of checking the accuracy of the Offering Memorandum's description.  The Defendants incorporated the Offering Memorandum's description of the loan characteristics into the deal roadshow that the Defendants sent at the same time.  The deal roadshow, which the Defendants built and circulated to prospective investors, presented the Offering Memorandum's description of the loan pool characteristics in a more digestible format, through stratification tables and charts.  The lead bookrunner and structuring agent created a capital structure and waterfall model (the "Underwriting Model"), which provided its assessment of anticipated bond cash flows, which likewise incorporated the loan characteristics from the Offering Memorandum to project future bond cashflows and returns to each Class of Notes.

174.    After reviewing and digesting the Offering Memorandum, deal roadshow, and the Underwriting Model that Defendants delivered, Janus Henderson prepared its own cash flow projections to run through the Underwriting Model to assess a possible investment.  In preparing its own cash flow projections, Janus Henderson relied on the loan pool characteristics that Defendants provided through the Offering Memorandum and deal roadshow, as well as the Underwriting Model.  Using the loan pool characteristics and their own professional judgment and experience with similar collateral pools, Janus Henderson assessed whether the anticipated loan collateral cash flow would be sufficient to cover interest payment and principal repayment of the subordinated notes that the Defendants were marketing for sale to the Janus Henderson Plaintiffs and the Guardian Plaintiff.  Janus Henderson chose to invest only after it became comfortable that the loan collateral would support payment of interest and repayment of its

Notes, and that it was being compensated adequately for any risk that the loan collateral would not generate sufficient cash flow to repay the Notes.

175.    In performing its cash flow modeling, Janus Henderson considered and relied upon various collateral pool characteristics and deal structure inputs, including but not limited to: outstanding pool balance, weighted average coupon, weighted average maturity, loan-to-value assumptions, loan seasoning characteristics, waterfall mechanics, credit enhancement, excess spread, performance triggers, and servicing practices.  Janus Henderson relied on data and information provided in the Offering Memorandum and incorporated into the Underwriting Model for each of these loan pool characteristics.

176.    In performing its cash flow modeling, Janus Henderson also considered and stress tested various default and loss assumptions, including projected cumulative net loss curves, default timing curves, recovery rates, and loss severity.  Janus Henderson relied on data provided in the Offering Memorandum and incorporated into the Underwriting Model to settle on the various default and loss assumptions it used to run its cash flow modeling.  As one example, the Offering Memorandum for each deal touted recovery rates of over 60% for defaulted and repossessed loans, which recovery rates were maintained after the COVID-19 pandemic. Appendix III ¶ 16, IV ¶ 16, and VI ¶ 16.  The historical recovery and net loss data presented in the Offering Memorandum and incorporated into the deal roadshow were important inputs for Janus Henderson's analysis, since there were no other sources for this supposedly historical performance data.  Janus Henderson relied on the historical recovery rate and net loss information provided in the Offering Memorandum and incorporated into the deal roadshow and Underwriting Model when performing its cash flow modeling.

177.    In evaluating investments in the Janus Henderson and Guardian Trusts, Janus Henderson also considered certain qualitative information that Defendants provided in the Offering Memorandum.  In particular, Janus Henderson considered and relied upon Defendants' representation that Tricolor had a "highly experienced management team with [a] strong operating record" in deciding to make its investment.  Had Janus Henderson known that Tricolor's management team, including its CEO Daniel Chu and CFO Jerry Kollar had been associated with a long history of scandals, and that Defendant JPMorgan declined to proceed with an initial public offering of Tricolor stock based, in large part, on questions it had about the integrity of the management team, it would never have invested in the Janus Henderson Trusts. Likewise, Janus Henderson relied on Defendants' representations regarding Tricolor's robust internal systems and controls, and underwriting policies, in deciding to invest.  Had Janus Henderson known that Tricolor was, in fact, plagued by serious internal control deficiencies and stuffing the Janus Henderson and Guardian Trusts with loans that were fictitious and not underwritten at all, it would never have invested in the Janus Henderson and Guardian Trusts. Finally, Janus Henderson relied on Defendants' representation that Tricolor was adequately capitalized to continue its operations, and would never have invested if it had known that Tricolor was, in fact, over-leveraged due to double pledging and fraud on its warehouse lines.

178.    In addition, Defendants had direct communications (by phone, in person, and by email) with Janus Henderson's investment team in which Defendants touted Tricolor and its performance while reiterating and reinforcing to Janus Henderson the same misstatements and omissions contained in the Offering Memoranda.  For example, Barclays hosted Janus Henderson investment team members at annual trips to see Tricolor's reconditioning facilities, boasting that these facilities were key to Tricolor's purported best-in-class recovery rates on

charged-off loans. Janus Henderson relied on these and other misstatements and omissions by JPMorgan and Barclays personnel when they made their investment decisions with respect to TAST Notes.

179. After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix III ¶¶ 7-21 and VI ¶¶ 7-21, Janus Henderson ultimately chose to make the following purchases of TAST Notes, which the Janus Henderson Plaintiffs and the Guardian Plaintiff still hold, in the primary offerings for TAST 2024-1 and TAST 2025-1:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 01/25/2024 | Barclays | TAST 2024-1A C | $500,000.00 | $99.98 |
| 01/25/2024 | Barclays | TAST 2024-1A D | $500,000.00 | $100.00 |
| 01/25/2024 | Barclays | TAST 2024-1A C | $1,850,000.00 | $99.98 |
| 01/25/2024 | Barclays | TAST 2024-1A D | $1,825,000.00 | $100.00 |
| 03/11/2025 | JPMorgan | TAST 2025-1A C | $7,304,000.00 | $100.00 |
| 03/11/2025 | JPMorgan | TAST 2025-1A D | $3,240,000.00 | $99.99 |
| 03/11/2025 | JPMorgan | TAST 2025-1A C | $906,000.00 | $100.00 |
| 03/11/2025 | JPMorgan | TAST 2025-1A D | $370,000.00 | $99.99 |

180. After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix III ¶¶ 7-21 and IV ¶¶ 7-21, Janus Henderson ultimately chose to make the following purchases of TAST Notes, which the Janus Henderson Plaintiffs sold at a loss, in the primary offerings for TAST 2024-1 and TAST 2024-2:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 01/25/2024 | Barclays | TAST 2024-1A A | $3,500,000.00 | $99.99 |
| 05/14/2024 | JPMorgan | TAST 2024-2A A | $6,948,000.00 | $99.99 |

181.    After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix III ¶¶ 7-21 and VI ¶¶ 7-21, Janus Henderson also chose to make the following secondary market purchases of Notes issued by TAST 2024-1 and 2025-1, each of which occurred before any public disclosure of the massive fraud at Tricolor and each of which is still held by the Janus Henderson Plaintiffs:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 03/07/2024 | Other | TAST 2024-1A D | $1,320,000.00 | $101.28 |
| 03/07/2024 | Other | TAST 2024-1A D | $1,000,000.00 | $101.28 |
| 04/21/2025 | Other | TAST 2025-1A C | $4,198,000.00 | $99.74 |
| 04/21/2025 | Other | TAST 2025-1A C | $802,000.00 | $99.74 |
| 07/24/2025 | Other | TAST 2024-1A D | $520,000.00 | $102.44 |

182.    After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix III ¶¶ 7-21, Janus Henderson also chose to make the following secondary market purchases of Notes issued by TAST 2024-1, each of which occurred before any public disclosure of the massive fraud at Tricolor and each of which was sold at a loss by the Janus Henderson Plaintiffs:

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 07/22/2025 | Other | TAST 2024-1A A | $1,104,084.00 | $100.25 |

| 07/22/2025 | Other | TAST 2024-1A A | $441,828.00 | $100.25 |

183.    In these secondary market purchases, Janus Henderson continued to rely upon data regarding loan pool characteristics from the Offering Memorandum because that remained the only data regarding loan pool characteristics available to investors.  While most of the offers that Janus Henderson purchased in the secondary market were seasoned by a few months, the monthly investor reporting focused on reporting investor cash flows and provided only limited updates on loan pool characteristics.  Janus Henderson considered the additional information available from the investor reporting only to confirm that the collateral was performing in accordance with its initial projections, at which point it made its secondary market investment decisions on the basis of, and in reliance on, the same information and analysis that it used for its primary market purchases.

**F.    Sagicor**

184.    Plaintiff Sagicor Life Insurance Company ("Sagicor") relied on Defendants' misrepresentations and material omissions when deciding whether to purchase Notes issued by the Tricolor Auto Securitization Trusts.  Sagicor utilized an active strategy based on an analytical and research-based investment process.  Sagicor's investment team made the decisions regarding whether to purchase, sell, or hold TAST Notes for Sagicor.

185.    Sagicor's investment team regularly evaluated asset-backed securities, including TAST Notes.  Factors considered by Sagicor's investment team included, among other things, collateral performance (e.g., payment delinquency rate, loan charge-off rate and recoveries on charged-off loans, contract interest rate, term to maturity, value of vehicle associated with each auto loan receivable), Tricolor's financial performance, including its risk management and

financial controls, and Tricolor's management team. Sagicor then relied on the analysis conducted by its investment team in deciding whether to purchase, sell, or hold TAST Notes.

186. Prior to Tricolor's bankruptcy, Sagicor made investments, which it still holds, in three TAST Trusts: TAST 2024-1, TAST 2024-2, and TAST 2024-3 (the "Sagicor Trusts"). For each of the Sagicor Trusts, one or more of the Defendants solicited Sagicor's investment by sending Sagicor an email containing the Offering Memorandum, a deal roadshow prepared by the underwriters for each respective transaction, and a cash flow model prepared by the lead bookrunner and structuring agent for each respective transaction. Specifically, Defendants sent the following solicitations to Sagicor.

- JPMorgan messaged Sagicor on January 18, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-1.
- JPMorgan messaged Sagicor on May 8, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-2.
- JPMorgan messaged Sagicor on October 2, 2024, with the Offering Memorandum, deal roadshow, and cash flow model for TAST 2024-3.

187. In each instance, Sagicor carefully reviewed all materials that the Defendants provided. In particular, the description of the loan pool characteristics in the Offering Memorandum, and incorporated into the deal roadshow and cash flow model sent alongside the Offering Memorandum, was the exclusive source of information made available to Sagicor to understand the characteristics of the loan collateral backing the proposed securitization. Neither Defendants nor anyone else made additional information available to Defendants about the loan pool characteristics beyond what the Defendants shared in the Offering Memorandum, deal roadshow, and underwriter cash flow model. Thus, for example, Sagicor did not have access to

the "loan tape" that Defendants used to put together the collateral pool characteristics described in the Offering Memorandum, or any other way of checking the accuracy of the Offering Memorandum's description.  The Defendants incorporated the Offering Memorandum's description of the loan characteristics into the deal roadshow that the Defendants sent at the same time.  The deal roadshow, which the Defendants built and circulated to prospective investors, presented the Offering Memorandum's description of the loan pool characteristics in a more digestible format, through stratification tables and charts.  The lead bookrunner and structuring agent created a capital structure and waterfall model (the "Underwriting Model"), which provided its assessment of anticipated bond cash flows, which likewise incorporated the loan characteristics from the Offering Memorandum to project future bond cashflows and returns to each Class of Notes.

188.     After reviewing and digesting the Offering Memorandum, deal roadshow, and the Underwriting Model that Defendants delivered, Sagicor prepared its own cash flow projections to run through the Underwriting Model to assess a possible investment.  In preparing its own cash flow projections, Sagicor relied on the loan pool characteristics that Defendants provided through the Offering Memorandum and deal roadshow, as well as the Underwriting Model. Using the loan pool characteristics and their own professional judgment and experience with similar collateral pools, Sagicor assessed whether the anticipated loan collateral cash flow would be sufficient to cover interest payment and principal repayment of the subordinated notes that the Defendants were marketing for sale to Sagicor.  Sagicor chose to invest only after it became comfortable that the loan collateral would support payment of interest and repayment of its Notes, and that it was being compensated adequately for any risk that the loan collateral would not generate sufficient cash flow to repay the Notes.

189.    In performing its cash flow modeling, Sagicor considered and relied upon various collateral pool characteristics and deal structure inputs, including but not limited to: outstanding pool balance, weighted average coupon, weighted average maturity, loan-to-value assumptions, loan seasoning characteristics, waterfall mechanics, credit enhancement, excess spread, performance triggers, and servicing practices.  Sagicor relied on data and information provided in the Offering Memorandum and incorporated into the Underwriting Model for each of these loan pool characteristics.

190.    In performing its cash flow modeling, Sagicor also considered and stress tested various default and loss assumptions, including projected cumulative net loss curves, default timing curves, recovery rates, and loss severity.  Sagicor relied on data provided in the Offering Memorandum and incorporated into the Underwriting Model to settle on the various default and loss assumptions it used to run its cash flow modeling.  As one example, the Offering Memorandum for each deal touted recovery rates of over 60% for defaulted and repossessed loans, which recovery rates were maintained after the COVID-19 pandemic.  Appendix III ¶ 16, IV ¶ 16, and V ¶ 16.  The historical recovery and net loss data presented in the Offering Memorandum and incorporated into the deal roadshow were important inputs for Sagicor's analysis, since there were no other sources for this supposedly historical performance data.  Sagicor relied on the historical recovery rate and net loss information provided in the Offering Memorandum and incorporated into the deal roadshow when performing its cash flow modeling.

191.    In evaluating investments in the Sagicor Trusts, Sagicor also considered certain qualitative information that Defendants provided in the Offering Memorandum.  In particular, Sagicor considered and relied upon Defendants' representation that Tricolor had a "highly experienced management team with [a] strong operating record" in deciding to make its

investment. Had Sagicor known that Tricolor's management team, including its CEO Daniel Chu and CFO Jerry Kollar had been associated with a long history of scandals, and that Defendant JPMorgan declined to proceed with an initial public offering of Tricolor stock based, in large part, on questions it had about the integrity of the management team, it would never have invested in the Sagicor Trusts. Likewise, Sagicor relied on Defendants' representations regarding Tricolor's robust internal systems and controls, and underwriting policies, in deciding to invest. Had Sagicor known that Tricolor was, in fact, plagued by serious internal control deficiencies and stuffing the Sagicor Trusts with loans that were fictitious and not underwritten at all, it would never have invested in the Sagicor Trusts. Finally, Sagicor relied on Defendants' representation that Tricolor was adequately capitalized to continue its operations, and would never have invested if it had known that Tricolor was, in fact, over-leveraged due to double pledging and fraud on its warehouse lines.

192. In addition, Defendants had direct communications (by phone, in person, and by email) with Sagicor's investment team in which Defendants touted Tricolor and its performance while reiterating and reinforcing to Sagicor the same misstatements and omissions contained in the Offering Memoranda. These and the other aforementioned statements and omissions influenced Sagicor's investment decisions with respect to TAST Notes, causing Sagicor to actually rely on Defendants' misstatements and omissions.

193. After completing its cash flow analysis and qualitative evaluations, and in direct reliance on the misrepresentations referenced in Appendix III ¶¶ 7-21, IV ¶¶ 7-21, and V ¶¶ 7-21, Sagicor chose to make the following secondary market purchases of Notes issued by TAST 2024-1, TAST 2024-2, and TAST 2024-3, each of which occurred before any public disclosure of the massive fraud at Tricolor and each of which is still held by Sagicor:

89

| Date of Purchase | Seller | Notes Purchased | Current Face at Purchase ($) | Price ($) |
|---|---|---|---|---|
| 08/08/2024 | JPMorgan | TAST 2024-1A A | $843,328.24 | $100.65 |
| 11/4/2024 | Other | TAST 2024-3A D | $2,750,000.00 | $100.26 |
| 12/23/2024 | Barclays | TAST 2024-2A C | $250,000.00 | $101.25 |
| 04/10/2025 | Other | TAST 2024-3A D | $2,000,000.00 | $100.13 |

194.    In these secondary market purchases, Sagicor relied upon data regarding loan pool characteristics from the Offering Memorandum because that remained the only data regarding loan pool characteristics available to investors.  While the offers that Sagicor purchased in the secondary market were seasoned by a few months, the monthly investor reporting focused on reporting investor cash flows and provided only limited updates on loan pool characteristics.  Sagicor considered the additional information available from the investor reporting only to confirm that the collateral was performing in accordance with Defendants' initial projections, at which point it made its secondary market investment decisions on the basis of, and in reliance on, the same information and analysis available for primary market purchases.

## VI.    V. Tricolor Abruptly Collapses And Declares Bankruptcy

195.    110. While Defendants were seemingly content to enable Tricolor's fraud in perpetuity, certain other participants in JPMorgan's warehouse facility were not so beholden to Tricolor's lucrative investment banking fees.  In August 2025, a junior analyst at an investment fund which had access to the loan data reviewed the loan data for the collateral backing the JPMorgan facility and noticed that loans with a balance of $63 million were listed as "performing" when they had not received any payment in over six months.  This same exact issue had previously been identified in the 2024 audits, but Defendants ignored it.  The

90

investment fund did not.  They immediately contacted JPMorgan who, faced with an outside investor's questions, could no longer pretend Tricolor's fraud did not exist.

196.    111. JPMorgan responded to the fund's concerns by doing what it should have done years earlier: calling in an independent auditor, FTI Consulting, to run a forensic analysis of the collateral pool.  That analysis did not take long.  Within a few days, FTI easily concluded that Tricolor was cooking the books on a massive scale.  By that time, Tricolor's fraud had swelled to $800 million in bogus collateral.  According to Tricolor's servicer reports, it had pledged or sold $2.2 billion in collateral to the warehouse SPVs and the Tricolor Trusts.  But Tricolor's internal dealer management system reflected that Tricolor had only $1.4 billion in real loan collateral.

197.    112. In late August 2025, the warehouse lenders terminated funding on the warehouse lines.  On September 5, 2025, Tricolor placed more than 1,000 of its employees on unpaid leave.  Without the funding needed to originate new loans or pay its employees, Tricolor filed for Chapter 7 bankruptcy on September 10, 2025.

198.    113. Tricolor's fraud and bankruptcy filing have been catastrophic for investors in the Tricolor Trusts.  The subordinate bonds issued by the Tricolor Trusts now trade at less than 10% of their face value, down from prices that exceeded par (100%) days before the bankruptcy. The Tricolor Trusts have not made any payments to the Noteholders since Tricolor declared bankruptcy.  On December 5, 2025, the controlling class Noteholders for five of the seven Tricolor Trusts accelerated the Notes, cutting off cash flow to all but the senior-most class of Notes still outstanding.  Absent litigation recoveries, therefore, it is likely that many of these Notes will never be paid again.  Plaintiffs bring this lawsuit to hold Defendants accountable for enabling Tricolor's massive fraud, which has inflicted hundreds of millions of dollars in lost value to Plaintiffs' holdings.

**FIRST CAUSE OF ACTION:**

**AGAINST THE UNDERWRITER DEFENDANTS**

**(Federal Securities Fraud under Section 10(b) of the 1934 Securities Exchange Act and SEC Rule 10b-5(b) relating to Defendants' Underwriting of the Tricolor Trusts)**

199. ~~114.~~ Plaintiffs repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

200. ~~115.~~ This Cause of Action is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC against the Underwriter Defendants.

201. ~~116.~~ As alleged herein, the Underwriter Defendants, individually and in concert, directly and indirectly, by the use ~~of the~~, means, or instrumentalities of interstate commerce and/or the mails, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading ~~and carried out a plan, scheme, and course of conduct,~~ in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

202. ~~117.~~ The Underwriter Defendants made multiple misstatements of material fact in the Offering Memoranda.[45] Among these were misrepresentations concerning the eligibility of the auto loan receivables for the Tricolor Trusts and the purported financial performance and other characteristics of the auto loan receivables, including:

1) "The Receivables have been or will be (in the case of the Subsequent Receivables) originated by the Originators in accordance with Tricolor's credit policies." *E.g.*, TAST 2022-1 Offering Memorandum, at 22.

---

[45] Each of the Offering Memoranda for the Tricolor Auto Securitization Trusts include materially identical misrepresentations and omissions. The misrepresentations and omissions that follow are therefore examples ~~of misrepresentations~~ that apply to each of the Trusts. These misrepresentations and omissions, and the reasons why they are each misleading, are listed for each of the Tricolor Trusts in the Appendix ~~1~~.

2) "The aggregate principal balance as of the Initial Cutoff Date of the Initial Receivables sold to the Issuer on the Closing Date will be approximately $205,204,481. The composition of the Initial Receivables as of the Initial Cutoff Date was as follows: Aggregate Principal Balance: $205,204,480.60[;] Number of Receivables: 9,500[;] Average Amount Financed: $22,737.06[;] Average Principal Balance: $21,600.47[;] Average Principal Balance (Range) $4,065.23 to $38,476.11[;] Weighted Average Contract Rate: 15.89%[;] Contract Rate (Range): 6.88% to 25.91%[;] Weighted Average Original Term: 58 months[;] Original Term (Range): 36 months to 71 months[;] Weighted Average Remaining Term: 54 months[;] Remaining Term (Range): 17 months to 73 months[;] Weighted Average Wholesale LTV: 126.66%[;] Non-Zero Weighted Average FICO® Score: 600." *E.g.*, *id*. at 22-23.

3) "Subsequent Receivables must meet the eligibility criteria that will be specified in the Receivables Purchase Agreement and in the Sale and Servicing Agreement as described herein." *E.g.*, *id*. at 23.

4) "The characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates are not expected to differ materially from the characteristics of the Receivables as of the Initial Cutoff Date, and each Subsequent Receivable must satisfy the eligibility criteria described herein." *E.g.*, *id*. at 46.

5) "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." *E.g.*, *id*. at 63.

6) "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." *E.g.*, *id*. at 64.

7) "Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, has been fairly consistent over the past few years. The portfolio losses have improved since the introduction of better credit grades at the beginning of 2016 and the focus on converting a higher percentage of loans to better credit grade customers. The losses for origination vintages during 2019 through 2021 are lower than prior vintages at a similar month on book, mostly due to the better separation of customers' credit qualities and more favorable loan term structure for high credit quality customers. Correspondingly, net losses have improved significantly from 2016 to 2020, while recoveries have also improved to 65%." *E.g.*, *id*. at 64-65.

93

8) The "Eligibility Criteria" described on page 67-68 of the TAST 22-1 Offering Memorandum.

9) Data tables under the heading, "Delinquency and Loss Information." *E.g.*, *id*. at 64-66. These data tables include misrepresentations of the recovery rates attained on delinquent and charged-off loans.

10) Data tables under the heading, "Characteristics of the Receivables." *E.g.*, *id*. at 69-76.

11) Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." *E.g.*, *id*. at 79-82.

12) Data tables under the heading, "Static Pool Information – Tricolor Originations." *E.g.*, *id*. at A-1-A-6.

203.    ~~118.~~ Additional misrepresentations concerned the quality and strength of Tricolor's management team and internal controls and the factors influencing each Trust's performance, including:

1) "*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." *E.g.*, TAST 2022-1 Offering Memorandum, at 59.

2) "*Sophisticated and Proprietary Information-Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." *E.g.*, *id*. at 60.

3) "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." *E.g.*, *id*. at 32.

4) "Notwithstanding the COVID-19 pandemic, Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit

94

markets, the size and liquidity of the secondary market for securitizations and other factors." *E.g.*, *id*. at 40.

204. ~~119.~~ Defendants made these misstatements with knowledge that they were inaccurate or recklessness as to their truth or falsity. As warehouse lenders, each Defendant assessed the background of key management team members prior to lending the company hundreds of millions of dollars. Defendants therefore knew of, or at a minimum were reckless as to, the truth or falsity of their misstatements as to the background and quality of the Tricolor executives when they underwrote the Trusts. At the latest, Defendant JPMorgan knew of the key Tricolor executives' history of fraud in November 2024, when JPMorgan used this as one rationale for shutting down Tricolor's planned IPO. As for the eligibility of the auto loan receivables and their falsely represented financial performance and other characteristics, Defendants knew of, or at a minimum were reckless as to, the strong likelihood that Tricolor's manifestly deficient internal controls had enabled the significant fraud that later caused Tricolor to collapse. Defendants knew of, or were reckless as to, significant errors in Tricolor's financial reporting, which were ultimately fundamental to Tricolor's fraud. Defendants were repeatedly told of instances of fraud or apparent fraud, or at the very least of signs of a complete absence of the kinds of systems and processes necessary to prevent fraud, by their auditor in 2022 and February 2024. They nonetheless continued underwriting Tricolor Trusts and representing that the auto loan receivables had traits that they did not have. These serious internal control issues were reported by external auditors dating back to at least 2022. Alongside the issues raised by the auditors, Tricolor's refusal to provide the regularly produced data needed to complete the double-pledging analysis was yet another glaring red flag that Tricolor had manipulated financials whose accuracy could not be trusted.

205.    ~~120.~~ For years Defendants knew of, or were at a minimum were reckless as to, the myriad issues that enabled and reflected Tricolor's fraud, yet continued to present Tricolor's financials as being accurate and its origination and securitization practices as being sound. Defendants had all of the information needed to identify Tricolor's fraud, given Tricolor provided them with extensive loan-level information for the loans in each Securitization as well as for loans that Defendants took as collateral for their warehouse lines.  Yet Defendants simply buried their heads in the sand.  They continued presenting Tricolor's financial information as accurate and representing that the auto loan receivables sold to each Trust met a demanding list of eligibility criteria and were very likely to perform in line with reported statistical characteristics.  Throughout, Defendants simply favored their own interests—they worked hand in glove with Tricolor to pass the risks of Tricolor's fraud away from their warehouse lines and onto investors, all while Defendants earned an underwriting fee to do so.

206.    ~~121.~~ Defendants made ~~these~~ the aforementioned misstatements in connection with the sale of securities.[56]  Defendants made the misstatements in each Offering Memorandum, which they created to offer the Tricolor Securitizations to investors and to solicit and consummate Note sales.  Defendants were provided with the underlying auto loan receivables composing each Trust offering, created the collateral and securitization analyses included in each Offering Memoranda, and structured the overall scheme of selling ownership to the Securitizations to investors.  Defendants' names were displayed prominently as authors on the cover of each Offering Memorandum.  Per each Offering Memorandum's terms, Defendants agreed to be educated and available to answer questions and provide additional information

---

[56]  Each of the Offering Memoranda for the Tricolor Auto Securitization Trusts include materially identical terms indicating the Underwriter Defendants made the misrepresentations at issue.  These terms are listed for each Tricolor Trust in the Appendix ~~1~~.

"necessary to verify the information furnished in" each Offering Memorandum. *E.g.*, TAST 2022-1 Offering Memorandum, at 7, 12-13. This obligation was intended to ensure that prospective investors had "the opportunity to ask questions and receive answers from knowledgeable individuals concerning the Issuer, the Depositor, Tricolor, the Notes and the Receivables." *E.g.*, *id*. at 7. Defendants therefore had explicit authorization to make representations about Tricolor and the auto loan receivables sold to each Trust. Additionally, Defendants were the only parties from whom investors could purchase Notes in the primary market. Defendants solicited investors, including pitching the opportunity to invest in Tricolor Trusts at roadshow presentations to individual investors in connection with which Defendants prepared additional diligence materials and made additional representations regarding Tricolor and its performance, distributed the Offering Memoranda to investors in connection with sales of Notes, set the terms of these sales, and controlled these transactions, with investors making their purchasing decisions based upon Defendants' representations in the Offering Memoranda and any other representations made by Defendants in connection with the sale (i.e., in response to any questions asked by investors to verify the truth of the representations contained in the Offering Memoranda). *E.g.*, *id*. at 1, 5, 7, 12-13, 127. Moreover, the Offering Memoranda created by Defendants were the primary source of information about the Tricolor Trusts after the initial offering was completed, and Defendants continued to be active traders of Notes for the Tricolor Trusts after their initial sale and made representations about the Securitizations on an ongoing basis in connection with these activities.

207. ~~122.~~ Plaintiffs relied upon Defendants' misstatements and such reliance was the proximate cause of Plaintiffs' losses. Plaintiffs have suffered damages, in reliance on Defendants' representations in the Offering Memoranda, by paying full market value for what

ended up being Trusts riddled with fraudulent collateral.  Plaintiffs would not have purchased the Notes at the prices they paid, or at all, had they been aware of the risk of this fraud.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Notes in Tricolor Trusts, whose value has been destroyed by the fraud and other misconduct perpetrated by Tricolor, fostered and encouraged by Defendants, and masked by Defendants' misleading representations in the Offering Memoranda.

208.    123. By virtue of the foregoing, Defendants JPMorgan and Barclays violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) with respect to each of the seven Tricolor Trusts and Defendant Fifth Third violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) for TAST 2023-1, TAST 2024-2, TAST 2024-3, TAST 2025-1, and TAST 2025-2.

## SECOND CAUSE OF ACTION:

## AGAINST THE UNDERWRITER DEFENDANTS

### (Federal Securities Fraud under Section 10(b) of the 1934 Securities Exchange Act and SEC Rule 10b-5(a), (c) relating to Defendants' Underwriting of the Tricolor Trusts)

209.    Plaintiffs repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

210.    This Cause of Action is asserted pursuant to Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder by the SEC against the Underwriter Defendants.

211.    As alleged herein, the Underwriter Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, carried out a plan, scheme, and course of conduct to defraud investors, including Plaintiffs, by disseminating Offering Memoranda containing false and misleading information,

structuring each Tricolor Trust, suppressing or failing to act after discovering information relating to Tricolor's blatant fraud, marketing Tricolor and each Trust to investors and soliciting investment, and harvesting the economic benefits of each Notes sale via repayment of their affiliates' (the Lender Defendants) warehouse lines.  Through these deceptive acts, Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder by participating in and furthering a scheme to defraud investors, including Plaintiffs.

212.    Defendants committed deceptive acts in furtherance of Tricolor's scheme to defraud investors, including Plaintiffs, with actual knowledge of, or willful blindness to, their deceptiveness.  For years, Defendants were on notice that Tricolor's loan data was fundamentally corrupted and unreliable, along with other red flags of Tricolor's fraud.  Rather than disclose these known data deficiencies and shut the fraud down, they chose to enable, participate in, and profit from that fraud.  Defendants knew that Tricolor's data was compromised and that the information contained in each Offering Memorandum, deal roadshow, and Underwriting Model was therefore false and misleading.  Nevertheless, Defendants actively assisted Tricolor's fraud by disseminating the Offering Memoranda and marketing the Notes that the Tricolor Trusts issued to Defendants' investor networks, including through in-person events such as non-deal roadshows and conferences at which senior bankers promoted Tricolor to prospective investors, including Plaintiffs, and direct phone and email solicitations to prospective investors, including Plaintiffs.  Without Defendants' assistance and support, Tricolor could not have continued its fraudulent scheme.  As discussed above, Defendants supported Tricolor with knowledge of, or willful blindness to, its fraudulent conduct because they directly benefitted from the success of Tricolor's securitization program.  The warehouse facilities alone generated premium returns for Defendants, with SPV 4 paying approximately $50 million per year in interest and Unused Fees

to JPMorgan and Barclays, and SPV 6 paying approximately $20 million per year in interest and Unused Fees to Fifth Third.

213.    As described above, Defendants acted with scienter in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth, or acted with intent to deceive when disseminating the Offering Memoranda.

214.    Plaintiffs relied upon Defendants' deceptive acts and such reliance was the proximate cause of Plaintiffs' losses.  Plaintiffs have suffered damages, in reliance on Defendants' dissemination of the Offering Memoranda and supporting materials summarizing the information contained therein (e.g., deal roadshow presentations, cash flow models) and Defendants' marketing of Tricolor and each Trust and solicitation of investors including Plaintiffs, by paying full market value for what ended up being Trusts riddled with fraudulent collateral.  Plaintiffs would not have purchased the Notes at the prices they paid, or at all, had they been aware of the risk of this fraud.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Notes in Tricolor Trusts, whose value has been destroyed by the fraud and other misconduct perpetrated by Tricolor, fostered and encouraged by Defendants, and masked by Defendants' deceptive acts.

215.    By virtue of the foregoing, Defendants JPMorgan and Barclays violated Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c) with respect to each of the seven Tricolor Trusts and Defendant Fifth Third violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) for TAST 2023-1, TAST 2024-2, TAST 2024-3, TAST 2025-1, and TAST 2025-2.

100

**THIRD CAUSE OF ACTION:**

**AGAINST UNDERWRITER DEFENDANTS JPMORGAN AND BARCLAYS**

**(State Securities Fraud under Colo. Rev. Stat. Ann. §§ 11-51-501, 11-51-604 relating to ~~Defendants'~~JPMorgan and Barclays's Underwriting and Sale of the Tricolor Trusts)**

216.    ~~124.~~ Clear Haven Plaintiffs Clear Haven Total Return Partners LP and California Insurance Company (the "Clear Haven BSL Plaintiffs"), along with Janus Henderson Plaintiffs Janus Henderson Securitized Income ETF, Janus Henderson Multi-Sector Income Fund, and Janus Henderson Mortgage-Backed Securities ETF (the "Janus Henderson BSL Plaintiffs"), and Guardian Multi-Sector Bond VIP Fund (the "Guardian Plaintiff") (collectively, with the Clear Haven BSL Plaintiffs, the "Colorado BSL Plaintiffs"), repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

217.    Underwriter Defendants JPMorgan and Barclays sold Notes in the Tricolor Trusts to the Colorado BSL Plaintiffs in Colorado.  Underwriter Defendants JPMorgan and Barclays marketed Notes issued by the Tricolor Trusts to the Clear Haven Plaintiffs through its Colorado-based investment adviser, Clear Haven, and directed marketing materials to members of Clear Haven's ABS trading desk that sit in Colorado.  Clear Haven, on behalf of the Clear Haven BSL Plaintiffs, made the decision to invest in the Tricolor Trusts in Colorado.  Underwriter Defendants JPMorgan and Barclays marketed Notes issued by the Tricolor Trusts to the Janus Henderson BSL Plaintiffs through its Colorado-based investment adviser, Janus Henderson, and directed marketing materials to members of Janus Henderson's ABS trading desk that sit in Colorado.  Janus Henderson, on behalf of the Janus Henderson BSL Plaintiffs, made the decision to invest in the Tricolor Trusts in Colorado.  Underwriter Defendant JPMorgan marketed Notes issued by the Tricolor Trusts to the Guardian Plaintiff through its Colorado-based investment sub-adviser, Janus Henderson, and directed marketing materials to

101

members of Janus Henderson's ABS trading desk that sit in Colorado.   Janus Henderson, on behalf of the Guardian Plaintiff, made the decision to invest in the Tricolor Trusts in Colorado.

218.    125. The Underwriter Defendants  sold Notes in the Tricolor Trusts to  Plaintiffs in Colorado.  In connection with these sales, Underwriter Defendants JPMorgan and Barclays made untrue statements regarding Tricolor's management team, the eligibility of each Trust's auto loan receivables for the Trust, and the financial and other characteristics of the auto loan receivables composing the Trust's collateral in the Offering Memoranda distributed to investors in connection with each Note sale, including but not limited to the Offering Memorandum misstatements identified in the Appendix 1.

219.    126. The Colorado BSL Plaintiffs did not know that these misstatements were false and misleading while the Underwriter Defendants knew of, or were at a minimum reckless as to, the falsity of these misrepresentations and would have known they were false had they exercised reasonable care.

220.    127. The Colorado BSL Plaintiffs' purchased the following Notes, which they still hold, from Underwriter Defendants JPMorgan and Barclays in Colorado:

| Plaintiff | Defendant | Date of Purchase | Notes Purchased | Consideration PaidCurrent Face at Purchase |
|---|---|---|---|---|
| Janus Henderson Securitized Income ETF | Barclays | 01/25/2024 | TAST  2024-1A C | $500,000.00 |
| Janus Henderson Securitized Income ETF | Barclays | 01/25/2024 | TAST  2024-1A D | $500,000.00 |
| Janus Henderson Multi-Sector Income Fund | Barclays | 01/25/2024 | TAST  2024-1A C | $1,850,000.00 |

| Janus Henderson Multi-Sector Income Fund | Barclays | 01/25/2024 | TAST 2024-1A D | $1,825,000.00 |
|---|---|---|---|---|
| Clear Haven Total Return Partners LP | JPMorgan | 10/7/2024 | TAST 2024-3A F | $2,000,000.00 |
| Janus Henderson Securitized Income ETF | JPMorgan | 03/11/2025 | TAST 2025-1A C | $7,304,000.00 |
| Janus Henderson Securitized Income ETF | JPMorgan | 03/11/2025 | TAST 2025-1A D | $3,240,000.00 |
| California Insurance Company | JPMorgan | 06/10/2025 | TAST 2025-2A E | $250,000.00 |
| California Insurance Company | JPMorgan | 06/11/2025 | TAST 2025-2A E | $1,050,000.00 |
| Guardian Multi-Sector Bond VIP Fund | JPMorgan | 06/11/2025 | TAST 2025-1A C | $906,000.00 |
| Guardian Multi-Sector Bond VIP Fund | JPMorgan | 06/11/2025 | TAST 2025-1A D | $370,000.00 |

221. 128. The Colorado BSL Plaintiffs did not discover the Underwriter Defendants' misrepresentations until Tricolor filed for bankruptcy on September 10, 2025, and the full extent of the Underwriter Defendants' misrepresentations is subject to ongoing investigation and continuing to emerge. The Colorado BSL Plaintiffs are thus entitled to return of the consideration paid for these Notes, with interest at the statutory rate from the date of payment, as well as costs and reasonable attorneys' fees.

103

222.    ~~129.~~ The Colorado BSL Plaintiffs' purchased the following Notes, which they sold for a loss prior to the filing of this action, from Underwriter Defendants JPMorgan and Barclays in Colorado:

| Plaintiff | Defendant | Date of Purchase | Date of Sale | Notes Purchased | ~~Consideration Paid~~Current Face at Purchase |
|---|---|---|---|---|---|
| Janus Henderson Mortgage-Backed Securities ETF | Barclays | 01/25/2024 | 09/10/2025 | TAST 2024-1A A | $3,500,000.00 |
| Janus Henderson Mortgage-Backed Securities ETF | JPMorgan | 05/14/2024 | 09/11/2025 | TAST 2024-2A A | $6,948,000.00 |

223.    ~~130.~~ The Colorado BSL Plaintiffs did not discover the Underwriter Defendants' misrepresentations, and did not sell these Notes, until Tricolor filed for bankruptcy on September 10, 2025.  Plaintiffs are thus entitled to money damages equivalent to return of the consideration paid for the Notes less the value of the Notes when the Colorado BSL Plaintiffs sold them, with interest at the statutory rate from the date of sale, as well as costs and reasonable attorneys' fees.

**~~THIRD~~FOURTH CAUSE OF ACTION:**

**AGAINST ~~THE~~ UNDERWRITER DEFENDANTS JPMORGAN AND BARCLAYS**

**(State Securities Fraud under Fla. Stat. Ann. § 517.301 relating to ~~Defendants'~~JPMorgan and Barclays's Underwriting and Sale of the Tricolor Trusts)**

224.    ~~131. Plaintiffs repeat and reallege~~Sagicor repeats and realleges the allegations contained in the preceding Paragraphs as if fully set forth herein.

225.    132. The Underwriter Defendants JPMorgan and Barclays sold Notes in the Tricolor Trusts to PlaintiffsSagicor in Florida.  Underwriter Defendants JPMorgan and Barclays marketed Notes issued by the Tricolor Trusts to Sagicor and directed marketing materials to members of Sagicor's investment team that sit in Florida.  Sagicor made the decision to invest in the Tricolor Trusts in Florida.

226.    In connection with these sales, Underwriter Defendants JPMorgan and Barclays made untrue statements regarding Tricolor's management team, the eligibility of each Trust's auto loan receivables for the Trust, and the financial and other characteristics of the auto loan receivables composing the Trust's collateral in the Offering Memoranda distributed to investors in connection with each Note sale, including but not limited to the Offering Memorandum misstatements identified in the Appendix 1.

227.    133. PlaintiffsSagicor did not know that these misstatements were false and misleading while the Underwriter Defendants knew of, or were at a minimum reckless as to, the falsity of these misrepresentations and would have known they were false had they exercised reasonable care. Plaintiffs' purchases of the Notes occurred in Florida as follows:

228.    Sagicor purchased the following Notes, which it still holds, from Underwriter Defendants JPMorgan and Barclays in Florida:

| Plaintiff | Defendant | Date of Purchase | Notes Purchased | Consideration PaidCurrent Face at Purchase |
| --- | --- | --- | --- | --- |
| Sagicor Life Insurance Company | JPMorgan | 08/08/2024 | TAST 2024-1A A | $843,328.24 |
| Sagicor Life Insurance Company | Barclays | 12/23/2024 | TAST 2024-2A DC | $250,000.00253,000.00 |

105

229.    ~~134. Plaintiffs~~Sagicor still ~~hold~~holds the Notes purchased from Underwriter Defendants JPMorgan and Barclays in Florida.  ~~Plaintiffs~~Sagicor did not discover the Underwriter Defendants' misrepresentations until Tricolor filed for bankruptcy on September 10, 2025, and the full extent of the Underwriter Defendants' misrepresentations is subject to ongoing investigation and continuing to emerge.  ~~Plaintiffs are~~Sagicor is thus entitled to return of the consideration paid for the Notes, with interest at the statutory rate from the date of payment, as well as costs and reasonable attorneys' fees.

**~~FOURTH~~FIFTH CAUSE OF ACTION:**

**AGAINST ~~THE~~ UNDERWRITER ~~DEFENDANTS~~DEFENDANT JPMORGAN**

**(State Securities Fraud under N. J. Stat. Ann. § 49:3-71 relating to ~~Defendants'~~JPMorgan's Underwriting and Sale of the Tricolor Trusts)**

230.    ~~135. Plaintiffs repeat and reallege~~The Hudson Cove Plaintiff repeats and realleges the allegations contained in the preceding Paragraphs as if fully set forth herein.

231.    Underwriter Defendant JPMorgan underwrote, acted as broker-dealer, and sold Notes in the Tricolor Trusts to the Hudson Cove Plaintiff in New Jersey.  Underwriter Defendant JPMorgan marketed Notes issued by the Tricolor Trusts to the Hudson Cove Plaintiff through its New Jersey-based investment adviser, Hudson Cove, and directed marketing materials to members of Hudson Cove's ABS trading desk that sit in New Jersey.  Hudson Cove, on behalf of the Hudson Cove Plaintiff, made the decision to invest in the Tricolor Trusts in New Jersey.

232.    ~~136. The Underwriter Defendants  sold Notes in the Tricolor Trusts to  Plaintiffs in New Jersey.~~  In connection with these sales, ~~Defendants~~Underwriter Defendant JPMorgan made untrue statements regarding Tricolor's management team, the eligibility of each Trust's auto loan receivables for the Trust, and the financial and other characteristics of the auto loan receivables composing the Trust's collateral in the Offering Memoranda distributed to investors

in connection with each Note sale, including but not limited to the Offering Memorandum misstatements identified in the Appendix 1.

233.    137. PlaintiffsHudson Cove did not know that these misstatements were false and misleading while DefendantsUnderwriter Defendant JPMorgan knew of, or werewas at a minimum reckless as to, the falsity of these misrepresentations and would have known they were false had they exercised reasonable care. Plaintiffs' purchases of the Notes occurred in New Jersey as follows:

234.    The Hudson Cove Plaintiff purchased the following Notes, which it still holds, from Underwriter Defendant JPMorgan in New Jersey:

| Plaintiff | Defendant | Date of Purchase | Notes Purchased | Consideration PaidCurrent Face at Purchase |
|---|---|---|---|---|
| Hudson Cove Credit Opportunity Master Fund, L.P. | JPMorgan | 10/17/2024 | TAST 2024-3A D | $2,250,000.00 |

235.    The Hudson Cove Plaintiff still holds the Notes that it purchased in New Jersey. Underwriter Defendant JPMorgan acted as underwriter and broker-dealer to this sale.  The Hudson Cove Plaintiff did not discover the Underwriter Defendants' misrepresentations until Tricolor filed for bankruptcy on September 10, 2025, and the full extent of the Underwriter Defendants' is subject to ongoing investigation and continuing to emerge.  The Hudson Cove Plaintiff is thus entitled to return of the consideration paid for the Notes, with interest at the statutory rate from the date of payment, as well as costs and reasonable attorneys' fees.

**SIXTH CAUSE OF ACTION:**

**AGAINST UNDERWRITER DEFENDANT JPMORGAN**

**(State Securities Fraud under Tex. Gov't Code Ann. § 4008.052 relating to JPMorgan's Underwriting and Sale of the Tricolor Trusts)**

236.    The Frost Plaintiffs repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

237.    Underwriter Defendant JPMorgan sold Notes in the Tricolor Trusts to the Frost Plaintiffs in Texas.  Underwriter Defendant JPMorgan marketed Notes issued by the Tricolor Trusts to the Frost Plaintiffs through its Texas-based investment adviser, Frost, and directed marketing materials to members of Frost's ABS trading desk that sit in Texas.  Frost, on behalf of the Frost Plaintiffs, made the decision to invest in the Tricolor Trusts in Texas.

238.    In connection with these sales, Underwriter Defendant JPMorgan made untrue statements regarding Tricolor's management team, the eligibility of each Trust's auto loan receivables for the Trust, and the financial and other characteristics of the auto loan receivables composing the Trust's collateral in the Offering Memoranda distributed to investors in connection with each Note sale, including but not limited to the Offering Memorandum misstatements identified in the Appendix.

239.    The Frost Plaintiffs did not know that these misstatements were false and misleading while Underwriter Defendant JPMorgan knew of, or was at a minimum reckless as to, the falsity of these misrepresentations and would have known they were false had it exercised reasonable care.

240.    The Frost Plaintiffs purchased the following Notes, which they still hold, from Underwriter Defendant JPMorgan in Texas:

| Plaintiff | Defendant | Date of | Notes Purchased | Current Face at |
|-----------|-----------|---------|-----------------|-----------------|

108

| | | Purchase | | Purchase |
|---|---|---|---|---|
| Frost Credit Fund | JPMorgan | 04/29/2022 | TAST 2022-1A F | $1,000,000.00 |
| Advisors' Inner Circle Fund II - Frost Total Return Bond Fund | JPMorgan | 04/29/2022 | TAST 2022-1A F | $4,000,000.00 |
| Frost Credit Fund | JPMorgan | 02/09/2023 | TAST 2023-1A F | $1,000,000.00 |
| Advisors' Inner Circle Fund II - Frost Total Return Bond Fund | JPMorgan | 02/09/2023 | TAST 2023-1A F | $11,910,000.00 |
| Frost Credit Fund | JPMorgan | 03/11/2025 | TAST 2025-1A E | $500,000.00 |
| Advisors' Inner Circle Fund II - Frost Total Return Bond Fund | JPMorgan | 03/11/2025 | TAST 2025-1A A | $7,000,000.00 |

241.    138. The Frost Plaintiffs still hold the Notes purchased from Defendants in New Jersey. Underwriter Defendant JPMorgan in Texas. The Frost Plaintiffs did not discover the Underwriter Defendants' misrepresentations until Tricolor filed for bankruptcy on September 10, 2025, and the full extent of the Underwriter Defendants' misrepresentations is subject to ongoing investigation and continuing to emerge. The Frost Plaintiffs are thus entitled to return of the consideration paid for the Notes, with interest at the statutory rate from the date of payment, as well as costs and reasonable attorneys' fees.

## ~~FIFTH~~SEVENTH CAUSE OF ACTION:

## AGAINST THE UNDERWRITER DEFENDANTS

## (Aiding and Abetting State Securities Fraud under Tex. Gov't Code Ann. § 4008.055(c) relating to Defendants' Underwriting and Sale of the Tricolor Trusts)

242.    Plaintiffs repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

243.    Primary violations of the Texas Securities Act occurred with respect to each of the Tricolor Trusts.  Each Tricolor Trust was formed and controlled by Texas-based individuals, Tricolor CEO Daniel Chu and CFO Jerry Kollar.  Tricolor's corporate headquarters and most of its operations, including its operations servicing the collateral sold to each Trust, were in Texas. Tricolor was the sole equity member of the Depositor, a Texas resident, which formed each Tricolor Trust.

244.    As described above, each Tricolor Trust issued Notes as part of Tricolor's fraudulent scheme.  The Underwriter Defendants delivered an Offering Memorandum to investors soliciting investment in those Notes.  As described above, that Offering Memorandum contained numerous misrepresentations and omissions regarding the loan pool characteristics, among other things, including but not limited to the Offering Memorandum misstatements identified in the Appendix.  These misstatements and omissions violate Texas Government Code Section 4008.52.

245.    As explained above, Plaintiffs contend that the Underwriter Defendants are the makers of the statements in the Offering Memorandum, in addition to the statements in the deal roadshow and Underwriting Model that incorporate misrepresentations about the loan pool characteristics from the Offering Memorandum.  In the alternative, Plaintiffs contend that the Underwriter Defendants aided and abetted Tricolor's misstatements and omissions in the

110

Offering Memorandum in violation of Texas Government Code Section 4008.55(c) by structuring and underwriting the Notes sold pursuant to the Offering Memorandum, disseminating the misstatements and omissions in the Offering Memorandum to its customers, and soliciting its customers to purchase the Notes in reliance on those misstatements and omissions.

246.    By underwriting and structuring the Notes sold pursuant to the Offering Memorandum, disseminating the misstatements and omissions in the Offering Memorandum to its customers, and soliciting its customers to purchase the Notes in reliance on those misstatements and omissions, the Underwriter Defendants provided substantial assistance to the fraudulent scheme.  This assistance was essential to the continued growth of Tricolor's fraudulent scheme.

247.    The Underwriter Defendants provided this substantial assistance with knowledge of, or reckless disregard for, the falsity of the statements in the Offering Memorandum.  For years, Defendants were on notice as to all the indicators of Tricolor's fraud.  Rather than shut the fraud down, they chose to enable, participate in, and profit from that fraud.  Defendants knew that Tricolor's data was compromised and that the information contained in each Offering Memorandum was therefore false and misleading.  Nevertheless, Defendants continued to actively assist the fraud through their role creating and disseminating each Offering Memorandum and related offering materials, marketing Tricolor and each Trust to investors, and otherwise suppressing the glaring evidence that Tricolor was committing pervasive fraud.

248.    Plaintiffs are entitled to return of the consideration paid for the Notes, with interest at the statutory rate from the date of payment, as well as costs and reasonable attorneys' fees.

**EIGHTH CAUSE OF ACTION:**

**AGAINST THE UNDERWRITER DEFENDANTS**

**(Common Law Fraud)**

249. 139. Plaintiffs repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

250. 140. The elements of common law fraud are substantially identical to those governing violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Those elements are: 1) that a material misrepresentation or omission was made; 2) that when the material misrepresentation or omission was made, the speaker knew of, or was reckless as to, its falsity; 3) that the speaker made it with the intention that it be acted upon by the plaintiff; 4) that the plaintiff acted in reliance upon it; 5) and that the plaintiff thereby suffered an injury.

251. 141. The Underwriter Defendants made multiple misstatements of material fact in the Offering Memoranda.[67] Among these were misrepresentations concerning the eligibility of the auto loan receivables for the Tricolor Trusts and the purported financial performance and other characteristics of the auto loan receivables, including:

1) "The Receivables have been or will be (in the case of the Subsequent Receivables) originated by the Originators in accordance with Tricolor's credit policies." *E.g.*, TAST 2022-1 Offering Memorandum, at 22.

2) "The aggregate principal balance as of the Initial Cutoff Date of the Initial Receivables sold to the Issuer on the Closing Date will be approximately $205,204,481. The composition of the Initial Receivables as of the Initial Cutoff Date was as follows: Aggregate Principal Balance: $205,204,480.60[;] Number of

---

[67] Each of the Offering Memoranda for the Tricolor Auto Securitization Trusts include materially identical misrepresentations and omissions. The misrepresentations and omissions that follow are therefore examples of misrepresentations that apply to each of the Trusts. These misrepresentations and omissions, and the reasons why they are each misleading, are listed for each of the Tricolor Trusts in the Appendix 1.

Receivables: 9,500[;] Average Amount Financed: $22,737.06[;] Average Principal Balance: $21,600.47[;] Average Principal Balance (Range) $4,065.23 to $38,476.11[;] Weighted Average Contract Rate: 15.89%[;] Contract Rate (Range): 6.88% to 25.91%[;] Weighted Average Original Term: 58 months[;] Original Term (Range): 36 months to 71 months[;] Weighted Average Remaining Term: 54 months[;] Remaining Term (Range): 17 months to 73 months[;] Weighted Average Wholesale LTV: 126.66%[;] Non-Zero Weighted Average FICO® Score: 600." *E.g.*, *id.* at 22-23.

3) "Subsequent Receivables must meet the eligibility criteria that will be specified in the Receivables Purchase Agreement and in the Sale and Servicing Agreement as described herein." *E.g.*, *id.* at 23.

4) "The characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates are not expected to differ materially from the characteristics of the Receivables as of the Initial Cutoff Date, and each Subsequent Receivable must satisfy the eligibility criteria described herein." *E.g.*, *id.* at 46.

5) "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." *E.g.*, *id.* at 63.

6) "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." *E.g.*, *id.* at 64.

7) "Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, has been fairly consistent over the past few years. The portfolio losses have improved since the introduction of better credit grades at the beginning of 2016 and the focus on converting a higher percentage of loans to better credit grade customers. The losses for origination vintages during 2019 through 2021 are lower than prior vintages at a similar month on book, mostly due to the better separation of customers' credit qualities and more favorable loan term structure for high credit quality customers. Correspondingly, net losses have improved significantly from 2016 to 2020, while recoveries have also improved to 65%." *E.g.*, *id.* at 64-65.

8) The "Eligibility Criteria" described on page 67-68 of the TAST 22-1 Offering Memorandum.

9) Data tables under the heading, "Delinquency and Loss Information." *E.g.*, *id.* at 64-66. These data tables include misrepresentations of the recovery rates attained on delinquent and charged-off loans.

10) Data tables under the heading, "Characteristics of the Receivables." *E.g.*, *id.* at 69-76.

11) Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." *E.g.*, *id.* at 79-82.

12) Data tables under the heading, "Static Pool Information – Tricolor Originations." *E.g.*, *id.* at A-1-A-6.

252. ~~142.~~ Additional misrepresentations concerned the quality and strength of Tricolor's management team and internal controls and the factors influencing each Trust's performance, including:

1) "*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." *E.g.*, TAST 2022-1 Offering Memorandum, at 59.

2) "*Sophisticated and Proprietary Information-Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." *E.g.*, *id.* at 60.

3) "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." *E.g.*, *id.* at 32.

4) "Notwithstanding the COVID-19 pandemic, Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature. The ability to obtain

114

additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." *E.g.*, *id*. at 40.

253. ~~143.~~ Defendants made these misstatements with knowledge that they were inaccurate or recklessness as to their truth or falsity. As warehouse lenders, each Defendant assessed the background of key management team members prior to lending the company hundreds of millions of dollars. Defendants therefore knew of, or at a minimum were reckless as to, the falsity of their misstatements as to the background and quality of the Tricolor executives when they underwrote the Trusts. At the latest, Defendant JPMorgan knew of the key Tricolor executives' history of fraud in November 2024, when JPMorgan used this as one rationale for shutting down Tricolor's planned IPO. As for the eligibility of the auto loan receivables and their falsely represented financial performance and other characteristics, Defendants knew of, or at a minimum were reckless as to, the strong likelihood that Tricolor's manifestly deficient internal controls had enabled the significant fraud that later caused Tricolor to collapse. Defendants knew of, or were reckless as to, significant errors in Tricolor's financial reporting, which were ultimately fundamental to Tricolor's fraud. Defendants were repeatedly told of instances of fraud or apparent fraud, or at the very least of signs of a complete absence of the kinds of systems and processes necessary to prevent fraud, by their auditor in 2022 and February 2024. They nonetheless continued underwriting Tricolor Trusts and representing that the auto loan receivables had traits that they did not have. Alongside the issues raised by the auditors, Tricolor's refusal to provide the regularly produced data needed to complete the double-pledging analysis was yet another glaring red flag that Tricolor had manipulated financials whose accuracy could not be trusted.

254.    ~~144.~~ For years Defendants knew of, or were at a minimum were reckless as to, the myriad issues that enabled and reflected Tricolor's fraud, yet continued to present Tricolor's financials as being accurate and its origination and securitization practices as being sound. Defendants had all of the information needed to identify Tricolor's fraud, given Tricolor provided them with extensive loan-level information for the loans in each Securitization as well as for loans that Defendants took as collateral for their warehouse lines. Yet Defendants simply buried their heads in the sand. They continued presenting Tricolor's financial information as accurate and representing that the auto loan receivables sold to each Trust met a demanding list of eligibility criteria and were very likely to perform in line with reported statistical characteristics. Throughout, Defendants simply favored their own interests—they worked hand in glove with Tricolor to pass the risks of Tricolor's fraud away from their warehouse lines and onto investors, all while Defendants earned an underwriting fee to do so.

255.    ~~145.~~ Defendants made the misstatements in each Offering Memorandum, which they created to offer the Tricolor Securitizations to investors and to solicit and consummate Note sales.[78] Defendants were provided with detailed information regarding each of the underlying loan receivables comprising each Trust offering, created the collateral and securitization analyses included in each Offering Memoranda, and structured the overall scheme of selling ownership to the Securitizations to investors. Defendants' names were displayed prominently as authors on the cover of each Offering Memorandum. Per each Offering Memorandum's terms, Defendants agreed to be educated and available to answer questions and provide additional information "necessary to verify the information furnished in" each Offering Memorandum. *E.g.*, TAST

---

[78]    Each of the Offering Memoranda for the Tricolor Auto Securitization Trusts include materially identical terms indicating the Underwriter Defendants made the misrepresentations at issue. These terms are listed for each Tricolor Trust in the Appendix ~~1~~.

2022-1 Offering Memorandum, at 7, 12-13.   This obligation was intended to ensure that prospective investors had "the opportunity to ask questions and receive answers from knowledgeable individuals concerning the Issuer, the Depositor, Tricolor, the Notes and the Receivables."   *E.g.*, *id*. at 7.   Defendants therefore had explicit authorization to make representations about Tricolor and the auto loan receivables sold to each Trust.   Additionally, Defendants were the only parties from whom investors could purchase Notes in the primary market.

256.   ~~146.~~ Defendants solicited investors, including pitching the opportunity to invest in Tricolor Trusts at roadshow presentations to individual investors in connection with which Defendants prepared additional diligence materials and made additional representations regarding Tricolor and its performance, distributed the Offering Memoranda to investors in connection with sales of Notes, set the terms of these sales, and controlled these transactions, with investors making their purchasing decisions based upon Defendants' representations in the Offering Memoranda and any other representations made by Defendants in connection with the sale (i.e., in response to any questions asked by investors to verify the truth of the representations contained in the Offering Memoranda).   *E.g.*, *id*. at 1, 5, 7, 12-13, 127.   Moreover, the Offering Memoranda created by Defendants were the primary source of information about the Tricolor Trusts after the initial offering was completed, and Defendants continued to be active traders of Notes for the Tricolor Trusts after their initial sale and made representations about the Securitizations on an ongoing basis in connection with these activities.

257.   ~~147.~~ In making these misstatements to market the Notes to investors, including Plaintiffs, Defendants intended that investors would rely on them in making investment decisions.   Defendants knew that the Offering Memoranda were the most detailed information

available about each Trust and its collateral.  Because the collateral belonging to each Trust was its primary asset, Defendants understood that misrepresentations of the collateral would be relied upon by investors.  This continued to be true after the initial offering of Notes issued by each Trust because the Offering Memoranda created by Defendants remained the primary source of information about the Tricolor Trusts after the initial offering was completed.

258.    ~~148.~~ Plaintiffs relied upon Defendants' misstatements and such reliance was the proximate cause of Plaintiffs' losses.  Plaintiffs have suffered damages, in reliance on Defendants' representations in the Offering Memoranda, by paying full market value for what ended up being Trusts riddled with fraudulent collateral.  Plaintiffs would not have purchased the Notes at the prices they paid, or at all, had they been aware of the risk of this fraud.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Notes in Tricolor Trusts, whose value has been destroyed by the fraud and other misconduct perpetrated by Tricolor, fostered and encouraged by Defendants, and masked by Defendants' misleading representations in the Offering Memoranda.

### ~~SIXTH~~NINTH CAUSE OF ACTION:

### AGAINST THE LENDER DEFENDANTS

**(Actual Fraudulent Transfer in violation of 6 *Del. C.* § 1304(a)(1) and Tex. Bus. & Com. Code § 24.005(a)(1))**

259.    ~~149.~~ Plaintiffs repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

260.    ~~150.~~ Under both the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1304(a)(1), and the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.005(a)(1), a creditor may recover the value of a transfer made with actual intent to hinder,

118

delay, or defraud any creditor of the debtor from subsequent transferees of that fraudulent transfer.

261.    ~~151.~~ As purchasers of the Notes, Plaintiffs are creditors of the Tricolor Trusts.

262.    ~~152.~~ The Tricolor Trusts' debts to Plaintiffs arose at the time of each ~~Trust-warehouse~~Trust-Warehouse SPV transfer.

263.    As part of a single integrated transaction: (i) the Tricolor Trusts, acting through the Depositor, sold the Notes to investors, with the Underwriter Defendants marketing the Notes and soliciting investors; (ii) the Tricolor Trusts, again acting through the Depositor, transferred the cash raised from the sale of the Notes through the Tricolor Servicer to the warehouse SPVs; and (iii) in exchange, the warehouse SPVs transferred the receivables through the Tricolor Servicer and the Depositor to the Tricolor Trusts, which held the receivables as collateral for the Notes.

264.    ~~153.~~ The end result of steps (i) through (iii), which were interdependent and would not have happened if not for each other step, is that the Tricolor Trusts ~~transferred the~~raised cash ~~raised~~ by selling ~~the~~ Notes, and then transferred that cash to the warehouse SPVs (the "~~Trust-warehouse~~Trust-Warehouse SPV ~~transfers~~Transfers") in exchange for ~~auto loan~~the receivables ~~that~~.  These receivables were partially fictitious, double-pledged, or otherwise significantly impaired.  ~~These transfers were made~~The Tricolor Trusts made Trust-Warehouse SPV Transfers as part of a Ponzi-like scheme conducted by Daniel Chu, Jerry Kollar, and other Tricolor executives.  The Tricolor Trusts, which operated under the complete control of these Tricolor executives, made the ~~Trust-warehouse~~Trust-Warehouse SPV transfers with actual intent to defraud the purchasers of the Notes.  The Tricolor executives controlled all processes related to the securitization program, including by: 1) initiating each Securitization, 2) acting through

119

the Depositor, Tricolor's wholly owned subsidiary, to form each Tricolor Trust, 3) causing the Tricolor Trusts to issue Notes to obtain cash from investors to buy collateral from the warehouse SPVs, 4) selecting the receivables to be transferred to each Tricolor Trust from the warehouse SPVs, and 5) preparing the data tapes and other ongoing reporting that concealed the fraud.

265. 154. These individuals were the masterminds of pervasive fraud, and knew that the loan receivables the Tricolor Trusts were purchasingpurchased from the warehouse SPVs were tainted by double-pledging, fictitious loans, and other fraud, and were therefore worth far less than what each Tricolor Trust paid for them. Indeed, each Trust-warehouseTrust-Warehouse SPV transfer occurred as part of the ongoing Ponzi-like scheme. The Trust-warehouseTrust-Warehouse SPV transfers were essential to this scheme, because they provided financing to pay off warehouse loans, created new borrowing capacity for the warehouse SPVs, and enabled Tricolor to continue perpetrating its fraud.

266. 155. In addition to the clear evidence of the Tricolor Trusts' actual intent to defraud their creditors, multiple statutory badges of fraud under 6 *Del. C.* § 1304(b) and Tex. Bus. & Com. Code § 24.005(b) supporting an inference of the Tricolor Trusts' actual intent to defraud also exist. These include that: (1) the value the Tricolor Trusts received in exchange for the Trust-warehouseTrust-Warehouse SPV transfers was not reasonably equivalent to the value transferred because each Tricolor Trust paid for receivables that were substantially impaired, double-pledged, or non-existent, as if those deficiencies did not exist; (2) the Tricolor Trusts were insolvent or became insolvent shortly after the Trust-warehouseTrust-Warehouse SPV transfers—because the debt they incurred to purchase the loan receivables exceeded the value of the loan receivables, which, as explained above, were substantially impaired, double-pledged, or

non-existent; and (3) ~~Trust warehouse~~Trust-Warehouse SPV transfers were made contemporaneously with the Tricolor Trusts' incurrence of debt under the Notes.

267.    ~~156.~~ As a central element of Tricolor's fraudulent scheme, each warehouse SPV immediately transferred the cash it received from the Tricolor Trusts to the Lender Defendants. The Lender Defendants are therefore subsequent transferees of each ~~Trust warehouse~~Trust-Warehouse SPV transfer from which the value of the transfers may be recovered.

268.    ~~157.~~ The ~~Trust warehouse~~Trust-Warehouse SPV transfers resulted in the Lender Defendants receiving the following amounts as proceeds of these fraudulent transfers: (1) $212,130,000.00 (in or about April 29, 2022) in respect of Tricolor Auto Securitization Trust 2022-1;[89] (2) $223,970,000.00 (in or about February 9, 2023) in respect of Tricolor Auto Securitization Trust 2023-1; (3) $271,320,000.00 (in or about January 25, 2024) in respect of Tricolor Auto Securitization Trust 2024-1; (4) $276,710,000.00 (in or about May 14, 2024) in respect of Tricolor Auto Securitization Trust 2024-2; (5) $287,550,000.00 (in or about October 7, 2024) in respect of Tricolor Auto Securitization Trust 2024-3; (6) $328,100,000.00 (in or about March 11, 2025) in respect of Tricolor Auto Securitization Trust 2025-1; and (7) $217,180,000.00 (in or about June 10, 2025) in respect of Tricolor Auto Securitization Trust 2025-2.

269.    ~~158.~~ The Lender Defendants did not receive those transfers in good faith.  For the reasons set forth in detail above, each of the Lender Defendants had knowledge of, or was reckless with respect to, Tricolor's fraud, as perpetrated through the Trusts.  At a minimum, the

---

[89]    This transfer was received only by JPMorgan and Barclays, as it predated Fifth Third's involvement through SPV 6.

Lender Defendants each turned a blind eye to Tricolor's fraud, continuing to receive payments flowing from the Trusts notwithstanding their possession of extensive information regarding Tricolor's misconduct and misrepresentation of underlying loans.

**SEVENTHTENTH CAUSE OF ACTION:**

**AGAINST THE LENDER DEFENDANTS**

**(Constructive Fraudulent Transfer in violation of 6 *Del. C.* §§ 1304(a)(2), 1305(a) and Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006(a))**

270.    159. Plaintiffs repeat and reallege the allegations contained in the preceding Paragraphs as if fully set forth herein.

271.    160. Under both the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* §§ 1304(a)(2), 1305(a), and the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code §§ 24.005(a)(2), 24.006(a), a creditor may recover the value of a transfer made without receiving a reasonably equivalent value in exchange for the transfer, where the debtor (a) was insolvent; (b) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business transaction; or (c) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

272.    161. As purchasers of the Notes, Plaintiffs are creditors of the Tricolor Trusts.

273.    162. The Tricolor Trusts' debts to Plaintiffs arose at the time of each Trust warehouseTrust-Warehouse SPV transfer.

274.    163. The Tricolor Trusts did not receive reasonably equivalent value in the Trust warehouseTrust-Warehouse SPV transfers.  The Chapter 7 Trustee's forensic analysis reveals that the auto loan receivables that the warehouse SPVs sold to the Tricolor Trusts included 31,408 double-pledged loans representing $547,928,874 in falsely reported value, and

122

6,960 entirely fictitious loans representing \$135,488,888 of non-existent value.  Together, these fraudulent loans represent approximately \$683 million in overstated collateral—roughly 31% of the purported \$2.2 billion in auto loan receivables that the Tricolor Trusts should have received in exchange for the ~~Trust-warehouse~~Trust-Warehouse SPV transfers.  The value of the receivables was also impaired by virtue of their association with the Tricolor executives' Ponzi-like scheme.  The Tricolor Trusts paid full face value, obtained from investors based on false representations, for loan portfolios that were materially impaired by this fraud.

275.    ~~164.~~ For example, in TAST 2025-2, the Tricolor Trust paid approximately \$217 million for a stated pool of 12,570 receivables, but a substantial portion of those receivables were either pledged to other parties (making them unavailable to satisfy Noteholder claims) or did not exist at all.  The value the Tricolor Trusts received was thus a fraction of what they paid, establishing lack of reasonably equivalent value as a matter of law.

276.    ~~165. Each~~The Trust-Warehouse SPV Transfers rendered each Tricolor Trust ~~was left~~ balance sheet insolvent ~~or with unreasonably small capital as a result of the Trust-warehouse SPV transfer~~, inadequately capitalized, and unable to pay its debts as they came due.  As explained above, the receivables that the Warehouse SPVs delivered to the Tricolor Trusts were substantially impaired, double-pledged, or non-existent.  Each Trust's sole function is to hold receivables and use the cash flows from those receivables to pay Noteholders.  ~~When a substantial~~Because a meaningful portion of the receivables ~~are~~that the Warehouse SPVs delivered to the Tricolor Trusts were substantially impaired, double-pledged to other parties, or entirely fictitious, the ~~Trust~~value of those receivables was not reasonably equivalent to the obligation that the Trusts incurred on the Notes.  As a result, the Tricolor Trusts cannot generate the cash flows necessary to meet ~~its~~their obligations.

277.    ~~166.~~ At the time of each transfer, it was reasonably foreseeable that the Tricolor Trusts would be unable to pay their debts as they became due because: (i) double-pledged receivables would generate competing claims from other secured parties, reducing available cash flows; (ii) fictitious receivables would generate no cash flows whatsoever; and (iii) the overcollateralization and reserve structures built into each securitization assumed ~~an honest~~a complete and untainted loan pool and were inadequate to absorb losses of the magnitude caused by Tricolor's fraud.  The Tricolor Trusts' payment obligations to Noteholders were premised on the assumption that the Tricolor Trusts held unencumbered, performing collateral.  The actual collateral—riddled with fraud and tainted by its association with the Tricolor executives' Ponzi-like scheme—was manifestly insufficient to meet those obligations, rendering each Trust undercapitalized from inception.

278.    ~~167. As a central element  of Tricolor's fraudulent scheme, each~~Each warehouse SPV immediately transferred the cash it received from the Tricolor Trusts to the Lender Defendants.  The Lender Defendants are therefore subsequent transferees of each ~~Trust-warehouse~~Trust-Warehouse SPV transfer from which the value of the ~~Trust-warehouse~~Trust-Warehouse SPV transfers may be recovered.

279.    ~~168.~~ The ~~Trust-warehouse~~Trust-Warehouse SPV transfers resulted in the Lender Defendants receiving the following amounts as proceeds of these fraudulent transfers: (1) $212,130,000.00 (in or about April 29, 2022) in respect of Tricolor Auto Securitization Trust 2022-1;[9̶10̶] (2) $223,970,000.00 (in or about February 9, 2023) in respect of Tricolor Auto Securitization Trust 2023-1; (3) $271,320,000.00 (in or about January 25, 2024) in respect of

---

[9̶10̶]    This transfer was received only by JPMorgan and Barclays, as it predated Fifth Third's involvement through SPV 6.

Tricolor Auto Securitization Trust 2024-1; (4) $276,710,000.00 (in or about May 14, 2024) in respect of Tricolor Auto Securitization Trust 2024-2; (5) $287,550,000.00 (in or about October 7, 2024) in respect of Tricolor Auto Securitization Trust 2024-3; (6) $328,100,000.00 (in or about March 11, 2025) in respect of Tricolor Auto Securitization Trust 2025-1; and (7) $217,180,000.00 (in or about June 10, 2025) in respect of Tricolor Auto Securitization Trust 2025-2.

280.    169. The Lender Defendants did not receive those transfers in good faith.  For the reasons set forth in detail above, each of the Lender Defendants had knowledge of, or was reckless with respect to, Tricolor's fraud, as perpetrated through the Trusts.  At a minimum, the Lender Defendants each turned a blind eye to Tricolor's fraud, continuing to receive payments flowing from the Trusts notwithstanding their possession of extensive information regarding Tricolor's misconduct and misrepresentation of underlying loans.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against Defendants as follows:

(a)    Money damages in an amount to be proven at trial;

(b)    Rescission and a return of the consideration paid by Plaintiffs;

(c)    Any and all remedies permitted under applicable law, including payment of the value of the funds transferred to the Lender Defendants, as subsequent transferees;

(d)    (c) All costs and expenses incurred in connection with this action, including reasonable attorneys' fees and expenses; and

(e)    (d) Such other, further, or different relief as the Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

**QUINN EMANUEL URQUHART
& SULLIVAN LLP**

Dated: New York, New York
April 16, 2026

By:        */s/ Blair Adams*
Blair Adams
Deborah Newman
Robert Loigman
Toby Futter
295 Fifth Avenue
New York, NY 10010
(212) 849-7000
blairadams@quinnemanuel.com
deborahnewman@quinnemanuel.com
robertloigman@quinnemanuel.com
tobyfutter@quinnemanuel.com

Eric Winston (admitted *pro hac vice*
forthcoming)
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa St.
Los Angeles, CA 90017
ericwinston@quinnemanuel.com

*Attorneys for Plaintiffs*

127

# APPENDIX

**I.    Tricolor Auto Securitization Trust 2022-1**

**Underwriters:**

1) Bookrunner and Structuring Agent (Lead Left): JPMorgan

2) Co-Manager: Barclays

**Other parties to Offering Memorandum (Dated April 29, 2022):**

1) Issuer: Tricolor Auto Securitization Trust 2022-1

2) Depositor: Tricolor Auto Receivables 2 LLC

3) Sponsor, Servicer, and Administrator: Tricolor Auto Acceptance, LLC

**The ~~Misstatements Contained~~Underwriter Defendants Made the Statements in the Offering Memorandum ~~Were Made by the Underwriter Defendants~~:**

1.    "The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part." (at 1).

2.    "EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF." (at 5).

3.    "THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM." (at 7).

4.    "THE PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS

128

FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES." (at 7).

5. "Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available. Questions and requests for information may be directed to: J.P. Morgan Securities LLC[;] 383 Madison Avenue, 8th Floor[;] New York, New York 10179[;] (212) 834-4154." (at 12-13).

6. "Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers. The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale." (at 127).

**Misleading Statements and Omissions Made By the Underwriter Defendants in the Offering Memorandum:**

| Statement | Misleading because: |
|---|---|
| 7. "The Receivables have been or will be (in the case of the Subsequent Receivables) originated by the Originators in accordance with Tricolor's credit policies." (at 22). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore were not originated in accordance with Tricolor's credit policies. |
| 8. "The aggregate principal balance as of the Initial Cutoff Date of the Initial Receivables sold to the Issuer on the Closing Date will be approximately $205,204,481. The composition of the Initial Receivables as of the Initial Cutoff Date was as follows: Aggregate Principal Balance: $205,204,480.60[;] Number of Receivables: 9,500[;] Average Amount Financed: $22,737.06[;] Average Principal Balance: $21,600.47[;] Average Principal Balance (Range) $4,065.23 to $38,476.11[;] Weighted Average Contract Rate: 15.89%[;] Contract | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. For example, |

| | |
|---|---|
| Rate (Range): 6.88% to 25.91%[;] Weighted Average Original Term: 58 months[;] Original Term (Range): 36 months to 71 months[;] Weighted Average Remaining Term: 54 months[;] Remaining Term (Range): 17 months to 73 months[;] Weighted Average Wholesale LTV: 126.66%[;] Non-Zero Weighted Average FICO® Score: 600." (at 22-23). | fictitious and double-pledged loans were improperly included in the aggregate principal balance. This fictitious and double-pledged collateral was, moreover, taken into account in calculating the other loan pool characteristics, rendering the description of each loan pool characteristic listed in the Offering Memorandum false and misleading. |
| 9. "Subsequent Receivables must meet the eligibility criteria that will be specified in the Receivables Purchase Agreement and in the Sale and Servicing Agreement as described herein." (at 23). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore failed to meet the eligibility criteria. |
| 10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 32). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. In failing to disclose this primary and prevailing risk factor for the performance of the Receivables, the remaining performance risk factors are rendered false and misleading, and only half-truths. |
| 11. "Notwithstanding the COVID-19 pandemic, Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 40). | Tricolor's "ability to obtain additional capital" was not "dependent upon Tricolor's future operating performance," but rather, entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud. |
| 12. "The characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates are not expected to differ materially from the characteristics of the Receivables as of the Initial Cutoff Date, and each Subsequent Receivable must satisfy the eligibility criteria described herein." (at 46). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. The Subsequent Receivables were therefore expected to differ materially from the characteristics of the Receivables that were |

130

| | |
|---|---|
| | disclosed in the Offering Memorandum, and did not satisfy the eligibility criteria. |
| 13. "*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 59). | Tricolor's CEO, Mr. Chu, and CFO, Mr. Kollar, had a known history of engaging in fraudulent and deceptive activities that was sufficiently developed to cause JPMorgan to pass on the opportunity to underwrite an initial public offering of Tricolor's securities. |
| 14. "*Sophisticated and Proprietary Information-Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 60). | Tricolor's internal systems were hopelessly compromised, as detailed in several audits and reports. Such systems were in no way "sophisticated" as claimed here. |
| 15. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 63). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 16. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 64). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 17. "Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, has been fairly consistent over the past few years. The portfolio losses have improved since the introduction of better credit grades at the beginning of 2016 and the focus on converting a higher percentage of loans to better credit grade customers. The losses for origination vintages during 2019 through 2021 are lower than prior vintages at a similar month on book, mostly due to the better separation of customers' credit qualities and more favorable loan term structure for high credit quality customers. Correspondingly, net losses have improved | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan |

131

| | |
|---|---|
| significantly from 2016 to 2020, while recoveries have also improved to 65%." (at 64-65). | pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 18. Data tables under the heading, "Delinquency and Loss Information." (at 64-66). | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 19. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer on the Closing Date or during the Prefunding Period will be required to satisfy each of the criteria for transfer to the Issuer as of the applicable Cutoff Date, including that, as of the applicable Cutoff Date: each Receivable shall not be more than 30 days delinquent as of such Cutoff Date and was not a Defaulted Receivable as of such Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least three months and not more than 73 months; each Receivable is denominated in United States dollars and | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. Tricolor was therefore not selecting the Receivables in accordance with the eligibility criteria listed in the Offering Memorandum. |

had a remaining Principal Balance of at least $4,000 and not more than $40,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 6.50% and not more than 25.99%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of such Cutoff Date; each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title; no Subsequent Receivable will cause the weighted average Contract Rate (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Subsequent Receivables to be less than 15.25%; no Subsequent Receivable will cause the weighted average FICO® score only for those obligors having a FICO® score at the time of application (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Receivables to be less than 575; no Subsequent Receivable will cause the weighted average original term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 60 months; no Subsequent Receivable will cause the weighted average remaining term (based upon the Principal Balance of the

133

| | |
|---|---|
| Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 57 months; in any given month during the Prefunding Period, the aggregate Principal Balance of all Subsequent Receivables having (1) an Internal Risk Grade of "D" has not equaled or exceeded 2% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates and (2) an Internal Risk Grade of "E" has not equaled or exceeded 1% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A+" will be at least 13.0% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A" will be at least 28.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; and the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "B" will be at least 34.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates."  (at 67-68). | |
| 20. Data tables under the heading, "Characteristics of the Receivables." (at 69-76). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |
| 21. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 79-82). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading.  That, in turn, rendered statements regarding the weighted average lives of the |

134

| | Notes false and misleading, including because double-pledged and fictitious loan collateral would not be repaid and could not properly amortize the note balances. |
|---|---|
| 22. Data tables under the heading, "Static Pool Information – Tricolor Originations." (at A-1-A-6). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |

7. "The Receivables have been or will be (in the case of the Subsequent Receivables) originated by the Originators in accordance with Tricolor's credit policies." (at 22).

8. "The aggregate principal balance as of the Initial Cutoff Date of the Initial Receivables sold to the Issuer on the Closing Date will be approximately $205,204,481. The composition of the Initial Receivables as of the Initial Cutoff Date was as follows: Aggregate Principal Balance: $205,204,480.60[;] Number of Receivables: 9,500[;] Average Amount Financed: $22,737.06[;] Average Principal Balance: $21,600.47[;] Average Principal Balance (Range) $4,065.23 to $38,476.11[;] Weighted Average Contract Rate: 15.89%[;] Contract Rate (Range): 6.88% to 25.91%[;] Weighted Average Original Term: 58 months[;] Original Term (Range): 36 months to 71 months[;] Weighted Average Remaining Term: 54 months[;] Remaining Term (Range): 17 months to 73 months[;] Weighted Average Wholesale LTV: 126.66%[;] Non-Zero Weighted Average FICO® Score: 600." (at 22-23).

9. "Subsequent Receivables must meet the eligibility criteria that will be specified in the Receivables Purchase Agreement and in the Sale and Servicing Agreement as described herein." (at 23).

10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 32).

11. "Notwithstanding the COVID-19 pandemic, Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 40).

12. "The characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates are not expected to differ materially from the characteristics of the Receivables as of the Initial Cutoff Date, and each Subsequent Receivable must satisfy the eligibility criteria described herein." (at 46).

13. "*Highly Experienced Management Team With Strong Operating Track Record*. Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 59).

136

14. "*Sophisticated and Proprietary Information Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 60).

15. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 63).

16. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 64).

17. "Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, has been fairly consistent over the past few years. The portfolio losses have improved since the introduction of better credit grades at the beginning of 2016 and the focus on converting a higher percentage of loans to better credit grade customers. The losses for origination vintages during 2019 through 2021 are lower than prior vintages at a similar month on book, mostly due to the better separation of customers' credit qualities and more favorable loan term structure for high credit quality customers. Correspondingly, net losses have improved significantly from 2016 to 2020, while recoveries have also improved to 65%." (at 64-65).

18. Data tables under the heading, "Delinquency and Loss Information." (at 64-66).

19. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer on the Closing Date or during the Prefunding Period will be required to satisfy each of the criteria for transfer to the Issuer as of the applicable Cutoff Date, including that, as of the applicable Cutoff Date: each Receivable shall not be more than 30 days delinquent as of such Cutoff Date and was not a Defaulted Receivable as of such Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least three months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $4,000 and not more than $40,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 6.50% and not more than 25.99%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing

137

address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of such Cutoff Date; each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title; no Subsequent Receivable will cause the weighted average Contract Rate (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Subsequent Receivables to be less than 15.25%; no Subsequent Receivable will cause the weighted average FICO® score only for those obligors having a FICO® score at the time of application (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Receivables to be less than 575; no Subsequent Receivable will cause the weighted average original term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 60 months; no Subsequent Receivable will cause the weighted average remaining term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 57 months; in any given month during the Prefunding Period, the aggregate Principal Balance of all Subsequent Receivables having (1) an Internal Risk Grade of "D" has not equaled or exceeded 2% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates and (2) an Internal Risk Grade of "E" has not equaled or exceeded 1% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A+" will be at least 13.0% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A" will be at least 28.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; and the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "B" will be at least 34.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates." (at 67-68).

20. Data tables under the heading, "Characteristics of the Receivables." (at 69-76).

21. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 79-82).

22. Data tables under the heading, "Static Pool Information — Tricolor Originations." (at A-1-A-6).

138

## II.     TRICOLOR AUTO SECURITIZATION TRUST 2023-1

**Underwriters:**

1) <u>Bookrunner and Structuring Agent (Lead Left)</u>: JPMorgan;

2) <u>Co-Managers</u>: Barclays; Fifth Third Securities

**Other parties to Offering Memorandum (dated February 9, 2023):**

1) <u>Issuer:</u> Tricolor Auto Securitization Trust 2023-1

2) <u>Depositor:</u> Tricolor Auto Receivables 2 LLC

3) <u>Sponsor, Servicer, and Administrator:</u> Tricolor Auto Acceptance, LLC

**The ~~Misstatements Contained~~<u>Underwriter Defendants Made the Statements</u> in the Offering Memorandum ~~Were Made by the Underwriter Defendants~~:**

1.      "The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part." (at 1).

2.      "EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF." (at 5).

3.      "THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM." (at 7).

4.      "THE PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING

139

SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES." (at 7).

5.    "Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available. Questions and requests for information may be directed to: J.P. Morgan Securities LLC[;] 383 Madison Avenue, 8th Floor[;] New York, New York 10179[;] (212) 834-4154." (at 12-13).

6.    "Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers. The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale." (at 126).

**Misleading Statements and Omissions Made By the Underwriter Defendants in the Offering Memorandum:**

| Statement | Misleading because: |
|---|---|
| 7. "The Receivables have been or will be (in the case of the Subsequent Receivables) originated by the Originators in accordance with Tricolor's credit policies." (at 22). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore were not originated in accordance with Tricolor's credit policies. |
| 8. "The aggregate principal balance as of the Initial Cutoff Date of the Initial Receivables sold to the Issuer on the Closing Date will be approximately $250,000,000. The aggregate principal balance of the Receivables in the Statistical Pool as of the Statistical Cutoff Date was $244,881,503.32. The composition of the Receivables in the Statistical Pool as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $244,881,503.32[;] Number of Receivables: 10,068[;] Average Amount Financed: $25,738.83[;] Average Principal Balance: $24,322.76[;] Principal Balance (Range) $2,508.26 to $43,552.25[;] Weighted Average | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. For example, fictitious and double-pledged loans were improperly included in the |

140

| | |
|---|---|
| Contract Rate: 15.74%[;] Contract Rate (Range): 5.88% to 25.87%[;] Weighted Average Original Term: 61 months[;] Original Term (Range): 23 months to 72 months[;] Weighted Average Remaining Term: 56 months[;] Remaining Term (Range)(2): 3 months to 70 months[;] Weighted Average Wholesale LTV: 130.99%[;] Non-Zero Weighted Average FICO® Score: 613" (at 22-23). | aggregate principal balance. This fictitious and double-pledged collateral was, moreover, taken into account in calculating the other loan pool characteristics, rendering the description of each loan pool characteristic listed in the Offering Memorandum false and misleading. |
| 9. "Subsequent Receivables must meet the eligibility criteria that will be specified in the Receivables Purchase Agreement and in the Sale and Servicing Agreement as described herein." (at 23). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore failed to meet the eligibility criteria. |
| 10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. In failing to disclose this primary and prevailing risk factor for the performance of the Receivables, the remaining performance risk factors are rendered false and misleading, and only half-truths. |
| 11. "Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 39-40). | Tricolor's "ability to obtain additional capital" was not "dependent upon Tricolor's future operating performance," but rather, entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud. |
| 12. "The characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates are not expected to differ materially from the characteristics of the Receivables as of the Initial Cutoff Date, and each Subsequent Receivable must satisfy the eligibility criteria described herein." (at 46). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. The Subsequent Receivables were therefore expected to differ materially from the characteristics of the Receivables that were disclosed in the Offering Memorandum, and did not satisfy the eligibility criteria. |

141

| 13. "*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 58). | Tricolor's CEO, Mr. Chu, and CFO, Mr. Kollar, had a known history of engaging in fraudulent and deceptive activities that was sufficiently developed to cause JPMorgan to pass on the opportunity to underwrite an initial public offering of Tricolor's securities. |
|---|---|
| 14. "*Sophisticated and Proprietary Information-Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 59). | Tricolor's internal systems were hopelessly compromised, as detailed in several audits and reports. Such systems were in no way "sophisticated" as claimed here. |
| 15. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 62). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 16. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 64). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 17. "Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, has been fairly consistent over the past few years. The portfolio losses have improved since the introduction of better credit grades at the beginning of 2016 and the focus on converting a higher percentage of loans to better credit grade customers. The losses for origination vintages during 2019 through 2022 are lower than prior vintages at a similar month on book, mostly due to the better separation of customers' credit qualities and more favorable loan term structure for high credit quality customers. Correspondingly, net losses have continued to improve since 2018, while recoveries have also improved to 63.5%." (at 64). | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was |

142

| | |
|---|---|
| | fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 18. Data tables under the heading, "Delinquency and Loss Information." (at 65.) | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 19. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer on the Closing Date or during the Prefunding Period will be required to satisfy each of the criteria for transfer to the Issuer as of the applicable Cutoff Date, including that, as of the applicable Cutoff Date: each Receivable shall not be more than 30 days delinquent as of such Cutoff Date and was not a Defaulted Receivable as of such Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least three months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least | There were material amounts of double-pledging and fictitious loans among the Receivables sold to the Trust. Such fraud was not in accordance with the eligibility criteria, which required, among other things, that the Receivables were genuine, had legitimate obligors, and were unencumbered collateral complying with numerous payment qualifications. |

143

5.00% and not more than 25.99%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of such Cutoff Date; each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title; no Subsequent Receivable will cause the weighted average Contract Rate (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Subsequent Receivables to be less than 16.00%; no Subsequent Receivable will cause the weighted average FICO® score only for those obligors having a FICO® score at the time of application (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Receivables to be less than 590; no Subsequent Receivable will cause the weighted average original term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 62 months; no Subsequent Receivable will cause the weighted average remaining term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 62 months; in any given month during the Prefunding Period, the aggregate

144

| | |
|---|---|
| Principal Balance of all Subsequent Receivables having (1) an Internal Risk Grade of "D" has not equaled or exceeded 1.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates and (2) an Internal Risk Grade of "E" has not equaled or exceeded 0.75% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A+" will be at least 13.00% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A" will be at least 29.00% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; and the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "B" will be at least 34.50% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates."  (at 66-68). | |
| 20. Data tables under the heading, "Characteristics of the Receivables."  (at 68-75). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |
| 21.  Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES."  (at 78-81). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading.  That, in turn, rendered statements regarding the weighted average lives of the Notes false and misleading, including because double-pledged |

145

| | and fictitious loan collateral would not be repaid and could not properly amortize the note balances. |
|---|---|
| 22. Data tables under the heading, "Static Pool Information – Tricolor Originations." (at A-1-A-6). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |

7. "The Receivables have been or will be (in the case of the Subsequent Receivables) originated by the Originators in accordance with Tricolor's credit policies." (at 22).

8. "The aggregate principal balance as of the Initial Cutoff Date of the Initial Receivables sold to the Issuer on the Closing Date will be approximately $250,000,000. The aggregate principal balance of the Receivables in the Statistical Pool as of the Statistical Cutoff Date was $244,881,503.32. The composition of the Receivables in the Statistical Pool as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $244,881,503.32[;] Number of Receivables: 10,068[;] Average Amount Financed: $25,738.83[;] Average Principal Balance: $24,322.76[;] Principal Balance (Range) $2,508.26 to $43,552.25[;] Weighted Average Contract Rate: 15.74%[;] Contract Rate (Range): 5.88% to 25.87%[;] Weighted Average Original Term: 61 months[;] Original Term (Range): 23 months to 72 months[;] Weighted Average Remaining Term: 56 months[;] Remaining Term (Range)(2): 3 months to 70 months[;] Weighted Average Wholesale LTV: 130.99%[;] Non-Zero Weighted Average FICO® Score: 613" (at 22-23).

9. "Subsequent Receivables must meet the eligibility criteria that will be specified in the Receivables Purchase Agreement and in the Sale and Servicing Agreement as described herein." (at 23).

10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31).

11. "Tricolor does not expect to have any additional funding requirements beyond the funding currently available to it, although at some point in the future, Tricolor may require additional borrowings to fund the retirement of its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 39-40).

146

12. "The characteristics of the Subsequent Receivables as of their respective Subsequent Cutoff Dates are not expected to differ materially from the characteristics of the Receivables as of the Initial Cutoff Date, and each Subsequent Receivable must satisfy the eligibility criteria described herein." (at 46).

13. "*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 58).

14. "*Sophisticated and Proprietary Information-Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 59).

15. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 62).

16. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 64).

17. "Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, has been fairly consistent over the past few years. The portfolio losses have improved since the introduction of better credit grades at the beginning of 2016 and the focus on converting a higher percentage of loans to better credit grade customers. The losses for origination vintages during 2019 through 2022 are lower than prior vintages at a similar month on book, mostly due to the better separation of customers' credit qualities and more favorable loan term structure for high credit quality customers. Correspondingly, net losses have continued to improve since 2018, while recoveries have also improved to 63.5%." (at 64).

18. Data tables under the heading, "Delinquency and Loss Information." (at 65.)

19. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer on the Closing Date or during the Prefunding Period will be required to satisfy each of the criteria for transfer to the Issuer as of the applicable Cutoff Date, including that, as of the applicable Cutoff Date: each Receivable shall not be more than 30 days delinquent as of such Cutoff Date and was not a Defaulted Receivable as of such Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least three months and not more than 73 months; each Receivable is

147

denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 25.99%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of such Cutoff Date; each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title; no Subsequent Receivable will cause the weighted average Contract Rate (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Subsequent Receivables to be less than 16.00%; no Subsequent Receivable will cause the weighted average FICO® score only for those obligors having a FICO® score at the time of application (based upon the Principal Balance of the Subsequent Receivables as of their respective Subsequent Cutoff Dates) of all Receivables to be less than 590; no Subsequent Receivable will cause the weighted average original term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 62 months; no Subsequent Receivable will cause the weighted average remaining term (based upon the Principal Balance of the Receivables as of their respective Cutoff Dates) of all Receivables to be greater than 62 months; in any given month during the Prefunding Period, the aggregate Principal Balance of all Subsequent Receivables having (1) an Internal Risk Grade of "D" has not equaled or exceeded 1.5% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates and (2) an Internal Risk Grade of "E" has not equaled or exceeded 0.75% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A+" will be at least 13.00% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "A" will be at least 29.00% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates; and the aggregate Principal Balance of all Subsequent Receivables having an Internal Risk Grade of "B" will be at least 34.50% of the aggregate Principal Balance of all Subsequent Receivables as of their respective Subsequent Cutoff Dates." (at 66-68).

20. Data tables under the heading, "Characteristics of the Receivables." (at 68-75).

21. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 78-81).

148

22. Data tables under the heading, "Static Pool Information — Tricolor Originations." (at A-1-A-6).

## III.    TRICOLOR AUTO SECURITIZATION TRUST 2024-1

### Underwriters:

1) Bookrunner and Structuring Agent (Lead Left): Barclays

2) Joint Bookrunner: JPMorgan

### Other parties to Offering Memorandum (dated January 25, 2024):

1) Issuer: Tricolor Auto Securitization Trust 2024-1

2) Depositor: Tricolor Auto Receivables 2 LLC

3) Sponsor, Servicer, and Administrator: Tricolor Auto Acceptance, LLC

### The ~~Misstatements Contained~~Underwriter Defendants Made the Statements in the Offering Memorandum ~~Were Made by the Underwriter Defendants~~:

1.    "The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part." (at 1).

2.    "EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF." (at 5).

3.    "THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM." (at 7).

4.    "EACH PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING

149

INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES." (at 7).

5.      "Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available. Questions and requests for information may be directed to: Barclays Capital Inc. 745 Seventh Avenue, 5th Floor New York, New York 10179[;] (212) 528-7474." (at 13).

6.      "Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers. The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale." (at 130).

**Misleading Statements and Omissions Made By the Underwriter Defendants in the Offering Memorandum:**

| Statement | Misleading because: |
|---|---|
| 7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore were not originated in accordance with Tricolor's credit policies. |
| 8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $353,513,549.99. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $353,513,549.99[;] Number of Receivables: 13,833[;] Average Amount Financed: $26,796.07[;] Average Principal Balance: $25,555.81[;] Principal Balance | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and |

150

| | |
|---|---|
| (Range) $2,927.86 to $46,215.37[;] Weighted Average Contract Rate: 15.66%[;] Contract Rate (Range): 9.01% to 25.83%[;] Weighted Average Original Term: 64 months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 59 months[;] Remaining Term (Range)(2): 22 months to 72 months[;] Weighted Average Wholesale LTV: 126.17%[;] Non-Zero Weighted Average FICO® Score: 602." (at 22-23). | misleading. For example, fictitious and double-pledged loans were improperly included in the aggregate principal balance. This fictitious and double-pledged collateral was, moreover, taken into account in calculating the other loan pool characteristics, rendering the description of each loan pool characteristic listed in the Offering Memorandum false and misleading. |
| 9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. The Receivables were therefore expected to differ materially from the characteristics of the Receivables that were disclosed in the Offering Memorandum as of both the Statistical Cutoff Date and the Closing Date. |
| 10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 32). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. In failing to disclose this primary and prevailing risk factor for the performance of the Receivables, the remaining performance risk factors are rendered false and misleading, and only half-truths. |
| 11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's | Tricolor's "ability to obtain additional capital" was not "dependent upon Tricolor's future operating performance," but rather, entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud. |

151

| | |
|---|---|
| future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 40). | |
| 12. "*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 61). | Tricolor's CEO, Mr. Chu, and CFO, Mr. Kollar, had a known history of engaging in fraudulent and deceptive activities that was sufficiently developed to cause JPMorgan to pass on the opportunity to underwrite an initial public offering of Tricolor's securities. |
| 13. "*Sophisticated and Proprietary Information-Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 62). | Tricolor's internal systems were hopelessly compromised, as detailed in several audits and reports. Such systems were in no way "sophisticated" as claimed here. |
| 14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 65). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 66). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 16. "From 2019 through 2023, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2019 through 2023 time period, recoveries have remained above 60%, and losses during 2023 have approximated those prior to the COVID-19 pandemic. | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data |

| | |
|---|---|
| Tricolor believes that the losses experienced by its portfolio are consistent with, if not better than, those of most other sub-prime lenders." (at 67). | underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 17. Data tables under the heading, "Delinquency and Loss Information." (at 68). | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly | There were material amounts of double-pledging and fictitious loans among the Receivables sold to the Trust. Such fraud was not in accordance with the eligibility criteria, which required, among other things, that the Receivables were genuine, had legitimate obligors, and were unencumbered collateral complying with numerous payment qualifications. |

153

| | |
|---|---|
| or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 25.99%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 69-70). | |
| 19. Data tables under the heading, "Characteristics of the Receivables." (at 70-77). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |
| 20. Data tables under the heading, "WEIGHTED | Because a substantial portion of |

| | |
|---|---|
| AVERAGE LIVES OF THE NOTES." (at 80-83). | the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. That, in turn, rendered statements regarding the weighted average lives of the Notes false and misleading, including because double-pledged and fictitious loan collateral would not be repaid and could not properly amortize the note balances. |
| 21. Data tables under the heading, "Static Pool Information – Tricolor Originations." A-1-A-6. | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |

7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22).

8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $353,513,549.99. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $353,513,549.99[;] Number of Receivables: 13,833[;] Average Amount Financed: $26,796.07[;] Average Principal Balance: $25,555.81[;] Principal Balance (Range) $2,927.86 to $46,215.37[;] Weighted Average Contract Rate: 15.66%[;] Contract Rate (Range): 9.01% to 25.83%[;] Weighted Average Original Term: 64 months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 59 months[;] Remaining Term (Range)(2): 22 months to 72 months[;] Weighted Average Wholesale LTV: 126.17%[;] Non-Zero Weighted Average FICO® Score: 602." (at 22-23).

9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described

155

herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23).

10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 32).

11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 40).

12. "*Highly Experienced Management Team With Strong Operating Track Record.* Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 61).

13. "*Sophisticated and Proprietary Information-Based Systems and Strategies.* Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 62).

14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 65).

15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 66).

16. "From 2019 through 2023, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2019 through 2023 time period, recoveries have remained above 60%, and losses during 2023 have approximated those prior to the COVID-19 pandemic. Tricolor believes

that the losses experienced by its portfolio are consistent with, if not better than, those of most other sub-prime lenders." (at 67).

17. Data tables under the heading, "Delinquency and Loss Information." (at 68).

18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 25.99%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 69-70).

19. Data tables under the heading, "Characteristics of the Receivables." (at 70-77).

20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 80-83).

21. Data tables under the heading, "Static Pool Information — Tricolor Originations." A-1-A-6.

## IV.    TRICOLOR AUTO SECURITIZATION TRUST 2024-2

**Underwriters:**

1) Bookrunner and Structuring Agent (Lead Left): JPMorgan

2) Joint Bookrunner: Barclays

3) Co-Manager: Fifth Third Securities

**Other parties to Offering Memorandum (dated May 14, 2024):**

1) Issuer: Tricolor Auto Securitization Trust 2024-2

2) Depositor: Tricolor Auto Receivables 2 LLC

3) Sponsor, Servicer, and Administrator: Tricolor Auto Acceptance, LLC

**The ~~Misstatements Contained~~Underwriter Defendants Made the Statements in the Offering Memorandum ~~Were Made by the Underwriter Defendants~~:**

1.    "The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part."  (at 1).

2.    "EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF."  (at 5).

3.    "THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM."  (at 7).

4.    "EACH PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING

158

THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES." (at 7).

5.    "Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available. Questions and requests for information may be directed to: J.P. Morgan Securities LLC[;] 383 Madison Avenue, 8th Floor[;] New York, New York 10179[;] (212) 834-4154." (at 13).

6.    "Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers. The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale." (at 132).

**Misleading Statements and Omissions Made By the Underwriter Defendants in the Offering Memorandum:**

| Statement | Misleading because: |
|---|---|
| 7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore were not originated in accordance with Tricolor's credit policies. |
| 8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $357,500,000.00. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $348,422,381.48[;] Number of Receivables: 14,015[;] Average Amount Financed: $26,155.94[;] Average Principal Balance: $24,860.68[;] Principal Balance (Range) $3,440.62 to $46,094.59[;] Weighted Average Contract Rate: 17.10%[;] Contract Rate (Range): 7.90% | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. For example, fictitious and double-pledged loans |

159

| | |
|---|---|
| to 26.90%[;] Weighted Average Original Term: 63 months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 58 months[;] Remaining Term (Range): 17 months to 72 months[;] Weighted Average Wholesale LTV: 128.86%[;] Non-Zero Weighted Average FICO® Score: 604" (at 22-23). | were improperly included in the aggregate principal balance. This fictitious and double-pledged collateral was, moreover, taken into account in calculating the other loan pool characteristics, rendering the description of each loan pool characteristic listed in the Offering Memorandum false and misleading. |
| 9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. The Receivables were therefore expected to differ materially from the characteristics of the Receivables that were disclosed in the Offering Memorandum as of both the Statistical Cutoff Date and the Closing Date. |
| 10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. In failing to disclose this primary and prevailing risk factor for the performance of the Receivables, the remaining performance risk factors are rendered false and misleading, and only half-truths. |
| 11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations | Tricolor's "ability to obtain additional capital" was not "dependent upon Tricolor's future operating performance," but rather, entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud. |

160

| | |
|---|---|
| as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 39-40). | |
| 12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from five to ten years of relevant industry experience." (at 61). | Tricolor's CEO, Mr. Chu, and CFO, Mr. Kollar, had a known history of engaging in fraudulent and deceptive activities that was sufficiently developed to cause JPMorgan to pass on the opportunity to underwrite an initial public offering of Tricolor's securities. |
| 13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 62). | Tricolor's internal systems were hopelessly compromised, as detailed in several audits and reports. Such systems were in no way "sophisticated" as claimed here. |
| 14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 65). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 66). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 16. "From 2019 through 2023, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023... While portfolio losses also fluctuated during the 2019 through 2023 time period, recoveries have remained above 60%, and losses during 2023 have approximated those prior to the COVID-19 pandemic. Tricolor believes that the losses experienced by its portfolio are consistent with, if not better than, those of | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and |

| | |
|---|---|
| most other sub-prime lenders."  (at 67). | loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading.  Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 17. Data tables under the heading, "Delinquency and Loss Information."  (at 66-68). | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans.  Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading.  Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining | There were material amounts of double-pledging and fictitious loans among the Receivables sold to the Trust.  Such fraud was not in accordance with the eligibility criteria, which required, among other things, that the Receivables were genuine, had legitimate obligors, and were unencumbered collateral complying with numerous payment qualifications. |

162

| | |
|---|---|
| maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 26.999%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 70-71). | |
| 19. Data tables under the heading, "Characteristics of the Receivables." (at 72-79). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |
| 20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 82-85). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, |

163

| | the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. That, in turn, rendered statements regarding the weighted average lives of the Notes false and misleading, including because double-pledged and fictitious loan collateral would not be repaid and could not properly amortize the note balances. |
|---|---|
| 21. Data tables under the heading, "Static Pool Information – Tricolor Originations." (at A-1-A-7). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |

7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22).

8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $357,500,000.00. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $348,422,381.48[;] Number of Receivables: 14,015[;] Average Amount Financed: $26,155.94[;] Average Principal Balance: $24,860.68[;] Principal Balance (Range) $3,440.62 to $46,094.59[;] Weighted Average Contract Rate: 17.10%[;] Contract Rate (Range): 7.90% to 26.90%[;] Weighted Average Original Term: 63 months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 58 months[;] Remaining Term (Range): 17 months to 72 months[;] Weighted Average Wholesale LTV: 128.86%[;] Non-Zero Weighted Average FICO® Score: 604" (at 22-23).

9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables

164

sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23).

10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31).

11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 39-40).

12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from five to ten years of relevant industry experience." (at 61).

13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy-here-pay-here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 62).

14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 65).

15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 66).

16. "From 2019 through 2023, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2019 through 2023 time period, recoveries have remained above 60%, and losses during 2023 have approximated those prior to the COVID-19 pandemic. Tricolor believes

that the losses experienced by its portfolio are consistent with, if not better than, those of most other sub-prime lenders." (at 67).

17. Data tables under the heading, "Delinquency and Loss Information." 68 (at 69).

18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 26.999%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 70-71).

19. Data tables under the heading, "Characteristics of the Receivables." (at 72-79).

20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 82-85).

21. Data tables under the heading, "Static Pool Information — Tricolor Originations." (at A-1-A-7.

## V.    TRICOLOR AUTO SECURITIZATION TRUST 2024-3

**Underwriters:**

1) Bookrunner and Structuring Agent (Lead Left): JPMorgan

2) Joint Bookrunner: Barclays

3) Co-Manager: Fifth Third Securities

**Other parties to Offering Memorandum (dated October 7, 2024):**

1) Issuer: Tricolor Auto Securitization Trust 2024-3

2) Depositor: Tricolor Auto Receivables 2 LLC

3) Sponsor, Servicer, and Administrator: Tricolor Auto Acceptance, LLC

**The ~~Misstatements Contained~~Underwriter Defendants Made the Statements in the Offering Memorandum ~~Were Made by the Underwriter Defendants~~:**

1.    "The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part."  (at 1).

2.    "EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF."  (at 5).

3.    "THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM."  (at 7).

4.    "EACH PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING

167

THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES." (at 7).

5.      "Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available. Questions and requests for information may be directed to: J.P. Morgan Securities LLC[;] 383 Madison Avenue, 8th Floor[;] New York, New York 10179[;] (212) 834-4154." (at 13).

6.      "Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers. The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale." (at 132).

**Misleading Statements and Omissions Made By the Underwriter Defendants in the Offering Memorandum:**

| Statement | Misleading because: |
|---|---|
| 7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore were not originated in accordance with Tricolor's credit policies. |
| 8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $355,000,000. The composition of the Receivables as of the Statistical Cutoff Date was as follows:     Aggregate     Principal     Balance: $355,038,477.43[;] Number of Receivables: 13,786[;] Average Amount Financed: $27,170.17[;] Average Principal Balance: $25,753.55[;] Principal Balance (Range) $2,972.00 to $44,061.88[;] Weighted Average Contract Rate: 16.60%[;] Contract Rate (Range): 7.90% | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading.     For example, fictitious and double-pledged loans |

| | |
|---|---|
| to 25.90%[;] Weighted Average Original Term: 64 Months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 60 Months[;] Remaining Term (Range)(2): 12 months to 72 months[;] Weighted Average Wholesale LTV: 128.53%[;] Non-Zero Weighted Average FICO® Score: 617." (at 22-23). | were improperly included in the aggregate principal balance. This fictitious and double-pledged collateral was, moreover, taken into account in calculating the other loan pool characteristics, rendering the description of each loan pool characteristic listed in the Offering Memorandum false and misleading. |
| 9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. The Receivables were therefore expected to differ materially from the characteristics of the Receivables that were disclosed in the Offering Memorandum as of both the Statistical Cutoff Date and the Closing Date. |
| 10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. In failing to disclose this primary and prevailing risk factor for the performance of the Receivables, the remaining performance risk factors are rendered false and misleading, and only half-truths. |
| 11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations | Tricolor's "ability to obtain additional capital" was not "dependent upon Tricolor's future operating performance," but rather, entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud. |

| | |
|---|---|
| as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 39-40). | |
| 12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 61). | Tricolor's CEO, Mr. Chu, and CFO, Mr. Kollar, had a known history of engaging in fraudulent and deceptive activities that was sufficiently developed to cause JPMorgan to pass on the opportunity to underwrite an initial public offering of Tricolor's securities. |
| 13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 62). | Tricolor's internal systems were hopelessly compromised, as detailed in several audits and reports. Such systems were in no way "sophisticated" as claimed here. |
| 14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 65). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 66). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 16. "From 2019 through 2023, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2019 through 2023 time period, recoveries have remained above 60%, and losses during 2023 have approximated those prior to the COVID-19 pandemic. Tricolor believes that the losses experienced by its portfolio are consistent with, if not better than, those of | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and |

| | |
|---|---|
| most other sub-prime lenders." (at 67). | loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 17. Data tables under the heading, "Delinquency and Loss Information." (at 68-69). | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining | There were material amounts of double-pledging and fictitious loans among the Receivables sold to the Trust. Such fraud was not in accordance with the eligibility criteria, which required, among other things, that the Receivables were genuine, had legitimate obligors, and were unencumbered collateral complying with numerous payment qualifications. |

171

| | |
|---|---|
| maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 25.90%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 70-71). | |
| 19. Data tables under the heading, "Characteristics of the Receivables." (at 72-79). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |
| 20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 82-85). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, |

| | |
|---|---|
| | the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. That, in turn, rendered statements regarding the weighted average lives of the Notes false and misleading, including because double-pledged and fictitious loan collateral would not be repaid and could not properly amortize the note balances. |
| 21. Data tables under the heading, "Static Pool Information – Tricolor Originations." (at A-1-A-7). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |

7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22).

8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $355,000,000. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $355,038,477.43[;] Number of Receivables: 13,786[;] Average Amount Financed: $27,170.17[;] Average Principal Balance: $25,753.55[;] Principal Balance (Range) $2,972.00 to $44,061.88[;] Weighted Average Contract Rate: 16.60%[;] Contract Rate (Range): 7.90% to 25.90%[;] Weighted Average Original Term: 64 Months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 60 Months[;] Remaining Term (Range)(2): 12 months to 72 months[;] Weighted Average Wholesale LTV: 128.53%[;] Non-Zero Weighted Average FICO® Score: 617." (at 22-23).

9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables

173

sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23).

10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31).

11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 39-40).

12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 61).

13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy-here-pay-here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 62).

14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 65).

15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 66).

16. "From 2019 through 2023, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2019 through 2023 time period, recoveries have remained above 60%, and losses during 2023 have approximated those prior to the COVID-19 pandemic. Tricolor believes

174

that the losses experienced by its portfolio are consistent with, if not better than, those of most other sub-prime lenders." (at 67).

17. Data tables under the heading, "Delinquency and Loss Information." (at 68-69).

18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $50,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 25.90%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 70-71).

19. Data tables under the heading, "Characteristics of the Receivables." (at 72-79).

20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 82-85).

21. Data tables under the heading, "Static Pool Information — Tricolor Originations." (at A-1-A-7).

175

**VI.    TRICOLOR AUTO SECURITIZATION TRUST 2025-1**

**Underwriters:**

1) <u>Bookrunner and Structuring Agent (Lead Left)</u>: JPMorgan

2) <u>Joint Bookrunner</u>: Barclays

3) <u>Co-Manager</u>: Fifth Third Securities

**Other parties to Offering Memorandum (dated March 11, 2025):**

1) <u>Issuer:</u> Tricolor Auto Securitization Trust 2025-1

2) <u>Depositor:</u> Tricolor Auto Receivables 2 LLC

3) <u>Sponsor, Servicer, and Administrator:</u> Tricolor Auto Acceptance, LLC

**The ~~Misstatements Contained~~<u>Underwriter Defendants Made the Statements</u> in the Offering Memorandum ~~Were Made by the Underwriter Defendants~~:**

1.      "The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part." (at 1).

2.      "EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF." (at 5).

3.      "THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM." (at 7).'

4.      "EACH PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING

176

THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES." (at 7).

5.    "Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available. Questions and requests for information may be directed to: J.P. Morgan Securities LLC[;] 383 Madison Avenue, 8th Floor[;] New York, New York 10179[;] (212) 834-4154." (at 12).

6.    "Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers. The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale." (at 126).

**Misleading Statements and Omissions Made By the Underwriter Defendants in the Offering Memorandum:**

| Statement | Misleading because: |
|---|---|
| 7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 21). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore were not originated in accordance with Tricolor's credit policies. |
| 8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $400,110,066.80. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $400,110,066.80[;] Number of Receivables: 18,713[;] Average Principal Balance: $21,381.40[;] Average Amount Financed: $25,867.18[;] Principal Balance (Range) $2,501.56 to $50,461.36[;] Weighted Average Contract Rate: 16.64%[;] Contract Rate (Range): 6.90% | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. For example, fictitious and double-pledged loans |

177

| | |
|---|---|
| to 26.90%[;] Weighted Average Original Term: 64 months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 57 months[;] Remaining Term (Range): 3 months to 73 months[;] Weighted Average Wholesale LTV: 130.06%[;] Non-Zero Weighted Average FICO® Score: 614." (at 21). | were improperly included in the aggregate principal balance. This fictitious and double-pledged collateral was, moreover, taken into account in calculating the other loan pool characteristics, rendering the description of each loan pool characteristic listed in the Offering Memorandum false and misleading. |
| 9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 22). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. The Receivables were therefore expected to differ materially from the characteristics of the Receivables that were disclosed in the Offering Memorandum as of both the Statistical Cutoff Date and the Closing Date. |
| 10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 29). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. In failing to disclose this primary and prevailing risk factor for the performance of the Receivables, the remaining performance risk factors are rendered false and misleading, and only half-truths. |
| 11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations | Tricolor's "ability to obtain additional capital" was not "dependent upon Tricolor's future operating performance," but rather, entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud. |

| | |
|---|---|
| as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 37-38). | |
| 12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 55). | Tricolor's CEO, Mr. Chu, and CFO, Mr. Kollar, had a known history of engaging in fraudulent and deceptive activities that was sufficiently developed to cause JPMorgan to pass on the opportunity to underwrite an initial public offering of Tricolor's securities. |
| 13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 56). | Tricolor's internal systems were hopelessly compromised, as detailed in several audits and reports. Such systems were in no way "sophisticated" as claimed here. |
| 14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 59). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 61). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 16. "From 2020 through 2024, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023... While portfolio losses also fluctuated during the 2020 through 2023 time period, recoveries have remained above 60%, and losses during 2023 and 2024 have approximated those prior to the COVID-19 pandemic. Tricolor believes that the losses experienced by its portfolio are consistent with, if not better than, | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and |

| | |
|---|---|
| those of most other sub-prime lenders." (at 61). | loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 17. Data tables under the heading, "Delinquency and Loss Information." (at 62-63). | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining | There were material amounts of double-pledging and fictitious loans among the Receivables sold to the Trust. Such fraud was not in accordance with the eligibility criteria, which required, among other things, that the Receivables were genuine, had legitimate obligors, and were unencumbered collateral complying with numerous payment qualifications. |

| | |
|---|---|
| maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $51,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 26.90%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 64-65). | |
| 19. Data tables under the heading, "Characteristics of the Receivables." (at 66-74). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |
| 20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 77-80). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, |

181

| | the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. That, in turn, rendered statements regarding the weighted average lives of the Notes false and misleading, including because double-pledged and fictitious loan collateral would not be repaid and could not properly amortize the note balances. |
|---|---|
| 21. Data tables under the heading, "Static Pool Information – Tricolor Originations." (at A-1-A-7). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |

7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 21)

8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $400,110,066.80. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $400,110,066.80[;] Number of Receivables: 18,713[;] Average Principal Balance: $21,381.40[;] Average Amount Financed: $25,867.18[;] Principal Balance (Range) $2,501.56 to $50,461.36[;] Weighted Average Contract Rate: 16.64%[;] Contract Rate (Range): 6.90% to 26.90%[;] Weighted Average Original Term: 64 months[;] Original Term (Range): 29 months to 73 months[;] Weighted Average Remaining Term: 57 months[;] Remaining Term (Range): 3 months to 73 months[;] Weighted Average Wholesale LTV: 130.06%[;] Non-Zero Weighted Average FICO® Score: 614." (at 21).

9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables

182

sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 22).

10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 29)

11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 37-38).

12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 55).

13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 56).

14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 59).

15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 61).

16. "From 2020 through 2024, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2020 through 2023 time period, recoveries have remained above 60%, and losses during 2023 and 2024 have approximated those prior to the COVID-19 pandemic.

183

Tricolor believes that the losses experienced by its portfolio are consistent with, if not better than, those of most other sub-prime lenders." (at 61).

17. Data tables under the heading, "Delinquency and Loss Information." (at 62-63).

18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $51,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 26.90%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 64-65).

19. Data tables under the heading, "Characteristics of the Receivables." (at 66-74).

20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 77-80).

21. Data tables under the heading, "Static Pool Information — Tricolor Originations." (at A-1-A-7).

184

## VII.    TRICOLOR AUTO SECURITIZATION TRUST 2025-2

**Underwriters:**

1) Bookrunner and Structuring Agent (Lead Left): Barclays

2) Joint Bookrunner: JPMorgan

3) Co-Manager: Fifth Third Securities

**Other parties to Offering Memorandum (dated June 10, 2025):**

1) Issuer: Tricolor Auto Securitization Trust 2025-2

2) Depositor: Tricolor Auto Receivables 2 LLC

3) Sponsor, Servicer, and Administrator: Tricolor Auto Acceptance, LLC

**The ~~Misstatements Contained~~Underwriter Defendants Made the Statements in the Offering Memorandum ~~Were Made by the Underwriter Defendants~~:**

1.      "The Notes are being offered by the Initial Purchasers, subject to prior sale, when, as and if issued to and accepted by the Initial Purchasers and subject to approval of certain legal matters by their counsel. The Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part." (at 1).

2.      "EACH INITIAL PURCHASER RESERVES THE RIGHT TO REJECT ANY OFFER TO PURCHASE THE NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF THE NOTES. THIS OFFERING MEMORANDUM IS PERSONAL TO EACH OFFEREE TO WHOM IT HAS BEEN DELIVERED BY THE ISSUER, AN INITIAL PURCHASER OR AN AFFILIATE THEREOF." (at 5).

3.      "THE DEPOSITOR, TRICOLOR AND THE INITIAL PURCHASERS WILL BE AVAILABLE TO ANSWER QUESTIONS FROM PROSPECTIVE INVESTORS AND THEIR REPRESENTATIVES CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING AND WILL FURNISH ADDITIONAL INFORMATION (TO THE EXTENT THEY HAVE OR CAN ACQUIRE SUCH ADDITIONAL INFORMATION WITHOUT UNREASONABLE EFFORT OR EXPENSE) NECESSARY TO VERIFY THE INFORMATION FURNISHED IN THIS OFFERING MEMORANDUM." (at 7).

4.      "EACH PROSPECTIVE INVESTOR ACKNOWLEDGES THAT IT HAS EITHER BEEN SUPPLIED WITH OR GIVEN ACCESS TO INFORMATION, INCLUDING FINANCIAL STATEMENTS AND OTHER FINANCIAL INFORMATION REGARDING THE ISSUER, THE DEPOSITOR AND TRICOLOR, TO WHICH A REASONABLE INVESTOR WOULD ATTACH SIGNIFICANCE IN MAKING INVESTMENT DECISIONS, AND HAS HAD THE OPPORTUNITY TO ASK QUESTIONS AND RECEIVE ANSWERS FROM KNOWLEDGEABLE INDIVIDUALS CONCERNING

185

THE ISSUER, THE DEPOSITOR, TRICOLOR AND THE NOTES AND THE RECEIVABLES PROVIDING SECURITY THEREFOR, SO THAT AS A REASONABLE INVESTOR, IT HAS BEEN ABLE TO MAKE ITS DECISION TO PURCHASE THE NOTES." (at 7).

5.    "Each prospective purchaser of the Notes and its representatives and beneficial owners, if any, are invited to ask questions of the Depositor and Tricolor concerning the terms, conditions and other aspects of this Offering Memorandum and to obtain any additional information with respect to the Notes, the Receivables, the Issuer, the Depositor and Tricolor necessary to verify the accuracy of the information contained herein and, in the case of documents referred to herein, to request that such documents be made available. Questions and requests for information may be directed to: Barclays Capital Inc. 745 Seventh Avenue, 5th Floor New York, New York 10179[;] (212) 528-7474." (at 12-13).

6.    "Subject to the terms and conditions set forth in the Note Purchase Agreement, the Initial Purchasers will agree to purchase the Notes from the Depositor and the Depositor will agree to sell the Notes to the Initial Purchasers. The Depositor has been advised by the Initial Purchasers that they propose to offer the Notes for resale in transactions not requiring registration under the Securities Act or applicable State securities laws, including sales pursuant to Rule 144A. The Notes are offered by the Initial Purchasers when, as and if issued, delivered to and accepted by the Initial Purchasers, and subject to their right to reject orders in whole or in part. Each Initial Purchaser will agree that it will not offer or sell the Notes other than (1) to persons that they either reasonably believe to be QIBs or (2) in the case of the initial investors in the Notes, to IAIs. The Notes will be offered in negotiated transactions or otherwise on varying terms and at varying prices, in each case to be determined at the time of sale." (at 130).

**Misleading Statements and Omissions Made By the Underwriter Defendants in the Offering Memorandum:**

| Statement | Misleading because: |
|---|---|
| 7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious, and therefore were not originated in accordance with Tricolor's credit policies. |
| 8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $263,252,406.75. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $263,252,406.75[;] Number of Receivables: 12,570[;] Average Principal Balance: $20,942.91[;] Average Amount Financed: $25,086.68[;] Principal Balance (Range) $2,013.39 to $43,078.46[;] Weighted Average Contract Rate: 16.90%[;] Contract Rate (Range): 6.90% | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. For example, fictitious and double-pledged loans |

186

| | |
|---|---|
| to 27.00%[;] Weighted Average Original Term: 64 months[;] Original Term (Range): 33 months to 73 months[;] Weighted Average Remaining Term: 58 months[;] Remaining Term (Range): 3 months to 73 months[;] Weighted Average Wholesale LTV: 128.53%[;] Non-Zero Weighted Average FICO® Score: 600." (at 22-23). | were improperly included in the aggregate principal balance. This fictitious and double-pledged collateral was, moreover, taken into account in calculating the other loan pool characteristics, rendering the description of each loan pool characteristic listed in the Offering Memorandum false and misleading. |
| 9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. The Receivables were therefore expected to differ materially from the characteristics of the Receivables that were disclosed in the Offering Memorandum as of both the Statistical Cutoff Date and the Closing Date. |
| 10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31). | A substantial portion of the Receivables for each Trust were double-pledged or fictitious. In failing to disclose this primary and prevailing risk factor for the performance of the Receivables, the remaining performance risk factors are rendered false and misleading, and only half-truths. |
| 11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations | Tricolor's "ability to obtain additional capital" was not "dependent upon Tricolor's future operating performance," but rather, entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud. |

187

| | |
|---|---|
| as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 40). | |
| 12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 58). | Tricolor's CEO, Mr. Chu, and CFO, Mr. Kollar, had a known history of engaging in fraudulent and deceptive activities that was sufficiently developed to cause JPMorgan to pass on the opportunity to underwrite an initial public offering of Tricolor's securities. |
| 13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 59). | Tricolor's internal systems were hopelessly compromised, as detailed in several audits and reports. Such systems were in no way "sophisticated" as claimed here. |
| 14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 62). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 64). | Tricolor was knowingly and intentionally stuffing the borrowing base for the warehouse facilities with receivables that were more than 120 days past due, and not following its policy to charge off these loans. |
| 16. "From 2020 through 2024, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2020 through 2023 time period, recoveries have remained above 60%, and losses during 2023 and 2024 have approximated those prior to the COVID-19 pandemic. Tricolor believes that the losses experienced by its portfolio are consistent with, if not better than, | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and |

188

| | |
|---|---|
| those of most other sub-prime lenders." (at 64). | loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 17. Data tables under the heading, "Delinquency and Loss Information." (at 65-66). | Tricolor was knowingly and intentionally misrepresenting and manipulating the delinquency, default and loss data for its loan pools, and calculating other statistics based on loan pools that contained double-pledged and fictitious loans. Because the data underlying Tricolor's calculation of these delinquency, default, and loss characteristics was fundamentally corrupted, the loan pool characteristics described in the Offering Memorandum were false and misleading. Tricolor was fabricating recovery rates for its loan pools through a Ponzi-like scheme, and actual recovery rates were substantially below the recovery rates reflected in the Offering Memorandum. |
| 18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining | There were material amounts of double-pledging and fictitious loans among the Receivables sold to the Trust. Such fraud was not in accordance with the eligibility criteria, which required, among other things, that the Receivables were genuine, had legitimate obligors, and were unencumbered collateral complying with numerous payment qualifications. |

189

| | |
|---|---|
| maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $51,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 27.00%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 67-68). | |
| 19. Data tables under the heading, "Characteristics of the Receivables." (at 69-77). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |
| 20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 80-83). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, |

190

| | the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. That, in turn, rendered statements regarding the weighted average lives of the Notes false and misleading, including because double-pledged and fictitious loan collateral would not be repaid and could not properly amortize the note balances. |
|---|---|
| 21. Data tables under the heading, "Static Pool Information – Tricolor Originations." (at A-1-A-7). | Because a substantial portion of the Receivables for each Trust were double-pledged or fictitious, the loan pool characteristics listed in the Offering Memorandum were predicated on fundamentally compromised loan data, which rendered those loan pool characteristics false and misleading. |

7. "The Receivables have been originated by the Originators in accordance with Tricolor's credit policies." (at 22).

8. "The aggregate principal balance as of the Cutoff Date of the Receivables sold to the Issuer and assigned to the Underlying Trust on the Closing Date will be approximately $263,252,406.75. The composition of the Receivables as of the Statistical Cutoff Date was as follows: Aggregate Principal Balance: $263,252,406.75[;] Number of Receivables: 12,570[;] Average Principal Balance: $20,942.91[;] Average Amount Financed: $25,086.68[;] Principal Balance (Range) $2,013.39 to $43,078.46[;] Weighted Average Contract Rate: 16.90%[;] Contract Rate (Range): 6.90% to 27.00%[;] Weighted Average Original Term: 64 months[;] Original Term (Range): 33 months to 73 months[;] Weighted Average Remaining Term: 58 months[;] Remaining Term (Range): 3 months to 73 months[;] Weighted Average Wholesale LTV: 128.53%[;] Non-Zero Weighted Average FICO® Score: 600." (at 22-23).

9. "The statistical information in this Offering Memorandum is based on the Receivables in a Statistical Pool as of the Statistical Cutoff Date. The actual pool of Receivables sold to the Issuer on the Closing Date will include Receivables selected from the Statistical Pool, along with additional Receivables originated after the Statistical Cutoff Date up to and including the Cutoff Date. The characteristics of the Receivables sold to the Issuer on the Closing Date may vary somewhat from the characteristics of the Receivables in the Statistical Pool described herein, although we do not expect the characteristics, as of the Cutoff Date, of the receivables

191

sold to the Issuer on the Closing Date to vary materially from the characteristics, as of the Statistical Cutoff Date, of the Receivables in the Statistical Pool." (at 23).

10. "The performance of the Receivables will depend on a number of factors, including general economic conditions, employment levels, the circumstances of individual borrowers, Tricolor's underwriting standards at origination and the success of Tricolor's servicing and collection efforts." (at 31).

11. "The operations of Tricolor require significant amounts of capital. To fund its operations, Tricolor has borrowed, and will continue to borrow, capital, complete securitizations or other structured finance transactions and, from time to time, evaluate and consider other strategic transactions, sales, combinations, acquisitions or alliances. At some point in the future, Tricolor may require additional capital to fund its operations and retire its debt obligations as they mature. The ability to obtain additional capital will be dependent upon Tricolor's future operating performance and the overall performance of its loan portfolio and servicing operations as well as other factors, many of which are outside of Tricolor's control, including general economic conditions, competitive factors, general conditions in the credit markets, the size and liquidity of the secondary market for securitizations and other factors." (at 40).

12. "*Highly Experienced Management Team With Strong Operating Track Record*[.] Its executive management team has leveraged its centralized operations and data-driven model to become the largest auto retailer serving the Hispanic segment. Its head senior executive has over 25 years of relevant industry experience and a number of other executives have experience ranging from 5 to 10 years of relevant industry experience." (at 58).

13. "*Sophisticated and Proprietary Information-Based Systems and Strategies*[.] Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business." (at 59).

14. "Tricolor's policy generally requires that a receivable be charged-off under the following circumstances: the receivable is 120 or more days past due at the end of a month; the customer is in a bankruptcy proceeding; or if the related financed vehicle has been repossessed, sold and Tricolor has made a final determination of any deficiency owed on the auto loan." (at 62).

15. "Tricolor considers a receivable to be delinquent if the borrower fails to remit more than 90% of any payment by its contractual due date. Tricolor expenses losses directly against income in the month incurred. For credit loss terminations, Tricolor charges off the account balance when the auto loan becomes 120 days delinquent, when a repossessed vehicle is sold at auction or when the auto loan is determined to be uncollectible." (at 64).

16. "From 2020 through 2024, Tricolor's portfolio delinquency rates, as measured by receivables that are 30 or more days past due, fluctuated with the general United States macro-economic environment, but improved during 2023… While portfolio losses also fluctuated during the 2020 through 2023 time period, recoveries have remained above 60%, and losses during 2023 and 2024 have approximated those prior to the COVID-19 pandemic.

192

Tricolor believes that the losses experienced by its portfolio are consistent with, if not better than, those of most other sub-prime lenders." (at 64).

17. Data tables under the heading, "Delinquency and Loss Information." (at 65-66).

18. "Eligibility Criteria[:] The Receivables were or will be selected from Tricolor's portfolio of sub-prime receivables according to several criteria. Each Receivable to be transferred to the Issuer and assigned by the Issuer to the Underlying Trust on the Closing Date will be required to satisfy each of the criteria for transfer to the Issuer and assignment to the Underlying Trust as of the Cutoff Date, including that, as of the Cutoff Date: each Receivable shall not be more than 30 days delinquent as of the Cutoff Date and was not a Defaulted Receivable as of the Cutoff Date; each Receivable shall have made at least its first scheduled weekly, bi-weekly, semi-monthly or monthly payment; each Receivable had an original maturity of not more than 73 months and a remaining maturity of at least 3 months and not more than 73 months; each Receivable is denominated in United States dollars and had a remaining Principal Balance of at least $2,000 and not more than $51,000; each Receivable is a Simple Interest Receivable and has a Contract Rate of at least 5.00% and not more than 27.00%; each Receivable provides for level scheduled monthly, semi-monthly, bi-weekly or weekly payments that fully amortize the Amount Financed over its original term to maturity, except for the first and last payments, which may be minimally different from the level payments; each Receivable was originated in the United States and the related obligor was not identified on the records of the Servicer as being subject to any pending bankruptcy proceeding; each Receivable has an obligor who is a natural person and is not an affiliate of any party to any of the Transaction Documents; each Receivable has an obligor that has a billing address in, or is domiciled in, the United States; each Receivable arose under a contract with respect to which Tricolor has performed all obligations required to be performed by it thereunder, and delivery of the Financed Vehicle securing such Receivable to the related obligor has occurred; each Receivable arose under a contract with respect to which the obligor has paid all deferred down payment amounts; each Receivable constitutes "tangible chattel paper" under the UCC; each Receivable has been originated under a contract that is assignable without the consent of the related obligor or any other person; no Financed Vehicle was held in repossession as of the Cutoff Date; and each Receivable is evidenced by a retail installment sale contract and recorded and assigned certificate of title." (at 67-68).

19. Data tables under the heading, "Characteristics of the Receivables." (at 69-77).

20. Data tables under the heading, "WEIGHTED AVERAGE LIVES OF THE NOTES." (at 80-83).

21. Data tables under the heading, "Static Pool Information — Tricolor Originations." (at A-1-A-7).

193

## VIII.   PRE-BANKRUPTCY PURCHASES BY PLAINTIFF

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| ABS IV Sub I, LLC | Barclays | Primary | 01/25/2024 | TAST 2024-1A F | $4,000,000.00 | $99.99 |
| OWS Credit Opportunity Sub I, Ltd. | Barclays | Primary | 01/25/2024 | TAST 2024-1A F | $24,280,000.00 | $99.99 |
| One William Street Capital Master Fund Ltd | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A E | $13,620,000.00 | $99.98 |
| OWS Credit Opportunity Sub I, Ltd. | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A E | $8,638,000.00 | $99.98 |
| OWS ABS Master Fund II, L.P. | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A E | $2,094,000.00 | $99.98 |
| ABS IV Sub I, LLC | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A E | $823,000.00 | $99.98 |
| 1WSCI Sub I, LLC | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A E | $700,000.00 | $99.98 |
| 1WSCI Sub I, LLC | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A F | $700,000.00 | $100.00 |
| ABS IV Sub I, LLC | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A F | $905,000.00 | $100.00 |
| OWS Credit Opportunity Sub I, Ltd. | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A F | $9,504,000.00 | $100.00 |

194

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| One William Street Capital Master Fund Ltd | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A F | $14,985,000.00 | $100.00 |
| 1WS Credit Income Fund | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A E | $700,000.00 | $99.99 |
| OWS ABS IV, L.P. | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A E | $700,000.00 | $99.99 |
| OWS ABS Master Fund II, L.P. | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A E | $700,000.00 | $99.99 |
| One William Street Capital Master Fund Ltd | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A E | $4,200,000.00 | $99.99 |
| 1WSCI Sub I, LLC | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A F | $1,320,000.00 | $100.00 |
| ABS IV Sub I, LLC | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A F | $1,184,000.00 | $100.00 |
| OWS ABS Master Fund II, L.P. | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A F | $1,796,000.00 | $100.00 |
| OWS Credit Opportunity Sub I, Ltd. | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A F | $6,283,000.00 | $100.00 |
| OWS ABS | JPMorgan | Primary | 10/07/2024 | TAST | $13,697,000.00 | $100.00 |

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| Master Fund Ltd (Cayman) | n | | | 2024-3A F | | |
| One William Street Capital Master Fund Ltd | Barclays | Primary | 06/10/2025 | TAST 2025-2A E | $650,000.00 | $99.99 |
| OWS ABS Master Fund II, L.P. | Barclays | Primary | 06/10/2025 | TAST 2025-2A E | $400,000.00 | $99.99 |
| 1WS Credit Income Fund | Barclays | Primary | 06/10/2025 | TAST 2025-2A E | $400,000.00 | $99.99 |
| 1WS Credit Income Fund | Other | Secondary | 10/08/2024 | TAST 2024-3A E | $700,000.00 | $100.39 |
| One William Street Capital Master Fund Ltd | Other | Secondary | 06/10/2025 | TAST 2025-2A E | $300,000.00 | $101.13 |
| OWS ABS Master Fund II, L.P. | Other | Secondary | 06/10/2025 | TAST 2025-2A E | $100,000.00 | $101.13 |
| 1WS Credit Income Fund | Other | Secondary | 06/10/2025 | TAST 2025-2A E | $100,000.00 | $101.13 |
| One William Street | Other | Secondary | 06/10/2025 | TAST 2025-2A E | $300,000.00 | $101.19 |

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| Capital Master Fund Ltd | | | | | | |
| OWS ABS Master Fund II, L.P. | Other | Secondary | 06/10/2025 | TAST 2025-2A E | $100,000.00 | $101.19 |
| 1WS Credit Income Fund | Other | Secondary | 06/10/2025 | TAST 2025-2A E | $100,000.00 | $101.19 |
| One William Street Capital Master Fund Ltd | Other | Secondary | 06/11/2025 | TAST 2025-2A E | $400,000.00 | $101.25 |
| One William Street Capital Master Fund Ltd | Other | Secondary | 06/11/2025 | TAST 2025-2A E | $250,000.00 | $101.55 |
| One William Street Capital Master Fund Ltd | Other | Secondary | 08/01/2025 | TAST 2024-2A E | $1,295,000.00 | $104.18 |
| One William Street Capital Master Fund Ltd | Other | Secondary | 08/01/2025 | TAST 2024-2A F | $1,426,000.00 | $107.36 |
| One William | Other | Secondary | 08/01/2025 | TAST | $700,000.00 | $102.56 |

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| Street Capital Master Fund Ltd | | | | 2024-3A E | | |
| OWS ABS Master Fund Ltd (Cayman) | Other | Secondary | 08/01/2025 | TAST 2024-3A F | $700,000.00 | $102.97 |
| Clear Haven Total Return Partners LP | JPMorgan | Primary | 10/07/2024 | TAST 2024-3A F | $2,000,000.00 | $100.00 |
| California Insurance Company | JPMorgan | Primary | 06/10/2025 | TAST 2025-2A E | $250,000.00 | $100.00 |
| California Insurance Company | JPMorgan | Primary | 06/11/2025 | TAST 2025-2A E | $1,050,000.00 | $101.55 |
| California Insurance Company | Other | Secondary | 08/08/2025 | TAST 2025-1A D | $1,977,000.00 | $102.69 |
| Constitution Insurance Company | Other | Secondary | 08/08/2025 | TAST 2025-1A D | $3,000.00 | $102.69 |
| Texas Insurance Company | Other | Secondary | 08/08/2025 | TAST 2025-1A D | $20,000.00 | $102.69 |
| Clear Haven UMF Fund LP | Other | Secondary | 08/26/2025 | TAST 2025-1A D | $1,475,000.00 | $102.75 |
| Frost Credit | JPMorgan | Primary | 04/29/2022 | TAST | $1,000,000.00 | $99.50 |

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| Fund | n | | | 2022-1A F | | |
| Advisors' Inner Circle Fund II - Frost Total Return Bond Fund | JPMorgan | Primary | 04/29/2022 | TAST 2022-1A F | $4,000,000.00 | $99.50 |
| Frost Credit Fund | JPMorgan | Primary | 02/09/2023 | TAST 2023-1A F | $1,000,000.00 | $95.27 |
| Advisors' Inner Circle Fund II - Frost Total Return Bond Fund | JPMorgan | Primary | 02/09/2023 | TAST 2023-1A F | $11,910,000.00 | $95.27 |
| Frost Credit Fund | JPMorgan | Primary | 03/11/2025 | TAST 2025-1A E | $500,000.00 | $99.99 |
| Advisors' Inner Circle Fund II - Frost Total Return Bond Fund | JPMorgan | Primary | 03/11/2025 | TAST 2025-1A A | $7,000,000.00 | $100.00 |
| Hudson Cove Credit Opportunity Master Fund, L.P. | JPMorgan | Primary | 10/17/2024 | TAST 2024-3A D | $2,250,000.00 | $100.00 |
| Janus Henderson Securitized Income ETF | Barclays | Primary | 01/25/2024 | TAST 2024-1A C | $500,000.00 | $99.98 |
| Janus Henderson | Barclays | Primary | 01/25/2024 | TAST 2024-1A | $500,000.00 | $100.00 |

199

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| Securitized Income ETF | | | | D | | |
| Janus Henderson Multi-Sector Income Fund | Barclays | Primary | 01/25/2024 | TAST 2024-1A C | $1,850,000.00 | $99.98 |
| Janus Henderson Multi-Sector Income Fund | Barclays | Primary | 01/25/2024 | TAST 2024-1A D | $1,825,000.00 | $100.00 |
| Janus Henderson Securitized Income ETF | JPMorgan | Primary | 03/11/2025 | TAST 2025-1A C | $7,304,000.00 | $100.00 |
| Janus Henderson Securitized Income ETF | JPMorgan | Primary | 03/11/2025 | TAST 2025-1A D | $3,240,000.00 | $99.99 |
| Guardian Multi-Sector Bond VIP Fund | JPMorgan | Primary | 03/11/2025 | TAST 2025-1A C | $906,000.00 | $100.00 |
| Guardian Multi-Sector Bond VIP Fund | JPMorgan | Primary | 03/11/2025 | TAST 2025-1A D | $370,000.00 | $99.99 |
| Janus Henderson Mortgage-Backed Securities | Barclays | Primary | 01/25/2024 | TAST 2024-1A A | $3,500,000.00 | $99.99 |

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| ETF | | | | | | |
| Janus Henderson Mortgage-Backed Securities ETF | JPMorgan | Primary | 05/14/2024 | TAST 2024-2A A | $6,948,000.00 | $99.99 |
| Janus Henderson Securitized Income ETF | Other | Secondary | 03/07/2024 | TAST 2024-1A D | $1,000,000.00 | $101.28 |
| Janus Henderson Multi-Sector Income Fund | Other | Secondary | 03/07/2024 | TAST 2024-1A D | $1,320,000.00 | $101.28 |
| Janus Henderson Securitized Income ETF | Other | Secondary | 04/21/2025 | TAST 2025-1A C | $4,198,000.00 | $99.74 |
| Janus Henderson Income ETF | Other | Secondary | 04/21/2025 | TAST 2025-1A C | $802,000.00 | $99.74 |
| Janus Henderson Asset-Backed Securities ETF | Other | Secondary | 07/22/2025 | TAST 2024-1A A | $1,104,084.00 | $100.25 |
| Janus Henderson Securitized Income | Other | Secondary | 07/22/2025 | TAST 2024-1A A | $441,828.00 | $100.25 |

| Plaintiff | Seller | Primary / Secondary | Date | Notes Purchased | Current Face at Purchase ($) | Price |
|---|---|---|---|---|---|---|
| ETF | | | | | | |
| Janus Henderson Asset-Backed Securities ETF | Other | Secondary | 07/24/2025 | TAST 2024-1A D | $520,000.00 | $102.44 |
| Sagicor Life Insurance Company | JPMorgan | Secondary | 08/08/2024 | TAST 2024-1A A | $843,328.24 | $100.65 |
| Sagicor Life Insurance Company | Other | Secondary | 11/4/2024 | TAST 2024-3A D | $2,750,000.00 | $100.26 |
| Sagicor Life Insurance Company | Barclays | Secondary | 12/23/2024 | TAST 2024-2A C | $250,000.00 | $101.25 |
| Sagicor Life Insurance Company | Other | Secondary | 04/10/2025 | TAST 2024-3A D | $2,000,000.00 | $100.13 |