**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| One William Street Capital Master Fund Ltd., OWS ABS IV, L.P., OWS ABS IV Sub I, LLC, OWS ABS Master Fund, Ltd., OWS ABS Master Fund II, L.P., OWS Credit Opportunity I, LLC, OWS Credit Opportunity Sub I, Ltd., 1WS Credit Income Fund, 1WSCI Sub I, LLC, Clear Haven Investment Fund LP, Clear Haven Investments LLC, Clear Haven Total Return Partners LP, Clear Haven Ultra Short Investment Grade Bond Fund LP, Clear Haven UMF Fund LP, California Insurance Company, Constitution Insurance Company, Florida Casualty Insurance Company, Superior Risk Solutions (SAC) Ltd, Texas Insurance Company, Crescent II Fund, L.P., EF Securities LLC, Ellington Empire Fund LLC, Ellington M Credit Master Fund Ltd., Ellington Private Opportunities Main Master Fund III LP, Ellington Special Relative Value Fund LLC, St. Bernard Opportunity Fund I, Ltd., Advisors' Inner Circle Fund II - Frost Total Return Bond Fund, Frost Credit Fund, Hudson Cove Credit Opportunity Master Fund, L.P., Janus Henderson Asset-Backed Securities ETF, Janus Henderson Income ETF, Janus Henderson Mortgage-Backed Securities ETF, Janus Henderson Multi-Sector Income Fund, Janus Henderson Securitized Income ETF, Guardian Multi-Sector Bond VIP Fund, and Sagicor Life Insurance Company,<br><br>                    Plaintiffs,<br><br>-against-<br><br>JPMorgan Chase Bank, National Association, J.P. Morgan Securities LLC, Barclays Bank PLC, Barclays Capital Inc., Fifth Third Bank, National Association, and Fifth Third Securities, Inc.<br><br>                    Defendants. | Case No. 1:26-cv-01622 |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................4

      A.    Tricolor's Auto Loan Business And Warehouse-To-Securitization Pipeline..........4

      B.    Defendants' Information Access and Control Over The Securitization Pipeline ....................................................................................................................6

      C.    Tricolor Perpetrated A Pervasive, Multi-Year Fraud ............................................7

      D.    The 2022 Audit Warned Defendants That Tricolor Was Ripe For Fraud ..............8

      E.    The February 2024 CBIZ Audit Presented Clear Evidence Of Fraud ....................9

      F.    JPMorgan Abandoned Tricolor's IPO Based On The Same Red Flags ...............11

      G.    Following the CBIZ Report, Defendants Doubled The Pace Of Securitizations While Hedging Their Own Warehouse Exposure........................12

      H.    Defendants Made and Disseminated Materially False Offering Materials...........13

      I.    Plaintiffs Relied On Defendants' False Statements ..............................................15

      J.    Tricolor's Collapse And Revelation Of The Fraud...............................................15

ARGUMENT ........................................................................................................................17

I.    The First Amended Complaint Adequately Alleges Federal Securities Fraud.................18

      A.    Plaintiffs Have Pleaded A Strong Inference of Scienter.......................................18

      B.    The Fraudulent Statements Are Properly Attributable To Defendants..................37

      C.    The FAC Alleges Actionable Misrepresentations and Omissions.........................41

      D.    Plaintiffs Relied On Defendants' Fraudulent Statements .....................................44

      E.    Defendants Are Also Liable For Rule 10b-5(a) and (c) Scheme Liability............46

      F.    The FAC Adequately Alleges Securities Fraud Against Fifth Third Securities.................................................................................................................51

II.    Supplemental Jurisdiction Over The State Law Claims Is Proper....................................52

III.    The First Amended Complaint Adequately Alleges The State Law Claims .....................52

A.     The FAC States Common Law Fraud Claims ........................................................52

B.     The FAC States Blue Sky Law Claims................................................................52

C.     The FAC States Fraudulent Transfer Claims.......................................................58

CONCLUSION....................................................................................................................70

# TABLE OF AUTHORITIES

**Page**

**Cases**

*2 3 Suited, LLC v. Patel,*
2025 WL 2461151 (S.D. Fla. Mar. 10, 2025)...................................................................55

*In re A.W. Lawrence & Co.,*
346 B.R. 51 (N.D.N.Y. 2006) .........................................................................................60

*In re Amp'd Mobile,*
404 B.R. 118 (Bankr. D. Del. 2009) ...............................................................................69

*Anwar v. Fairfield Greenwich Ltd.,*
728 F. Supp. 2d 372 (S.D.N.Y. 2010)..............................................................................44

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).........................................................................................................17

*Ashland Inc. v. Morgan Stanley & Co.,*
652 F.3d 333 (2d Cir. 2011).............................................................................................46

*In re AstraZeneca plc Securities Litigation,*
2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022)..................................................................42

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87 (2d Cir. 2007)...........................................................................................18, 19

*August v. August,*
2009 WL 458778 (Del. Ch. Feb. 20, 2009) .....................................................................69

*B.E.L.T., Inc. v. Wachovia Corp.,*
403 F.3d 474 (7th Cir. 2005) ...........................................................................................66

*Baron v. Strassner,*
7 F. Supp. 2d 871 (S.D. Tex. 1998) .................................................................................57

*In re Bear Stearns Cos., Inc. Sec. Litig.,*
763 F. Supp. 2d 423 (S.D.N.Y. 2011)..............................................................................25

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007).........................................................................................................17

*Black Diamond Fund, LLLP v. Joseph,*
211 P.3d 727 (Colo. App. 2009)......................................................................................53

*Boca Raton Firefighters v. Bahash,*
506 F. App'x 32 (2d Cir. 2012) .......................................................................................42

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*,
    838 F.2d 890 (7th Cir. 1988) ....................................................................................70

*Bos. Trading Grp., Inc. v. Burnazos*,
    835 F.2d 1504 (1st Cir. 1987) ...................................................................................66

*Brand Engagement Network, Inc. v. AFG Companies, Inc.*,
    2026 WL 658521 (S.D.N.Y. Mar. 9, 2026) ...............................................................56

*Caiola v. Citibank, N.A., New York*,
    295 F.3d 312 (2d Cir. 2002)................................................................................25, 44

*In re Cannavest Corp. Secs. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)........................................................................19

*Cassirer v. Herskowitz (In re Schick)*,
    234 B.R. 337 (Bankr. S.D.N.Y. 1999)........................................................................59

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996)......................................................................................24

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)..................................................................27, 35

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)........................................................................19

*City of Warren Police & Fire Retirement System v. World Wrestling
    Entertainment, Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020)........................................................................23

*In re CL H Winddown LLC*,
    2023 WL 5740195 (Bankr. D. Del. Sept. 5, 2023) ....................................................66

*Contemporary Indus. Corp. v. Frost*,
    2001 WL 34630639 (Bankr. D. Neb. Feb. 14, 2001) ................................................64

*In re Cool Springs LLC*,
    657 B.R. 767 (Bankr. D. Del. 2024) ..........................................................................59

*Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.*,
    879 F.3d 79 (3d Cir. 2018)........................................................................................65

*Defer LP v. Raymond James Fin., Inc.*,
    2010 WL 3452387 (S.D.N.Y. Sept. 2, 2010).............................................................18

*Dexia SA/NV v. Bear, Stearns & Co.*,
    929 F. Supp. 2d 231 (S.D.N.Y. 2013)..................................................................39, 46

iv

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   847 F. Supp. 2d 624 (S.D.N.Y. 2012) ........................................................................22, 28, 51

*E. F. Hutton & Co. v. Rousseff*,
   537 So. 2d 978 (Fla. 1989) ...................................................................................................54

*E.L.A. v. Abbott House*,
   2018 WL 3104632 (S.D.N.Y. Mar. 27, 2018) ......................................................................52

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
   551 F.Supp.2d 210 (S.D.N.Y. 2008) ....................................................................................41

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) .............................................................................57, 58

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   761 F. Supp. 2d 504 (S.D. Tex. 2011) ..................................................................................57

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ..................................................................................50

*In re Fannie Mae 2008 Sec. Litig.*,
   891 F. Supp. 2d 458 (S.D.N.Y. 2012) ..................................................................................40

*Fed. Deposit Ins. Corp. v. RBS Acceptance Inc.*,
   611 F. Supp. 3d 1089 (D. Colo. 2020) .................................................................................53

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*,
   902 F. Supp. 2d 476 (S.D.N.Y. 2012) ..................................................................................52

*FIH, LLC v. Found. Capital Partners LLC*,
   920 F.3d 134 (2d Cir. 2019) .................................................................................................44

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*,
   376 F. Supp. 2d 385 (S.D.N.Y. 2005), *as amended* (July 6, 2005) .....................................52

*Gabriel Cap., L.P. v. NatWest Fin., Inc.*,
   94 F. Supp. 2d 491 (S.D.N.Y. 2000) ...........................................................................28, 30, 41

*In re Giant Gray, Inc.*,
   629 B.R. 814 (Bankr. S.D. Tex. 2020) .................................................................................64

*Gimpel v. The Hain Celestial Grp., Inc.*,
   156 F.4th 121 (2d Cir. 2025) ................................................................................................29

*Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*,
   617 B.R. 496 (Bankr. D. Del. 2020) .....................................................................................65

*In re Glob. Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004)...................................................................19

*In re Glob. Cord Blood Corp. Secs. Litig.*,
   2026 WL 444770 (S.D.N.Y. Feb. 17, 2026)...........................................................49

*Grippo v. Perazzo*,
   357 F.3d 1218 (11th Cir. 2004) ...........................................................................54

*Hanson v. Frazer*,
   2013 WL 5372749 (S.D.N.Y. Sept. 24, 2013)........................................................29

*Hayes v. U.S. (In re Applied Machinery Rentals, LLC)*,
   670 B.R. 452 (W.D.N.C. 2025) ............................................................................60

*In re HH Liquidation, LLC*,
   590 B.R. 211 (Bankr. D. Del. 2018) .....................................................................65

*Holliday v. Credit Suisse Sec. (USA) LLC*,
   2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021).........................................................63

*In re Housecraft Indus. USA, Inc.*,
   310 F.3d 64 (2d Cir. 2002)...................................................................................68

*IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*,
   408 F.3d 689 (11th Cir. 2005) .............................................................................64

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   154 F. Supp. 2d 741 (S.D.N.Y. 2001)....................................................................23

*In re Initial Pub. Offering Secs. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)...............................................................41, 42

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)......................................................................................37, 53

*In re Jevic Holding Corp.*,
   2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ...........................................62, 63

*In re Joy Recovery Tech. Corp.*,
   286 B.R. 54 (Bankr. N.D. Ill. 2002) ......................................................................67

*KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*,
   528 F. Supp. 3d 192 (S.D.N.Y. 2021)....................................................................45

*Kubbernus v. ECAL Partners, Ltd.*,
   574 S.W.3d 444 (Tex. App. 2018).........................................................................56

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
    478 F. App'x 679 (2d Cir. 2012) ...................................................................23, 24

*In re Livent, Inc. Noteholder Sec. Litig.*,
    174 F. Supp. 2d 144 (S.D.N.Y. 2001)......................................................20, 22, 23

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)...................................................................36

*In re Longtop Fin. Techs. Ltd. Secs. Litig.*,
    939 F. Supp. 2d 360 (S.D.N.Y. 2013)...................................................................29

*Lorenzo v. S.E.C.*,
    587 U.S. 71 (2019)................................................................................................47, 49

*Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd sub nom. In re Lululemon Sec.*
    *Litig.*, 604 F. App'x 62 (2d Cir. 2015)...................................................................25

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)................................................................................................43, 44

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006).................................................................................................50

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
    541 F. Supp. 2d 986 (S.D. Ohio 2007) ...............................................21, 30, 41, 45

*In re Nat'l Century Fin. Enters., Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012), *adhered to on denial of*
    *reconsideration sub nom. Crown Cork & Seal Co. Master Ret. Tr. v. Credit*
    *Suisse First Bos. Corp.*, 2013 WL 490717 (S.D.N.Y. Feb. 6, 2013).................39, 55

*In re NewStarcom Holdings*,
    608 B.R. 614 (D. Del. 2019)..........................................................................63, 64, 65

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,
    813 F.2d 1177 (11th Cir. 1987) ............................................................................70

*Noriega v. Abbott Lab'ys*,
    714 F. Supp. 3d 453 (S.D.N.Y. 2024)...................................................................51

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)......................................................................19, 24, 25, 26

*O'Cheskey v. Hous. for Texans Charitable Tr. (In re Am. Hous. Found.)*,
    2012 WL 5430988 (Bankr. N.D. Tex. Nov. 7, 2012) ..........................................59

vii

*Oklahoma Firefighters Pension & Ret. Sys. v. Musk*,
779 F. Supp. 3d 396 (S.D.N.Y. 2025)................................................................46, 47

*In re ONH AFC CS Invs., LLC*,
2026 WL 312892 (Bankr. D. Del. Feb. 4, 2026) ....................................................64

*In re Optimal U.S. Litig.*,
837 F. Supp. 2d 244 (S.D.N.Y. 2011).............................................................52, 53

*In re Opus E. LLC*,
698 F. App'x 711 (3d Cir. 2017) .............................................................................67

*Orr v. Kinderhill Corp.*,
991 F.2d 31 (2d Cir. 1993)................................................................................62, 63

*Pac. Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*,
603 F.3d 144 (2d Cir. 2010)....................................................................................49

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021).........................................................55

*Parks v. FIA Card Servs., N.A. (In re Marshall)*,
550 F.3d 1251 (10th Cir. 2008) ..............................................................................59

*Penn. Public Sch. Empls. Retirement System v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012)......................................................................36

*Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*,
500 B.R. 371 (Bankr. S.D.N.Y. 2013).....................................................................62

*In Re Philip Morris Int'l Inc. Sec. Litig.*,
89 F.4th 408 (2d Cir. 2023) .....................................................................................43

*Pinnacle Oil Co. v. Triumph Okla., LP*,
1997 WL 362224 (S.D.N.Y. June 27, 1997) .....................................................57, 58

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .......................................................................................44

*Puchtler v. Barclays PLC*,
2025 WL 887502 (S.D.N.Y. Mar. 21, 2025).............................................................24

*In re Puda Coal Sec. Inc., Litig.*,
30 F. Supp. 3d 261 (S.D.N.Y. 2014)..........................................................30, 38, 39

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*,
357 F. App'x 393 (2d Cir. 2009)..............................................................................23

*In re Refco Inc. Sec. Litig.*,
   2011 WL 13168427 (S.D.N.Y. July 5, 2011) ...................................................................69, 70

*S.E.C. v. Amah*,
   2023 WL 6386956 (S.D.N.Y. Sept. 28, 2023), *aff'd in part, vacated in part*,
   2026 WL 504794 (2d Cir. Feb. 24, 2026)................................................................................47

*S.E.C. v. Kelly*,
   817 F. Supp. 2d 340 (S.D.N.Y. 2011)....................................................................................49

*S.E.C. v. Medallion Fin. Corp.*,
   2024 WL 4227753 (S.D.N.Y. Sept. 18, 2024)........................................................................48

*S.E.C. v. Passos*,
   760 F. Supp. 3d 95 (S.D.N.Y. 2024)......................................................................................47

*S.E.C. v. Rio Tinto plc*,
   41 F.4th 47 (2d Cir. 2022) .............................................................................................47, 50

*S.E.C. v. Rogas*,
   2024 WL 1120558 (S.D.N.Y. Mar. 14, 2024) .......................................................................48

*S.E.C. v. Sason*,
   433 F. Supp. 3d 496 (S.D.N.Y. 2020)....................................................................................48

*S.E.C. v. SeeThruEquity, LLC*,
   2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019).........................................................................49

*S.E.C. v. Terraform Labs Pte. Ltd.*,
   684 F. Supp. 3d 170 (S.D.N.Y. 2023)..............................................................17, 18, 25, 46

*In re Sabine Oil and Gas Corp.*,
   547 B.R. 503 (Bankr. S.D.N.Y. 2016)....................................................................................62

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024).....................................................................................26

*Saracheck v. Crown Heights House of Glatt, Inc. (In re Agriprocessors, Inc.)*,
   521 B.R. 292 (Bankr. N.D. Iowa 2014) ..................................................................................66

*Schmidt v. Fleet Bank*,
   1998 WL 47827 (S.D.N.Y. Feb. 4, 1998)...............................................................................23

*Scott v. ZST Dig. Networks, Inc.*,
   896 F. Supp. 2d 877 (C.D. Cal. 2012) ...................................................................................39

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   2023 WL 3964150 (Bankr. S.D.N.Y. June 12, 2023)............................................................61

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
    655 B.R. 149 (Bankr. S.D.N.Y. 2023) .................................................................. 64

*Set Capital LLC v. Credit Suisse Group AG*,
    996 F.3d 64 (2d Cir. 2021) .................................................................................... 43

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ......................................................... 27, 38, 39

*In re Sharp Int'l Corp.*,
    403 F.3d 43 (2d Cir. 2005) .................................................................................... 66

*Shriners Hosps. for Child. v. Qwest Commc'ns Int'l Inc.*,
    2005 WL 2350569 (D. Colo. Sept. 23, 2005) ....................................................... 53

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ............................................................. 57, 58

*Solow v. Citigroup, Inc.*,
    827 F. Supp. 2d 280 (S.D.N.Y. 2011) .................................................................. 36

*Stanley S. & Millicent R. Barasch Living Tr. et al. v. GPB Cap. Holdings, LLC et al.*,
    2021 WL 12414217 (W.D. Tex. Aug. 25, 2021) .................................................... 58

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
    704 F. Supp. 3d 429 (S.D.N.Y. 2023) ............................................................. 17, 18

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
    2023 WL 4744197 (S.D.N.Y. July 25, 2023) .................................... 18, 19, 24, 41

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ............................................................................ 36, 52

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................... 19, 27, 31

*Thomas v. Shiloh Indus., Inc.*,
    2017 WL 2937620 (S.D.N.Y. July 7, 2017) ......................................................... 37

*Tradeshift, Inc. v. Smucker Servs. Co.*,
    2021 WL 4463109 (S.D.N.Y. Sept. 29, 2021) ...................................................... 23

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ..................................................................... 67

x

*United States v. O'Hagan*,
    521 U.S. 642 (1997)................................................................................................50

*In re Vivendi, S.A. Securities Litigation*,
    838 F.3d 223 (2d Cir. 2016)...................................................................................42

*Warner Theatre Assocs. Ltd. P'Ship v. Metro Life Ins. Co.*,
    149 F.3d 134 (2d Cir. 1998)...................................................................................44

*In re Wickes Tr.*,
    2008 WL 4698477 (Del. Ch. Oct. 16, 2008) ..........................................................66

*Willis v. Marshall*,
    401 S.W.3d 689 (Tex. App. 2013)..........................................................................58

*Wohlstein v. Aliezer*,
    321 S.W.3d 765 (Tex. App. 2010)..........................................................................69

## Statutes and Regulations

6 Del. C. § 1302(a)..................................................................................................66

6 Del. C. § 1308 .................................................................................................64, 68

6 Del. C. § 1308(c)...................................................................................................68

15 U.S.C. § 77k........................................................................................................30

15 U.S.C. § 77*l*..............................................................................................54, 55, 56

15 U.S.C. § 78j(b)....................................................................................................18

15 U.S.C. § 78u-4(b)......................................................................................18, 41, 52

17 C.F.R. § 240.10b-5.......................18, 38, 39, 45, 47, 48, 50, 51, 53, 54

11 U.S.C. § 550.......................................................................................................64

Co. Rev. Stat. § 11-51-501(1)(b) ........................................................................52, 53

Co. Rev. Stat. § 11-51-604.................................................................................53, 54

Fla. Stat. § 517.211(2)..............................................................................................54

Fla. Stat. § 517.301 .............................................................................................54, 55

N.J.S.A. 49:3-71(a)(2) .............................................................................................55

N.J.S.A. 49:3-71(d)..................................................................................................55

Tex. Bus. & Com. Code § 24.003 ..................................................................................66

Tex. Bus. & Com. Code § 24.009 ..............................................................................64, 68

Tex. Gov't Code § 4008.052 ........................................................................................56

Tex. Gov't Code § 4008.055(c) ................................................................................57, 58

## Other Authorities

Anna Gelpern & Adam J. Levitin, *Rewriting Frankenstein Contracts*, 82 S. Cal.
    L. Rev. 1075, 1098 (2009) .....................................................................................68

## PRELIMINARY STATEMENT[1]

This case arises from a massive auto-loan securitization fraud made possible by Defendants' decision to ignore explicit, repeated warnings of widespread data manipulation at Tricolor and to push billions of dollars of tainted asset-backed securities into the market anyway. From 2022 through 2025, Defendants—Tricolor's largest warehouse lenders and the underwriters of every Tricolor securitization—structured, marketed, and sold seven Tricolor Auto Securitization Trusts (the Tricolor "Trusts" or "Securitizations") to Plaintiffs and other institutional investors. Two professional due diligence reviews, conducted in 2022 and 2024, advised Defendants in unmistakable terms that Tricolor's loan data was fundamentally impaired, its internal controls were broken, and its management was actively obstructing diligence. JPMorgan's own equity capital markets team agreed: it walked away from Tricolor's planned initial public offering ("IPO") over the very same concerns. Defendants' investment banking and credit teams—on the hook for over $750 million of warehouse exposure that could be repaid only through the securitization pipeline—made a different choice. They concealed what they knew, accelerated the pace of securitizations, and enhanced their own warehouse position by selling subordinate "mezzanine" warehouse loans to unsuspecting third parties, until a junior analyst at one of those third parties noticed in August 2025 what Defendants had known for years. No longer able to sweep Tricolor's fraudulent conduct under the rug, Defendants shut their warehouse lines, and Tricolor collapsed within weeks.

The FAC establishes federal and state securities law claims and state common law fraud claims. Defendants concede, as they must, the falsity of the bulk of the misrepresentations

---

[1] All terms not defined herein have the meaning ascribed to them in the First Amended Complaint ("FAC") (ECF No. 86).

contained in the Offering Memoranda—comprised of inaccurate descriptions of loan pool characteristics and recovery data. Defendants acted with scienter. They structured, underwrote, and sold each Securitization with knowledge that Tricolor's data was fundamentally impaired and they were at least willfully blind to the extent of Tricolor's actual fraud. In its 2024 report, CBIZ— the auditor Defendants retained to review Tricolor's operations—confirmed concerns raised in the 2022 audit and told Defendants in no uncertain terms that Tricolor's loan data contained pervasive inaccuracies. Undeterred, Defendants plowed ahead with selling the Securitizations without disclosing the known and pervasive inaccuracy of the loan data used to describe the loan pool characteristics in the offering materials. Defendants had motive and opportunity to commit this fraud—digging themselves out of the $750 million in warehouse loan exposure they held when CBIZ delivered the 2024 report. Defendants acted on these incentives, protecting themselves at the expense of innocent third parties with actual knowledge that the offering materials they created, controlled, and disseminated were based on inaccurate data and with reckless disregard for the actual facts about Tricolor's massive, underlying fraud. Defendants' arguments to the contrary misrepresent the FAC's allegations and controlling caselaw, improperly cherry-picking each "red flag" in isolation, and ignore the clear import of the audits' findings.

Defendants' other arguments for dismissal of Plaintiffs' federal securities claims are unavailing. Because Defendants prepared and controlled the content and distribution of each Offering Memorandum, and they were the party selling the securities offered thereunder, Defendants were the makers of the false statements in each Offering Memorandum. And because the Offering Memoranda were the only source of loan collateral information available to investors, Plaintiffs easily satisfy reliance. Finally, the FAC also pleads Rule 10b-5(a) and (c) scheme liability claims: Defendants disseminated the admittedly false and misleading Offering

2

Memoranda and otherwise facilitated each Securitization by structuring, marketing, and selling the Notes. These same factual allegations also establish Plaintiffs' state law claims.

Defendants' argument for dismissal of the fraudulent transfer claims fares no better. To create the Securitizations, the Tricolor Trusts paid nearly $2 billion to the warehouse SPVs to purchase auto loan receivables that served as collateral for the Tricolor Trusts' obligations to their respective Noteholders, including the Plaintiffs. Those purchases were fraudulent transfers: the Tricolor Trusts transferred money to buy impaired, double-pledged, and fictitious receivables. Plaintiffs may recover the fraudulently transferred funds from the Lender Defendants as subsequent transferees.

Defendants attempt to recast the fraudulent transfer claims as fraudulent inducement claims, whereby Plaintiffs challenge the fraud that induced them to purchase the Notes from the Tricolor Trusts in the first instance, rather than the Trusts' transfers. Not so. Plaintiffs do, of course, assert statutory and common law fraud claims rooted in their Notes purchases. But the fraudulent transfer claims, in contrast, are appropriately asserted by Plaintiffs in their capacities as creditors of the Trusts, and seek recovery based on the Trusts' cash transfers in exchange for impaired and fraudulent receivables, as part of the scheme orchestrated by Tricolor's executives.

Defendants' effort to avoid liability by pointing to the Depositor and Tricolor Servicer as intermediate entities in these overarching transactions ignores the economic substance of the transactions, which controls under the case law. The transferred funds—raised through the issuance of the Tricolor Trust Notes and used to purchase receivables to serve as collateral for those Notes—plainly were property of the Trusts. The Depositor and Tricolor Servicer were mere conduits with no dominion or control over the Notes, cash, or receivables, which they were required to instantaneously relinquish in order to effectuate the Trusts' acquisition of the impaired

3

and fraudulent receivables, thereby rendering each Trust balance-sheet insolvent, inadequately capitalized, and unable to pay their debts as they came due at inception. Also, the collapsing doctrine plainly applies: each securitization step was interdependent, simultaneous, and designed to effectuate these transactions.

The warehouse SPVs subsequently transferred the funds to the Lender Defendants, to pay down the Lender Defendants' warehouse loans. The Trusts were not obligors on this debt, and thus received no benefit whatsoever from the payments. And the Lender Defendants knew, or should have known, that the payments derived from the Trusts' purchases of impaired and fraudulent receivables left the Trusts in an untenable financial condition. The FAC's allegations thus satisfy every element of both actual and constructive fraudulent transfer under Delaware and Texas law, and state claims for the recovery of the transferred funds from the Lender Defendants.

In light of the foregoing, and as set forth more fully below, Plaintiffs respectfully request that Defendants' motion to dismiss be denied in its entirety.

## BACKGROUND

### A.    Tricolor's Auto Loan Business And Warehouse-To-Securitization Pipeline

Tricolor operated a chain of "buy-here, pay-here" used-car dealerships in Texas, Arizona, and California, primarily targeting Hispanic borrowers with poor or no credit history. FAC ¶ 56. Tricolor provided sub-prime auto loans to finance car purchases at its dealerships. *Id*. Tricolor funded new loans through revolving warehouse lines extended by the Lender Defendants. FAC ¶ 57. To draw on the warehouse lines, Tricolor used a series of "warehouse SPVs" that acquired the auto loans Tricolor originated—along with the underlying vehicles and any loan proceeds—as collateral for the warehouse loans. *Id*. JPMorgan opened its warehouse facility (SPV 4) with Tricolor in 2020; Barclays opened its facility (SPV 5) in 2021; and the two banks merged their warehouse lines in 2023, with SPV 4 surviving as the consolidated facility and growing to a $777

4

million commitment.  FAC ¶ 73.  Fifth Third opened its warehouse facility (SPV 6) in 2022, which grew to a $250 million commitment.  *Id.*  Thus, Defendants collectively committed more than $1 billion to finance Tricolor's loan originations by the time Tricolor's fraud unraveled.  FAC ¶ 123.

Tricolor repaid the warehouse facilities primarily from the proceeds of asset-backed securitizations that Defendants themselves structured, underwrote, and sold to investors.  FAC ¶¶ 69–70, 123.  Once Tricolor had originated a sufficient volume of loans, Defendants pooled the receivables and sold them through seven Tricolor Auto Securitization Trusts (the "TASTs" or "Trusts") issued between April 2022 and June 2025: TAST 2022-1; TAST 2023-1; TAST 2024-1; TAST 2024-2; TAST 2024-3; TAST 2025-1; and TAST 2025-2.  FAC ¶ 51.  JPMorgan served as Bookrunner and Structuring Agent for five of the seven Trusts; Barclays served in that role for the other two.  FAC ¶¶ 51, 74.  For each Trust where JPMorgan or Barclays, respectively, did not serve as Bookrunner and Structuring Agent, it served as Joint Bookrunner or Co-Manager.  *Id.*  Fifth Third served as Co-Manager for five of the seven Trusts.  *Id.*

Each Trust sold Notes to investors and used the proceeds to purchase receivables from the warehouse SPVs; the warehouse SPVs, in turn, used those proceeds to pay down the warehouse loans.  FAC ¶¶ 64–65, 69, 92.  Specifically: (i) the Trusts, operating under the sole and absolute control of Tricolor Servicer and through the Depositor, sold Notes to investors, with the Underwriter Defendants marketing the Notes and soliciting investors; (ii) the Trusts, again acting through the Depositor, transferred the cash raised from Notes sales through Tricolor Servicer to the warehouse SPVs; and (iii) in exchange, the warehouse SPVs transferred the receivables through Tricolor Servicer and the Depositor to the Tricolor Trusts, which held the receivables as collateral for the Notes.  FAC ¶ 64.  These steps occurred simultaneously as part of a single

5

integrated transaction designed to effectuate the warehouse SPVs' sale of the receivables to the Trusts. *Id.*

Tricolor Servicer and the Depositor acted as mere conduits for the transfers between the Trusts and warehouse SPVs. FAC ¶ 65. They never had dominion or control over either the Notes sale proceeds or the receivables themselves. *Id.* To the contrary, the governing agreements required the Depositor to immediately transfer the Notes sale proceeds to Tricolor Servicer, and Tricolor Servicer to immediately transfer those funds to the warehouse SPVs. *Id.* Similarly, the agreements required Tricolor Servicer to immediately transfer the receivables to the Depositor, and the Depositor to immediately transfer those receivables to the Tricolor Trusts. *Id.* In other words, while Notes sale proceeds and receivables passed, on paper, through Tricolor Servicer and the Depositor, in economic reality, the Trusts transferred Notes sale proceeds to the warehouse SPVs in exchange for the receivables. *Id.* Across the seven Securitizations, the Underwriter Defendants raised over $1.8 billion that went to the Lender Defendants. FAC ¶¶ 52, 268.

**B.      Defendants' Information Access and Control Over The Securitization Pipeline**

In their dual roles as warehouse lenders and underwriters, Defendants had access to "troves" of loan-level information unavailable to investors. FAC ¶¶ 75, 77. As warehouse lenders, Defendants received "borrowing base reports" multiple times per month, containing detailed entries for every loan pledged to their facilities, including outstanding principal balance, vehicle identification number ("VIN"), and delinquency status. *Id.* ¶ 75. They also received monthly servicer reports with loan-level information on collections, payment activity, and delinquency. *Id.* ¶¶ 75, 103. And as administrative agents for SPV 4 and SPV 6, JPMorgan and Fifth Third had express authority to audit Tricolor's loan files and internal controls, and were required to share the audit results with all participating warehouse lenders. FAC ¶¶ 76, 113.

Tricolor wholly depended on Defendants for both its warehouse financing and the monetization of those warehouse loans through the securitization pipeline. Defendants exercised absolute and complete control over the securitizations that they structured and sold for Tricolor because Tricolor lacked the in-house expertise and credibility to do it themselves and because Defendants had the "ability to shut down Tricolor's business at any time by pulling their warehouse lending facilities," which they ultimately did in September 2025. *See, e.g.*, FAC ¶¶ 78, 82. Defendants prepared and controlled the content of the offering materials for each Trust, including the Offering Memoranda, deal roadshow presentations, and Underwriting Models, marketed and sold the Notes for each Trust, and had sole responsibility for disseminating the offering materials to investors. *See, e.g.*, FAC ¶¶ 79–80, 82.

### C.    Tricolor Perpetrated A Pervasive, Multi-Year Fraud

Behind the steady drumbeat of securitizations was a brazen, multi-year fraud. FAC ¶¶ 1, 83. Tricolor double-pledged single auto loans as collateral on multiple credit lines and securitizations. FAC ¶¶ 84–85. The Chapter 7 Trustee in Tricolor's bankruptcy conducted a forensic analysis and identified at least 31,408 double-pledged loans representing at least $547,928,874 of falsely reported collateral value. FAC ¶ 84. In a "particularly flagrant" instance, Tricolor caused TAST 2025-2 to include 3,225 receivables—more than 25% of TAST 2025-2's collateral pool—that were *simultaneously* reported as owned by TAST 2022-1. FAC ¶ 86. "[A]cting as lead underwriters on both transactions," Barclays and JPMorgan affirmatively represented in the TAST 2025-2 Offering Memorandum that each receivable was unencumbered and freely assignable when in fact the receivables were not available because they were already owned by another Trust. *See id.*; FAC App. VII ¶ 18. "Had anyone checked the VINs listed for the securitization collateral against the VINs listed for the warehouse loan collateral, Tricolor's

7

fraud would have been obvious." FAC ¶ 85. Instead, Defendants did nothing, despite their knowledge that Tricolor's loan data was fundamentally impaired. FAC ¶¶ 121–22.

In addition, Tricolor purported to transfer entirely fictitious loans—loans backed by VINs found nowhere in Tricolor's finance receivable records—to its lenders and the Trusts. FAC ¶ 87. The Trustee identified at least 6,960 such fictitious loans, representing at least $135,488,888 of non-existent loan collateral. *Id.* Together with the double-pledged loans, the fraud inflated the value of Tricolor's purported loan collateral by at least $683 million—roughly 31% of the $2.2 billion of receivables that Noteholders were told would be held by the Trusts. FAC ¶¶ 84, 87, 274. By August 2025, the gap between the collateral the Trusts reportedly held ($2.2 billion) and the collateral actually held ($1.4 billion) reached $800 million. FAC ¶ 88.

### D.    The 2022 Audit Warned Defendants That Tricolor Was Ripe For Fraud

The risk of fraud at Tricolor was apparent for years. FAC ¶ 97. A 2022 audit delivered to JPMorgan identified pervasive "internal control weaknesses related to collateral, servicing, [and] collections," and found "[n]o controls to ensure reconciling items are addressed in a timely manner" and "[i]nsufficient controls surrounding inventory," with "errors identified within inventory such as lack of controls to identify needed reclassifications from inventory to charge offs, inventory recorded to the general ledger that the Company did not have possession of, and lack of review of repossession related accounts to ensure proper accounting and valuation of repossessions." *Id.* The audit concluded that these issues "*could result in material misstatements due to error or fraud.*" *Id.* (emphasis added). The Underwriter Defendants thus knew that Tricolor's data was fundamentally impaired, were directly warned of the risk of fraud, and yet continued to provide warehouse financing and securitization underwriting. *Id.*

### E.    The February 2024 CBIZ Audit Presented Clear Evidence Of Fraud

In or around September 2023, after JPMorgan and Barclays consolidated their warehouse facilities, JPMorgan exercised its audit rights under the SPV 4 Credit Agreement and engaged CBIZ MHM, LLC ("CBIZ") to conduct due diligence on Tricolor.  FAC ¶ 98; CBIZ Report (ECF No. 83-4) 3 (report prepared in connection with due diligence "for the existing extension of credit, be it through a warehouse line of credit, term loan, securitization, or other means").  The audit dragged on for over five months as Tricolor "repeatedly obstructed and evaded CBIZ's efforts to perform the agreed-upon due diligence procedures."  FAC ¶ 98.  And when CBIZ flagged the ongoing problems, "JPMorgan management instructed CBIZ to limit its agreed-upon procedures rather than supporting CBIZ in obtaining answers to numerous open and concerning issues."  *Id.*

On the procedures CBIZ did complete, the results were "startling, and further confirmed the 2022 audit's alarming findings."  *Id.*  A two-day cash test exposed a fundamental disconnect between reported and actual cash collections: 49% of payments received on January 12, 2024, and 32% of payments received on January 24, 2024, were deposited into accounts that did not belong to SPV 4, with variances reaching nearly 65% in some months.  FAC ¶ 103.  Similarly, a cash-application test was unable to reconcile cash for 20% of tested accounts, in part because Tricolor refused to provide any payment information.  FAC ¶ 104.  Tricolor admitted that it did not even track actual principal collections and instead "backed into" them from a chosen ending balance, allowing it to "make up whatever principal collections fit its borrowing needs."  FAC ¶ 106.

The fundamental infirmities in Tricolor's data did not end there.  An aging test found that 16% of the loan sample and 44% of the delinquent loans tested were incorrectly reported, including listing ineligible loans as eligible and repossessed loans as outstanding.  FAC ¶ 99.  CBIZ thus recommended that JPMorgan "follow up with management to discuss the reason for these discrepancies *and discuss the ultimate accuracy of the data tapes provided by* [Tricolor]"—a

9

"troubling remark CBIZ repeated multiple times throughout the report." *Id*. (emphasis added). Likewise, an age-shifting test found that 20% of the loans tested—and 63% of those more than two weeks delinquent—were not properly aged, with no documented basis for Tricolor's purported (unwritten) aging policy. FAC ¶ 100. To that end, an expired-accounts test revealed that *every single one* of 90 accounts more than 90 days past maturity was listed as current and treated as eligible collateral, despite many having gone unpaid for months or years. FAC ¶ 102. And finally, a charge-off test revealed that recorded recoveries on charged-off loans were not actual recoveries at all; they were "an accounting entry, reflecting an index-based wholesale price." FAC ¶ 101. This testing found reported recoveries on charged-off accounts where the *vehicle was never recovered*, with SPV 4 receiving supposed recoveries from "an unidentified source." *Id.* CBIZ confirmed that this practice would "skew any analysis performed to determine expected recoveries." FAC ¶ 105. JPMorgan management nevertheless cut off CBIZ's investigation by waiving "much of the repossession testing." *Id*.

Importantly, the agreed-upon procedures expressly directed CBIZ to test for double-pledging by preparing a schedule of accounts with duplicate VINs, identifying any double-pledging, and contacting the lead Managing Director in JPMorgan's Credit Risk Group to discuss findings. FAC ¶ 108. Because CBIZ found that reported cash was untethered to actual collections—an anomaly most obviously explained by double-pledging—this inquiry took on even greater importance. But the analysis never happened because Tricolor refused to provide the master servicer report required to perform any meaningful testing. FAC ¶ 109. CBIZ recorded the obstruction directly in its report. *Id.* As the FAC alleges, "Tricolor's refusal to cooperate with a double-pledging investigation—by its largest warehouse lender by a wide margin—should have

10

been a five-alarm fire," but Defendants instead "turned a blind eye" and "simply abandoned the double-pledging inquiry altogether."  FAC ¶¶ 109, 121.

In sum, the CBIZ report confirmed "in multiple ways" that Tricolor's data was fundamentally impaired, raising a substantial risk of fraud.  *See, e.g.*, FAC ¶¶ 107, 110.  The report was addressed to Alan English, an Executive Director in JPMorgan's ABS conduit and securitization banking group, and was shared with personnel in JPMorgan's credit department and their counterparts at Barclays.  FAC ¶ 111.  Mr. English in turn worked closely with those "responsible for managing the overall Tricolor relationship," including JPMorgan Executive Director Brian Honda and Managing Director Billy Wong.  *Id.*  As administrative agent for SPV 6, Fifth Third received a similar report and accordingly had the same knowledge.  FAC ¶ 113.  And because a significant portion of double-pledged loans came from warehouses, even a cursory review would have revealed the blatant fraud Defendants refused to see.  FAC ¶ 94.

**F.      JPMorgan Abandoned Tricolor's IPO Based On The Same Red Flags**

Around the same time CBIZ delivered its report, Tricolor engaged JPMorgan to lead a planned initial public offering of the company.  FAC ¶ 112.  Faced with the same accounting irregularities, control failures, and evasive management culture that the warehouse and securitization teams were presented with, JPMorgan's equity capital markets team—not personally invested in JPMorgan's warehouse exposure—reached a very different conclusion, refusing to proceed with the IPO.  FAC ¶¶ 5, 112.  This decision was based, at least in part, on JPMorgan's knowledge that Tricolor's CFO, Jerry Kollar, "was implicated in a fraud that resulted in the criminal indictment and ultimate imprisonment of the chief executive officer at his prior employer."  *Id.* ¶ 112.  The bankers responsible for the warehouse and securitization business were aware of Kollar's history at the same time they were assuring investors in the Offering

11

Memoranda—after the IPO was abandoned—that Tricolor had a "Highly Experienced Management Team With [a] Strong Operating Track Record." FAC ¶¶ 119, 203.

G. **Following the CBIZ Report, Defendants Doubled The Pace Of Securitizations While Hedging Their Own Warehouse Exposure**

Rather than disclose or investigate CBIZ's alarming findings, Defendants chose to "barrel forward." FAC ¶ 4. After receiving the CBIZ report, Defendants underwrote and sold "more than $1.1 billion of asset-backed securities to investors with no knowledge of or access to the startling discoveries that CBIZ presented." FAC ¶ 113. Defendants accelerated the cadence of securitizations after the audit, pushing four additional Trusts to market in the next 18 months. *Id.* The Offering Memoranda for those Securitizations "were materially identical to the disclosures predating that audit," with no disclosure of the known and pervasive errors in Tricolor's loan data, no mention of the CBIZ findings, and no disclosure of Kollar's history. FAC ¶ 4.

At the same time, Defendants commenced efforts to hedge their warehouse exposure and prop up Tricolor with additional liquidity by selling mezzanine warehouse loans to third-party mezzanine lenders. FAC ¶¶ 111, 124. The mezzanine loans "created a buffer of subordinated capital to protect JPMorgan and Barclays from losses resulting from the serious collateral deficiencies they had uncovered." *Id*. ¶ 124. "These efforts offloaded a material portion of JPMorgan's and Barclays's warehouse loan exposure to unsuspecting third parties before others learned of the alarming evidence of fraud at Tricolor that JPMorgan and Barclays already knew about." *Id.* Sale of the mezzanine warehouse loans depended on the securitization pipeline remaining open since "the securitization off-ramp was the primary means of monetizing warehouse loan collateral." *Id.*

Defendants thus had enormous financial incentives to keep the pipeline running. Their collective warehouse exposure "exceeded $750 million" by the time of the 2024 audit, and the

Securitizations were needed to repay those warehouse lines, to reduce Defendants' exposure to Tricolor's fraud, and to enable Defendants to continue with mezzanine loan placements. FAC ¶¶ 123–24. At the same time, the warehouse loans alone generated approximately $70 million per year in interest and fee income. FAC ¶¶ 3, 212. Defendants were also earning substantial fees for structuring, underwriting, and selling the Securitizations. *Id*.

## H.    Defendants Made and Disseminated Materially False Offering Materials

For each Trust, the Underwriter Defendants prepared, controlled, and disseminated an Offering Memorandum, deal roadshow, and Underwriting Model (collectively, the "Offering Materials") that contained detailed representations on the very subjects on which Defendants had been told Tricolor's data could not be trusted. FAC ¶¶ 80, 114–19, 202–03.

*First*, Defendants admit that the actual loan pool characteristics were markedly different from the characteristics represented in the Offering Materials. Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Br.") (ECF No. 82) 34 n.11; *see also* FAC ¶¶ 93–94. The representations in the Offering Materials were based on underlying data and systems that Defendants knew contained pervasive errors and inaccuracies. *See, e.g.*, FAC ¶¶ 116–18. And yet the Offering Materials presented that loan data as fully accurate and reliable, with no change in disclosures even after the CBIZ report confirmed the 2022 audit's findings. Br. 5 n.2 ("There are only minor differences between the Offering Memoranda … which are inconsequential for purposes of this action.").

*Second*, the Offering Memoranda contained detailed representations that the underlying receivables met specified "eligibility criteria." FAC ¶ 202. Among other things, these representations included that "each Receivable" "was not a Defaulted Receivable," "shall not be more than 30 days delinquent," and was not "held in repossession." *Id*. at App. I–VII. In reality, Defendants knew that accounts were "listed as current, and treated as eligible collateral," even though they were charged off and had not been paid in months or years, *id*. ¶ 102, 20% of sampled

13

loans were either more than 30 days delinquent or held in repossession, *id*. ¶ 99, and the data and systems upon which these representations were based contained pervasive errors and inaccuracies. *See id*. ¶¶ 116–18.

*Third*, the Offering Memoranda represented detailed historical recovery rates—touting recoveries exceeding 60% on charged-off loans—and incorporated those rates into the cash flow projections used to market the Notes. FAC ¶¶ 116, 132, 202. But the CBIZ report revealed, and Tricolor admitted, that recoveries on its data tapes "were tracked to 'black book' wholesale values, determined pursuant to an index, not to any actual cash recovery on the repossessed loan." *Id*. ¶ 105. CBIZ "made clear that this practice … would 'skew any analysis performed to determine expected recoveries,'" yet "JPMorgan management cut off CBIZ's efforts to further investigate … by waiving 'much of the repossession testing.'" *Id*. Defendants thus knew that the reported rates were inaccurate and misleading. *Id*. ¶ 113.

*Fourth*, the Offering Memoranda represented that Tricolor had a "Highly Experienced Management Team With Strong Operating Track Record" and used "Sophisticated and Proprietary Information-Based Systems and Strategies." *Id*. ¶ 203. Those representations were "flatly contradicted" by the audits' findings of "systematic and pervasive operational and control failures," Tricolor's obstruction of the 2024 audit, and JPMorgan's privately held knowledge that CFO Kollar had a documented history of fraud. *Id*. ¶ 119.

Additionally, for each Trust, Defendants prepared and disseminated additional offering materials, including the deal roadshow and Underwriting Model, that reflected the same data presented in the Offering Memorandum. *See, e.g., id*. ¶¶ 80, 129–30, 245. Defendants led roadshows for each offering, making further representations about Tricolor and the collateral sold to each Trust, including representations directly contradicted by the audits, and answering

14

investors' questions on an individual basis. *Id*. ¶ 114. Each of these channels carried the same false data into the market.

## I.    Plaintiffs Relied On Defendants' False Statements

Plaintiffs are institutional investors that collectively invested in Notes with over $270 million in current principal balance. FAC ¶¶ 6, 71. They had no independent means to verify the accuracy of Defendants' representations. FAC ¶ 125. Investors "did not receive the borrowing base reports, servicer reports, audit findings, or loan-level data that the Underwriter Defendants possessed," "could not compare VINs across facilities to detect double-pledging," and "took the Underwriter Defendants at their word." *Id.* Accordingly, the collateral pool information Defendants provided was the only source of information ever made available to investors. *Id*.

For each and every Note purchased by a Plaintiff prior to disclosure of the fraud, the FAC sets forth detailed information identifying which Defendant sent which Offering Materials on which date, what data each Plaintiff's investment professionals received and analyzed, what specific representations were relied upon, and the resulting Note purchases. *See* FAC ¶¶ 126–194. Plaintiffs "relied on these representations in deciding to purchase Notes at the prices they paid"— both in primary offerings and in secondary market purchases. *Id.* ¶ 125. In both, the Offering Memoranda were "the most detailed source of information about the Trusts and their collateral" available. *Id*. ¶ 125; *see id.* ¶¶ 137, 149, 183, 194. Plaintiffs would never have purchased Notes "if they had known that Tricolor's loan data [tape] lacked integrity, let alone if they had known Tricolor was operating a fraudulent scheme in which Defendants recklessly participated." *Id.* ¶ 125.

## J.    Tricolor's Collapse And Revelation Of The Fraud

Defendants' multi-year exercise in willful blindness ended in August 2025—not because Defendants finally took action, but because someone else did. FAC ¶ 195. A junior analyst at a

15

mezzanine lender (one of the very third parties Defendants had recruited to prop up Tricolor with additional, subordinate liquidity) reviewed the SPV 4 collateral data and noticed that loans with a balance of $63 million were listed as "performing" despite not having received any payment in over six months. *Id.* "This same exact issue had previously been identified in the 2024 audits, but Defendants ignored it." *Id.* The mezzanine lender did not. *Id.* Confronted with an outsider's questions, JPMorgan finally engaged FTI Consulting to perform a forensic analysis of the collateral pool. FAC ¶ 196. FTI confirmed within days what Defendants had been told repeatedly years earlier: Tricolor was "cooking the books on a massive scale." *Id.* At that point, Tricolor's fraud had swelled to at least $800 million in bogus collateral. *Id.* In late August 2025, the warehouse lenders terminated funding under their facilities. FAC ¶ 197. On September 5, 2025, Tricolor placed more than 1,000 employees on unpaid leave. *Id.* And on September 10, 2025, Tricolor filed for Chapter 7 bankruptcy. *Id.*

The subordinate TAST Notes "now trade at less than 10% of their face value, down from prices that exceeded par (100%) days before the bankruptcy." FAC ¶ 198. The Trusts have made no payments to Noteholders since the bankruptcy. *Id.* On December 5, 2025, the controlling-class Noteholders for five of the seven Tricolor Trusts accelerated the Notes, "cutting off cash flow to all but the senior-most class of Notes still outstanding." *Id.*

The Chapter 7 Trustee's subsequent forensic investigation—and the parallel federal indictment of Mr. Chu by the United States Attorney for the Southern District of New York on December 15, 2025—confirmed the issues raised by the audits years earlier. FAC ¶¶ 7, 84, 87, 274. The Trustee's analysis confirmed that there were at least 31,408 double-pledged loans and at least 6,960 fictitious loans pledged to the warehouse SPVs and sold to the Trusts—representing at least $683 million of overstated collateral, or roughly 31% of the $2.2 billion of receivables that

the Trusts had supposedly purchased. *Id.* Because of this fraud, the Trusts were "balance sheet insolvent, inadequately capitalized, and unable to pay [their] debts as they came due" at the moment of each Trust's inception. *Id.* ¶¶ 8, 276–77.

The money paid by the Trusts to the warehouse SPVs was subsequently transferred to the Lender Defendants. *Id.* ¶ 52. But the Lender Defendants did not take these proceeds in good faith. To the contrary, as discussed above, CBIZ had expressly warned Defendants of pervasive collateral irregularities and Tricolor management's active obstruction of the very double-pledging inquiry that would have uncovered the fraud. Nevertheless, Defendants continued to structure, market, and sell securitizations to purchase the Lender Defendants' impaired loan collateral for far more than its fair value. *Id.* ¶¶ 97–113, 269, 280. Defendants' purportedly innocent failure to identify any of this throughout years of warehouse lending and seven Securitizations was, as the FAC alleges, the entirely foreseeable—indeed inevitable—result of their decision to look away from Tricolor's pervasive fraud and hide Tricolor's fundamental data integrity issues.

## ARGUMENT

A complaint survives a Federal Rule of Civil Procedure Rule 12(b)(6) motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *S.E.C. v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 185 (S.D.N.Y. 2023) (Rakoff, J.) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible where it is supported by "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). For purposes of this motion, the Court must "construe the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F.

17

Supp. 3d 429, 437 (S.D.N.Y. 2023) (Rakoff, J.).   Accordingly, "defendants' contrary factual allegations" are "unavailing." *Terraform*, 684 F. Supp. 3d at 200.

Plaintiffs' securities fraud claims must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b), which requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is based on information or belief, the complaint shall state with particularity all facts on which that belief is formed," as well as "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." *Id*.

Finally, Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) claims are also subject to Rule 9(b)'s requirement that a plaintiff "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), which this Circuit has interpreted to mean that a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 2023 WL 4744197, at *2 (S.D.N.Y. July 25, 2023) (Rakoff, J.) (hereinafter "*Olo*").

## I.    THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES FEDERAL SECURITIES FRAUD

### A.    Plaintiffs Have Pleaded A Strong Inference of Scienter

In the Second Circuit, plaintiffs in Section 10(b) cases ordinarily plead scienter by alleging facts (1) showing that the defendant had motive and an opportunity to commit fraud or (2) constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Defer LP v. Raymond James Fin., Inc.*, 2010 WL 3452387, at *4 (S.D.N.Y. Sept. 2, 2010) (quoting *ATSI*

18

*Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)). The allegations in the complaint must be "taken collectively," not "scrutinized in isolation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. In other words, on a motion to dismiss, "a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

### 1.    Defendants Had Motive And Opportunity To Commit Fraud.

The scienter element may be satisfied by allegations that Defendants had "motive and opportunity to commit the fraud." *ATSI Commc'ns*, 493 F.3d at 99. "Motive to commit fraud entails 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *In re Cannavest Corp. Secs. Litig.*, 307 F. Supp. 3d 222, 244 (S.D.N.Y. 2018) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)). "While this element is not satisfied merely by an allegation of a 'motive possessed by virtually all corporate insiders,' it is satisfied by an allegation that the defendants 'benefited in some concrete and personal way from the purported fraud.'" *Olo*, 2023 WL 4744197, at *5 (quoting *Novak*, 216 F.3d at 307). "Thus…, the mere 'desire to maintain a high stock price in order to increase executive compensation' is not a sufficient motive, but the allegation that corporate insiders misled the public 'in order to keep the stock price artificially high while they sold their own shares at a profit' is." *Id.* (quoting *Novak*, 216 F.3d at 307–08). Courts "have been especially ready to find motive pleading adequate" where third-party advisors play a "dual role with respect to the client" because the advisor may take on a "vested interest in the [client's] performance and profitability." *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 345 (S.D.N.Y. 2004) (internal quotation marks and citations omitted). For example, where an investment bank selling client's securities "uniquely benefit[s] from the

19

application of the proceeds of the Notes sales to" repay the client's "considerable debt to" the investment bank, that constitutes a "concrete and personal" benefit that goes beyond the general profit motive of all insiders. *In re Livent, Inc. Noteholder Sec. Litig.*, 174 F. Supp. 2d 144, 152–53 (S.D.N.Y. 2001).

Here, Defendants concede opportunity, and the FAC's motive allegations easily satisfy these standards. Defendants, however, contest the assertion of motive, claiming that it would be economically irrational for them to continue to participate in the warehouse facilities if they had uncovered Tricolor's fraudulent double-pledging scheme. Br. 17; Defs.' Suppl. Mem. of Law in Supp. of Joint Mot. to Dismiss ("Joint Suppl.") (ECF No. 94) 1, 4. That is wrong for multiple reasons, and Plaintiffs' motive allegations are compelling.

*First*, when the Underwriter Defendants learned about the systematic and pervasive inaccuracies in Tricolor's loan tape from the CBIZ report, and in the leadup thereto, they were already heavily invested in Tricolor. FAC ¶ 3. Defendants' collective warehouse exposure exceeded $750 million. *Id.* ¶ 123. Defendants could not exit their warehouse commitments without causing a liquidity crisis that would bring Tricolor's business to a screeching halt—which is exactly what happened when they stopped funding the warehouse lines in September 2025. *Id.* ¶¶ 82, 197. By continuing to fund the warehouse lines and perpetuate the securitization pipeline, Defendants preserved (at least temporarily) their ability to monetize their investment in Tricolor—through more than $70 million per year in warehouse facility interest and fees, along with substantial additional fees earned from selling the securitizations. *Id.* ¶¶ 3, 122, 212. Facing significant losses on their warehouse lines if and when they could no longer sell the securitizations, Defendants' economic incentive was to continue to sell the securitizations for as long as possible in order to build up earnings to offset their potential future losses. Defendants' contrary claim that

20

they would have immediately exited the warehouse facilities upon uncovering a fraud is unpersuasive. Rejecting a remarkably similar motive challenge in *In re National Century Financial Enterprises, Inc., Investment Litigation*, where plaintiffs accused Credit Suisse of knowingly sponsoring a receivables-backed note program that involved pervasive fraud, the Court explained:

> Plaintiffs allege that Credit Suisse, having become deeply involved in the fraudulent enterprise and with hundreds of millions of dollars of unsold notes on its hands, reduced its exposure by selling the notes to unsuspecting investors. And by selling the notes, Credit Suisse generated enough funds to keep the note programs going awhile longer.

541 F. Supp. 2d 986, 1004 (S.D. Ohio 2007). The same reasoning applies here. Tellingly, none of the Defendants claims that it was a net loser on the overall Tricolor relationship, or how any losses they may have suffered compare to those of other stakeholders. Defendants' perpetuation of the fraud best positioned them to lose less than they would have, or nothing at all.

*Second*, Defendants' misstatements in selling the securitizations allowed them breathing room to raise additional liquidity for Tricolor by selling the mezzanine warehouse loans. The FAC is clear that in the immediate aftermath of the CBIZ report, JPMorgan and Barclays commenced efforts to sell the mezzanine exposure to their warehouse facilities. FAC ¶¶ 111, 124. The FAC further alleges that the mezzanine sale "offloaded a material portion of JPMorgan's and Barclays's warehouse loan exposure to unsuspecting third parties before others learned of the alarming evidence of fraud at Tricolor." *Id.* ¶ 124. Defendants claim, without citing any FAC allegation, that "the addition of the mezzanine lenders did not reduce JPMorgan's or Barclays's exposure; it served only to expand further the total borrowing capacity under the warehouse line." Joint Suppl. 4. Even if that were true, Defendants were able to substantially improve their position by raising additional, subordinated financing for their warehouse facilities. Whether the mezzanine loans were incremental or in lieu of lending under the senior warehouse loans, they without question

21

took the first loss position on the underlying collateral supporting the warehouse facility while providing funding that helped perpetuate Tricolor's fraudulent scheme. FAC ¶ 124. In other words, the mezzanine loans provided credit support for the senior warehouse loans and Tricolor itself, mitigating the senior warehouse lenders' exposure to loss in a downside scenario—such as the one that would be created upon disclosure of Tricolor's fraud.

Defendants are thus wrong when they claim that "the Lender Defendants actually *increased* their exposure to Tricolor, which makes no sense if anyone knew or believed that Tricolor was backing the money it was borrowing with phony collateral." Br. 17. While the warehouse lines increased, they were bolstered by additional capital from third-party mezzanine warehouse lenders, which had the additional effect of insulating Defendants, as the senior warehouse lenders, from losses. FAC ¶ 124. Defendants thus mitigated their exposure to losses on the warehouse collateral while they propped up Tricolor's securitization pipeline through false and misleading disclosures—a classic motive for fraudulent conduct. *See, e.g.*, *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 633–36, 647 (S.D.N.Y. 2012) (underwriter structured, marketed, and sold offerings with the intent of reducing its own exposure to the alleged risk).

Individually and collectively, each of these ulterior motives goes beyond the typical profit motive shared by all insiders. *Contra* Br. 16–17; Joint Suppl. 1. Defendants were not merely seeking to earn their regular underwriting income from sale of the Notes to Plaintiffs. They were instead seeking to protect their substantial warehouse loan exposures that relied on the securitization pipeline for repayment, while preserving (at least temporarily) the massive interest and fee income generated by those warehouse facilities. FAC ¶¶ 3, 123–24, 212; *accord In re Livent*, 174 F. Supp. 2d at 152–53. And, like the corporate insider that sells stock on the back of his misleading statements, Defendants were causing the warehouse facilities to sell their loan

22

collateral to the Securitizations at prices that could not be achieved otherwise. FAC ¶¶ 6, 125; *cf. In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 766 (S.D.N.Y. 2001) (underwriter motivated "to secure enormous financial benefits for its parent" in part because parent escaped almost all liability on line of credit guarantee via allegedly fraudulent issuance). At the same time, Defendants needed time to market and sell the junior warehouse loans to third parties to prop up Tricolor and insulate their warehouse exposure against loss. FAC ¶ 124; *accord City of Warren Police & Fire Retirement System v. World Wrestling Entertainment, Inc.*, 477 F. Supp. 3d 123, 136–37 (S.D.N.Y. 2020) (Rakoff, J.) (stock sales support scienter). These allegations are more than sufficient to establish motive because they make clear that Defendants "uniquely benefited" from "proceeds of Notes sales" because they had a "higher stake" in the financings at issue than "the standard fees and commissions associated with any investment bank's sales of securities." *In re Livent*, 174 F. Supp. 2d at 152–53.

Defendants' authorities do not support their requested dismissal. Rather, unlike here, each case cited by Defendants involved a complaint that included conclusory allegations that the defendant was motivated by a "general profit motive common to all corporations." *See, e.g.*, *Tradeshift, Inc. v. Smucker Servs. Co.*, 2021 WL 4463109, at *6 (S.D.N.Y. Sept. 29, 2021) (plaintiff "merely stat[ed] in conclusory fashion that [defendant] knew, or should have known, that its representations were false," offering no evidence, "circumstantial or otherwise, of an intent [] to deceive"); *Schmidt v. Fleet Bank*, 1998 WL 47827, at *7 (S.D.N.Y. Feb. 4, 1998) (plaintiffs alleged only that defendant was motivated "by the prospect of increased fees received by his law firm"); *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 533 (S.D.N.Y.) (alleged motive ("raising capital as part of an amorphous scheme") was "too generalized"), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009). And in *Landesbank Baden-Wurttemberg v.*

*Goldman, Sachs & Co.*, 478 F. App'x 679 (2d Cir. 2012), and *Puchtler v. Barclays PLC*, 2025 WL 887502 (S.D.N.Y. Mar. 21, 2025), plaintiffs apparently offered no particular motive at all. *See Landesbank*, 478 F. App'x at 681; *Puchtler,* 2025 WL 887502, at *14 ("As he concedes, Plaintiff does not allege facts that would give rise to a motive to defraud"). In contrast, here, Defendants were caught with significant exposure and had a clear motive to ignore the fraud. Defendants acted on this motive, accruing substantial additional profits while simultaneously reducing their downside exposure.

### 2. Defendants Acted With Conscious Misbehavior And Recklessness

While Plaintiffs' allegations of motive and opportunity are sufficient to plead a strong inference of scienter, the FAC alleges equally strong facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Olo*, 2023 WL 4744197, at *5. "Recklessness means conduct that is, 'at the least … highly unreasonable and which represents an extreme departure from the standards of ordinary care … to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at *6 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)). As the Second Circuit explained in *Novak v. Kasaks*:

> [S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

216 F.3d at 308; *accord Olo*, 2023 WL 4744197, at *6 ("Recklessness occurs when defendants 'knew facts or had access to information suggesting that their public statements were not accurate.").

The FAC presents a paradigmatic example of factual allegations that support a strong inference of recklessness. Defendants authored and disseminated the Offering Memoranda, deal

24

roadshow, and Underwriting Model for the Tricolor securitizations, which contained detailed descriptions of the loan pool characteristics for each transaction. Defendants admit, for purposes of this motion, that those loan pool characteristics were inaccurate. Br. 34 n.11. The CBIZ report identified the pervasive inaccuracy of Tricolor's loan tape that Defendants used to prepare the Offering Memoranda, deal roadshow, and Underwriting Model in black and white. *See e.g.*, FAC ¶¶ 116–18. Yet, the Underwriter Defendants continued to author and disseminate offering materials presenting the inaccurate loan tape data as true without ever disclosing that the loan data they relied upon contained known and pervasive inaccuracies. That decision satisfies the scienter requirement for fraud. *See In re Bear Stearns Cos., Inc. Sec. Litig.*, 763 F. Supp. 2d 423, 501–02 (S.D.N.Y. 2011) (SEC warnings about flaws in defendant's valuation-at-risk models, combined with failure to update models, supported strong inference of scienter); *see also Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 572 (S.D.N.Y. 2014) (where a party's existing statements would be misleading absent additional disclosures, the party has a duty to make such additional disclosures), *aff'd sub nom. In re Lululemon Sec. Litig.*, 604 F. App'x 62 (2d Cir. 2015); *Terraform*, 684 F. Supp. 3d at 200 (a "duty to disclose" applies "whenever secret information renders prior public statements materially misleading"); *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002) (defendant that chooses to speak on a material issue "ha[s] a duty to be both accurate and complete").

Across their 70 pages of briefing, Defendants do not address this point. Instead, they erect a strawman—arguing that Defendants lacked knowledge of Tricolor's double-pledging and fictitious loan scheme, and therefore lacked scienter. Br. 18–28; Joint Suppl. 2–5. Defendants' premise is wrong. The FAC alleges a different and equally viable theory of fraud based on Defendants' non-disclosure of the known and pervasive inaccuracy of the loan tape used to prepare

25

the offering materials, for which scienter cannot plausibly be contested.  In any event, Plaintiffs have also pled facts that are more than sufficient to support a strong inference that Defendants were, at best, willfully blind to Tricolor's underlying double-pledging and fictitious loan scheme. *See, e.g.*, *Novak*, 216 F.3d at 308 (scienter has been adequately pled where "plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud"); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 322 (S.D.N.Y. 2024) ("And even if they simply turned a blind eye to all the red flags, willful blindness is also enough.").

As detailed in the FAC, the 2022 and 2024 audit reports notified Defendants that: (1) nearly half of the loan payments received on one day and a third received on another were deposited into the wrong bank account for the wrong lender, FAC ¶¶ 2, 103, 118; (2) recoveries on supposedly repossessed vehicles were fabricated based on index-based "black book" values, not actual amounts recovered on successfully repossessed vehicles, causing loss rates and statistical attributes of the receivables to be misreported, *id.* ¶¶ 105, 116; (3) loans that were heavily delinquent or charged off were misrepresented as performing and current, further undermining the accuracy of Tricolor's data tape, *id*. ¶¶ 102, 107; and (4) compounding each of these accounting "red flags," Tricolor lacked an "appropriate control environment" making it particularly vulnerable to "material misstatements due to error or fraud," *id*. ¶ 97.  Moreover, despite the significant emphasis in CBIZ's agreed-upon procedures on testing for double-pledging, Tricolor blocked that testing by refusing to provide the master servicing report necessary to perform that analysis, rendering the Offering Memoranda's statements about the assignability and ownership of the receivables false and misleading. *Id*. ¶¶ 86, 108–09.  Based on these issues and others, CBIZ implored Defendants to investigate "the ultimate accuracy of the data tapes provided by" Tricolor.  *Id*. ¶¶ 99, 110.

26

But the FAC does not stop there.  It also alleges numerous additional facts that further support scienter.  As discussed above, Defendants accelerated the pace of Tricolor's securitization sales following receipt of the CBIZ report, while simultaneously taking steps to offset its own exposure to Tricolor's loan collateral by selling the mezzanine warehouse lines.  FAC ¶¶ 111, 113, 124.  In the six months following the CBIZ report, Defendant JPMorgan abandoned its plans to underwrite an initial public offering of Tricolor's stock based on concerns about the very accounting irregularities it ignored in continuing to pump out securitization transactions at record clip.  FAC ¶¶ 112–13 .  Despite Defendants' own defensive maneuvers to protect against loss from Tricolor's fraud, they made no change whatsoever to the investor disclosures in the offering materials to warn Noteholders, like Plaintiffs, of the risks described in the CBIZ report.  *See* FAC ¶¶ 4, 125, 202 n.5.  Defendant JPMorgan not only received the CBIZ report, it participated in its creation.  When the audit encountered major issues, JPMorgan agreed to override CBIZ's agreed upon procedures and short-circuited CBIZ's inquiry into incorrect—and ultimately fraudulent—recovery accounting for which Tricolor had no rational explanation.  FAC ¶¶ 98, 100–07, 109.

The law requires that these factual allegations be considered "collectively," not "scrutinized in isolation."  *Tellabs*, 551 U.S. at 323.  Taking Plaintiffs' factual allegations together, they are more than sufficient to show that Defendants were in possession of significant red flags that called into question the integrity and viability of Tricolor's business, and did nothing.  *See Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 101–02 (S.D.N.Y. 2015) ("Although speculation and conclusory allegations will not suffice to show scienter, neither do we require great specificity provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'") (cleaned up).  Indeed, courts routinely find a strong inference of scienter based on far less.  *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237 (S.D.N.Y. 2010)

(allegations indicated Citigroup's "awareness" of risk, which other underwriters and Citigroup analysts were also aware of, to support "strong inference that Citigroup officials were at least reckless in not appreciating" these risks); *Gabriel Cap., L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 506 (S.D.N.Y. 2000) (initial purchasers at least reckless because "the true facts could be found in … obvious sources").

Defendants did not follow up with management or investigate these red flags. If they had, they would have learned about a double-pledging scheme so obvious that a junior analyst at a mezzanine lender was able to uncover it—even without access to the warnings in the CBIZ report or exposure to Tricolor's evasive and uncooperative conduct and historical failure to maintain an adequate control environment. FAC ¶ 195. Combined with the evidence of recklessness discussed above and Defendants' motive and opportunity, Defendants' willful blindness to Tricolor's fraud supports a strong inference of scienter. Defendants' contrary arguments are unavailing.

*First*, Defendants accuse Plaintiffs of "improper hindsight bias" in alleging that Defendants should have uncovered Tricolor's double-pledging and fictitious loan scheme. Br. 18–19. But Defendants did not need hindsight to see the pervasive inaccuracy of Tricolor's loan tape and red flags of fraud because that information was placed squarely in front of them by the CBIZ report. *See Dodona I*, 847 F. Supp. 2d at 644 ("[T]he incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made."). CBIZ, *at that time*, implored Defendants to investigate the numerous accounting anomalies flagged in its report. FAC ¶¶ 99, 110. Defendants had the loan tape for Tricolor's prior Securitizations and their own borrowing base statements, and could easily have tested the collateral for double pledging. *Id*. ¶¶ 58–59, 75, 77, 205. Defendants, for example, would have seen that approximately 25% of the TAST 2025-2 collateral was already pledged to TAST 2022-1. *Id*. ¶

28

86.  They did not discover these facts only because, after being told there was "a monster under the bed," Br. 19, they refused to look.

*Second*, Defendants claim that the numerous "red flags" in the CBIZ report are insufficient to support a strong inference of scienter.  Br. 19–26.  As an initial matter, Defendants overstate the types of "red flags" required by reference to inapposite auditor cases.  *See id.* at 19.  In those cases, because "[a]n outside auditor will typically not have an apparent motive to commit fraud," the "strength of the circumstantial allegations" of scienter "must be correspondingly greater."  *In re Longtop Fin. Techs. Ltd. Secs. Litig.*, 939 F. Supp. 2d 360, 377 (S.D.N.Y. 2013).  Where, as here, the motive allegations are cogent and persuasive, the recklessness allegations are not so stringent.  *See, e.g.*, *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 145–46 (2d Cir. 2025) ("Because we conclude that Plaintiffs' motive allegations weigh in favor of scienter, the circumstantial evidence [of recklessness] need not be as great.").

Defendants place particular emphasis on this Court's decision in *Hanson v. Frazer*, 2013 WL 5372749 (S.D.N.Y. Sept. 24, 2013) (Rakoff, J.), another auditor case, where the plaintiff failed to allege that the auditor defendant actually saw the alleged red flags at issue.  Br. 19; Joint Suppl. 3.  The Court in *Hanson* held that "it is not enough that the auditor could have had access to information that might have constituted a red flag if seen."  *Hanson*, 2013 WL 5372749, at *5. Unlike in *Hanson*, there is no question here that Defendants saw the red flags in the CBIZ report, because that report was addressed to Defendants for the very purpose of assessing the accuracy and reliability of Tricolor's loan tape.  FAC ¶¶ 98, 111.  Nor is there any disconnect between the red flags identified by the CBIZ report and the actual fraud taking place.  *Contra Hanson*, 2013 WL 5372749, at *5 (red flag of potential bribery insufficient to show willful blindness to unrelated fraud).  The CBIZ report specifically and directly challenged the accuracy of Tricolor's loan tape—

29

and that data was, in fact, fabricated to cover for a pervasive fraud. The issues raised by the CBIZ report—including the facts that almost 50% of loan cash flow on a given day was delivered to a bank account that did not belong to the applicable lender and that the highly touted recovery rates on the car loans were completely made up—were the direct result of Tricolor's fraudulent scheme. FAC ¶¶ 96–107. Any meaningful investigation into these issues would have uncovered the fraud—as would the double-pledging test that Defendants allowed Tricolor to evade despite the CBIZ report's repeated warning that Defendants should investigate the loan tape's accuracy.

Defendants' decision to ignore these red flags was particularly egregious given their role in structuring, underwriting, and selling the securitizations, not to mention JPMorgan's role preparing Tricolor for its (ultimately abandoned) IPO. *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 270 (S.D.N.Y. 2014) (recognizing that underwriters have a duty to "exercise a high degree of care in investigation and independent verification of the company's representation[s]"). Defendants are not absolved of those duties simply because they called themselves "structuring agents," "bookrunners," and "initial purchasers" rather than "underwriters."[2]  *See, e.g.*, *Nat'l Century*, 541 F. Supp. 2d at 1004–05; *Gabriel Cap.*, 94 F. Supp. 2d at 506 (initial purchasers "drafted the Offering Memorandum, prepared the slides, and attended the road show, all of which contained a large number of false or misleading representations contradicted by basic source documents or obvious facts"). The Underwriter Defendants here are some of the most sophisticated financial institutions on the planet, and they structured the securitization transactions,

---

[2]  Defendants argue that they should not be considered underwriters because "[t]he TAST deals were not SEC-registered offerings sold on the public market by underwriters with due diligence obligations under Section 11 of the Securities Act." Br. 12. However, Plaintiffs have not asserted claims under Section 11 (15 U.S.C. § 77k), and the FAC contains ample allegations that the Underwriter Defendants acted as underwriters. *See, e.g.*, FAC ¶¶ 72–82. In any event, the allegations of Defendants' scienter suffice whether or not Defendants were technically "underwriters."

built the cash flow model sent to investors, and controlled every aspect of the Notes sales. *See, e.g.*, FAC ¶¶ 75–82. The notion that they did all this without understanding what they were building, modelling, and selling is untenable.

Defendants next claim that CBIZ checked for and did not find double-pledging on a sample of 50 loans. Br. 21, 25–26. That is wrong. The CBIZ report is clear that the consultants could not test double-pledging because Tricolor refused to provide the master servicer report necessary to conduct that test. FAC ¶ 109; *see also* CBIZ Report 35. The table that Defendants accuse Plaintiffs of "conveniently omitting" has no import—it identifies no evidence of double-pledging because Tricolor prevented CBIZ from accessing the information necessary to identify double-pledging, as CBIZ itself specifically called out in the report. *See* CBIZ Report 35.

Defendants spend the remaining 5 pages of their "red flags" argument trying to explain away the numerous red flags identified in the CBIZ report as inconsequential or otherwise subject to some plausible, innocent explanation. Br. 22–27. Taking each red flag in isolation, Defendants disregard the clear requirement that facts alleged in support of scienter be considered as a collective whole. *Tellabs*, 551 U.S. at 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Tellingly, neither CBIZ nor JPMorgan found these supposedly innocent explanations convincing. CBIZ, for its part, repeatedly implored Defendants to investigate "the ultimate accuracy of the data tapes provided by" Tricolor. FAC ¶ 99. JPMorgan's equity capital markets team, meanwhile, abandoned a lucrative assignment underwriting Tricolor's IPO based on the same accounting anomalies that JPMorgan simply ignored when selling more than a billion dollars of securitization Notes. *Id.* ¶¶ 5, 112–13.

Defendants' attempts to brush aside the red flags from the CBIZ reports are, in any event, unpersuasive:

31

- Defendants argue that, according to an indictment against Tricolor's CEO, Tricolor "'fabricated and falsified backup records when audits of the borrowing base were conducted,' . . . which would have prevented discovery of double pledging." Br. 21 (quoting ECF No. 83-1 ¶ 16). But, the FAC alleges that the borrowing base reports were so sloppily falsified that a junior analyst at a mezzanine warehouse lender was able to discover the fraud by identifying "8,000 charged-off loans included in a Borrowing Base statement that had been reported there for months without ever reducing their outstanding balance—as would be expected of genuine, performing auto loan receivables." FAC ¶ 88. If a warehouse lender with less information was able to uncover the double-pledging, the Underwriter Defendants with superior access to information could and should have discovered it, as illustrated by the fact that FTI discovered the fraud within days. FAC ¶ 196.

- Defendants quibble with Plaintiffs' characterization of the 2022 audit, insisting that it reflected merely that "Tricolor was a private company and, as such, may not have the same formalized controls that public companies need to meet the rigorous financial reporting obligations under the Sarbanes-Oxley Act." Br. 22. But CBIZ identified far more than a lack of formality. It expressly warned Defendants that Tricolor's "[l]ack of appropriate control environment could result in material misstatements due to error or fraud." FAC ¶ 97. Further, the notion that Defendants were reassured by the supposed sincerity of Tricolor's efforts to resolve issues is plainly rebutted by the fact that the very same issues were found to exist in the 2024 CBIZ audit, which was intended to check progress on the issues

identified two years earlier. *See, e.g.*, FAC ¶¶ 98–99 (alleging that the 2024 audit confirmed the 2022 audit's findings).

- Defendants argue that an "aging test" and "expired accounts test," which together revealed 95 repossessed and delinquent loans (including every account in a 90-account sample) that were improperly treated as eligible collateral, should be disregarded as "minor discrepancies." Br. 23. Even if these issues were truly minor in isolation (they are not), when viewed in combination with the other issues identified by the CBIZ report, such as false reporting of recoveries and loan payments that never reached the proper bank account, they are anything but minor. Indeed, they were enough to prompt CBIZ to recommend that JPMorgan follow up with management for an explanation and a larger discussion about "the ultimate accuracy of the data tapes," FAC ¶ 99, a step Defendants never took.

- Defendants next target an age-shifting test showing that five accounts—20% of a 25-loan sample—were not properly shifted from one age bucket to the next and posit that they were entitled to unquestioningly accept management's explanation that those accounts reflected a policy whereby aging was paused for loans backed by vehicles that were in service for more than thirty days. Br. 24. However, management had no written evidence of such a policy, and there was no evidence that two of the improperly shifted vehicles were ever even in the shop. FAC ¶ 100. Accordingly, the inference that management's explanation was correct was far less cogent and compelling than the inference that Tricolor's loan tapes were inaccurate.

- Defendants brush aside the CBIZ report's finding that Tricolor used an index value rather than actual Recoveries, Br. 24, but they ignore that this revelation renders

33

the Offering Memoranda false and misleading in every instance that it uses the defined term "Recoveries," including, for example, when it describes the expected cash flows for the Receivables underlying the Notes, TAST 2024-1 Offering Memorandum ("OM") (ECF No. 83-2) 94 (noting that "collections on the Receivables" include "Recoveries").    Defendants further argue in their Supplemental Brief that Tricolor's use of false "black book" recovery numbers should be ignored because they were merely using the index value "as a stand-in until the vehicle gets resold." Joint Suppl. 2.   But Defendants assume that each vehicle assigned a "black book" recovery value would eventually be repossessed and resold.   That is exactly what CBIZ was trying to verify when JPMorgan management intervened and narrowed the scope of CBIZ's audit to halt further inquiry.   Had CBIZ completed its work, it would have discovered that those recovery rates were falsely applied for cars that were never recovered.

- Defendants attempt to minimize the revelation that Tricolor "'back[ed] into' a particular calculation" without mentioning that the "calculation" is principal collections on loan accounts—the most fundamental source of repayment of the Notes.  *Compare* Br. 25, *with* FAC ¶ 106.   Defendants again ignore the law by suggesting that inaccurate loan collections were a "single hint," Br. 25, instead of considering them "collectively" with the other red flags described in the FAC.

- Defendants argue that Tricolor's refusal to provide a master servicer report is unremarkable because "CBIZ never stated that it was unable to *assess Tricolor* without that report." Br. 25 (emphasis added).   Defendants miss the point, which is not whether CBIZ was able to "assess" Tricolor, but whether it was able to

34

confirm that the assets supporting the loans were not pledged to a third party. It was not able to test for double-pledging, because Tricolor prevented that testing and Defendants acquiesced.

- Defendants' attempt to dismiss Kollar's history of fraud by association misses the mark. Br. 26–27. Kollar's history shows, at minimum, that the Offering Memoranda's claims regarding management's strong track record were materially false. The FAC also makes clear that JPMorgan understood this information's importance and its impact on the company's value in the context of an IPO, because it was a motivating factor in JPMorgan's abandonment of the IPO. Defendants have no excuse for leaving this information out of the Offering Memoranda, much less making reckless claims about the strong "track record" of Tricolor management. *See In re Citigroup*, 753 F. Supp. 2d at 236–38 (strong inference of scienter supported by allegations defendant was "taking significant steps internally" to address risks while "at the same time . . . continuing to mislead investors" about those risks).

Defendants' nitpicking of Plaintiffs' allegations about the numerous red flags in the CBIZ report only serves to highlight Defendants' failure to grapple with those allegations considered as a collective whole—including both the collective import of the many red flags and the additional allegations of motive, opportunity, and circumstantial evidence of recklessness.

*Third*, the only competing inference offered by Defendants in response—that they were just as deceived as Plaintiffs (Br. 27–28)—is far less compelling. As discussed above, Defendants were told that there were material inaccuracies in Tricolor's data. And yet they still presented Tricolor's purported data without caveat to investors. This direct knowledge flatly contradicts

35

Defendants' competing inference.  As for their knowledge of the full scope of the scheme, the FAC adequately alleges that, to the extent they lacked actual knowledge, it was only due to their willful blindness.  *See, e.g.*, FAC ¶ 120.  JPMorgan's initiation of an investigation *after* Tricolor's fraud otherwise came to light (responding to a mezzanine lender's concerns, FAC ¶¶ 195–96) is irrelevant.  *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 808 (S.D.N.Y. 2020) ("It is unclear why a company's initiation of an independent investigation [after the alleged misstatements] has any bearing on defendants' state of mind at the time of the alleged misstatements.").

### 3.    The FAC Adequately Alleges Defendants' Corporate Scienter

"When the defendant is a corporate entity, … the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  "[I]t is possible to raise the required [scienter] inference with regard to a corporate defendant without doing so with regard to a specific individual defendant."  *Id.*; *see also Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 291 (S.D.N.Y. 2011) ("The Plaintiff is not required to identify specifically the individuals at Citigroup who acted with scienter in order to plead scienter with respect to Citigroup."); *Penn. Public Sch. Empls. Retirement System v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371 (S.D.N.Y. 2012) ("Plaintiff alleged sufficient facts to plead that BoA acted with scienter, although Plaintiff failed to allege scienter as to any specific individual defendant.").

Here, Plaintiffs adequately allege corporate scienter because management-level employees at each Defendant received the CBIZ report for their respective warehouse facility, but continued to structure, underwrite and sell securitizations without disclosing the inaccuracy of Tricolor's loan data that CBIZ uncovered in its reports.  FAC ¶¶ 97–98, 111.  Plaintiffs, moreover, allege corporate level motive and opportunity to commit fraud that is independently sufficient to establish a strong

36

inference of scienter at the pleading stage. *See supra* at § I.A.1–2. Defendants are thus wrong when they fault Plaintiffs' scienter allegations for not sufficiently identifying specific individuals who acted with the requisite scienter. *See* Br. 15–16.

The FAC has, in any event, identified individuals at JPMorgan and Barclays by name and position whose individual scienter may be imputed to the corporate defendants. Plaintiffs allege, for example, that CBIZ delivered its report to Alan English, an Executive Director in JPMorgan's ABS conduit and securitization banking group, and that the report was circulated to personnel in JPMorgan's credit department and their counterparts in Barclays's investment banking and credit group. FAC ¶ 111. The FAC further alleges that Mr. English worked closely with other high-level managers responsible for Tricolor's securitization program, including Executive Director Brian Honda and Managing Director Billy Wong. *See id.* And the CBIZ report itself reveals that JPMorgan "management" directly intervened to narrow the scope of CBIZ's agreed upon procedures, and excuse Tricolor's refusal to explain fictitious recoveries booked on cars that were never successfully repossessed. *Id.* ¶¶ 98, 105; CBIZ Report 32. Courts routinely hold that the knowledge of high-level employees such as managing directors and executive directors is imputable to the company. *See, e.g.*, *Thomas v. Shiloh Indus., Inc.*, 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017) (individuals whose intent can be imputed range from "senior ... analysts and investment bankers" to "high-level employee[s]" such as managing directors).

### B.    The Fraudulent Statements Are Properly Attributable To Defendants

Under *Janus Capital Group, Inc. v. First Derivative Traders*, only the "maker" of a material misstatement or omission in the sale of securities is liable under Rule 10b-5(b). 564 U.S. 135, 142 (2011). "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.*

Defendants, as the Initial Purchasers of the securitization Notes and the parties offering to sell those Notes to institutional investors, including Plaintiffs, are the clear "maker" of statements in the Offering Memoranda that they prepared and disseminated to those investors in order to sell the Notes. The cover of each Offering Memorandum says this expressly: "The Notes are being offered *by the Initial Purchasers*" and "[t]he Initial Purchasers reserve the right to withdraw, cancel or modify such offer and to reject orders in whole or in part." *See, e.g.*, TAST 2024-1 OM 1 (emphasis added). Defendants' names are prominently displayed at the bottom of the Offering Memorandum in bold typeface. *Id.* Moreover, Defendants exercised complete control over Tricolor's securitization program. FAC ¶ 82. They structured each securitization transaction, prepared and disseminated the Offering Memoranda, deal roadshow, and cash flow model used to sell the Notes, and sold the Notes to institutional investors. *E.g. id.* ¶¶ 78–82; 114. Because they controlled the contents and distribution of the Offering Memoranda, and they were the parties selling the securities offered therein, Defendants were the maker of the admittedly false statements in the Offering Memoranda.

This conclusion is bolstered by the decision in *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261 (S.D.N.Y. 2014)—the leading case in this district on underwriter liability for statements in offering materials. Under *Puda Coal*, a complaint adequately pleads underwriter liability where it alleges:

> (1) the underwriters "actively participated in creating the [offering materials], drafting it jointly with [the issuer]"; (2) the underwriters' "sign off" was necessary for … the publication of the [offering materials] …; (3) that "[t]he front cover of the prospectus prominently displayed both underwriters names, thus endorsing the statement within the prospectus to investors"; (4) one of the underwriters "solicited investors for the offering and distributed the [offering materials] to investors"; and (5) the [offering materials] specifically "provided that the underwriters were authorized to make representations about [issuer] shares."

38

*Sharette*, 127 F. Supp. 3d at 91–92 (summarizing *Puda Coal*, 30 F. Supp. 3d at 267). Plaintiffs allege facts satisfying each of the *Puda Coal* factors. *See, e.g.*, FAC ¶ 206 (creation of offering materials); *id.* ¶¶ 115, 206 (control over contents); *id.* ¶ 206 (endorsement on cover); *id.* ¶¶ 122, 206, 211–12 (solicitation of investors); *id.* ¶¶ 114, 206 (authorization to answer questions). The facts supporting attribution of the offering materials to the underwriters here are even stronger than in *Puda Coal* because here the Underwriter Defendants, as Initial Purchasers, were the ones actually selling the securities through the offering materials to investors and had peculiar knowledge of the facts misrepresented. *See, e.g., id.* ¶¶ 3, 133; *see Dexia SA/NV v. Bear, Stearns & Co.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013) (Rakoff, J.) (securitization underwriters had peculiar knowledge of loan-level detail); *see also Scott v. ZST Dig. Networks, Inc.*, 896 F. Supp. 2d 877, 889–91 (C.D. Cal. 2012) (sustaining Rule 10b-5(b) claim where underwriter was "instrumental … in preparing or assisting with the relevant statements," helped distribute the offering documents, and the underwriter's name was "featured prominently" in such documents); *In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 861–62 (S.D. Ohio 2012) (holding that a factfinder could reasonably find that misstatements in offering materials were attributable to both issuer and placement agent bank, in part because the bank's name was "displayed … prominently on the front pages" of such documents and the bank "took these statements and put them into investors' hands"), *adhered to on denial of reconsideration sub nom. Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, 2013 WL 490717 (S.D.N.Y. Feb. 6, 2013). Cases before and after *Puda Coal* that reject underwriter attribution are distinguishable. *See Sharette*, 127 F. Supp. 3d at 91–93 (underwriters not "makers" of statements in offering materials by which the issuer sold stock because there were no non-conclusory allegations that the underwriters prepared those offering materials or controlled their contents); *In re Fannie Mae 2008 Sec. Litig.*,

39

891 F. Supp. 2d 458, 485 (S.D.N.Y. 2012) (misrepresentations at issue were contained in statements incorporated by reference from previous SEC filings over which Fannie Mae, rather than underwriter, had ultimate authority).

Without even mentioning the *Puda Coal* factors, Defendants selectively quote statements in the Offering Memoranda out of context to claim that the Depositor is the one and only maker of those statements.  The statements they rely on are inapposite to the attribution question.

*First*, Defendants pluck a boilerplate disclaimer from page seven of the Offering Memoranda stating that "THIS OFFERING MEMORANDUM IS PERSONAL TO PROSPECTIVE INVESTORS AND HAS BEEN PREPARED BY THE DEPOSITOR SOLELY FOR USE IN CONNECTION WITH THE OFFERING OF THE NOTES." *See, e.g.*, TAST 2024-1 OM 7 (capitalization in original); Br. 28.  This passing reference buried in the middle of the Offering Memorandum is not dispositive of attribution under *Janus*, where the deciding factor is control, and does not address the *Puda Coal* factors.

*Second*, Defendants rely on the boilerplate disclaimer that "NOTWITHSTANDING ANY INVESTIGATION THAT THE INITIAL PURCHASERS MAY HAVE CONDUCTED WITH RESPECT TO THE INFORMATION CONTAINED HEREIN, THE INITIAL PURCHASERS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION."  TAST 2024-1 OM 6 (capitalization in original); Br. 28.  But this case is not about contractual representations and warranties—it is about fraud.   An underwriter can make statements without undertaking contractual representations and warranties as to their accuracy.

More fundamentally, Defendants' selective parsing of the Offering Memoranda loses the forest for the trees.  Boilerplate disclaimers cannot convert the Initial Purchasers' offer to sell

securities into statements attributed to someone else, nor can they immunize Defendants from liability for their false statements in offering materials. Courts have consistently rejected reliance on these type of boilerplate disclaimers to avoid securities fraud liability. *See, e.g.*, *Nat'l Century*, 541 F. Supp. 2d at 1005 ("[I]t would defeat the securities laws if parties could escape liability … by inserting boilerplate disclaimers into offering materials"); *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F.Supp.2d 210, 226 (S.D.N.Y. 2008) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").

Finally, Defendants' use of the false information in the Offering Memoranda to prepare and circulate the deal roadshow and Underwriting Model provide an independent basis for attribution. These additional offering materials were expressly prepared and circulated by the Underwriter Defendants. FAC ¶ 114. The Underwriting Defendants' adoption of false statements from the Offering Memoranda in their separately created offering materials is an independent basis for their liability. *See, e.g.*, *Gabriel Cap.*, 94 F. Supp. 2d at 507 (initial purchasers could not use disclaimer "to deny that they authorized their own representations" in roadshow presentations).

## C.    The FAC Alleges Actionable Misrepresentations and Omissions

"[U]nder the PSLRA, the plaintiff must 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading.'" *Olo*, 2023 WL 4744197, at *2 (quoting 15 U.S.C. § 78u-4(b)(1)). This standard is satisfied where plaintiffs "point[] to specific provisions of the statement and then provide[] reasonable explanations as to why they believe specific statements or omissions were false or misleading." *In re Initial Pub. Offering Secs. Litig.*, 241 F. Supp. 2d 281, 354 (S.D.N.Y. 2003).

Here, Defendants concede that the FAC "adequately alleges that … data tables [in the offering Memoranda showing loan pool characteristics] contained inaccurate information." Br. 34

41

n.11.  Defendants therefore concede that the core misrepresentations alleged in the Complaint—including loan pool tables, eligibility criteria, and recovery rate and weighted average life disclosures—are actionable.  *See, e.g.*, FAC ¶ 125, 202.  Defendants nonetheless argue that other alleged misrepresentations are not actionable.  But that is incorrect.

*First*, Defendants wrongly contend that the detailed allegations in the FAC somehow fail to adequately explain why statements in the offering materials were false and misleading.  Joint Suppl. 9.  As detailed both in the narrative allegations in the body of the FAC and the appendices, most of the challenged statements in the offering materials are false because they adopt or incorporate the loan data that Defendants conceded, for purposes of this motion, is inaccurate.  *See, e.g.*, FAC ¶¶ 116–18; 202; *id.* at App. I-VII.  For those and the remaining claims, the FAC's statement-by-statement explanation of falsity satisfies the PSLRA's requirements.  *See In re Initial Pub. Offering Secs. Litig.*, 241 F. Supp. 2d at 354 (endorsing this approach and noting that the PSLRA's particularity requirements "are [therefore] easy to satisfy").[3]

*Second*, Defendants' puffery arguments regarding Tricolor's team and systems (Br. 34) fail because the FAC ties each statement to concrete, falsifiable, factual claims.  *Cf. In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223, 245 (2d Cir. 2016) (puffery where statements "lack the sort of definite positive projections that might require later correction.").  Tricolor's "Highly Experienced Management Team With Strong Operating Track Record" is a qualitative assurance flatly contradicted by Plaintiffs' allegations.  *See* FAC App. III ¶ 12; *id.* ¶¶ 5, 112–13; 119.  Similarly,

---

[3]  For these reasons, *Boca Raton Firefighters v. Bahash*, 506 F. App'x 32 (2d Cir. 2012), and *In re AstraZeneca plc Securities Litigation*, 2022 WL 4133258 (S.D.N.Y. Sept. 12, 2022), are inapposite.  Each involved long blocks of alleged misstatements followed by an undifferentiated list of "true facts," with no statement-specific tying.  *Boca*, 506 F. App'x at 38; *AstraZeneca*, 2022 WL 4133258, at *6.   In contrast, the FAC does the opposite, specifying why each misstatement or omission was misleading on a statement-by-statement basis.  *See* FAC App. I–VII.

the claim that "Tricolor's experience in the buy here-pay here industry has enabled it to develop sophisticated, proprietary systems and databases that help manage each aspect of its business" is contradicted by concrete factual allegations.  *See* FAC App. III ¶ 13; *id.* ¶¶ 84–90; 99–110.[4]

*Third*, Defendants wrongly assert that Plaintiffs base their misrepresentation allegations on "uncharged, unadjudicated wrongdoing" by Tricolor.  Joint Suppl. 9.  To the contrary, Plaintiffs challenge statements in the offering materials that provided false information about the characteristics of the loan pool backing the Notes and the risks associated with that loan pool.  *See, e.g.*, FAC ¶¶ 116–18.  The statements directly relaying those loan pool characteristics are misrepresentations, as Defendants concede.  The known and pervasive inaccuracy of the loan tape renders other statements actionable half-truths—"literally true statements that create a materially misleading impression."  *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 85–86 (2d Cir. 2021); *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 240 (2024).  For example:

- Each Offering Memoranda lists factors affecting collateral performance while omitting the primary factor that "[a] substantial portion of the Receivables . . . were double-pledged or fictitious." FAC App. III ¶ 10.

- Each Offering Memoranda describes Tricolor's capital funding as "dependent upon Tricolor's future operating performance," but fails to disclose that it was also "entirely dependent on Tricolor's ability to continue to conceal its ongoing fraud." FAC App. III ¶ 11.

---

[4]    In contrast to *In Re Philip Morris Int'l Inc. Sec. Litig.,* 89 F.4th 408 (2d Cir. 2023), there was an "objective, black-and-white standard by which to verify" the statements.  For example, systems employed for an unsophisticated, Ponzi scheme fraud, and which Defendants knew were fundamentally impaired, *see* FAC ¶¶ 84–90, 99–110, were neither "[s]ophisticated" nor "help[ful]" to Tricolor's business.

- Each Offering Memoranda represents that Tricolor originated the loan collateral in accordance with its "credit policy" without disclosing that portions of the loan collateral were entirely fictitious. FAC App. III ¶¶ 7, 14–15.

These half-truths omit information with a close nexus to facts actually disclosed because that information is necessary to make the related factual statements "clear and complete." *Macquarie*, 601 U.S. at 263–64. *Contra Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021) (no obligation to self-report "growing suspicions regarding … issues" at Estonia branch, because those issues did not make inaccurate Defendants' "disclosure of accurate historical data."). They are therefore actionable as misrepresentations under Rule 10b-5.

### D.    Plaintiffs Relied On Defendants' Fraudulent Statements

To plead reliance, Plaintiffs "need only allege that but for the claimed representations or omissions, [they] would not have entered into the detrimental securities transactions." *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 424 (S.D.N.Y. 2010). "[G]eneral disclaimers are insufficient to defeat reasonable reliance on material misrepresentations as a matter of law, even by a sophisticated party." *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 141 (2d Cir. 2019) (citing *Caiola*, 295 F.3d at 330–31). Even "a 'specific disclaimer will not undermine another party's allegation of reasonable reliance on the misrepresentations' if 'the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge.'" *Id.* at 141 n.7 (quoting *Warner Theatre Assocs. Ltd. P'Ship v. Metro Life Ins. Co.*, 149 F.3d 134, 136 (2d Cir. 1998)). "The reasonableness of a plaintiff's reliance is a nettlesome and fact intensive question and thus is often a question of fact for the jury rather than a question of law for the court." *Id.* at 141.

Defendants initially sought dismissal on the basis that Plaintiffs' allegations failed to allege reliance with particularity. Br. 30–32. Plaintiffs addressed this in the FAC, as Defendants appear

44

to concede.  *See* Joint Suppl. 8 (asserting that the FAC fails to allege *justifiable* reliance—not that Plaintiffs to allege reliance with particularity).  Defendants note that Plaintiffs have not pled individual reliance and/or provided transaction-level detail for certain Plaintiffs.[5]  Plaintiffs agree and are asserting only fraudulent transfer claims (Counts IX and X) on behalf of these entities.

Defendants' only remaining reliance argument (Br. 32; Joint Suppl. 8) is predicated on Defendants' disclaimer in the Offering Memorandum that: "NOTWITHSTANDING ANY INVESTIGATION THAT THE INITIAL PURCHASERS MAY HAVE CONDUCTED WITH RESPECT TO THE INFORMATION CONTAINED HEREIN, THE INITIAL PURCHASERS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION."  TAST 2024-1 OM 6.  But that is a quintessential example of a boilerplate disclaimer that is "insufficient as a matter of law to preclude reasonable reliance on material factual misrepresentations, even by a sophisticated investor." *KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 204 (S.D.N.Y. 2021); *see also Nat'l Century*, 541 F. Supp. 2d at 1005 ("[I]t would defeat the securities laws if parties could escape liability for their own deliberate misrepresentations by inserting boilerplate disclaimers into offering materials").  Indeed, the disclaimer itself is materially misleading: It fails to disclose that Defendants *had* commissioned CBIZ's audit of the loan tape, and based on that audit knew that the loan data used in the Offering Memoranda contained pervasive errors.  *See*

---

[5]  These Plaintiffs are: Crescent II Fund, L.P.; EF Securities LLC; Ellington Empire Fund LLC; Ellington M Credit Master Fund Ltd.; Ellington Private Opportunities Main Master Fund III LP; Ellington Special Relative Value Fund LLC; St. Bernard Opportunity Fund I, Ltd; OWS Credit Opportunity I, LLC; Clear Haven Investment Fund LP; Clear Haven Investments LLC; Clear Haven Ultra Short Investment Grade Bond Fund LP; Florida Casualty Insurance Company; and Superior Risk Solutions (SAC) Ltd.  *Id*. at 9.

45

*Terraform*, 684 F. Supp. 3d at 200 (a "duty to disclose" applies "whenever secret information renders prior public statements materially misleading").

Even if the "no representations and warranties" disclaimer were specific to the loan characteristics that Defendants knew to be inaccurate, which it was not, it would still not defeat reasonable reliance for the additional reason that the accuracy (or lack thereof) of the loan data was peculiarly within Defendants' (and Tricolor's) knowledge. *Dexia*, 929 F. Supp. 2d at 243 ("[G]iven the information regarding the individual loans that defendants possessed and that plaintiffs could not have obtained, no outside information could have led it to discover defendants' fraudulent practices."). Plaintiffs lacked access to the loan tape itself or any other source of information to confirm the accuracy of the loan characteristics described in the offering materials. *See* FAC ¶¶ 113, 129, 141, 153, 163, 173, 187. Defendants therefore had peculiar knowledge of the loan tape's pervasive inaccuracies, and could not disclaim liability for misrepresenting or concealing them.

Defendants' reliance on *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333 (2d Cir. 2011), is misplaced. Br. 32. The plaintiff in *Ashland* alleged that it was misled by oral statements about the liquidity of auction-rate securities that were directly contradicted by SEC-mandated written disclosures revealing the very liquidity risks that ultimately materialized. *Id.* at 338. Thus, in *Ashland*, there was no undisclosed risk. Here, Defendants failed to disclose the known and pervasive inaccuracy of the loan pool characteristics used in the offering materials.

E.    **Defendants Are Also Liable For Rule 10b-5(a) and (c) Scheme Liability**

For scheme liability under Rule 10b-5(a) and (c), Plaintiffs "must show (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Oklahoma Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 418 (S.D.N.Y. 2025). To meet this standard, it is sufficient to identify "what

46

deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *S.E.C. v. Passos*, 760 F. Supp. 3d 95, 122 (S.D.N.Y. 2024). The FAC satisfies the scienter and reliance requirements on the same basis as it does on its Section 10b-5(b) claim. *See* Section I.A and Section I.D *supra*.[6] The FAC also adequately alleges deceptive and manipulative conduct in furtherance of a scheme to defraud.[7]

*First*, the FAC alleges that the Underwriter Defendants engaged in deceptive acts by disseminating offering materials containing false statements to prospective investors. FAC ¶¶ 114, 122, 212; *Lorenzo v. S.E.C.*, 587 U.S. 71, 77 (2019) (defendant engaged in deceptive act by "disseminating false or misleading information to prospective investors"); *S.E.C. v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) ("[T]he Supreme Court held in *Lorenzo* that an individual who disseminated a false statement, but who did not make it, could be liable under the scheme subsections."); *Musk*, 779 F. Supp. 3d at 419–21, 428  (S.D.N.Y. 2025) (same). It is no matter that such conduct involves misstatements and omissions that might also give rise to Rule 10b-5(b) liability—scheme liability attaches when plaintiffs allege "something beyond" misstatements and omissions, "such as dissemination." *Rio Tinto*, 41 F.4th at 49. The Underwriter Defendants do not contest Plaintiffs' allegations that they disseminated offering materials for the Securitizations. FAC ¶ 212. And Defendants concede that the offering materials included numerous misstatements

---

6   Defendants' arguments on scienter and reliance do not distinguish between Rule 10b-5(b) misstatement claims and Rule 10b-5(a) and (c) scheme liability claims.

7   "Courts have repeatedly allowed both scheme liability and deceptive statement claims to go forward where the plaintiffs allege both that the defendants made misrepresentations in violations of Rule 10b–5(b), as well as that the defendants undertook a deceptive scheme or course of conduct *that went beyond the misrepresentations.*'" *S.E.C. v. Amah*, 2023 WL 6386956, at \*13–14 (S.D.N.Y. Sept. 28, 2023) (emphasis in original) (holding defendant liable, on summary judgment, under the scheme subsections for "directly disseminating" his own misstatements), *aff'd in part, vacated in part*, 2026 WL 504794 (2d Cir. Feb. 24, 2026) (affirming Rule 10b-5 holding).

and omissions. FAC ¶¶ 202–03; Br. 34 n.11. Accordingly, the FAC satisfies the deceptive act element of Rule 10b-5(a) and (c).

While dissemination is alone sufficient, the FAC also alleges additional deceptive acts that further satisfy the deceptive act element of scheme liability:

- The Underwriter Defendants facilitated the sale of the Notes by identifying third-party investors, including Plaintiffs, as prospective purchasers for the Notes and marketing and selling the Notes to those third-party investors. FAC ¶¶ 114, 122, 212; *see S.E.C. v. Rogas*, 2024 WL 1120558, at \*5 (S.D.N.Y. Mar. 14, 2024) (deceptive acts included "introducing investors," "arranging securities sales," "initiat[ing] … transactions," and selling the securities); and

- The Underwriter Defendants structured and underwrote the Securitizations and drafted the Offering Memorandum, deal roadshow, and Underwriting Model used to sell the Notes. FAC ¶¶ 114, 212; *S.E.C. v. Medallion Fin. Corp.*, 2024 WL 4227753, at \*16 (S.D.N.Y. Sept. 18, 2024) (defendant engages in deceptive act by telling speaker "where and how to publish [the misleading statements] or who to target").

These acts independently satisfy the deceptive act element of scheme liability.

*Second*, the Underwriter Defendants' deceptive acts advanced Tricolor's fraudulent scheme to sell double-pledged and fictitious loans to unsuspecting investors through the securitization pipeline. FAC ¶¶ 3, 95; *S.E.C. v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020) (liability exists where defendants "engaged in deceptive conduct that contributed to the larger scheme"). The FAC alleges that "Tricolor lacked the in-house expertise to operate its own securitization program and the market credibility to access investment capital available for asset-

backed securities investments." FAC ¶ 78.  To fill this gap,  Tricolor hired Defendants "JPMorgan and Barclays, two market-leading banks in the asset-backed financing space, to provide a full-service financing solution by providing the warehouse lending capacity and building out Tricolor's related securitization pipeline to facilitate an exit from the warehouse-backed loans."  *Id.* Defendants "dictate[d] the structure and terms" of the Securitizations, "prepare[d] all marketing materials," and sold the Notes to their "respective customer bases."  *Id*. ¶¶ 79–82.  These allegations satisfy the requirement that Defendants' deceptive acts advanced a fraudulent scheme.

Defendants try to cabin *Lorenzo* by pointing to cases not involving dissemination of false offering materials to argue that the Underwriter Defendants' dissemination here was not a "deceptive act."  Br. 29–30; Joint Suppl. 6–7.  But Defendants' own authorities acknowledge that *Lorenzo* is dispositive in dissemination cases like this one.  *See In re Global Cord Blood Corp. Secs. Litig.*, 2026 WL 444770, at \*16 (S.D.N.Y. Feb. 17, 2026).  *Lorenzo* and its progeny foreclose Defendants' assertion that the Underwriter Defendants' dissemination of Tricolor's false offering materials was "not 'affirmatively deceptive or manipulative.'"  Joint Suppl. 7.

By the same token, Defendants are wrong when they invoke pre-*Lorenzo* caselaw to argue that application of scheme liability for the dissemination of false statements made by others "would swallow the bright-line test between primary and secondary liability" under Rule 10b-5(b).  Joint Suppl. 7 (quoting *S.E.C.* v. *Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011)) (citing *Pac. Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*, 603 F.3d 144, 152-53 (2d Cir. 2010)).  Under *Lorenzo*, a defendant that disseminated the false statements of another is subject to scheme liability claims under Rule 10b-5(a) and (c) even if the same conduct would make the defendant only "secondarily liable under Rule 10b-5(b)."  *S.E.C. v. SeeThruEquity, LLC*, 2019 WL 1998027, at \*5 (S.D.N.Y. Apr. 26, 2019) (citing *Lorenzo*, 587 U.S. at 83–84).  As the Second Circuit explained in *Rio Tinto*,

49

"*Lorenzo* rejected the view that only subsection (b) of Rule 10b-5 can regulate conduct involving false or misleading statements." 41 F.4th at 53. While misstatements and omissions cannot be the "sole basis for scheme liability," the FAC's allegation that the Underwriter Defendants "disseminat[ed] … those misstatements" is sufficient to plead scheme liability claims under Rule 10b-5(a) and (c). *Id*.

Yet again, Defendants' reliance on boilerplate disclaimers in the Offering Memorandum does not change the outcome. *See* Joint Suppl. 7 (relying on statements in the Offering Memoranda "disclaiming that the Initial Purchasers were vouching for Tricolor's statements …"). As discussed above, boilerplate disclaimers do not absolve securities fraud defendants from liability for concealing known risks. *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 396 (S.D.N.Y. 2010) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.").

Finally, Defendants' footnote argument that secondary purchasers cannot assert a scheme liability claim fails. *See* Joint Suppl. 7 n.1. Plaintiffs completed their secondary market purchases on the backs of purchases in the primary offering, and in continued reliance on the misstatements and omissions in the offering materials that the Underwriter Defendants disseminated. *See, e.g.*, FAC ¶¶ 135–37, 142–45, 154–57, 164–67, 174–77, 180–82, 192–94.[8] The Supreme Court has repeatedly rejected Defendants' contention that Rule 10b-5 requires privity. *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 651 (1997) ("[Rule 10b-5] requires deception 'in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (rejecting a "narrow

---

[8]    Notably, a significant majority of Plaintiffs' secondary purchases were completed in close proximity to the initial Notes offering and all were completed before disclosure of the fraud. *See* FAC App. VIII.

construction" of Rule 10b-5 that would find liability "only when the plaintiff himself was defrauded into purchasing or selling particular securities"). Defendants offer no reasoned basis for departing from that precedent here.

### F.    The FAC Adequately Alleges Securities Fraud Against Fifth Third Securities

Fifth Third Securities' ("FTS") assertion that the securities fraud claims against it should be dismissed due to its limited role in the offerings is unavailing. The FAC identifies each Notes offering at issue, including those where FTS was an Initial Purchaser. FAC App. II, IV–VII. FTS's conclusory claim that it "did not 'underwrite' the notes; 'structure' the notes; 'disseminate' Offering Memoranda to any of its customers; or otherwise 'solicit' any customer to participate in these Trusts," Joint Suppl. 14–15, does not affect the FAC's adequacy, and is contradicted by the Purchase Agreements that FTS itself put in showing it participated in offering the Notes. *See* ECF No. 85-1–85-5 SA-1 (listing Fifth Third Securities, Inc., as an Initial Purchaser). At most, FTS raises a factual dispute that cannot be resolved on a motion to dismiss. *See, e.g.*, *Noriega v. Abbott Lab'ys*, 714 F. Supp. 3d 453, 457 (S.D.N.Y. 2024). FTS's complaints of "group pleading" and of the FAC not identifying individual FTS employees also ring hollow, as the FAC puts FTS on specific notice of the allegations against it. *See Dodona I*, 847 F. Supp. 2d at 647 n.13 ("Since the Complaint alleges what amounts to a tight weave of connections between all the Defendants, [a]t this stage of the litigation, any misstatements that could reasonably be found to have issued from one, essentially issued from all.") (cleaned up).

FTS's scienter arguments likewise fail. The FAC identifies FTS by name as Co-Manager and Initial Purchaser in five specific transactions. FAC ¶ 51. It identifies the audit report that FTS's affiliate Fifth Third Bank received through its SPV 6 role, and it further alleges Fifth Third Bank received at least $20 million per year in interest and fees from SPV 6. *Id*. ¶¶ 113, 212. And, as described above, "[i]t is possible to raise the required [scienter] inference with regard to a

51

corporate defendant without doing so with regard to a specific individual." *Teamsters*, 531 F.3d at 195.  Accordingly, the FAC adequately alleges scienter against FTS.

## II.    SUPPLEMENTAL JURISDICTION OVER THE STATE LAW CLAIMS IS PROPER

Because Plaintiffs have adequately alleged federal claims for securities fraud, the Court should exercise supplemental jurisdiction over Plaintiffs' state law claims. *See E.L.A. v. Abbott House*, 2018 WL 3104632, at *4 (S.D.N.Y. Mar. 27, 2018).

## III.    THE FIRST AMENDED COMPLAINT ADEQUATELY ALLEGES THE STATE LAW CLAIMS

### A.    The FAC States Common Law Fraud Claims

Defendants assert that Plaintiffs' "common law fraud claim has the same elements as a Section 10(b) claim" and do not separately argue for the dismissal of that claim.  Br. 37.  Plaintiffs have adequately pled both for the reasons addressed above.  *Accord Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.*, 376 F. Supp. 2d 385, 407 (S.D.N.Y. 2005), *as amended* (July 6, 2005).   In addition, there is no "maker" requirement for common law fraud, *see In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 262–64 (S.D.N.Y. 2011), and common law fraud claims are not subject to the heightened standard for pleading scienter under the PSLRA, *see Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 484 n.11 (S.D.N.Y. 2012).  For these reasons, as well, the Court should sustain the common law fraud claim.

### B.    The FAC States Blue Sky Law Claims

#### 1.    Colorado

The Colorado Securities Act makes it "unlawful for any person, in connection with the offer [or] sale … of any security, directly or indirectly, to make any untrue statement  of material fact or omit to state a material fact necessary in order to make the statements made … not misleading."  Colo. Rev. Stat. § 11-51-501(1)(b).  Section 501(1)(b) tracks the language of Rule

10b-5. 17 C.F.R. § 240.10b-5. While *Janus* grafted a "maker" requirement on the *implied* private right of action for Rule 10b-5, *see* 564 U.S. at 145, the Colorado Securities Act provides an *express* private right of action to the buyer against the seller:

> Any person who sells a security in violation of section 11-51-501(1)(b) (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from such person, who may sue to recover the consideration paid for the security, together with interest …, costs, and reasonable attorneys fees, less the amount of income received on the security ….

*Id.* § 11.51-604(4). This section imposes "quasi-strict liability" on the seller. *Fed. Deposit Ins. Corp. v. RBS Acceptance Inc.*, 611 F. Supp. 3d 1089, 1101 (D. Colo. 2020). The seller is liable if, "in the exercise of reasonable care [it] could have known, of the untruth or omission." *Id*. at 1097.

Defendants argue that Plaintiffs' claims under Section 604(4) should be dismissed because the FAC does not adequately allege that Defendants' were the "makers" of the untrue statements in the offering materials. Br. 38. This argument fails for multiple reasons.

*First*, Section 604(4) does not impose the "maker" requirement. "[T]he holding in *Janus* is based on the limited scope given to implied rights of action." *Optimal U.S.*, 837 F. Supp. 2d at 262. Section 604(4) provides an express private right of action against the seller in a securities transaction that violates Section 501(1) because *someone* in connection with that securities transaction made a false statement. By its plain terms, Section 604(4) does not require that the seller itself be the maker of the false statement, and this Court should not graft that requirement onto Section 604(4)'s broad scope.[9]

---

[9] Defendants' cases do not suggest otherwise. *Qwest* involved only Section 604(3), not Section 604(4). *See Shriners Hosps. for Child. v. Qwest Commc'ns Int'l Inc.*, 2005 WL 2350569, at *13–14 (D. Colo. Sept. 23, 2005). And *Black Diamond* involved neither. *See Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 729 (Colo. App. 2009).

*Second*, even if Section 604(4) did impose a "maker" requirement, the FAC adequately alleges that Defendants made the false statements in Offering Materials.  *See* Section I.B *supra*.

*Third*, the FAC separately states a claim under Section 604(3), which provides an express private right against the seller for scheme liability, subject only to a recklessness requirement.  Co. Rev. Stat. § 11-51-604(3).  As explained above, *see* Section I.A *supra*, the FAC pleads facts that support a strong inference that Defendants disseminated the offering materials with *scienter*.

### 2.    Florida

The Florida Securities Act prohibits securities sales "by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made … not misleading.  Fla. Stat. § 517.301(1)(a)(2).  The "by means" language in Section 301(1)(a)(2) tracks the language of Section 12 of the Securities Act of 1933.  15 U.S.C. § 77*l*.  The Act provides an express private right of action: "[a]ny person … selling a security in violation of § 517.301 … is … liable to the person … purchasing the security … in an action for rescission."  Fla. Stat. § 517.211(2); *see also E. F. Hutton & Co. v. Rousseff*, 537 So. 2d 978, 981 (Fla. 1989).[10]

Defendants argue that the Florida Securities Act claims should be dismissed because Defendants did not "make" the false statements alleged in the FAC.  *See* Br. 38.  This argument fails for multiple reasons.

*First*, given that Section 301(1)(a)(2) tracks the language of Section 12 of the Securities Act of 1933, the Florida Securities Act does not contain a "maker" requirement.  *See Hutton*, 537 So. 2d at 981 (Section 517.211 is the recessionary remedy for all violations of Section 517.301

---

[10]   Defendants claim that the Florida Securities Act applies a "negligence" requirement.  Br. 38. (citing *Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004)).  In *Hutton*, however, the Florida Supreme Court articulated a strict liability standard and that precedent controls.  *See* 537 So. 2d at 981.  Defendants, in any event, do not argue that the FAC fails to allege negligence.

and is analogous to Section 12; courts "need only follow the clear language of the statute"); *2 3 Suited, LLC v. Patel*, 2025 WL 2461151, at *5 (S.D. Fla. Mar. 10, 2025) (plaintiff must plead only: "1) a misrepresentation or omission, 2) of a material fact, 3) on which [it] relied."); *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *18–19 (S.D.N.Y. Aug. 11, 2021) (denying underwriter's motion to dismiss Section 12 claim, in part because offering materials included false statements, without considering statements' "maker").

*Second*, even if the Florida Securities Act had a "maker" requirement, the FAC adequately alleges that Defendants made the false statements in the Offering Materials. *See* Section I.B *supra*.

*Third*, Section 517.301 also provides for scheme liability, which Plaintiffs have established. *See* Fla. Stat. §§ 517.301(a), (c); Section I.E *supra*. The express private right of action under Section 211 applies equally to scheme liability and misstatement claims.

Defendants separately argue that the FAC fails to allege reliance. *See* Br. 38. For the reasons explained in Section I.D *supra*, the FAC adequately pleads reliance.

### 3.    New Jersey

The New Jersey Securities Act provides liability where a party offers or sells "a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission)." N.J.S.A. 49:3-71(a)(2). "[E]very broker-dealer … who materially aids in" such sale is jointly and severally liable, unless the broker-dealer "sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts" giving rise to the misstatement or omission. N.J.S.A. 49:3-71(d); *see Nat'l Century*, 846 F. Supp. 2d at 907 (the New Jersey Securities Act makes it unlawful for an underwriter or broker-dealer to "to participate in or materially aid an unlawful sale of securities."). Defendants do not address Section 49:3-71(d) in

either their opening or supplemental brief.    Nor do they argue here or elsewhere that "in the exercise of reasonable care" they "could *not* have known" about the admitted falsity of statements in the offering materials.  Defendants have thus conceded any argument that Hudson Cove's New Jersey Securities Act claim should be dismissed.

### 4.    Texas

#### (a)    Primary Violation

To state a primary violation under the Texas Securities Act, a security purchaser must allege that "the security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary in order to make the statements made not misleading." *Brand Engagement Network, Inc. v. AFG Companies, Inc.*, 2026 WL 658521, at \*18 (S.D.N.Y. Mar. 9, 2026) (citing *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App. 2018)); *see also* Tex. Gov't Code § 4008.052.  Scienter is not a required element.  *Id*.  The Texas Securities Act, like the Florida Securities Act, tracks the language of Section 12 of the Securities Act of 1933, and does not contain a "maker" requirement.  *See* Section III.B.2 *supra*. Defendants do not appear to argue otherwise.  Joint Suppl. 10.[11]  While Defendants state, without explanation, that "the [F]AC fails to plead actionable misstatements," *id.*, they have already conceded, for purposes of this motion, that the loan pool characteristics in the offering materials were false and misleading, Br. 34 n.11.  Thus, Defendants do not identify any credible basis to dismiss the FAC's fraud claims under the Texas Securities Act.

---

[11]    In addition, the FAC adequately alleges that JPMorgan "made" the misstatements and omissions in the offering materials, *see* Section I.B *supra*, and the FAC alleges that JPMorgan made additional misrepresentations and omissions regarding Tricolor to Frost.  *See* FAC ¶¶ 158, 204.

(b)    Aiding and Abetting

To establish liability for aiding and abetting securities fraud under the Texas Securities Act, Tex. Gov't Code § 4008.055(c), a plaintiff must allege: "(1) the existence of a primary violation of the [Texas Securities Act], (2) that the aider has a general awareness of its role in the violation, (3) that the aider gave substantial assistance in the violation, and (4) that the aider intended to deceive the plaintiff or acted with reckless disregard for the truth of the representations made by the primary violator." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 456 (S.D.N.Y. 2017). The FAC alleges, and Defendants readily acknowledge, that Tricolor and its executives, namely Daniel Chu and Jerry Kollar, all based in Texas, committed securities fraud with respect to each Securitization. *See* FAC ¶¶ 1, 83–95; Joint Suppl. 1 (arguing the Defendants were "the primary victims of Tricolor's double-pledging scheme").

Defendants' argument that there is an insufficient connection to Texas misses the mark. Joint Suppl. 10–11. The Texas Securities Act is a "broad remedial statute" that protects "non–Texas residents from fraudulent securities practices emanating from Texas." *Silvercreek*, 248 F. Supp. 3d at 456 (citing *Baron v. Strassner*, 7 F. Supp. 2d 871, 876 (S.D. Tex. 1998) (sustaining claim when primary violator and principals who allegedly committed securities fraud were based in Texas)); *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 691–92 (S.D. Tex. 2002) (same). It applies here because Tricolor perpetrated its fraudulent scheme through individuals and entities based in Texas. *See Silvercreek*, 248 F. Supp. 3d at 456. Thus, regardless of the Trusts' role in issuing the Notes, there should be no dispute that fraudulent statements were made in Texas. *Pinnacle Oil Co. v. Triumph Okla., LP*, 1997 WL 362224, at *2 (S.D.N.Y. June 27, 1997).[12]

---

[12] Defendants' cases are not to the contrary. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 554, 575 (S.D. Tex. 2011) (conclusory allegation that Delaware trust

As discussed *supra*, Plaintiffs have demonstrated scienter and reliance. *See* §§ I.A, D. Further, Defendants' argument that the FAC fails to "plead that Defendants rendered substantial assistance in a primary violation" (Joint Suppl. 11) (cleaned up) is spurious. Defendants' assistance was essential to the fraudulent scheme's growth and survival. *E.g.* FAC ¶ 246. Defendants provided a "full-service financing solution," in which they "exercised absolute and complete control" over the Notes offerings. FAC ¶¶ 78, 82. *Willis v. Marshall* is inapposite—the defendant audit firm there did not even know that the alleged primary violator was selling securities. 401 S.W.3d 689, 705 (Tex. App. 2013). To the contrary, courts widely recognize underwriter liability in similar circumstances. *See, e.g.*, *Silvercreek*, 248 F. Supp. 3d at 455–57; *Enron*, 235 F. Supp. 2d at 692; *Stanley S. & Millicent R. Barasch Living Tr. et al. v. GPB Cap. Holdings, LLC et al.*, 2021 WL 12414217, at *8 (W.D. Tex. Aug. 25, 2021). Accordingly, Plaintiffs have adequately pled aiding and abetting claims under the Texas Securities Act.

### C.    The FAC States Fraudulent Transfer Claims

#### 1.    The FAC Adequately Pleads Transfers of Property by the Tricolor Trusts

Defendants acknowledge that the Tricolor Trusts raised money by issuing the Notes that are now held by the Noteholders, including Plaintiffs in this case. Br. 2, 40. They acknowledge that the proceeds of the Note sales flowed through various entities to the warehouse SPVs, where the money was exchanged for receivables held by those SPVs. *Id*. at 8. And they acknowledge that the receivables then flowed back, again through various entities, to the Tricolor Trusts, which hold the receivables as collateral on the Trusts' obligations to the Noteholders. *Id*. at 13.

---

was a mere shell for Texas-based company insufficient to apply Texas law); *Pinnacle Oil Co.*, 1997 WL 362224, at *2 (conclusory allegations that misrepresentations "emanated from Texas" insufficient to apply Texas law).

Defendants ignore the indisputable economic reality that the transfers in question effectuated an exchange of Tricolor Trust funds for receivables, however, contending instead that the money exchanged for the receivables never belonged to the Tricolor Trusts. *Id*. at 42. In Defendants' telling, because the Tricolor Trusts never had physical possession of the cash raised by selling their Notes, they could not have made the transfers to the warehouse SPVs. *See id*.

Defendants' argument defies logic. To begin with, it cannot be disputed that the payments made by the Initial Purchasers were made to obtain Notes issued by the Tricolor Trusts. It follows, then, that the payments constituted property of the Trusts. It is no different than the analogous situation in which a borrower's lender sends the proceeds of the borrower's loan directly to a transferee upon the borrower's instruction. The fact that the borrower never physically possessed the loan proceeds does not mean that the proceeds did not constitute the borrower's property, or that the transferee was not a recipient of the borrower's funds. *See, e.g.*, *In re Cool Springs LLC*, 657 B.R. 767, 779–80 (Bankr. D. Del. 2024) (holding that financer's direct payments to vendor "in satisfaction of the Debtor's obligation" were "in essence a loan from [financer] to the Debtor," and thus the funds advanced were Debtor's property); *O'Cheskey v. Hous. for Texans Charitable Tr. (In re Am. Hous. Found.)*, 2012 WL 5430988, at *6–7 (Bankr. N.D. Tex. Nov. 7, 2012) (holding that funds in affiliate's account "constituted funds of the debtor" where the account served as a "conduit" for payment of debtor's creditors); *Cassirer v. Herskowitz (In re Schick)*, 234 B.R. 337, 346–47 (Bankr. S.D.N.Y. 1999) (holding that third-party payments directly to creditor were "transfers of property of the debtor" where the payments "represent[ed] a loan by the third party to the debtor" and the debtor directed application of the loan to pay creditors); *see also Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1256 (10th Cir. 2008) ("dominion or control over [loan proceeds] as evidenced by an ability to direct their distribution" indicates an

interest of a debtor in property sufficient to bring it into the estate, "even if [the debtor was] never in actual possession of the loaned proceeds."); *Hayes v. U.S. (In re Applied Machinery Rentals, LLC)*, 670 B.R. 452, 460 (W.D.N.C. 2025) ("The fact that the loan proceeds were wired from the loan closing directly to McGillewie's personal account did not divest Debtor of its property interest in those proceeds.").

The *A.W. Lawrence* case cited by Defendants does not hold otherwise. *See* Br. 42 (citing *In re A.W. Lawrence & Co.*, 346 B.R. 51, 57–58 (N.D.N.Y. 2006)). The debtor there sought to avoid and recover as a fraudulent transfer the proceeds of a check made out to the debtor by the wife of the debtor's chairman, as purported consideration for a sailboat allegedly sold to her by the debtor. *Id*. at 53–54. But the check was never deposited into the debtor's bank account, and was used to pay the chairman's debt to a party unrelated to debtor. *Id*. The court ruled in the avoidance defendants' favor, finding that the debtor's "purported" basis for rendering the transferred funds debtor property—the supposed sale of the debtor's boat to the chairman' wife— "was indeed 'purported.'" *Id.* at 58. The court noted, however, that "this conclusion might have been different if the evidence supported the actual transfer of ownership in the [boat] by [the debtor] to [the chairman's wife.]." *Id*. Unlike in *A.W. Lawrence*, there is no dispute here that the Initial Purchasers transferred funds as consideration for each Tricolor Trust's obligations under the Notes. *A.W. Lawrence* thus supports, rather than undermines, a finding that the funds constituted property of the Tricolor Trusts.

The fact that the Notes passed through the Depositor on their way to the Initial Purchasers does not warrant a different conclusion. A party that lacks "dominion and control" over assets transferred to it, and that therefore lacks "the right to put the [assets] to one's own purposes," is a "mere conduit" that is disregarded as a transferee for the purposes of fraudulent transfer law. *Sec.*

*Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2023 WL 3964150, at \*10 (Bankr. S.D.N.Y. June 12, 2023).   As the Offering Memorandum attached as Exhibit 2 to Defendants' Joint Memorandum of Law demonstrates, the Depositor served as a mere conduit here with respect to the Notes, as the Depositor's sole purpose with respect to the Notes was to transfer them from the Tricolor Trusts to the Initial Purchasers.   TAST 2024-1 OM 14 (showing the structure of the transactions).   The relevant parties are the Tricolor Trusts, which were obligated to pay on the Notes, and the Initial Purchasers, which provided the funds necessary to effectuate the Securitizations by purchasing the Notes.

The Offering Memorandum also makes clear that it was the Tricolor Trusts that had the ability to determine how the Notes proceeds would be used.   The Offering Memorandum states that one of the activities in which the Tricolor Trusts would engage was "using *(or permitting the Depositor to use)* the proceeds of the sale of the Notes to (1) purchase the Receivables on the Closing Date, (2) fund the Reserve Fund, (3) pay the organizational, start-up and transactional expenses of the Issuer and (4) pay the balance to the Depositor."  *Id.* at 54 (emphasis added).   If the Notes proceeds had belonged to the Depositor as Defendants contend, it would not have needed the Tricolor Trusts' permission to put them to use.

By similar logic, the Depositor and Tricolor Servicer also served as mere conduits in the transfers of Tricolor Trust cash to the warehouse SPVs, and transfers of receivables to the Tricolor Trusts.  As the FAC alleges:

> The Tricolor Servicer and the Depositor never had dominion or control over either the Tricolor Trust funds that were used to purchase the receivables or the receivables themselves. To the contrary, the governing documents required the Depositor to immediately transfer the funds raised through sales of the Notes to the Tricolor Servicer, and the Tricolor Servicer to immediately transfer those funds to the Warehouse SPVs. Similarly, the documents required the Tricolor Servicer to immediately transfer the receivables to the Depositor, and the Depositor to immediately transfer those receivables to the Tricolor Trusts. In other words, while

> Notes sales proceeds passed, on paper, through the Tricolor Servicer and the Depositor, the economic reality is that the Tricolor Trusts transferred funds raised from sale of the Notes to the warehouse SPVs in exchange for the receivables.

FAC ¶ 65.

Case law also dictates that the various steps between the Tricolor Trusts' issuance of the Notes and their receipt of the receivables—namely, the intermediate transfers of the Notes to the Depositor before the Notes were transferred to the Initial Purchasers, the intermediate transfers of the Note proceeds to the Depositor and Servicer before the Notes proceeds were transferred to the warehouse SPVs, and the intermediate transfers of the receivables to the Tricolor Servicer and Depositor before being transferred to the Tricolor Trusts—should be collapsed into single integrated transactions in which the Tricolor Trusts used the Notes proceeds to purchase receivables from the warehouse SPVs.  The Second Circuit has instructed that "an allegedly fraudulent conveyance must be evaluated in context; '[w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.'"  *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) ("we will not turn a blind eye to the reality that the transfer of the New York Property and the spin-off of KIC shares constituted a single, integrated transaction").  Thus, courts in this Circuit and others "collapse" the multiple steps of an integrated transaction where "all of the parties involved had knowledge of the multiple transactions," none of the transactions "would have occurred on its own," and "each transaction was dependent or conditioned on other transactions." *In re Sabine Oil and Gas Corp.,* 547 B.R. 503, 540–41 (Bankr. S.D.N.Y. 2016) (holding that a merger, share exchange, and debt financing "must be treated as parts of a general plan, and … analyzed as a whole for purposes of fraudulent transfer law"); *see also Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371, 380 (Bankr. S.D.N.Y. 2013) ("If the various closely related transactions are just means to reach a particular result, the court will view them as a single transaction"); *In re Jevic Holding Corp.*, 2011

WL 4345204, at *5 (Bankr. D. Del. Sept. 15, 2011) ("To determine whether a series of transactions should be "collapsed" and viewed as a single integrated transaction, courts focus on the substance rather than on the form of the transactions and consider the overall intent and impact of the transactions"); *Holliday v. Credit Suisse Sec. (USA) LLC*, 2021 WL 4150523, *3 (S.D.N.Y. Sept. 13, 2021) (holding that a single interim transfer in a leverage recap transaction could not be challenged as the initial transfer for purposes of a fraudulent transfer claim because courts do not analyze a single interim transfer "in a vacuum," and instead holding that relevant transfer for purposes of the claim was the "overarching transfer").

There is no question that collapsing is mandated here. First, all parties had knowledge of the multiple steps of the Securitizations. The governing documents expressly required that each step occur simultaneously. FAC ¶¶ 65, 95. Second, none of the steps would have occurred on its own, and each step was dependent on the others. *Id.* ¶ 65. Indeed, the entire purpose of the steps was to raise cash through the issuance of debt that would be secured by the receivables, which necessitated that each step occur simultaneously with the others. It is thus plain that the various steps of each Securitization constituted a "single, integrated transaction" to exchange Notes proceeds for receivables, and should be treated as such under the applicable fraudulent transfer statutes. *Orr*, 991 F.2d 31 at 35.

Defendants' response, that a court may apply the collapsing doctrine only if all participants in the transaction are named as are parties to the action, Joint Suppl. 12, is wholly unsupported. And for good reason: such a holding would require a plaintiff to name as defendants parties from which it seeks no relief. The cases cited by Defendants do not support such a wasteful exercise. *In re NewStarcom Holdings* held only that the complaint failed to state a claim for the avoidance

of a stock transfer because it did not name as a defendant the recipient of the transfer from which the plaintiff allegedly sought to recover the stock. 608 B.R. 614, 621–22 (D. Del. 2019).

*Contemporary Industries Corp. v. Frost*, 2001 WL 34630639 (Bankr. D. Neb. Feb. 14, 2001), is also inapposite. The court there held that in order to state a claim against a subsequent transferee, the plaintiffs must include the initial transferee as a defendant as well. *See id*. at *10. But even this more limited holding has been expressly rejected by the courts within this Circuit and others. *See, e.g.*, *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 655 B.R. 149, 166 (Bankr. S.D.N.Y. 2023) ("While the Trustee must allege that the initial transfer from BLMIS to Groupement is avoidable, he is not required to avoid the transfer received by the initial transferee before asserting an action against subsequent transferees. . . . The Trustee is free to pursue any of the immediate or mediate transferees . . . ."); *In re Giant Gray, Inc.*, 629 B.R. 814, 832–33 (Bankr. S.D. Tex. 2020) (plaintiff need not name the initial transferee in an action to recover from a subsequent transferee); *In re ONH AFC CS Invs., LLC*, 2026 WL 312892, at *8 (Bankr. D. Del. Feb. 4, 2026) (holding that "there is no reason that the initial transferee needs to be a party to the lawsuit" to recover from a subsequent transferee) (emphasis in original); *see also IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 706–08 (11th Cir. 2005) (trustee did not need to name initial transferees as defendants to recover from subsequent transferees across a chain of over one hundred transfers among twenty-three entities).

Moreover, the *Contemporary Industries* holding was based on the court's conclusion that because section 550 of the Bankruptcy Code (11 U.S.C. § 550) allows a plaintiff to recover from a subsequent transferee "to the extent the [initial transfer] is *avoided*," "[t]he statutory language requires the actual avoidance of the initial transfer before recovery may be sought from a subsequent transferee." *Contemporary Indus.,* 2001 WL 34630639, at *7–8 (emphasis added).

64

Here, however, the statutory language under which Plaintiffs are pursuing their claims allows for recovery from a subsequent transferee "to the extent the [initial transfer] is *voidable*."  6 Del. C. § 1308(b) (emphasis added); Tex. Bus. & Com. Code § 24.009(b) (emphasis added).

Defendants' other argument, that "'the use of the collapsing doctrine to re-characterize the parties to a transaction' is foreclosed by Delaware law," Joint Suppl. 12, misses the point entirely. As discussed above, the funds Plaintiffs seek to recover were raised through the issuance of Tricolor Trust Notes, and thus constituted Tricolor Trust property.  Plaintiffs have no need to "recharacterize the parties" to the Securitizations, as they are appropriately seeking to recover transfers of Tricolor Trust assets.   The cases cited by Defendants, in which plaintiffs sought to recover transfers of property in which the debtor could claim no interest, have no bearing here. *See Giuliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 617 B.R. 496, 504–05 (Bankr. D. Del. 2020) (holding that a bankruptcy trustee could not recover fraudulent transfer damages attributable to assets held or provided by the debtor's prepetition lenders or shareholders); *In re HH Liquidation, LLC*, 590 B.R. 211, 256, 269 (Bankr. D. Del. 2018) (holding that creditors of operating company could not avoid and recover transfers of property belonging to debtor's parent company); *Crystallex Int'l Corp.* v. *Petróleos De Venezuela, S.A.*, 879 F.3d 79, 84–86 (3d Cir. 2018) (holding that the plaintiff could not avoid and recover a dividend issued to its debtor by a non-debtor); *NewStarcom*, 608 B.R. at 622–23 (holding that the debtors' bankruptcy trustee could not avoid and recover asset transfers made by the debtors' non-debtor sister entity).

### 2.    The FAC Adequately Pleads Lack of Reasonably Equivalent Value

Defendants confusingly—and plainly inaccurately—assert that use of the Notes' proceeds to repay Tricolor's warehouse loans constitutes a "repayment of an antecedent debt" that both undermines the actual fraudulent transfer claim and constitutes "reasonably equivalent value" to defeat the constructive fraudulent transfer claim.  Br. 43–44.  Defendants' argument rests on a

fundamental misidentification of the debtor.  The debtors for purposes of the fraudulent transfer claims are the Tricolor Trusts—not the Depositor, not the Servicer, and not the warehouse SPVs. FAC ¶¶ 261–62, 266.  Because the warehouse loans were not obligations of the Trusts, *see id.* ¶¶ 52, 57–58, the Trusts did not receive any value in the form of a paydown on antecedent debt.

Repayment of a third party's debt cannot constitute "reasonably equivalent value" received by the Tricolor Trusts.  *See, e.g.*, *Saracheck v. Crown Heights House of Glatt, Inc. (In re Agriprocessors, Inc.)*, 521 B.R. 292, 306 (Bankr. N.D. Iowa 2014) ("Generally, when a debtor pays the debt of a third party, there is not reasonably equivalent value to the debtor.").  Defendants' cases do not say otherwise.  *Wickes Trust* merely recites the threshold rule that "one must first have a valid claim against the person . . . alleged to have fraudulently made the transfer," and found that the plaintiff was "precluded from asserting that she is a creditor with a valid claim against the Estate."  *In re Wickes Tr.*, 2008 WL 4698477, at *7 (Del. Ch. Oct. 16, 2008).  And the remaining cases involved a debtor's payment to *its own creditor*.[13]  By contrast, here, it cannot be credibly argued that the Noteholders are not valid creditors of the transferor Tricolor Trusts, or that the warehouse SPV debt constituted antecedent debt of the Trusts.  The Tricolor Trusts obtained no value—much less reasonably equivalent value—from payment of the warehouse SPVs' debt.

> ### 3.    The FAC Adequately Alleges The Tricolor Trusts' Insolvency, Unreasonably Small Capital, And Inability To Pay Debts As They Came Due

Plaintiffs properly allege that the Tricolor Trusts were insolvent or became insolvent shortly after the warehouse SPV transfers because the debts they incurred far exceeded the value

---

[13]    *See In re Sharp Int'l Corp.*, 403 F.3d 43, 54–56 (2d Cir. 2005); *Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1510–11 (1st Cir. 1987); *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 477–78 (7th Cir. 2005); *In re CL H Winddown LLC*, 2023 WL 5740195, at *4 (Bankr. D. Del. Sept. 5, 2023).

of their only assets: the substantially impaired, double-pledged, or non-existent receivables. FAC ¶¶ 4, 266, 274–76; 6 Del. C. § 1302(a) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."); Tex. Bus. & Com. Code § 24.003(a) (same). Plaintiffs also properly allege that the Tricolor Trusts had unreasonably small assets because the cash flows from double-pledged or non-existent loans were insufficient to service the Tricolor Trusts' debts. FAC ¶ 276.

Defendants make two arguments in response, both of which lack merit. *First,* Defendants argue that the Tricolor Trusts could not have had unreasonably small assets because they had been making payments to Noteholders for some time before Tricolor declared bankruptcy. Br. 44. This argument misses the point: Even if the Tricolor Trusts could satisfy some of their obligations to the Noteholders—including obligations stretching over several years—they would *never* be able to satisfy all of their obligations because their assets were substantially impaired, and thus plainly inadequate, from the outset. Accordingly, the Tricolor Trusts, at all relevant times, had unreasonably small assets in relation to their businesses. FAC ¶ 276. *See, e.g., In re Tribune Co.*, 464 B.R. 126, 169–70 (Bankr. D. Del. 2011) (explaining that a party can demonstrate inadequate capital by showing that operating cash flows were insufficient to service debts).[14]

*Second*, Defendants argue that the Tricolor Trusts cannot have been insolvent because they are passthrough entities that merely distribute whatever cash the receivables generate and bear

---

[14]    Both of the cases that Defendants cite to support their argument are inapposite. *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002), did not involve the sale of double-pledged receivables, nor were the cash flows from those receivables the debtors' only source of capital. And, in any event, the court found that the debtor was balance sheet insolvent. *Id*. at 78. *In re Opus E. LLC*, 698 F. App'x 711, 715–17 (3d Cir. 2017), is inapposite because there was no suggestion in that case that the debtor's capital source was impaired. That case's general proposition—that a company surviving for an extended period suggests adequate capital—has no application to an entity whose sole assets are receivables that were fraudulently inflated from the outset.

no liability for any shortfall. Br. 45. This argument presumes that creditors' rights to recoveries on the Notes—and, correspondingly, the Tricolor Trusts' obligations to pay the Noteholders— were contractually limited to the proceeds of the receivables held as collateral. But that simply isn't so. The Notes provide for fixed principal and interest payments that the Tricolor Trusts are required to pay to the Noteholders. Those obligations are not extinguished if the collateral proves insufficient.[15]

### 4.    Plaintiffs May Obtain A Money Judgment For The Value Of The Transferred Property

Defendants contend that the "typical" remedy for a fraudulent transfer is a return of the transferred property[16] to the transferor, and they fault Plaintiffs for seeking money damages or rescission. Br. 40. But Plaintiffs do not just ask for "[m]oney damages" and/or "[r]escission"; rather, Plaintiffs seek "payment of the value of the funds transferred to the Lender Defendants." FAC 122 (Prayer for Relief (c)). That is *exactly* what the law permits: both the Delaware and Texas Uniform Voidable Transactions Acts state that "a creditor may recover judgment for the value of the asset transferred" based on "the value of the asset at the time of the transfer." 6 Del. C. § 1308(b), (c); Tex. Bus. & Com. Code § 24.009(b), (c); *see, e.g.*, *In re Housecraft Indus. USA, Inc.*, 310 F.3d 64, 69 (2d Cir. 2002) (affirming judgment for "full value of the property transferred,

---

[15]   Notably, Defendants do not cite any case law to support this argument. Instead, they cite: (i) an SEC release; (ii) a securities litigation handbook; and (3) a law review article about residential mortgage-back securitizations. Br. 45. Those sources merely describe how securitization trusts function, and the law review article discusses bankruptcy-remoteness. Nothing in those sources suggests that a securitization trust is always solvent. Moreover, these sources presuppose that the receivables transferred into the vehicle were legitimate and unimpaired. For example, Gelpern & Levitin's "immortal automaton" metaphor describes a trust operating as designed with genuine collateral, not one whose collateral pool was riddled with fictitious and doubly-pledged assets from inception. *See* Anna Gelpern & Adam J. Levitin, *Rewriting Frankenstein Contracts*, 82 S. Cal. L. Rev. 1075, 1098 (2009).

[16]   Here, of course, the "transferred property" received by the warehouse SPVs, and subsequently paid to the Lender Defendants, was cash.

plus interest."); *August v. August*, 2009 WL 458778, at \*10, \*17 (Del. Ch. Feb. 20, 2009) (entering a money damages judgment for a creditor and against a transferee on a fraudulent transfer claim and, citing 6 Del. C. § 1308(c), explaining that a creditor can obtain a judgment in an amount equal to the value of the asset at the time of the transfer); *Wohlstein v. Aliezer*, 321 S.W.3d 765, 776–78 (Tex. App. 2010) (stating that Texas law permits creditors in fraudulent transfer cases to recover "money damages up to the value of the property transferred").[17]  Simply put, the remedy Plaintiffs seek on the fraudulent transfer claims—payment of the value of the funds transferred by the Tricolor Trusts—is specifically sanctioned by the statues and commonplace in such actions.

### 5.    Plaintiffs Do Not Need To Bring The Fraudulent Transfer Claims In Bankruptcy Court

Defendants' final argument is that Plaintiffs must bring their fraudulent transfer claims in bankruptcy court because the cash passed through the Tricolor Servicer, which has now filed for bankruptcy.  Br. 42–43 (citing *In re Refco Inc. Sec. Litig.*, 2011 WL 13168427, at \*2 (S.D.N.Y. July 5, 2011)).  This argument also lacks merit.

These fraudulent transfer claims are not property of the debtors' estates.  Instead, as discussed above, Plaintiffs seek to avoid the warehouse SPV transfers, which moved money raised by the Tricolor Trusts' issuance of the Notes through multiple entities to the warehouse SPVs, which then used that money to pay down their debt to Defendants.  FAC ¶¶ 261–68.  The transfers' fleeting passage through an entity that is now in bankruptcy does not mean that the fraudulent transfer claims belong in bankruptcy court.  As alleged in the FAC and explained in detail above,

---

[17]  The sole case and the very footnote in that case that Defendants cite confirms that plaintiffs in fraudulent transfer cases can obtain judgments for the value of the property transferred. *See In re Amp'd Mobile*, 404 B.R. 118, 125 n.7 (Bankr. D. Del. 2009) (recognizing that a plaintiff in a fraudulent transfer case, which in *Amp'd Mobile* was a debtor-in-possession in a bankruptcy case, can recover "the value of the property" transferred).

the Tricolor Servicer was a mere conduit of the cash, which had no discretion to keep the money rather than transfer it to the warehouse SPVs as part of mandatory, multi-step transaction.  FAC ¶ 65; *see Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1178–79, 1181–82 (11th Cir. 1987) ("conclud[ing] that the debtor corporation was a mere conduit" and that the funds were "not the 'property' of the debtor corporation" where the transfer involved only "a two-day layover in a special account"); *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893–94 (7th Cir. 1988) (bank was "no different from a courier or an intermediary on a wire transfer" because it "held the check only for the purpose of fulfilling an instruction to make the funds available to someone else").  Given that no entity in bankruptcy ever had control over the funds involved in these transactions, there is no basis whatsoever to relegate to bankruptcy court claims to recover the value of the transferred funds.[18]

Finally, re-affirming what is already clear—that the fraudulent transfer claims here do not involve harm to a debtor entity—the Tricolor chapter 7 Trustee has not objected to Plaintiffs asserting these claims in this Court.

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion in its entirety.

---

[18]   Defendants have not cited any authority that these claims belong in the bankruptcy court.  The sole case that they cite, *Refco*, did not even analyze fraudulent transfer claims.  Instead, *Refco* was discussing whether a chapter 7 trustee or the debtor's creditors had standing to bring fraud claims, and explained the uncontroversial proposition that only a trustee can bring claims that involve direct harm to a debtor even though the conduct may have indirectly harmed creditors.  2011 WL 13168427, at *2, *9.

Respectfully submitted,

Dated: New York, New York
        May 14, 2026

**QUINN EMANUEL URQUHART
& SULLIVAN LLP**

By:      */s/ Blair Adams*

Blair Adams
Deborah Newman
Robert Loigman
Toby Futter
295 Fifth Avenue
New York, NY 10010
(212) 849-7000
blairadams@quinnemanuel.com
deborahnewman@quinnemanuel.com
robertloigman@quinnemanuel.com
tobyfutter@quinnemanuel.com

Eric Winston (admitted *pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa St.
Los Angeles, CA 90017
ericwinston@quinnemanuel.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, Blair Adams, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Civil Rule 7.1(c) that the annexed Memorandum of Law was prepared using Microsoft Word and the document contains 22,750 words as calculated by the application's word-counting function, excluding the parts of the Memorandum of Law exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury the forgoing statements are true and correct. Executed on this 14 day of May, 2026 in New York, New York.

*/s/ Blair Adams*
*Attorney's Name*

71