**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| One William Street Capital Master Fund Ltd., *et al.*, <br><br>     Plaintiffs, <br><br> v. <br><br> JPMorgan Chase Bank, National Association, *et al.*, <br><br>     Defendants. | Case No. 1:26-cv-01622-JSR |

**DEFENDANTS' JOINT REPLY MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR JOINT MOTION TO DISMISS**

May 21, 2026

**TABLE OF CONTENTS**

*Page*

ARGUMENT ............................................................................................................................... 1

I.     Plaintiffs' Section 10(b) Securities Fraud Claim Should Be Dismissed ............................ 1

        A.     Plaintiffs Have Not Pled a Strong Inference of Scienter ....................................... 1

               1.     Plaintiffs' Motive Allegations Are Inadequate .......................................... 1

               2.     Plaintiffs Do Not Allege Conscious Recklessness ..................................... 4

               3.     The Opposing Inference of Non-Fraudulent Intent Is More Compelling ................................................................................................ 10

        B.     Plaintiffs Have Not Pled That Any Defendant Was the "Maker" of a Challenged Statement, or Engaged in a Fraudulent Scheme ............................... 11

        C.     Plaintiffs Have Not Pled Reliance on Any Statements by Defendants ................. 13

        D.     Many of the Challenged Statements Are Not Actionable ..................................... 14

II.     The State Law Claims Should Be Dismissed ..................................................................... 14

        A.     Plaintiffs Fail to Plead Common Law Fraud and State Securities Act Claims ................................................................................................................. 14

        B.     Plaintiffs Fail to Plead Fraudulent Transfer Claims ........................................... 15

CONCLUSION .......................................................................................................................... 20

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  2007 WL 2615928 (S.D.N.Y. Sept. 10, 2017)..............................................................................3

*Ashland Inc.* v. *Morgan Stanley & Co.*,
  652 F.3d 333 (2d Cir. 2011)........................................................................................................13

*B.E.L.T., Inc.* v. *Wachovia Corp.*,
  403 F.3d 474 (7th Cir. 2005) ......................................................................................................19

*In re Bear Stearns Cos., Inc. Sec. Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011).........................................................................................7

*Bos. Trading Grp., Inc.* v. *Burnazos*,
  835 F.2d 1504 (1st Cir. 1987).....................................................................................................17

*Chill* v. *Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)..........................................................................................................2

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010)..........................................................................................8

*In re Citigroup Sec. Litig.*,
  2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .......................................................................8, 10

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
  2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).............................................................................9

*City of Miami Gen. Emps. & Sanitation Emps. Ret. Tr.* v. *Dimon*,
  711 F. Supp. 3d 208 (S.D.N.Y. 2024)....................................................................................8, 15

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)........................................................................................................14

*DeLollis* v. *Friedberg, Smith & Co., P.C.*,
  600 F. App'x 792 (2d Cir. 2015) ..................................................................................................4

*In re DNTW Chartered Accts. Sec. Litig.*,
  172 F. Supp. 3d 675 (S.D.N.Y. 2016)..........................................................................................7

*Dodona I, LLC* v. *Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)..........................................................................................2

*In re DSI Renal Holdings, LLC,*
    617 B.R. 496 (Bankr. D. Del. 2020) ...............................................................................16

*In re Dynagas LNG Partners LP Sec. Litig.,*
    504 F. Supp. 3d 289 (S.D.N.Y. 2020)...............................................................................2

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
    761 F. Supp. 2d 504 (S.D. Tex. 2011) ............................................................................15

*In re Fannie Mae 2008 Sec. Litig.,*
    891 F. Supp. 2d 458 (S.D.N.Y. 2012)...........................................................................12

*Gabriel Cap., L.P.* v. *NatWest Fin., Inc.,*
    94 F. Supp. 2d 491 (S.D.N.Y. 2000)................................................................................8

*Handal* v. *Innovative Indus. Props., Inc.,*
    157 F.4th 279 (3d Cir. 2025) ............................................................................................5

*Hanson* v. *Frazer, LLP,*
    2013 WL 5372749 (S.D.N.Y. Sept. 24, 2013).................................................................9

*Heabeart* v. *Coinbase, Inc.,*
    2026 WL 1250578 (S.D.N.Y. May 7, 2026) ................................................................2, 4

*In re HH Liquidation, LLC,*
    590 B.R. 211 (Bankr. D. Del. 2018) ...............................................................................18

*Iowa Pub. Emps.' Ret. Sys.* v. *Deloitte & Touche LLP,*
    973 F. Supp. 2d 459 (S.D.N.Y. 2013)..............................................................................8

*Janus Cap. Grp., Inc.* v. *First Derivative Traders,*
    564 U.S. 135 (2011)................................................................................................ *passim*

*KDH Consulting Grp. LLC* v. *Iterative Cap. Mgmt. LP,*
    528 F. Supp. 3d 192 (S.D.N.Y. 2021).............................................................................13

*Lattanzio* v. *Deloitte & Touche LLP,*
    476 F.3d 147 (2d Cir. 2007).............................................................................................12

*Lian* v. *Tuya Inc.,*
    2025 WL 733253 (S.D.N.Y. Mar. 7, 2025) .....................................................................14

*Long Miao* v. *Fanhua, Inc.,*
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)..............................................................................11

*Lorenzo* v. *SEC,*
    587 U.S. 71 (2019)...........................................................................................................12

*Malik* v. *Network 1 Fin. Sec., Inc.*,
   2022 WL 453439 (2d Cir. Feb. 15, 2022)..................................................................................3

*In re Marshall*,
   550 F.3d 1251 (10th Cir. 2008) ..............................................................................................17

*May* v. *Barclays PLC*,
   2025 WL 887300 (S.D.N.Y. Mar. 21, 2025) .............................................................................5

*Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*,
   2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ...........................................................................4

*In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*,
   541 F. Supp. 2d 986 (S.D. Ohio 2007) .....................................................................................2

*In re NewStarcom Holdings, Inc.*,
   608 B.R. 614 (D. Del. 2019).....................................................................................................18

*Novak* v. *Kasaks*,
   216 F.3d 300 (2d Cir. 2000).......................................................................................................4

*Pac. Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*,
   603 F.3d 144 (2d Cir. 2010)................................................................................................12, 13

*Prue* v. *Fiber Composites, LLC*,
   2012 WL 1314114 (E.D.N.Y. Apr. 17, 2012) ...........................................................................5

*In re Puda Coal Sec. Inc., Litig.*,
   30 F. Supp. 3d 261 (S.D.N.Y. 2014).......................................................................................12

*Pugh* v. *Trib. Co.*,
   521 F.3d 686 (7th Cir. 2008) .....................................................................................................9

*Rissman* v. *Rissman*,
   213 F.3d 381 (7th Cir. 2000) ...................................................................................................11

*Roseton OL, LLC* v. *Dynegy Holdings Inc.*,
   2011 WL 3275965 (Del. Ch. July 29, 2011)............................................................................16

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009)......................................................................................................3, 4

*San Antonio Fire & Police Pension Fund* v. *Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024).......................................................................................7

*Schmidt* v. *Fleet Bank*,
   1998 WL 47827 (S.D.N.Y. Feb. 4, 1998)..................................................................................3

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
2023 WL 3964150 (Bankr. S.D.N.Y. June 12, 2023)..................................................................18

*Shriners Hosps. for Child.* v. *Qwest Commc'ns Int'l Inc.*,
2005 WL 2350569 (D. Colo. Sept. 23, 2005)..........................................................................15

*W. Va. Inv. Mgmt. Bd.* v. *Doral Fin. Corp.*,
344 F. App'x 717 (2d Cir. 2009) ..........................................................................10

*Zech Cap. LLC* v. *Ernst & Young Hua Ming*,
636 F. App'x 582 (2d Cir. 2016) ..........................................................................7

**Statutes, Regulations and Rules**

6 Del. C. § 1304 ..........................................................................16

15 U.S.C. § 78u-4 ..........................................................................9

17 C.F.R. § 230.144A ..........................................................................5

Colo. Rev. Stat. § 11-51-604 ..........................................................................14, 15

Colo. Rev. Stat. § 11-51-501 ..........................................................................15

Fed. R. Civ. P. 9 ..........................................................................10

N.J. Stat. Ann. § 49:3-71..........................................................................15

Plaintiffs' Opposition confirms that the Amended Complaint ("AC") should be dismissed. To begin, even with the opportunity to amend, more than one-third of Plaintiffs—thirteen in all—concede that their federal 10(b) and state fraud claims must be dismissed because they have not alleged individual reliance or pled any relevant transactions. (Opp. 45 & n.5; Supp. MTD 9.) As for the remaining Plaintiffs, their allegations that Defendants, at most, negligently failed to discover sooner that Defendants were victims of Tricolor's fraud do not somehow transform Defendants into perpetrators of a fraudulent scheme against Plaintiffs. No amount of alarming adjectives or embellishments of minor data discrepancies identified in a vendor's report can change that reality. Although civil plaintiffs sometimes rely on DOJ indictments, Plaintiffs' reliance on one here is highly unusual: the indictment they copied into their complaint identifies Defendants as *victims* of the fraud, not the victimizers. (*See* ECF 83-1 ¶ 1 ("Tricolor executives repeatedly defrauded lenders using various fraudulent schemes, including 'double-pledging' collateral.").) Plaintiffs' attempt to turn that indictment on its head by alleging that Defendants "failed to stop" Tricolor's "intentional[] . . . fraud" sooner than they did has never been a valid basis for a securities fraud claim in this Circuit. (AC ¶ 91.) All claims are fatally flawed and should be dismissed.

## ARGUMENT

### I.    Plaintiffs' Section 10(b) Securities Fraud Claim Should Be Dismissed.

Neither the opportunity to amend nor the Opposition rehabilitates the Section 10(b) claim. The AC fails to plead (i) scienter, (ii) that Defendants made the challenged statements or engaged in a fraudulent scheme, (iii) reliance by Plaintiffs, and (iv) material misrepresentations.

#### A.    Plaintiffs Have Not Pled a Strong Inference of Scienter.

##### 1.    Plaintiffs' Motive Allegations Are Inadequate.

Plaintiffs acknowledge that, to plead motive, they must allege that Defendants "uniquely benefited" from the alleged fraud. (Opp. 23.) But Plaintiffs do not allege how Defendants

"uniquely benefited" in a way that is different from any other warehouse lender.  (*Id.*)  Plaintiffs merely describe the business model of warehouse lending—namely, lending money to Tricolor to fund origination of auto loans and then using the proceeds from "securitization[s]" of those auto loans for "repayment" of the warehouse loans.  (*Id.* at 22.)  As a matter of law, "[t]he 'need to attract investors in order to pay down debt accruing . . . is insufficient to demonstrate scienter because it is common to most for-profit companies.'"  *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 321 (S.D.N.Y. 2020).  Scienter cannot be pled based on motives that "pertain to virtually any company" in the relevant industry.  *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996).  Plaintiffs' cases suggesting that motive can be pled merely by alleging that a bank has a stake in the financial performance of its client (Opp. 19-20) contravenes this settled case law.  As this Court recently held, the theory that "Coinbase had a financial stake in bolstering LUNA's price" because of its "equity" in the company was a "generalized allegation[] of a desire to profit."  *Heabeart* v. *Coinbase, Inc.*, 2026 WL 1250578, at *7 (S.D.N.Y. May 7, 2026) (Rakoff, J.).[1]  In contrast, the other case Plaintiffs cite (at 22), involved defendants that did not merely act as an ordinary underwriter or bank, but instead allegedly engaged in "self-dealing" by "discard[ing] its toxic subprime assets" by "creating CDOs" and then profiting from the eventual collapse of those CDOs by "betting heavily against them."  *Dodona I, LLC* v. *Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 640, 644-65 (S.D.N.Y. 2012).  Nothing like that is alleged here.  Indeed, by continuing to lend money to Tricolor, Defendants *increased* their exposure to Tricolor's fraud, reinforcing Defendants' status as victims and contradicting Plaintiffs' theory of the case.

---

[1] Plaintiffs observe that an Ohio district court once held that the ordinary business of an initial purchaser—*i.e.*, buying notes from an issuer and then "reduc[ing] its exposure" by "[re-]selling the notes to [] investors"—supported motive allegations.  (Opp. 21 (quoting *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1004 (S.D. Ohio 2007)).)  But in this Circuit, such "generalized allegations of a desire to profit—shared by virtually every corporate actor—do not establish motive under the PSLRA."  *Coinbase*, 2026 WL 1250578, at *7.

Recognizing as much, Plaintiffs pivot to arguing that Defendants were motivated to earn "fees." (Opp. 20.) As Plaintiffs' theory goes: Defendants must have discovered Tricolor's fraud but deliberately chose to not "exit their warehouse commitments" and fully recover payment on the loans, because that would have "halt[ed]" Tricolor's business going forward. (*Id.*) So instead, the theory goes, Defendants chose to allow Tricolor to continue defrauding both Defendants and TAST investors to "preserve[] (at least temporarily) their ability" to earn "fees" from their lending and securitization work. (*Id.*) This economically irrational argument is wrong twice over. *First*, "receipt of commissions" and "fees" is "insufficient to support scienter through motive." *Malik* v. *Network 1 Fin. Sec., Inc.*, 2022 WL 453439, at *3 (2d Cir. Feb. 15, 2022). *Second*, it is "hardly a cogent or compelling suggestion" that banks "would deliberately jeopardize [their] standing and reliability, and the viability of [their] business" by selling securities issued by a fraudulent company because they wanted to "receive[] [] fee[s]." *S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 113 (2d Cir. 2009). "[S]uch generalized motives are insufficient to allege scienter" because "the potential economic benefit to [Defendants] pales in comparison to the potential damage [they] could suffer from participating in a massive fraud." *Schmidt* v. *Fleet Bank*, 1998 WL 47827, at *7 (S.D.N.Y. Feb. 4, 1998). For the same reason, Plaintiffs' theory (at 21-22) that Defendants were motivated to allow Tricolor to continue "perpetuat[ing] [its] fraudulent scheme" *against Defendants* because a mezzanine lender might "insulat[e]" a portion of their losses once "Tricolor's fraud" was eventually stopped makes no sense. *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2007 WL 2615928, at *3 (S.D.N.Y. Sept. 10, 2017) ("For lenders . . . to throw billions of good dollars after bad in the hope that their investments could be propped up, profitably, by concealing a massive fraud 'ad infinitum' would be illogical.").[2]

---

[2] It is true that Defendants did not introduce evidence proving that they were "net loser[s] on the

### 2.    Plaintiffs Do Not Allege Conscious Recklessness.

Because Plaintiffs' "motive allegations are thin, 'the strength of the circumstantial allegations must be correspondingly greater.'" *Coinbase*, 2026 WL 1250578, at *7.  Plaintiffs do not come close.  At most, they allege that Defendants "could and should have" discovered Tricolor's fraudulent double-pledging.  (Opp. 32.)  But "allegations that a defendant 'would have learned the truth' if it had performed sufficient due diligence have been repeatedly rejected as insufficient to allege [scienter]."  *Menora Mivtachim Ins. Ltd.* v. *Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *26 (S.D.N.Y. Mar. 30, 2021).[3]

***a. Should Have Known Allegations.***  Plaintiffs insist that, if Defendants had thought to compare the loans in TAST 2025-2 against the loans in TAST 2022-1, it "would have been obvious" that loans were double-pledged.  (Opp. 8, 28.)  But allegations "that 'if' [a defendant] had asked various questions earlier, it would have" learned the truth fail to plead recklessness.  *S. Cherry*, 573 F.3d at 112-13.  Plaintiffs persist that Defendants had a "duty" to leave no stone unturned, analogizing to what they claim are underwriters' due diligence obligations.  (Opp. 26, 30.)  This argument also fails.  As the Second Circuit made clear in the case Plaintiffs cite (at 26), "the failure of a non-fiduciary," as here, "to identify problems . . . does not constitute reckless conduct sufficient for § 10(b) liability."  *Novak*, 216 F.3d at 309; *see DeLollis* v. *Friedberg, Smith & Co., P.C.*, 600 F. App'x 792, 796 (2d Cir. 2015) (rejecting that defendant had "a duty to discover

---

overall Tricolor relationship" or showing "how any losses they may have suffered compare to those of other stakeholders."  (Opp. 21.)  But on a motion to dismiss, Defendants were not permitted to introduce evidence outside of the complaint.  Plaintiffs cannot flip the burden by claiming that the Court must accept their deficient scienter allegations because Defendants did not affirmatively disprove with evidence Plaintiffs' legally deficient scienter allegations.

[3] Plaintiffs claim that auditor cases are irrelevant because motive allegations against auditors are weak and so the recklessness allegations need to be stronger (Opp. 29), but that is also the case here.  Regardless, the overarching point remains even though Defendants are not auditors:  "there are limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others."  *Novak* v. *Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

-4-

the red flags in the first place"). In short, irrespective of what Defendants *could have* done, "there is no allegation that 'what [Defendants] *knew* made obvious' that" there were misstatements in the Offering Memoranda. *Handal* v. *Innovative Indus. Props., Inc.*, 157 F.4th 279, 304 (3d Cir. 2025); *accord May* v. *Barclays PLC*, 2025 WL 887300, at *25 (S.D.N.Y. Mar. 21, 2025).[4]

   ***b.  "2022" Report.***  Plaintiffs contend that a report regarding Tricolor's 2022 financials attached to the 2024 CBIZ report[5] criticized certain "manual" processes (AC ¶ 97), and warned that the lack of more robust controls "*could result in* . . . error or fraud" (Opp. 8). Based on that, Plaintiffs leap to asserting that Defendants somehow "knew" Tricolor was perpetrating a fraud and its data was "fundamentally impaired." (Opp. 8.)  But general allegations about "controls" untethered to double-pledging do not plausibly plead awareness of the fraud alleged in the complaint, and Plaintiffs cannot "embellish their factual allegations . . . in their opposition" brief. *Prue* v. *Fiber Composites, LLC*, 2012 WL 1314114, at *5 n.2 (E.D.N.Y. Apr. 17, 2012).

   ***c.  2024 CBIZ Report.***  Nothing in the 2024 CBIZ report alerted Defendants to "pervasive inaccuracy of the loan data used to describe the loan pool characteristics in the offering materials." (Opp. 2.)  Plaintiffs nonetheless double down on twisting CBIZ's conclusions to suggest that CBIZ warned Defendants about Tricolor's double-pledging and fictitious loans. That is wrong.

   Plaintiffs continue to assert (at 9, 34) that CBIZ's "Observation," which CBIZ did not flag as a "Finding," that Tricolor "backs into" a particular calculation using a formula (ECF 83-4 at 15) put Defendants on notice that Tricolor might "make up whatever principal collections fit its borrowing needs" (Opp. 9).  But Plaintiffs do not dispute that CBIZ "verified [that] the calculation"

---

[4] Defendants were not underwriters of SEC registered offerings; they were initial purchasers of privately offered securities under SEC Rule 144A and owed no fiduciary duties. (*See* MTD 32.)

[5] Plaintiffs do not allege the Fifth Third Defendants ever received this report, nor do they allege adequately that Barclays or JPMorgan received the "2022" report prior to the 2024 CBIZ report to which it was attached as an exhibit. (ECF No. 83-4, Ex. F.1.)

was accurate (ECF 83-4 at 15)—*i.e.*, CBIZ told Defendants that Tricolor had ***not*** "made up" loan data.  Plaintiffs' response that the calculation that Tricolor "backed into" was a "fundamental" data point for TAST noteholders (Opp. 34) only underscores the absence of scienter, given that CBIZ verified that Tricolor had not manipulated this "fundamental" metric.

Along the same lines, Plaintiffs continue to mischaracterize CBIZ's discussion about how Tricolor ascribed the "black book" "wholesale value[]" for vehicles that it *had not yet repossessed* when a borrower has defaulted.  (Opp. 14, 26-27, 34; *see* MTD 24; Supp. MTD 2-3.)  None of this has anything to do with double-pledging or fictitious loans.  Nevertheless, Plaintiffs try to make this finding relevant to the trusts by claiming that the Offering Memoranda reported data about "Recoveries."  (Opp. 34.)  But they acknowledge that the term "Recoveries" in the Offering Memoranda is a "defined term" (Opp. 34) that specifically means *actual recoveries* on defaulted and repossessed vehicles (*see* ECF 83-2 at 140).  Plaintiffs do not bridge the gap because they do not allege that Tricolor falsified any of the data *in the Offering Memoranda about the actual recovery rates on repossessed vehicles* by using the "black book" "wholesale value."  Nor does the CBIZ report suggest that Tricolor prevented CBIZ from checking whether "recovery rates" reported in the Offering Memoranda "were falsely applied for cars that were never recovered." (Opp. 34.)  Putting aside that CBIZ was reviewing information for the warehouse line and not Offering Memoranda disclosures, the test that JPMorgan allegedly waived was *not* to verify whether vehicles were in fact repossessed, but to "test the amount of actual recoveries (cash received) for repossessed vehicles (whether at auction or resold by Tricolor) as compared to the Manheim Market Report ('MMR') value used to reduce the gross charge-off."  (ECF 83-4 at 11.)

Plaintiffs' remaining attempts to make something out of nothing fall flat.  They say that the mistaken routing of money to an incorrect bank account was "anything but minor."  (Opp. 26, 33.)

But this has nothing to do with double pledging. And they do not explain why it is anything but minor, especially considering the explanation from Tricolor management as discussed in the MTD (at 24 n.7),[6] which Plaintiffs do not address. In any event, Plaintiffs do not explain how this one mistake put Defendants on notice that Tricolor "was engaged in wrongdoing to the detriment of its investors." *Zech Cap. LLC* v. *Ernst & Young Hua Ming*, 636 F. App'x 582, 584 (2d Cir. 2016). Nor do Plaintiffs try to explain how the minor discrepancies regarding the delinquency status of loans—which, at worst, suggested a lag in reporting borrower payments on real legitimate loans— put Defendants on notice that Tricolor had created fictitious loans, the fraud they allege. (Opp. 26, 33; *see* AC ¶ 7 (alleging "fictitious loan receivables").)

In the end, all Plaintiffs have is a remark from CBIZ that it "did not have a master servicer report of all [warehouse] facilities to confirm if there was any evidence that the assets were pledged to a third party." (ECF 83-4 at 35.) Plaintiffs claim that "Tricolor refused to provide" that data (Opp. 31), even though CBIZ's report never said that. At any rate, CBIZ *did* sample for double-pledging and found that each loan in the sample was a "unique pledge." (ECF 83-4 at Ex. B.1.) In the absence of any red flag of double-pledging, the allegation that "if [JPMorgan and Barclays] had exercised greater skepticism or performed further procedures, [they] potentially could have discovered the fraud" is "not sufficient to allege scienter." *In re DNTW Chartered Accts. Sec. Litig.*, 172 F. Supp. 3d 675, 688 (S.D.N.Y. 2016).[7]

---

[6] Tricolor explained that the error occurred because Tricolor had "consolidated the SPV5 warehouse line into the [SPV4] warehouse in November 2023 and repurchased receivables from SPV3, which are now part of SPV4. Management stated the process of directing customer payments to the correct account is manual and there are errors, which the Company is currently working to correct." (ECF 83-4 at 9.)

[7] The allegations here thus bear no resemblance to the cases Plaintiffs cite (at 25-28). *See In re Bear Stearns Cos., Inc. Sec. Litig.*, 763 F. Supp. 2d 423, 501-02 (S.D.N.Y. 2011) (SEC expressly warned the company that the "risk and valuation models" it used for making its public disclosures were unreliable); *San Antonio Fire & Police Pension Fund* v. *Dentsply Sirona Inc.*, 732 F. Supp.

Because none of the things CBIZ identified constitute "red flags of fraud," *Iowa Pub. Emps.' Ret. Sys.* v. *Deloitte & Touche LLP*, 973 F. Supp. 2d 459, 466 (S.D.N.Y. 2013), Plaintiffs resort to distractions to mask their pleading failure:

*First*, Plaintiffs make an entirely new allegation that appears nowhere in the AC or in CBIZ's report—namely, that CBIZ supposedly "found that reported cash was untethered to actual collections," and that this was "an anomaly most obviously explained by double-pledging." (Opp. 10.) CBIZ made no such finding, and the Opposition cites no source for this contention— not the AC or anything else. As this Court has held, "Plaintiffs cannot amend their complaint through their opposition papers." *City of Miami Gen. Emps. & Sanitation Emps. Ret. Tr.* v. *Dimon*, 711 F. Supp. 3d 208, 215 (S.D.N.Y. 2024) (Rakoff, J.).

*Second*, Plaintiffs say that, when all the minor and unrelated data discrepancies CBIZ identified are added together and considered as a "collective whole," that alchemy turns into a red flag of "double-pledging." (Opp. 31, 35.) But "combin[ing] inadequate allegations" gets Plaintiffs nowhere, because "zero plus zero cannot equal one." *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *22 (S.D.N.Y. Mar. 24, 2023). Plaintiffs similarly speculate that CBIZ must have secretly told JPMorgan that Tricolor was double-pledging loans because allegedly "JPMorgan abandoned its plans to underwrite [Tricolor's] initial public offering" "six months" after it received the CBIZ report. (Opp. 27.) Setting aside there are no such allegations regarding Barclays or Fifth Third, "[s]uch speculation and conclusory allegations" based on "timing" alone "will not suffice

---

3d 300, 321 (S.D.N.Y. 2024) ("[T]he SEC sent a cease-and-desist letter alleging a channel-stuffing scheme" and later "remind[ed] [the company] to 'account[] for returns, rebates and discounts.'"); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 237-38 (S.D.N.Y. 2010) ("statements denying" CDO risks made with scienter where complaint alleged that "people within Citigroup were foreseeing an upcoming CDO meltdown"); *Gabriel Cap., L.P.* v. *NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 505 (S.D.N.Y. 2000) ("representations made by NatWest and McDonald were contradicted by the primary source documents for those representations").

to plead scienter." *City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*, 2014 WL 4832321, at \*28 (S.D.N.Y. Sept. 29, 2014) (quotation omitted).

*Third*, Plaintiffs presume Defendants "did not follow up" on any issues CBIZ raised, because they speculate that, if Defendants had followed up on the minor data discrepancies unrelated to double-pledging, they "would have learned about a double-pledging scheme." (Opp. 28, 33.) This Court has rejected the scienter theory that if defendants had "follow[ed] th[e] trail, [they] would have discovered a series of suspicious facts that would have led them to discover" the fraud. *Hanson* v. *Frazer, LLP*, 2013 WL 5372749, at \*5 (S.D.N.Y. Sept. 24, 2013).

*Fourth*, Plaintiffs assert that the Initial Purchasers were "sophisticated" and built "cash flow" models using Tricolor's loan data, and therefore they must have known that Tricolor had manipulated that data through a double-pledging scheme. (Opp. 30-31.) But "there is a big difference between knowing about the reports . . . and knowing that the reports are false." *Pugh* v. *Trib. Co.*, 521 F.3d 686, 694 (7th Cir. 2008).

*Lastly*, realizing that the CBIZ report does not suggest anything about double-pledging or fictitious loans, Plaintiffs pivot to arguing that it does not matter that CBIZ did not identify any risk of double-pledged and fictitious loans because Plaintiffs' claims are not actually about that. (Opp. 25-26.) That argument is curious, given that the AC itself refers to double-pledging 149 times and to fictitious loans 119 times. Nevertheless, in a last ditch effort, Plaintiffs now say that they "allege[] a different and equally viable theory of fraud" based on some other unspecified "pervasive inaccuracy of the loan tape used to prepare the offering materials." (Opp. 25-26.) But neither the AC nor the Opposition identifies what other data about the loans was supposedly misstated in the Offering Memoranda, let alone that CBIZ told Defendants that unspecified data was "pervasive[ly]" inaccurate in ways that Plaintiffs do not explain. (*Id.*) The PSLRA and

Rule 9(b) require more than this. *See Citigroup*, 2023 WL 2632258, at *17 ("The Court cannot infer that Citigroup should have disclosed more information on a specific topic at a particular time without factual allegations identifying with some level of specificity what contradictory information Citigroup had and when it had it.").

*d.* ***"Kollar's history of fraud by association."*** The MTD showed that courts reject the kind of guilt-by-association allegations Plaintiffs make, alleging that JPMorgan should have assumed that Kollar had a propensity to commit fraud because he had worked for someone who had violated the law in some unspecified way. (MTD 26-27.) Plaintiffs do not cite any contrary authority; instead, they just ask this Court to ignore the uniform case law. (Opp. 35.)

### 3. The Opposing Inference of Non-Fraudulent Intent Is More Compelling.

Plaintiffs cannot deny that the "objectively more compelling" inference is that Tricolor "concealed its fraud from [Defendants], just as it concealed its fraud from [TAST] investors." *W. Va. Inv. Mgmt. Bd.* v. *Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009). Plaintiffs counter that, even if Defendants did not know about Tricolor's double-pledging fraud, CBIZ identified minor data discrepancies and therefore it would have been prudent for the Initial Purchasers to ask Tricolor to include a warning in the Offering Memoranda that Tricolor's control systems are imperfect and could result in errors. (*See* Opp. 35.) This argument fails because the Offering Memoranda included that exact warning. (ECF 83-2 at 38 ("Tricolor uses certain management information systems . . . to manage its loan portfolio" that "may contain errors that could cause the information network to fail or produce inaccurate data.").) In any event, this contention has nothing to do with scienter, because Plaintiffs do not claim they were defrauded and incurred a loss because of minor data discrepancies, but because of Tricolor's double-pledging and fictitious loan scheme—a scheme the AC fails to allege Defendants knew about.

Plaintiffs also say that JPMorgan's investigation and subsequent termination of Tricolor's warehouse line after a mezzanine lender raised concerns "[are] irrelevant" to scienter. (Opp. 36.) But the case they cite held it is relevant and that it undermines any scienter inference: the "initiation of an independent investigation . . . , if anything, supports the opposite inference [to scienter]." *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 808 (S.D.N.Y. 2020).

> **B.      Plaintiffs Have Not Pled That Any Defendant Was the "Maker" of a Challenged Statement or Engaged in a Fraudulent Scheme.**

*1. Maker Liability.* Plaintiffs allege that, because the Initial Purchasers "offered" and sold the TAST notes, they also must have made the statements in the Offering Memoranda. (Opp. 38.) But that is a *non sequitur* and ignores that the Offering Memoranda state that they were "prepared by the Depositor [a Tricolor entity]" (ECF 83-2 at 7), and that "the Initial Purchasers make no representation or warranty as to the accuracy or completeness" of Tricolor's statements (*id.* at 6). As the Supreme Court held in *Janus*, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus Cap. Grp., Inc.* v. *First Derivative Traders*, 564 U.S. 135, 142-43 (2011). To this, Plaintiffs say that these disclosures were "boilerplate" and "buried" on "page seven" of 150 in the Offering Memoranda. (Opp. 40.) But "the fact that language has been used before does not make it less binding when used again," *Rissman* v. *Rissman*, 213 F.3d 381, 385 (7th Cir. 2000), and Plaintiffs cite no authority that disclosures on page seven of a 150-page document can be ignored. Plaintiffs also note that someone can "make statements without undertaking contractual representations and warranties." (Opp. 40.) That misses the point, which is that Defendants neither made the statements (Tricolor did), nor warranted the accuracy of Tricolor's statements.[8]

---

[8] Plaintiffs cite cases declining to enforce non-reliance disclaimers at the motion-to-dismiss stage (Opp. 41), which have no relevance here. The point here is that the Offering Memoranda attributed

Plaintiffs also allege that Defendants helped Tricolor (i) "structure[] each securitization transaction," and (ii) "prepare[]" the Offering Memoranda.   (Opp. 38.)   But the fact that a defendant "is at work behind the scenes does not create an exception to the requirement that an actionable misstatement be made by the [defendant]."  *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 155 (2d Cir. 2007).  Plaintiffs nonetheless assert (at 38-39) that Judge Forrest held in *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014), that underwriters were makers of the statements in the offering materials where, among other things, they "participated" in creating the offering materials, "solicited" investors, and were "authorized to make" statements outside the offering documents.  But *Puda Coal* is distinguishable in one key respect:  unlike here, the underwriter in *Puda Coal* had ultimate control over the statements because "[the issuer] agreed to 'prepare the [offering documents] in a form approved by' [the underwriter]," pursuant to a "formal agreement" between the parties.  *Id.*  To the extent *Puda Coal* suggests that merely helping the issuer prepare offering documents renders underwriters the makers of the statements—which would upend decades of understanding about how securities are offered and sold—it is in significant tension with *Janus* and other Second Circuit authority.  *See Pac. Inv. Mgmt. Co. LLC* v. *Mayer Brown LLP*, 603 F.3d 144, 152-53 (2d Cir. 2010) ("Allegations of 'assisting,' 'participating in,' . . . and similar synonyms" are the textbook definition of "aiding and abetting"); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 484 (S.D.N.Y. 2012) (holding that the issuer, not the underwriter, makes the statements in offering documents).[9]

   ***2. Scheme Liability.***  Plaintiffs argue that under the Supreme Court's decision in *Lorenzo*

---

the statements to Tricolor and not to Defendants, which is the test for maker liability under *Janus*. Moreover, the "peculiar knowledge doctrine" (Opp. 46) has no application here because the AC fails to plead that Defendants knew about Tricolor's double-pledging scheme.

[9] Defendants' supplemental brief (at 6, 8) explained that any claims based on statements outside of the Offering Memoranda fail because they are not pled with particularity and no Plaintiff adequately alleges reliance on them.  Plaintiffs concede those points by not responding to them.

v. *SEC*, 587 U.S. 71, 77 (2019), merely "disseminating offering materials containing false statements" made by Tricolor qualifies as a "deceptive act[]" for purposes of scheme liability. (Opp. 47.) But if the sole basis for liability against Defendants is that they may have disseminated Tricolor's allegedly false statements, that poses an insurmountable reliance problem for Plaintiffs. As the Second Circuit held, Plaintiffs must plead they "rel[ied] on [a defendant's] *own* deceptive conduct to state a [scheme] claim under Rule 10b-5(a) and (c)." *Pac. Inv. Mgmt.*, 603 F.3d at 155. Plaintiffs have not done so. Plaintiffs' only argument on that score is their allegation that they "rel[ied] on Defendants' dissemination of the Offering Memoranda" as placing "JPMorgan's and Barclays's stamp of approval" on Tricolor's statements (and they make no such allegations as to Fifth Third). (AC ¶¶ 81, 214.) But that argument runs into the clear warning (in all caps) that the Initial Purchaser Defendants "MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION" in the Offering Memoranda. (ECF 83-2 at 6; ECF 83-5 at 7.) Plaintiffs' response (at 45) that courts occasionally hold that reliance cannot be decided at the motion-to-dismiss stage where a "general disclaimer" is in "tension" with "other language" encouraging reliance cannot save Plaintiffs. *KDH Consulting Grp. LLC* v. *Iterative Cap. Mgmt. LP*, 528 F. Supp. 3d 192, 204 (S.D.N.Y. 2021). The disclosures here were not generic nor in "tension" with any "other language." The Offering Memoranda "explicitly disclosed" that the Initial Purchasers were not vouching for Tricolor's statements. *Ashland Inc.* v. *Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011) (affirming dismissal).

## C.    Plaintiffs Have Not Pled Reliance on Any Statements by Defendants.

Plaintiffs allege that they relied on Tricolor's statements about "loan characteristics" in the Offering Memoranda, but Defendants did not make any of those statements. (Opp. 46.) Moreover, as explained immediately above, Plaintiffs failed to plead that they relied on Defendants' supposed fraudulent scheme to "disseminate" Tricolor's statements.

**D.      Many of the Challenged Statements Are Not Actionable.**

Plaintiffs argue that the generic statements they challenge (*see* MTD 34 (identifying statements)) are actionable because they are "flatly contradicted" by Tricolor's conduct. (Opp. 42-43.) But whether generic statements are "verifiably false when made" is irrelevant, because that "does not cure [the statements'] generality, which is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

Plaintiffs also argue that the factually accurate statements they challenge—*e.g.*, the definition of a "delinquent" loan, descriptions of Tricolor's "charge[]-off" policy, and Tricolor's expectations about "additional borrowings" (MTD 35-36)—were "half-truths" because they "omit[ted]" that some loans were "double-pledged or fictitious." (Opp. 43-44.) Not so. "[T]he mere reference to a given topic does not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge regarding that subject." *Lian* v. *Tuya Inc.*, 2025 WL 733253, at *8 (S.D.N.Y. Mar. 7, 2025). That is why "it is usually unreasonable for an investor to take general statements regarding an issuer's business for more than what they are worth, reading into them sweeping denials of discrete instances of misconduct." *Id.*

**II.      The State Law Claims Should Be Dismissed.**

Plaintiffs do not dispute the Court should decline supplemental jurisdiction over their state law claims if the sole federal claim is dismissed. (Opp. 52.) Regardless, those claims fail.

**A.      Plaintiffs Fail to Plead Common Law Fraud and State Securities Act Claims.**

Plaintiffs do not dispute that their common law fraud and state securities claims rise or fall with their federal securities fraud claim to the extent explained in the MTD (at 37-39). (Opp. 52-57.) Instead, they quibble about a few points. *First*, Plaintiffs argue that Colorado Securities Act Section 11-51-604(4) does not require that the defendant "make" the challenged statements.

-14-

(Opp. 53.) That is wrong. Section 604(4) imposes liability on "[a]ny person who sells a security in violation of section 11-51-501(1)(b)," which limits liability to the person who "make[s] an[] untrue statement of a material fact." In Plaintiffs' view, "Section 604(4) does not require that the seller itself be the maker of the false statement," it only requires that "*someone* in connection with that securities transaction made a false statement." (Opp. 53.) Not so. Plaintiffs must plead that "*the defendant's conduct* was in violation of . . . § 501(1)," *i.e.*, that the defendant made the challenged statements. *Shriners Hosps. for Child.* v. *Qwest Commc'ns Int'l Inc.*, 2005 WL 2350569, at *13 (D. Colo. Sept. 23, 2005) (emphasis added).

*Second*, Plaintiffs assert that New Jersey Securities Act Section 49:3-71(d) imposes liability on broker dealers who "materially aid" an unlawful sale and criticize JPMorgan for "not address[ing]" this aiding-and-abetting provision. (Opp. 55-56.) But JPMorgan did not address aiding-and-abetting liability because the AC does not mention Section 49:3-71(d) and does not allege that JPMorgan "materially aided" any violation; the AC instead asserts only a primary-liability claim for "ma[king] untrue statements." (AC ¶¶ 231-35.) "Plaintiffs cannot amend their complaint through their opposition papers." *Dimon*, 711 F. Supp. 3d at 215.

*Third*, with respect to the Texas aiding-and-abetting statute, Plaintiffs assert that Tricolor executives "perpetrated" the "fraudulent" double-pledging scheme "in Texas," and so the Court should simply assume that the conduct at issue here—the making of "fraudulent statements"—was also "made in Texas." (Opp. 57.) The court rejected that sleight of hand in *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 554 (S.D. Tex. 2011).

**B.     Plaintiffs Fail to Plead Fraudulent Transfer Claims.**

Plaintiffs argue the thirteen Plaintiffs who concede they have not pled any TAST-note purchases still assert fraudulent transfer claims. (*See* Opp. 45 & n.5; Supp. MTD 9.) But those thirteen Plaintiffs cannot do so because their failure to allege any relevant transaction means they

cannot plead that they (i) suffered any Article III injury in fact, or (ii) are "creditors" of any TAST trust sufficient to state a claim.  The remaining Plaintiffs' fraudulent transfer claims also fail.

       ***1. Actual Fraudulent Transfer.***  A fraudulent transfer requires that there be (i) a debtor and creditor and (ii) a transfer of the debtor's property with (iii) fraudulent intent (either actual or constructive).  6 Del. C. § 1304(a); *Roseton OL, LLC* v. *Dynegy Holdings Inc.*, 2011 WL 3275965, at *15 (Del. Ch. July 29, 2011) ("DUFTA focuses on 'transfers' of an 'asset,' which is defined to mean the 'property of the debtor.'").  There is no dispute that Plaintiffs (aside from the thirteen that fail to allege any relevant transactions) are creditors only of the TAST trusts in their capacity as purchasers of TAST notes.  But the proceeds from the Depositor's sale of TAST notes to the Initial Purchasers in exchange for cash, which the Depositor (a non-debtor entity) transferred to the Sponsor (also a non-debtor entity) in exchange for loan receivables—the transfer that Plaintiffs say was fraudulent—was not "property of the debtor" and therefore cannot be the basis for a fraudulent transfer claim.  As the transaction diagram (illustrated at MTD 42) makes clear, the TAST trusts never received, nor had an interest in, the proceeds from the sale of the notes.  As a result, those proceeds were not an asset available to the trusts' creditors (*i.e.*, Plaintiffs) upon default.  *See In re DSI Renal Holdings, LLC*, 617 B.R. 496, 503 n.29 (Bankr. D. Del. 2020) (explaining that fraudulent transfer law is limited to transfers "'that affect property that would have been property of the estate but for the transfer'") (quoting Collier on Bankruptcy).

       Plaintiffs concede that the TAST trusts never physically received the proceeds from the sales of the notes (Opp. 59) and instead resort to various inapplicable theories to conjure up property rights that do not exist (*id.* at 59-65).  Their argument that the Court should disregard the transactions that happened in favor of a fictionalized transaction based on Plaintiffs' view of the "economic reality" fails as a matter of law.  (*Id.* at 59.)

-16-

*First*, Plaintiffs contend that it does not matter that the TAST trusts never "physically possessed" the proceeds from the Depositor's sale of TAST notes to the Initial Purchasers, analogizing to cases where a lender acting as the debtor's agent "transfers [the] property of the debtor" to a third party. (*Id.*) But that analogy fails at the start because the sale proceeds were never property of the TAST trusts (the debtor) to begin with. In the cases cited by Plaintiffs, the property is owned by the debtor—meaning that it is a source of payment that "would otherwise have been used to satisfy the claims of creditors"—and the debtor directs its lender to transfer that property to put it out of reach of creditors. *In re Marshall*, 550 F.3d 1251, 1256 (10th Cir. 2008). That is the classic fact pattern for a fraudulent transfer claim. But that is not what happened here. The cash that the Depositor received was never the TAST trusts' property, nor was it a source of payment to TAST noteholders. As stated in the disclosure Plaintiffs cite, the whole point of the transaction was that the Depositor would create the debt obligation to TAST noteholders by using those sale proceeds to "purchase the receivables" (Opp. 61), and those receivables were the sole payment source to noteholders (MTD 45). True, Tricolor lied to Plaintiffs and Defendants about the quality of the receivables serving as the sole source of payment to noteholders. But "[f]raudulent conveyance law is basically concerned with *transfers* that 'hinder, delay or defraud' creditors," not "fraud or dishonesty" as to the "manner in which the original debt to [plaintiff] arose." *Bos. Trading Grp., Inc.* v. *Burnazos*, 835 F.2d 1504, 1510 (1st Cir. 1987).

*Second*, Plaintiffs argue that Tricolor, the Depositor, and the Sponsor/Servicer were "mere conduits" of the TAST trusts and so their separate identities can be disregarded. (Opp. 60-65.) They further posit that if the Court accepts that mischaracterization, then the separate transactions can be "collapsed into single integrated transactions" because of the "economic reality" of the

-17-

transactions. (*Id.*)  This novel and unprecedented argument is wrong for several reasons.[10]

At the first step, Plaintiffs' reliance on the "mere conduit" doctrine fails because that doctrine is not a basis for a plaintiff to challenge transfers by a non-debtor (*i.e.*, the Depositor). Rather, as shown in the case they cite (at 60-61), the "mere conduit" doctrine is an "affirmative defense" that allows ***a defendant*** to argue that it is not liable for any fraudulent transfers because it is "a mere conduit of the funds instead of a true transferee." *Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 2023 WL 3964150, at *10 (Bankr. S.D.N.Y. June 12, 2023).  Plaintiffs cannot transform an affirmative defense into an improper sword to pierce the corporate veil.

But even if there were a basis to smash together separate transactions by separate entities, Plaintiffs have not named all those entities as parties.  Plaintiffs claim there is no such requirement (Opp. 63-65), asserting that the courts did not mean what they said when holding that collapsing transactions as to all participants requires that "all entities involved in those transactions [be] named parties." *In re NewStarcom Holdings, Inc.*, 608 B.R. 614, 622 (D. Del. 2019).  Plaintiffs are wrong, and none of the cases they cite support their contrary view.  Instead, they cite cases recognizing the basic and irrelevant proposition that a plaintiff can sue a "subsequent transferee" without also suing the "initial transferee." (Opp. 64.)  That is not what Plaintiffs are doing here; instead, they want the Court to treat a transfer by a non-debtor (the Depositor) as a transfer by the debtor (the TAST trust) by pretending that they are a single entity.  No law supports that gambit. To be sure, when a debtor engages in two related transactions, the court may consider them as a "single integrated transaction," as in the cases Plaintiffs cite (at 62-63).  But "[t]he collapse doctrine does not allow the court to collapse separate entities, or pierce the corporate veil." *In re HH Liquidation, LLC*, 590 B.R. 211, 269 (Bankr. D. Del. 2018).

---

[10] It is telling that Plaintiffs do not cite a single case holding that the creation of an asset-backed security constitutes a fraudulent transfer.

-18-

*Lastly*, Plaintiffs cannot evade the implications of their own argument, which would require that their fraudulent transfer claims be pursued in Tricolor's bankruptcy proceeding.  (Opp. 69-70.)  The separate transactions by separate entities were deliberately structured to protect Plaintiffs and other noteholders if Tricolor went bankrupt.  (*See* MTD 12.)   That bankruptcy-remote transaction structure protects noteholders from a situation where a bankruptcy trustee of Tricolor claims that the receivables held by the TAST trusts should be considered property of the bankruptcy estate and distributed to Tricolor's other creditors.  Plaintiffs cannot have it both ways. If they want the Court to ignore the separate legal identities of the TAST trusts, the Depositor, the Servicer/Sponsor (an entity currently in bankruptcy) and Tricolor (also in bankruptcy), then they need to accept the implications of that position.  That would mean that the true-sale protections disappear, any payments due on their notes are property of the bankruptcy estate, and any fraudulent transfer claim they have must be brought in the bankruptcy case.

**2.  *Constructive Fraudulent Transfer.***  Plaintiffs' arguments regarding the constructive fraudulent transfer claim are equally meritless.  *First*, Plaintiffs try to run from their allegation that Tricolor used the proceeds from the sale of notes "to repay their warehouse loans" (AC ¶ 52), because that is a complaint about the "[r]epayment of an antecedent loan," which is not a "fraudulent conveyance[]."  *B.E.L.T., Inc.* v. *Wachovia Corp.*, 403 F.3d 474, 477-78 (7th Cir. 2005).  Plaintiffs respond by invoking the formalism that they try to disavow, claiming that the specific "Debtors" are the "Tricolor Trusts—not the Depositor, not the Servicer, and not the warehouse SPVs"—and claim it is improper to treat the "warehouse loans" as "obligations of the Trusts."  (Opp. 66.)   But that argument only underscores the games Plaintiffs are playing with distinct corporate forms.  Plaintiffs' entire fraudulent transfer claim revolves around the idea that the cash raised from the sale of the notes was transferred "[a]s part of a single integrated

transaction" to the "warehouse SPVs," which "immediately transferred the cash it received from the Tricolor Trusts to the Lender Defendants." (AC ¶¶ 263, 267; Opp. 58-65.) Plaintiffs cannot now disclaim those allegations when they boomerang against them, while continuing to rely on those allegations when they suit their needs.

*Second*, Plaintiffs fail to plead that the trusts were "insolvent" or had "unreasonably small" assets. (Opp. 66-67.) Plaintiffs claim it is irrelevant that the trusts made payments to noteholders for years, based on the truism that the payment streams on "impaired" collateral will eventually dry up sooner than payment streams on non-impaired collateral. (*Id.*) But that is irrelevant to the question here, which Plaintiffs acknowledge is whether the trusts were insolvent "from the outset" on the day they were created. (*Id.*) The answer to that question is "no." (MTD 44-45.)

Plaintiffs also assert—without citation to any source—that the receivables were not the sole source of payment on the notes, claiming instead that someone (they do not say who) was required to pay noteholders their "fixed principal and interest payments . . . if the collateral proves insufficient." (Opp. 68.) This argument contradicts what Plaintiffs say on the prior page of their brief, where they try to distinguish a case on the ground that, here, "the cash flows from th[e] receivables [are] the debtors' *only* source of capital." (*Id.* at 67 n.14 (emphasis added).) Their argument also contradicts the plain language of the Offering Memoranda, which states that "[t]he funds available to the Issuer to make payments on the notes on each Distribution Date will come from Available Funds, which will be the only funds that will be used to make payments to Noteholders on each Distribution Date." (ECF 83-2 at 93.) And if those funds are insufficient, "losses will be borne in reverse order of payment priority." (*Id.* at 20.)

## CONCLUSION

The Amended Complaint should be dismissed with prejudice.

-20-

Dated:  May 21, 2026

Respectfully submitted,

/s/ *Robert A. Sacks*
Robert A. Sacks
Jonathan S. Carter
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000

*Attorneys for JPMorgan Chase Bank, N.A.
and J.P. Morgan Securities LLC*

/s/ *Robert J. McGahan*
Robert J. McGahan
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street, N.W., Suite 1350
Washington, DC 20036
Tel:  (202) 719-8298

Rebeccah Lynn Bower
BRADLEY ARANT BOULT CUMMINGS LLP
Promenade Tower
1230 Peachtree Street NE, Suite 2100
Atlanta, Georgia 30309
Tel:  (404) 868-2806

/s/ *Jenna M. Dabbs*
Jenna M. Dabbs
Sean Hecker
Marshall L. Miller
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
Tel:  (212) 763-0883

*Attorneys for Fifth Third Bank, N.A.
and Fifth Third Securities, Inc.*

/s/ *Jeffrey T. Scott*
Jeffrey T. Scott
Jonathan M. Sedlak
Jacob E. Cohen
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel:  (212) 558-4000

*Attorneys for Barclays Bank PLC
and Barclays Capital Inc.*

-22-

**CERTIFICATE OF WORD COUNT COMPLIANCE**

I, Jeffrey T. Scott, an attorney duly admitted to practice before this Court, hereby certify pursuant to Local Civil Rule 7.1(c) that this Memorandum of Law was prepared using Microsoft Word and the document contains 6,976 words as calculated by the application's word-counting function, excluding the parts of the Memorandum of Law exempted by Local Civil Rule 7.1(c).

I certify under the penalty of perjury that the foregoing statements are true and correct. Executed on this 21st day of May, 2026 in New York, New York.


/s/ *Jeffrey T. Scott*
Jeffrey T. Scott