Q61RONEo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x

ONE WILLIAM STREET CAPITAL
MASTER FUND LTD.,

                  Plaintiff,

          v.                          26 Civ. 1622 (JSR)

J.P. MORGAN SECURITIES LLC, ET
AL.,
                                      Oral Argument

                  Defendants.

-------------------------------x
                                      New York, N.Y.
                                      June 1, 2026
                                      10:30 a.m.

Before:

                      HON. JED S. RAKOFF,

                                      District Judge

                      APPEARANCES

QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Plaintiff
BY:  BLAIR ADAMS
     DEBORAH NEWMAN
     ZACHARY RUSSELL
     NICHOLAS HARDIMAN

SULLIVAN & CROMWELL, LLP
     Attorneys for the JPMorgan entities
BY:  ROBERT SACKS
     JONATHAN CARTER

     -and-

SULLIVAN & CROMWELL, LLP
     Attorneys for the Barclays entities
BY:  JEFFREY SCOTT
     JACOB COHEN

Q61RONEo

                          APPEARANCES (Continued)


HECKER FINK LLP
     Attorneys for the Fifth Third entities
BY:   JENNA DABBS
      MARSHALL MILLER

Q61RONEo

(Case called)

THE DEPUTY CLERK:  Everyone please be seated, and will the parties please identify themselves for the record.

MR. ADAMS:  Your Honor, Blair Adams, from Quinn Emanuel Urquhart & Sullivan, on behalf of the plaintiffs.  I'm joined to the left by Deborah Newman and Zachary Russell and on the right by Nick Hardiman, also of Quinn Emanuel.

MR. SACKS:  Good morning, your Honor.  Robert Sacks, Sullivan & Cromwell, for JPMorgan Chase Bank and JPMorgan Securities.  I am joined by my partner Jonathan Carter.

MR. SCOTT:  Good morning, your Honor.  Jeff Scott from Sullivan & Cromwell on behalf of the Barclays entities.  I'm here with my colleague Jacob Cohen.

MS. DABBS:  Good morning, your Honor.  Jenna Dabbs from Hecker Fink on behalf of Fifth Third Bank, Fifth Third Securities, and I'm joined by my colleague Marshall Miller.

THE COURT:  Good morning.  We're here on the motion to dismiss, and thank you for putting it off until today.  I had a bench trial last week, and it would have been collapsing this argument, and accordingly the billable fees would have gone way down.  So in the hopes of maintaining your solvency, I thought we should do it today.  So let's hear first from moving counsel.

MR. SACKS:  Thank you, your Honor.  Again, Robert Sacks on behalf of the JPMorgan defendants.  Your Honor, I'm

going to address the federal claims in the case, the two 10(b) claims.  Mr. Scott from Barclays will address any state law issues to the extent the Court has questions about them or plaintiff's counsel addressed them in their argument. Otherwise, we're prepared on the state law issues to stand on our papers.  Ms. Dabbs will take several minutes to address issues specific to Fifth Third.  I understand we have a total of 45 minutes, and therefore we --

THE COURT:  No.  That was when we were limited by the trial that I had, so feel free to take 46, 47.

MR. SACKS:  All right.  I'll try to keep it under that, but we would like to reserve a little bit of time for rebuttal, if we could, your Honor.

This case comes down to the two 10(b)(5) claims.  I don't think there's any dispute that if the claims are dismissed, that the Court should decline supplemental jurisdiction over the state claims and dismiss the entire action.  I'm going to focus specifically on the plaintiff's failure to plead scienter.  I'm not going to address the other points unless the Court has specific questions about it because this case does come down to a gross failure to plead scienter.

The complaint in this case is based almost entirely on a federal indictment which alleges that Tricolor repeatedly defrauded the lenders, i.e. the defendants in this case, by double pledging collateral, manipulating loan data, and

fabricating records to conceal that fraud not only from the lenders but also from the company's auditors and others. Missing from the complaint in this case are any facts to support the, I would say, overly bold assertions that defendants in this case were privately warned for years about Tricolor's coming implosion and concealed and misrepresented clear evidence of that fraudulent conduct.

There's zero factual allegation of any employee of any defendant, who actually knew or suspected Tricolor was engaged in double pledging of loans, manipulating loan data, or misrepresenting clear evidence of their fraudulent conduct. There are no facts from which one could infer that the defendants were provided with red flags, warnings of fraud, and consciously disregarded them.  And under the PSLRA claims --

THE COURT:  Well, I didn't understand plaintiffs to be adopting your view that there are no facts, etc.  What about the '22 audit?  What about the 2024 CBIZ report?  What about failure to exercise due diligence with the IPO, etc.?

MR. SACKS:  I intend to address each of those in turn very specifically, your Honor, because that is what they allege, but what they allege does not suffice to plead scienter under the standard that's required.  They don't allege actual knowledge.  They have to allege clear red flags that would establish conscious recklessness, i.e., knowledge so obvious that it is almost tantamount to actual knowledge, and they

don't come close to that.  And the very things your Honor mentions are, in fact, the sole bases for their claims in this case.  I will address each of them in turn, if I may, your Honor.  I'll be happy to do them out of turn, but it might be better if I address them in turn, however you prefer.

THE COURT:  Whichever you like.

MR. SACKS:  All right.  Your Honor, they allege four bases for alleging scienter here.  First, motive and opportunity to commit fraud to earn fees from securitizing and protecting the warehouse exposure.  The CBIZ consulting report, which is dated in February of 2024.  That was a diligence report, your Honor, commissioned by JPMorgan itself, which they then allege JPMorgan ignored.  It doesn't say close to what they allege conclusorily it says.

Third, a Crowe management letter from July of 2023, which was attached to the CBIZ report.  It's not an audit report, your Honor.  They mislabel it as an audit report.  It's a management letter that accompanied an audit report.  The audit report is not what they rely on, and, in fact, I will explain to you, the audit report contradicts their claims about the management letter because they got a clean audit opinion.

THE COURT:  In the CBIZ situation, if I understand it, the allegation is they were supposed to check for double pledging, which was one of the ultimate problems that led to the criminal indictments, and that Tricolor refused to provide

Q61RONEo

the data necessary to do the double pledging analysis and that that was, according to plaintiffs, a "five-alarm fire." Now, putting aside their use of cliche, what about that?

MR. SACKS: So let me address that specifically. I'll do that right now, your Honor. The claim that this was -- what they say, and I'm going to quote it, "It never happened because Tricolor refused to provide the master servicer report required to perform any meaningful testing." That's their characterization. It's not a characterization that is based upon the CBIZ audit report itself. What the CBIZ audit report says, your Honor, and let me quote what the CBIZ audit report says, because I think it is important to understand what is actually alleged rather than how they characterize it. It says, after a sentence which says that the asset details agreed to the data tapes, there is a sentence that says, "The consultants did not have a master servicer report of all facilities to confirm if there was any evidence that the assets were pledged to a third party." That's the only reference to it.

It doesn't say that Tricolor refused to provide it. It doesn't say they ever asked for that report, and it doesn't identify what they did. But what we do know, your Honor, is the CBIZ report did contain a double pledging analysis, even if it wasn't one that covered all facilities, and that's reflected in Exhibit B-1 to the CBIZ report. The way CBIZ did their work

was they took 55 loans as a sample, and the report contains a schedule that identifies each of the 55 loans as being a unique pledge.  Your Honor, that's the antithesis of a red flag.  If CBIZ was trying to convey concern about double pledge or fictitious loans, they wouldn't have identified each of the sample loans as being a unique pledge.  So what they allege is not -- what that allegation is to the CBIZ report is not supported by the actual CBIZ report.

What we know from reading the CBIZ report is that there were 55 sampled loans, each is identified as a unique pledge, and that with a few minor exceptions, the data comported with the data tapes, the information they reviewed. That's not the type of red flag that gives rise to conscious recklessness.  CBIZ --

I want to go back because I think it's important, your Honor.  This report was commissioned by JPMorgan.  It was part of JPMorgan doing protective diligence on the warehouse facility.  The notion that JPMorgan commissioned the report and then ignored red flags doesn't make any sense.  They commissioned the report in the first place just to understand what was happening first.

Second, given that it was a report specifically for JPMorgan, if CBIZ had wanted to convey that they had concerns that they were double pledging, that they had evidence of double pledging, that they had evidence of fictitious loans,

that they had evidence of fictitious documents, they would have come out and said it somewhere in the report.  But the report doesn't say that anywhere.

We're dealing with a situation where they are trying to impute knowledge or reckless disregard of knowledge to the defendants in this case under circumstances where the people who did the reporting, one, were doing it at our behest, and, two, didn't say something like we think there is a fraud occurring here.  We are concerned that there is double pledging that is occurring here.  We have evidence that these people have made up documents here.

What they did was they went through meticulously a whole bunch of tests, and what they found after doing those tests was, in general, that most analyses came back clean. 100 percent of them didn't come back clean but most did come back clean.  The 55 loans, for example, your Honor, sampled——this was the core of the thing——said "except where documented below, the loans were approved in compliance with the company's policies and procedures.  The asset details included in the detailed data tape agreed to the respective system."

That's the conclusion that they reached.  The exceptions, the excepts to that, were very minor.  They were not obvious, glaring, red flags of fraud of the type that this Court and every other requires in order to put a third party on

notice where they can be in a position where you can say that this consciously disregarded obvious evidence of fraud.  They tested eligibility criteria for the loans and concluded that there were no issues.  They described bank reconciliations with no significant reconciling items of note.  They went through the monthly servicer report and the borrower based calculations.  And over 11 pages, they meticulously confirmed that they had agreed the amounts in those reports.

Yet what they're doing is picking up occasional issues that not every loan was compliant.  There were occasional lapses, but none of that—none of that, your Honor—comes close to suggesting that—again, we're not talking about should you have done more, could you have done more—was this a glaring obvious inference of fraud.  And, your Honor, they don't come close to doing that.

THE COURT:  What about the statement made in your offering memoranda that refers to Tricolor's, quote, highly experienced management team with a strong operating track record. Plaintiffs allege that this was false both because the audits had shown various failures but also because the CFO had a close association with the prior criminal case.

MR. SACKS:  Let me address those in turn.  First, your Honor, this company had been around for an -- this wasn't a new or a nascent company.  This company had been around for a long period of time, had operated successfully for a long period of

time, and but for the fact that they were engaged in a fraud, which our clients did not know about, was incredibly successful, and had people who were experienced in the industry.  As to the issue of the prior --

THE COURT:  I think the same thing could have been said of Mr. Madoff's company, but go ahead.

MR. SACKS:  That's entirely correct, your Honor.  And, in fact, it would have been true but for the fact he was engaged in a fraud, and then you have to get back to the question about whether the person who is sitting here in my client's position being accused of the fraud was, in fact, consciously reckless in disregarding evidence of the fraud. Many of the Madoff cases were thrown out because there wasn't adequate pleading of conscious recklessness against third parties.  And that's the case here, your Honor.

Remember, the government brought a claim where the government concluded that the fraud that went on was a fraud perpetrated against our clients who, in fact, are the largest victims of this fraud.  Our clients are exposed for hundreds of millions of dollars in warehouse lines.  If any of these theories is correct, they're exposed to hundreds of millions of dollars in securities of purchasers here.  And so, I mean --

THE COURT:  What about --

MR. SACKS:  But let me address, your Honor, the issue of you called it an audit because the plaintiffs called it an

audit, but it was a management letter.  It was a management letter that accompanied an audit.  And the actual audit opinion, your Honor, is quoted in the CBIZ report at page 44 to 45, and it in and of itself undermines all inferences of fraud the plaintiffs want to draw from the management letter.  It's an unqualified audit opinion that Tricolor's financial statements for the prior two years are materially compliant with GAAP.

So nothing in that management letter that the auditors at Crowe came up with, the control weaknesses that they identified as many companies get in their management letter, was the five-alarm fire that plaintiffs claim it is.  None of it caused the auditors, the people who were making those comments, to conclude that they could not rely on management's representations; that they could not rely on the information in Tricolor's accounting systems; that they could not issue an audit opinion, or that they needed to qualify their audit opinion in any way.

And if an accounting firm believes that a client is engaged in fraud or suspects they are, they don't issue an audit opinion.  They say, sorry, we're resigning.  They didn't do that here, and they didn't tell us or anyone reading their report.  What they asked for is an inference that defendants somehow were reckless in not concluding from the management property and the audit opinion—the same things that the

auditors issued an opinion on——that a fraud was occurring.  But the auditors didn't offer that opinion, and they didn't conclude that it was occurring.  If the auditors themselves who did the investigating didn't conclude that these findings were indicative of a fraud, how can a third party reading that audit opinion be charged with recklessness in not concluding that this was evidence or clear evidence of a fraud?

Plaintiffs also in their complaint and in their opposition ignore completely management's responses to the control issues that were raised.  They were raised with the audit committee of the board, and the report itself identifies all of the responses of management to address them.  They were addressing each and every one.  None of them, in fact, identifies fraud, fraudulent documents, double pledging of loans.  Again, let's not lose sight --

THE COURT:  I didn't yet hear your response to the question about Mr. Kollar, I think his name was.

MR. SACKS:  OK.  I will address that as well, your Honor.  So the allegations as to the CFO, which were not well pleaded, your Honor, I will say, in the first instance.  So that is the first response, which is they are not well pleaded, they are suppositions here, and that we abandoned an IPO do nothing to establish scienter.  They claim, to be clear, that we abandoned an IPO six months or so after the CBIZ report when we discovered that Tricolor's CFO Kollar——and I'm using their

words now because they are not accurate——was implicated in a fraud that resulted in the criminal indictment and ultimate imprisonment of the chief executive officer of his prior employer.

They cite no facts to support that assertion that anyone at JPMorgan was, in fact, aware of that.  It's just they say it, but they don't say who was aware of it, when they were aware of it.

THE COURT:  I will go back and look at this, but I have a vague recollection that they asserted that while you were still considering the IPO, they recommended that he be removed or replaced or something like that.

MR. SACKS:  Again, they don't identify who said what and when.  This is a fraud claim, your Honor.  They have these generalized statements in there, but they are not pleaded and they are not attributed to any particular person said it.  They said JPMorgan said this.  Well, who at JPMorgan?  When did they say it?  Who did they say it to?

THE COURT:  The normal remedy for that problem would be to give them leave to replead.

MR. SACKS:  Yes.  Well, they've already had one chance, your Honor.  If you will recall, you told them they could replead then or they could replead now and it would be up to them, and so they repleaded.  We're here now on a complaint that you said they won't be given leave to replead.  Put that

Q61RONEo

aside, they've had an opportunity to replead.

But there's a more fundamental problem with this, which is these allegations have nothing to do with fraud in this case. The fact that Kollar -- first of all, Kollar himself was not implicated, and there's no factual allegation that Mr. Kollar was implicated in that fraud. He is at a company that was implicated in a fraud. That says nothing about Mr. Kollar himself. So their characterization of him as an "experienced fraudster" is factually empty, and there's no allegation as to -- no well-pleaded allegation as to Kollar himself being involved in any criminal wrongdoing.

Second, no facts about anything having to do with this fraud at this other company are alleged at all. It's an allegation there was some unspecified fraud at some unspecified other company that Mr. Kollar worked at and that the CEO was imprisoned as a result of it.

Third, unspecified involvement in prior wrongdoing would not, even if it was properly pleaded, be a basis for inferring scienter here. The *Hubiack v. Li-Cycle* case, for example. You can't infer propensity to commit fraud because somebody did so elsewhere, and there's no allegation that Mr. Kollar did commit fraud elsewhere.

And so, fourth and finally, there's nothing that would tie him to double pledging of loans or the fraud here. So, again, we're talking about scienter in this particular case

Q61RONEo

with this particular company, that we had to have red flags, that there was double pledging of loans, that there were fictitious loans, that there were fraudulent documents, and it's simply not pleaded in this complaint, your Honor.  It's simply not pleaded.

THE COURT:  All right.  So you've answered most of the questions I had off the top of my head, so I think we ought to interrupt you at this point here on the securities claims from plaintiff's counsel and then come back to you and your colleagues.

MR. SACKS:  Very well, your Honor.  Thank you very much.

MR. ADAMS:  Good morning, your Honor.

THE COURT:  Good morning.

MR. ADAMS:  I want to start out by just addressing what the fraud is here, because I think that there is an effort to create a strawman in this case and say that we had to allege that they were reckless or willfully blind as to the underlying double pledging and fictitious loan scheme at Tricolor.  And, in fact, we have made allegations that are more than sufficient to support that inference, and that is, I think the strongest inference from the facts that we allege.  But we have very, very clearly alleged that they were put on direct and specific notice by the CBIZ report that the loan data that they were promulgating to investors in the securities agent program that

were the underpinning of the offering memorandum, that that loan data, and in particular delinquency data and recovery rates with respect to the loan collateral in these non-recourse facilities was pervasively inaccurate and completely unreliable. And they failed to disclose that whatsoever in any of the offering materials that they provided to investors.

In fact, if you look at the offering materials before and the offering materials after the CBIZ report, they are exactly the same. There's no disclosure whatsoever. What am I talking about here? For example, your Honor, they received information that recovery rates on the loans were fabricated—fabricated. They were describing the recovery rates on the underlying loans as the wholesale value of the car that was associated with that loan. They were doing that regardless of what was actually recovered, but more importantly, your Honor, they were doing that regardless of whether the car was actually recovered.

And the CBIZ report, by the way, called that out very specifically and said, this is deceptive. It creates a misimpression that these loans are healthier than they are, that the collateral can support lending in a better way that it can. And nonetheless, they didn't provide any of that information when they advertised those recovery rates to investors in the securitizations.

It is the misrepresentation of the loan pool

Q61RONEo

characteristics that they very clearly did have direct

knowledge of, and there can be no real question of that.  They

got that in the CBIZ report.  Your Honor has the CBIZ report.

I frankly think it speaks for it.  It's at docket 83-4.  I

think it's very, very clear that that report identifies

numerous issues with the data.

Delinquency is another example.  In the delinquency

data, your Honor, there was an aged loan test.  They checked

aging.  There were nine delinquent loans that --

THE COURT:  What is your claim as to their scienter

and motive if, because they're the immediate victims, they get

this report, which in your view confirms or identifies how

they're being defrauded, and if that's the fair reading, why

didn't they just turn around and say, we're going to sue you,

rather than continue with the business and indeed promote it?

So what is your analysis there?

MR. ADAMS:  Yes, your Honor.  The question of motive,

and I think that really gets to the core of what the debate

among the parties is.

The defendants had over half a billion dollars of

exposure on the warehouse lines at the time they got the CBIZ

report.  They couldn't press a button and make that go away.

They had a huge problem on their hands, and the only exit they

had from their warehouse loans was the securitization pipeline.

If they pulled support at that point in time from the warehouse

loans, they would have lost money in a dramatic fashion immediately.

What they did instead, was continued business as usual on the securitization pipeline. That allowed them to continue to -- not just business as usual. I should add they accelerated the securitization pipeline. That allowed them to keep these loans and their exposure to them on their balance sheet for less time, and then on top of that, they immediately started marketing the mezzanine piece of the warehouse facilities to third-party investors.

That was an effort to give the company a shot in the arm of $150 million of subordinate capital that could either prop the company up or allow the company to grow out of whatever problems it was, having in the hopes that they wouldn't face these massive losses on their warehouse lines. They could only do that by continuing to lend on the warehouse lines. If they stopped lending on the warehouse lines, everything falls, and so they didn't really have a good choice.

THE COURT: But you don't have a confidential informant who says that's what they intended. This is a hypothesis?

MR. ADAMS: It's a motive and opportunity, your Honor. We're not asserting that there is an email where they say, we have to keep this going. The fact that they had to keep the warehouse line going is self-evident from the facts of this

case, including that within days of pulling the warehouse lines in 2025, the whole company collapsed into bankruptcy.  So I don't think there's any supposition in the notion that they could not continue -- this company could not continue to operate without the warehouse lines continuing.

And so we have alleged motive and opportunity.  That is a way that you can allege scienter.  It is one way.  We've also alleged very direct evidence that they had the information.  They had a specific report that provided information that contradicted their public statements in the offering memorandum about the loan characteristics and the key loan characteristics of these pools that were being sold to securitization investors, including my clients.

And, frankly, your Honor, those specific facts that they had in the CBIZ report that is now with the Court is a quintessential example of direct evidence pled with specificity in the complaint that they had knowledge of the contradictory facts regarding the loan pool characteristics, and they failed to disclose those facts to investors in the securitizations.

You don't even have to get to motive and opportunity, but we do have motive and opportunity.  This is clearly not a case like *Suprema* cheese where they say the underwriter was merely motivated by the desire to collect its underwriting fee. This is a case where they played dual roles.  The dual roles, by the way, in and of themselves in many of the cases, have

been found to be sufficient for a motive and opportunity allegation.

They had $60- to $70 million a year coming in this interest and fees on the warehouse lines, and that alone, your Honor, gave them a reason to continue to sell the securitizations.  Because if they are in a down-case scenario where the collateral is fundamentally impaired, they are better off making that $60- to $70 million a year for as long as they can to offset their ultimate losses on warehouse facilities. So the fact that they kept this going for another two years and sold another billion two of the securitizations during that period of time and collected another $100-plus million in income on the warehouse lines while the securitization investors took on the collateral that was flowing through those warehouse lines and out into the securitization pipeline.

So they had a clear motive and opportunity to commit the fraud, and then they were in possession of the report that told them that the information that they were disseminating to investors, including delinquency data, including recovery rates of the underlying collateral pools, were false and inaccurate, and they failed fundamentally to disclose those facts to investors.

So I think with either of those allegations, either the motive and opportunity or the recklessness allegations, you can get to scienter here, your Honor.  And I think, frankly,

the allegations pled together make this not even a particularly close case.

THE COURT:  So what do you say to the point that was made by your adversary?  When I asked them about the inability of the CBIZ people to do a double pledging analysis for lack of adequate information, and says you have mischaracterized what was actually said in the CBIZ report and rather have simply resorted to rhetoric.  What about that?

MR. ADAMS:  We totally disagree with that, your Honor. At page 19 of the CBIZ report, it's very, very clear that the double pledging analysis was a core component of the agreed-upon procedures that CBIZ was supposed to implement. And then if you go to what they say about the actual double pledging testing that they were supposed to perform, it says, and it's in the same quote.  I think it's clear on its face. "The consultants did not have a master servicing report of all facilities to confirm that there was any evidence that the assets were pledged to a third party."

They didn't have the underlying report to perform the analysis.  The fact that they have some chart at the end of the report that says that they didn't find evidence of double pledging is not reassuring in a case where they weren't able to for double pledging in the first place.  It's not like what they needed to have to test for double pledging was some arcane or difficult-to-find object.  They needed the master servicing

reports for the facilities.  The company had that at their hands, at their fingertips.  They didn't give it to CBIZ because they didn't want to give it to CBIZ.  They weren't comfortable giving to it CBIZ because they knew exactly what it would disclose.

We know CBIZ didn't test double pledging because there was pervasive double pledging on the JPMorgan warehouse lines.  There's no debate about that.  You probably couldn't have found a random sample of 55 loans in that pool that didn't have very persuasive double pledging.  They didn't test for it, and they refused to provide the information for it.  Now, does this say that they refused to provide the information?  I will say that there's numerous places throughout this report that express—and I think you can sense it from the tone of the report—a deep frustration with Tricolor and its unwillingness to cooperate with the audit.  So that's clearly here throughout.  I think it is self-evident that Tricolor didn't cooperate --

THE COURT:  That's interesting, and I will go back and read it with that in mind.  But I doubt, unless you can point me to a case that says the failure to reveal the tone of the report states some sort of violation.

MR. ADAMS:  I'm not suggesting that, your Honor.  I'm merely responding to the suggestion that this doesn't specifically say that the company didn't provide the report,

the master servicer reports, that CBIZ didn't have, that the company had easily at its fingertips, and that CBIZ calls out specifically and it wasn't able to look at in order to perform a very important test that it wasn't able to perform because it didn't have those.  And the suggestion that maybe they didn't ask for them doesn't make any sense, your Honor.  I don't think that's a reasonable inference from the facts that have been alleged.

And, your Honor, while I think the tone of the report is very interesting and it is circumstantial evidence that there was something very wrong going on here, there's nothing circumstantial or inferential about a recklessness case.  The report says in black and white that cash was not being delivered to the right bank accounts pervasively.  Two-day cash tests, 50 percent of the cash is going into bank accounts of other lenders.  Not one, not two bank accounts of other lenders; it's going to four bank accounts of other lenders. Hundreds of thousands of dollars a day going to the wrong place in direct violation of the way these securitizations are required to operate.

There was a very clear statement that Tricolor was fabricating recovery rates, and there is very clear evidence that the delinquency data was fundamentally wrong and incorrect.  They haven't covered that in great detail, but they did an aging test.  They tested nine delinquent loans, or

Q61RONEo

almost half of them, were not aged correctly.  The age shifting test showed a substantial number of loans not age shifting from one aging bucket to the next correctly.  Every single loan in the pool that had a maturity date before the date of the CBIZ report was listed as a current obligation rather than defaulted, when obviously if it's after the maturity date, it's defaulted.

The data that they were using to prepare and populate the loan pool characteristics, which were the fundamental core of what the securitizations relied on.  It was the loans that investors in securitizations relied upon to recover their investment, and those loans were not what Tricolor said they were, and the defendants were told that in black and white in the CBIZ report.  They were told on no uncertain terms that the data from the loan tape was pervasively inaccurate, could not be relied upon.  The report even said --

THE COURT:  Again, I didn't go and more than skim the report at this point because I'm not deciding this until after I hear oral argument.  I don't recall the reports using the words you just used.  The report didn't say that data is pervasively inaccurate, etc.  So this is your, if you will, characterization of what you think it showed, yes?

MR. ADAMS:  "Pervasively inaccurate" are my words.  Their words are:  "Consultant suggests client follow up with management to discuss the reasons for these discrepancies and

discuss the ultimate accuracy of the data tapes provided by the company."

CBIZ was specifically calling into question and could not verify the accuracy of the data tapes and had identified specific errors in the data tapes that there was no adequate explanation for.  The explanations that the company gave, by the way—not that anybody has to sort of blindly follow those explanations—weren't particularly compelling.  You've got 50 percent of the cash going to the wrong place, and they say, oh, the procedures are manual and, you know, some loans moved around.  I mean that's it?  That's the end of the inquiry?  Because any further inquiry would have identified that the cash was going to the wrong place because these loans were sitting in multiple pools.

And with the recovery rates, they were told specifically—specifically told—that the recovery rates, which were a core selling point, by the way, of this particular program and these notes, the recovery rates in the loans were completely made up.  They didn't disclose that in any of the offering materials to investors.  They knew it.  It's right here in the report in black and white.  Cars that were not even recovered were being treated as if they recovered their wholesale value of the car.  That alone fundamentally misrepresents the nature of the pool, its ability to withstand a down-case scenario where the parties are relying on

Q61RONEo

collateral to recover their investment.

Your Honor, if I can just quickly note a couple cases? This is very closely on point with several of the cases that we cite.  There's a case called *Livent Securities*, and the investment bank that was underwriting that securitization was CIBC.  There CIBC was also a lender to Livent, and the allegation in the complaint was actually much more narrow than our allegations.  It was simply that CIBC had a motive and opportunity to commit fraud because they hoped that the proceeds or expected that the proceeds of the issuance that it was underwriting would be paid or be used to repay its loan. That was found to be an adequate motive and opportunity allegation to support a strong inference of scienter.

You've also got -- excuse me for one second.  You've also got the *National Century* case, your Honor, which is almost directly on point.  It's out of circuit, but it involves an asset backed notes program.  There the notes were backed by receivables from health care companies.  Credit Suisse was the initial purchaser on the asset-backed notes, was selling them. The motive and opportunity there was that Credit Suisse had notes on its balance sheet.  It needed time to be able to sell those off and work out its exposure, and it was therefore motivated and had motive and opportunity to commit fraud by continuing to support the note program.

That's exactly the allegation that we've made here

with respect to the defendants, that they were creating time and opportunity to try and work out of their exposure on the warehouse lines where they had over half a billion dollars. They needed to continue to sell securitizations in order to monetize those assets, number one.

Number two, they immediately started to sell the mezzanine piece of the warehouse facilities to bring $150 million of subordinate capital that could be used to pay off their loans in a down-case scenario and in a best case scenario puts the company back on track.  And all of this occurs in the context of JPMorgan being hired and retained to conduct an IPO of the company and deciding to abandon that IPO based on the same accounting irregularities that were identified in the CBIZ report.

So when it came to IPO-ing the company with registered securities and the additional exposures that the sale of registered securities creates, the company at JPMorgan made one decision.  When they were presented with those same facts with respect to the securitization pipeline, where they needed to keep it going in order to protect themselves on their half-a-billion-dollar exposure on the warehouse lines, they did the opposite.  And that is another very strong circumstantial piece of evidence to support the existence of scienter here.

Your Honor, I think that is --

THE COURT:  All right.  Let me go back to your

adversary here, his response to the points you've just made, and then we'll turn to the other issues in the case.  Thank you.

MR. SACKS:  Thank you, your Honor.

Let me start, I guess, with motive since that was one of the points that he raised.  The theory is that defendants wanted to continue earning fees from warehouse lending and securitizations and protect their warehouse exposure.  Any bank earns fees from issuing securitizations.  Any bank earns interest from lending money, and any investment bank earns fees from securitizations.  That is exactly the type of generalized profit motive that courts have found do not establish motive. You need something concrete, specific, specific benefit from the fraud.

Their theory is exactly the one that was rejected by courts in this district in *Adelphia* and *Schmidt v. Fleet*, relating to the idea that plaintiffs would -- a motive theory that would require the defendant to expose itself to massive financial and reputational harm for modest or short-term benefits on the hope that they could conceal a massive fraud infinitum.  That, the courts have held in both *Adelphia* and *Schmidt* is not a cogent inference of fraudulent intent.  It is not a compelling motive theory, certainly less compelling than the theory here, which is that it's alleged by the Department of Justice and the bankruptcy trustee that the defendant

continued to do business with Tricolor because they were unaware of the ongoing fraud.

The cases that they cite are completely different than the cases here. *National Century*, the case in Ohio --

THE COURT:  Well, my understanding of the motive argument, it is that, OK, we now suspect we're being defrauded, and if we are, we've suffered a big loss.  We can reduce that through various devices to offload some of the risk to other people, like the players here, but to do so, we have to conceal the fraud.  That's, I think, their theory.

MR. SACKS:  Let me address that specifically, your Honor, but also point out first that's sort of the notion what underlies *Adelphia* and the *Fleet* cases because the idea is you keep perpetuating the fraud with the idea that you are going to find a way to reduce your exposure to the fraud, and that makes no sense.  They don't logically explain, your Honor, how the continuation here actually reduced defendants' liability.

What they say is that -- because what happened here is the warehouse exposure to Tricolor did not go down.  We didn't bring in to the defendant someone is to replace their warehouse lending.  They added to the warehouse lending.  Admittedly it was say mezzanine lenders and admittedly that might have a limited impact in absorbing losses, but our exposure remained, on the warehouse side, the same.

However, if we consciously knew of this fraud, we were

continuing to engage in new securities offering giving us exposure to new and more securities plaintiffs to argue exactly what Mr. Adams is arguing here today, that we went forward with securities offerings.  That would increase our exposure, not reduce our exposure.

We continued to loan money to Tricolor.  Who knows what our position would be when the music stopped?  We were bringing in two new lenders, they allege.  Lenders who might uncover the fraud, as ultimately happened here, and we were exposing ourselves potentially to claims from them for not warning them that they were bringing them into a fraud.

So overall, your Honor, we were increasing our exposure, not consciously decreasing our exposure, and it defies economic sense whatsoever.  If we knew that they were committing a fraud, a massive fraud of this type, the type that was ultimately——it's a Ponzi scheme——going to come to light and result in their failure, that we would do this instead of protecting ourselves.

The pleading also ignores, your Honor, what they themselves plead, which is --

THE COURT:  Just to go a little further, I just want to make sure I understand the standard that I need to apply if I reach the motive issue.  I mean, it would be that, taking most favorably to the plaintiff all well-pleaded allegations, the motive still must be one that the Court can find was

plausible.  Do I have that right?

MR. SACKS:  Not just plausible, your Honor, but more than plausible.  Plausible and more compelling than the contrary inferences that exist here, and an inference that is plausible as an inference of conscious recklessness, not just an inference that's plausible as you might have some motive in the ether to do something.  You have to tie it to the standard that is required to plead scienter in a 10(b) case, when in fact, it's not just --

THE COURT:  Yes, it's the heightened pleading.

MR. SACKS:  Correct, the heightened pleading standard.

THE COURT:  I understand.  That's a fair point.

MR. SACKS:  And a more compelling inference than the contrary inference under the circumstances.  I would also point out, your Honor, what they also don't -- what you didn't hear is what happened -- and you can't ignore it when you are dealing with competing inferences, what happened when we did learn facts that suggested a fraud.  What happened was that JPMorgan immediately brought in FTI to conduct an analysis to see if there was fraud, and then immediately terminated the warehouse line.  That is on the other side of the equation, and it undermines their whole notion that we perpetuated this fraud for another couple of months when, in fact, what we did when we actually learned of it was terminated immediately.

OK.  That's motive, your Honor.  Let me deal with some

of the other issues that were addressed by Mr. Adams.  On the issue of double pledging here, again, a lot of language, but read the report, your Honor, because there's no evidence in this -- again, this is a scienter case.  It's not a question of should we have done more?  If we had done more, would we have learned something?

There's no reference in this to the fact that anyone suspected double pledging was happening.  CBIZ does not say, we think you shouldn't do business with this company because they may be double pledging; we uncovered evidence that documents were fraudulent; we uncovered evidence that people were concealing information.  They don't say that.

What they say in this case is -- they don't say we did no double pledging analysis.  They said we couldn't do a complete double pledging analysis because we didn't have a report of all facilities.  They don't say nobody gave it to us. They don't say we asked for it.  They don't say anything about that.  They're drawing inferences that don't have a factual basis for them, and they are not in the report itself.  In fact, you'd have to look at the report, which has a full line of 51 out of 51 or 55 out of 55—whatever the number—was loans that were sampled.  Every single one says it's a unique pledge. If you thought you couldn't do any analysis and had no basis to do it, why were they saying it was a unique pledge?  Look at Schedule B-1 to the report.  It says it's a unique pledge.

Q61RONEo

It's not an indication that anything was withheld here.

Your Honor, on the loan tape data, I think the plaintiffs here are sort of walking back the basic allegation of the complaint. The basic allegation of the complaint is that we were consciously reckless in disregarding evidence of double pledged loans and fictitious loans and fraudulent documents. Now we're hearing, well, maybe not so much, but we did know enough to know that the loan tapes were not accurate. Well, that's not supported anywhere here, your Honor. Nowhere at all.

There are no specific facts pleaded about the loan tapes nor any securitization. The CBIZ report doesn't deal with the loan tapes for the securitization or loans in the securitization. The CBIZ report deals with the warehouse line and what was false in any loan tape in any particular securitization. They don't plead that. They don't plead what loans were false. They don't plead why they were false. They have a lengthy attachment to the complaint.

Almost all of the things in there are: It's false because you didn't disclose or because these loans were double pledged -- a substantial portion of the loans were double pledged and fictitious. The CBIZ report doesn't suggest the unreliability of the loan tapes. It suggests the opposite. "except where documented below, the asset details included in the detailed data tape agreed to the respective system." So

even if we were dealing with the loan tapes for the securitizations, this report is not a red flag to the reader that the loan tapes were unreliable.

The exceptions, if you read the whole report, your Honor, are a very, very small percentage of the sampled loans. And as to those exceptions, there is no conclusion from CBIZ that those loans or those failures or those exceptions render anything false, fictitious, or indicative of fraud.

THE COURT:  Let me press you on a couple of specifics there.

MR. SACKS:  Sure.

THE COURT:  First, according to the CBIZ report, 16 percent of the 25 sample loans and 44 percent of the delinquent loans within the sample were improperly reported. For example, two loans were listed as 32 days past due when they were at least 52 days past due.  CBIZ says that they were unable to obtain management's explanation before the report was due but that JPMorgan should follow up.  So I have a bunch of things I want to ask you, but let me just stop there.

MR. SACKS:  Let me address that, your Honor, because I think that is a generalization.  That's not actually what the report says.  So there were a couple of things where they didn't have an opportunity to get management's explanation and that they said JPMorgan should follow up.  But, again, a couple of things, not the entirety of the report, and if you read the

Q61RONEo

report, it contains management's explanations for most of the items in there and most of those explanations are important to understanding the findings in the first place.  And, again, we're here looking for evidence of red flags of scienter for double pledging of loans and fictitious documents, as to which none of these tests really relate.

The aging test and age shifting test, which your Honor was referring to about two loans, were a minor percentage of the loans, and they involved loans that were marked as they were 52 days delinquent rather than 32 days delinquent.  They were actually marked in the correct bucket because the bucket was 30 to 60 days, but those were two loans there.

The age shifting test, which is related and which Mr. Adams referenced a moment ago, Tricolor did give an explanation.  It's in the report and explained that several of the loans were paused because the vehicles were in the shop, and they pause the aging of loans when cars are in the shop. So only one of -- what CBIZ concludes is of the five loans initially identified, only one of them should have been deemed to be ineligible.

The black book findings or the recovery things that Mr. Adams referenced, it reflects an accounting methodology, which is entirely separate from fictitious loans or double pledging of loans, and there's no allegation that the offering memorandum misstated actually recoveries on cars.  Again, all

Q61RONEo

of this information was verified by CBIZ even though they believed that it was not a methodology that should be employed, and they recommended that Tricolor change its methodologies.

The two-day cash test, which is the test that is the specific name of the test that Mr. Adams was referring to when he referred to the fact that money went into the wrong accounts.

THE COURT:  Right.

MR. SACKS:  This testing occurred at a point in time, your Honor, right after the SPV5 and SPV4 facilities had been combined.  And there was a little bit of confusion, and there had to be manual -- this was all explained in the report and had to be manual adjustments because some of the loans went into the prior bank account.  The SPV5 facility was Barclays facility, which was later combined with the JPMorgan SPV4 facility.  But they also did a test and found that the bank accounts had more than sufficient cash in them to cover all of their obligations and that these corrections were ultimately made.

So there's no doubt that things were not perfect. But, again, we're here talking about scienter in the sense of where is the evidence that we ignored, consciously, red flags of fraud.  That's very different than seeing that there were accounting issues that weren't perfect that needed to be improved, and nobody in the CBIZ report, nobody in the

management letter that accompanied the audit; the fact that there was an audit, that it was a clean audit opinion given by Crowe at that time, suggested or said or told JPMorgan or the other lenders that they were suspecting that wrongdoing was occurring in the form of fraud.  So, again, we're here looking for that.  We're not looking to do --

THE COURT:  Well, I'm not sure that I totally understand the --

MR. SACKS:  Your Honor, how can --

THE COURT:  There are a whole bunch of Second Circuit cases going back at least 40 years involving accounting fraud, where an accounting firm is told something that seems a little suspicious but a good explanation is given, but then it happens again and again and again.  And the Second Circuit beginning in, if I recall correctly, *United States v. Simon*, written by Judge Friendly --

MR. SACKS:  You are dating yourself, your Honor, with Judge friendly.

THE COURT:  Pardon?

MR. SACKS:  You are dating yourself with Judge friendly.  I'm just joking.

THE COURT:  He had a law clerk named Roberts.  I don't know whatever happened to that guy.

In any event, the point was when improbable events occur again and again and again, then, said the Second Circuit,

Q61RONEo

one can infer that deep in their hearts the accountants knew something fishy was going on.  So my point is me they don't have to be told by someone, oh, that's a fraud.

MR. SACKS:  Yes.  But there have to be appropriate red flags that would lead any reasonable person in their position to recognize that a fraud was happening here and consciously disregarding it.  It's a very high standard, your Honor.  In this particular case, I don't know whether that was a malpractice case or what kind of case.

THE COURT:  It was a criminal case.

MR. SACKS:  It was a criminal case.

THE COURT:  I agree.  It's not the same as this, but I just want to --

MR. SACKS:  Your Honor, we don't have *seriatim* warnings here.  We have a single point in time.  We have a CBIZ report, which attached to it a management letter, and that management letter was accompanied by an audit report, which was a clean audit opinion.  Those are the circumstances from which they asked you to derive scienter in this particular case.  It is a far, far, far cry from what is required to plead scienter in a case like this.

I meant to—I got distracted—mention the cases that Mr. Adams mentioned to you.  There's nothing like *National Century* where Credit Suisse had a unique circumstance where they were holding hundreds of millions of dollars in inventory

that they needed to unload.  We don't have that sort of a situation here.  It's not like *Livent*——I guess is what it is——where CIBC's role, they were actually involved in the very transaction that was alleged to be fraudulent in that particular case.  And the third case they cite is the *Dodona* case, again, which involved Goldman Sachs.  And it was a case where there was pleaded specific evidence that while they were representing how wonderful these CDOs were to the investing public, internally they had memos quoted in the complaint about how they were betting against the toxic CDOs and believed that the market was going to implode.  We don't have any of that in this case.

You are being asked, your Honor, to draw an inference from a report that was commissioned by JPMorgan and an accompanying management letter, which was accompanied with the most recent audit, which was a clean audit, and draw a conclusion about something that the banks in this case must have known or were oblivious to an obvious fraud under those circumstances.  And I respectfully suggest, your Honor, they don't come close to pleading what's required to plead scienter in this court.

And additionally, under *Tellabs*, the far more compelling inference here, looking at all the facts, is the one that is set out in the indictment on which the very complaint in this case fundamentally relies.  The defendants were unaware

Q61RONEo

of the fraud. It was concealed from them. Tricolor took steps to conceal it from them. And like the defendants, the plaintiffs are victims of the same fraud that the defendants here are victims of. But the plaintiffs cannot sustain a 10(b) case here, your Honor, and I would respectfully ask that the claims be dismissed and that the entire action therefore be dismissed.

THE COURT: All right. Let me hear a brief response from plaintiff's counsel, and then we'll turn to any of the other issues that the other defense counsel want to raise.

MR. ADAMS: Thank you, your Honor.

I just want to hit a couple points quickly. First, my colleague cited the wrong standard. The standard for pleading scienter is that you need to plead a strong inference of scienter that is at least as plausible as competing inferences. A tie in this case goes to the runner; a tie goes to the plaintiff. So we don't have to plead facts that create a stronger inference than --

THE COURT: Of course, I don't need to reach that issue because both sides have assured me already that it's a slam dunk for their respective sides.

MR. ADAMS: That's what I was about to say. I was about to say we don't have to get there because it's not even close, but if it were close, your Honor, the tie goes to us.

Number two, they suggest that because when a mezzanine

Q61RONEo

warehouse lender that they brought in with subordinate capital discovered the fraud and called them out on it, they sent in FTI, and within a matter of a few days uncovered the full scope of the problem.  That doesn't help their case.  That shows what happens when someone forced them to actually do what they should have done back in 2024, which is go into the company and figure out what was going on.  It wasn't hard to figure out what was going on.  They didn't want to figure out what was going on.  That's the willful blindness allegation in our case.

But I think it's really important to address, because they said it a couple times; they said it in their papers and they said it here today, that we're somehow changing our theory.  That is completely inaccurate, your Honor.

We have a section in our complaint.  It's called: Defendants made material misstatements and omissions in connection with the sale of the Tricolor trust notes.  That's section four.  Under that section, first, the offering memorandum included detailed historical delinquency and loss data regarding the Tricolor originated loans dating back to 2019.  The underwriters defendants were well aware that Tricolor's loan tape did not accurately report delinquency or loss information.  Both the 2022 and 2024 audits highlighted that recoveries on repossessed vehicles were entirely fabricated based on black book value, which was attributed to loans even where Tricolor was unable to recover the vehicle

Q61RONEo

collateral.

This was our first and foremost theory of fraud from the beginning.  It's right there in black and white.  And if it's not clear enough, your Honor, that that's separate and in addition to the alternative theory of willful blindness, we have a paragraph -- I just read you paragraph 116.  We have paragraph 120, which says, "On top of all that"——that's how we start the sentence——"the defendants were at best willfully blind to the fact that Tricolor was engaged in a fraudulent, Ponzi-like scheme that involved doubling pledging for sale of assets, misrepresentations concerning asset performance, and intermingling of loan recoveries to manipulate borrowing capacity."

So we very, very clearly alleged both theories.  We're not walking anything back.  We think we survive on both theories, but we have certainly alleged the mischaracterization of loan pool characteristics theory very, very clearly in our complaint.

On that theory, I heard my colleague suggest that, hey, these were inaccuracies that were identified in the loan tape for the warehouse loans, so this wasn't a red flag that there might be inaccuracies in the data tape for the securitizations.  That doesn't make sense for a couple reasons.  Number one, same loan tape, some company, same characterizations of loan pool characteristics.  Number two --

Q61RONEo

THE COURT:  Forgive me for interrupting you.

How long was it between the time that the CBIZ report came out and the time when JPMorgan basically closed the program down from their end?

MR. ADAMS:  The CBIZ report is February 2024, and JPMorgan shut down the warehouse lines, I think it was September 5, 2025 or thereabouts.

THE COURT:  All right.

MR. ADAMS:  I just have a couple more points, so hopefully, I'm not wearing out my welcome here, your Honor.

Not only was it the same data tape, but it was exactly the same loans.  The loans that were going into the securitizations were the very loans that were in the warehouse facilities.  That was the whole point of the securitization pipelines, so, of course, the same mischaracterizations are going to show up in the securitization pipelines.

On the recovery rates -- sorry.  With respect to the aging, they suggest that the aging was explained because there was this unwritten policy that they stopped aging loans when cars were in the shop.  So two things on, that, your Honor. Number one, I think that the folks that were investing in pools of those loans would have wanted to know that unwritten policy if they were to invest, because that would obviously change the degree to which enforcement actions were being taken against delinquent lenders and cash flows for the pool.

Q61RONEo

But beyond even that, your Honor, they couldn't verify that unwritten policy because, for at least half of the loans that they were looking at that supposedly that policy applied to, the servicing notes had no mention of any shop issue or mechanical issue with the car whatsoever.  So it didn't -- I think it's very clear from the report that that explanation was at the very best highly, highly suspect.

And, finally, your Honor, the cases that they cite, like the *Fleet* case for example, in that case the motive alleged was that the bank got a lot of deposits, and so it wanted to keep its deposit levels high, and that's why it perpetuated this Ponzi scheme by an individual named Schmidt. That is a very different theory that having 600 or more million dollars of exposure on warehouse lines that could face a catastrophic loss if you disclose the facts that were revealed. That's a very different situation than losing some deposits because you uncovered a fraud.

And then I think where I'll end, your Honor, is on some cases that were cited by my colleague at the end, *Dodona* but I wouldn't stop at *Dodona*.  You have *Bear Stearns*.  You've got *Citigroup*.  These cases are cases prior to the financial crisis that the allegation is banks were aware of the fundamental deterioration in underwriting policies at the mortgage originators, and that they therefore, misrepresented, in Dodona, a CDO backed by RMBS, and, in *Bear Stearns* and

*Citigroup*, their overall exposure, in *Bear Stearns*, to RMBS and subprime, and Citigroup was to large senior positions in CDOs.

In all of these cases, the facts that were allegedly received by the banks were much less specific and alarming and precise than the facts that were received here.  And so, for example, in *Bear Stearns*, the allegation is that the SEC had said that your value-at-risk model is not capturing all the risks accurately and all the downside scenarios.

THE COURT:  All right.

MR. ADAMS:  That was enough in that case to put them that there was a red flag that they were misrepresenting their risk modeling, and in this case, we have a much more detailed and specific allegation of a specific report revealing the fraud.

THE COURT:  All right.  Thank you very much.

I don't know who wanted to go next, but maybe we should hear from counsel for Fifth Third.

MS. DABBS:  Thank you, your Honor.

I think that order makes good sense, as the Court has just heard a lengthy colloquy between counsel for JPMorgan but speaking on behalf of defendants, of course, on this topic, and plaintiff's counsel about this report that the crux of plaintiff's allegations about what was known to the defendants. And critically, your Honor, and the reason I'm taking an opportunity to speak separately, is that Fifth Third sits in a

Q61RONEo

fundamentally different position from the other defendants, and the plaintiffs do not allege and they cannot allege that Fifth Third, any Fifth Third entity, even received the report that has been the subject of this colloquy back-and-forth.  But even --

THE COURT:  Of course, I shouldn't reveal that Ms. Dabbs was an AUSA that I greatly admired in her earlier career, but she was just a kid then, so it won't factor into my reasoning now.

Go ahead.

MS. DABBS:  This is the part, your Honor, where you say that I haven't changed at all, but I won't force you to do that.

I want to take a step back because that fundamentally different position for Fifth Third in this case, and Fifth Third Securities in particular, yields three independent bases for dismissing the fraud claims against Fifth Third that are dispositive and mandate dismissal apart from the group arguments that obviously we endorse and that apply with equal force to Fifth Third.

First, the plaintiffs have not pled and they cannot plead that any plaintiff actually purchased notes from Fifth Third Securities.  In fact, the fact that plaintiffs do allege about their purchases contradict rather than support any plausible transactional connection between Fifth Third

Q61RONEo

Securities and the plaintiff's injuries.  And this is a threshold deficiency, your Honor, that the plaintiffs have conceded by silence.  In 70 pages of opposition briefing, they entirely ignore the argument that they must plead that they actually purchased notes from Fifth Third Securities.  That concession alone mandates dismissal.

THE COURT:  And the same point would apply with respect to scienter.  They have to indicate for each defendant that their position and their role and so forth led them to considering the same allegedly red flags that they've referred to.  It can't be pled as a generality as to all defendants when at least one defendant, Fifth Third, was in a very different position.

MS. DABBS:  That's exactly right, your Honor.  And having been given an opportunity --

THE COURT:  I'm right, oh, my.  You have changed.

MS. DABBS:  Having been given an opportunity to amend with these specific deficiencies flagged for them, in particular their group allegations lumping the defendants together despite their different roles, and no basis to allege or a failure to allege any receipt of the same facts that have been the subject of this entire back-and-forth up to this point, they've failed to do that.  They improperly continue to lump the defendants together, and counsel did that in the course of the argument with reference to the CBIZ, which,

again, there is no allegation any Fifth Third entity received, referring to defendants, and they with respect to facts allegedly known.  There are no such allegations with respect to Fifth Third Securities, your Honor.

The lack of any facts is unsurprising if you look at the specific role played by Fifth Third Securities here, which was as a junior comanager and initial purchaser of a very small fraction of only the most senior Class A notes across five of the seven securitizations that are at issue here.  We're not aware, your Honor --

THE COURT:  Of course, the big question, and maybe this shows my ignorance, how did a company ever wind up with a name like Fifth Third?

MS. DABBS:  Arguably, your Honor, that's a question that I should be prepared to answer, but I'm not sure that I have the back story there.

In any event, your Honor, I just wanted to highlight the very different posture for Fifth Third Securities here.  It is that failure entirely to plead with any specificity with respect to role, specific conduct, conduct in sales, solicitation, there's just nothing in the amended complaint at all, and this was after the issue was flagged, and the scienter piece as well for the reasons that I articulated.

Unless the Court has specific questions -- I guess, let me just add, your Honor, that I appreciate that there may

Q61RONEo

or may not be a separate discussion about the state claims. Obviously, our position is that the Court should dismiss the federal claims with respect to Fifth Third Securities and decline to exercise supplemental jurisdiction over any state claims. Of course, the state claims that are fraud claims fail for the same reasons with respect to Fifth Third Securities. And the constructive and fraudulent transfer claims also fail with respect to the intent element, actual or constructive fraudulent intent there. There's just a complete dearth of allegations with respect to any knowledge by any Fifth Third entities as to fraudulent or problematic conduct here.

THE COURT: All right. Let me hear from whoever from plaintiff's counsel wants to address Fifth Third.

MR. ADAMS: Your Honor, I'll be very brief on FTS with respect to the securities fraud claims. They didn't make the fraudulent transfer arguments in their separate motion, but to the extent your Honor wants to address those, I'm going to be handing it over to my colleague Ms. Newman, who is doing the fraudulent transfer issues.

On Fifth Third, it's really sort of two points that they made, I think. Number one is that we don't allege that they sold the notes to us or were the ones who disseminated the marketing materials to us. We agree with that. We're not arguing otherwise. That's not our allegation. Our allegation is that they are the maker of statements in the offering

memorandum as a comanager of the transaction, and they made those statements.  We relied on them, and we suffered a loss as a result.  There's no privity requirement under 10(b)(5), so we don't have to allege that we bought the securities directly from them.  We've been able to allege that in spades with respect to Barclays and JPMorgan, but it's not a requirement of 10(b)(5).

And then, on the scienter issue, what we've alleged in paragraph 113 is that Fifth Third received a very similar CBIZ report around the exact same time as the 2024 CBIZ report was delivered.  We think that is sufficient for purposes of pleading.  If it's not, your Honor, we'd ask for an opportunity to try and address that.

THE COURT:  Well, assuming arguendo that I don't find that sufficient, you've already amended once, and I'm reluctant to give you another bite at the apple particularly because that Fifth Third was different was kind of obvious from the get-go.

MR. ADAMS:  Your Honor, I understand we've had the opportunity to amend, and we did the best we could within the time we had.  I think we may be able to allege some additional facts.  I can't speak to them here today, and I would be willing to put in, if your Honor would like it, an additional submission on that.  But, you know, we believe that they both received a report from the same auditor identifying the same problems.  It wasn't incumbent upon us to go through paragraph

Q61RONEo

by paragraph each of those reports and double the length of the complaint. So that's our position with respect to scienter.

THE COURT: Thank you very much. Anything further that defense counsel wanted to say? Otherwise, we'll move on to the state claims.

MS. DABBS: Your Honor, just briefly, and I'll remain at the trouble, if that's acceptable. I'll try to project.

This was flagged explicitly in our opening motion papers, and the notion that plaintiff should by permitted or brief the potential to replead because they think they may be able to allege additional facts, respectfully, should be rejected by the Court. And the report was a similar report. Today it's very similar today, and today it's very similar and alleges some of the same issues.

They plead none of that in the amended complaint. There's no basis for the Court to even engage with the substance that was allegedly understood by Fifth Third any entity, and it's fatal to the claims in terms of the scienter showing.

THE COURT: All right. Let's turn to the state claims.

MR. SCOTT: Your Honor, Jeff Scott from Sullivan & Cromwell on behalf of Barclays. We, of course, join in Mr. Sacks' argument with respect to the federal securities laws claims.

Q61RONEo

THE COURT:  Really?  I'm surprised.

MR. SCOTT:  Yes, we do, and that was indicated in the papers too.

With respect to the state law claims, the common law claims and the blue sky law claims fail for the same reasons the federal securities law claims fail.  And then, with respect to the fraudulent transfer claims, that claim is even weaker than the federal securities claims, and so we're happy to rest on the papers with respect to the fraudulent transfer claims. If the plaintiffs would like to address that, we would be happy to reserve a few minutes on rebuttal.

Thank you, your Honor.

THE COURT:  All right.  Anyone want to respond for plaintiffs?

MS. NEWMAN:  One moment, your Honor.

MR. ADAMS:  Your Honor --

THE COURT:  Why did you bring all of your colleagues along if only you were going to speak?

MR. ADAMS:  Because I do not want to be up here arguing fraudulent transfer, so I needed Debbie here.  She's going to come up in a moment to address fraudulent transfer. I'm going to briefly address the state law claims.

THE COURT:  OK.

MR. ADAMS:  The defendants initially argued that we should graft a maker requirement from *Janus* onto the state law

Q61RONEo

claims because they don't have the same scienter requirements, so they can't make the scienter arguments on the state law claims.  They seem to have abandoned that with respect to Florida, Texas, and New Jersey.  Each of those states use language from Section 12 of the 1933 Act.  They don't have a maker requirement.  That's not the language that was used to create the maker requirement, and *Janus* doesn't apply to Section 12 of the 1933 Act.  They do argue that there's a maker requirement --

THE COURT:  Assuming arguendo—and I'm very far from reaching any decision on any aspect of this; this is just hypothetical—that I were to dismiss the federal claims, are you in agreement that I should then not take jurisdiction over the state claims?

MR. ADAMS:  Yes, your Honor.

THE COURT:  OK.  Go ahead.  I just wanted to get that clear.

MR. ADAMS:  OK.  The Colorado statute does use the 10(b)(5) language for prohibiting fraudulent misstatements and omissions.  But unlike federal law, Colorado law has a separate express private right of action available to buyers of securities sold by fraudulent misstatement against the seller of those securities, and the private right of action does not include a requirement that the seller be the party that made the misstatement.  It only requires that the seller knew or

with reasonable diligence could have known that someone had made a misstatement in connection with the sale.  And that's Section 6044.

And as the Court explained *In re Optimal U.S. Litigation*, which was about common law fraud claims, the maker requirement itself in *Janus* is based on the "limited scope given to implied private rights of action."  And here where we have an express private of action with no textural hook in that private right of action for maker requirement, there's no basis to import *Janus*.

Finally, just quickly, two more points.  New Jersey, they say they didn't assert broker-dealer claims in New Jersey. We clearly did.  That's at FAC, paragraph 231.  We very clearly allege they made these violations as a broker-dealer.

Then, finally, on the Texas aiding and abetting claim, which is one that has particular significance because all plaintiffs have it, the defendants seem to argue, somewhat confusingly to me, that the Delaware law applies because the Tricolor securitizations were structured as Delaware statutory trusts.  But the defendants are arguing that the depositor entity is the maker of the statements in the offering memorandum.  We say that they're made by defendants and probably are joint statements, frankly.  But the OM has expressed that the depositor in Texas.  It says, at page 55, "The depositor's address is 6021 Connection Drive, 4th Floor,

Q61RONEo

Irving, Texas, 75039."  So these statements, if they were made by the depositor, were made out of Texas.

And if you look at the *Silvercreek Management* case where fraudulent statements were made out of Texas, and you've alleged that there is participation or aiding and abetting by other parties, that is a sufficient nexus for Texas law to apply.  And so we would respectfully, submit, your Honor, that those claims are well pled.

Then if I may, I would like to turn it over to Ms. Newman to briefly address fraudulent transfer.

THE COURT:  About time.

MS. NEWMAN:  Good afternoon, I think, your Honor. Deborah Newman, for the record, from Quinn Emanuel for plaintiffs.

THE COURT:  Time passes fast when you are having so much fun.

MS. NEWMAN:  I'm glad you're enjoying yourself.

Your Honor, as Mr. Adams said, I'm going to address the fraudulent transfer claims, and I'm going to focus primarily on defendants' arguments that the fraudulent transfer claims should be dismissed because plaintiffs failed to allege that it was the Tricolor trust that made the transfers here. We'll rest on our papers with respect to the majority of the other arguments defendants assert on the fraudulent transfer claims.  I think it's very clear.  Those issues are very easily

resolved in plaintiff's favor.

I do want to briefly respond to the argument that defendants made for the first time in their joint reply brief, however, that plaintiffs have failed to allege creditor status for the 13 plaintiffs for whom plaintiffs do not allege details of their notes purchases.  Your Honor, all that is required in this respect is that plaintiffs allege that they are creditors of trust that made the challenged transfers.

The complaint easily meets that standard.  That allegation is made repeatedly in the complaint.  For example, that allegation is made in paragraphs 6 and 64.  Defendants do not cite any case holding that a plaintiff must plead the details of how it became a creditor in order to assert a fraudulent transfer claim.  I'm not aware of any case holding that that is a requirement.

Turning to the question of whether the trusts made transfers, the answer to that question is yes.  The securitization transactions at issue here were multistep transactions involving four entities.  The trusts themselves, the depositor, the sponsors and the warehouse entities --

THE COURT:  Forgive me for interrupting.

Under both Delaware and Texas law, fraudulent transfer requires a transfer of property of the debtor, yes?

MS. NEWMAN:  Yes, your Honor.

THE COURT:  And the debtor here, it seems to be the

Q61RONEo

TAST trust.

MS. NEWMAN:  That's right, your Honor.

THE COURT:  And the transfer of the cash was first the depositor and then the sponsor, so neither of which is the debtor.  So how do you get around that problem?

MS. NEWMAN:  Sure, your Honor.  The cash that came in was paid on account of notes that were issued by the trust.  And then it came in from the initial purchasers, went to the depositor, the sponsor, and then to the warehouse entities to purchase the receivables that then served as collateral for the notes issued by the trust.  The idea that the depositor bought the notes from the trust in exchange from the receivables is a fiction because the depositor didn't own any receivables to exchange with the trust.

What the depositor did was facilitate the issuance of notes by the issuer.  It facilitated the issuance of those notes to the market, and then the money came in to the depositor next to the sponsor, then to the warehouse entity on paper, but in truth all at the same time, and the receivables went back to the issuer.  What really happened is the issuer issued notes.  The proceeds of those notes were used to purchase the receivables that served as collateral for those notes.

It's somewhat similar, your Honor, to the *Merit Management* case issued by the Supreme Court.  In that case, you

Q61RONEo

had a company called Valley View which bought the shares of another company called Bedford Downs.  The way in which the transaction was effectuated was that entity that was financing Valley View's purchase of the Bedford Downs' shares was Credit Suisse.  Credit Suisse paid the money not to Valley View, who was borrowing the money to purchase the shares but instead to Citizens Bank, which served as the escrow agent for the share purchase.  When the deal closed, the shares went out to the purchasers.

Now, when Valley View ultimately filed for bankruptcy, a creditor -- the litigation trustee there sued the shareholders, arguing that Valley View had transferred money to the shareholders and that that transfer was a fraudulent transfer.  One of the defendant shareholders argued, no, the transfer actually went from Credit Suisse to Citizens Bank, and that because those are financial institutions, the fraudulent transfer claim was barred by a specific section of the bankruptcy code, Section 546(c).

The Supreme Court rejected that contention by the defendant.  The Supreme Court said that in the fraudulent transfer context, what you have to look at is the overarching transfer.  Not any interim step but the overarching transfer that the plaintiff challenges.  And in Valley View, the overarching transfer the plaintiff was challenging was the transfer from Valley View to the shareholder.  And that was the

case, your Honor, notwithstanding that Valley View never touched the money.  The money went right from Credit Suisse to Citizens Bank and then from Citizens Bank to the shareholders.  The court said the transfer that the court had to analyze was the transfer from Valley View to the shareholder.

So here, your Honor, the overarching transfer is the transfer from the initial purchase -- excuse me -- the transfer of the cash, which belonged to the trust.  So the trust's cash that was loaned to them by the note holders to the warehouse entities to purchase the receivables.  You don't look at the interim steps.  You have to look at what was the overarching purchase of this transaction here.  And clearly the overarching purchase of this transaction was initial purchasers loaned money to the trust; the trust used that money to buy the receivables; the receivables served as security for the debt held by the trust.

So it was the lenders loaning money to the trusts.  The obligation was held by the trusts.  It was the trust's money that was then being used to purchase collateral for the notes issued by the trusts.  And that's consistent, your Honor, also with the Second Circuit case law *Orr v. Kinderhill*, where the Second Circuit held where there are multiple steps in an integrated transaction, you have to look at the integrated transaction and the purpose of the transaction.  And I would submit, your Honor, that here it's clear that the purpose of

the transaction, again, was to issue notes.  The borrower was the trusts.  The money was used to buy the receivables that served as collateral for the trust's obligation.

THE COURT:  OK.

MS. NEWMAN:  What defendants come back and say is that, well, if you want to collapse the transactions, then you have to name all of the parties in the transaction.  I submit, your Honor, that's clearly wrong.  There's no case that says that.  The single case they rely on is a case out of Minnesota, and what that case dealt with is whether an initial transferee had to be named in order to recover from a subsequent transferee.  The court in Minnesota argued, yes, the initial transferee does need to be named.  That's not the law in the Fifth Circuit, in the Third Circuit, or in the Second Circuit.

That court does suggest, your Honor, *in dicta* that in order to collapse a transaction, all parties in the transaction must be named.  And it cites a string of cases, your Honor, but it's very curious because five of the cases that are cited in that string cite actually expressly rejected the idea that parties to a transaction had to be named in order for the transaction to be collapsed where the plaintiff was not seeking any relief from that party.  And there's no case -- none of the cases that that decision cites to actually hold that a party from whom a plaintiff is not seeking any relief must be named as a defendant in order for a transaction to be collapsed.

Q61RONEo

Your Honor, that's just not the law.

THE COURT:  So the offering memorandum on which your complaint relies in a great many other respects explicitly shows cash never flowed through the trust, yes?

MS. NEWMAN:  That's true, your Honor.  And it's similar, as I said, in *Merit*, the cash never touched -- Valley View never held the cash.  And there are a number of cases, your Honor—we cite to them in our papers—where a lender is loaning money to a debtor, but the debtor never actually physically possesses the proceeds of the loan.  The lender pays the money to a different party at the direction of the borrower, and that's what happened here.

I mean, there's no dispute, your Honor, that it's actually the trusts that are the borrower on the notes.  The depositor is a mere conduit, your Honor.  There are several ways in which you can get to the finding, which I think is clearly correct here, that it was the trust's cash that was being transferred to the warehouse entities.  You can do that under *Orr*, which is basically a collapsing case.  You can do that under *Merit*, which instructs that you have to look at the overarching transfer.  And you can do it under the conduit cases, which hold that, where parties are interim steps in a transfer but have no real control as to how the cash being transferred will be used, those parties mere conduits and have no relevance for a fraudulent transfer analysis.

Your Honor, the defendants' response to that argument is that a mere conduit principle, it can be used as a defense only to argue that a party is not a transferor or a transferee. There's no support for that, and it makes no sense. Either a party is transferor or transferee for all purposes, and that's an argument that can be made by a plaintiff or a defendant. Because for a fraudulent transfer analysis, the entity has no relevance. It certainly is something that we can argue here, and it is factually the case that these entities had no relevance.

Your Honor, I'll note also that the offering memorandum states that the trust would use or would "permit the depositor to use the funds raised through the note's issuance to purchase the receivables that would serve as collateral." Your Honor, why would the depositor need the trust's permission to use the cash in a certain way if it wasn't actually the trust's cash that was coming in?

And, your Honor, I'll note also that in *Merit*, going back to the idea that all parties need to be named, of course, in *Merit* the interim entities also were not named.

THE COURT: Thank you very much.

Let me hear from defense counsel.

MR. SCOTT: Your Honor, Jeff Scott, from Sullivan & Cromwell. I'll be very quick. The cases that were just referred to, *Merit* wasn't cited in the papers, but we know that

case well.  All of those cases deal with the situation where a third party, the lender, has the actual assets of the debtor and then transfers the money.  Here, they claim that the asset of the trust was cash.  But as your Honor noted, the trust here never had any cash.  They received the receivables because they exchanged them for the note.  The cash was sold to the -- was given to the initial purchasers who provided it to the depositor, to the sponsor.  These are separate transactions.

There simply cannot be an actual fraudulent transfer claim or a constructive fraudulent transfer claim if the debtor in question here, the trust, never had an interest in the cash. And it never had an interest in the cash here, so the claim fails right out of the gate.  And I should note this.  There have been hundreds and hundreds of securitization cases in the RMBS context.  No one has ever alleged a fraudulent transfer claim in those cases for the same reason.  The reason is because the separate transactions are true sales.  The assets are sold away from the entity, the originator.  And if that originator, like here, goes into bankruptcy, then you cannot attach the assets that are inside the trust because the transactions were structured in such a way that they are true sales.  In fact, if the plaintiffs are correct here in their argument, that you should simply collapse all of these transactions to one, then the trust assets here, the receivables, are actually property of the estate.  And if they

Q61RONEo

want to pursue payment on those receivables, they should bring a claim in bankruptcy court.

Now, with respect to the 13 entities that are no longer plaintiffs here, there's no allegation that they purchased the notes.  They are not creditors of the trust, so clearly they can't have a fraudulent transfer claim where they are not a creditor of the trust.  And with respect to the blue sky claim under Colorado law, the plaintiffs are incorrect to say that there's no allegation here that they have to be a maker.  The statute requires them to be a maker.  They say, well, they don't need to be a maker because they are a seller, but the statute there actually says that the seller has to engage in the violative conduct.  The violative conduct there is making the misstatement, so they are wrong on that as well, too, your Honor.

On that, I'll rest, and I'll ask that the Court, if the Court does retain jurisdiction under the state law claims, it dismisses them under 12(b)(6).

Thank you, your Honor.

THE COURT:  Thank you very much.

So you've given me a lot of work.  That's a good thing because like most of the judges on this court, I'll be spending the rest of this week at the second judicial conference.  I was worried I was going to have to spend the time talking to my fellow judges, and you can't imagine how boring a task that

Q61RONEo

would be.  So instead all take all this stuff with me to the conference.

I like to set myself deadlines, so I'm going to get you a bottom-line ruling by no later than June 12.  In other words, Friday a week.  I am quite sure I won't have the opportunity to write a full opinion.  That will follow, but then you'll know where we are and whether the case is going forward.  If so, which portions are going forward, etc., etc. If the case is going forward in any respect, we'll then have to have a conference to work out the schedule, but we'll know then what the scope of it is.  If the case is not going forward, the final judgment will not be entered until I issue my full written opinion.  So those are the alternatives.

Is there anything else anyone needs to raise with the Court today?

MR. SACKS:  No, your Honor, from us.

MR. ADAMS:  Not from us, your Honor.

THE COURT:  Very good.  Thanks very much.

(Adjourned)

o0o