UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ONE WILLIAM STREET CAPITAL MASTER
FUND LTD., et al.,

      Plaintiffs,

  -v-

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, et al.,

      Defendants.

---

26-cv-1622 (JSR)

OPINION & ORDER

---

JED S. RAKOFF, U.S.D.J.:

Loss begets suspicion, and the victims of a substantial securities fraud may, in their frustration, impute fraudulent intent to anyone whose actions facilitated the fraud. But suspicion is no substitute for evidence, as this case illustrates.

One William Street Capital Master Fund Ltd. and numerous other investment funds and insurance companies[1] (collectively,

---

[1] The full list of plaintiffs is as follows: OWS ABS IV, L.P., OWS ABS IV Sub I, LLC, OWS ABS Master Fund, Ltd., OWD ABS Master Fund II, L.P., OWS Credit Opportunity I, LLC, OWS Credit Opportunity Sub I, Ltd., 1WS Credit Income Fund, 1WSCI Sub I, LLC, Clear Haven Investment Fund LP, Clear Haven Investments LLC, Clear Haven Total Return Partners LP, Clear Haven Ultra Short Investment Grade Bond Fund LP, Clear Haven UMF Fund LP, California Insurance Company, Constitution Insurance Company, Florida Casualty Insurance Company, Superior Risk Solutions (SAC) Ltd., Texas Insurance Company, Crescent II Fund, L.P., EF Securities LLC, Ellington M Credit Master Fund Ltd., Ellington Private Opportunities Main Master Fund III LP, Ellington Special Relative Value Fund LLC, Hudson Cove Credit Opportunity Master Fund, L.P., Janus Henderson Asset-Backed Securities ETF, Janus Henderson Income ETF, Janus Henderson Mortgage-Backed Securities ETF, Janus Henderson Securitized Income ETF, Sagicor Life Insurance Company, Frost Credit Fund, Janus Henderson Multi-Sector Income Fund, Ellington Empire Fund LLC, St. Bernard Opportunity Fund I, Ltd., Advisors'

1

"plaintiffs"), bring this securities fraud action against JPMorgan Chase Bank, N.A. ("J.P. Morgan"), Barclays Bank PLC, and Fifth Third Bank, N.A. (the "Lender Defendants") and J.P. Morgan Securities LLC, Barclays Capital Inc., and Fifth Third Securities, Inc. (the "Manager Defendants").

Plaintiffs' original complaint, ECF No. 1, was the subject of a joint motion to dismiss, ECF No. 81, but before the motion could be fully briefed, plaintiffs, with the Court's approval, filed a First Amended Complaint ("FAC"), ECF No. 86, which is the operative complaint here. The defendants then renewed their motion to dismiss, ECF No. 94, which was thereafter fully briefed, see ECF Nos. 94, 95, 96, 97, and was the subject of oral argument on June 1, 2026. After full consideration of the briefs and oral arguments, the Court granted defendants' joint motion by "bottom-line" Order dated June 10, 2026. See ECF No. 98. This Opinion and Order reconfirms that Order and directs the entry of final judgment.

I.    Background

For the purposes of this motion, the Court accepts as true all well-pleaded factual allegations in the FAC and draws all reasonable inferences in the plaintiffs' favor. See Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc., 704 F. Supp. 3d 429, 437 (S.D.N.Y. 2023). The Court

---

Inner Circle Fund II - Frost Total Return Bond Fund, and Guardian Multi-Sector Bond VIP Fund.

further presumes the parties' familiarity with the underlying allegations and recounts only what is necessary to resolve the instant motion.

Tricolor Holdings, LLC (together with its affiliates, "Tricolor") operated a vertically integrated "buy here, pay here" used-car dealer/lender chain that targeted communities in Texas, Arizona, and California, extending subprime auto loans at interest rates regularly exceeding 20%. FAC ¶ 56. To fund its loans, Tricolor established a network of "warehouse" special purpose vehicles ("SPVs") that pledged auto loan receivables in exchange for revolving credit from the Lender Defendants. Id. ¶ 57. Once Tricolor had originated sufficient loan volume, it would bundle loans from the SPVs into Tricolor Trusts, sell Notes, i.e., interests in the Trusts, to investors (including plaintiffs), and use the proceeds to pay down the credit lines. Id. ¶¶ 61-69. The Manager Defendants acted as initial purchasers of the Tricolor Trust Notes and arranged, structured, and managed the sale of the Notes to investors. Tricolor then used cash from the sale of the Notes to repay the Lender Defendants' warehouse credit lines. Id. ¶¶ 1, 69.

But it turned out that Tricolor was perpetrating a substantial fraud. The company represented that its auto-loan collateral was as much as $800 million more than it actually was, and used that misrepresentation to greatly increase its borrowing capacity. FAC

3

¶¶ 1, 88. Further, to support the overstatement of collateral, Tricolor double-pledged auto loans as collateral for warehouse lines, transferred fictitious loans to warehouse lenders and Tricolor Trusts, and misrepresented the delinquency status of loans so as to make them appear as eligible collateral. Id. ¶¶ 84-89.

In August 2025, an investment fund notified J.P. Morgan of irregularities it had discovered in the loan data for the collateral that backed Tricolor's J.P. Morgan warehouse credit facility. FAC ¶ 195. By the end of that month, the Lender Defendants (including J.P. Morgan) had terminated funding for Tricolor's warehouse lines. Id. ¶ 197. On September 10, 2025, Tricolor ceased operations and filed for Chapter 7 bankruptcy. Id. Tricolor's founder and Chief Executive Officer, Daniel Chu, as well as its Chief Operating Officer, David Goodgame, were indicted and are currently awaiting trial in this District. Id. ¶ 7; see ECF No. 83-1.[2] Meanwhile, as a result of Tricolor's collapse, plaintiffs' Notes became illiquid and lost hundreds of millions of dollars in value. FAC ¶ 198.

This action alleges that the defendants, while financing Tricolor's auto loans and participating in the sale of hundreds of

_____

[2] Two other executives, Jerome ("Jerry") Kollar and Ameryn Seibold, pleaded guilty and are cooperating with the Government. DOJ Press Release, CEO, CFO, Coo Charged in Connection with Billion-Dollar Collapse of Tricolor Auto (Dec. 17, 2025) <tinyurl.com/43rjj46h>.

millions of dollars of Notes to investors, "willfully blind[ed] themselves" to Tricolor's fraudulent scheme. FAC at 34. Specifically, the FAC alleges that the defendants became aware of weaknesses and irregularities in Tricolor's business operations, first through receipt of a 2022 Tricolor audit and then, more particularly, through receipt of a report in 2024 (the "CBIZ report") that raised questions about the accuracy of Tricolor's loan pool and the reliability of Tricolor's origination practices.[3] FAC ¶¶ 4, 75, 77, 97-98, 113. The plaintiffs allege that, despite these warnings, the defendants continued to help securitize Tricolor's loan pool and sell further Notes, in order to partially offload to plaintiffs the defendants' exposure to Tricolor and to continue to benefit from the company's repayment of the warehouse lines of credit. Id. ¶¶ 3, 211. The plaintiffs further allege, that in promoting these new Notes, the defendants, after discovering information that should have alerted them to Tricolor's fraud, disseminated to investors multiple misstatements

---

[3] Throughout the FAC, the plaintiffs refer to the "2022 and 2024 audits" to mean the 2022 audit and the 2024 CBIZ report. See, e.g., FAC ¶ 2. But the CBIZ report is explicitly not an audit. See ECF No. 83-4 at 3 ("The procedures we performed do not constitute, in accordance with generally accepted auditing other applicable professional standards, (1) an audit . . ."). And "[w]hen documents attached to the complaint as exhibits or incorporated by reference in the complaint contain statements that contradict the allegations in the complaint, the documents control and the Court need not accept the allegations as true." Albert v. DistroKid LLC, 2026 WL 710041, at *5 (S.D.N.Y. Mar. 13, 2026).

concerning the eligibility, financial performance, and characteristics of the auto loan receivables underlying the Tricolor Trusts, as well as misrepresentations concerning the quality and strength of Tricolor's management team, internal controls, and factors influencing each trust's performance. FAC ¶¶ 201-03.

On the basis of the foregoing, the FAC asserts two federal claims:

(1)    That, in connection with offering the Notes, the defendants made false or misleading statements of material fact, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5(b) promulgated thereunder ("Count One"); and

(2)    That, more generally, the defendants joined and participated in Tricolor's scheme to defraud investors, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder ("Count Two").

Plaintiffs also bring several other causes of action against some or all of the defendants pursuant to various state statutes.[4]

II.  Legal Standards

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face."

---

[4] The parties agreed at oral argument that the Court, if it chose to dismiss the federal claims, should not exercise supplemental jurisdiction over the state-law claims. See Transcript, 6/1/2026.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[5] For the purposes of such a motion, the Court "assumes the truth of the plaintiff's factual allegations" and "construe[s] the pleadings . . . in the light most favorable to plaintiffs, resolving all doubts in their favor." Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 85 (2d Cir. 2013). To survive a motion to dismiss on Count One, the plaintiffs "must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." Ark. Pub. Emp. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 351-52 (2d Cir. 2022). For Count Two to proceed, the plaintiffs "must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." Okla. Firefighters Pension & Ret. Sys. v. Musk, 779 F. Supp. 3d 396, 418 (S.D.N.Y. 2025).

Both of the federal claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), which the Second Circuit has interpreted to

---

[5] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

require that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Similarly, under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b).

Additionally, however, the PSLRA requires the complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (here, "scienter," as more particularly described below). Id. While Rule 9(b) reflects the common law view that someone who claims he was fraudulently misled should be required to state at the outset exactly what representations are claimed to have misled him, see Charles E. Clark, Handbook of the Law of Code Pleading, § 48, at 214 (1st ed. 1928), Congress added the heightened state-of-mind pleading requirements of the PSLRA out of concern that injured securities investors and their counsel were overly prone to perceive fraudulent intent on the part of any "deep pocket" that had any connection to a misstatement, leading to lawsuits that in Congress's view were often frivolous or extortionate, see Merill

8

Lynch, Pierce, Fierce & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006) (citing H.R. Conf. Rep. No. 104-369, p.31 (1995)).

## III. Discussion

Both of the federal claims here fail because the plaintiffs have not adequately pleaded scienter. Count One must additionally be dismissed because plaintiffs have not adequately pleaded reliance. Count Two must additionally be dismissed because the plaintiffs have not adequately pleaded that the defendants participated in Tricolor's scheme to defraud. The Court considers each of these grounds in turn.[6]

### A. The plaintiffs have not established scienter.

Under the PSLRA, as noted, plaintiffs must plead particularized facts giving rise to a "strong inference" that the defendants acted with the required state of mind. In the case of the federal claims here, the required state of mind is what is commonly called "scienter," i.e., fraudulent intent or at least a purposeful intent to disregard clear evidence of fraud (sometimes called "reckless disregard" or "willful blindness"). Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007). Overall, the inference of fraudulent intent or willful blindness must be

---

[6] While the counts may well be inadequate on one or more other grounds argued by defendants, the Court sees no need to reach those other grounds.

"cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id.

This, indeed, was already the law in the Second Circuit prior to the passage of the PSLRA. As stated in Novak v. Kasaks:

> We can easily summarize the pleading standard for scienter that prevailed in this circuit prior to the PSLRA:
>
> > Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

216 F.3d 300, 307 (2d Cir. 2000) (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995), in turn quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)). The Court in Novak added that, however, "th[is] statement of the standard conceals the complexity and uncertainty that often surround its application." Id.

After further analysis, the Court in Novak stated that "[w]e conclude that the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement). At the same time, however, we believe that Congress's failure to include language about motive and opportunity suggests that we need not be wedded to these concepts in articulating the prevailing standard." Id. at 310. While this language left some uncertainty

as to whether "motive and opportunity," standing alone, was sufficient to satisfy the scienter pleading requirement of the PSLRA, the Second Circuit indicated that it was sufficient in ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

But even accepting that well-pleaded particularized allegations of motive and opportunity are sufficient in themselves to satisfy the current standard for pleading scienter, the FAC does not meet that standard. Although the parties do not dispute that defendants had at least the opportunity to commit the fraud here alleged, defendants contest whether plaintiffs have adequately pleaded motive under the PSLRA's heightened pleading requirement. In this Circuit, pleading motive in such circumstances requires particularized factual statements showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Novak, 216 F.3d at 307. Plaintiffs claim that this is satisfied by their allegation that defendants realized various financial benefits (detailed below) by concealing for a time by means of false or misleading statements their knowledge of Tricolor's fraud. But this argument is circular because it presupposes that the FAC has satisfied the alternative way of proving scienter through well-pleaded particularized allegations of circumstantial evidence proving "conscious misbehavior or recklessness." Novak, 216 F.3d

11

at 307. In the absence of such evidence (as discussed later), the fact that defendants profited by continuing the Tricolor program is insufficient to establish motive. Indeed, generalized motives common to virtually any business such as an interest in profitability, maintaining a high stock price, or preserving a favorable credit rating, are insufficient. Id. (citing cases).

Here, the plaintiffs assert that the defendants were motivated to deceive investors by temporarily concealing defendants' knowledge of the Tricolor fraud for two reasons: first, because the defendants earned revenue and fees through the continued sale of the Notes, FAC ¶¶ 3, 205, and second, because the sale of the Notes to the plaintiff-investors offloaded onto the plaintiffs some of defendants' direct financial exposure to Tricolor, id. According to the FAC, at the time that the defendants learned of Tricolor's fraud, they had already invested hundreds of millions of dollars in Tricolor, earning "substantial structuring fees, underwriting fees, interest income, and other revenue" from that relationship. Id. ¶ 122. The plaintiffs allege that even after defendants discovered Tricolor's fraud, the defendants continued securitizing and selling Notes to plaintiffs as a means of offloading their exposure to Tricolor, all while continuing to collect fees from Tricolor and repayments on the warehouse credit lines. Id. ¶¶ 205, 212.

But once again this entire theory presupposes that plaintiffs have satisfied the alternative theory of proving scienter through evidence of fraudulent intent. In the absence of such evidence, there is no reason to believe that defendants would not have sought these fees or sold these Notes even if they continued to believe that Tricolor was acting in a non-fraudulent manner. Indeed, it is well-settled that the "fee" theory -- that defendants continued to collect fees and revenue from the Notes -- cannot by itself satisfy the particularized motive requirement. "General profit motive[s] common to all corporations" cannot, as a matter of law, support the requirement under the PSLRA that the plaintiffs prove that the defendants had a clear and specific motive to intentionally commit fraud. Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co., 478 F. App'x 679, 681 (2d Cir. 2012). The continuing sale of Notes and receipt of revenue and fees otherwise due, even when substantial in amount (as plaintiffs allege here), shows only any enterprise's interest in continuing to receive revenue from continuing arrangements. See Malik v. Network 1 Fin. Sec., Inc., 2022 WL 453439, at *3 (2d Cir. Feb. 15, 2022) (holding that the receipt of "commissions" and "fees" are generally "insufficient to support scienter through motive"). The fee theory, standing alone, therefore cannot establish scienter.

The plaintiffs' other theory of fraudulent motive -- that the defendants were incentivized to defraud investors because the

13

continued sales of the Notes to plaintiffs allowed the defendants to reduce their own exposure -- fares no better. The plaintiffs allege that the defendants' continuing securitization and sale of mezzanine loans to plaintiffs even after defendants discovered Tricolor's fraud served to reduce defendants' exposure to future losses in the event that Tricolor's fraud came to light. But once again this begs the question because it assumes that plaintiffs have satisfied the alternative way of proving scienter, i.e., proof of defendants' knowledge and participation in Tricolor's fraud. In the absence of sufficient evidence that defendants actually knew or deliberately disregarded Tricolor's fraud, this allegation does little more than describe, in non-particularized fashion and without any proof that this was in defendants' minds, how warehouse lending ordinarily functions. Thus, courts in this Circuit have held that the "need to attract investors in order to pay down debt . . . is insufficient to demonstrate scienter because it is common to most for-profit companies." Bd. of Trs. of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO, 811 F. Supp. 2d 853, 867 (S.D.N.Y. 2011), aff'd sub nom. Frederick v. Mechel OAO, 475 F. App'x 353 (2d Cir. 2012).

The magnitude of the defendants' exposure does not change this analysis. The Second Circuit has explained that "any corporation would be motivated to make a profit[] [or] to avoid bankruptcy" by minimizing risk or offsetting potential losses and

that "a desire to raise much needed capital," even "to stave off a company's collapse," does not satisfy the PSLRA's heightened pleading standards. In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 532-33 (S.D.N.Y. 2009), aff'd sub nom. Condra v. PXRE Grp. Ltd., 357 F. App'x 393 (2d Cir. 2009). Thus, even if defendants' risk approached the level of potential "collapse," plaintiffs' motive allegations would still fail.

Furthermore, even assuming arguendo (and contrary to the above discussion) that plaintiffs' allegations of motive and opportunity, standing alone, were somehow sufficient to satisfy the heightened particularized intent requirement of the PSLRA, their scienter theory would still fail to be "at least as compelling as any opposing inference of nonfraudulent intent or mistake." Tellabs, 551 U.S. at 314. In assessing fraudulent intent, courts must assume that a defendant acts in its "informed economic self-interest." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994). Applying that presumption, the Second Circuit has found it "far less than plausible to infer that an industry leader that . . . values and advertises its credibility in the industry . . . would deliberately jeopardize its standing and reliability, and the viability of its business" by perpetuating a fraudulent scheme. S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 113 (2d Cir. 2009). To this end, courts in this District have reasoned that it would be illogical for lenders "to throw

15

billions of good dollars after bad in the hope that their investments could be propped up, profitably, by concealing a massive fraud ad infinitum." In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 2007 WL 2615928, at *3 (S.D.N.Y. Sept. 10, 2007). In short, because it is rarely in a sophisticated defendant's economic self-interest to perpetuate a fraud by others, and the marginal benefits of doing so are often outweighed by the costs of reputational damage and continuing (if arguably reduced) financial loss, inferences of scienter resting on that theory are rarely sufficient.

That principle applies with great force here. With their typical rhetorical license, plaintiffs allege that defendants were "too busy lining [] their own pockets to care that they were actively erecting a house of cards." FAC ¶ 122. The plaintiffs further assert that defendants continued to "fund the warehouse lines and perpetuate the securitization pipeline" for "as long as possible in order to build up earnings to offset their potential future losses." ECF No. 95 at 20. But, quite aside from the speculative and conclusory nature of plaintiffs' theory, plaintiffs' own language undermines their theory. A "house of cards" is doomed to collapse, making it difficult to credit the inference that the defendants would knowingly seek postponement of the inevitable. Such an inference would require assuming that defendants -- sophisticated institutions that have spent years

16

cultivating their reputations and credibility in the market -- would "deliberately jeopardize" their reputation by perpetuating a fraud they knew would eventually surface, continuing to throw "good dollars after bad in the hope" of mitigating losses they had already recognized as certain. In re Adelphia Comm'cns Corp. Sec. & Derivative Litig., 2007 WL 2615928, at *3. The opposing inference -- that the defendants were themselves victims defrauded by Tricolor -- is far more compelling.

What this all comes down to is that, in this case, plaintiffs, in order to satisfy the PSLRA's enhanced pleading requirement for scienter, must allege particularized facts raising a strong inference that defendants took the actions complained of either with actual fraudulent intent or at least with reckless disregard for what they had discovered was Tricolor's fraud. Since the FAC offers no particularized evidence of actual fraudulent intent, it essentially relies on the latter theory, or what the FAC refers to as "willful blindness." See, e.g., FAC ¶ 212. This theory is a substitute for actual intent to defraud because it posits that defendants consciously chose to disregard evidence that indicated a high probability that Tricolor was engaging in fraud. Under this theory, the plaintiffs contend that the defendants purposely chose to ignore the "glaring red flags" that arose from the 2022 audit, the 2024 CBIZ report, and the alleged prior association with

17

criminal activity of Tricolor's Chief Financial Officer, Jerry Kollar. Id. ¶ 112.

But willful blindness is a high bar. It requires a "reckless disregard for the truth" that "approximat[es] actual intent." S. Cherry St., LLC, 573 F.3d at 109. The conduct alleged must be "highly unreasonable" and "represent[] an extreme departure from the standards of ordinary care to the extent that the danger was either known . . . or so obvious that the defendants must have been aware of it." Id. This means that corporations need not be "clairvoyant" -- there is no liability for "fraud by hindsight." Novak, 216 F.3d at 309. Moreover, where adequate motive allegations are lacking, as they are here (for the reasons discussed above), "the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).

The plaintiffs' "red flag" theory fails to meet this standard. The plaintiffs first allege that the 2022 Tricolor audit and, especially, the 2024 CBIZ report identified that Tricolor had "accounting irregularities" and a "lack of internal controls." FAC ¶ 112. As noted, plaintiffs characterize these findings as "glaring red flags" that should have put defendants on notice of Tricolor's fraud, id. ¶ 113, and assert that the defendants purposely chose to disregard Tricolor's fraud or that, at a minimum, defendants' failure to investigate further constituted an extreme departure

18

from the ordinary standard of care tantamount to recklessness, id. ¶ 120.

Knowledge of accounting irregularities alone, however, rarely establishes willful blindness at the pleadings stage. Usually, it is only when such irregularities are "coupled with evidence of corresponding fraudulent intent" that a plaintiff states a claim for securities fraud. Novak, 216 F.3d at 309. The plaintiffs' repeated assertions that the defendants could have discovered the truth had they investigated further does not satisfy that standard. When a party asserts that the defendants "would have learned the truth" had it "performed the due diligence" promised, or investigated some matter more thoroughly, courts have typically found, at most, negligence, not intentional recklessness. S. Cherry St., 573 F.3d at 112. Even a failure to conform to "professional standards" establishes, at best, an "inference of negligence, not recklessness." In re Advanced Battery Techs., Inc., 781 F.3d 638, 643-44 (2d Cir. 2015). The same is true here.

Moreover, plaintiffs' assertions as to what the 2022 audit and the 2024 CBIZ report caused the defendants to believe are deficient. The plaintiffs allege that the CBIZ report, in particular, alerted the defendants to Tricolor's accounting weaknesses, thereby raising the specter of double-pledging. But "knowledge of weaknesses in the accounting department," even when "widespread," does not lead to the inference that "defendants knew

19

or had reason to know anything about the mistaken application of" a given accounting principle. City of Brockton Ret. Sys. v. Shaw Grp. Inc., 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008). And here, there was far less than "widespread knowledge" of weakness in Tricolor. The CBIZ report was neither an audit nor an examination of Tricolor's internal controls, and it did not conclude anywhere that Tricolor was engaged in fraud, in double-pledging, or even that its accounting issues were extraordinary. See generally ECF No. 83-4. Rather, the report recommended that the defendants follow up with Tricolor on certain specified items, id. at 11, 12, 14, and attached a remediation plan submitted by Tricolor to address issues raised in the earlier audit report, id. Exh. F.2, at 104-09.

These allegations (described in greater detail in subsection B, below) do not come close to supporting an inference of conscious recklessness. Tricolor provided responses to most of the issues flagged in the CBIZ report, and nothing in those responses suggests that the defendants should have assumed, or consciously chose to disregard, that Tricolor was operating a fraud under those circumstances. See, e.g., Webb v. Solarcity Corp., 884 F.3d 844, 856 (9th Cir. 2018) (noting that even if defendants had "reason to suspect that the company's internal accounting controls were imperfect," a failure to follow up on those suspicions did not amount to scienter). Moreover, Tricolor's own claims of

remediation efforts further weigh against a finding of conscious recklessness on the defendants' part. See, e.g., Smallen v. W. Union. Co., 950 F.3d 1297, 1313 (10th Cir. 2020).

The plaintiffs' second theory of willful blindness is, if anything, even less meritorious. Under this theory, plaintiffs allege that the defendants knew of, or consciously chose to ignore, Tricolor's fraud because a separate team at J.P. Morgan -- its equity capital markets team -- declined to work on Tricolor's planned initial public offering ("IPO") after reviewing the same accounting irregularities available to the securities team and after becoming aware that Tricolor's CFO, Jerry Kollar, had been previously "implicated" in a fraud that resulted in the criminal indictment and imprisonment of his former employer's CEO. FAC ¶ 112. In essence, the plaintiffs argue that because J.P. Morgan's equity capital markets team abandoned Tricolor's IPO -- allegedly because of concerns about Tricolor's accounting irregularities and Kollar's ambiguous history -- the bank's securities team must have willfully blinded themselves to these red flags and was consciously reckless in doing so.

This theory, however, is woefully short on well-pleaded facts. To begin with, the plaintiffs never allege in the FAC that J.P. Morgan's equity capital markets team ever communicated any concerns to the securities team. See generally FAC. Even more basic, the plaintiffs infer that the equity team declined to assist

with the IPO because of concerns about accounting irregularities and/or Kollar's work history without pleading any facts to support that inference. Id. ¶ 112.[7] And the plaintiffs further presuppose, without any factual basis, that J.P. Morgan's standards for an IPO parallel the bank's securities team's standards for assisting with securitization or warehouse lending. Given these thin and largely conclusory allegations, the Court cannot infer conscious recklessness from the defendants' failure to investigate further, particularly where, as here, the heightened Kalnit standard demands correspondingly stronger circumstantial evidence.

Finally, plaintiffs' theories for willful blindness cannot carry the day because they too fail to give rise to an inference that is at least as compelling as the opposing inference of nonfraudulent intent or mistake. See Tellabs, 551 U.S. at 314. Plaintiffs' suggestion that the defendants' failure to further investigate Tricolor, based upon a handful of accounting irregularities and one executive's history, approximates "actual intent," is neither cogent nor "at least as likely" as the opposing

_____

[7] While plaintiffs characterize Kollar as an "experienced fraudster" with "ties to past criminal conduct," they fail to allege the nature or extent of his involvement in that earlier episode. FAC ¶ 112; see Hubiack v. Li-Cycle Holdings Corp., 2024 WL 2943959, at *10 (S.D.N.Y. June 10, 2024); see also Saraf v. Ebix, Inc., 632 F. Supp. 3d 389, 400 (S.D.N.Y. 2022) (rejecting similar attempt to bolster a scienter argument by citing prior instances in which an executive was accused of misconduct).

22

inference that defendants, like plaintiffs, were themselves deceived by Tricolor. Id. at 328.

Accordingly, the plaintiffs' federal securities claims must be dismissed. Their allegations do not support a finding of scienter, either on "motive and opportunity" or "willful blindness" grounds.

B. The plaintiffs cannot plead that they reasonably relied on the alleged misstatements and omissions in the offering memoranda.

While the failure to adequately allege scienter to the level expressly required by the PSLRA is sufficient in itself to require the dismissal of both of plaintiffs' federal claims, it also serves to buttress several of defendants' other grounds for dismissal. Consider, for example, the issue of reliance with respect to Count One, which is specifically directed at alleged misstatements and material omissions regarding Tricolor in the offering memoranda distributed to plaintiffs in connection with the sale of the Notes.

The offering memoranda, which refer to the defendants as the "initial purchasers" of the Notes, states in full capitals: "NOTWITHSTANDING ANY INVESTIGATION THAT THE INITIAL PURCHASERS MAY HAVE CONDUCTED WITH RESPECT TO THE INFORMATION CONTAINED HEREIN, THE INITIAL PURCHASERS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION." See, e.g., ECF No. 83-2 (TAST 2024-1) at 6. When such disclaimers appear on investment prospectuses, plaintiffs typically cannot plead

23

reasonable reliance. See, e.g., Alpert v. Shafer, 1991 WL 222130, at *5 (S.D.N.Y. Oct. 24, 1991) (collecting cases); see also Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 338 (2d Cir. 2011) (plaintiffs were not "justified in relying" on assumptions undercut by publicly posted "explicit[] disclos[ures]"). That is because, as the Second Circuit has explained, "[w]e are not inclined to impose liability on the basis of statements that clearly bespeak caution." Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986).

Indeed, courts have given additional weight to disclaimers when plaintiffs are, as they are here, "highly sophisticated investor[s]" who "should have appreciated that there were significant risks associated with" the investment in question. CL-Alexanders Laing & Cruickshank v. Goldfeld, 739 F. Supp. 158, 162-63 (S.D.N.Y. 1990). To put a finer point on it, a sophisticated investor generally cannot claim to be misled by a document offering an investment opportunity related to an underlying business when the underwriters who prepared the document affirmatively state that they are not representing the reliability of the representations regarding the underlying business. That is precisely the situation here. The defendants allegedly worked to assemble the offering material for the Notes but did not guarantee that the information regarding Tricolor's underlying business operations was comprehensive and fully accurate. Plaintiffs,

24

having been so cautioned and, as sophisticated investors themselves, not without ability to conduct their own analysis and investigation, cannot now contend that they reasonably relied on that information as though it carried such a guarantee.

To be sure, such disclaimers cannot completely shield from liability an underwriter defendant who intentionally includes in the offering memoranda statements about Tricolor (or otherwise), the falsity of which they either actually knew or deliberately disregarded. See, e.g., In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made."). But, as already described, neither of these possibilities is the subject of any well-pleaded particularized factual pleadings in the FAC. To further elaborate, FAC's primary focus here is on the 2024 CBIZ report, combined with a 2022 Tricolor audit that was in the defendants' possession prior to issuance of the offering memoranda and that was also attached to the CBIZ report. But, supplementing what has already been described above in connection with scienter, the report and audit do not remotely reach the level sufficient to deprive the disclaimers in the offering statements of their legal force. According to the FAC itself, the 2022 audit did no more than identify "internal control weaknesses related to collateral, servicing, [and] collections," including "[n]o controls to ensure

25

reconciling items are addressed in a timely manner," "[i]nsufficient controls surrounding inventory [resulting in] a number of errors identified within inventory," and "[n]o formal process" to evaluate Tricolor's loan valuation model. FAC ¶ 97. In other words, the 2022 audit, like many audits, flagged the need for certain improvements, but nowhere indicated intentional fraud.

The CBIZ report did little more than raise similar concerns regarding specific loans in Tricolor's portfolio. An "aging test" conducted to verify whether Tricolor had properly reported the delinquency status of twenty-five loans identified four that had been incorrectly aged. Id. ¶ 99. The report additionally flagged anomalies through an "age shifting" test, a "charge-off" test, and more. Id. ¶¶ 99-106. Taking (as one must on this motion) every reasonable inference favorable to plaintiffs, it may be inferred that the defendants, upon reviewing these findings, became aware that Tricolor had some corporate accounting issues. But these findings do not establish to anywhere near the level required by the PSLRA that defendants knew, or deliberately disregarded, that "Tricolor had cultivated an environment ripe for fraud and abuse," as the plaintiffs allege. FAC ¶ 97. The reports do not, for example, urge immediate remedial steps, employ "sharp[] and . . . direct" language warning of risky business practices, Edison Fund v. Cogent Investment Strategies Fund, Ltd., 551 F. Supp. 2d 210, 225-26 (S.D.N.Y. 2008), or present "clear indicia of

26

wrongdoing," Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 430 (S.D.N.Y. 2014). In other words, nothing in the reports affirmatively put the defendants on clear notice that Tricolor was engaged in fraudulent or deceptive business practices.

Indeed, while the plaintiffs focus on the concerns raised in the reports, those same documents also reflect positive assessments of Tricolor that defendants had no basis at the time for not accepting. The CBIZ report, as discussed above, attached Tricolor's plan to address the deficiencies identified in the 2022 audit, a remediation effort that cuts against any inference of fraudulent intent. See ECF No. 83-4, Exh. F.2; see also Smallen, 950 F.3d at 1313 (A "report indicat[ing] the company had already implemented remedial measures . . . fails to show [defendant] knew or consciously disregarded widespread failures by [the company] to address compliance issues"). Moreover, many of the issues identified in the CBIZ report were accompanied by explanations from Tricolor management. For instance, when the "age shifting" test revealed that the payment status for five of the twenty-five sampled loans had not been properly updated from month to month, Tricolor management explained that its servicing department had "pause[d]" the borrowers' payment obligations on three of those five loans because the cars had been in the shop for repairs. ECF No. 83-4 at 12, 38.

27

None of this is to say that the defendants, with the benefit of hindsight, could not have conducted more searching due diligence. See Special Situations Fund III, 645 F. App'x at 75. But even at the pleadings stage, plaintiffs' allegations do not establish that the defendants actually knew or purposefully blinded themselves to the fact that the information provided by Tricolor was materially false or misleading. As already noted, this is sufficient to warrant dismissal of both federal claims for failure to adequately plead scienter. But, in addition, when coupled to the offering memoranda disclaimers, which put investors on notice that the defendants did not make assurances for the information about Tricolor contained in the offering memoranda, it serves to preclude any claim of reasonable reliance. Accordingly, the plaintiffs' failure to adequately plead reliance provides an additional ground for dismissal of Count One.

C. The plaintiffs cannot establish scheme liability.

Count Two, which alleges that defendants participated in Tricolor's fraudulent scheme in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder, also fails because the plaintiffs have not adequately pleaded that the defendants acted in furtherance of the scheme described. As noted, to state a scheme liability claim, a plaintiff must show "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with

28

scienter, and (4) reliance." <u>Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S</u>, 11 F.4th 90, 105 (2d Cir. 2021). While the failure to adequately allege scienter to the degree required by the PSLRA is, as already shown, sufficient to defeat this claim, the FAC also fails to adequately allege the basic elements of committing a deceptive or manipulative act in furtherance of the Tricolor scheme here alleged.

Plaintiffs' scheme liability claim rests on the theory that the defendants, knowing "that Tricolor's loan data was fundamentally corrupted and unreliable, along with other red flags of Tricolor's fraud," chose to "enable, participate in, and profit from that fraud." FAC ¶ 212. More particularly, the claim is not simply that defendants made false or misleading statements in offering the Notes (the subject of Count One) but that in so doing and by other means, the defendants, already knowing of Tricolor's fraud, chose to "actively assist[]," <u>id.</u>, and thereby became co-schemers.[8]

---

[8] The plaintiffs also suggest in one paragraph of the FAC that the defendants engaged in a securities fraud scheme by "structuring each Tricolor Trust," "suppressing or failing to act after discovering information relating to Tricolor's blatant fraud," and "harvesting the economic benefits of each Notes sale via repayment of their affiliates' . . . warehouse lines." FAC ¶ 211. But these allegations are threadbare; they never appear again or are supported by any particularized allegations of fact directed at this particular alleged scheme.

29

For reasons already discussed, the failure of the FAC to adequately allege fraudulent intent applies with even greater force to this extraordinary claim that the defendants, who suffered substantial financial losses from Tricolor's fraud, were not only guilty of concealing from investors their knowledge of Tricolor's fraud (the theory of Count One), but chose to intentionally join in Tricolor's fraud (the theory of Count Two). Even putting aside the inherent implausibility of this claim, this claim requires the plaintiffs to establish an "intent to defraud" on the part of defendants which this Court has already found lacking in the instant action. Lorenzo v. Sec. & Exch. Comm., 587 U.S. 71, 78 (2019).

But even aside from scienter, Count Two also fails because the FAC does not adequately allege deceptive or manipulative acts sufficiently tied to this broad co-schemer claim. It is well-established that misstatements or omissions on their own cannot be the basis of such a claim of co-scheme liability -- "something beyond" is needed. Sec. & Exch. Comm. v. Rio Tinto plc, 41 F.4th 47, 49 (2d Cir. 2022); In re Turquoise Hill Resources Ltd. Sec. Litig., 625 F. Supp. 3d 164, 247-48 (S.D.N.Y. Sept. 2, 2022) (discussing Lorenzo, 587 U.S. 71). The Second Circuit has "explicitly left open the question what 'extra' facts . . . would be sufficient to state a claim for scheme liability." In re Turquoise Hill, 625 F. Supp. 3d at 248.

Here, however, the FAC alleges little to nothing in the way of facts to indicate that <u>any</u> of the actions that defendants purportedly took were for the purpose of joining in Tricolor's scheme. Instead the FAC's contention, even as a matter of theory, is that defendants engaged in the actions, not to further Tricolor's fraud, but to minimize their own losses from it. <u>See, e.g.,</u> FAC ¶¶ 122-23. While the effect may have been to allow Tricolor's fraud to continue for a time, the particularized factual allegations of the FAC in no way support the notion that the defendants took these actions for the purpose of assisting Tricolor's fraud, rather than for the purpose of minimizing their own losses (which is plaintiffs' theory) or because they had not yet discovered Tricolor's fraud (which is the most the well-pleaded factual allegations actually suggest).

IV.  Conclusion

For the foregoing reasons, the Court reconfirms its earlier bottom-line Order granting the defendants' motion to dismiss. The plaintiffs' pleadings fail to show that defendants, themselves victims of Tricolor's fraud, were any worse than negligent, if that. The Clerk of Court is directed to enter final judgment in favor of the defendants, dismissing the federal causes of action with prejudice and the remaining state law claims for lack of jurisdiction, and then to close this case.

SO ORDERED.

31

New York, NY
July 16, 2026

JED S. RAKOFF, U.S.D.J.